APPEAL,CLOSED,TYPE–E

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:20–cv–00466–EGS</u>

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC. et al v. WILBUR L. ROSS, JR. et al | Date Filed: 02/19/2020 |
| Assigned to: Judge Emmet G. Sullivan | Date Terminated: 06/24/2021 |
| Cause: 16:1801 Fishery Conservation and Management Act (FCMA) | Jury Demand: None |
| | Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **LOPER BRIGHT ENTERPRISES, INC.** | represented by | **Eric R. Bolinder**<br>CAUSE OF ACTION INSTITUTE<br>1310 N. Courthouse Rd<br>Suite 700<br>Arlington, VA 22079<br>571–329–3324<br>Email: <u>eric.bolinder@causeofaction.org</u><br>*ATTORNEY TO BE NOTICED* |
| | | **Ryan Patrick Mulvey**<br>CAUSE OF ACTION INSTITUTE<br>1310 N. Courthouse Road<br>Suite 700<br>Arlington, VA 22201–2961<br>571–444–2841<br>Email: <u>ryan.mulvey@causeofaction.org</u><br>*ATTORNEY TO BE NOTICED* |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **H&L AXELSSON, INC.** | represented by | **Eric R. Bolinder**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Ryan Patrick Mulvey**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **CAPE TRAWLERS, INC.** | represented by | **Eric R. Bolinder**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Ryan Patrick Mulvey**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

**SCOMBRUS ONE LLC**                    represented by   **Eric R. Bolinder**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ryan Patrick Mulvey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GOLDEN NUGGET LLC**                   represented by   **Eric R. Bolinder**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ryan Patrick Mulvey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**LUND MARR TRAWLERS LLC**              represented by   **Eric R. Bolinder**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ryan Patrick Mulvey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MOUNT VERNON LLC**                    represented by   **Eric R. Bolinder**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ryan Patrick Mulvey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**NANCY ELIZABETH LLC**                 represented by   **Eric R. Bolinder**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ryan Patrick Mulvey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**WILBUR L. ROSS, JR.**
*in his official capacity as Secretary of Commerce*
*TERMINATED: 03/29/2021*

represented by **Alison C. Finnegan**
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources
Division
P.O. Box 7611
Washington, DC 20044–7611
(202) 305–0500
Email: alison.c.finnegan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
UNITED STATES DEPARTMENT OF
JUSTICE
Environment & Natural Resources
Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
603–230–2583
Email: kristine.tardiff@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF
COMMERCE**

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NEIL JACOBS**
*in his official capacity as Acting NOAA Administrator*

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION**

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRIS OLIVER**                                  represented by  **Alison C. Finnegan**
*in his official capacity as Assistant*                          (See above for address)
*Administrator for NOAA Fisheries*                               *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Kristine S. Tardiff**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL MARINE FISHERIES**                     represented by  **Alison C. Finnegan**
**SERVICE**                                                      (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Kristine S. Tardiff**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**GINA RAIMONDO**                                 represented by  **Alison C. Finnegan**
*in her official capacity as Secretary of*                       (See above for address)
*Commerce*                                                       *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|------------|---|------|-------------|
| 02/19/2020 | 1 |      | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number ADCDC–6843123) filed by LUND MARR TRAWLERS LLC, CAPE TRAWLERS, INC., MOUNT VERNON LLC, H&L AXELSSON, INC., NANCY ELIZABETH LLC, LOPER BRIGHT ENTERPRISES, INC., SCOMBRUS ONE LLC, GOLDEN NUGGET LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Civil Cover Sheet, # 10 Summons Wilbur L. Ross, Jr., # 11 Summons Dep't of Commerce, # 12 Summons Neil Jacobs, # 13 Summons NOAA, # 14 Summons Chris Oliver, # 15 Summons NMFS, # 16 Summons U.S. Att'y Gen., # 17 Summons U.S.A.O. Civil Process Clerk)(Mulvey, Ryan) (Entered: 02/19/2020) |
| 02/19/2020 | 2 |      | NOTICE of Appearance by Eric R. Bolinder on behalf of All Plaintiffs (Bolinder, Eric) (Entered: 02/19/2020) |
| 02/20/2020 | 3 |      | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests *of All Plaintiffs* by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Mulvey, Ryan) (Entered: 02/20/2020) |
| 02/21/2020 |   |      | Case Assigned to Judge Emmet G. Sullivan. (adh, ) (Entered: 02/21/2020) |

| 02/21/2020 | 4 | | SUMMONS (8) Issued Electronically as to CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR., U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(adh, ) (Entered: 02/21/2020) |
|---|---|---|---|
| 02/25/2020 | 5 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to U.S. Attorney served on 2/24/2020, answer due 4/9/2020. (Mulvey, Ryan) Modified on 2/25/2020 to correct filer (jf). (Entered: 02/25/2020) |
| 02/25/2020 | 6 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/24/2020. Answer due for ALL FEDERAL DEFENDANTS by 4/9/2020. (See Docket Entry 5 to view document)(jf) (Entered: 02/25/2020) |
| 02/28/2020 | 7 | | STANDING ORDER: The parties are directed to read the attached Standing Order Governing Civil Cases Before Judge Emmet G. Sullivan in its entirety upon receipt. The parties are hereby ORDERED to comply with the directives in the attached Standing Order. Signed by Judge Emmet G. Sullivan on 02/28/20. (Attachment: Exhibit 1) (mac) (Entered: 02/28/2020) |
| 03/05/2020 | 8 | | NOTICE of Appearance by Alison C. Finnegan on behalf of CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Finnegan, Alison) (Entered: 03/05/2020) |
| 03/09/2020 | 9 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 02/24/2020. (Mulvey, Ryan) (Entered: 03/09/2020) |
| 03/09/2020 | 10 | | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. All Defendants (Mulvey, Ryan) Modified on 3/9/2020 (jf). (Entered: 03/09/2020) |
| 03/09/2020 | | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 10 Summons Returned Executed as to Federal Defendant was entered in error and counsel was instructed to refile said pleading without selecting the radio button. (jf) (Entered: 03/09/2020) |
| 03/09/2020 | 11 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILBUR L. ROSS, JR. served on 2/24/2020. (Entered: 03/09/2020) |
| 04/09/2020 | 12 | | ANSWER to Complaint by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR..(Finnegan, Alison) (Entered: 04/09/2020) |
| 04/09/2020 | 13 | | NOTICE *of Administrative Record and Certified List of Administrative Record Documents* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Attachments: # 1 Exhibit A (Index of Administrative Record Documents), # 2 Exhibit B (Certification))(Finnegan, |

5

| | | | |
|---|---|---|---|
| | | | Alison) (Entered: 04/09/2020) |
| 04/21/2020 | 14 | | Joint MOTION for Briefing Schedule by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Attachments: # 1 Text of Proposed Order)(Mulvey, Ryan) (Entered: 04/21/2020) |
| 04/21/2020 | 15 | | Unopposed MOTION to Expedite by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Attachments: # 1 Text of Proposed Order)(Mulvey, Ryan) (Entered: 04/21/2020) |
| 04/21/2020 | 16 | | Consent MOTION for Order *to Drop Parties under Rule 21* by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Attachments: # 1 Text of Proposed Order)(Mulvey, Ryan) (Entered: 04/21/2020) |
| 04/22/2020 | | | MINUTE ORDER granting 14 Joint Motion for Briefing Schedule; holding in abeyance 15 Unopposed Motion to Expedite; granting 16 Consent Motion for Order to Drop Parties under Rule 21. It is hereby ORDERED that the parties shall adhere to the following briefing schedule: (1) Plaintiffs shall file their motion for summary judgment by no later than June 8, 2020; (2) Defendants shall file their opposition to Plaintiffs' motion for summary judgment and cross−motion for summary judgment by no later than July 24, 2020; (3) Plaintiffs shall file their reply brief and opposition to Defendants' cross−motion for summary judgment by no later than August 14, 2020; and (4) Defendants shall file their reply brief by no later than September 4, 2020. It is FURTHER ORDERED that the parties shall file a joint status report by no later than May 8, 2020, addressing Plaintiffs' request to schedule a hearing pursuant to 16 U.S.C. § 1855(f)(4) in light of the COVID−19 pandemic; and proposing dates for said hearing. It is FURTHER ORDERED that Cape Trawlers, Inc., Golden Nugget LLC, Mount Vernon LLC, and Nancy Elizabeth LLC are dropped as plaintiffs from this case pursuant to Federal Rule of Civil Procedure 21. Signed by Judge Emmet G. Sullivan on 4/22/2020. (lcegs3) (Entered: 04/22/2020) |
| 04/23/2020 | | | Set/Reset Deadlines: Plaintiffs Motion For Summary Judgment due by 6/8/2020. Defendants Opposition To Plaintiffs' Motion For Summary Judgment And Cross−Motion For Summary Judgment due by 7/24/2020. Plaintiffs Reply Brief And Opposition To Defendants' Cross−Motion For Summary Judgment due by 8/14/2020. Defendants Reply Brief due by 9/4/2020. Joint Status Report due by 5/8/2020 (mac) (Entered: 04/23/2020) |
| 05/04/2020 | 17 | | Joint STATUS REPORT by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 05/04/2020) |
| 05/04/2020 | | | MINUTE ORDER granting 15 Unopposed Motion to Expedite in light of the parties' representations in the 17 Joint Status Report. Plaintiffs bring this action under the Magnuson−Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* Section 1855(f)(4) provides that "[u]pon a motion by the |

| | | |
|---|---|---|
| | | person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way." 16 U.S.C. § 1855(f)(4). Given the difficulties posed by the ongoing COVID–19 pandemic, the parties state that "[t]he Court could reassess the feasibility of an in–person court hearing shortly before any scheduled hearing would be held." Joint Status Report, ECF No. 17 at 2. And "Defendants defer to the Court's determination of whether it is appropriate to schedule a hearing on the parties' cross–motions for summary judgment or whether the Court will decide the matter on the papers." *Id.* at 2 n.1. Pursuant to 16 U.S.C. § 1855(f)(4) and upon consideration of the parties' proposals, the Court hereby schedules the hearing on the parties' cross–motions for summary judgment for October 9, 2020 at 1:00 PM in Courtroom 24A. The parties shall file a joint status report by no later than September 25, 2020, informing the Court whether a hearing is necessary following the completion of the summary judgment briefing. Signed by Judge Emmet G. Sullivan on 5/4/2020. (lcegs3) (Entered: 05/04/2020) |
| 05/05/2020 | | Set/Reset Deadlines/Hearings: Status Report due by 9/25/2020. Hearing On Cross–Motions set for 10/9/2020 at 01:00 PM in Courtroom 24A before Judge Emmet G. Sullivan. (mac) (Entered: 05/05/2020) |
| 06/08/2020 | 18 | MOTION for Summary Judgment by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Mulvey, Ryan) (Entered: 06/08/2020) |
| 07/01/2020 | 19 | NOTICE of Appearance by Kristine S. Tardiff on behalf of All Defendants (Tardiff, Kristine) (Entered: 07/01/2020) |
| 07/24/2020 | 20 | Cross MOTION for Summary Judgment *& Memorandum in Support of Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Finnegan, Alison) (Entered: 07/24/2020) |
| 07/24/2020 | 21 | Memorandum in opposition to re 18 MOTION for Summary Judgment filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (See Docket Entry 23 to view document) (zjf) (Entered: 07/27/2020) |
| 07/27/2020 | | NOTICE OF ERROR re 20 Motion for Summary Judgment; emailed to alison.c.finnegan@usdoj.gov, cc'd 6 associated attorneys –– The PDF file you docketed contained errors: 1. Two–part docket entry, 2. DO NOT REFILE – Counsel is reminded to docket all parts of their filing (zjf, ) (Entered: 07/27/2020) |
| 08/14/2020 | 22 | Memorandum in opposition to re 20 Cross MOTION for Summary Judgment *& Memorandum in Support of Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* filed by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Attachments: # 1 Declaration of |

| | | | Jeffrey Howard Kaelin)(Mulvey, Ryan) (Entered: 08/14/2020) |
|---|---|---|---|
| 08/14/2020 | 23 | | REPLY to opposition to motion re 18 MOTION for Summary Judgment filed by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 08/14/2020) |
| 08/25/2020 | 24 | | MOTION to Exclude Plaintiffs' Extra–Record Declaration *(ECF 22–1)* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Finnegan, Alison) (Entered: 08/25/2020) |
| 09/03/2020 | 25 | | Memorandum in opposition to re 24 MOTION to Exclude Plaintiffs' Extra–Record Declaration *(ECF 22–1)* filed by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Attachments: # 1 Exhibit 2014 MAFMC Cost Survey)(Mulvey, Ryan) (Entered: 09/03/2020) |
| 09/04/2020 | 26 | | REPLY to opposition to motion re 20 Cross MOTION for Summary Judgment *& Memorandum in Support of Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Finnegan, Alison) (Entered: 09/04/2020) |
| 09/10/2020 | 27 | | REPLY to opposition to motion re 24 MOTION to Exclude Plaintiffs' Extra–Record Declaration *(ECF 22–1)* filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Attachments: # 1 Exhibit 1 (AR17683 (cmt from Lund's Fisheries)), # 2 Exhibit 2 (AR10728 (IFM Amendment Discussion Document)))(Finnegan, Alison) (Entered: 09/10/2020) |
| 09/16/2020 | 28 | | JOINT APPENDIX by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 09/16/2020) |
| 09/25/2020 | 29 | | Joint STATUS REPORT by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 09/25/2020) |
| 09/30/2020 | | | MINUTE ORDER. In view of 29 joint status report and the Court's forthcoming Memorandum Opinion and Order, the Court hereby cancels the motion hearing scheduled for October 9, 2020. Signed by Judge Emmet G. Sullivan on 9/30/2020. (lcegs3) (Entered: 09/30/2020) |
| 01/26/2021 | 30 | | ERRATA *re: Memorandum in Support of Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Finnegan, Alison) (Entered: 01/26/2021) |

| 02/22/2021 | 31 | | NOTICE OF SUPPLEMENTAL AUTHORITY by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Attachments: # 1 Exhibit Burke v. Coggins, No. 20–0667 (D.D.C. Feb. 18, 2021))(Mulvey, Ryan) (Entered: 02/22/2021) |
| 02/25/2021 | 32 | | RESPONSE re 31 NOTICE OF SUPPLEMENTAL AUTHORITY filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Finnegan, Alison) (Entered: 02/25/2021) |
| 03/26/2021 | 33 | | NOTICE *of Factual Development* by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Attachments: # 1 Exhibit A)(Mulvey, Ryan) (Entered: 03/26/2021) |
| 03/29/2021 | 34 | | NOTICE *Regarding Industry−Funded Monitoring Coverage in the Atlantic Herring Fishery* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Finnegan, Alison) (Entered: 03/29/2021) |
| 05/17/2021 | 35 | | NOTICE *of Factual Development* by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Mulvey, Ryan) (Entered: 05/17/2021) |
| 06/15/2021 | 36 | | ORDER denying 18 Plaintiffs' Motion for Summary Judgment; granting 20 Defendants' Cross−Motion for Summary Judgment; and granting 24 Defendants' Motion to Exclude. Signed by Judge Emmet G. Sullivan on 6/15/2021. (lcegs3) (Entered: 06/15/2021) |
| 06/15/2021 | 37 | | MEMORANDUM OPINION. Signed by Judge Emmet G. Sullivan on 6/15/2021. (lcegs3) (Entered: 06/15/2021) |
| 06/23/2021 | 38 | | FINAL JUDGMENT. Signed by Judge Emmet G. Sullivan on 6/23/2021. (lcegs3) (Entered: 06/23/2021) |
| 06/24/2021 | 39 | | JUDGMENT in favor of Defendants against Plaintiffs Signed by Judge Emmet G. Sullivan on 06/24/21. (mac) (Entered: 06/24/2021) |
| 07/15/2021 | 40 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 36 Order on Motion for Summary Judgment, Order on Motion for Miscellaneous Relief, 39 Judgment, 37 Memorandum & Opinion, 38 Order by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. Filing fee $ 505, receipt number ADCDC−8601448. Fee Status: Fee Paid. Parties have been notified. (Mulvey, Ryan) (Entered: 07/15/2021) |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Loper Bright Enterprises, Inc., et al.
_____
                Plaintiff

              vs.                          Civil Action No. 20-0466 (EGS)

Gina Raimondo, et al.
_____
                Defendant

# NOTICE OF APPEAL

Notice is hereby given this 15th day of July , 20 21 , that

Plaintiffs Loper Bright Enterprises, Inc; H&L Axelsson, Inc.; Scombrus One LLC; and Lund Marr Trawlers LLC

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the judgment of this Court entered on the 23d day of June , 20 21

in favor of Defendants Gina Raimond, in her official capacity as Secretary of Commerce, et al.

against said Plaintiffs

                        /s/ Ryan P. Mulvey
                    _____
                        Attorney or Pro Se Litigant

                    Cause of Action Institute
                    1310 N. Courthouse Road, Ste. 700
                    Arlington, VA 22201-2961
                    (571) 444-2841
                        Address and Phone Number

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil action must be filed within 30 days after the date of entry of judgment or 60 days if the United States or officer or agency is a party)

**CLERK**  Please mail copies of the above Notice of Appeal to the following at the addresses indicated:

Alison C. Finnegan
U.S. Department of Justice - Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

Kristine S. Tardiff
U.S. Department of Justice - Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Loper Bright Enterprises, Inc.,
*et al.*,

              Plaintiffs,

v.

GINA RAIMONDO, in her official
capacity, Secretary, U.S.
Department of Commerce, *et
al.*,

              Defendants.

Civ. Action No. 20-466 (EGS)

## MEMORANDUM OPINION

Plaintiffs, "a collection of commercial fishing firms headquartered in southern New Jersey that participate regularly in the Atlantic herring fishery," challenge the U.S. Department of Commerce Secretary's final rule promulgating the New England Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment") and its implementing regulations, which establish a process for administering future industry-funded monitoring in Fishery Management Plans governing certain New England fisheries and implement a required industry-funded monitoring program in the Atlantic herring fishery. Pls.' Mem. P. & A. Supp. Mot. Summ. J. ("Pls.' Mot."), ECF No. 18-1 at 22-23.[1] Plaintiffs

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

allege that the Omnibus Amendment suffers from procedural flaws and violates the directives of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*; and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. *See* Compl., ECF No. 1. Plaintiffs further contend that the industry-funded monitoring requirement constitutes an unconstitutional tax and violates the Anti-Deficiency Act, 31 U.S.C. § 1341; the Independent Offices Appropriations Act, 31 U.S.C. § 9701; and the Miscellaneous Receipts Act, 31 U.S.C. § 3302. *See* Pls.' Mot., ECF No. 18-1 at 38-40. Defendants—Gina Raimondo,[2] Secretary of the U.S. Department of Commerce; the U.S. Department of Commerce; Benjamin Friedman,[3] Deputy Under Secretary for Operations, performing the duties of Under Secretary of Commerce for Oceans and Atmosphere and National Oceanic and Atmospheric Administration ("NOAA") Administrator; the NOAA; Chris Oliver, Assistant Administrator for NOAA

---

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as defendant the United States Secretary of Commerce, Gina Raimondo, for the former United States Secretary of Commerce, Wilbur L. Ross.

[3] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as defendant the current Official Performing the Duties of NOAA Administrator, Benjamin Friedman, for the former Acting NOAA Administrator, Neil Jacobs.

Fisheries; and the National Marine Fisheries Service ("NMFS")—
dispute Plaintiffs' claims.

Pending before the Court are Plaintiffs' Motion for Summary
Judgment, ECF No. 18; Defendants' Cross-Motion for Summary
Judgment, ECF No. 20; and Defendants' Motion to Exclude
Plaintiffs' Extra-Record Declaration, ECF No. 24. Upon
consideration of the parties' submissions, the applicable law,
and the entire record herein, the Court **DENIES** Plaintiffs'
Motion for Summary Judgment, **GRANTS** Defendants' Cross-Motion for
Summary Judgment, and **GRANTS** Defendants' Motion to Exclude.

## I. Background

### A. Statutory and Regulatory Background

#### 1. The Magnuson-Stevens Fishery Conservation and Management Act of 1976

The MSA "balances the twin goals of conserving our nation's
aquatic resources and allowing U.S. fisheries to thrive."
*Oceana, Inc. v. Pritzker*, 26 F. Supp. 3d 33, 36 (D.D.C. 2014).
Congress enacted the MSA to, among other things, "conserve and
manage the fishery resources found off the coasts of the United
States," and "promote domestic commercial and recreational
fishing under sound conservation and management principles." 16
U.S.C. § 1801(b)(1), (3). The MSA tasks the Secretary of
Commerce with the pursuit of these goals, and the Secretary has
in turn delegated her responsibility to the National Marine

3

Fisheries Service ("NMFS" or the "Service").[4] *See* 16 U.S.C. §
1855(d). In addition, the MSA divides the country into eight
regions, and establishes a Fishery Management Council in each
region to manage the region's marine fisheries.[5] *See id.* § 1852.
"Together, the Service and the Councils act to address
imbalances in aquatic ecosystems." *Oceana, Inc.*, 26 F. Supp. 3d
at 37.

Each Fishery Management Council must prepare and submit to
the Secretary of the U.S. Department of Commerce a Fishery
Management Plan ("FMP"), which is approved by the Service. 16
U.S.C. §§ 1852(h), 1854(a). As is most relevant here, the New
England Fishery Management Council ("NEFMC" or the "Council") is
responsible for developing and recommending FMPs for fisheries
in the Atlantic Ocean seaward of Maine, New Hampshire,
Massachusetts, Rhode Island, and Connecticut, including the
Atlantic herring fishery. *See id.* §§ 1852(a)(1)(A), 1852(h)(1).

FMPs contain "conservation and management measures" that
are "necessary and appropriate for the conservation and
management of the fishery, to prevent overfishing and rebuild

---

[4] The Service is a federal agency within the Department of
Commerce's NOAA.
[5] The MSA defines a "fishery" as "one or more stocks of fish
which can be treated as a unit for purposes of conservation and
management and which are identified on the basis of
geographical, scientific, technical, recreational, and economic
characteristics" and "any fishing for such stocks." 16 U.S.C. §
1802(13).

4

overfished stocks, and to protect, restore, and promote the

long-term health and stability of the fishery." *Id.* §

1853(a)(1)(A). FMPs must also be consistent with the ten

"national standards" provided for in the MSA, as well as all

other provisions of the MSA, and "any other applicable law." *Id.*

§ 1853(a)(1)(C); *see also id.* § 1851 (setting forth National

Standards). In this case, Plaintiffs claim that the Omnibus

Amendment violates two of those national standards:

> ["National Standard Seven":] Conservation and
> management measures shall, where practicable,
> minimize costs and avoid unnecessary
> duplication.
>
> ["National Standard Eight":] Conservation and
> management measures shall, consistent with the
> conservation requirements of this chapter
> (including the prevention of overfishing and
> rebuilding of overfished stocks), take into
> account the importance of fishery resources to
> fishing communities by utilizing economic and
> social data that meet the requirements of
> paragraph (2), in order to (A) provide for the
> sustained participation of such communities,
> and (B) to the extent practicable, minimize
> adverse economic impacts on such communities.

*Id.* § 1851(a)(7)-(8).

FMPs may also include additional discretionary provisions

to conserve and manage fisheries. *Id.* § 1853(b). Among other

things, FMPs may "require that one or more observers be carried

on board a vessel of the United States engaged in fishing for

species that are subject to the plan, for the purpose of

collecting data necessary for the conservation and management of

5

the fishery." *Id.* § 1853(b)(8). FMPs may also "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(b)(14).

After a council prepares an FMP or amendment and any proposed implementing regulations, it submits them to the Service, which acts on behalf of the Commerce Secretary, for review. *See generally id.* § 1854. The Service reviews the submission for consistency with applicable law and solicits public comments for sixty days. *Id.* § 1854(a)(1)(A)–(B). Within thirty days of the end of the comment period, the Service shall approve, disapprove, or partially approve the submission. *Id.* § 1854(a)(3). If the Service approves, a final rule is published in the Federal Register. *See id.* § 1854(b)(3). Approved FMPs or amendments are subject to judicial review under the APA within thirty days. *See id.* § 1855(f)(1).

### 2. The National Environmental Policy Act

Congress enacted NEPA "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b). To comply with these obligations, agencies must prepare

6

16

an Environmental Impact Statement ("EIS") in which the agency takes a "hard look" at the environmental consequences before taking major action. *Id.* § 4332(c). An EIS must "inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts . . . of the human environment." 40 C.F.R. § 1502.1.

To determine whether an EIS must be prepared, the agency must first prepare an environmental assessment ("EA"), which must (1) "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* § 1501.5(c). Even if the agency performs only an EA, it must still briefly discuss the need for the proposal, the alternatives, and the environmental impacts of the proposed action and the alternatives. *Id.* If the agency determines, after preparing an EA, that a full EIS is not necessary, it must prepare a Finding of No Significant Impact ("FONSI") setting forth the reasons why the action will not have a significant impact on the environment. *Id.* § 1501.6. An EA and FONSI alone will not be sufficient, however, in certain circumstances. Agencies must prepare a supplement to a draft or final EIS when: (1) "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns"; or (2) "[t]here are significant new circumstances or information relevant to

7

environmental concerns and bearing on the proposed action or its
impacts." 40 C.F.R. § 1502.9(d)(1).

## B. Factual Background

Plaintiffs—a "collection of commercial fishing firms
headquartered in southern New Jersey that participate regularly
in the Atlantic herring fishery," Pls.' Mot., ECF No. 18-1 at
23—challenge the Omnibus Amendment, which the NEFMC finalized in
2018 to establish a standardized process for the development of
industry-funded monitoring in FMPs across New England fisheries
and to establish industry-funded monitoring in the Atlantic
herring fishery. *See* Administrative R. ("AR") at 17769-71. The
approved Omnibus Amendment measures include the following "core
elements":

> First, the omnibus measures establish a
> process for FMP-specific industry monitoring
> to be implemented through an FMP amendment and
> revised through a framework adjustment. . . .
>
> Second, the omnibus measures identify standard
> cost responsibilities for industry-funded
> monitoring for NMFS and the fishing industry,
> dividing those responsibilities by cost
> category. . . .
>
> Third, the omnibus measures establish standard
> administrative requirements for monitoring
> service providers and industry-funded
> observers/monitors as set forth in 50 C.F.R.
> § 648.11(h) and (i), respectively. . . .
>
> Fourth, the omnibus measures establish a
> Council-led process for prioritizing
> [industry-funded monitoring] programs for
> available federal funding across New England
> FMPs. . . .

> Fifth, the omnibus measures standardize the
> process to develop future monitoring set-aside
> programs, and allow monitoring set-aside
> programs to be developed in a framework
> adjustment to the relevant FMP.

Defs.' Opp'n, ECF No. 20-1 at 18-19; *see also* Pls.' Mot., ECF
No. 18-1 at 22-23.

     In addition, there are approved measures establishing
industry-funded monitoring in the Atlantic herring fishery,[6]
which is managed through the Atlantic Herring FMP. *See* Defs.'
Opp'n, ECF No. 20-1 at 20-21; Pls.' Mot., ECF No. 18-1 at 22-23.
In other words, this mandate "requires herring fishermen along
the eastern seaboard of the United States to carry [NOAA]
contractors—called 'at-sea monitors'—on their vessels during
fishing trips and, moreover, to pay out-of-pocket for"
associated costs. Compl., ECF No. 1 ¶ 1. Among other things, the
measures establish a 50 percent monitoring coverage target for
all declared herring trips undertaken by a vessel possessing a
Category A or B limited access herring permit.[7] *See* Defs.' Opp'n,

---

[6] Atlantic herring inhabit the Atlantic Ocean off of the East
coast of the United States and Canada, ranging from North
Carolina to the Canadian Maritime Provinces. AR 17103. Atlantic
herring play an important role in the Northwest Atlantic
ecosystem, serving as a "forage species" for a number of other
fish, marine mammals, and seabirds. *Id.* at 17070, 17161, 17511.
There is also a directed fishery for Atlantic herring, composed
primarily of vessels using midwater trawl gear, small-mesh
bottom trawl vessels, and purse seines. *Id.* at 17104.
[7] "The Atlantic Herring FMP achieves the NEFMC's management goals
through a stock-wide annual catch limit ('ACL') that is
allocated between four distinct geographic management areas . .

9

ECF No. 20-1 at 20; Pls.' Mot., ECF No. 18-1 at 22-23. The
monitoring coverage target includes a combination of both
industry-funded monitoring, as well as NMFS-funded Standardized
Bycatch Reporting Methodology ("SBRM") coverage. Defs.' Opp'n,
ECF No. 20-1 at 20; Pls.' Mot., ECF No. 18-1 at 23. "Vessel
owners would pay for any additional monitoring coverage above
SBRM coverage requirements to achieve the 50% coverage target,
which is calculated by combining SBRM and [industry-funded
monitoring] coverage, thus a vessel will not have SBRM and
[industry-funded monitoring] coverage on the same trip." Defs.'
Opp'n, ECF No. 20-1 at 20-21. "On any given trip, if a vessel is
notified that it will 'need at-sea monitoring coverage' and it
has not already been assigned an observer, '[it] will be
required to obtain and pay for an at-sea monitor on that trip.'"
Pls.' Mot., ECF No. 18-1 at 23 (quoting AR 17735). "Any
additional coverage above SBRM is contingent on NMFS having
appropriated funds to pay for its administrative costs for

---

. ." Compl., ECF No. 1 ¶ 63 (citing 50 C.F.R. § 648.200(f)). The
four areas include: "Area 1A – Inshore Gulf of Maine"; "Area 1B
– Offshore Gulf of Maine"; "Area 2 – South Coastal Area"; and
"Area 3 – Georges Bank." *Id.* A Category A permit is an All Areas
Limited Access permit that allows vessels with such permits to
fish in all areas. *See* AR 17135, AR 17152. A Category B permit
is an Areas 2/3 Limited Access permit that allows vessels to
fish in areas 2 and 3. *Id.* Category A and B permit holders are
not restricted in the amount of herring they can catch per trip
or land per calendar day. Compl., ECF No. 1 ¶ 68.

[industry-funded monitoring] coverage." Defs.' Opp'n, ECF No.
20-1 at 21 (quoting AR 17737).

There are some exceptions to the coverage requirements. On
a trip-by-trip basis, coverage requirements may be waived if:
(1) "monitoring coverage is unavailable"; (2) "vessels intend to
land less than 50 metric tons (mt) of herring"; or (3) "wing
vessels carry no fish on pair trawling trips." *Id.* (citing AR
17735). Furthermore, the Service may "issue an exempted fishing
permit (EFP) to midwater trawl vessels that choose to use
electronic monitoring together with portside sampling. . . . The
EFP exempts midwater trawl vessels from at-sea monitoring
coverage, and allows use of electronic monitoring and portside
sampling to comply with the 50% [industry-funded monitoring]
coverage target." *Id.* (citing AR 17736-37).

NMFS has acknowledged that "[i]ndustry-funded monitoring
w[ill] have direct economic impacts on vessels issued Category A
and B permits participating in the herring fishery," including
an estimated cost responsibility of up to $710 per day and an
approximately 20% reduction in annual returns-to-owner in some
situations. AR 17735.

**C. Procedural History**

The NEFMC adopted the Omnibus Amendment on April 20, 2017,
and finalized the recommendations for industry-funded monitoring
in the Atlantic herring fishery on April 19, 2018. AR 17731. On

11

September 19, 2018, Defendants published a "notice of availability" in the Federal Register, opening a sixty-day comment period for the Secretary of Commerce's decision on the Omnibus Amendment. *Id.* On December 18, 2018, NEFMC was informed by letter that NMFS had approved the Omnibus Amendment on behalf of the Secretary of Commerce. *Id.*

On November 7, 2018, Defendants also published in the Federal Register a proposed rule to implement the Omnibus Amendment and opened a public comment period ending on December 24, 2019. *Id.* Defendants published the final rule implementing the Omnibus Amendment on February 7, 2020. *Id.* at 17731-59. The regulations associated with establishing the standard for developing industry-funded monitoring programs ("omnibus measures") became effective on March 9, 2020, and the regulations associated with industry-funded monitoring in the Atlantic herring fishery became effective on April 1, 2020. *See* Defs.' Opp'n, ECF No. 20-1 at 23.

Plaintiffs filed suit against Defendants on February 19, 2020. *See* Compl., ECF No. 1. Defendants filed their Answer on April 9, 2020, along with a certified list of the contents of the administrative record. *See* Answer, ECF No. 12; Notice, ECF No. 13. On May 4, 2020, the Court granted Plaintiffs' unopposed motion to expedite the case "in every possible way," pursuant to the MSA, 16 U.S.C. § 1855(f)(4). *See* Min. Order (May 4, 2020).

12

Plaintiffs filed their motion for summary judgment on June 8, 2020, seeking a Court order "declar[ing] industry-funding monitoring unlawful, enjoin[ing] Defendants from pursuing it, and vacat[ing] the Omnibus Amendment." Pls.' Mot., ECF No. 18-1 at 14. Defendants filed their opposition and cross-motion for summary judgment on July 24, 2020. *See* Defs.' Opp'n, ECF No. 20. Plaintiffs filed their reply brief and opposition to Defendants' cross-motion on August 14, 2020, *see* Pls.' Reply, ECF No. 22; and Defendants filed their reply brief on September 4, 2020, *see* Defs.' Reply, ECF No. 26. In addition, on August 25, 2020, Defendants filed a motion to exclude Plaintiffs' extra-record declaration (ECF No. 22-1). Defs.' Mot. Exclude, ECF No. 24. Plaintiffs opposed Defendants' motion on September 3, 2020, *see* Pls.' Opp'n Exclude, ECF No. 25; and Defendants replied on September 10, 2020, *see* Defs.' Reply Exclude, ECF No. 27. The cross-motions for summary judgment and the motion to exclude extra-record evidence are ripe for adjudication.

On May 17, 2021, Plaintiffs filed a notice of factual development, informing the Court that Defendants had "pushed back implementation" of the industry-funded monitoring requirement to July 1, 2021. *See* Notice Factual Development, ECF No. 35.

13

## II. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts review agency decisions under the MSA and NEPA pursuant to Section 706(2) of the APA. *See Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240-41 (D.C. Cir. 2011); *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1562 (D.C. Cir. 1991). Accordingly, the Court's review on summary judgment is limited to the administrative record. *See* 5 U.S.C. § 706; *Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record."); *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d. 150, 155 (D.D.C. 2012) ("When reviewing agency actions under the APA, the Court's review is limited to the administrative record, either 'the whole record or those parts of it cited by a party.'" (citation omitted)).

Under the APA, courts must set aside agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by

14

law." 5 U.S.C. § 706(2)(A)-(D); *see also* 16 U.S.C. § 1855(f)(1)
(stating that a court "shall only set aside any such regulation
or action on a ground specified in section 706(2)(A), (B), (C),
or (D) of [the APA]"). Under the APA's "narrow" standard of
review, "a court is not to substitute its judgment for that of
the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State
Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); and "will
defer to the [agency's] interpretation of what [a statute]
requires so long as it is 'rational and supported by the
record.'" *Oceana, Inc.*, 670 F.3d at 1240 (quoting *C & W Fish
Co.*, 931 F.2d at 1562).

Although "[j]udicial review of agency action under the MSA
is especially deferential," *N.C. Fisheries Ass'n, Inc. v.
Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007); to meet the APA
standard an agency must "examine the relevant data and
articulate a satisfactory explanation for its action including a
rational connection between the facts found and the choice
made," *PPL Wallingford Energy LLC v. Fed. Energy Regulatory
Comm'n*, 419 F.3d 1194, 1198 (D.C.Cir.2005) (quoting *State Farm*,
463 U.S. at 43) (internal quotation marks omitted). An agency
acts arbitrarily and capriciously when the agency (1) "has
relied on factors which Congress has not intended it to
consider," (2) "entirely failed to consider an important aspect
of the problem," (3) "offered an explanation for its decision

that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to difference in view or the product of agency expertise." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1144-45 (D.C. Cir. 2005) (quoting *State Farm*, 463 U.S. at 43). In addition, when a party challenges an FMP, plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 16 U.S.C. § 1851(a), a court's "task is not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co.*, 931 F.2d at 1562 (citing 16 U.S.C. § 1855(d)). "Fisheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 80; *see also Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) ("Courts defer to NMFS decisions that are supported in the record and reflect reasoned decision making, especially where, as here, the dispute involves technical legal issues that implicate substantial agency expertise."), *aff'd*, 488 F.3d 1020 (D.C. Cir. 2007).

However, the "deferential standard cannot permit courts merely to rubber stamp agency actions, nor be used to shield the

16

agency's decision from undergoing a thorough, probing, in-depth

review." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 47 (D.D.C.

2012) (internal citations and quotation marks omitted). The

court should evaluate "whether the decision was based on a

consideration of the relevant factors and whether there has been

a clear error of judgment." *Id.* (quoting *Bloch v. Powell*, 348

F.3d 1060, 1070 (D.C.Cir.2003)).

## III. Analysis

### A. The Court Will Not Consider Plaintiffs' Extra-Record Declaration

As an initial matter, Defendants seek to exclude a

declaration signed by Jeffrey Howard Kaelin—the Director of

Sustainability and Government Relations at Lund's Fisheries[8]—and

any portion of Plaintiffs' reply brief that relies on it. Defs.'

Mot. Exclude, ECF No. 24-1 at 1-2; Kaelin Decl., ECF No. 22-1 ¶

1. Mr. Kaelin's declaration, which Plaintiffs attached to their

reply brief, discusses the costs associated with Lund's

Fisheries' efforts to install video monitoring system ("VMS")

units on several vessels during the months of January, February,

---

[8] Lund's Fisheries is not a plaintiff in this case. However,
according to Plaintiffs, several Plaintiffs have the same owners
and managers as Lund's Fisheries, and, as such, they are
operated together as a "single family of businesses." *See*
Compl., ECF No. 1 ¶ 19; Pls.' Opp'n Exclude, ECF No. 25 at 6.
For example, Plaintiff Loper Bright Enterprises, Inc., co-owns
and operates a vessel with the owners of Lund's Fisheries. *See*
Compl., ECF No. 1 ¶ 11; Pls.' Opp'n Exclude, ECF No. 25 at 6.

and March 2020. *See* Kaelin Decl., ECF No. 22-1 ¶¶ 7-12. The
declaration also discusses the economic feasibility of Lund's
Fisheries converting three vessels so that they qualify for the
Omnibus Amendment's waiver for vessels that catch less than 50
metric tons. *Id.* ¶¶ 13-18. According to Plaintiffs, "Mr.
Kaelin's declaration is offered principally for illustrative
purposes and to give the Court the full context behind costs
associated with vessel monitoring and the nature of several of
the boats owned and operated by Plaintiffs." Pls.' Reply, ECF
No. 22 at 23 n.8. Thus, because Plaintiffs "do not rely on Mr.
Kaelin's declaration in their discussion of Defendants' failure
to properly consider the costs of industry-funded monitoring,"
Plaintiffs argue that the Court may consider the information
contained in the declaration. Pls.' Opp'n Exclude, ECF No. 25 at
7, 10-11.

    However, there is no "illustrative purposes" exception to
the general rule that review of an agency's action under the APA
"is to be based on the full administrative record that was
before [the agency] at the time [it] made [its] decision."
*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,
420 (1971). While a court may consider extra-record evidence in
reviewing agency action in limited circumstances, the party
seeking admittance of the extra-record evidence must
"demonstrate unusual circumstances justifying a departure from

18

28

[the] general rule." *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has identified only three such unusual circumstances: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information [is] needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'" *Id.* (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). Accordingly, given that "[t]hese narrow exceptions must be applied sparingly to maintain incentives for interested parties to present their evidence and views fully before an agency renders a final decision and to ensure that courts limit their role to the review of what occurred before the agency," *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, No. 20-cv-103, 2020 WL 5642287, at *9 (D.D.C. Sept. 22, 2020) (citations omitted); the Court declines to review the declaration, even for "illustrative purposes."

Plaintiffs next argue, however, that even if the Court declines to consider the declaration for "illustrative purposes," the Court may consider the declaration under an exception to the general rule precluding extra-record evidence.

19

First, Plaintiffs argue that "Mr. Kaelin's declaration provides information that is absent from the administrative record and would otherwise 'enable the court to understand the issues [at hand more] clearly.'" Pls.' Opp'n Exclude, ECF No. 25 at 12 (citing *Esch*, 876 F.2d at 991). In making this argument, Plaintiffs rely on the D.C. Circuit case *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989), which recognized eight exceptions to the general rule, including an exception "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly." *Id.* at 991. However, since the D.C. Circuit decided *Esch* in 1989, the case has been "given a limited interpretation." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)). According to the D.C. Circuit, "at most [*Esch*] may be invoked to challenge gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review." *Id.*; *see also Butte Cnty., Calif. v. Chaudhuri*, 887 F.3d 501, 507 (D.C. Cir. 2018) ("[T]hose narrow and rarely invoked exceptions apply when evidence is excluded from the record because of some 'gross procedural deficiency.'"(quotation marks and alteration omitted)). Indeed, "the Circuit has gradually winnowed the number of circumstances in which courts may consider extra-record evidence" to only the

20

30

three exceptions recited above. *Oceana, Inc. v. Ross*, 454 F.
Supp. 3d 62, 68 n.5 (D.D.C. 2020) (citing *Dania Beach*, 628 F.3d
at 590). Thus, in view of the D.C. Circuit's restricted view of
*Esch*, courts in this Circuit may no longer consider extra-record
information solely "to understand the issues [at hand more]
clearly." And even if the Court did consider it to be a valid
exception, the facts in this case are not so complex that it
would require extra-record evidence to clearly understand them.

Second, Plaintiffs contend that the declaration should be
admitted as extra-record evidence because they "have highlighted
serious procedural irregularities in Defendants' approval of the
Omnibus Amendment, which suggest prejudgment of the legality of
industry-funded monitoring." Pls.' Opp'n Exclude, ECF No. 25 at
12. Specifically, Plaintiffs note that Defendants published the
Omnibus Amendment's implementing regulations in November 2018,
prior to the Commerce Secretary's approval of the Omnibus
Amendment in mid-December 2018. Pls.' Mot., ECF No. 18-1 at 54.
In addition, following the Secretary's approval of the Omnibus
Amendment, "NOAA informed the NEFMC of that approval in a non-
public letter that it never officially disseminated." *Id.*
Plaintiffs' contend that these alleged procedural
irregularities, coupled with the fact that Plaintiffs raise
claims under NEPA and the Regulatory Flexibility Act, are
sufficient reasons to justify admitting extra-record evidence.

21

31

Pls.' Opp'n Exclude, ECF No. 25 at 12. But this argument also fails. To the extent that evidence of procedural irregularities remains an exception following the D.C. Circuit's narrowing of *Esch*, a review of the MSA's provisions governing the Secretary's review of FMPs and proposed regulations shows that Defendants followed proper procedures, as this Court more fully discusses in Section III.I below. And in any event, Plaintiffs fail to explain how a declaration discussing various costs related to fishing vessels would assist the Court's analysis of any alleged procedural irregularities in promulgating the final rule and regulations.

Third, Plaintiffs appear to seek to include the declaration as "background information," which is an exception to the general rule when the information is needed "to determine whether the agency considered all the relevant factors." Pls.' Opp'n Exclude, ECF No. 25 at 12. The Court remains unpersuaded. "To satisfy the relevant factors exception, the document in question must do more than raise nuanced points about a particular issue; it must point out an *entirely new* general subject matter that the defendant agency failed to consider." *Ross*, 454 F. Supp. 3d at 70 (quoting *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013)) (quotation marks omitted). "In a complicated, scientific analysis, . . . consideration of the intermediary evidentiary

22

factors which lead to the ultimate conclusion are the very means
by which the agency renders its decision and, generally
speaking, any of them can be a 'relevant factor' justifying
supplementation of the administrative record if ignored." *Id.*
(quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F.
Supp. 2d 1, 8 (D.D.C. 2001)).

Here, the administrative record is clear that Defendants
considered VMS installation costs and how the 50-metric-ton
exemption would affect midwater trawl vessels. *See, e.g.*, AR
17742 ("Waiving industry-funded monitoring requirements on
certain trips, including trips that land less than 50 mt of
herring and pair trawl trips carrying no fish, would minimize
the cost of additional monitoring [for certain smaller vessels].
. . . Electronic monitoring and portside sampling may be a more
cost effective way for midwater trawl vessels to meet the 50-
percent coverage target requirement than at-sea monitoring
coverage."); *id.* at 10821 (noting the "highly variable" costs of
installing electronic video monitoring systems); *see also id.* at
17250; *id.* at 17264. Plaintiffs also appear to concede as much.
*See, e.g.*, Pls.' Opp'n Exclude, ECF No. 25 at 13 ("Here,
Defendants and the NEFMC considered VMS and other operating
costs. . . . Industry stakeholders presented them with concerns
about the limited impact of the proposed 50-metric-ton exemption
and the viability of fish[er]men simply moving to a different

23

fishery. Mr. Kaelin's testimony merely provides more concrete detail that shows Defendants failed to adequately consider these issues."). Thus, the Court finds that Mr. Kaelin's declaration "does not add factors that [the agency] failed to consider as much as it questions the manner in which [the agency] went about considering the factors it did." *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 31-32 (D.D.C. 2001).

Finally, Plaintiffs argue that "[i]f the Court excludes Mr. Kaelin's declaration, it may still consider the cost survey and order Defendants to complete the record with the data compiled by" the Mid-Atlantic Fishery Management Council regarding compliance cost information. Pls.' Opp'n Exclude, ECF No. 25 at 15-16. As Plaintiffs did not object to Defendants' compilation of the administrative record and have not filed a motion requesting that the Court supplement the administrative record with such information, the Court declines to order Defendants to produce the information now.

Accordingly, the Court finds that Plaintiffs have not demonstrated exceptional circumstances justifying departure from the general rule against extra-record evidence.

## B. The MSA Authorizes Industry-Funded Monitoring

Plaintiffs first contend that Defendants exceeded their statutory authority under the MSA in promulgating the industry-funded monitoring measures within the Omnibus Amendment. *See*

24

34

Pls.' Mot., ECF No. 18-1 at 27. Plaintiffs argue that the MSA does not authorize industry-funded monitoring in the Atlantic herring fishery or in the other New England fisheries contemplated in the amendment. *Id.* at 28. And because the expected economic impact of such monitoring programs is "possibly disastrous for the herring fleet," Plaintiffs contend that Congress would not grant authority for such significant measures through an implicit delegation. *Id.* Defendants, in opposition, argue that "Congress has spoken directly to the precise question at issue by including multiple provisions in the MSA that presuppose" industry-funded monitoring. Defs.' Opp'n, ECF No. 20-1 at 26. Even if the Court finds that Congress has not directly spoken on the issue, Defendants argue that NMFS's interpretation of the MSA was reasonable. *Id.*

In reviewing an agency's interpretation of a statute Congress has entrusted it to administer, courts' analyses are governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under step one of the *Chevron* analysis, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43. Courts utilize "traditional tools of statutory construction" to determine whether Congress has unambiguously expressed its intent. *Serono Lab'ys, Inc. v.*

25

35

*Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998) (quoting *Chevron*, 467 U.S. at 843 n.9). "When the statute is clear, the text controls and no deference is extended to an agency's interpretation in conflict with the text." *Adirondack Med. Ctr. v. Sebelius*, 29 F. Supp. 3d 25, 36 (D.D.C. 2014) (citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011)). Under step two of the *Chevron* analysis, if Congress "has not directly addressed the precise question" at issue, the agency's interpretation of the statute is entitled to deference so long as it is "reasonable" and not otherwise "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44.

"An agency is owed no deference if it has no delegated authority from Congress to act." *N.Y. Stock Exch. LLC v. Secs. & Exch. Comm'n*, 962 F.3d 541, 553 (D.C. Cir. 2020); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). Furthermore, "[a]gency authority may not be lightly presumed," and "[m]ere ambiguity in a statute is not evidence of congressional delegation of authority." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001) (citing *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998)). "Not only must an agency's decreed result be within the scope of its lawful authority, but the

26

process by which it reaches that result must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *State Farm*, 463 U.S. at 43).

The Court's analysis begins with the statutory text. *See S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 22-23 (D.C. Cir. 1999). Here, Section 1853 of the MSA explicitly provides that FMPs may require that at-sea monitors "be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. § 1853(a)(8). In the same section, the MSA provides that FMPs may also "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(a)(14). Significantly, the MSA also states that each FMP "shall contain the conservation and management measures" it finds are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A).

Taken together, these statutory provisions "vest[] broad authority in the Secretary to promulgate such regulations as are necessary to carry out the conservation and management measures

27

of an approved FMP." *Nat'l Fisheries Inst., Inc. v. Mosbacher*,
732 F. Supp. 210, 216 (D.D.C. 1990). Indeed, the Supreme Court
has recognized that the phrase "necessary and appropriate" is
"capacious[]" and "leaves agencies with flexibility." *Michigan*,
576 U.S. at 752 (2015); *see also Coastal Conservation Ass'n v.
U.S. Dep't of Commerce*, No. 15-1300, 2016 WL 54911, at \*4 (E.D.
La. Jan. 5, 2016) (describing "necessary and appropriate" phrase
in Section 1853(a)(1)(A) as "empowering language represent[ing]
a delegation of authority to the agency"). Moreover, "the MSA
defines 'conservation and management' measures in relevant part
as 'all of the rules, regulations, conditions, methods, and
other measures . . . required to rebuild, restore, or maintain,
and which are useful in rebuilding, restoring, or maintaining,
any fishery resource and the marine environment.'" *Groundfish
Forum v. Ross*, 375 F. Supp. 3d 72, 84 (D.D.C. 2019) (quoting 16
U.S.C. § 1802(5)). Given that the MSA expressly authorizes FMPs
to contain provisions requiring that vessels carry at-sea
monitors, as well any "necessary and appropriate" conservation
and management requirements, the Court declines to read the MSA
as narrowly as Plaintiffs urge. *See* 16 U.S.C. § 1853(a)(1)(A),
(b)(8), (b)(14); *see also Groundfish Forum*, 375 F. Supp. 3d at
84 (D.D.C. 2019) (finding that, given the "broad" definition of
"conservation and management" measures, "the Court has no basis

28

38

to recognize a strict yet unspoken limitation on the Service's authority").

Plaintiffs, however, contend that, though the MSA authorizes placement of at-sea monitors on vessels, the MSA is silent on whether Defendants may further require that vessel operators pay for the monitoring services. *See* Pls.' Reply, ECF No. 22 at 13. According to Plaintiffs, courts have rejected the "nothing-equals-something argument," based entirely on the existence of the phrase "necessary and appropriate" in a statute, "that presumed congressional silence left the agency a 'mere gap' . . . to fill.'" Pls.' Reply, ECF No. 22 at 13 (quoting *Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020)). Plaintiffs primarily rely on the D.C. Circuit's decision in *New York Stock Exchange, LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020), and the Supreme Court's decision in *Michigan v. EPA*, 576 U.S. 743 (2015), in support of their argument. *See* Pls.' Reply, ECF No. 22 at 19.

However, both cases are distinguishable. In *New York Stock Exchange, LLC*, the D.C. Circuit concluded that the Securities and Exchange Commission inappropriately relied on the phrase "necessary and appropriate" under section 23(a) of the Securities and Exchange Act in implementing a rule without any regulatory agenda and without any other statutory authority. 962 F.3d at 557. The D.C. Circuit explained that the Commission had

29

adopted the program "without explaining what problems with the existing regulatory requirements it meant to address." *Id.* Moreover, the costly program was adopted despite the Exchange Act's command "forbid[ding] the Commission from adopting a rule that will unnecessarily burden competition." *Id.* at 555. Here, in contrast, Defendants have tethered the Omnibus Amendment measures to the congressionally authorized purpose of "conservation and management of the fishery." 16 U.S.C. § 1853(b)(8). For example, the record reflects that Defendants considered the economic impacts to the fishing community as well as the environmental impacts, concluding that the preferred alternatives "may lead to direct positive impacts on the herring resource and non-target species if herring fishing effort is limited, by increased information on catch tracked against catch limits, and that increases the reproductive potential of the herring resource and non-target species." AR 17318.

Similarly, in *Michigan*, the Supreme Court concluded that, among other things, the "established administrative practice" to "treat cost as a centrally relevant factor" and the "[s]tatutory context" requiring consideration of costs in reference to various actions, made it unreasonable for the EPA to read the phrase "appropriate and necessary" to mean that it could ignore cost when deciding whether to regulate power plants. 576 U.S. at 752-57. Here, however, the established administrative practice

30

and statutory context both favor Defendants. First, as Plaintiffs concede, since 1990, the North Pacific Council has managed an observer program that is "funded through a combination of fees and third-party contracts between observer providers and fishing industry members." Pls.' Mot., ECF No. 18-1 at 35. Second, regarding the statutory context, in addition to the provision explicitly authorizing mandatory at-sea monitors, the MSA recognizes the existence of an at-sea monitoring program in which a vessel may hire and directly provide payment for monitoring services. In Section 1858(g), the MSA authorizes the Commerce Secretary to issue sanctions "[i]n any case in which . . . any payment required for observer services provided to or *contracted by an owner or operator* . . . has not been paid and is overdue." 16 U.S.C. § 1858(g)(1) (emphasis added). "This provision would be unnecessary if the MSA prohibited the very type of industry funding at issue in this case." *See Goethel v. Pritzker*, No. 15-cv-497, 2016 WL 4076831, at \*5 (D.N.H. July 29, 2016) (finding that Section 1858(g) "demonstrates beyond peradventure that the MSA contemplates—and most certainly does not prohibit—the use of industry funded monitors"). And while Plaintiffs argue that Section 1858(g) must only refer to other provisions of the MSA establishing fee-based monitoring programs, *see* Pls.' Mot., ECF No. 18-1 at 36-37 (citing 16 U.S.C. §§ 1862, 1821(h)(4), 1853a(e)(2)); Plaintiffs' argument

31

41

lacks a textual basis. Moreover, by mandating that conservation
and management measures, where practicable, "minimize costs" and
"minimize adverse economic impacts" on fishing communities, the
MSA acknowledges that such measures may result in costs to the
fishing industry. *See* 16 U.S.C. § 1851(a)(7), (8).

The Court is mindful that "the mere reference to
'necessary' or 'appropriate' in a statutory provision
authorizing an agency to engage in rulemaking does not afford
the agency authority to adopt regulations as it sees fit with
respect to all matters covered by the agency's authorizing
statute." *N.Y. Stock Exch. LLC*, 962 F.3d at 554 (citing
*Michigan*, 576 U.S. at 749-51). But, as demonstrated above, the
MSA contains more than only the phrase "necessary and
appropriate."

Plaintiffs further argue that certain canons of statutory
interpretation demonstrate that Defendants have exceeded their
authority. First, Plaintiffs invoke the anti-surplusage canon,
"which encourages courts to give effect to 'all of [a statute's]
provisions, so that no part will be inoperative or superfluous,
void or insignificant.'" *Gulf Fishermen's Ass'n*, 968 F.3d at
464-65 (quoting *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d
286, 294 (5th Cir. 2020) (en banc)). Plaintiffs contend that if
Congress had intended to grant Defendants "implied authority" to
require industry-funded monitoring, it would not have

32

42

specifically authorized the collection of fees or surcharges to
cover the cost of three monitoring programs elsewhere in the
statute. *See* Pls.' Mot., ECF No. 18-1 at 29-30. Plaintiffs
specifically refer to: (1) the "limited access privilege
program," which authorizes the Council to collect "fees" to
"cover the costs of management, data collection and analysis,
and enforcement activities," 16 U.S.C. § 1853a(e)(2); (2) the
monitoring program for foreign fishing vessels, which authorizes
the Secretary to impose a "surcharge" to "cover all the costs of
providing a United States observer aboard that vessel," *id.* §
1821(h)(4); and (3) the North Pacific Council program, which
"establishes a system . . . of fees, which may vary by fishery,
management area, or observer coverage level, to pay for the cost
of implementing the plan," *id.* § 1862(a). Second, Plaintiffs
argue that the *expressio unius est exclusio alterius* canon
applies for the same reasons: that the inclusion of provisions
governing fee-based monitoring programs impliedly excludes other
types of industry-funded monitoring programs. Pls.' Mot., ECF
No. 18-1 at 30; *see also* Pls.' Reply, ECF No. 22 at 14.

The Court is unpersuaded. A fee-based program—"where the
industry is assessed a payment by the agency, authorized by
statute, to be deposited in the U.S. Treasury and disbursed for
administrative costs otherwise borne by the agency," AR 17739—is
different from the industry-funded observer measures at issue

33

43

here, in which the fishing vessels contract with and make
payments directly to third-party monitoring service providers.
Because the Omnibus Amendment does not involve fees or
surcharges, the Court cannot not find that the MSA's provisions
governing cost recovery are made "superfluous, void or
insignificant," *Citizens for Responsibility & Ethics in Wash. v.
FEC*, 316 F. Supp. 3d 349, 391 (D.D.C. 2018) (quoting *Rubin v.
Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018)); nor do
the circumstances "support a sensible inference that the term
left out must have been meant to be excluded." *Del. Riverkeeper
Network v. FERC*, 857 F.3d 388, 398 (D.C. Cir. 2017) (citing
*N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017)); *see also
Goethel*, 2016 WL 4076831, at \*5 (finding that "the Pacific
Northwest fee mechanism is a substantively different animal than
A16's industry funding requirement for at-sea monitoring").

    Plaintiffs also assert that "[t]here is no evidence of
congressional recognition of any sort of pre-existing, implied
authority to impose monitoring costs on the regulated industry."
Pls.' Mot., ECF No. 18-1 at 31. The Court disagrees. Rather, the
legislative history further supports the conclusion that
Defendants have acted within the scope of the MSA.

    As Defendants point out, prior to Congress adding to the
MSA the provisions authorizing the mandatory placement of at-sea
monitors on fishing vessels (16 U.S.C. § 1853(b)(8)) and the

34

44

fee-based observer program in the North Pacific region (16
U.S.C. § 1862), the Secretary had issued regulations
implementing an observer program in the North Pacific's FMP in
which the vessel operator directly paid a third-party monitoring
services provider. *See Groundfish of the Gulf of Alaska,
Groundfish Fishery of the Bering Sea & Aleutian Islands Area*, 55
Fed. Reg. 4839-02, 4840 (Feb. 12, 1990) (providing that "[a]ny
vessel operator or manager of a shoreside processing facility
who is required to accommodate an observer is responsible for
obtaining a NMFS-certified observer . . . . [and] *will pay the
cost of the observer directly to the contractor*" (emphasis
added)). As Plaintiffs acknowledge, to this day, "the North
Pacific observer program is still funded through a combination
of fees and third-party contracts between observer providers and
fishing industry members." Pls.' Mot., ECF No. 18-1 at 35.
Congress was thus aware of the industry-funded monitoring
program in the North Pacific when it authorized the at-sea
monitoring requirement located in Section 1853(b)(8), and,
indeed, the Committee on Merchant Marine and Fisheries noted
that "the Councils already have—*and have used*—such authority;
the amendment makes the authority explicit." *See* Defs.' Opp'n,
ECF No. 20-1 at 31-32 (quoting Comm. on Merchant Marine &
Fisheries, H.R. Rep. No. 101-393 at 38 (1990)). Congressional
committees have continued to take note of such industry-funded

35

programs. *See, e.g.*, S. Rep. No. 114-66 at 31-32 (June 16, 2015); S. Rep. No. 114-239 at 31-32 (Apr. 21, 2016); H. Rpt. No. 114-605 at 17 (June 7, 2016); S. Rep. No. 115-139 at 34 (July 27, 2017); S. Rep. No. 115-275 at 36 (June 14, 2018); S. Rpt. No. 116-127 at 42 (Sept. 26, 2019).

Accordingly, the Court concludes that Defendants acted within the bounds of their statutory authority in promulgating the Omnibus Amendment. Even if Plaintiffs' arguments were enough to raise an ambiguity in the statutory text, the Court, for the same reasons identified above, would conclude that Defendants' interpretation is a reasonable reading of the MSA. *See Groundfish Forum*, 375 F. Supp. 3d at 85.

## C. Industry-Funded Monitoring Does Not Violate Agency Financing and Expenditure Statutes

Plaintiffs next argue that the Omnibus Amendment "impliedly repeals" the Anti-Deficiency Act, 31 U.S.C. § 1341; the Miscellaneous Receipts Statute, 31 U.S.C. § 3302; and the Independent Offices Appropriations Act, 31 U.S.C. § 9701. Pls.' Mot., ECF No. 18-1 at 38-40. According to Plaintiffs, the amendment inappropriately "offload[s] costs" of Defendants' observer programs onto the industry when Defendants exceed appropriated funds. *Id.* at 39. For the reasons stated below, the Court disagrees and concludes that the industry-funded

monitoring requirement does not violate the statutes governing agency expenditures and obligations.

Plaintiffs first argue that the industry-funded monitoring requirement violates the Anti-Deficiency Act, 31 U.S.C. § 1341. Pls.' Mot., ECF No. 18-1 at 38. The Anti–Deficiency Act provides that a federal officer may not "(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"; or "(B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A)-(B). Here, however, Defendants are not expending government funds without authorization from Congress. Nor do the monitoring requirements contemplate that NFMS will enter into any contracts or obligations for the payment of money. Rather, it is the vessels that directly make payments to the monitoring service providers, subject to any terms provided for in contracts between the two private parties. Accordingly, based upon the statute's plain language, Defendants have not violated the Anti-Deficiency Act. *See Goethel*, 2016 WL 4076831, at \*6 (holding that an industry funding requirement did not violate the Anti-Deficiency Act because "the effect of industry funding is a cessation of government spending").

37

Plaintiffs also contend that the monitoring requirement
violates the Miscellaneous Receipts Act, 31 U.S.C. § 3302, which
provides that "an official or agent of the Government receiving
money for the Government from any source shall deposit the money
in the Treasury as soon as practicable without deduction for any
charge or claim." 31 U.S.C. § 3302(b). The D.C. Circuit has
explained that this provision "derives from and safeguards a
principle fundamental to our constitutional structure, the
separation-of-powers precept embedded in the Appropriations
Clause, that '[n]o Money shall be drawn from the Treasury, but
in Consequence of Appropriations made by Law.'" *Scheduled
Airlines Traffic Offs., Inc. v. U.S. Dep't of Def.*, 87 F.3d
1356, 1361-62 (D.C. Cir. 1996) (quoting U.S. Const. art. I, § 9,
cl. 7). "By requiring government officials to deposit government
monies in the Treasury, Congress has precluded the executive
branch from using such monies for unappropriated purposes." *Id.*
at 1362. Here, the service providers are not government
officials and do not otherwise receive money for the government,
and thus industry-funded monitoring does not involve an
"official or agent of the Government" receiving money. *See
Carver v. United States*, 16 Ct. Cl. 361, 381 (1880) ("The
Treasurer is the official custodian [of public money] for
Congress, and unless money is in his custody, or in the hands of
the persons authorized by law to receive it on behalf of the

38

United States, it is not in the possession of the United
States."), *aff'd*, 111 U.S. 609 (1884). Under the Omnibus
Amendment, the vessels pay the monitoring service providers for
services rendered under contracts between the vessels and the
service providers. "Mindful of both the plain language of the
Miscellaneous Receipts statute and its underlying purpose to
preserve congressional control of the appropriations power,"
*Scheduled Airlines Traffic Offs., Inc.*, 87 F.3d at 1362; the
Court concludes that the statute is not implicated.

Plaintiffs next argue that the industry funding
requirements of the Omnibus Amendment violate the Independent
Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701, which
"generally governs user fees collected by the federal
government." *Seafarers Int'l Union of N. Am. v. U.S. Coast
Guard*, 81 F.3d 179, 181 n.1 (D.C. Cir. 1996). "Under the Act,
the 'head of each agency . . . may prescribe regulations
establishing the charge for a service or thing of value provided
by the agency.'" *Montrois v. United States*, 916 F.3d 1056, 1062
(D.C. Cir. 2019) (quoting 31 U.S.C. § 9701(b)). Here, Defendants
are not collecting a fee from any party related to industry-
funded monitoring, and Defendants are not providing a "service
or thing of value." 31 U.S.C. § 9701(b). As Defendants point
out, instead, "a private entity (a monitoring provider) collects
a vessel's payment for the service provider's at-sea monitoring,

39

an arrangement under which no government agent or official ever has custody or possession of any public money." Defs.' Opp'n, ECF No. 20-1 at 47. Accordingly, the Court concludes that industry-funded monitoring does not violate the IOAA.

Despite the above, Plaintiffs assert that it is "a distinction without a difference" that "Defendants and the Council seek to require the industry to contract directly with monitoring service providers, in lieu of the government paying those companies." Pls.' Reply, ECF No. 22 at 29. According to Plaintiffs, "the law looks past superficial structures to the heart of what an agency is trying to accomplish." *Id.* The Court is unpersuaded. First, Plaintiffs fail to specify to which "law" they are referring, and they fail to cite any case law in support of their argument. Second, the plain language of the three statutes unambiguously demonstrates that they are not applicable to this case. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342 (1974) (cautioning that the IOAA should be read "narrowly to avoid constitutional problems"); *Davis & Assocs., Inc. v. District of Columbia*, 501 F. Supp. 2d 77, 80 (D.D.C. 2007) ("The relevant language of the Anti-Deficiency Act is unambiguous."); *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (2003) ("All the [Miscellaneous Receipts] Act literally requires is that miscellaneous money received by government officials be deposited in the general

Treasury."); *see also Estate of Cowart v. Nicklos Drilling Co.*,
505 U.S. 469, 475 (1992) ("[W]hen a statute speaks with clarity
to an issue[,] judicial inquiry into the statute's meaning, in
all but the most extraordinary circumstance, is finished.").

　　　Plaintiffs also argue that "it is incorrect for Defendants
to assert that NMFS does not closely 'control' monitoring
service providers or the contractual relationships they enter
with vessel owners" because: (1) "the market for monitoring
service providers is highly regulated and controlled by NMFS";
(2) "NMFS must certify the companies permitted to provide
monitors," of which there are only four such companies; and (3)
of the certified companies, "[n]ot all these companies operate
in the same geographic regions." Pls.' Reply, ECF No. 22 at 29.
However, none of these details regarding Defendants' regulation
and oversight of the required standards set by the Council
change the fact that Defendants do not receive any payments
related to industry-funded monitoring and do not "maintain
control over the contractual relationship between the vessel and
the service provider that the vessel itself selects." Defs.'
Reply, ECF No. 26 at 23.

　　　Accordingly, industry-funded monitoring does not violate
the Anti-Deficiency Act, the Miscellaneous Receipts Act, or the
IOAA.

41

**D. The Omnibus Amendment Is Not an Unconstitutional Tax**

Plaintiffs argue that the industry-funded monitoring measures—which they characterize as "a government program created by the NEFMC and Defendants, regulated by them in detail, and which they will continue to fund in-part themselves"—are an unconstitutional tax. *See* Pls.' Mot., ECF No. 18-1 at 40. Defendants disagree with Plaintiffs' characterization of the industry-funded monitoring requirement and contend that there is "no resemblance" between the industry-funded monitoring requirement and a tax levied and collected by Congress. *See* Defs.' Opp'n, ECF No. 20-1 at 49. The Court agrees with Defendants.

"A payment made to a third party vendor (in this case, an at-sea monitor) is not a tax simply because the law requires it." *Goethel*, 2016 WL 4076831, at \*6. As the Supreme Court has explained, the "essential feature" of a tax is that it "produces at least some revenue for the Government." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012); *see also* Black's Law Dictionary (11th ed. 2019) (defining "tax" as "a charge, [usually] monetary, imposed by the government on persons, entities, transactions or property to yield public revenue"). Here, it is undisputed that the payment for industry-funded monitoring flows from the vessels directly to the monitoring service providers. *See* Pls.' Mot., ECF No. 18-1 at 40; Defs.'

Opp'n, ECF No. 20-1 at 46-47. The government receives no funds related to the requirement, nor are the funds available to the government to be expended for any public purpose. And the government's role is limited to approving at-sea monitors employed by private companies to serve as the monitoring service providers.

Accordingly, because industry-funded monitoring generates no public revenue, it does not constitute an unlawful tax.

### E. The Omnibus Amendment Does Not Violate National Standard 7 and National Standard 8

Plaintiffs contend that the Omnibus Amendment violates National Standards 7 and 8 because any demonstrated scientific or conservation benefits resulting from increased monitoring services do not outweigh the economic consequences to the fishing community. Pls.' Mot., ECF No. 18-1 at 41.

In reviewing the Omnibus Amendment, the Court's "task is not to review *de novo* whether the amendment complies with [the National Standards] but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C&W Fish Co.*, 931 F.2d at 1562.

For the reasons explained below, the Court concludes that the Omnibus Amendment does not violate National Standards 7 and 8.

43

### 1. National Standard 7

National Standard 7 provides that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). The regulations concerning National Standard 7 instruct that management measures should not impose "unnecessary burdens on the economy, on individuals, on private or public organizations, or on Federal, state, or local governments. Factors such as fuel costs, enforcement costs, or the burdens of collecting data may well suggest a preferred alternative." 50 C.F.R. § 600.340(b). "Any analysis for fishery management plans 'should demonstrate that the benefits of fishery regulation are real and substantial relative to the added research, administrative, and enforcement costs, as well as costs to the industry of compliance.'" *Burke v. Coggins*, No. 20-667, 2021 WL 638796, at *5 (D.D.C. Feb. 18, 2021) (quoting 50 C.F.R. § 600.340(c)). The regulations also provide that "an evaluation of effects and costs, especially of differences among workable alternatives, including the status quo, is adequate." 50 C.F.R. § 600.340(c).

Plaintiffs first argue that "[a]t a cost upwards of $710 per day, many small business herring fishermen will suffer severe economic consequence." Pls.' Mot., ECF No. 18-1 at 41. Plaintiffs contend that "[a]t no point did Defendants justify

44

the Omnibus Amendment by describing less costly alternatives
that the NEFMC seriously considered." *Id.* at 42.

The administrative record reflects, however, that
Defendants did consider less costly alternatives and included
exemptions to the amendment to minimize costs. NMFS recognized
that while industry-funded monitoring coverage would cause
"direct economic impacts" on vessels participating in the
herring fishery, the requirement also would have positive
impacts, including ensuring "(1) [a]ccurate estimates of catch
(retained and discarded); (2) accurate catch estimates for
incidental species for which catch caps apply; and (3)
affordable monitoring for the herring fishery." AR 17740, 17744.
The record also demonstrates that Defendants considered
alternatives to determine which monitoring target goal would
best achieve the agency's goals while minimizing the economic
impact on fishing communities. The analysis within the EA
indicates Defendants considered a "no coverage target," a 25%
coverage target, a 50% coverage target, and a 75% coverage
target. AR 17075, 17082-83; *see also id.* at 17097 ("Different
coverage targets (25%, 50%, 75%, or 100%) were analyzed for each
gear type (midwater trawl, purse seine, bottom trawl), but the
Council selected a 50% coverage target for all gear types.").
After weighing the benefits against the costs, Defendants
concluded that "[t]he 50% coverage target selected by the

45

Council for vessels with a Category A or B herring permit
provides for the benefits of collecting additional information
on biological resources while minimizing industry cost
responsibilities, especially when compared to non-preferred
coverage targets of 100% and 75%." *Id.* at 17315.

The Omnibus Amendment also provides for exemptions from the
coverage requirements to minimize costs where practicable. For
example, waivers are available if: (1) "monitoring coverage is
unavailable"; (2) "vessels intend to land less than 50 metric
tons (mt) of herring"; or (3) "wing vessels carry no fish on
pair trawling trips." *Id.* at 17735. Furthermore, the EFP
"exempt[s] midwater vessels from the requirement for industry-
funded at-sea monitoring coverage and allow[s] midwater trawl
vessels to use electronic monitoring and portside sampling
coverage to comply with the" 50% monitoring coverage target. *Id.*
at 17736-37. Finally, Defendants found that "[a]llowing SBRM
coverage to contribute toward the 50-percent coverage target for
at-sea monitoring is expected to reduce costs for the industry."
*Id.* at 17742. Accordingly, Plaintiffs' contention that
Defendants "at no point" discussed less costly alternatives is
belied by the record. *See Nat'l Coal. for Marine Cons. v. Evans*,
231 F. Supp. 2d 119, 133 (D.D.C. 2002) (dismissing plaintiffs'
arguments that NMFS failed to analyze alternative conservation
measures, explaining that they "ha[d] not specified any record

46

evidence showing that NMFS ignored a less costly, practicable
approach . . . , as National Standard Seven prohibits").

Plaintiffs, however, argue that Defendants' discussion of
alternatives is conclusory and that "[m]ore detailed analysis is
required, particularly when the proposed regulation will harm
most of the herring fleet." Pls.' Reply, ECF No. 22 at 32.
Plaintiffs assert that the Council failed to note that midwater
trawlers will bear the brunt of the industry-funded monitoring
costs because: (1) they have low observer coverage rates due to
differences in SBRM coverage among gear types; and (2) the
majority of them would not qualify under the 50-metric-ton
exemption. *Id.* However, it is settled law that "in making a
decision on the practicability of a fishery management
amendment, the Secretary does not have to conduct a formal
cost/benefit analysis of the measure." *Alaska Factory Trawler
Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987); *see
also Nat'l Fisheries*, 732 F. Supp. at 222. As stated above,
there is ample evidence in the record that Defendants considered
the costs and benefits of choosing a 50% coverage target, which
was neither the most nor the least severe plan considered, and
took action to minimize the economic impacts of the industry-
funded monitoring measures. *E.g.*, AR at 17005-06, 17030, 17070-
71, 17075, 17082-83, 17315, 17346. In addition, the record
reflects that Defendants made efforts to minimize the economic

47

impacts by tailoring the industry-funded monitoring requirement to that portion of the industry most in need of regulatory controls. Thus, though Plaintiffs assert that midwater trawls will end up bearing a greater share of the costs, as Defendants assert, the monitoring coverage target is intended to encompass those vessels with the largest herring catch. *See e.g.*, *id.* at 17742 ("Coverage waivers would only be issued under specific circumstances, when monitors are unavailable *or trips have minimal to no catch*, and are not expected to reduce the benefits of additional monitoring." (emphasis added)); *id.* at 17743 ("Ultimately, the Council determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring."). Furthermore, in view of the fact that these midwater trawl vessels would be less likely to fall under the 50-metric-ton exception, Defendants found that, via the EFP exemption, "[e]lectronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage." *Id.* at 17742.

Plaintiffs also contend that the omnibus measures, which establish a standardized process for developing industry-funded monitoring programs across other New England FMPs, "may lead to the sort of 'duplication' that National Standard Seven aims to avoid" because "vessels in non-herring fisheries could become

48

subject to concurrent monitoring requirements." Pls.' Reply, ECF
No. 22 at 30. Plaintiffs assert that the Omnibus Amendment fails
to address this potential future duplication with other NEFMC-
administered fisheries. *Id.* at 30-31. But Plaintiffs' argument
fails. Defendants explained that "[b]ecause herring and mackerel
are often harvested together on the same trip," the Omnibus
Amendment "specifies that the higher coverage target applies on
trips declared into both fisheries. If the Council considers
industry-funded monitoring in other fisheries in the future, the
impacts of those programs relative to existing industry-funded
monitoring programs will be considered at that time." AR 17742.
Further, because the 50% monitoring coverage target is
calculated by combining both SBRM and industry-funded
monitoring, a vessel will not have SBRM and industry-funded
monitoring coverage on the same trip. *See id.* at 17315, 17734.
Thus, the industry-funded monitoring requirement in the Atlantic
herring fishery "avoid[s] unnecessary duplication." 16 U.S.C. §
1851(a)(7).

   Accordingly, the Omnibus Amendment does not violate
National Standard 7.

### 2. National Standard 8

   National Standard 8 requires that FMPs and plan amendments
"take into account the importance of fishery resources to
fishing communities . . . in order to (A) provide for the

49

sustained participation of such communities, and (B) to the
extent practicable, minimize adverse economic impacts on such
communities." 16 U.S.C. § 1851(a)(8). The agency "must give
priority to conservation measures." *Nat. Res. Def. Council, Inc.
v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000). "It is only when
two different plans achieve similar conservation measures that
the [Department] takes into consideration adverse economic
consequences." *Id.* But where two alternatives in fact achieve
similar conservation goals, the preferred option will be the
alternative that provides the greater potential for sustained
participation of fishing communities and that minimizes adverse
economic impacts. *See* 50 C.F.R. § 600.345(b)(1). "These
sometimes conflicting goals of conservation on the one hand and
minimizing harm to fishing communities on the other mean that
the Secretary has substantial discretion to strike what he deems
an appropriate balance." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d
at 92 (citing *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350
(9th Cir. 1996)). "In striking that balance, moreover, the
Secretary need not conduct an official or numerical cost/benefit
analysis." *Id.* (citing *Nat'l Fisheries Inst.*, 732 F. Supp. at
222).

Plaintiffs argue that the Omnibus Amendment violates
National Standard 8 because Defendants have failed to establish
its scientific and conservation need. Pls.' Reply, ECF No. 22 at

50

34; *see also* Pls.' Mot., ECF No. 18-1 at 41. The Court
disagrees. It is clear from the administrative record that
Defendants explained the scientific and conservation benefits of
the Omnibus Amendment. Defendants explained that the amendment
establishes industry-funded monitoring "to help increase the
accuracy of catch estimates," which in turn will "improv[e]
catch estimation for stock assessments and management." AR 17742
("Analysis in the EA suggests a 50-percent coverage target would
reduce the uncertainty around estimates of catch tracked against
catch caps, likely resulting in a CV of less than 30 percent for
the majority of catch caps."); *see also id.* at 17316. "If
increased monitoring reduces the uncertainty in the catch of
haddock and river herring and shad tracked against catch caps,
herring vessels may be more constrained by catch caps, thereby
increasing accountability, or they may be less constrained by
catch caps and better able to fully harvest herring sub-ACLs."
*Id.* at 17742; *see also id.* at 17789. Furthermore, Defendants
explained that "[i]mproving [the] ability to track catch against
catch limits is expected to support the herring fishery achieve
optimum yield, minimize bycatch and incidental catch to the
extent practicable, and support the sustained participation of
fishing communities." *Id.* at 17742; *see also id.* at 17789-90. As
explained above, those conservation needs were weighed against
the associated costs to the industry, and the Council considered

significant alternatives and selected measures to minimize adverse economic impacts on the fishing industry and communities. *See id.* at 17316.

Plaintiffs also argue that the cost-minimization efforts "impermissibly benefit a select number of fishing communities where that sliver of the fleet berths and does business." Pls.' Reply, ECF No. 22 at 34. Plaintiffs further contend that "differences in SBRM coverage among different gear types will lead to the midwater trawl fleet carrying more of the financial burden in meeting the herring monitoring coverage target." *Id.* But, as stated above, the administrative record demonstrates that Defendants took into account the negative economic impacts upon participants in the herring fishery "to the extent practicable." 16 U.S.C. § 1851(a)(8). In taking into account the economic impacts, Defendants weighed the alternatives and reasonably concluded that the 50% monitoring coverage target best met the balance of the costs and benefits of additional monitoring. AR 17257, 17734.

"[C]ourts have consistently rejected challenges under this standard where the administrative record reveals that the Secretary was aware of potentially devastating economic consequences, considered significant alternatives, and ultimately concluded that the benefits of the challenged regulation outweighed the identified harms." *N.C. Fisheries*

52

*Ass'n*, 518 F. Supp. 2d at 92 (citing cases). Accordingly, the
Court concludes that there is no violation of National Standard
Eight.

## F. The February 7, 2020 Final Rule Is Not Substantively Deficient

Plaintiffs argue that Defendants' responses to comments
submitted in connection with the final rule were "substantively
deficient." Pls.' Mot., ECF No. 18-1 at 43.

"The APA's arbitrary-and-capricious standard requires that
agency rules be reasonable and reasonably explained." *Nat'l Tel.
Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). "An
agency violates this standard if it 'entirely fail[s] to
consider an important aspect of the problem.'" *Carlson v. Postal
Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *State
Farm*, 463 U.S. at 43). "An agency also violates this standard if
it fails to respond to 'significant points' and consider 'all
relevant factors' raised by the public comments." *Id.* (quoting
*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir.
1977)). "The fundamental purpose of the response requirement is,
of course, to show that the agency has indeed considered all
significant points articulated by the public." *Nat. Res. Def.
Council, Inc. v. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988).
However, "[t]he failure to respond to comments is significant
only insofar as it demonstrates that the agency's decision was

53

not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (internal quotations and citations omitted).

First, Plaintiffs argue that Defendants' failed to cite statutory authority supporting its statement that Section 1853(b)(8)'s requirement "to carry observers . . . includes compliance costs on industry participants" because "there is no statutory authorization for industry-funded monitoring." Pls.' Mot., ECF No. 18-1 at 43 (emphasis omitted) (quoting AR 17739). Plaintiffs contend that Defendants never addressed the argument that if authorization for industry-funded monitoring were "implied, then Congress's efforts to allow it elsewhere would be rendered surplusage." *Id.*

However, the Service explained in its response that its authority derives from Section 1853(b)(8) of the MSA, which authorizes at-sea monitors to be placed on fishing vessels, and explained its view that "[t]he requirement to carry observers, along with many other requirements under the [MSA], includes compliance costs on industry participants." AR 17739 (explaining that "NMFS regulations require fishing vessels to install vessel monitoring systems for monitoring vessel positions and fishing, report catch electronically, fish with certain gear types or mesh sizes, or ensure a vessel is safe before an observer may be carried on a vessel. Vessels pay costs to third-parties for

54

services or goods in order to comply with these regulatory
requirements that are authorized by the Magnuson-Stevens Act.
There are also opportunity costs imposed by restrictions on
vessel sizes, fish sizes, fishing areas, or fishing seasons.").
Defendants' response is not "substantively deficient" for
failing to expressly mention the surplusage canon, as Defendants
had already noted their disagreement with the premise that
industry-funded monitoring was unauthorized. *Cf. Del. Dep't of
Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir.
2015) (stating that an agency need not "discuss every item of
fact or opinion included in the submissions made to it"
(citation omitted)).

Plaintiffs also assert that "there is a key distinction
between regulatory costs—often enumerated by statute—and
effectively paying the salary of your direct, government
minder." Pls.' Mot., ECF No. 18-1 at 43-44. Plaintiffs contend
that the measures within the Omnibus Amendment are more
comparable to *inspection* costs than *compliance* costs. *Id.* at 44.
Finally, Plaintiffs argue that Defendants "tried to dismiss
arguments that industry funding is an unlawful tax." *Id.* at 45.

However, Defendants also sufficiently responded to these
concerns raised in submitted comments. Defendants explained that
the purpose of monitoring programs was to "collect[] data
necessary for the conversation and management of the fishery"

55

and that "[a]t-sea monitors are not authorized officers

conducting vessel searches for purposes of ensuring compliance

with fisheries requirements." AR 17740. Defendants further

explained that industry funding is not a tax because the

government receives no revenue. *Id.*

Accordingly, the Court concludes that the record indicates

that Defendants sufficiently considered the relevant factors

raised by the submitted comments and provided reasonable

explanations in response. *See Nat'l Tel. Coop. Ass'n*, 563 F.3d

at 540.

### G. Defendants Did Not Violate NEPA

Plaintiffs further argue that Defendants' EA violates NEPA.

*See* Pls.' Mot., ECF No. 18-1 at 46.

While NEPA establishes a "national policy [to] encourage

productive and enjoyable harmony between man and his

environment," 42 U.S.C. § 4321; "NEPA itself does not mandate

particular results," *Robertson v. Methow Valley Citizens

Council*, 490 U.S. 332, 350 (1989). "Rather, NEPA imposes only

procedural requirements on federal agencies with a particular

focus on requiring agencies to undertake analyses of the

environmental impact of their proposals and actions." *Dep't of

Transp. v. Public Citizen*, 541 U.S. 752, 756–57 (2004). In

reviewing an agency's decision not to issue an EIS, the court's

role is a "'limited' one, designed primarily to ensure 'that no

arguably significant consequences have been ignored.'" *Taxpayers of Mich. Against Casinos v. Norton* ["*TOMAC*"], 433 F.3d 852, 860 (D.C. Cir. 2006) (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988)). Thus, courts apply "a 'rule of reason' to an agency's NEPA analysis" and decline to "'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322–23 (D.C. Cir. 2015) (quoting *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

Plaintiffs argue that Defendants violated NEPA because: (1) Defendants failed to take a "hard look" at the Omnibus Amendment's impacts; (2) Defendants did not adequately consider regulatory alternatives or potential mitigation measures; (3) Defendants did not seriously consider alternatives to industry-funded monitoring; and (4) Defendants did not submit a supplement to their environmental impact analysis despite reductions in herring catch. *See* Pls.' Mot., ECF No. 18-1 at 46-51. For the reasons explained below, the Court rejects Plaintiffs' arguments.

### 1. Plaintiffs Do Not Have a Cause of Action Under NEPA

As a threshold matter, the Court first addresses whether Plaintiffs' interests fall within NEPA's "zone of interests."

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015).

"In addition to constitutional standing, a plaintiff must have a valid cause of action for the court to proceed to the merits of its claim." *Id.* (citing *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1018 (D.C. Cir. 2014)). As the Supreme Court has explained, courts "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

"The zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone." *Gunpowder Riverkeeper*, 807 F.3d at 274. "To be sure, a [party] is not disqualified from asserting a claim under the NEPA simply because it has an economic interest in defeating a challenged regulatory action." *Id.* (citing *Realty Income Trust v. Eckerd*, 564 F.2d 447, 452 (D.C. Cir. 1977). But a party "must assert an environmental harm in order to come within the relevant zone of interests," and that zone of interests "does not encompass monetary interests alone," *id.* (quoting *Eckerd*, 564 F.2d at 452 & n.10, n.11).

Here, while Plaintiffs refer generally to unspecified "environmental impacts," Plaintiffs have not alleged that they

will suffer any environmental injury as a result of the Omnibus
Amendment. Rather, Plaintiffs' sole concern is with the
financial burden on fishing vessels and companies as a result of
industry-funded monitoring. In their motion briefing and in
their Complaint, Plaintiffs have detailed their fears regarding
the economic impact of the Omnibus Amendment. *See, e.g.*, Pls.'
Mot., ECF No. 18-1 at 48-51; Pls.' Reply, ECF No. 22 at 36-42;
Compl., ECF No. 1 ¶¶ 3-5, 45, 78-80, 86, 91, 98. However,
Plaintiffs have failed to name any specific harms to the
environment and have not "linked [their] pecuniary interest to
the physical environment or to the environmental impacts."
*Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th
Cir. 2005) (holding that plaintiff failed to establish
prudential standing under NEPA because plaintiff's "sole
interest is in selling phosphate to Agrium").

Accordingly, because Plaintiffs' interest in challenging
the Omnibus Amendment is a purely economic interest, and
economic concerns are "not within the zone of interests
protected by NEPA," *ANR Pipeline Co v. FERC*, 205 F.3d 403, 408
(D.C. Cir. 2000); Plaintiffs cannot sustain a claim under NEPA,
*see Goethel*, 2016 WL 4076831, at *8 (dismissing plaintiffs' NEPA
claim because their "argument appears limited to the claim that
NMFS failed to adequately assess the economic impact of industry
funding").

59

## 2. Plaintiffs' NEPA Claims Fail on the Merits

Even if the Court found that NEPA was applicable to Plaintiffs' claims, Plaintiffs' arguments would still fail on the merits for the reasons stated below.

### a. Defendants Took a "Hard Look" at Environmental Impacts

Plaintiffs argue that Defendants failed to take a "hard look" at the "complete environmental impact" of the omnibus measures, which created a process to implement future industry-funded monitoring programs in other New England FMPs. Pls.' Mot., ECF No. 18-1 at 47. Plaintiffs contend that despite recognizing that future industry-funded monitoring programs will have an "economic impact" if implemented, Defendants undertook no analysis of these future costs. *Id.* at 47-48. In Plaintiffs' view, Defendants' inclusion of these measures into the Omnibus Amendment "suggests an improper attempt to 'artificially divid[e] a major federal action into smaller components, each without significant impact.'" *Id.* at 48 (quoting *Jackson City v. FERC*, 589 F.3d 1284, 1290 (D.C. Cir. 2009)).

Under NEPA, the EA must "take[] a hard look at the problem." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011). "Although the contours of the 'hard look' doctrine may be imprecise," a court must at a minimum "'ensure that the agency has adequately considered and disclosed the environmental

60

impact of its actions and that its decision is not arbitrary or

capricious.'" *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C.

Cir. 2006) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def.

Council, Inc.*, 462 U.S. 87, 97–98 (1983)). A "hard look"

includes "considering all foreseeable direct and indirect

impacts . . . . [It] should involve a discussion of adverse

impacts that does not improperly minimize negative side

effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975

(9th Cir. 2006) (internal quotation marks and citation omitted).

Here, the Court notes at the outset that while Plaintiffs

broadly claim that Defendants failed to take a "hard look" at

the *environmental* impacts of the future industry-funded

monitoring programs, Plaintiffs only identify alleged *economic*

impacts. *See* Pls.' Mot., ECF No. 18-1 at 48 (stating that NEFMC

recognized the "economic impact" of future monitoring programs);

*id.* (noting that NEFMC had suggested a potential rise in

"monitoring costs" due to overlapping requirements); *id.* at 49

(arguing a NEPA violation because the "final EA provides no

detail about the potential economic impact"); *id.* (citing to

"meager evidence" in the administrative record regarding the

economic impact on the non-herring fleet); Pls.' Reply, ECF No.

22 at 36 (arguing the Council refused to "recognize[] the

uniformly negative expected economic pact of future" monitoring

programs). As explained above, a party "must assert an

61

environmental harm in order to come within [NEPA's] zone of interests." *Gunpowder Riverkeeper*, 807 F.3d at 274 (citing *Eckerd*, 564 F.2d 447, 452 & n.10 (D.C. Cir. 1977); *see Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 606 (9th Cir. 2018) ("We have 'consistently held that purely economic interests do not fall within NEPA's zone of interests.'" (quoting *Ashley Creek Phosphate*, 420 F.3d at 940)).

However, even if NEPA was applicable here, the Court's conclusion would remain the same. Plaintiffs dispute Defendants' determination that the omnibus measures "do not have any direct economic impacts on fishery-related business or human communities because they do not require the development of [industry-funded monitoring] programs nor do they directly impose any costs." AR 17179. Plaintiffs contend that because Defendants are aware of which New England FMPs are in the position to implement industry-funded programs and "have access to extensive information about the demographics and operation of New England fisheries," Defendants could conduct an analysis of economic impact of future monitoring programs. Pls.' Reply, ECF No. 22 at 37. Defendants, on the other hand, argue that such future costs are too speculative to include in the EA "[w]ithout knowing the goals or the details of the measures to achieve [future industry-funded monitoring] goals." Defs.' Opp'n, ECF No. 20-1 at 50 (quoting AR 17741). Defendants state that "[t]he

economic impacts to fishing vessels and benefits resulting from a future . . . program would be evaluated in the amendment to establish that . . . program." *Id.* (quoting AR 17741).

The Court agrees with Defendants. "The 'rule of reason' requires that consideration be given to practical limitations on the agency's analysis, such as the information available at the time." *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 61 (D.D.C. 2009) (citing *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 736 (D.C. Cir. 2000)). Because the omnibus measures do not require the development of industry-funded monitoring programs in all FMPs but rather set up a process to be used if such programs are developed in the future, Defendants did not know the location of any future monitoring program or the future program's specific goals at the time of the EA's preparation. Furthermore, "[t]hat [D]efendants may continue to assess impacts as more information becomes available does not indicate that defendants failed to take a 'hard look' at the environmental consequences of its proposed action." *Id.* at 62. Requiring Defendants to analyze future industry-funded monitoring programs without knowing where the programs will be implemented would be unreasonable and beyond NEPA's mandate. *See id.; see also WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 66-67 (D.D.C. 2019) (finding that defendant agency did not violate NEPA when the agency "could not reasonably foresee the

63

projects to be undertaken on specific leased parcels, nor could

it evaluate the impacts of those projects on a parcel-by-parcel

basis"). For the same reasons the Court finds that Defendants

did not improperly segment the Omnibus Amendment. *See Jackson

Cnty.*, 589 F.3d at 1291 (finding it reasonable that FERC treated

two projects separately when, among other thing, the projects

were geographically distinct and triggered separate agency

approval decisions).

## b. Defendants Adequately Considered Alternatives and Potential Mitigation Measures

Plaintiffs next argue that Defendants violated NEPA because

they did not adequately address potential mitigation measures or

alternatives to the Omnibus Amendment. Pls.' Mot., ECF No. 18-1

at 49. The Court disagrees.

An EA "must include a 'brief discussion[]' of reasonable

alternatives to the proposed action." *Myersville*, 783 F.3d at

1323 (citation omitted). "An alternative is reasonable if it is

objectively feasible as well as reasonable in light of the

agency's objectives." *Id.* (alterations and quotation marks

omitted) (quoting *Theodore Roosevelt Conservation P'ship*, 661

F.3d at 72). An agency's specification of the range of

reasonable alternatives is entitled to deference. *Citizens

Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir.

1991). Furthermore, an agency's consideration of alternatives in

an EA "need not be as rigorous as the consideration of alternatives in an EIS." *Myersville*, 783 F.3d at 1323. "In assessing whether an agency has shown that a project's environmental impacts are adequately addressed by mitigation measures, a court must ask . . . whether the agency discussed the mitigation measures 'in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *Food & Water Watch v. U.S. Dep't of Agric.*, 451 F. Supp. 3d 11, 37 (D.D.C. 2020) (quoting *Indian River Cnty., Fla. V. U.S. Dep't of Transp.*, 945 F.3d 515, 522 (D.C. Cir. 2019)). "NEPA does not, however, 'require agencies to discuss any particular mitigation plans that they might put in place.'" *Id.* (quoting *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503).

First, regarding consideration of alternatives, the Court finds that Defendants have complied with NEPA's requirements. The EA included a brief discussion of seven alternatives to the omnibus measures, including an option preserving the status quo, "that would modify all the FMPs managed by the Council to allow standardized development of future FMP-specific industry-funded monitoring programs." AR 17046-47. The EA also included a discussion of multiple alternatives regarding increasing monitoring in the Atlantic herring fishery specifically, including a "no additional coverage" alternative, electric monitoring options, and portside sampling options. *See* AR 17069-

65

101. Plaintiffs do not explain how the EA's discussion of these alternatives is inadequate, nor do they argue that there were any alternatives that Defendants improperly excluded from consideration. To the extent that Plaintiffs suggest that "at-sea monitoring under the Omnibus Amendment in the herring fishery is discretionary," "unnecessary to advance conservation goals," and "*less* efficient than shoreside alternatives," Pls.' Opp'n, ECF No. 22 at 34-35; "NEPA does not compel a particular result," *Myersville*, 783 F.3d at 1324. "Even if an agency has conceded that an alternative is environmentally superior, it nevertheless may be entitled under the circumstances not to choose that alternative." *Id.*; *see also Robertson*, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."). Thus, in view of the cursory nature of Plaintiffs' argument, the Court finds that Defendants' discussion of alternatives is sufficient to meet the NEPA obligations. *Cf. Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 205 (1st Cir. 1999) (noting arguments raised "in a perfunctory manner, unaccompanied by some effort at developed argumentation" are waived when they "do not attempt to explain the manner in which the environment will be significantly affected").

66

Second, regarding mitigation measures, the Court finds that Defendants' EA satisfies the relevant standard. Plaintiffs contend that although the EA contains information regarding the negative effects that industry-funded monitoring will have on businesses and communities, the EA "downplays" such impacts "by referring to the waiver of coverage for vessels that land less than 50 metric tons of herring per trip—a mitigation measure that applies to an especially small portion of the herring fleet . . . —and by vaguely referring to potential adjustments by the NEFMC in the next two years." Pls.' Mot., ECF No. 18-1 at 49 (citing AR 17250, 17327); *see also* Pls.' Reply, ECF No. 22 at 38 (arguing that "the exemption for vessels landing under 50 metric tons of herring will favor a sliver of the fleet and therefore impermissibly benefit a select number of fishing communities").

Again, Plaintiffs' argument regards economic interests, not environmental ones. *See Gunpowder Riverkeeper*, 807 F.3d at 274. Furthermore, Plaintiffs' challenge to the 50-metric-ton exemption is ultimately based on a disagreement with the substance of the exemption rather than on Defendants' compliance with NEPA's procedural requirements. It is well established that "[w]here NEPA analysis is required, its role is 'primarily information-forcing.'" *Mayo v. Reynolds*, 875 F.3d 11, 15-16 (D.C. Cir. 2017) (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017)). "As the Supreme Court has explained,

'[t]here is a fundamental distinction . . . between a
requirement that mitigation be discussed in sufficient detail to
ensure that environmental consequences have been fairly
evaluated, on the one hand, and a substantive requirement that a
complete mitigation plan be actually formulated and adopted, on
the other.'" *Id.* (quoting *Robertson*, 490 U.S. at 352). In other
words, "NEPA is 'not a suitable vehicle' for airing grievances
about the substantive policies adopted by an agency, as 'NEPA
was not intended to resolve fundamental policy disputes.'" *Id.*
(quoting *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir.
2015)).

     To the extent that Plaintiffs refer to environmental
impacts in arguing that the Council's plan to re-evaluate the
Atlantic herring monitoring program in two years is "vague,"
Pls.' Mot., ECF No. 18-1 at 49; the EA reflects that Defendants
were aware of the environmental impacts of the Omnibus Amendment
and its alternatives and the need to incorporate mitigation
efforts to reduce any negative impacts. *See, e.g.*, AR 17177-241.

     The omnibus measures were determined to have "no direct
impacts" on biological resources or the physical environment.
*Id.* at 17179. The industry-funded monitoring program in the
Atlantic herring fishery was determined to have a "negligible"
impact on the physical environment and an "indirect" impact on
biological resources because "they affect levels of monitoring

68

78

rather than harvest specifications or gear requirements." *Id.* at 17179, 17316; *see also id.* at 17326 ("The proposed action is not expected to cause significant environmental impacts because it establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior."). The EA then took into account "variations and contingencies in [the Atlantic herring] fishery by adapting coverage levels to available funding or logistics and allowing vessels to choose electronic monitoring and portside sampling coverage, if it is suitable for the fishery and depending on a vessel owner's preference." *Id.* at 17315. The EA explained that one of the "preferred" alternatives "would require the Council to revisit the preferred Herring Alternatives two years after implementation and evaluate whether changes to management measures are necessary." *Id.* "This requirement to evaluate the impacts of increased monitoring in the herring fishery takes into account and allows for variations and contingencies in the fishery, fishery resources, and catches." *Id.* Given that the Omnibus Amendment's measures may "increase monitoring and that may improve management of the fishery and provide a better opportunity for achieving optimum yield," resulting in indirect benefits for the environment, *id.* at 17312; Plaintiffs have failed to show that the two-year re-examination provision is an inadequate mitigant under NEPA.

Finally, Plaintiffs contend that Defendants have used the
"uncertainty of future management efforts," particularly the
two-year re-examination provision, "as a shield to avoid fuller
environmental impact analysis." Pls.' Reply, ECF No. 22 at 38
(quotation marks omitted). This argument is without merit. As
explained above, the EA includes a thorough description of
potential environmental impacts, and Plaintiffs fail to point to
any specific deficiencies in Defendants' discussion of
environmental impacts or mitigation measures.

Accordingly, the Court finds that, even if the Court found
that NEPA was applicable to Plaintiffs' claims, the EA's
discussion of environmental impacts and mitigation measures
complies with NEPA's mandate.

### c. Defendants Did Not Predetermine the Outcome

Plaintiffs next argue that "Defendants pre-judged the
outcome of the EA in favor of the NEFMC's preferred
alternatives." Pls.' Mot., ECF No. 18-1 at 49. According to
Plaintiffs, "[n]othing in the administrative record suggests
that NEFMC and Defendants seriously considered preserving the
status quo." *Id.* at 50. As evidence, Plaintiffs point to
sections of the administrative record in which Defendants state
that a cost-benefit analysis could not be "completed" before the
Council selected its preferred alternatives, and that the
Omnibus Amendment's purpose was to "establish[] a clear

70

delineation of costs for monitoring between the industry and NMFS for all FMPs." *Id.*; Pls.' Reply, ECF No. 22 at 39. Plaintiffs also assert that Defendants received "overwhelmingly negative feedback from stakeholders and regulated parties," which they argue would cause a "reasonable regulator" to "think twice." Pls.' Mot., ECF No. 18-1 at 50; *see also* Pls.' Reply, ECF No. 22 at 39.

The standard for demonstrating predetermination is high. *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010); *Stand Up for Calif.! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 304 (D.D.C. 2016). "[P]redetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis." *Forest Guardians*, 611 F.3d at 714. Indeed, "NEPA does not require agency officials to be 'subjectively impartial,'" *id.* at 712 (quoting *Env't Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 470 F.2d 289, 295 (8th Cir. 1972)); and "[b]ias towards a preferred outcome does not violate NEPA so long as it does not prevent full and frank consideration of environmental concerns," *Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191, 205–06 (D.D.C. 2015). Thus, in determining what is an "irreversible and irretrievable"

71

commitment, courts in this Circuit have looked "to the practical effects of [an] agency's conduct rather than whether the conduct suggests subjective agency bias in favor of the project." *Id.* at 207.

Defendants' actions do not rise to the level of predetermination. Regardless of whether Defendants had a bias toward implementing some type of increased monitoring program in the region, the extensive administrative record demonstrates that any preferred outcome did not "prevent full and frank consideration of environmental concerns." *Id.* at 205-06. Furthermore, while Plaintiffs note that Defendants received negative feedback during the comment periods for the Omnibus Amendment and its implementing regulations, Plaintiffs do not contend that Defendants ignored these comments or provided insufficient responses. *See* Pls.' Mot., ECF No. 18-1 at 49-50. And as Defendants point out, Defendants likewise received positive feedback advocating for greater monitoring coverage than the alternative that was selected. Defs.' Opp'n, ECF No. 20-1 at 54 (citing AR 17668-71, 17742). Put simply, an agency "may work toward a solution, even its preferred one," *Stand Up for Calif.!*, 410 F. Supp. 3d at 61; and here, Defendants did not "irreversibly and irretrievably" commit itself to the measures within the amendment prior to conducting its environmental analysis, *see Wyo. Outdoor Council v. U.S. Forest Serv.*, 165

72

82

F.3d 43, 49 (D.C. Cir. 1999) (explaining that issuing leases

such that agency no longer retains "the authority to preclude

all surface disturbing activities" constitutes an irretrievable

commitment of resources (quoting *Sierra Club v. Peterson*, 717

F.2d 1409, 1415 (D.C. Cir. 1983)); *Flaherty v. Bryson*, 850 F.

Supp. 2d 38, 71 (D.D.C. 2012) ("An administrator's statement of

an opinion, based upon review of the action's subject matter and

relevant regulatory guidance, suggests conscious thought rather

than prejudgment, and does not lead to the conclusion that the

administrator would not change his or her mind upon review of

the full EA.").

Accordingly, the Court concludes that Defendants did not

predetermine the outcome of the EA.

### d. Defendants Were Not Required to Supplement the EA

Plaintiffs also argue that Defendants violated NEPA because

they did not supplement the EA following herring catch

reductions in 2019 and 2020, which Plaintiffs contend "will

significantly impact the economics of the fishery and the

viability of the fleet under an industry-funded monitoring

regime." Pls.' Reply, ECF No. 22 at 39. Plaintiffs argue that

the EA "contains no data" supporting Defendants' finding that

"increases in total revenue from other fisheries" would

"mitigate the negative impacts of reductions to the herring ACL

73

83

and associated revenue." Pls.' Mot., ECF No. 18-1 at 51; *see also* Pls.' Reply, ECF No. 22 at 42.

Under NEPA, an agency must prepare a supplement to an EA when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii). However, as the Supreme Court has explained, under the "rule of reason," an agency need not supplement an EA "every time new information comes to light" after the EA is finalized. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). Rather, "if the new information shows that the remaining action will affect the quality of the environment 'in a significant manner or to a significant extent not already considered,'" a supplemental must be prepared. *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (quoting *Marsh*, 490 U.S. at 374). In addition, the D.C. Circuit has instructed that a supplement "is only required where new information 'provides a *seriously* different picture of the environmental landscape.'" *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002); *see also Pub. Emps. for Env't Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 29–30 (D.D.C. 2011) ("[W]hether a change is 'substantial' so as to warrant [a supplement] is determined not by the modification in the abstract, but rather

74

by the significance of the environmental effects of the changes.").

Here, Defendants reasonably concluded that the herring catch reductions did not "significantly transform the nature of the environmental issues raised in the [EA]." *Nat'l Comm. for the New River*, 373 F.3d at 1330-31 (finding that new information did not "seriously change[] the environmental landscape" where the agency's process for evaluating the environmental impact was "comprehensive"). First, Plaintiffs do not point to any evidence that herring catch reductions will have significant *environmental* impacts on industry-funded monitoring programs. *See* Pls.' Mot., ECF No. 18-1 at 51; Pls.' Reply, ECF No. 22 at 39-42. Plaintiffs refer solely to the "economics of the fishery and the viability of the fleet" and do not attempt to show how the fleet's revenue stream is "interrelated" with "natural or physical environmental effects." 40 C.F.R. § 1508.1(m) (defining "human environment"); *cf. Blue Ridge*, 716 F.3d at 198 (rejecting argument that new environmental reports were required because the argument "relie[d] on Petitioners' elision of 'safety significance' with 'environmental significance'"). Because "NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment," *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983); Defendants did not run afoul

75

of NEPA's requirements in deciding a supplemental EA was not needed, *see Stand Up for Calif.!*, 410 F. Supp. 3d at 55-56 (finding that alleged impacts to the public safety did not fall within the Court's NEPA review because it was not an "environmental concern").

Second, the record indicates that Defendants undertook a careful evaluation of the significance of the herring catch reductions prior to determining whether a supplement was needed. *See Marsh*, 490 U.S. at 378 (instructing that when reviewing an agency's decision not to supplement an environmental impact statement, courts must be satisfied that "the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information"). Defendants explained that "[t]he EA describes the economic impacts of herring measures on fishery-related businesses and human communities as negative," but that "[t]he economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries." AR 17737. Defendants estimated that "at-sea monitoring coverage associated with the 50-percent coverage target has the potential to reduce annual [returns-to-owner] for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for

76

midwater trawl access to Groundfish Closed Areas," and noted that "[e]lectronic monitoring and portside sampling may be a more cost effective way for herring vessels to satisfy industry-funded monitoring requirements." *Id.*

Defendants then compared herring revenue generated by Category A and B herring vessels from 2014 to 2018 to assess the economic impact of a reduction in herring catch. *Id.* Based on this assessment, Defendants determined that "[e]ven though the 2018 [annual catch limit ("ACL")] was reduced by 52 percent (54,188 mt) from the 2014 ACL, the impact on 2018 revenue was not proportional to the reduction in ACL and differed by gear type." *Id.* Defendants explained that the change in revenue between 2014 and 2018 was affected by several factors, "such as the availability of herring relative to the demand and vessel participation in other fisheries." *Id.* at 17738. Defendants also considered how the level of fishing effort, SBRM coverage, and certain mitigation measures would affect the economic impact of industry-funded monitoring. *Id.* at 17738-39. After analyzing these factors, Defendants determined that reduced herring catch and its impacts fell within the initial EA's scope and that a supplement was unnecessary because: "(1) the action is identical to the proposed action analyzed in the EA and (2) no new information or circumstances relevant to environmental concerns or impacts of the action are significantly different from when

77

the EA's finding of no significant impact was signed on December 17, 2018." *Id.* at 17739.

As the D.C. Circuit has explained, "[t]he determination as to whether information is either new or significant 'requires a high level of technical expertise'; thus, [courts] 'defer to the informed discretion of the [agency].'" *Blue Ridge*, 716 F.3d at 196-97 (quoting *Marsh*, 490 U.S. at 377); *Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) ("[C]ourts are not authorized to second-guess agency rulemaking decisions . . . ."). In view of Defendants' considered analysis, Plaintiffs simply have not demonstrated how Defendants' conclusion was arbitrary or capricious. Accordingly, the Court does not find that the Defendants' conclusion was so deficient as to suffer from "want of reasoned decisionmaking." *Advocates for Hwy. & Auto Safety*, 429 F.3d at 1150.

## H. The Omnibus Amendment Does Not Violate the Regulatory Flexibility Act

Plaintiffs next argue that Defendants failed to meet their obligations under the Regulatory Flexibility Act ("RFA") when promulgating the Omnibus Amendment.

Under the RFA, agencies must "consider the effect that their regulation will have on small entities, analyze effective alternatives that may minimize a regulation's impact on such

78

88

entities, and make their analyses available for public comment."
*Nat'l Women, Infants, & Children Grocers Ass'n v. Food &*
*Nutrition Serv.*, 416 F. Supp. 2d 92, 99 (D.D.C. 2006). The RFA
requires agencies issuing regulations likely to have an "impact"
on "small entities" to prepare an initial regulatory flexibility
analysis ("IRFA") describing the effect of the proposed rule on
small businesses and discussing alternatives that might minimize
adverse economic consequences upon publishing a notice of
proposed rulemaking. *See* 5 U.S.C. § 603. Then, when promulgating
the final rule, the agency must prepare a final regulatory
flexibility analysis ("FRFA"), to be made available to the
public and published in the Federal Register. *See id.* § 604.

"Although the RFA compels an agency to make substantive
determinations, a court cannot find an agency violated the RFA
merely because it disagrees with those determinations." *Alfa*
*Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 67 (D.D.C. 2017). The
D.C. Circuit has explained that the RFA is "[p]urely
procedural." *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C.
Cir. 2001) (stating that "RFA section 604 requires nothing more
than that the agency file a FRFA demonstrating a 'reasonable,
good-faith effort to carry out [RFA's] mandate.'" (quoting
*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir.
2000)). A court does not "evaluate whether the agency got the
required analysis right, but instead examines whether the agency

79

has followed the procedural steps laid out in the statute. What is required of the agency is not perfection, but rather a reasonable, good-faith effort to take those steps and therefore satisfy the statute's mandate." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 95. "Thus, in assessing the adequacy of an FRFA, courts look to see whether the agency made a reasonable attempt to address all five required elements in its FRFA, and do not measure the FRFA under a standard of 'mathematical exactitude.'" *Alfa Int'l Seafood*, 264 F. Supp. 3d at 67 (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997)).

Here, Plaintiffs argue that the NEFMC and Defendants failed to comply with the RFA because the IRFA and the FRFA contained "conclusory findings" regarding the economic effects of the Omnibus Amendment that are "facially unreasonable." Pls. Mot., ECF No. 18-1 at 52. Specifically, Plaintiffs contend that Defendants failed to consider: (1) "economic impacts associated with the omnibus alternatives," *id.* (citing AR 17339); (2) "the full set of costs" that the industry-funded monitoring alternatives would "impose on regulated entities," including "the danger of overlapping monitoring requirements, the effect of significant quota cuts . . . , and the actual feasibility of alternatives," *id.* (citing AR 17341-46); and (3) an "explanation for their conclusion that certain businesses 'were more likely

80

to exit the fishery if the cost of monitoring [were] perceived as too expensive,'" *id.* at 52-53 (citing AR 17342).

As an initial matter, the Court notes that Plaintiffs' arguments appear to be a "non-starter" because Plaintiffs' motion only cites to alleged compliance failures within the IRFA and do not point to any alleged deficiencies within the FRFA. *Alfa Int'l Seafood*, 264 F. Supp. 3d at 67. Pursuant to section 611(a) of the RFA, the adequacy of an agency's IRFA is not reviewable. *See* 5 U.S.C. § 611(a) ("[A] small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with chapter 7."). Thus, the Court lacks jurisdiction to consider Plaintiffs' challenge to Defendants' IRFA. *See Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000).

Even if the Court construed Plaintiffs' three arguments as "attack[ing] the overall adequacy of Defendants' economic impact analysis," Pls.' Reply, ECF No. 22 at 42; the arguments would still fail. First, while Plaintiffs contend that Defendants did not consider the economic impacts of the omnibus measures, the IRFA and the FRFA explain that those measures are "administrative and have no direct economic impacts." AR 17339, 17744. Indeed, the measures explicitly set out the

administrative process to develop and maintain future industry-

funded monitoring programs in other New England FMPs.

Plaintiffs' contention that "Defendants and the NEFMC conceded

its omnibus measures will have 'direct negative economic impacts

to fishing vessels," Pls.' Reply, ECF No. 22 at 43, is

misleading. In making that statement, Defendants were referring

to potential future programs and explained that "any direct

negative economic impacts to fishing vessels resulting from a

future [industry-funded monitoring] program would be evaluated

in the amendment to establish that [industry-funded monitoring]

program." AR 17179; *cf. Associated Fishers of Me.*, 127 F.3d 104

at 110 n.5 (finding that, because "the Secretary considered the

Coast Guard's estimate to be budgetary in nature and not rooted

in cost increases which were likely to accompany the

implementation of Amendment 7," "[t]he Secretary must be

accorded some latitude to make such judgment calls").

Defendants' conclusion is reasonable.

Second, regarding Plaintiffs' argument that Defendants did

not consider the "full set of costs" that would be imposed on

regulated entities, Pls.' Mot., ECF No. 18-1 at 52; the record

demonstrates that Defendants underwent a reasoned analysis of

the economic impacts that vessels would face upon the

implementation of the Omnibus Amendment and that Defendants had

taken steps to minimize economic impacts on affected entities.

82

*See* AR 17341-46. While it is possible that the agency could have included further detail or more study, the record nonetheless demonstrates that Defendants engaged in a "reasonable, good faith effort" to carry out the RFA's mandate. *U.S. Cellular Corp.*, 254 F.3d at 89; *see also Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 471 (1st Cir. 2003) (noting that the RFA does not include a requirement as to the amount of detail with which an agency must address specific comments).

Third, Plaintiffs argue that Defendants failed to explain their conclusion that certain businesses "were more likely to exit the fishery if the cost of monitoring [were] perceived as too expensive." Pls.' Mot., ECF No. 18-1 at 52-53 (citing AR 17342). "[W]here the agency has addressed a range of comments and considered a set of alternatives to the proposal adopted, the burden is upon the critic to show why a brief response on one set of comments or the failure to analyze one element as a separate alternative condemns the effort." *Little Bay Lobster Co.*, 352 F.3d at 471. Plaintiffs have failed to make such a showing here.

Additionally, *Southern Offshore Fishing Association v. Daley*, 995 F. Supp. 1411 (M.D. Fla. 1998), upon which Plaintiffs rely, is distinguishable. In that case, the United States District Court for the Middle District of Florida found that an FRFA prepared by NMFS did not comply with the requirements of

the RFA. Unlike in *Southern Offshore Fishing*, however,

Defendants here prepared both an IRFA and a FRFA. *See id.* at

1436 ("NMFS could not possibly have complied with § 604 by

summarizing and considering comments on an IRFA that NMFS never

prepared."); AR 17744 ("NMFS prepared a final regulatory

flexibility analysis (FRFA) in support of this action. The FRFA

incorporates the initial RFA, a summary of the significant

issues raised by the public comments in response to the initial

RFA, NMFS responses to those comments, and a summary of the

analyses completed in support of this action."). And unlike in

*Southern Offshore Fishing*, Plaintiffs here have not "point[ed]

to plentiful record evidence undermining NMFS's certifications."

*Id.* Instead, Plaintiffs' motion merely points to three pages in

the IRFA. "Such a meager citation to the record simply cannot

upend the deference due to the Department under the RFA." *Alfa*

*Int'l Seafood*, 264 F. Supp. 3d at 68.

    Accordingly, the Court finds that Defendants fulfilled the

requirements of the RFA in promulgating the Omnibus Amendment.

## I. The Approval and Finalization of the Omnibus Amendment Was Procedurally Proper

    Finally, Plaintiffs argue that the process of approving and

finalizing the Omnibus Amendment was procedurally irregular and

raises "procedural due process concerns." Pls.' Mot., ECF No.

18-1 at 54. However, a review of the MSA's provisions governing

84

the Secretary's review of FMPs, amendments, and proposed regulations demonstrates that Defendants followed the proper procedure.

Under the MSA's regulatory framework, once the Council transmits an FMP or amendment to the Secretary, the Secretary must do two things: (1) "immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law"; and (2) "immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published." 16 U.S.C. § 1854(a)(1). Once the comment period has closed, the Secretary then has 30 days to approve, disapprove, or partially approve an FMP or amendment. *Id.* § 1854(a)(3). "If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved." *Id.*

Proposed regulations implementing an FMP or amendment that the Council deems "necessary or appropriate" must be submitted to the Secretary "simultaneously" with the FMP or amendment. *Id.* § 1853(c). Once the Secretary receives the proposed regulations,

85

"the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the [FMP], plan amendment, [the MSA] and other applicable law." *Id.* § 1854(b)(1). The Secretary must make a determination within 15 days of initiating such evaluation, and, if the Secretary approves the proposed regulations, she must publish the regulations for comment in the Federal Register, "with such technical changes as may be necessary for clarity and an explanation of those changes." *Id.* § 1854(b)(1)(A). There must be a public comment period of between 15 to 60 days, and, after the public comment period has expired, the Secretary must then promulgate the final regulations within 30 days, consulting with the Council on any revisions and explaining the changes in the Federal Register. *Id.* § 1854(b)(3).

Here, it is "undisputed" that Defendants "followed the statutorily prescribed timelines for approval of an FMP amendment and implementing regulations." *See* Pls.' Reply, ECF No. 22 at 44. Instead, Plaintiffs argue that "[t]he irregularities and due process concerns arise from Defendants presuming the legality of the Omnibus Amendment and proposing implementing regulations *before* any final approval decision for the underlying FMP amendment." *Id.* at 44-45. However, Plaintiffs' argument is belied by the text of the statute. The MSA clearly contemplates such a situation given its mandate that

86

proposed regulations be submitted "simultaneously with the plan or amendment under section 1854 of this title," 16 U.S.C. § 1853(c); and the agency also confirms that this is its usual practice, *see* AR 17741 ("It is our practice to publish an NOA and proposed rule concurrently."). Furthermore, Defendants appropriately set a 60-day comment period for the FMP amendment and a 45-day comment period for the proposed regulations, with the public comments for both overlapping for 13 days. *See id.* Both the notice of the amendment and the proposed regulations included a statement explaining that any public comments received on the amendment or the proposed rule during the amendment's comment period would be considered in the decision on the amendment. *Id.* The public thus had fair notice and a meaningful opportunity to participate in the process. *See, e.g.*, *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982).

Finally, Plaintiffs' description of an inappropriate "secret approval" of the Omnibus Amendment "in a non-public letter [to the Council] that [NOAA] never officially disseminated," Pls.' Mot., ECF No. 18-1 at 54; lacks any basis. Rather, NOAA acted as the MSA requires: upon approval of an FMP or amendment, there must be "written notice to the Council" of the Secretary's decision. 16 U.S.C. § 1854(a)(3). No further publication is statutorily required.

87

**IV. Conclusion**

For the aforementioned reasons, the Court **DENIES**

Plaintiffs' Motion for Summary Judgment, **GRANTS** Defendants'

Cross-Motion for Summary Judgment, and **GRANTS** Defendants' Motion

to Exclude. An appropriate Order accompanies this Memorandum

Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**June 15, 2021**

88

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| Loper Bright Enterprises, Inc., *et al.*, |
| Plaintiffs, |
| v. |
| GINA RAIMONDO, in her official capacity, Secretary, U.S. Department of Commerce, *et al.*, |
| Defendants. |

Civ. Action No. 20-466 (EGS)

#### ORDER

For the reasons stated in the accompanying Memorandum

Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF

No. 18, is **DENIED**; and it is further

**ORDERED** that Defendants' Cross-Motion for Summary Judgment,

ECF No. 20, is **GRANTED**; and it is further

**ORDERED** that Defendants' Motion to Exclude Plaintiffs'

Extra-Record Declaration, ECF No. 24, is **GRANTED**.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
          **United States District Judge**
          **June 15, 2021**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Loper Bright Enterprises, Inc.,
*et al.*,

                    Plaintiffs,

v.                                  Civ. Action No. 20-466 (EGS)

GINA RAIMONDO, in her official
capacity, Secretary, U.S.
Department of Commerce, *et
al.*,

                    Defendants.

**FINAL JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated in the accompanying Memorandum Opinion and Order, it is hereby

**ORDERED** that the Clerk shall enter final judgment in favor of Defendants Gina Raimondo, Secretary of the U.S. Department of Commerce; the U.S. Department of Commerce; Benjamin Friedman, Deputy Under Secretary for Operations, performing the duties of Under Secretary of Commerce for Oceans and Atmosphere and National Oceanic and Atmospheric Administration ("NOAA") Administrator; the NOAA; Chris Oliver, Assistant Administrator for NOAA Fisheries; and the National Marine Fisheries Service; and against Plaintiffs Loper Bright Enterprises, Inc.; H&L Axelsson, Inc.; Cape Trawlers, Inc.; Scombrus One LLC; Golden Nugget LLC; Lund Marr Trawlers LLC; Mount Vernon LLC; and Nancy

Elizabeth LLC. This is a final appealable Order. *See* Fed. R.

App. P. 4(a).

    **SO ORDERED.**

**Signed:    Emmet G. Sullivan**
            **United States District Judge**
            **June 23, 2021**

2

# UNITED STATES DISTRICT COURT

for the ·

District of Columbia

**FILED**

**JUN 2 4 2021**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| Loper Bright Enterprises, Inc., et al., | ) |
| *Plaintiff* | ) |
| v. | ) |
| Gina Raimondo, et al | ) |
| *Defendant* | ) |

Civil Action No.   20-466 (EGS)

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus postjudgment interest at the rate of _____ %, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____

☑ other:   Ordered that the Clerk shall enter final judgment in favor of Defendants against Plaintiffs.

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision
was reached.

☑ decided by Judge   EMMET G. SULLIVAN _____ on a motion for
Summary Judgment  by Plaintiffs

Date: _____ 06/24/2021 _____

*ANGELA D. CAESAR, CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*