**ORAL ARGUMENT NOT YET SCHEDULED**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————

**No. 21-5166**

—————————————

**Loper Bright Enterprises, Inc., *et al.*
*Plaintiffs-Appellants,***

**v.**

**Gina Raimondo, in her official capacity
as Secretary of Commerce, *et al.*
*Defendants-Appellees.***

—————————————

On Appeal from the United States District Court
for the District of Columbia
Civil Action No. 20-0466 (Hon. Emmet G. Sullivan)

—————————————

**OPENING BRIEF OF APPELLANTS**

—————————————

RYAN P. MULVEY
ERIC R. BOLINDER
CAUSE OF ACTION INSTITUTE
1310 N. Courthouse Rd., Ste. 700
Arlington, VA 22201
Telephone: (571) 444-4182

*Counsel for Plaintiffs-Appellants*

November 16, 2021

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellants state the following:

## I.    Parties and *Amici*

Loper Bright Enterprises, Inc.; H&L Axelsson, Inc.; Scombrus One LLC; and Lund Marr Trawlers LLC are the Appellants in this case and were among the Plaintiffs in the proceedings below.  Several additional parties were plaintiffs in the district court but were dropped on a consent motion as misjoined under Federal Rule of Civil Procedure 21.  The misjoined parties were Cape Trawlers, Inc.; Golden Nugget LLC; Mount Vernon LLC; and Nancy Elizabeth LLC.

Gina Raimondo, in her official capacity as Secretary of Commerce; the Department of Commerce; Richard Spinrad, in his official capacity as Administrator of the National Oceanic and Atmospheric Administration; the National Oceanic and Atmospheric Administration; Chris Oliver, in his official capacity as Assistant Administrator for NOAA Fisheries; and the National Marine Fisheries Service are the Appellees in this case and were the Defendants in the proceedings below.  At various times, other individuals serving in an official capacity were defendants but have been substituted for the current officeholders.  *See* Fed. R. Civ. P. 25(d); *cf.*

Fed. R. App. P. 43(c).  On the Complaint, Wilbur L. Ross, Jr. is named as Secretary of Commerce and Neil Jacobs as Acting Administrator of the National Oceanic and Atmospheric Administration.

There were no *amici curiae* in the district court, and there are no *amici* before this Court.  There are no intervenors.

## II.    Ruling Under Review

The ruling under review is the Order and Memorandum Opinion by Judge Emmet Sullivan in the United States District Court for the District of Columbia, dated June 15, 2021, which denied Appellants' motion for summary judgment and granted Appellees' cross-motion for summary judgment.  The district court entered final judgment on June 23, 2021.

The June 15, 2021 Memorandum Opinion is published in electronic database format as *Loper Bright Enterprises, Inc. v. Raimondo*, No. 20-0466, 2021 WL 2440511 (D.D.C. June 15, 2021), and *Loper Bright Enterprises, Inc. v. Raimondo*, No. 20-0466, 2021 U.S. Dist. LEXIS 112020 (D.D.C. June 15, 2021).

## III.    Related Cases

This case has not previously been before this Court.  Appellants are aware of a pending related case in the United States Court of Appeals for

the First Circuit.  That case involves a similar challenge to the legality of the New England Industry-Funded Monitoring Omnibus Amendment. *See Relentless, Inc., v. Dep't of Commerce*, No. 21-1886 (1st Cir. appeal docketed Nov. 5, 2021).

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Appellants are New Jersey corporations engaged in commercial fishing operations. They are subject to the regulatory requirements under legal challenge in this case. Appellants are neither parent companies nor subsidiaries or affiliates of any other entities. Appellants have not issued shares or debt securities to the public.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................vii

GLOSSARY................................................................................xiv

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ............................................................2

PERTINENT STATUTORY PROVISIONS ..............................................4

STATEMENT OF THE CASE ..............................................................5

   I.    The Magnuson-Stevens Act .......................................................5

   II.   Initial Development of the Omnibus Amendment .......................8

   III.  Finalization and Promulgation of the Omnibus Amendment ....11

   IV.  Proceedings in the District Court..............................................14

SUMMARY OF ARGUMENT ...........................................................17

STANDARD OF REVIEW .................................................................22

ARGUMENT ................................................................................23

   I.    The Magnuson-Stevens Act does not authorize the
       government to require industry funding of at-sea monitors.......23

      A.   The Magnuson-Stevens Act contains specific grants of
           authority for industry funding, but not for this fishery.....25

      B.   These three specific grants of authority govern the
           general, and the general does not swallow them back.......26

           1.   The Court should draw a negative inference
                 from Congress's specific grants of authority. ............30

           2.   Other district court judges in this Circuit have
                 applied the analysis the fishermen ask for here.......33

      C.   The penalty provisions of the Magnuson-Stevens Act
           do not meaningful speak to Congress's authorization
           of industry-funded monitoring. ...........................................34

D.    The district court also wrongly distinguished the word "fee" from the Omnibus Amendment's industry-funding provisions. ................................................ 37

E.    Without statutory authority, the government's enactment of the Omnibus Amendment is unlawful and contrary to binding Circuit precedent. ........................ 41

F.    If relevant, the legislative history supports a narrow reading of the Magnuson-Stevens Act. .............. 47

II.    The government should not get *Chevron* deference. ................... 49

III.    The government's argument fail under *Chevron* Step Two. ........ 53

A.    Whether under Chevron Step Two or Step One, the government lacks statutory authority to require industry-funded monitoring. ................................................ 54

B.    But even if this Court does find some semblance of authority, the Omnibus Amendment and its implementing rule are arbitrary and capricious. .............. 55

IV.    The Magnuson-Stevens Act could not have authorized the government to overlap the approval processes for the Omnibus Amendment and its implementing regulations ........... 59

CONCLUSION .......................................................................... 67

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Alabama Ass'n of Realtors v.*
  *Department of Health & Human Services,*
  141 S. Ct. 2485 (2021).......................................................20, 45, 46, 47

*American Bar Ass'n v. Federal Trade Commission,*
  430 F.3d 457 (D.C. Cir. 2005).............................................................52

\* *American Petroleum Institute v.*
  *Environmental Protection Agency,*
  52 F.3d 1113 (D.C. Cir. 1995)................................................29, 30, 51

*Anglers Conservation Network v. Pritzker,*
  139 F. Supp. 3d 102 (D.D.C. 2015).....................................................31

*Bais Yaakov of Spring Valley v.*
  *Federal Communications Commission,*
  852 F.3d 1078 (D.C. Cir. 2017).....................................................31, 32

*Center for Biological Diversity v. Department of the Interior,*
  563 F.3d 466 (D.C. Cir. 2009).............................................................54

*Center for Biological Diversity v. Everson,*
  435 F. Supp. 3d 69 (D.D.C. 2020).......................................................54

*Groundfish Forum v. Ross,*
  375 F. Supp. 3d 72 (D.D.C. 2019).......................................................52

*Chevron, U.S.A., Inc. v.*
  *Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984).............................................................................23

\* Authorities on which Appellants chiefly rely are marked
  with an asterisk.

vii

*Connecticut Light & Power Co. v.*
  *Nuclear Regulatory Commission*,
  673 F.2d 525 (D.C. Cir. 1982) ............................................................. 65

*Duncan v. Walker*,
  533 U.S. 167 (2001) ............................................................. 30

*EchoStar Satellite LLC v.*
  *Federal Communications Commission*,
  704 F.3d 992 (D.C. Cir. 2013) ............................................................. 30

*Epic Systems Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ............................................................. 51

*Ethyl Corp. v. Environmental Protection Agency*,
  51 F.3d 1053 (D.C. Cir. 1995) ............................................................. 52

*Food & Drug Administration v.*
  *Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................. 41

* *Genus Medical Technologies LLC v.*
  *Food & Drug Administration*,
  994 F.3d 631 (D.C. Cir. 2021) ............................................................. 27

*Glob. Tel*Link v. Federal Communications Commission*,
  866 F.3d 397 (D.C. Cir. 2017) ............................................................. 54

*Goethel v. Department of Commerce*,
  854 F.3d 106 (1st Cir. 2017) ............................................................. 36

*Goethel v. Pritzker*,
  No. 15-497, 2016 WL 4076831 (D.N.H. July 29, 2016) ............... 35, 36

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ............................................................. 42

*Graham County & Water Conservation District v.*
  *U.S. ex rel. Wilson*,
  559 U.S. 280 (2010) ............................................................. 25

*Grand Canyon Air Tour Coalition v.*
*Federal Aviation Administration,*
154 F.3d 455 (D.C. Cir. 1998) ............................................................. 66

*Gross v. FBL Financial Services, Inc.,*
557 U.S. 167 (2009) ............................................................................. 49

*Gulf Fishermen's Ass'n v. National Marine Fisheries Service,*
968 F.3d 454 (5th Cir. 2020) ............................................................... 53

*Hibbs v. Winn,*
542 U.S. 88 (2004) ............................................................................... 39

*King v. Burwell,*
576 U.S. 473 (2015) ............................................................................. 31

*Louisiana Public Service Commission v.*
*Federal Communications Commission,*
476 U.S. 355 (1986) ..................................................................... 24, 49

*Marx v. General Revenue Corp.,*
568 U.S. 371 (2013) ............................................................................. 32

*McLouth Steel Products Corp. v. Thomas,*
838 F.2d 1317 (D.C. Cir. 1988) .......................................................... 67

*Mendoza v. Perez,*
754 F.3d 1002 (D.C. Cir. 2014) .......................................................... 65

* *Michigan v. Environmental Protection Agency,*
576 U.S. 743 (2015) ....................................................... 19, 43, 56, 58

*Motion Picture Ass'n of America, Inc. v.*
*Federal Communications Commission,*
309 F.3d 796 (D.C. Cir. 2002) ............................................................ 49

*National Ass'n of Home Builders v. Defenders of Wildlife,*
551 U.S. 644 (2007) ............................................................................. 31

\* *New York Stock Exchange LLC v.*
  *Securities & Exchange Commission,*
  962 F.3d 541 (D.C. Cir. 2020) ............. 19, 43, 44, 45, 50, 52, 54, 55, 56

*PayPal, Inc. v. Consumer Finance Protection Bureau,*
  512 F. Supp. 3d 1 (D.D.C. 2020) ..................................................... 33, 34

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015) .............................................................................. 64

\* *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) ....................................................................... 27, 28

*Railway Labor Executives' Ass'n v.*
  *National Mediation Board,*
  29 F.3d 655 (D.C. Cir. 1994) ......................................................... 22, 30

*Relentless, Inc. v. Department of Commerce,*
  No. 20-108, 2021 WL 4256067 (D.R.I. Sept. 20, 2021) ........... 37, 38, 53

*SAS Institute, Inc. v. Iancu,*
  138 S. Ct. 1348 (2018) ........................................................................ 23

*Tao v. Freeh,*
  27 F.3d 635 (D.C. Cir. 1994) .............................................................. 22

*U.S. Telecom Ass'n v. Federal Commuications Commission,*
  359 F.3d 554 (D.C. Cir. 1994) ............................................................ 50

*Warger v. Shauers,*
  574 U.S. 40 (2014) .............................................................................. 48

*Whitman v. American Trucking Ass'ns,*
  531 U.S. 457 (2001) ............................................................................ 42

*Wisconsin Central Ltd. v. United States,*
  138 S. Ct. 2067 (2018) ........................................................................ 50

## Statutes

16 U.S.C. § 1801(a) ..................................................................................... 5

16 U.S.C. § 1801(b) ............................................................... 5

16 U.S.C. § 1801(b)(5) .......................................................... 5

16 U.S.C. § 1801(c) ............................................................... 5

16 U.S.C. § 1802(31) ............................................................ 7

16 U.S.C. § 1821(h)(3) ........................................................ 40

* 16 U.S.C. § 1821(h)(4) ............................. 26, 28, 34, 41

16 U.S.C. § 1821(h)(6)(C) ............................... 26, 39, 40

16 U.S.C. § 1851(a) ......................................................... 7, 56

16 U.S.C. § 1851(a)(7) ........................................................ 56

16 U.S.C. § 1851(a)(8) ........................................................ 57

16 U.S.C. § 1852(a)(A) .......................................................... 5

16 U.S.C. § 1852(a)(B) .......................................................... 5

16 U.S.C. § 1852(a)(C) .......................................................... 5

16 U.S.C. § 1852(a)(D) .......................................................... 5

16 U.S.C. § 1852(a)(E) .......................................................... 5

16 U.S.C. § 1852(a)(F) .......................................................... 5

16 U.S.C. § 1852(a)(G) .......................................................... 5

16 U.S.C. § 1852(a)(H) .......................................................... 5

16 U.S.C. § 1852(h) ............................................................... 5

16 U.S.C. § 1852(h)(1) .......................................................... 6

16 U.S.C. § 1853(a) ............................................................... 6

16 U.S.C. § 1853(a)(1) .......................................................... 6

16 U.S.C. § 1853(a)(2) ............................................................ 6

16 U.S.C. § 1853(a)(3) ............................................................ 6

16 U.S.C. § 1853(a)(4) ............................................................ 6

16 U.S.C. § 1853(a)(11) .......................................................... 6

16 U.S.C. § 1853(a)(14) ........................................................ 26

16 U.S.C. § 1853(a)(15) .......................................................... 6

16 U.S.C. § 1853(b) ................................................................. 6

16 U.S.C. § 1853(b)(1) ....................................................... 6, 47

16 U.S.C. § 1853(b)(2) ............................................................ 6

16 U.S.C. § 1853(b)(6) ............................................................ 6

16 U.S.C. § 1853(b)(8) ....................................................... 7, 41

16 U.S.C. § 1853(b)(14) ........................................................ 28

16 U.S.C. § 1853(c) ............................................................... 62

16 U.S.C. § 1853a ................................................................... 6

* 16 U.S.C. § 1853a(e)(2) ................................... 26, 28, 29, 34, 41

16 U.S.C. § 1854(a) ................................................................. 6

16 U.S.C. § 1854(a)(1)(A) .................................................. 7, 60

16 U.S.C. § 1854(a)(1)(B) .................................................. 7, 60

16 U.S.C. § 1854(a)(2) ........................................................... 60

16 U.S.C. § 1854(a)(3) ...................................................... 7, 60

16 U.S.C. § 1854(a)(5) ........................................................... 60

16 U.S.C. § 1854(b) ................................................................. 7

16 U.S.C. § 1854(b)(1)(A) .................................................................. 63

16 U.S.C. § 1854(b)(3) ........................................................................ 63

16 U.S.C. § 1854(c)(6) ........................................................................ 62

16 U.S.C. § 1854(c)(7) ........................................................................ 62

16 U.S.C. § 1854(d)(2)(B) ................................................................... 26

16 U.S.C. § 1855(f)(1) ......................................................................... 22

16 U.S.C. § 1858(g)(1)(D) ................................................................... 34

* 16 U.S.C. § 1862(a) ........................................................ 25, 28, 34, 41

16 U.S.C. § 1862(a)(1) ......................................................................... 28

16 U.S.C. § 1862(b)(2) ......................................................................... 39

Fishery Conservation Amendments of 1990,
  Pub. L. No. 101-627, 104 Stat. 4436 ........................................... 48, 49

## Legislative Materials

H.R. 39, 104th Cong. (1995) ............................................................... 48

H.R. 1554, 101st Cong. (1989) ............................................................ 48

H.R. 5018, 109th Cong. (2006) ............................................................ 48

H.R. Rep. No. 101-393 (1989) ............................................................. 49

## GLOSSARY

APA          Administrative Procedure Act

NOAA         National Oceanic and Atmospheric Administration

## JURISDICTIONAL STATEMENT

Appellants' claims in the district court arose under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the Magnuson-Stevens Fishery Conservation and Management Act. 16 U.S.C. § 1801 *et seq.* Their petition for judicial review was timely filed within the statutorily mandated thirty-day window following promulgation of regulations implementing the New England Industry-Funded Monitoring Omnibus Amendment. 16 U.S.C. § 1855(f)(1). The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 704 (APA), and 16 U.S.C. §§ 1861(d), 1855(f) (Magnuson-Stevens Act).

On June 15, 2021, Judge Emmet Sullivan issued an order granting summary judgment for Appellees and denying summary judgment for Appellants. A155 (Order); A156 (Memorandum Opinion). Judge Sullivan entered final judgment on June 23, 2021. A244. Appellants timely filed their notice of appeal on July 15, 2021, in compliance with Federal Rule of Appellate Procedure 4(a)(1)(B). A247. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     The Magnuson-Stevens Fishery Conservation and Management Act authorizes regional fishery management councils and the Secretary of Commerce to require commercial fishing vessels to carry observers on-board for the purposes of data collection, insofar as it is determined necessary for conservation and management of a fishery.  *See* 16 U.S.C. § 1853(b)(8).  The Act also permits the creation of other "necessary and appropriate" measures.  *Id.* § 1853(a)(1), (b)(14).  But it explicitly provides for industry-funded observers in only three limited instances—*id.* §§ 1821(h)(4), 1853a(e)(2), 1862(a)—and is silent about industry funding in other contexts.  Did the district court err by concluding Congress unambiguously vested regional councils and the Secretary with broad-ranging authority to impose industry-funded at-sea monitoring in any fishery or under any circumstance?

2.     Assuming the Act did not directly address the government's authority to impose industry-funded at-sea monitoring but was instead ambiguous, did the district court err by concluding the government's interpretation of the Act was reasonable?

3.    The Act contemplates separate processes by which fishery management plans or amendments, on the one hand, and implementing regulations, on the other, are approved by the Secretary.  Here, the government proposed implementing regulations for the New England Industry-Funded Omnibus Amendment before the Amendment was approved as consistent with the Act's National Standards, as well as other applicable federal law.  Those proposed regulations were never deemed "necessary and appropriate" by the New England Fishery Management Council.  This suggests the government prejudged the legality of the Amendment, and its implementing regulations, and never intended to seriously consider public comments.  Did the district court err by concluding otherwise and accepting the procedural soundness of the Omnibus Amendment and related agency rulemaking?

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    The Magnuson-Stevens Act

The Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.*, establishes the basis and authority for the federal management of domestic marine fisheries in the United States. Recognizing the importance of fishery resources for the well-being of the American economy, Congress enacted the Magnuson-Stevens Act to promote the conservation of fisheries in a way that sustains the industry. *See* 16 U.S.C. § 1801(a)–(c).

The Department of Commerce exercises the Magnuson-Stevens Act's regulatory authority through its various components, including the National Oceanic and Atmospheric Administration ("NOAA") and the National Marine Fisheries Service.  The government may only use its authority in a manner consistent with fishery management plans adopted and maintained by a system of eight regional councils.  *Id.* § 1852(a)(A)–(H); *id.* § 1852(h).  Congress designed these councils to enable stakeholder participation in the regulatory process.  *See id.* § 1801(b)(5).  Regional councils are the formal mechanism by which the federal government manages domestic fisheries and seeks to achieve the

Magnuson-Stevens Act's conservation and resource management goals. *See id.* § 1853(a)–(b). Regional councils draft and approve fishery management plans to regulate the harvesting of different fish species within specified geographic areas. *Id.* § 1852(h)(1). The Secretary implements and enforce those plans. *See id.* § 1854(a).

Each fishery management plan must contain, among other things, measures (1) to prevent overfishing and to rebuild overfished stocks, or otherwise promote the long-term stability of the fishery, *id.* § 1853(a)(1); (2) that describe and delimit the kinds of fishing vessels prosecuting regulated species, and otherwise delimit the harvesting of fish based on the expected sustainable and optimum yield, *id.* § 1853(a)(2)–(4), (15); and (3) establish a standardized reporting methodology to minimize bycatch. *Id.* § 1853(a)(11). Management plans may also include, as a discretionary matter, provisions that (1) require permitting, *id.* § 1853(b)(1); (2) limit fishing in certain areas based on type or quantity of gear, *id.* § 1853(b)(2); (3) establish limited access privilege programs, *id.* § 1853(b)(6); *see id.* § 1853a; and—relevant here—(4) require the placement of observers "for the purpose of collecting data necessary for the conversation and management of the fishery," subject

6

to certain conditions. *Id.* § 1853(b)(8); *cf. id.* § 1802(31). Finally, the Magnuson-Stevens Act requires any plan or amendment adopted or revised by a council—or any implementing regulation or secretarial action undertaken by the Secretary—to be consistent with ten National Standards. *See id.* § 1851(a).

When a regional council adopts a management plan or amendment, the Secretary of Commerce must "immediately commence a review" to ensure compliance with the Magnuson-Stevens Act, its National Standards, and other applicable law. *Id.* § 1854(a)(1)(A). The Secretary "immediately" publishes a notice of availability in the *Federal Register* to solicit public feedback and must provide a final approval decision within thirty days of the end of the required comment period. *Id.* § 1854(a)(1)(B), (a)(3). A similar process is undertaken for implementing regulations deemed "necessary and appropriate" by a council under Section 1853(c), except the Secretary must complete his preliminary evaluation within fifteen days; the subsequent comment period may last between fifteen and sixty days; and the final rule must be promulgated within thirty days "after the end of the comment period." *Id.* § 1854(b). There is no specified process for implementing regulations devised by the Secretary.

7

## II.     Initial Development of the Omnibus Amendment

The establishment of industry-funded at-sea monitoring in the Atlantic herring fishery, and the creation of a standardized process for introducing similar industry-funding requirements in the remaining New England fisheries, has been a years-long process. In 2013, the New England Fishery Management Council, in consultation with its corollary in the Mid-Atlantic region, initiated a process to design and implement an "omnibus" amendment that would permit industry-funded monitoring in all fisheries managed by the two councils. A251; A340. This effort eventually produced the New England Industry-Funded Monitoring Omnibus Amendment, which is the subject of this appeal.

From the outset, the New England and Mid-Atlantic Councils aimed to increase monitoring levels—ostensibly, to better assess catch, monitor limits, and collect other information—but without expending as much money as would be required under existing observing programs, such as the Northeast Fisheries Observer Program. The Councils recognized they had "limited funding for monitoring" and wanted "the option to allow the fishing industry to pay its costs for additional monitoring, when[ever] Federal funding is unavailable to cover

industry's costs." A273. In this sense, industry-funded at-sea monitoring was intended to supplement mandatory, federally funded observing under the Standardized Bycatch Reporting Methodology, Endangered Species Act, and Marine Mammal Protection Act. A251; A284.

The government has always recognized industry funding would be a "complex and highly sensitive issue." A293; A411–12 ("This action is controversial. Development . . . was contentious and took several years. . . . Recent changes in the herring fishery have exacerbated industry's concerns about paying for industry-funded monitoring."). The complexity and controversiality of the Omnibus Amendment is underscored by the history of legal issues related to cost sharing and cost recovery. A251; A273 ("[NOAA] ha[s] disapproved past Council proposals for industry-funded monitoring because . . . [they] were inconsistent with Federal law."); A411. Early in the regulatory process, agency officials hinted the *only* way for the New England and Mid-Atlantic Councils to achieve their discretionary monitoring goals would be to require "industry to be responsible for 100 percent of observing monitoring costs, and for the Council[s] to recommend coverage targets rather than mandating specific coverage levels." A248–49.

9

Industry stakeholders were actively engaged in the development of the Omnibus Amendment from the start and worried about the adverse economic impact of an industry-funding requirement. A275–76; A411–15. Commercial fishermen and their allies continually reiterated concerns about the feasibility of industry-funded monitoring, particularly given existing regulatory burdens and decreasing quota. A347–49; A353–54; A427–30.

Public feedback on the Omnibus Amendment has always been overwhelming negative. A349 ("The [council and agency] have received overwhelmingly negative feedback in pursuing the Omnibus Amendment. Of the eight-three submissions posted to the electronic docket during the last round of public comment . . . only six stakeholders voiced various levels of support . . . ; the vast majority—93%—opposed it."). One company—Lund's Fisheries—explained "projected costs [for complying with the Omnibus Amendment] are steep and . . . likely to be unsustainable[.]" A041. The company also observed the Omnibus Amendment marked "a turning point in regional fishery management policy . . . by requiring significant industry funding for monitoring programs that have been funded by the federal government since the

10

passage of the [Magnuson-Stevens Act] in 1977." A041. Although Lund's recognized reasonable regulation was unavoidable, it pointed out the projected costs of industry-funded monitoring did not appear "balanced with . . . biological benefits accruing to the herring and mackerel resource." A041.

The New England Council finalized its selection of preferred alternatives in April 2017 and transmitted the Omnibus Amendment to the Secretary for implementation. A340; A342.[1]

## III.  Finalization and Promulgation of the Omnibus Amendment

In September 2018, the government published a "notice of availability" for the Omnibus Amendment in the *Federal Register*, which described industry-funded monitoring for the Atlantic herring fishery, as well as "omnibus" measures that would govern the introduction of industry-funded monitoring in other fisheries managed by the New England Council. A340–41. That "notice of availability" initiated a sixty-day comment period for the Secretary's "approval/disapproval decision on the amendment." A341.

---

[1] The Mid-Atlantic Council postponed final action for the mackerel fishery, ending its involvement in the Omnibus Amendment. A340.

The overall response to the notice of availability was negative. One company argued the Omnibus Amendment would impose "an impossible financial burden" on the herring fleet, especially given then-expected substantial quota reductions. A356. The same company requested the Secretary pause the Omnibus Amendment while the council explored other accountability measures, such as electronic and shoreside monitoring. A356.

In November 2018—before the end of the comment period on the approval decision for the Omnibus Amendment, and while secretarial review of industry-funded monitoring was still pending—the government published proposed implementing regulations in the *Federal Register*. A250–72. This started a second comment period. Stakeholders and other interested parties again challenged the legality and economic feasibility of industry-funded monitoring. A411–15.

By letter, dated December 18, 2018, the Regional Administrator for NOAA's Greater Atlantic Regional Office, Michael Pentony, informed the New England Council that the Secretary of Commerce had approved the Omnibus Amendment. A406–08. Mr. Pentony transmitted this letter before the close of the comment period on the proposed implementing

regulations, and he did not address comments submitted in response to the Secretary's notice of availability. Mr. Pentony neither published nor publicly disclosed his letter. A077–78. And the government only disclosed its responses to public comments as part of the proceedings below. A425–38.

On February 7, 2020, the government published a final rule implementing the Omnibus Amendment. A377–405. The omnibus measures create a standardized process to devise and introduce industry-funded monitoring programs across various New England fishery management plans, clarify cost responsibilities, establish requirements for monitoring service providers, and set a prioritization process for distributing available funds for the government's cost responsibilities. A377–80. As for the Atlantic herring fishery, the final rule establishes, in relevant part, a 50% industry-funded monitoring coverage target for all declared herring trips undertaken by a vessel possessing a Category A or B permit. A380. The government calculates this coverage target together with federally funded observing coverage targets. On any given trip, if a vessel is notified it "need[s] at-sea monitoring coverage," and has

not already been assigned a federally funded observer, "[it] will be required to obtain and pay for an at-sea monitor[.]" A381.

The government acknowledges "[i]ndustry-funded monitoring w[ill] have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery," including estimated costs upwards of $710 per sea day, as well as an overall reduction in "returns-to-owner" of "approximately 20 percent." A381. The expected cost for midwater-trawl vessels employing electronic monitoring and portside sampling with an exempted fishing permit is "$515 per day," with a "reduction in annual [returns-to-owner] of up to 10 percent[.]" A383. Midwater-trawl vessels that "purchase observer coverage" to gain access to Groundfish Closed Areas can expect to pay "$818 per day," leading to roughly a "5 percent reduction in [returns-to-owner] . . . in addition to any reduction . . . due to other types of industry-funded monitoring coverage." A382.

## IV.  Proceedings in the District Court

Appellants—a collection of commercial fishermen based in New Jersey—filed their complaint in February 2020 within the thirty-day window for judicial review provided by the Magnuson-Stevens Act. A009. The fishermen raised two claims: *First*, they argued the Omnibus

14

Amendment was substantively unlawful because it exceeded any statutory authority provided by Congress in the Magnuson-Stevens Act. A035–36. *Second*, they argued the Omnibus Amendment, and related implementing regulations, were procedurally infirm. A036–38.

The fishermen moved for summary judgment; the government opposed the motion and filed a cross-motion. A005–06. In June 2021, the district court denied the fishermen's motion and ruled in favor of the government. A155; A156.[2] On the question of statutory authorization for industry-funded monitoring, the district court adopted the familiar analytic framework from *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* and held various provisions of the Magnuson-Stevens Act, "[t]aken together[,] . . . 'vest[] broad authority in the Secretary to promulgate such regulations as are necessary to carry out the conservation and management measures of an approved [fishery management plan]." A182–83.

The district court, in short, reasoned the Magnuson-Stevens Act's authorization of "necessary and appropriate" conservation and

---

[2] Although not germane to this appeal, the district court also granted the government's motion to exclude an extra-record declaration. A172–79.

management measures, together with its explicit authorization to require vessels to carry observers (or monitors), cut against any ambiguity and established the legality of the Omnibus Amendment. A183. To do so, the district court distinguished this Court's recent decision in *New York Stock Exchange, LLC v. Securities & Exchange Commission* and the Supreme Court's decision in *Michigan v. Environmental Protection Agency.* A184–87.

At *Chevron* Step Two, the district court provided no detailed analysis, but merely stated, "[e]ven if Plaintiffs' arguments were enough to raise an ambiguity in the statutory text, the Court . . . would conclude that Defendants' interpretation is a reasonable reading of the [Magnuson-Stevens Act]." A191.[3]

As for the fishermen's procedural challenge, the district court ruled initiation of a rulemaking to implement the Omnibus Amendment before

---

[3] The district court also held: (1) industry-funded monitoring does not violate financing and expenditure statutes, A191–96; (2) the Omnibus Amendment is not an unconstitutional tax and does not violate National Standards 7 and 8, A197–208; (3) the final rule implementing the Omnibus Amendment was not substantively deficient, A208–11; and (5) the government did not violate the National Environmental Policy Act or the Regulatory Flexibility Act. A211–39. These aspects of the district court's judgment are not directly challenged on appeal.

16

its clearance and approval was permissible given the "text of the statute." A241. In reaching that decision, the district court assumed the regulations were deemed "necessary or appropriate" by the Council. A240. The district court entered final judgment on June 23, 2021. A244–45. The fishermen timely filed a notice of appeal on July 15, 2021. A247.

## SUMMARY OF ARGUMENT

The government promulgated the Omnibus Amendment, which requires a portion of the industry to fund at-sea monitors in the Atlantic herring fishery, without statutory authority. The Magnuson-Stevens Act grants authority to require industry-funded monitoring only in three specific fisheries—the North Pacific, foreign fishing, and limited access privilege programs. It grants no such authority here.

The government wrongly relies on a general-powers provision to claim authority. But given the explicit grants of authority elsewhere in the statute, the specific governs the general. Congress would not have specifically delegated authority for industry funding in three other instances, only to imply it more broadly under a general powers provision. This Court should read the statute to explicitly *withhold* industry-funding authority for the Atlantic herring fishery.

Relying on Supreme Court and Circuit precedent, the Court can draw a negative inference from Congress's enumerated authority in one instance, and its silence in another. Statutes should be read in context as a whole and not as isolated provisions. Here, Congress drew a line between three specific circumstances and withheld authority for industry-funded monitoring in all other circumstances. Even a broad "necessary and appropriate" clause affords the government no authority in the latter scenario. None of the provisions in the list of authorizations for the contents of fishery management plans preceding the "necessary and appropriate" clause speaks to industry-funding of at-sea monitors.

The sanctions provision of the Magnuson-Stevens Act applies to a fisherman's failure to pay for monitoring or observing under the three specific grants of authority, and thus does not act as an implied grant of authority to charge herring fishermen for at-sea monitors. The provision merely discusses the various ways the government can require fishermen to procure at-sea monitors—whether through direct contract or placement by the government—and violations for failure to pay the explicitly authorized fees.

18

The district court's finding that fee provisions are distinct from third-party contracts between monitors and fishermen wrongly isolates one provision of the statute, ignoring the overall context. It permitted the government to use strategic drafting, avoiding the word "fee" and changing the process of payment, to grab expanded power. This is so even though monitors under the more general grant of authority fulfill virtually identical functions to the observers covered by the fee-shifting provisions. Additionally, the foreign vessel observer provision addresses payments made directly to observers, showing Congress knew how to delegate such authority—and intentionally decided not to do so under the Act's "necessary and appropriate" clause or elsewhere.

Because the application of canons of construction to the statutory context reveals the government has no grant of authority to require industry-funded monitoring in the Atlantic herring fishery, the Omnibus Amendment is *ultra vires*. The district court wrongly distinguished and failed to apply binding Supreme Court and Circuit precedent from *New York Stock Exchange*, 962 F.3d 541 (D.C. Cir. 2020), and *Michigan v. Environmental Protection Agency*, 576 U.S. 743 (2015), which limits unlawful agency overreach of "necessary and appropriate" clauses in

rulemaking.   The Supreme Court's recent decision in the eviction mortarium case, where the Court looked at the whole context of the statute and declined to find broad and unlimited powers for an agency, is instructive.  *See generally Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485 (2021).

Legislative history reveals Congress considered giving authority to the government to require industry-funding in all fisheries, but repeatedly declined to do so.  For example, Congress specifically authorized both placement of observers and the ability to bill fees for them in the North Pacific fisheries in the same bill.  Congress knew how to include fee provisions but chose to do so only for certain fisheries, even while authorizing discretionary monitoring in all fisheries.

The application of canons of statutory interpretation establishes that the government has no authority to act as it did here.  The Court should thus afford no deference to the government's interpretation of the Magnuson-Stevens Act.  Agency authority cannot be presumed, and silence—or even mere alleged ambiguity—is not evidence of a congressional grant.  Just because Congress did not expressly withhold a power does not mean the agency has it.

20

Even if the Court does give the agency *Chevron* deference, the government still acted unlawfully. For the reasons above—plain text, context, the canons, and legislative history—the Court should find even under *Chevron* Step Two the government's actions were arbitrary, capricious, and contrary to law.

If the Court finds the agency had authority to regulate in this area, it should still invalidate the government's action for a failure to consider cost. National Standards Seven and Eight in the Magnuson-Stevens Act mandate the government assess the impact of cost and how regulation will affect the longevity of the fishing industry. In addition, *Michigan* requires that, as part of any *Chevron* analysis, agencies analyze cost functions. Here, while the government and New England Council evaluated different monitoring coverage target rates, they never engaged in the proper analysis of the cost of each, the reasons for choosing the preferred rates, and the impact on fishermen. Therefore, the Omnibus Amendment and implementing rule are arbitrary and capricious.

In terms of the procedural soundness of the Omnibus Amendment and implementing rule, the district court erred by presuming the government's rulemaking was ever deemed "necessary or appropriate" by

the New England Council.  It was not.  Because the government—and

not the Council—devised the implementing regulations for the Omnibus

Amendment, it was improper for the government to proceed with a

rulemaking without securing secretarial approval for Omnibus

Amendment.  The administrative record demonstrates the government

prejudged the legality of the Omnibus Amendment, never intended to

seriously consider public comments, and was committed to enforcing the

New England Council's desired monitoring goals, no matter the economic

impact on the Atlantic herring fishery.

## STANDARD OF REVIEW

This Court reviews a grant or denial of summary judgment de novo,

"applying the same standards as the district court." *Tao v. Freeh*, 27 F.3d

635, 638 (D.C. Cir. 1994).  The Administrative Procedure Act ("APA")

provides the exclusive vehicle for reviewing regulatory action under the

Magnuson-Stevens Act.  16 U.S.C. § 1855(f)(1).  The government's actions

must be "rooted in a grant of such power by the Congress and subject to

limitations which that body imposes."  *Ry. Labor Execs.' Ass'n v. Nat'l*

*Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994).

Agency action that carries the force of law is typically reviewed under the standard from *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Yet, "[e]ven under *Chevron*," the Court "owe[s] an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' [it finds itself] unable to discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (citation omitted).

## ARGUMENT

## I. The Magnuson-Stevens Act does not authorize the government to require industry funding of at-sea monitors.

The Magnuson-Stevens Act does not authorize the government to require fishermen in the Atlantic herring fishery to pay for at-sea monitors. The district court erred when it failed to apply canons of statutory construction, thus disregarding that Congress *explicitly granted* authority for industry funding in certain fisheries—but not this one. The district court similarly erred when it ignored binding Supreme Court and Circuit precedent to find broad, unlimited power in a "necessary and appropriate" clause. And the district court erred when it found that, even if the Act's ostensible grant of authority were

23

ambiguous, the government adopted a reasonable interpretation warranting deference.

By approving the Omnibus Amendment and finalizing implementing regulations, the government has repeated an error that both the Supreme Court and this Circuit have addressed in recent years: taking a "necessary and appropriate" clause and stretching it in a way that grants an agency virtually unlimited authority. This error is compounded because the authority the government claims—namely, forcing fishermen to pay at-sea monitoring costs—is explicitly granted elsewhere in the Magnuson-Stevens Act, but for different fisheries and different geographic regions than the one at issue here.

"[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986). As the New England Council itself recognized when designing the Omnibus Amendment, the government "cannot get around [a] maximum [congressionally] authorized program level by adding to its appropriations from sources outside the government without permission from Congress." A297. Yet here, the government has done exactly that, grabbing powers not

24

authorized by Congress and promulgating regulations under them that have direct and severe economic impacts on many herring fishermen.

## A.   The Magnuson-Stevens Act contains specific grants of authority for industry funding, but not for this fishery.

Courts "construe statutes, not isolated provisions[.]" *Graham Cty. & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (citation and internal quotation marks omitted).  The whole context of the Magnuson-Stevens Act shows Congress knew how to give the government authority to require industry-funded monitoring and did so in three specific circumstances—but not here.

*First*, and most importantly, the Act authorizes the North Pacific Council—*and only the North Pacific Council*—to propose "fisheries research plans" that fund observers through mandatory fees, but *only* for certain fisheries in that region.  16 U.S.C. § 1862(a) (permitting the establishment of "a system, or system [*sic*], of fees . . . to pay for the cost of implementing the plan").  This is the same type of program the government now seeks to implement in New England without any specific grant of authority.  A377–405.

*Second*, when a fishery is managed as a limited access privilege program, Congress has authorized cost recovery through the collection of

fees to "cover the costs of management, data collection and analysis, and enforcement activities." 16 U.S.C. § 1853a(e)(2). This would include monitoring or observing. Congress also capped the maximum fee that can be assessed against permit holders to no more than "3 percent of the ex-vessel value of fish harvested[.]" *Id.* § 1854(d)(2)(B).

*Third*, the Magnuson-Stevens Act requires foreign fishing vessels to carry and pay for observers through a special surcharge that is deposited in a "Foreign Fishing Observer Fund." 16 U.S.C. § 1821(h)(4). Notably, Section 1821 grants authority to require direct payment for observer services when "insufficient appropriations" prevent normal operation of the observer program. *Id.* § 1821(h)(6)(C). These provisions are separate from other provisions governing domestic fisheries.

## B. These three specific grants of authority govern the general, and the general does not swallow them back.

Despite these three exclusive grants of authority, the government contends, and the district court agreed, that the Magnuson-Stevens Act's broad "necessary and appropriate" clause impliedly affords it the authority to require industry-funded monitoring in *any* fishery it wants. *See id.* § 1853(a)(14). Yet Congress would not specifically delegate authority in one place of a statute if that authority could be found in a

general grant elsewhere.  "[I]t is a commonplace of statutory construction that the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) [hereinafter "*RadLAX*"] (cleaned up); *see Genus Med. Tech. LLC v. Food & Drug Admin.*, 994 F.3d 631, 638 (D.C. Cir. 2021).  This canon "is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission."  *RadLAX*, 566 U.S. at 645.  But it still has full application to "statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side."  *Id.*  In situations like this, the canon avoids "the superfluity of a specific provision that is swallowed by the general one, violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute."  *Id.* at 646 (cleaned up).  And the "general-specific canon is particularly appropriate where, as here, the provisions at issue are 'interrelated and closely positioned' as 'parts of the same statutory scheme.'"  *Genus Med. Tech. LLC*, 994 F.3d at 638 (quoting *RadLAX*, 566 U.S. at 645).

So too with the Magnuson-Stevens Act.  If Congress intended for general language in the Act's "necessary and appropriate" clause to grant

27

authority to require industry funding, *see* 16 U.S.C. § 1853(b)(14), it would not have provided specific, limited grants of industry-funding authority elsewhere in the statute.  *See id.* §§ 1821(h)(4), 1853a(e)(2), 1862(a).  These specific grants are "interrelated and closely positioned," in the same legislative enactment, dealing with the same issue: charging fishermen for the cost of observers.  *RadLAX*, 566 U.S. at 645

While any of the three specific grants reflect Congress's ability and intent to afford limited authority for industry funding, the provision enabling the North Pacific fisheries research plan is most damaging to the government's case.  That program allows the government to bill fishermen for observer services identical to what the Omnibus Amendment requires.  There, observers must be placed "for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction[.]"  *Id.* § 1862(a)(1).  That is almost identical to the provision the government cites in its final rule implementing the Omnibus Amendment: "The Magnuson-Stevens Act expressly authorizes onboard monitors to be carried on fishing vessels 'for the purpose of collecting data necessary for the conservation and management of the fishery.'" A385

(citing 16 U.S.C. § 1853(b)(8)). The only difference is that the former provision, concerning the North Pacific, contains a grant of fee authority, whereas the latter provision does not. It is therefore logical to assume Congress wanted the North Pacific Council to charge for observer services, but not any other jurisdiction, at least absent another explicit grant of authority. *See, e.g.*, 16 U.S.C. § 1853a(e)(2). To read the Magnuson-Stevens Act the way the government and the district court did allows the general to swallow the specific and renders Congress's three specific grants superfluous. This Court should read the statute to grant the government authority to collect fees only in those three circumstances—and not here.

In many ways, this case is like *American Petroleum Institute v. Environmental Protection Agency*, where this Court held an agency "cannot rely on its general authority to make rules necessary to carry out its functions when a *specific statutory directive defines* the relevant functions of [the agency] in a particular area." 52 F.3d 1113, 1119 (D.C. Cir. 1995) (emphasis added). There, the Environmental Protection Agency could not use its "general rulemaking authority" to justify "adding new factors to a list of statutorily specified ones." *Id*. Here, the

Magnuson-Stevens Act gives the government a "specific statutory directive" by permitting industry-funded monitoring in only three distinct scenarios. Much like the agency in *American Petroleum Institute*, the government cannot simply add a fourth grant of authority to Congress's limited list of three. Just because the Act "does not expressly *negate* the existence of a claimed administrative power" does not mean this Court should "presume a delegation of power based solely on the fact that there is not an express withholding of such power[.]" *Id.* at 1121 (cleaned up).

### 1. The Court should draw a negative inference from Congress's specific grants of authority.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker*, 533 U.S. 167, 173 (2001) (cleaned up). Similarly, when Congress enumerates certain regulatory powers, it denies additional powers. *EchoStar Satellite LLC v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Lab. Execs.' Ass'n*, 29 F.3d at 670–71. And, as the government has conceded in other litigation, "'cost sharing' programs with industry participants in

30

other fisheries in order to provide higher observer coverage levels . . .

[are] *expressly authorized by statute for particular fisheries only*." *Anglers*

*Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C.

2015) (emphasis added) (citing 16 U.S.C. § 1862).

In *King v. Burwell*, the Supreme Court explained "we must read the

words [of a statute] in their context and with a view to their place in the

overall statutory scheme . . . [A court's] duty, after all, is to construe

statutes, not isolated provisions." 576 U.S. 473, 486 (2015) (cleaned up).

Moreover, a "threshold determination under *Chevron*" is not limited to a

certain grouping of words in isolated parts of a statute. *Nat'l Ass'n of*

*Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (citation

omitted). This Court confirmed as much when it invalidated a rule

governing solicited fax advertisements. *Bais Yaakov of Spring Valley v.*

*Fed. Commc'ns Comm'n*, 852 F.3d 1078, 1081 (D.C. Cir. 2017). The *Bais*

*Yaakov* court found that because Congress had authorized the Federal

Communications Commission to regulate *unsolicited* fax advertisements,

but said nothing about *solicited* fax advertisements, Congress did not

grant the agency authority to regulate the latter:

> Congress drew a line in the text of the statute between
> unsolicited    fax    advertisements    and    solicited    fax

31

advertisements.  Unsolicited fax advertisements must include an opt-out notice.  But the Act does not require (or give the [agency] authority to require) opt-out notices on solicited fax advertisements.  It is the Judiciary's job to respect the line drawn by Congress, not to redraw it as we might think best.

*Id.* at 1082.

Here, Congress distinguished between the North Pacific Council, limited access privilege programs, foreign vessels, and the rest of the nation.  In the former three, it granted power to impose industry funding for observer coverage.  Everywhere else, it did not.  And it would require a judicial rewriting of the statute to fit any broader grant of authority into a "necessary and appropriate" clause found in a provision describing discretionary elements of a fishery management plan.

Given the overall statutory context, and the strong legislative history backing it, *see infra* at pp. 47–49, this Court can draw a negative implication against the government's claim to authority.  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication . . . depends on context.").  Indeed, courts should have no qualms applying the *expressio unius* canon if "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it[.]'" *Id.* (internal citation omitted).  Whether this Court uses the legislative

32

history, Congress considered the authority to require regulated parties to pay for monitoring, intentionally granted such authority in some cases, and knowingly said "no" to a freestanding power.

### 2. Other district court judges in this Circuit have applied the analysis the fishermen ask for here.

In a recent district court case, which is currently on appeal before this Court, Judge Leon correctly found an agency's abuse of a similar "necessary or proper" clause was limited by grants and prohibitions of authority elsewhere in the same statute. *See PayPal, Inc. v. Consumer Fin. Prot. Bureau*, 512 F. Supp. 3d 1 (D.D.C. 2020), *appeal docketed* No. 21-5057 (D.C. Cir. Mar. 10, 2021). As the *PayPal* court explained, a "necessary or proper" clause cannot provide "unfettered discretion." *Id.* at 10. Indeed, the court rejected the agency's argument that it could enact a certain regulation "because Congress did not explicitly prohibit it," calling that "meritless . . . [because] courts cannot presume congressional authority based on congressional silence." *Id.* at 11.

There, as here, the legislative history makes "clear that the [agency's] authority . . . is limited[.]" *Id.* Specifically, Judge Leon held the Consumer Financial Protection Bureau's authority to regulate was limited by textual grants in the governing statute—namely, disclosure

33

requirements—and any attempt by the agency to stretch its regulatory power *beyond* disclosure requirements through reliance on a "necessary or proper" clause was patently unlawful. *Id*. at 12. So too here: both the Magnuson-Stevens Act and attendant legislative history limit the government's ability to impose industry-funding requirements to certain fisheries. To take that authority and expand it to other unenumerated contexts would effectively afford the government "unfettered discretion" to do as it sees fit, regardless of the boundaries setup by Congress.

### C.    The penalty provisions of the Magnuson-Stevens Act do not meaningful speak to Congress's authorization of industry-funded monitoring.

The district court incorrectly relied on a civil penalties and permit sanctions section of the Magnuson-Stevens Act to find implied congressional authorization for industry-funded monitoring. These provisions, in relevant part, allow the government to seek sanctions if "any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit under any maritime resource law administered by the Secretary has not been paid or is overdue[.]" 16 U.S.C. § 1858(g)(1)(D). Of course, Congress explicitly provides for industry funding in specific fisheries, *see* 16 U.S.C.

34

§§ 1821(h)(4), 1853a(e)(2), 1862, and leaves some discretion for how any of those funding programs might actually be designed and implemented. It is entirely possible, for example, that an authorized industry-funding scheme could include third-party contracting. A fisherman in one of the North Pacific fisheries, where such fees are allowed, may have to *contract* with and book an observer provider for a certain trip. Or the agency could simply assign and place an observer on the boat. The flexibility is there for the agency to pursue either solution and, regardless of the choice, the congressionally authorized fee collection compensates the observer. But if the fisherman fails to pay the required fees for the observer, he could trigger the permit sanctions provision. The same logic extends to both the foreign fishing and limited access privilege program context.

Multiple district courts, each citing and building on the first, have now wrongly determined that the penalty provision implicitly grants the authority the government seeks here. This error finds its origin in *Goethel v. Pritzker*, an unpublished district court case from New Hampshire. No. 15-497, 2016 WL 4076831 (D.N.H. July 29, 2016). There, the district court dealt with a similar at-sea monitoring requirement for a different New England fishery. Although the case was

ultimately decided on statute-of-limitations grounds, the *Goethel* court, in dicta, nevertheless opined on the merits of the plaintiffs' claims, *id.* at *4—something the First Circuit declined to do.  *See Goethel v. Dep't of Commerce*, 854 F.3d 106, 116 (1st Cir. 2017) ("[W]e take no position on the district court's statutory and constitutional rulings.").

Here, the district court cited and quoted the *Goethel* court's dicta, finding the penalty "'provision would be unnecessary if the [Act] prohibited the very type of industry funding at issue[.]'"  A186.  This is simply incorrect; the penalty provision exists to enforce the authorized fees.  Even more boldly, the district court concluded Section 1858(g) "'demonstrates beyond peradventure that the [Act] contemplates—and most certainly does not prohibit—the use of industry funded monitors.'"  A186.  But the district court made a key error when it held that, "while Plaintiffs argue that section 1858(g) must only refer to other provisions of the [Act] . . . [that] argument lacks a textual basis."  A186–87.  In the citation immediately preceding that claim, the court openly acknowledged the fishermen's reliance on Sections 1821(h)(4), 1853a(e)(2), and 1862.  A186.  Those provisions, which grant mandatory fee authority, *are the textual basis* for why Congress included the

36

sanctions provision and further basis for why Congress could not have intended for the government to have a general power to require industry funding.

The *Goethel* court's error has now compounded with a recent judgment in the District of Rhode Island.  In *Relentless, Inc. v. Department of Commerce*—a related case involving a similar challenge now pending in the First Circuit—the court quoted a section of the district court opinion here that quotes *Goethel* and concluded the "statute's mention of contracts 'would be unnecessary if the [Magnuson-Stevens Act] prohibited the very type of industry funding at issue in this case.'"  No. 20-108, 2021 WL 4256067, at *4 (D.R.I. Sept. 20, 2021), *appeal docketed*, No. 21-1886 (1st Cir. Nov. 5, 2021).  That approach is incorrect for the same reason: the contracts mentioned are those in the three provisions authorizing fees—it is not a freestanding grant of authority.

### D.    The district court also wrongly distinguished the word "fee" from the Omnibus Amendment's industry-funding provisions.

Both the district court here and the *Relentless* court wrongly distinguished the fee-based provisions in Sections 1821(h)(4), 1853(e)(2), and 1862 from the funding authority claimed by the government in the

37

Omnibus Amendment.  For example, the district court concluded "[a] fee-based program . . . is different from the industry-funded observer measures at issue [in the Atlantic herring fishery], in which the fishing vessels contract with and make payments directly to third-party monitoring service providers."  A188–89; *Relentless, Inc.*, 2021 WL 4256067, at \*5.  Because "the Omnibus Amendment does not involve fees or surcharges," the district court could not "find that the [Act's] provisions governing cost recovery [were] made 'superfluous, void or insignificant.'"  A189 (quoting *Citizens for Responsibility & Ethics in Wash. v. Fed. Elections Comm'n*, 316 F. Supp. 3d, 349, 391 (D.D.C. 2018)).

This approach is wrong and allows the government to claim "virtually limitless" power by simply changing a few words when designing its industry-funding scheme.  Even if the Act did not address fees paid directly to observers—which it does, as discussed below—the district court and the government indulged in a game of semantics.  By avoiding use of the word "fee" and tweaking the funding mechanism to involve direct payments through mandatory third-party contracting, the government claims unfettered authority.

An agency cannot expand its authority by abusing a general-powers clause and playing word games. The substance of the fee-based programs and industry-funded monitoring programs are precisely the same: fishermen pay for non-governmental parties to ride their boats and watch them work. The only distinction is what those third parties are called— "observers" versus "at-sea monitors"—and how money is extracted from the fishermen. Courts should not focus on words "in isolation." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). They should "follow the cardinal rule that statutory language must be read in context [because] a phrase gathers meaning from the words around it." *Id.* (cleaned up). To zero in on the word "fee"—it's here, but not there!— ignores the context of what the fee provisions authorize: charging fishermen for observer costs. *See, e.g.*, 16 U.S.C. § 1862(b)(2) ("system of fees").

The text of the foreign fishing provision is instructive. If observer requirements "cannot be met because of insufficient appropriations, the Secretary shall . . . establish a reasonable schedule of fees that certified observers or their agents shall be paid by the owners or operators of foreign fishing vessels for observer services[.]" 16 U.S.C. § 1821(h)(6)(C). This is, again, much like the authority the government claims in the

Omnibus Amendment: if the agency is not picking up the bill, the government can mandate that fishermen pay the observers directly— "observers . . . shall be paid by the owners or operators." *Id*. Compare that with the language in the Omnibus Amendment itself: "If [the government] informs the vessel representative that they need at-sea monitoring coverage, they will be required to obtain and pay for an at-sea monitor to carry on that trip." A381.

Further, observers in the foreign fishing context conduct "scientific, compliance monitoring and other functions." 16 U.S.C. § 1821(h)(3). At-sea monitors in the Atlantic herring fishery perform strikingly similar tasks. A381 (listing the collection requirements for monitors). A distinction of who collects the cash—the government or the observers directly—does not support an implied grant of statutory authority. Congress delegated both sorts of powers in the statute for specific situations and withheld it for all other circumstances.

This Court should end the original sin of *Goethel* and hold (1) the Magnuson-Stevens Act permits the government to charge fishermen for observer or monitoring costs only in enumerated circumstances, and (2) the Omnibus Amendment industry-funding mandate is not one of them.

40

**E.    Without statutory authority, the government's enactment of the Omnibus Amendment is unlawful and contrary to binding Circuit precedent.**

The Magnuson-Stevens Act only allows fishery management plans to "require that one or more observers be carried on board a vessel . . . for the purpose of collecting data[.]." 16 U.S.C. § 1853(b)(8). The provision stops there. It says nothing about fees. It says nothing about industry funding. Congress assumed the government would pay for observers or monitors included as part of a fishery management plan and never intended to shift the cost to fishermen, at least outside of three explicit situations. *See* 16 U.S.C. §§ 1821(h)(4), 1853a(e)(2), 1862(a).

The government refuses to acknowledge this. It instead intends to impose on many herring fishermen a monitoring program they must fund, which, at a cost of upwards $710 per day, is expected to impose a substantial hardship on the fleet. A381. But Congress would not have delegated "a decision of such economic and political significance to an agency in so cryptic a fashion." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Asking fishermen to pay for government observers to watch them fish is a significant and extraordinary request, one that Congress must (and did, in other

41

fisheries) explicitly authorize. Congress does not grant "broad and unusual authority through implicit delegation," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006), and it does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The district court erroneously concluded an industry-funding requirement could fit within its capacious reading of the Magnuson-Stevens Act's authorization that fishery management plans "'prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." A182 (quoting 16 U.S.C. 1853(b)(14)). The district court noted the Act "also states that each [fishery management plan] 'shall contain the conservation and management measures' it finds are 'necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery,'" A182 (quoting 16 U.S.C. § 1853(a)(1)(A)), and declined "to read the [Act] as narrowly as Plaintiffs urge." A183.

In reaching that position, however, the district court ignored important precedents from the Supreme Court and this Circuit. As the

42

fishermen argued below, *New York Stock Exchange LLC*, 962 F.3d at 541 and *Michigan*, 576 U.S. at 743, control here.

In *Michigan*, the Environmental Protection Agency tried to read an "appropriate and necessary" clause as a virtually unlimited grant of authority. Specifically, the agency argued it need not consider the cost of its regulations. The Supreme Court disagreed, holding the term "'appropriate' . . . naturally and traditionally includes considerations of all the relevant factors." 576 U.S. at 752. And while "this term leaves agencies with flexibility, an agency may not 'entirely fai[l] to consider an important aspect of the problem' when deciding whether regulation is appropriate." *Id*. This is no less the case when adding a discretionary provision to a fishery management plan. "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id*. at 750.

Relatedly, in *New York Stock Exchange*, this Circuit implemented *Michigan*, describing its central holding as having "ma[de] it plain that mere reference to 'necessary' or 'appropriate' in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit with respect to all matters

covered by the agency's authorizing statute." 962 F.3d at 554. "The larger point . . . is that an agency cannot purport to act with the force of law without delegated authority from Congress." *Id.*

Here, the district court sought to distinguish *New York Stock Exchange* in various ways. None of them is persuasive. The district court first suggested the reason this Court ruled against the agency in *New York Stock Exchange* is because "the costly program [at issue there] was adopted despite the Exchange Act's command 'forbid[ding] the Commission from adopting a rule that will unnecessarily burden competition." A185 (quoting *N.Y. Stock Exch., LLC*, 962 F.3d at 555). But it does not matter whether it is an express statutory prohibition or a lack of authority in the form of statutory silence the agency is betraying.

The district court also reasoned that in *New York Stock Exchange* the government had passed a rule "'without explaining what problems with the existing regulatory requirements it meant to address.'" A185 (quoting *N.Y. Stock Exch. LLC*, 962 F.3d at 557). The court reasoned the government here had "tethered the Omnibus Amendment . . . to the congressionally authorized purpose of conservation and management of the fishery." A185 (citing 16 U.S.C. § 1853(b)(8)). But that is a red

herring. *New York Stock Exchange* stands for a simple but important proposition: "an agency cannot purport to act with the force of law without delegated authority from Congress." 962 F.3d at 554. Necessary-or-appropriate clauses do "not afford [an] agency authority to adopt regulations as it sees fit with respect to all matters covered by the agency's authorizing statute." *Id.* They instead operate within the contextually limiting nature of the statute and surrounding passages. Attempting to draw a close relationship, as the district court did, between the Omnibus Amendment and vague notions of statutory purpose, or the reasons for discretionarily requiring observers to be carried on board vessels as part of a fishery management plan, is not good enough. This is even more so given the existence of provisions of the Magnuson-Stevens Act that speak specifically to industry funding.

The Supreme Court just addressed a similar issue in a case about the Center for Disease Control's eviction moratorium. In *Alabama Ass'n of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021), the agency claimed authority to impose an eviction moratorium based on statutory language that permitted regulations deemed "necessary to prevent the introduction, transmission, or spread of

communicable diseases [interstate]." *Id.* at 2491 (citing 42 U.S.C. § 264(a)). But the Supreme Court considered the full context of the statute, rather than the word "necessary" in isolation. *Id.* at 2488. It held a "second sentence," which followed the initial, ostensibly broad "necessary" clause, informed Congress's grant of authority by illustrating the kinds of measures that could be "necessary," namely, "th[o]se measures directly related to preventing the interstate spread of disease[.]" *Id.* at 2488.

The Supreme Court then reasoned that, "[e]ven if the text were ambiguous, the sheer scope of the [agency's] claimed authority . . . would counsel against [its] interpretation" considering the "vast economic and political significance" of a moratorium that would impact a significant proportion of regulated entities. *Id.* at 2489 (cleaned up). It concluded the government's broad reading "would give the [agency] a breathtaking amount of authority." *Id.*

The textual analysis from *Alabama Association of Realtors* applies here. Courts should evaluate the full statutory context when gauging the breadth of a "necessary"—or "necessary and appropriate"— clause. In this case that means, as a first step, conducting a close analysis of the

46

surrounding text in Section 1853(b). There are thirteen items in this list, yet only one of them mentions any type of payment by a regulated party. To wit: a fishery management plan "may," but is not required to, condition issuance of a permit on payment of "fees" by a vessel owner, operator, or processor for the permit itself. 16 U.S.C. § 1853(b)(1). None of the other provisions that detail the permissible discretionary provisions of a fishery plan mention industry funding, third-party contracting, or *any* flexible authority to charge other fees for the government's regulatory purposes. If Congress wanted the government to have broad industry-funding authority—something it granted elsewhere in the statute in more limited situations—it would have provided for it in this extensive list of authorizations. This Court—like the Supreme Court in *Alabama Association of Realtors*—should determine Congress only granted powers akin to the other twelve detailed in Section 1853(b).

## F.    If relevant, the legislative history supports a narrow reading of the Magnuson-Stevens Act.

There is no evidence of congressional recognition of any sort of pre-existing, implied authority to impose monitoring costs on the regulated industry. "For those who consider legislative history relevant, here it

confirms that this choice of language was no accident." *Warger v. Shauers*, 574 U.S. 40, 48 (2014). Congress has, in fact, repeatedly declined the opportunity to authorize industry-funded monitoring nationwide. Each time Congress reauthorized the Magnuson-Stevens Act, it considered and rejected bills that would have created blanket authority for mandatory industry-funded monitoring programs. *See, e.g.*, H.R. 5018, 109th Cong. § 9(b) (2006); H.R. 39, 104th Cong. § 9(b)(4) (1995); H.R. 1554, 101st Cong. § 2(a)(3) (1989). The Omnibus Amendment, and the future industry-funded monitoring programs it envisions for the remaining New England fisheries, flouts this clear legislative history.

In addition to the statute's reauthorization history, the specific history of Section 1862, the North Pacific observer funding provision, is helpful for understanding why the Magnuson-Stevens Act contains no implicit authorization for industry-funded monitoring. Section 1862 originated as part of the Fishery Conservation Amendments of 1990, which also added other sections to the statute to provide for placement of observers on vessels pursuant to a fishery management plan. *See* Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 109(b)(2), 104

48

Stat. 4436, 4448 (codified at 16 U.S.C. 1853(b)(8)); *id.* § 118(a), 104 Stat. 4457–59 (codified at 16 U.S.C. § 1862). Congress authorized *placement* of observers nationwide but only established a method for industry *funding* of those observers for particular fisheries in a single region. By including those distinct enactments in one bill, Congress made clear it sought to authorize industry funding for certain observers in the North Pacific but not elsewhere. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). Congress understood Section 1862's funding mechanism to be "specific to the North Pacific Fishery Management Council," and that funding mechanism did not affect other councils or fisheries. *See* H.R. Rep. No. 101-393, at 31 (1989).

## II. The government should not get *Chevron* deference.

"[A]n agency's interpretation of [a] statute is not entitled to deference absent a delegation of authority from Congress to regulate in the areas at issue." *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n*, 309 F.3d 796, 801 (D.C. Cir. 2002). As the district court acknowledged, "[an] agency is owed no deference if it has no delegated authority from Congress to act." A181 (citing and quoting *N.Y. Stock Exch. LLC*, 962 F.3d at 553) ; *see La. Pub. Serv. Comm'n*, 476 U.S. at 374

49

("[A]n agency literally has no power to act . . . unless and until Congress confers power on it.")).  The district court also correctly noted "'[a]gency authority may not be lightly presumed,' and '[m]ere ambiguity in a statute is not evidence of a congressional delegation of authority.'"  A181 (quoting *Michigan*, 268 F.3d at 1082).

But here, in "light of all the textual and structural clues . . . it's clear enough" the text does not afford the government any authority, and deference is therefore inappropriate.  *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2064 (2018).  "[F]or an agency to suggest that *Chevron* deference is due any time a statute does not expressly *negate* the existence of a claimed administrative power is both flatly unfaithful to the principles of administrative law and refuted by precedent."  *N.Y. Stock Exch. LLC*, 962 F.3d at 553 (cleaned up).  In the case of the Magnuson-Stevens Act and industry-funded monitoring, the specific governs the general, *see supra* pp. 26–34, and Congress need not have spelled out its prohibition of the unbounded power undergirding the Omnibus Amendment.  "[T]he failure of Congress to use 'Thou Shalt Not' language doesn't create a statutory ambiguity of the sort that triggers *Chevron* deference."  *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 359

F.3d 554, 466 (D.C. Cir. 1994). "Where, as here, the canons supply an answer, *Chevron* leaves the stage." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (citation and quotation marks omitted).

Again, this case is like *American Petroleum Institute*, where the Environmental Protection Agency argued that "because Congress [had] not explicitly limited its authority to promulgate" a new requirement, "its interpretation . . . thus passes *Chevron*'s first step, and this court must then defer to its expansive interpretation of the section under *Chevron's* second step." 52 F.3d at 1120. But as this Court correctly held, such an approach is "both flatly unfaithful to the principles of administrative law . . . and refuted by precedent[.]" *Id.* "[W]e will not presume a delegation of power based solely on the fact that there is not an express withholding of such power." *Id.* So too here. The Magnuson-Stevens Act *does not* grant the government power to require industry funding in the Atlantic herring fishery, and the government's unlawful power grab cannot inject ambiguity in the statute, thus earning the government its coveted deference. Any agency that succeeded in doing so "would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and

quite likely with the Constitution as well." *Ethyl Corp. v. Envtl. Prot. Agency*, 51 F.3d 1053, 1060 (D.C. Cir. 1995).

When a litigant claims a fishery regulation has "exceeded or ran contrary to [a] grant of statutory authority in the [Magnuson-Stevens Act]," a court should "only defer to the [government's] interpretations of the [the Act] to the extent that deference is warranted under" *Chevron*. *Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 82 (D.D.C. 2019) (citing *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 752–53 (D.C. Cir. 2000). An "agency may not promulgate even reasonable regulations that claim a force of law without delegated authority from Congress." *Id.* This much is undisputed. But ultimately "[i]t does not matter that the statute is *arguably* ambiguous . . . . Nor does it matter that a disputed agency action is *not expressly* foreclosed by the statute." *N.Y. Stock Exch. LLC*, 962 F.3d at 557; *Am. Bar Ass'n v. Fed. Trade Comm'n*, 430 F.3d 457, 468 (D.C. Cir. 2005) (rejecting argument "that *Chevron* step two is implicated any time a statute does not expressly negate the existence of a claimed administrative power"). Here, the statutory context, read through the lens of traditional canons of interpretation, is enough to demonstrate Congress's intentional silence as a form of withholding authority.

The Fifth Circuit recently rejected an attempt by the National Marine Fisheries Service to advance the "nothing-equals-something" argument, which would turn congressional silence into a "mere 'gap' . . . to fill" at the pleasure of an agency. *Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020). Thankfully, that circuit held Congress had unambiguously withheld a power under the Magnuson-Stevens Act by never granting it. *Id.* ("[T]he agency argues it has the power to regulate 'aquaculture' because the [MSA] 'do[es] not unambiguously express Congress's intent to prohibit the regulation of aquaculture. This nothing-equals something argument is barred[.]"). The government here also is due no deference, considering the full context of the Magnuson-Stevens Act and the absence of any explicit or implied power to require industry-funded monitoring.

## III.   The government's arguments fail under *Chevron* Step Two.

If this Court decides to afford the government *Chevron* deference, the government's arguments still fail. Although the *Relentless* court in Rhode Island incorrectly found the statute was "ambiguous" and moved to *Chevron* Step Two, *see* 2021 WL 4256067, at *5, the district court in this case did not get that far, and merely concluded, assuming that *if* the

53

fishermen's "arguments [had been] enough to raise an ambiguity in the statutory text, the [c]ourt . . . would conclude that [the government's] interpretation is a reasonable reading of the [Magnuson-Stevens Act]." A191. But this too is wrong.

### A. Whether under *Chevron* Step Two or Step One, the government lacks statutory authority to require industry-funded monitoring.

Under *Chevron* Step Two, courts must defer to agency interpretations so long as they are "not arbitrary, capricious, or manifestly contrary to the statue." *Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 79 (D.D.C. 2020) (cleaned up). To succeed, the agency's interpretation must be "a permissible construction." *Ctr. for Biological Diversity v. Dep't of the Interior*, 563 F.3d 466, 484 (D.C. Cir. 2009). "[A]gency action cannot be 'permissible' under *Chevron* step two if the agency acts in excess of the authority under the applicable statute . . . or if the agency's interpretation of the statue is unreasonable[.]" *N.Y. Stock Exch. LLC*, 962 F.3d at 557 (citations omitted); *see Glob. Tel\*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 418 (D.C. Cir. 2017) (Silberman, J., concurring) (Step Two is "a meaningful limitation on the ability of . . .

agencies to exploit statutory ambiguities, assert farfetched interpretations, and usurp undelegated policymaking discretion.")

For all the reasons above, the government's interpretation of the Magnuson-Stevens Act is unreasonable because it would afford the government unbounded authority to require industry-funded monitoring. These arguments are enough to show the government's claimed authority is arbitrary, capricious, and manifestly contrary to the statute.

**B.    But even if this Court does find a semblance of authority, the Omnibus Amendment and its implementing rule are arbitrary and capricious.**

Assuming this Court were inclined to hold the government can permissibly implement industry-funded monitoring in any fishery, it should still rule the Omnibus Amendment and its implementing rule are arbitrary and capricious because they do not adequately account for the economic cost the regulation will impose on a large swath of the Atlantic herring fleet.  As the *New York Stock Exchange* court noted, "the process by which [an agency] reaches [its final action] must be logical and rational."  962 F.3d at 554 (citation omitted).  Relatedly, in *Michigan*, one of the agency's failures was that it glossed over cost, particularly considering a necessary-and-appropriate clause:

> Read naturally in the present context, the phrase 'appropriate
> and necessary' requires at least some attention to cost. One
> would not say it rational, never mind 'appropriate' to impose
> billions of dollars in economic costs in return for a few dollars
> in . . . benefits.

*Michigan*, 576 U.S. at 752. And "[a]gencies have long treated cost as a

centrally relevant factor when deciding whether to regulate . . . . No

regulation is 'appropriate' if it does significant more harm than good." *Id.*

at 752–53. This is particularly true when the "[s]tatutory context

reinforces the relevance of cost." *Id.* at 753; *see N.Y. Stock Exch. LLC*,

962 F.3d at 554 (reading *Michigan* to find an agency "strayed far beyond

the bounds of reasonable interpretation when it read 'appropriate and

necessary' to mean that it could ignore cost[.]") (cleaned up and citing

*Michigan*, 576 U.S. at 751).

The statutory context in this case strongly counsels close

consideration of cost. The Magnuson-Stevens Act contains several

National Standards that guide the regional councils and the Secretary

when regulating marine resources. 16 U.S.C. § 1851(a). Two of those

standards are relevant here. Standard Seven requires "[c]onservation

and management measures shall, where practicable, minimize costs and

avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). And Standard

Eight mandates "[c]onservation and management measures shall . . . take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . in order to provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts[.]" 16 U.S.C. § 1851(a)(8).

This appeal does not challenge the district court's decision on the claims alleging violations of National Standards 7 and 8. However, those standards—and the government's inadequate cost analysis—are still relevant to the narrower issue of whether the Omnibus Amendment is a correct exercise of delegated authority to impose an industry-funding requirement, or whether it is arbitrary and capricious.

One line from the district court opinion bears consideration: "it is settled law that 'in making a decision on the practicability of a fishery management amendment, the Secretary does not have to conduct a formal cost/benefit analysis of the measure." A202 (quoting *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1490 (9th Cir. 1987)). But under *Chevron* Step Two, this is wrong. *Michigan*, decided 18 years after *Baldridge*, calls for analysis of cost. And given the statutory context

57

here, the New England Council and the Secretary needed to conduct the same thorough analysis.

Unfortunately, the record is devoid of any such serious analysis. While the government did consider a range of monitoring coverage targets, it never explained why it picked a 50% target coverage rate, how it arrived at that number, or why it was the best approach, especially as compared to the status quo.[4] A202; A313–14. This lack of analysis is fatal to the Omnibus Amendment. While, yes, necessary-and-appropriate clauses leave "agencies with flexibility, an agency may not *entirely fail* to consider an important aspect of the problem when deciding whether regulation is appropriate." *Michigan*, 576 U.S. at 752 (cleaned

---

[4] Additionally, these costs arbitrarily favor certain fishermen over others. For example, certain boats in the herring fishery already receive government-funded monitoring under the Standardized Bycatch Reporting Methodology, which will count as an observed trip under the Omnibus Amendment. A377; A380. But not all vessels will gain that benefit. Herring monitoring is based on permit category, A380, while "SBRM" coverage is based on discard rates. A379. Appellants, as midwater trawl vessels, have some of the lowest discard rates of all fisheries in the region, as does the Atlantic herring fishery as a whole. A356. This means that midwater trawl vessels will bear a greater share of the costs of a 50% industry-funded monitoring target rate, at least compared to herring participants with different gear. A319; A332.

up, citation omitted, and emphasis added).  This failure here resulted in an arbitrary and capricious regulation.

## IV. The Magnuson-Stevens Act could not have authorized the government to overlap the approval processes for the Omnibus Amendment and its implementing regulations.

The Magnuson-Stevens Act provides detailed instructions for how the Secretary of Commerce is to review and approve fishery management plans or amendments, as well as implementing regulations deemed "necessary or appropriate" by a regional council.  But the statute is silent as to the procedure for implementing regulations devised solely by the Secretary, or his designee, without the participation of a regional council.

Here, the district court made a consequential error in presuming the regulations implementing the Omnibus Amendment were ever deemed "necessary or appropriate" by the New England Council.  They were not.  The government's decision to overlap the comment periods and approval processes for the notice of availability, A340–41, and proposed rulemaking, A250–272, is unsupported by the statutory text, reveals prejudgment of the legality of the Omnibus Amendment, and reflects an unwillingness to consider objections raised by interested parties in the public comment process.  This procedural defect is fatal to the rule.

The Secretary plays an important gatekeeping function in fisheries regulation.  After a regional council adopts a new plan or amendment, the Secretary "immediately commence[s] a review" to ensure the council action complies with the Magnuson-Stevens Act, its National Standards, and other applicable laws.  16 U.S.C. § 1854(a)(1)(A).  The Secretary thereafter publishes a notice of availability, which opens a sixty-day comment period.  *Id.* § 1854(a)(1)(B).  The Secretary then has another thirty days to provide a final approval decision, which takes into account the "information, views, and comments received from interested persons[.]"  *Id.* § 1854(a)(2); *see id.* § 1854(a)(1)(B), (a)(3).

Here, the administrative record suggests the government did not strictly follow the statutorily prescribed timeline for review of the Omnibus Amendment.  Upon receipt of the amendment from the New England Council, the government "declared a transmittal date of September 11, 2018[.]"  A342.  Publication of the notice of availability should have taken place before September 16, 2018.  *See* 16 U.S.C. § 1854(a)(5).  But the notice did not appear in the *Federal Register* until September 19, 2018.  A340–41.  Although the government missed this

deadline by only a few days, that delay in many ways typifies the procedural irregularities of the Omnibus Amendment.

As for the government's subsequent actions, the Secretary cleared the Omnibus Amendment as consistent with the Magnuson-Stevens Act and other federal laws on December 17, 2018. A425–38. The next day, NOAA informed the New England Council of that approval in a non-public letter. A406–08. NOAA only published its responses to public comments on the notice of availability roughly fourteen months later, when it published a final rule. A377–405.

The most egregious procedural defect in this case, however, arises from the government's decision to overlap its consideration of the legality of the Omnibus Amendment with its rulemaking to implement the Amendment's management measures, including the industry-funded monitoring requirement. NOAA's implementing regulations should only have been proposed *after* secretarial approval of the Omnibus Amendment had been secured.

As the district court correctly observed, the Magnuson-Stevens Act does provide for "simultaneous" review of regulations a regional council has "deem[ed] necessary or appropriate" to implement a management

plan.  16 U.S.C. § 1853(c).  But the New England Council never approved and transmitted regulations it had "deem[ed] necessary or appropriate," and the administrative record is devoid of anything that would suggest otherwise.  The clearance memorandum for the November 2018 proposed rule, for example, is silent and only mentions transmission of the Omnibus Amendment itself.  A273–79.  The implementing regulations for the Omnibus Amendment were devised entirely by the Secretary. Section 1853(c) simply does not apply, and never did.[5]

The government's failure to follow the rest of the prescribed timeline in Section 1854(b) underscores it was not dealing with proposed regulations "deemed" as "necessary or appropriate."  To wit: if the New England Council had indeed proposed "necessary" implementing regulations, and those regulations were received with the Omnibus Amendment on September 11, 2018, A342, then the government's notice of proposed rulemaking would have needed to appear in the *Federal Register* by the end of the month, at the same time a secretarial

---

[5] Statutory provisions concerning regulations proposed by the Secretary to implement a *secretarial* fishery management plan are inapt because the Secretary of Commerce did not prepare the Omnibus Amendment. *See* 16 U.S.C. § 1854(c)(6)–(7).

determination on the consistency of the regulations with the Omnibus Amendment was due.  16 U.S.C. § 1854(b)(1)(A).  Yet the government waited *two months* after the notice of availability to publish publishing anything about the implementing rule.  A250–72.

Crucially, the Magnuson-Stevens Act also provides "[t]he Secretary shall promulgate final regulations [prepared under Section 1853(c)] *within 30 days after the end of the comment period under paragraph (1)(A)*." 16 U.S.C. § 1854(b)(3) (emphasis added).  The district court noted this requirement but failed to consider whether it had been satisfied in this case.  A241.  If it had, the district court would have found that, while the comment period for the November 2018 proposed rule closed on December 24, 2018, A250, the government did not promulgate its final rule until February 2020.  A377.  That is *more than twelve months* past the presumptive statutory deadline of January 23, 2019.   The government itself obviously did not believe it was dealing with regulations proposed by the New England Council under Section 1853(c).

Whatever Congress's reasons for permitting expedited, simultaneous review of a fishery management plan and council-proposed implementing regulations, those reasons do not apply in this case.  And

the government's alleged "practice" of "publish[ing] a[] [notice of availability] and proposed rule concurrently" cannot stand in as adequate justification. A387. Because the Magnuson-Stevens Act is silent on the matter of implementing regulations devised by the Secretary, the standard principles governing notice-and-comment rulemaking under the APA should apply. Those principles provide an important check on "administrators whose zeal might otherwise [carry] them to excesses not contemplated in legislation creating their offices." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (citation omitted).

By proposing implementing regulations for an *unapproved* fishery plan amendment, but without any statutory authorization, the government effectively prejudged the legality of the Omnibus Amendment and committed itself to proceeding with implementation of industry-funded monitoring. That was a violation of common-sense norms of procedural due process and the APA. Specifically, the decision to overlap these approval processes denied the public the ability to meaningfully comment on the exceedingly controversial rule.

"The process of notice and comment rule-making is not to be an empty charade. . . . One particularly important component . . . is the

opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982). Indeed, "[a]n agency is generally required by the APA . . . to accept and *consider* public comments on its proposal." *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014) (emphasis added).    But here, the government's decision to publish a proposed rule before finalizing what the rule was meant to implement strongly suggests the government's intent to force the Omnibus Amendment onto regulated fishermen regardless of the public outcry,[6] the clear (and unaddressed) legal infirmities, and the negative impact on the long-term viability of the commercial fishing fleet.  It is the same as if the Secretary had proposed regulations to implement a bill still working its way through Congress.

The approval processes for the Omnibus Amendment and implementing regulations were irregular in other ways, too.  The public comment instructions for the notice of availability, for example,

---

[6] A359 ("It has come to my attention that the Secretary of Commerce has approved this amendment prior to the closing of the Public Comment period.  It is disappointing to see the process proceed in this manner. How are public comments considered when the amendment has already been approved?"); A076–83.

confusingly advised interested parties that the agency would accept the submission of comments on the *yet-to-be published* proposed regulations. A341. But the introduction to the government's November 2018 proposed rule failed to mention the *still-pending approval decision* for the Omnibus Amendment except for a single, vague paragraph several pages into the *Federal Register* publication. A252. If anything, the government's language suggested approval of the Omnibus Amendment was a foregone conclusion: "This action proposes regulations to implement the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment." A250. Even sophisticated members of the regulated industry, including a former New England Council member, were confused. A358–59.

To reiterate: an important aspect of the public comment process is that "the *agency's mind must be open* to considering" stakeholder feedback and revaluating its positions. *Grand Canyon Air Tour Coal. v. Fed. Aviation Admin.*, 154 F.3d 455, 468 (D.C. Cir. 1998) (emphasis added). The preambular language of the September 2018 notice of availability and the November 2018 proposed rule, read together, casts serious doubt on the government's willingness to have entertained

66

criticism of the legality of the Omnibus Amendment and industry-funded monitoring. A250–52; A340. The Secretary may have superficially "considered" comments received in response to the notice of availability, but "[c]onsideration of comments as a matter of grace is not enough." *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988). Publication of proposed implementing regulations amid the process of secretarial approval for the underlying fishery management plan is indicative of prejudgment of the Omnibus Amendment.

## CONCLUSION

For these reasons, this Court should reverse the judgement of the district court and vacate the Omnibus Amendment as beyond the power of the agency.

Dated: November 16, 2021    Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
Eric R. Bolinder

CAUSE OF ACTION INSTITUTE
1310 N. Courthouse Rd., Ste. 700
Arlington, VA 22201
Telephone: (571) 444-4182

*Counsel for Appellants*

67

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,630 words, as counted by the word-processing system used to prepare the document and excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: November 16, 2021          /s/ Ryan P. Mulvey
                                  Ryan P. Mulvey

                                  *Counsel for Appellants*

## Statutory Addendum

16 U.S.C. § 1821................................................................................. ADD-1

16 U.S.C. § 1853................................................................................. ADD-4

16 U.S.C. § 1853a.............................................................................. ADD-16

16 U.S.C. § 1854................................................................................ ADD-12

16 U.S.C. § 1858................................................................................ ADD-17

16 U.S.C. § 1862................................................................................ ADD-19

## 16 U.S.C. § 1821 – Foreign fishing

[. . .]

(h) Full observer coverage program

(1)(A) Except as provided in paragraph (2), the Secretary shall establish a program under which a United States observer will be stationed aboard each foreign fishing vessel while that vessel is engaged in fishing within the exclusive economic zone.

(B) The Secretary shall by regulation prescribe minimum health and safety standards that shall be maintained aboard each foreign fishing vessel with regard to the facilities provided for the quartering of, and the carrying out of observer functions by, United States observers.

(2) The requirement in paragraph (1) that a United States observer be placed aboard each foreign fishing vessel may be waived by the Secretary if he finds that—

(A) in a situation where a fleet of harvesting vessels transfers its catch taken within the exclusive economic zone to another vessel, aboard which is a United States observer, the stationing of United States observers on only a portion of the harvesting vessel fleet will provide a representative sampling of the by-catch of the fleet that is sufficient for purposes of determining whether the requirements of the applicable management plans for the by-catch species are being complied with;

(B) in a situation where the foreign fishing vessel is operating under a Pacific Insular Area fishing agreement, the Governor of the applicable Pacific Insular Area, in consultation with the Western Pacific Council, has established an observer coverage program or other monitoring program that the Secretary, in consultation with the Western Pacific Management Council, determines is adequate to monitor harvest, bycatch, and compliance with the laws of the United States by vessels fishing under the agreement;

(C) the time during which a foreign fishing vessel will engage in fishing within the exclusive economic zone will be of such short duration that the placing of a United States observer aboard the vessel would be impractical; or

(D) for reasons beyond the control of the Secretary, an observer is not available.

(3) Observers, while stationed aboard foreign fishing vessels, shall carry out such scientific, compliance monitoring, and other functions as the Secretary deems necessary or appropriate to carry out the purposes of this chapter; and shall cooperate in carrying out such other scientific programs relating to the conservation and management of living resources as the Secretary deems appropriate.

(4) In addition to any fee imposed under section 1824(b)(10) of this title and section 1980(e) of Title 22 with respect to foreign fishing for any year after 1980, the Secretary shall impose, with respect to each foreign fishing vessel for which a permit is issued under such section 1824 of this title, a surcharge in an amount sufficient to cover all the costs of providing a United States observer aboard that vessel.  The failure to pay any surcharge imposed under this paragraph shall be treated by the Secretary as a failure to pay the permit fee for such vessel under section 1824(b)(10) of this title.  All surcharges collected by the Secretary under this paragraph shall be deposited in the Foreign Fishing Observer Fund established by paragraph (5).

(5) There is established in the Treasury of the United States the Foreign Fishing Observer Fund.  The Fund shall be available to the Secretary as a revolving fund for the purpose of carrying out this subsection.  The Fund shall consist of the surcharges deposited into it as required under paragraph (4).  All payments made by the Secretary to carry out this subsection shall be paid from the Fund, only to the extent and in the amounts provided for in advance in appropriation Acts.  Sums in the Fund which are not currently needed for the purposes of this subsection shall be kept on deposit or invested in obligations of, or guaranteed by, the United States.

(6) If at any time the requirement set forth in paragraph (1) cannot be met because of insufficient appropriations, the Secretary shall, in implementing a supplementary observer program:

(A) certify as observers, for the purposes of this subsection, individuals who are citizens or nationals of the United States and who have the requisite education or experience to carry out the functions referred to in paragraph (3);

(B) establish standards of conduct for certified observers equivalent to those applicable to Federal personnel;

(C) establish a reasonable schedule of fees that certified observers or their agents shall be paid by the owners and operators of foreign fishing vessels for observer services; and

(D) monitor the performance of observers to ensure that it meets the purposes of this chapter.

## 16 U.S.C. § 1853 – Contents of fishery management plans

(a) Required provisions — Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—

(1) contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are—

(A) necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;

(B) described in this subsection or subsection (b), or both; and

(C) consistent with the national standards, the other provisions of this chapter, regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law;

(2) contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interests in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any;

(3) assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification;

(4) assess and specify—

(A) the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield specified under paragraph (3),

(B) the portion of such optimum yield which, on an annual basis, will not be harvested by fishing vessels of the United States and can be made available for foreign fishing, and

(C) the capacity and extent to which United States fish processors, on an annual basis, will process that portion of such optimum yield that will be harvested by fishing vessels of the United States;

(5) specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational, charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of, and the actual processing capacity utilized by, United States fish processors,

(6) consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;

(7) describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under section 1855(b)(1)(A) of this title, minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat;

(8) in the case of a fishery management plan that, after January 1, 1991, is submitted to the Secretary for review under section 1854(a) of this title (including any plan for which an amendment is submitted to the Secretary for such review) or is prepared by the Secretary, assess and specify the nature and extent of scientific data which is needed for effective implementation of the plan;

(9) include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for—

    (A) participants in the fisheries and fishing communities affected by the plan or amendment;

    (B) participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants; and

    (C) the safety of human life at sea, including whether and to what extent such measures may affect the safety of participants in the fishery;

(10) specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery;

(11) establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority—

(A) minimize bycatch; and

(B) minimize the mortality of bycatch which cannot be avoided;

(12) assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish;

(13) include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery, including its economic impact, and, to the extent practicable, quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors;

(14) to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery and;[3]

(15) establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

(b) Discretionary provisions — Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may—

(1) require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to--

(A) any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone or for anadromous species or Continental Shelf fishery resources beyond such zone;

(B) the operator of any such vessel; or

(C) any United States fish processor who first receives fish that are subject to the plan;

(2)(A) designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specified types and quantities of fishing gear;

(B) designate such zones in areas where deep sea corals are identified under section 1884 of this title, to protect deep sea corals from physical damage from fishing gear or to prevent loss or damage to such fishing gear from interactions with deep sea corals, after considering long-term sustainable uses of fishery resources in such areas; and

(C) with respect to any closure of an area under this chapter that prohibits all fishing, ensure that such closure--

(i) is based on the best scientific information available;

(ii) includes criteria to assess the conservation benefit of the closed area;

(iii) establishes a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and

(iv) is based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures (either alone or in combination with such measures), including the benefits and impacts of limiting access to: users of the area, overall fishing activity, fishery science, and fishery and marine conservation;

ADD-8

(3) establish specified limitations which are necessary and appropriate for the conservation and management of the fishery on the--

     (A) catch of fish (based on area, species, size, number, weight, sex, bycatch, total biomass, or other factors);

     (B) sale of fish caught during commercial, recreational, or charter fishing, consistent with any applicable Federal and State safety and quality requirements; and

     (C) transshipment or transportation of fish or fish products under permits issued pursuant to section 1824 of this title;

(4) prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter;

(5) incorporate (consistent with the national standards, the other provisions of this chapter, and any other applicable law) the relevant fishery conservation and management measures of the coastal States nearest to the fishery and take into account the different circumstances affecting fisheries from different States and ports, including distances to fishing grounds and proximity to time and area closures;

(6) establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account--

     (A) present participation in the fishery;

     (B) historical fishing practices in, and dependence on, the fishery;

     (C) the economics of the fishery;

     (D) the capability of fishing vessels used in the fishery to engage in other fisheries;

(E) the cultural and social framework relevant to the fishery and any affected fishing communities;

(F) the fair and equitable distribution of access privileges in the fishery; and

(G) any other relevant considerations;

(7) require fish processors who first receive fish that are subject to the plan to submit data which are necessary for the conservation and management of the fishery;

(8) require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

(9) assess and specify the effect which the conservation and management measures of the plan will have on the stocks of naturally spawning anadromous fish in the region;

(10) include, consistent with the other provisions of this chapter, conservation and management measures that provide harvest incentives for participants within each gear group to employ fishing practices that result in lower levels of bycatch or in lower levels of the mortality of bycatch;

(11) reserve a portion of the allowable biological catch of the fishery for use in scientific research;

(12) include management measures in the plan to conserve target and non-target species and habitats, considering the variety of ecological factors affecting fishery populations; and

(14)  [*sic*] prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery.

(c) Proposed regulations — Proposed regulations which the Council deems necessary or appropriate for the purposes of—

(1) implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment under section 1854 of this title; and

(2) making modifications to regulations implementing a fishery management plan or plan amendment may be submitted to the Secretary at any time after the plan or amendment is approved under section 1854 of this title.

**16 U.S.C. § 1853a – Limited access privilege programs**

[. . .]

(e) Cost recovery — In establishing a limited access privilege program, a Council shall—

    (1) develop a methodology and the means to identify and assess the management, data collection and analysis, and enforcement programs that are directly related to and in support of the program; and

    (2) provide, under section 1854(d)(2) of this title, for a program of fees paid by limited access privilege holders that will cover the costs of management, data collection and analysis, and enforcement activities.

## 16 U.S.C. § 1854 – Action by Secretary

(a) Review of plans

(1) Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall—

(A) immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law; and

(B) immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

(2) In undertaking the review required under paragraph (1), the Secretary shall--

(A) take into account the information, views, and comments received from interested persons;

(B) consult with the Secretary of State with respect to foreign fishing; and

(C) consult with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea and to fishery access adjustments referred to in section 1853(a)(6) of this title.

(3) The Secretary shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period under paragraph (1) by written notice to the Council. A notice of disapproval or partial approval shall specify—

(A) the applicable law with which the plan or amendment is inconsistent;

(B) the nature of such inconsistencies; and

(C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.

If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved.

(4) If the Secretary disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review under this subsection.

(5) For purposes of this subsection and subsection (b), the term "immediately" means on or before the 5th day after the day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final.

(b) Review of regulations

(1) Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and—

(A) if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an

explanation of those changes, for a public comment period of 15 to 60 days; or

(B) if that determination is negative, the Secretary shall notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the fishery management plan, plan amendment, this chapter, and other applicable law.

(2) Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation under paragraph (1).

(3) The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (1)(A). The Secretary shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations.

[. . .]

(d) Establishment of fees

(1) The Secretary shall by regulation establish the level of any fees which are authorized to be charged pursuant to section 1853(b)(1) of this title. The Secretary may enter into a cooperative agreement with the States concerned under which the States administer the permit system and the agreement may provide that all or part of the fees collected under the system shall accrue to the States. The level of fees charged under this subsection shall not exceed the administrative costs incurred in issuing the permits.

(2)(A) Notwithstanding paragraph (1), the Secretary is authorized and shall collect a fee to recover the actual costs directly related to the management, data collection, and enforcement of any—

(i) limited access privilege program; and

(ii) community development quota program that allocates a percentage of the total allowable catch of a fishery to such program.

(B) Such fee shall not exceed 3 percent of the ex-vessel value of fish harvested under any such program, and shall be collected at either the time of the landing, filing of a landing report, or sale of such fish during a fishing season or in the last quarter of the calendar year in which the fish is harvested.

(C)(i) Fees collected under this paragraph shall be in addition to any other fees charged under this chapter and shall be deposited in the Limited Access System Administration Fund established under section 1855(h)(5)(B) of this title.

(ii) Upon application by a State, the Secretary shall transfer to such State up to 33 percent of any fee collected pursuant to subparagraph (A) under a community development quota program and deposited in the Limited Access System Administration Fund in order to reimburse such State for actual costs directly incurred in the management and enforcement of such program.

[. . .]

## 16 U.S.C. § 1858 – Civil penalties and permit sanctions

[. . .]

(g) Permit sanctions

(1) In any case in which (A) a vessel has been used in the commission of an act prohibited under section 1857 of this title, (B) the owner or operator of a vessel or any other person who has been issued or has applied for a permit under this chapter has acted in violation of section 1857 of this title, (C) any amount in settlement of a civil forfeiture imposed on a vessel or other property, or any civil penalty or criminal fine imposed on a vessel or owner or operator of a vessel or any other person who has been issued or has applied for a permit under any marine resource law enforced by the Secretary has not been paid and is overdue, or (D) any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit under any marine resource law administered by the Secretary has not been paid and is overdue, the Secretary may—

(i) revoke any permit issued with respect to such vessel or person, with or without prejudice to the issuance of subsequent permits;

(ii) suspend such permit for a period of time considered by the Secretary to be appropriate;

(iii) deny such permit; or

(iv) impose additional conditions and restrictions on any permit issued to or applied for by such vessel or person under this chapter and, with respect to foreign fishing vessels, on the approved application of the foreign nation involved and on any permit issued under that application.

(2) In imposing a sanction under this subsection, the Secretary shall take into account—

(A) the nature, circumstances, extent, and gravity of the prohibited acts for which the sanction is imposed; and

(B) with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require.

(3) Transfer of ownership of a vessel, by sale or otherwise, shall not extinguish any permit sanction that is in effect or is pending at the time of transfer of ownership. Before executing the transfer of ownership of a vessel, by sale or otherwise, the owner shall disclose in writing to the prospective transferee the existence of any permit sanction that will be in effect or pending with respect to the vessel at the time of the transfer.

(4) In the case of any permit that is suspended under this subsection for nonpayment of a civil penalty or criminal fine, the Secretary shall reinstate the permit upon payment of the penalty or fine and interest thereon at the prevailing rate.

(5) No sanctions shall be imposed under this subsection unless there has been a prior opportunity for a hearing on the facts underlying the violation for which the sanction is imposed, either in conjunction with a civil penalty proceeding under this section or otherwise.

## 16 U.S.C. § 1862 – North Pacific fisheries conservation

(a) In general — The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which—

(1) requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and

(2) establishes a system, or system [*sic*], of fees which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

(b) Standards

(1) Any plan or plan amendment prepared under this section shall be reasonably calculated to—

(A) gather reliable data, by stationing observers on all or a statistically reliable sample of the fishing vessels and United States fish processors included in the plan, necessary for the conservation, management, and scientific understanding of the fisheries covered by the plan;

(B) be fair and equitable to all vessels and processors;

(C) be consistent with applicable provisions of law; and

(D) take into consideration the operating requirements of the fisheries and the safety of observers and fishermen.

(2) Any system of fees established under this section shall—

(A) provide that the total amount of fees collected under this section not exceed the combined cost of (i) stationing observers, or electronic monitoring systems, on board fishing vessels and United States fish processors, (ii) the actual cost of inputting collected data, and (iii) assessments necessary for a risk-sharing pool implemented under subsection (e) of this section, less any amount received for such purpose from another source or from an existing surplus in the North Pacific Fishery Observer Fund established in subsection (d) of this section;

(B) be fair and equitable to all participants in the fisheries under the jurisdiction of the Council, including the Northern Pacific halibut fishery;

(C) provide that fees collected not be used to pay any costs of administrative overhead or other costs not directly incurred in carrying out the plan;

(D) not be used to offset amounts authorized under other provisions of law;

(E) be expressed as a fixed amount reflecting actual observer costs as described in subparagraph (A) or a percentage, not to exceed 2 percent, of the unprocessed ex-vessel value of fish and shellfish harvested under the jurisdiction of the Council, including the Northern Pacific halibut fishery;

(F) be assessed against some or all fishing vessels and United States fish processors, including those not required to carry an observer or an electronic monitoring system under the plan, participating in fisheries under the jurisdiction of the Council, including the Northern Pacific halibut fishery;

(G) provide that fees collected will be deposited in the North Pacific Fishery Observer Fund established under subsection (d) of this section;

(H) provide that fees collected will only be used for implementing the plan established under this section;

(I) provide that fees collected will be credited against any fee for stationing observers or electronic monitoring systems on board fishing vessels and United States fish processors and the actual cost of inputting collected data to which a fishing vessel or fish processor is subject under section 1854(d) of this title; and

(J) meet the requirements of section 9701(b) of Title 31.

[. . .]

(d) Fishery Observer Fund — There is established in the Treasury a North Pacific Fishery Observer Fund. The Fund shall be available, without appropriation or fiscal year limitation, only to the Secretary for the purpose of carrying out the provisions of this section, subject to the restrictions in subsection (b)(2) of this section. The Fund shall consist of all monies deposited into it in accordance with this section. Sums in the Fund that are not currently needed for the purposes of this section shall be kept on deposit or invested in obligations of, or guaranteed by, the United States.

(e) Special provisions regarding observers

(1) The Secretary shall review—

(A) the feasibility of establishing a risk sharing pool through a reasonable fee, subject to the limitations of subsection (b)(2)(E) of this section, to provide coverage for vessels and owners against liability from civil suits by observers, and

(B) the availability of comprehensive commercial insurance for vessel and owner liability against civil suits by observers.

(2) If the Secretary determines that a risk sharing pool is feasible, the Secretary shall establish such a pool, subject to the provisions of subsection (b)(2) of this section, unless the Secretary determines that—

(A) comprehensive commercial insurance is available for all fishing vessels and United States fish processors required to have observers under the provisions of this section, and

(B) such comprehensive commercial insurance will provide a greater measure of coverage at a lower cost to each participant.

[. . .]

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2021, I filed the foregoing Opening Brief of Appellants in the United States Court of Appeals for the District of Columbia Circuit using the Appellate CM/ECF system. Service will be accomplished by the Appellate CM/ECF System. As required by Circuit Rule 31(b), I will also cause to be filed eight paper copies of the brief with the Court.

/s/ Ryan P. Mulvey
Ryan P. Mulvey

*Counsel for Appellants*