**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 21-5166**

_____

**Loper Bright Enterprises, Inc., *et al.*
*Plaintiffs-Appellants,***

**v.**

**Gina Raimondo, in her official capacity
as Secretary of Commerce, *et al.*,
*Defendants-Appellees.***

_____

On Appeal from the United States District Court
for the District of Columbia
Civil Action No. 20-0466 (Hon. Emmet G. Sullivan)

_____

**APPENDIX – VOLUME I
(A001–A247)**

_____

RYAN P. MULVEY
ERIC R. BOLINDER
CAUSE OF ACTION INSTITUTE
1310 N. Courthouse Rd., Ste. 700
Arlington, VA 22201
Telephone: (571) 444-4182

*Counsel for Plaintiffs-Appellants*

November 16, 2021

# TABLE OF CONTENTS

District Court Docket Sheet ............................................................ A001

Complaint [Doc. 1] ........................................................................ A009

Complaint Exhibits

    Exhibit 1 – Nov. 8, 2016 Comment Letter [Doc. 1-1] ...................... A040

    Exhibit 2 – Sept. 19, 2018 Notice of Availability [Doc. 1-2] ............ A042

    Exhibit 3 – Nov. 19, 2018 Comment Letter [Doc. 1-3] ................... A045

    Exhibit 4 – Nov. 7, 2018 Proposed Rule [Doc. 1-4] ........................ A048

    Exhibit 5 – Dec. 18, 2018 NOAA Letter [Doc. 1-5] ........................ A072

    Exhibit 6 – Feb. 12, 2019 Cause of Action Inst. Letter [Doc. 1-6] .. A076

    Exhibit 7 – Aug. 8, 2019 Sec'y of Commerce Letter [Doc. 1-7] ....... A084

    Exhibit 8 – Feb. 7, 2020 Final Rule [Doc. 1-8] ............................... A086

Answer [Doc. 12] .......................................................................... A116

Certified List of the Administrative Record [Doc. 13-1] ................... A139

June 15, 2021 District Court Order [Doc. 36] .................................. A155

June 15, 2021 District Court Memorandum Opinion [Doc. 37] ........ A156

June 23, 2021 District Court Final Judgment [Doc. 38] ................... A244

June 24, 2021 Clerk's Notice of Final Judgment [Doc. 39] ............... A246

July 15, 2021 Notice of Appeal [Doc. 40] ........................................ A247

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:20−cv−00466−EGS

LOPER BRIGHT ENTERPRISES, INC. et al v. WILBUR L. ROSS, JR. et al
Assigned to: Judge Emmet G. Sullivan
Case in other court: 21−05166
Cause: 16:1801 Fishery Conservation and Management Act (FCMA)

Date Filed: 02/19/2020
Date Terminated: 06/24/2021
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**LOPER BRIGHT ENTERPRISES, INC.**

represented by **Eric R. Bolinder**
CAUSE OF ACTION INSTITUTE
1310 N. Courthouse Rd
Suite 700
Arlington, VA 22079
571−329−3324
Email: eric.bolinder@causeofaction.org
*ATTORNEY TO BE NOTICED*

**Ryan Patrick Mulvey**
CAUSE OF ACTION INSTITUTE
1310 N. Courthouse Road
Suite 700
Arlington, VA 22201−2961
571−444−2841
Email: ryan.mulvey@causeofaction.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**H&L AXELSSON, INC.**

represented by **Eric R. Bolinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Patrick Mulvey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CAPE TRAWLERS, INC.**

represented by **Eric R. Bolinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Patrick Mulvey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SCOMBRUS ONE LLC**

represented by **Eric R. Bolinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Patrick Mulvey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GOLDEN NUGGET LLC**

represented by

A001

Eric R. Bolinder
(See above for address)
*ATTORNEY TO BE NOTICED*

Ryan Patrick Mulvey
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LUND MARR TRAWLERS LLC**                represented by    Eric R. Bolinder
(See above for address)
*ATTORNEY TO BE NOTICED*

Ryan Patrick Mulvey
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MOUNT VERNON LLC**                represented by    Eric R. Bolinder
(See above for address)
*ATTORNEY TO BE NOTICED*

Ryan Patrick Mulvey
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NANCY ELIZABETH LLC**                represented by    Eric R. Bolinder
(See above for address)
*ATTORNEY TO BE NOTICED*

Ryan Patrick Mulvey
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**WILBUR L. ROSS, JR.**                represented by    Alison C. Finnegan
*in his official capacity as Secretary of*          U.S. DEPARTMENT OF JUSTICE
*Commerce*          Environment & Natural Resources
*TERMINATED: 03/29/2021*          Division
P.O. Box 7611
Washington, DC 20044–7611
(202) 305–0500
Email: alison.c.finnegan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Kristine S. Tardiff
UNITED STATES DEPARTMENT OF
JUSTICE
Environment & Natural Resources
Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
603–230–2583
Email: kristine.tardiff@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF COMMERCE**

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NEIL JACOBS**
*in his official capacity as Acting NOAA Administrator*

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION**

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRIS OLIVER**
*in his official capacity as Assistant Administrator for NOAA Fisheries*

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL MARINE FISHERIES SERVICE**

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristine S. Tardiff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**GINA RAIMONDO**
*in her official capacity as Secretary of Commerce*

represented by **Alison C. Finnegan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/19/2020 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number ADCDC–6843123) filed by LUND MARR TRAWLERS LLC, CAPE TRAWLERS, INC., MOUNT VERNON LLC, H&L AXELSSON, INC., NANCY ELIZABETH LLC, LOPER BRIGHT ENTERPRISES, INC., SCOMBRUS ONE LLC, GOLDEN |

**A003**

| | | |
|---|---|---|
| | | NUGGET LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Civil Cover Sheet, # 10 Summons Wilbur L. Ross, Jr., # 11 Summons Dep't of Commerce, # 12 Summons Neil Jacobs, # 13 Summons NOAA, # 14 Summons Chris Oliver, # 15 Summons NMFS, # 16 Summons U.S. Att'y Gen., # 17 Summons U.S.A.O. Civil Process Clerk)(Mulvey, Ryan) (Entered: 02/19/2020) |
| 02/19/2020 | 2 | NOTICE of Appearance by Eric R. Bolinder on behalf of All Plaintiffs (Bolinder, Eric) (Entered: 02/19/2020) |
| 02/20/2020 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests *of All Plaintiffs* by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Mulvey, Ryan) (Entered: 02/20/2020) |
| 02/21/2020 | | Case Assigned to Judge Emmet G. Sullivan. (adh, ) (Entered: 02/21/2020) |
| 02/21/2020 | 4 | SUMMONS (8) Issued Electronically as to CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR., U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(adh, ) (Entered: 02/21/2020) |
| 02/25/2020 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to U.S. Attorney served on 2/24/2020, answer due 4/9/2020. (Mulvey, Ryan) Modified on 2/25/2020 to correct filer (jf). (Entered: 02/25/2020) |
| 02/25/2020 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/24/2020. Answer due for ALL FEDERAL DEFENDANTS by 4/9/2020. (See Docket Entry 5 to view document)(jf) (Entered: 02/25/2020) |
| 02/28/2020 | 7 | STANDING ORDER: The parties are directed to read the attached Standing Order Governing Civil Cases Before Judge Emmet G. Sullivan in its entirety upon receipt. The parties are hereby ORDERED to comply with the directives in the attached Standing Order. Signed by Judge Emmet G. Sullivan on 02/28/20. (Attachment: Exhibit 1) (mac) (Entered: 02/28/2020) |
| 03/05/2020 | 8 | NOTICE of Appearance by Alison C. Finnegan on behalf of CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Finnegan, Alison) (Entered: 03/05/2020) |
| 03/09/2020 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 02/24/2020. (Mulvey, Ryan) (Entered: 03/09/2020) |
| 03/09/2020 | 10 | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. All Defendants (Mulvey, Ryan) Modified on 3/9/2020 (jf). (Entered: 03/09/2020) |
| 03/09/2020 | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 10 Summons Returned Executed as to Federal Defendant was entered in error and counsel was instructed to refile said pleading without selecting the radio button. (jf) (Entered: 03/09/2020) |
| 03/09/2020 | 11 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILBUR L. ROSS, JR. served on 2/24/2020. (Entered: 03/09/2020) |
| 04/09/2020 | 12 | ANSWER to Complaint by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR..(Finnegan, Alison) (Entered: 04/09/2020) |
| 04/09/2020 | 13 | NOTICE *of Administrative Record and Certified List of Administrative Record Documents* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL |

| | | JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Attachments: # 1 Exhibit A (Index of Administrative Record Documents), # 2 Exhibit B (Certification))(Finnegan, Alison) (Entered: 04/09/2020) |
|---|---|---|
| 04/21/2020 | 14 | Joint MOTION for Briefing Schedule by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Attachments: # 1 Text of Proposed Order)(Mulvey, Ryan) (Entered: 04/21/2020) |
| 04/21/2020 | 15 | Unopposed MOTION to Expedite by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Attachments: # 1 Text of Proposed Order)(Mulvey, Ryan) (Entered: 04/21/2020) |
| 04/21/2020 | 16 | Consent MOTION for Order *to Drop Parties under Rule 21* by CAPE TRAWLERS, INC., GOLDEN NUGGET LLC, H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, MOUNT VERNON LLC, NANCY ELIZABETH LLC, SCOMBRUS ONE LLC (Attachments: # 1 Text of Proposed Order)(Mulvey, Ryan) (Entered: 04/21/2020) |
| 04/22/2020 | | MINUTE ORDER granting 14 Joint Motion for Briefing Schedule; holding in abeyance 15 Unopposed Motion to Expedite; granting 16 Consent Motion for Order to Drop Parties under Rule 21. It is hereby ORDERED that the parties shall adhere to the following briefing schedule: (1) Plaintiffs shall file their motion for summary judgment by no later than June 8, 2020; (2) Defendants shall file their opposition to Plaintiffs' motion for summary judgment and cross–motion for summary judgment by no later than July 24, 2020; (3) Plaintiffs shall file their reply brief and opposition to Defendants' cross–motion for summary judgment by no later than August 14, 2020; and (4) Defendants shall file their reply brief by no later than September 4, 2020. It is FURTHER ORDERED that the parties shall file a joint status report by no later than May 8, 2020, addressing Plaintiffs' request to schedule a hearing pursuant to 16 U.S.C. § 1855(f)(4) in light of the COVID–19 pandemic; and proposing dates for said hearing. It is FURTHER ORDERED that Cape Trawlers, Inc., Golden Nugget LLC, Mount Vernon LLC, and Nancy Elizabeth LLC are dropped as plaintiffs from this case pursuant to Federal Rule of Civil Procedure 21. Signed by Judge Emmet G. Sullivan on 4/22/2020. (lcegs3) (Entered: 04/22/2020) |
| 04/23/2020 | | Set/Reset Deadlines: Plaintiffs Motion For Summary Judgment due by 6/8/2020. Defendants Opposition To Plaintiffs' Motion For Summary Judgment And Cross–Motion For Summary Judgment due by 7/24/2020. Plaintiffs Reply Brief And Opposition To Defendants' Cross–Motion For Summary Judgment due by 8/14/2020. Defendants Reply Brief due by 9/4/2020. Joint Status Report due by 5/8/2020 (mac) (Entered: 04/23/2020) |
| 05/04/2020 | 17 | Joint STATUS REPORT by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 05/04/2020) |
| 05/04/2020 | | MINUTE ORDER granting 15 Unopposed Motion to Expedite in light of the parties' representations in the 17 Joint Status Report. Plaintiffs bring this action under the Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* Section 1855(f)(4) provides that "[u]pon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way." 16 U.S.C. § 1855(f)(4). Given the difficulties posed by the ongoing COVID–19 pandemic, the parties state that "[t]he Court could reassess the feasibility of an in–person court hearing shortly before any scheduled hearing would be held." Joint Status Report, ECF No. 17 at 2. And "Defendants defer to the Court's determination of whether it is appropriate to schedule a hearing on the parties' cross–motions for summary judgment or whether the Court will decide the matter on the papers." *Id.* at 2 n.1. Pursuant to 16 U.S.C. § 1855(f)(4) and upon consideration of the parties' proposals, the Court hereby schedules the hearing on the parties' cross–motions for summary judgment for October 9, 2020 at 1:00 PM in Courtroom 24A. The parties shall file a joint status report by no later than September 25, 2020, informing the Court |

| | | |
|---|---|---|
| | | whether a hearing is necessary following the completion of the summary judgment briefing. Signed by Judge Emmet G. Sullivan on 5/4/2020. (lcegs3) (Entered: 05/04/2020) |
| 05/05/2020 | | Set/Reset Deadlines/Hearings: Status Report due by 9/25/2020. Hearing On Cross−Motions set for 10/9/2020 at 01:00 PM in Courtroom 24A before Judge Emmet G. Sullivan. (mac) (Entered: 05/05/2020) |
| 06/08/2020 | 18 | MOTION for Summary Judgment by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Mulvey, Ryan) (Entered: 06/08/2020) |
| 07/01/2020 | 19 | NOTICE of Appearance by Kristine S. Tardiff on behalf of All Defendants (Tardiff, Kristine) (Entered: 07/01/2020) |
| 07/24/2020 | 20 | Cross MOTION for Summary Judgment *& Memorandum in Support of Cross−Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Finnegan, Alison) (Entered: 07/24/2020) |
| 07/24/2020 | 21 | Memorandum in opposition to re 18 MOTION for Summary Judgment filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (See Docket Entry 23 to view document) (zjf) (Entered: 07/27/2020) |
| 07/27/2020 | | NOTICE OF ERROR re 20 Motion for Summary Judgment; emailed to alison.c.finnegan@usdoj.gov, cc'd 6 associated attorneys −− The PDF file you docketed contained errors: 1. Two−part docket entry, 2. DO NOT REFILE − Counsel is reminded to docket all parts of their filing (zjf, ) (Entered: 07/27/2020) |
| 08/14/2020 | 22 | Memorandum in opposition to re 20 Cross MOTION for Summary Judgment *& Memorandum in Support of Cross−Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* filed by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Attachments: # 1 Declaration of Jeffrey Howard Kaelin)(Mulvey, Ryan) (Entered: 08/14/2020) |
| 08/14/2020 | 23 | REPLY to opposition to motion re 18 MOTION for Summary Judgment filed by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 08/14/2020) |
| 08/25/2020 | 24 | MOTION to Exclude Plaintiffs' Extra−Record Declaration *(ECF 22−1)* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Finnegan, Alison) (Entered: 08/25/2020) |
| 09/03/2020 | 25 | Memorandum in opposition to re 24 MOTION to Exclude Plaintiffs' Extra−Record Declaration *(ECF 22−1)* filed by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Attachments: # 1 Exhibit 2014 MAFMC Cost Survey)(Mulvey, Ryan) (Entered: 09/03/2020) |
| 09/04/2020 | 26 | REPLY to opposition to motion re 20 Cross MOTION for Summary Judgment *& Memorandum in Support of Cross−Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Finnegan, Alison) (Entered: 09/04/2020) |
| 09/10/2020 | 27 | REPLY to opposition to motion re 24 MOTION to Exclude Plaintiffs' Extra−Record Declaration *(ECF 22−1)* filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC |

| | | |
|---|---|---|
| | | ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Attachments: # 1 Exhibit 1 (AR17683 (cmt from Lund's Fisheries)), # 2 Exhibit 2 (AR10728 (IFM Amendment Discussion Document)))(Finnegan, Alison) (Entered: 09/10/2020) |
| 09/16/2020 | 28 | JOINT APPENDIX by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 09/16/2020) |
| 09/25/2020 | 29 | Joint STATUS REPORT by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. (Mulvey, Ryan) (Entered: 09/25/2020) |
| 09/30/2020 | | MINUTE ORDER. In view of 29 joint status report and the Court's forthcoming Memorandum Opinion and Order, the Court hereby cancels the motion hearing scheduled for October 9, 2020. Signed by Judge Emmet G. Sullivan on 9/30/2020. (lcegs3) (Entered: 09/30/2020) |
| 01/26/2021 | 30 | ERRATA *re: Memorandum in Support of Cross−Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Finnegan, Alison) (Entered: 01/26/2021) |
| 02/22/2021 | 31 | NOTICE OF SUPPLEMENTAL AUTHORITY by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Attachments: # 1 Exhibit Burke v. Coggins, No. 20−0667 (D.D.C. Feb. 18, 2021))(Mulvey, Ryan) (Entered: 02/22/2021) |
| 02/25/2021 | 32 | RESPONSE re 31 NOTICE OF SUPPLEMENTAL AUTHORITY filed by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR.. (Finnegan, Alison) (Entered: 02/25/2021) |
| 03/26/2021 | 33 | NOTICE *of Factual Development* by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Attachments: # 1 Exhibit A)(Mulvey, Ryan) (Entered: 03/26/2021) |
| 03/29/2021 | 34 | NOTICE *Regarding Industry−Funded Monitoring Coverage in the Atlantic Herring Fishery* by CHRIS OLIVER, NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NEIL JACOBS, U.S. DEPARTMENT OF COMMERCE, WILBUR L. ROSS, JR. (Finnegan, Alison) (Entered: 03/29/2021) |
| 05/17/2021 | 35 | NOTICE *of Factual Development* by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC (Mulvey, Ryan) (Entered: 05/17/2021) |
| 06/15/2021 | 36 | ORDER denying 18 Plaintiffs' Motion for Summary Judgment; granting 20 Defendants' Cross−Motion for Summary Judgment; and granting 24 Defendants' Motion to Exclude. Signed by Judge Emmet G. Sullivan on 6/15/2021. (lcegs3) (Entered: 06/15/2021) |
| 06/15/2021 | 37 | MEMORANDUM OPINION. Signed by Judge Emmet G. Sullivan on 6/15/2021. (lcegs3) (Entered: 06/15/2021) |
| 06/23/2021 | 38 | FINAL JUDGMENT. Signed by Judge Emmet G. Sullivan on 6/23/2021. (lcegs3) (Entered: 06/23/2021) |
| 06/24/2021 | 39 | JUDGMENT in favor of Defendants against Plaintiffs Signed by Judge Emmet G. Sullivan on 06/24/21. (mac) (Entered: 06/24/2021) |
| 07/15/2021 | 40 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 36 Order on Motion for Summary Judgment, Order on Motion for Miscellaneous Relief, 39 Judgment, 37 Memorandum & Opinion, 38 Order by H&L AXELSSON, INC., LOPER BRIGHT ENTERPRISES, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC. Filing fee $ 505, receipt number ADCDC−8601448. Fee Status: Fee Paid. Parties have been notified. (Mulvey, Ryan) (Entered: 07/15/2021) |

| 07/15/2021 | 41 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 40 Notice of Appeal to DC Circuit Court. (zjf) (Entered: 07/15/2021) |
|---|---|---|
| 07/19/2021 | | USCA Case Number 21–5166 for 40 Notice of Appeal to DC Circuit Court, filed by H&L AXELSSON, INC., LUND MARR TRAWLERS LLC, SCOMBRUS ONE LLC, LOPER BRIGHT ENTERPRISES, INC. (zjf) (Entered: 07/19/2021) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC.<br>c/o William Bright, President<br>615 Goshen Road<br>Cape May Courthouse, NJ 08210; | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| H&L AXELSSON, INC.<br>c/o Lars Axelsson, President<br>738 Shunpike Road<br>Cape May, NJ 08204; | ) <br> ) <br> ) <br> ) <br> ) |
| CAPE TRAWLERS, INC.;<br>SCOMBRUS ONE LLC;<br>GOLDEN NUGGET LLC;<br>LUND MARR TRAWLERS LLC;<br>MOUNT VERNON LLC; and<br>NANCY ELIZABETH LLC<br>c/o Jeffrey Reichle, Chairman/Managing Member<br>997 Ocean Drive<br>Cape May, NJ 08204, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | )   Civil Action No. 20-466 |
| WILBUR L. ROSS, JR., in his official capacity<br>as Secretary of Commerce<br>U.S. Department of Commerce<br>Office of the Secretary<br>1401 Constitution Avenue, NW, Room 5858<br>Washington, DC 20230; | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| U.S. DEPARTMENT OF COMMERCE<br>1401 Constitution Avenue, NW<br>Washington, DC 20230; | ) <br> ) <br> ) <br> ) |
| NEIL JACOBS, in his official capacity<br>as Acting NOAA Administrator<br>U.S. Department of Commerce<br>1401 Constitution Avenue, NW, Room 5128<br>Washington, DC 20230; | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| *(continued on the next page)* | ) |

**A009**

NATIONAL OCEANIC AND                              )
ATMOSPHERIC ADMINISTRATION                        )
U.S. Department of Commerce                       )
1401 Constitution Avenue, NW, Room 5128           )
Washington, DC 20230;                             )
                                                  )
CHRIS OLIVER, in his official capacity            )
as Assistant Administrator for NOAA Fisheries     )
National Marine Fisheries Service                 )
U.S. Department of Commerce                        )
1315 East-West Highway, Room 14636                )
Silver Spring, MD 20910; and                      )
                                                  )
NATIONAL MARINE FISHERIES SERVICE                 )
U.S. Department of Commerce                        )
1315 East-West Highway, Room 14636                )
Silver Spring, MD 20910,                          )
                                                  )
            Defendants.                            )
_____ )

## **COMPLAINT**

### **NATURE OF THE ACTION**

1.     This case arises out of an unlawful mandate by the federal government that requires

herring fishermen along the eastern seaboard of the United States to carry National Oceanic and

Atmospheric Administration contractors—called "at-sea monitors"—on their vessels during

fishing trips and, moreover, to pay out-of-pocket for costs associated with allowing these

government contractors to monitor their fishing activity.  *See* Nat'l Oceanic & Atmospheric

Admin., Industry-Funded Monitoring, 85 Fed. Reg. 7,414 (Feb. 7, 2020) (to be codified at 50

C.F.R. pt. 648) ("February 7, 2020 Final Rule"); *see also* New Eng. Fishery Mgmt. Council,

Industry-Funded Monitoring Omnibus Amendment (Dec. 2018) [hereinafter "Omnibus

Amendment"], *available at* https://go.aws/39eKRTu (the "Omnibus Amendment").

2.     In addition to creating an industry-funded at-sea monitoring program for the

Atlantic herring fishery, the Omnibus Amendment introduces provisions into other New England

A010

fishery management plans allowing for standardized and simplified implementation of statutorily unauthorized industry funding via future plan-specific amendments.

3.     Despite years of adverse feedback from fishermen and other stakeholders concerning the absence of statutory authority for industry-funded monitoring in the Atlantic herring fishery (and in other fisheries)—and in the face of the predicted negative economic impact—Defendants nevertheless pushed through the regulation at hand.

4.     Along the way, Defendants ignored well-established procedural safeguards.  For example, they refused to respond to public concerns about the economic feasibility of industry funding and kept secret important aspects of the rulemaking process—such as the timing and nature of the Secretary of Commerce's approval of the Omnibus Amendment and the proposal of implementing regulations.  Defendants also refused to revisit their economic and environmental analyses in light of drastic quota cuts introduced after approval of the Omnibus Amendment.

5.     Plaintiffs bring this action to protect their livelihoods and advocate for fellow fishermen in the face of regulations that may destroy their iconic way of life.

## JURISDICTION AND VENUE

6.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Sustainable Fisheries Act, 16 U.S.C. § 1801 *et seq.* ("MSA"); the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370e ("NEPA"); the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* ("RFA"); the Anti-Deficiency Act, 31 U.S.C. § 1341 ("ADA"); the Independent Offices Appropriations Act, 31 U.S.C. § 9701 ("IOAA"); and the Miscellaneous Receipts Act, 31 U.S.C. § 3302 ("MRA").

7.      This Court has jurisdiction pursuant to the MSA, 16 U.S.C. §§ 1861(d), 1855(f), using the standards of the APA. *Id.* § 1855(f)(1); *cf.* 5 U.S.C. § 706(2)(A)–(D). Plaintiffs' petition for review is timely filed within the statutorily mandated thirty-day window following the February 7, 2020 promulgation of the rule at issue. 16 U.S.C. § 1855(f)(1); *see infra* ¶ 97.

8.      The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 701 *et seq.* The challenged rule is final and reviewable agency action; it marks the consummation of agency decision-making, mandates obligations on Plaintiffs, and carries legal consequences. *See* 5 U.S.C. § 704.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(e).

10.     The Court may issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 and grant permanent injunctive relief pursuant to the MSA, 16 U.S.C. §§ 1855(f), 1861(d); and the APA, 5 U.S.C. § 706.

## PARTIES

11.     Plaintiff LOPER BRIGHT ENTERPRISES, INC. ("Loper Bright") is a New Jersey corporation founded in 1977 and headquartered and operating at Cape May Courthouse, New Jersey. Loper Bright co-owns and operates F/V *Retriever*, which targets and harvests Atlantic herring, among other fish species. F/V *Retriever* utilizes mid-water trawl gear. Loper Bright holds a Category A permit for the Atlantic herring fishery. It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

12.     Plaintiff H&L AXELSSON, INC. ("H&L Axelsson") is a New Jersey corporation founded in 1978 and headquartered and operating at Cape May, New Jersey. H&L Axelsson owns and operates F/V *Dyrsten*, which targets and harvests Atlantic herring, among other fish species.

A012

F/V *Dyrsten* utilizes mid-water trawl gear.  H&L Axelsson holds 2 Category A permits for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

13.     Plaintiff CAPE TRAWLERS, INC. ("Cape Trawlers") is a New Jersey corporation founded in 1982 and headquartered and operating at Cape May, New Jersey.  Cape Trawlers owns and operates F/V *Jersey Cape*, which targets and harvests Atlantic herring, among other fish species.  F/V *Jersey Cape* utilizes bottom trawl gear.  Cape Trawlers holds a Category B permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

14.     Plaintiff SCOMBRUS ONE LLC ("Scombrus One") is a New Jersey corporation founded in 2004 and headquartered and operating at Cape May, New Jersey.  Scombrus One owns and operates F/V *Eva Marie*, which targets and harvests Atlantic herring, among other fish species.  F/V *Eva Marie* utilizes bottom trawl gear.  Scombrus One holds a Category A permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

15.     Plaintiff GOLDEN NUGGET LLC ("Golden Nugget") is a New Jersey corporation founded in 2012 and headquartered and operating at Cape May, New Jersey.  Golden Nugget owns and operates F/V *Golden Nugget*, which targets and harvests Atlantic herring, among other fish species.  F/V *Golden Nugget* utilizes bottom trawl gear.  Golden Nugget holds a Category B permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-

5

sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

16.     Plaintiff LUND MARR TRAWLERS LLC ("Lund Marr Trawlers") is a New Jersey corporation founded in 2003 and headquartered and operating at Cape May, New Jersey. Lund Marr Trawlers owns and operates F/V *Enterprise*, which targets and harvests Atlantic herring, among other fish species.  F/V *Enterprise* utilizes mid-water trawl gear.  Lund Marr Trawlers holds a Category A permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

17.     Plaintiff MOUNT VERNON LLC ("Mount Vernon") is a New Jersey corporation founded in 2007 and headquartered and operating at Cape May, New Jersey.  Mount Vernon owns and operates F/V *Anya Jo*, which targets and harvests Atlantic herring, among other fish species. F/V *Anya Jo* utilizes bottom trawl gear.  Mount Vernon holds a Category B permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

18.     Plaintiff NANCY ELIZABETH LLC ("Nancy Elizabeth") is a New Jersey corporation founded in 2010 and headquartered and operating at Cape May, New Jersey.  Nancy Elizabeth owns and operates F/V *Nancy Elizabeth*, which targets and harvests Atlantic herring, among other fish species.  F/V *Nancy Elizabeth* utilizes bottom trawl gear.  Nancy Elizabeth holds a Category A permit for the Atlantic herring fishery.  It will be subject to Defendants' burdensome industry-funded at-sea monitoring requirement, and it will be adversely impacted once the Omnibus Amendment and the February 7, 2020 Final Rule take effect.

6

**A014**

19.     Collectively, the six (6) foregoing plaintiffs—*viz.*, Cape Trawlers, Scombrus One, Golden Nugget, Lund Marr Trawlers, Mount Vernon, and Nancy Elizabeth—form an important part of the Lund's Fisheries family of businesses.  LUND'S FISHERIES, INC. is a family-owned, vertically integrated company established in 1954, which purchases, produces, and distributes nearly 75 million pounds of fresh and frozen fish annually.  Atlantic herring landings make up approximately 10% of the company's production, although that percentage has declined in recent years due to burdensome regulation.  Lund's Fisheries, Inc. employs approximately 200 people in its processing plant and storage facility, including 100 full-time employees.  It distributes its high-quality fresh seafood, purchased from its own vessels and a number of independently owned vessels, across the country.  Lund's Fisheries, Inc. and its associated businesses are active stewards of fishery resources.  The company participates in regional fishery management council activities, assists in improving the data upon which fishery regulations are based, and is a founding member of the Science Center for Marine Fisheries, a National Science Foundation industry-government-academic partnership that funds applied science to minimize uncertainty in fish stock assessments.  Although Lund's Fisheries, Inc. is not party to the instant action, as the principal purchaser and processors of Plaintiffs' landings, the Omnibus Amendment and February 7, 2020 Final Rule will similarly adversely impact it.

20.     Defendant WILBUR L. ROSS, JR. is the Secretary of the United States Department of Commerce.  He is sued in his official capacity as the chief administrator of the federal agency charged with managing United States marine fisheries.  He also is sued in his capacity as the government official who gave final approval to both the fishery management plan amendments and implementing regulations at issue in this lawsuit.

A015

21.     Defendant UNITED STATES DEPARTMENT OF COMMERCE ("DOC") is the federal agency charged with managing domestic marine fisheries.

22.     Defendant TIMOTHY C. GALLAUDET is the Assistant Secretary of Commerce for Oceans and Atmosphere.  He is sued in his official capacity as the Acting Administrator of the National Oceanic and Atmospheric Administration.

23.     Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA") is the component agency of DOC tasked with supervision of the National Marine Fisheries Service.  The Secretary of Commerce has delegated his management responsibilities for domestic marine fisheries to NOAA, which, in turn, has sub-delegated those responsibilities to the National Marine Fisheries Service.  NOAA promulgated the rule at issue.

24.     Defendant CHRIS OLIVER is the Assistant Administrator for Fisheries at NOAA. He is sued in his official capacity as chief administrator of the National Marine Fisheries Service.

25.     Defendant NATIONAL MARINE FISHERIES SERVICE ("NMFS") is a sub-component of DOC, which has sub-delegated responsibility from the NOAA Administrator to manage domestic fisheries and liaise with regional fishery management councils.

## STATUTORY AND REGULATORY CONTEXT

### The Magnuson-Stevens Act

26.     The MSA establishes the basis and authority for the federal management of domestic marine fisheries in the United States.  Recognizing the importance of fishery resources for the well-being of the American economy, Congress enacted the MSA to promote the conservation of fisheries in a way that also sustains the industry.  *See* 16 U.S.C. § 1801(a)–(c).

27.     Congress granted DOC the authority to regulate commercial fishing in a zone extending from each state's territorial waters to a line 200 nautical miles from the United States

A016

coastline.  *See id.* § 1801(b)(1).  This area is known as the "Exclusive Economic Zone" or "EEZ." *See id.* § 1802(11).

28.     DOC has delegated its regulatory authority to NOAA, which exercises it through NMFS in the various domestic marine fisheries located within the EEZ, including the Atlantic herring and other New England fisheries at issue in this action.

29.     The government's regulatory authority must be exercised in a manner consistent with the fishery management plans adopted and maintained by a system of regional fishery management councils.  *See infra* ¶¶ 31–44.  Congress created regional councils to "exercise sound judgment in the stewardship of fishery resources," to enable stakeholder participation in the regulatory process, and to protect "the social and economic needs" of each state.   16 U.S.C. § 1801(b)(5).

30.     The MSA requires that any fishery management plan adopted or revised by a regional council—or any implementing regulation or secretarial action promulgated by the federal government—be consistent with ten "National Standards."  *See id.* § 1851(a).  Among the ten National Standards, the following are relevant to this case:

a.     *National Standard One* – "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the . . . fishing industry."  *Id.* § 1851(a)(1); *cf.* 50 C.F.R. § 600.310.

b.     *National Standard Two* – "Conservation and management measures shall be based upon the best scientific information available."   16 U.S.C.  §  1851(a)(2);  *cf.* 50 C.F.R. § 600.315.

A017

c.   *National Standard Seven* – "Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."   16 U.S.C. § 1851(a)(7); *cf.* 50 C.F.R. § 600.340.

d.   *National Standard Eight* – "Conservation and management measures shall, consistent with the conservation requirements of this Act . . . , take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard Two], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."   16 U.S.C. § 1851(a)(8); *cf.* 50 C.F.R. § 600.345.

### Fishery Management Councils

31.   The MSA establishes eight regional fishery management councils that share responsibility with DOC and its component agencies for the conservation, management, and regulation of domestic marine fisheries.  16 U.S.C. § 1852(a)(A)–(H); *see id.* § 1852(h).

32.   Under the MSA, the regional councils prepare fishery management plans ("FMPs") and relevant amendments that regulate the harvesting of different species of fish within specified geographic areas.  *Id.* § 1852(h)(1).  FMPs and FMP amendments are approved by the Secretary of Commerce and implemented and enforced by NMFS.  *See id.* § 1854(a).

33.   Regional fishery management councils also have independent authority to propose implementing regulations for any FMP.  *See id.* § 1853(c); *see also id.* § 1854(b).

34.   FMPs are the formal mechanism by which the federal government manages domestic fisheries and seeks to achieve the MSA's conservation and resource management goals.  *See id.* § 1853(a)–(b); *see also infra* ¶¶ 38–44.

35.     Regional fishery management councils have other functions too.  For example, the councils hold public hearings to facilitate stakeholder input on fisheries management, 16 U.S.C. § 1852(h)(3); set annual catch limits for regulated species of fish, *id.* § 1852(h)(6); and prioritize scientific and statistical research priorities.  *Id.* § 1852(h)(7).

36.     The voting members of any given regional fishery management council include (1) a set number of members appointed by the Secretary of Commerce, based on nominations from the governors of the states within the jurisdiction of each council; (2) the principal officer with marine fishery management responsibility and expertise, or his or her designee, from each of these same states; and (3) the regional director of NMFS for the area within the jurisdiction of the council.  *Id.* § 1852(b)(1); *id.* § 1852(b)(2) (describing appointment of governor-nominated members).  Non-voting members include representatives of the U.S. Fish and Wildlife Service, U.S. Coast Guard, Marine Fisheries Commission, and U.S. Department of State.  *Id.* § 1852(c).

37.     There are two regional councils relevant to this case.  The New England Fishery Management Council ("NEFMC") has jurisdiction over the Atlantic Ocean seaward of the coastal waters of Maine, New Hampshire, Massachusetts, Connecticut, and Rhode Island.  *Id.* § 1852(a)(1)(A).  The Mid-Atlantic Fishery Management Council ("MAFMC") has similar jurisdiction seaward of the coastal waters of New York, Pennsylvania, New Jersey, Maryland, Delaware, Virginia, and North Carolina.  *Id.* § 1852(a)(1)(B).

## Fishery Management Plans

38.     The MSA sets forth the required and discretionary elements that a regional fishery management council may adopt for each FMP, and which the Secretary of Commerce, in conjunction with the council, must thereafter implement through regulation.

39.     Each FMP must contain, among other things, conservation and management measures for foreign and domestic fishing that (1) prevent overfishing and rebuild overfished stocks, or otherwise promote the long-term stability of the fishery, *id.* § 1853(a)(1); (2) describe and delimit the kinds of fishing vessels prosecuting regulated species, including gear type, and otherwise delimit the harvesting of fish based on the expected sustainable and optimum yield, *id.* § 1853(a)(2)–(4), (15); and (3) establish a standardized reporting methodology to minimize bycatch and bycatch mortality.  *Id.* § 1853(a)(11).

40.     FMPs may include—but need not contain—measures that (1) require permitting, *id.* § 1853(b)(1); (2) limit fishing in certain geographic areas based on type or quantity of fishing gear, *id.* § 1853(b)(2); (3) establish limited access privilege programs, *id.* § 1853(b)(6); *see also id.* § 1853a; or (4) require the placement of observers on domestic vessels "for the purpose of collecting data necessary for the conservation and management of the fishery," subject to conditions.  *Id.* § 1853(b)(8); *cf. id.* § 1802(31).

41.     When a council adopts an FMP or FMP amendment, the Secretary of Commerce must "immediately commence a review" to ensure the plan or amendment complies with the MSA, the National Standards, and other applicable law.   *Id.* § 1854(a)(1)(A).[1]   The Secretary "immediately" publishes a notice of availability in the *Federal Register* to solicit public feedback and provides a final approval decision within thirty days of the end of that required sixty-day comment period.   *Id.* § 1854(a)(1)(B), (a)(3).   The Secretary is obliged to consider the "information, views, and comments received from interested persons[.]"  *Id.* § 1854(a)(2).

---

[1] For purposes of Section 1854, the term "immediately" is defined to mean "on or before the 5th day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final."  16 U.S.C. § 1854(a)(5).

A020

42.     The Secretary conducts a similar compliance review for implementing regulations proposed by a regional council under 16 U.S.C. § 1853(c), except that the required preliminary evaluation must be completed within fifteen days and the public comment period on the proposed regulations may last between fifteen and sixty days.  *Id.* § 1854(b).

43.     In limited situations, the Secretary of Commerce may prepare an FMP, plan amendment, or implementing regulations *sua sponte* and without the involvement of a council. This only occurs when a council fails to fulfill its statutory obligations, *id.* § 1854(c)(1)(A)–(B), or when the MSA provides explicit authority for the Secretary to do.  *Id.* § 1854(c)(1)(C).  In any case, the Secretary is prohibited from enacting certain management measures, including the creation of a limited access privilege program, without council participation.  *Id.* § 1854(c)(3).

44.     The Secretary of Commerce may "promulgate emergency regulations or interim measures necessary to address [an] emergency or overfishing, without regard to whether a [FMP] exists for [any given] fishery."  *Id.* § 1855(c).

## The National Environmental Policy Act

45.     Congress enacted the National Environmental Policy Act ("NEPA") to "promote efforts which will prevent or eliminate damages to the environment[.]"  42 U.S.C. § 4321.  To achieve this goal, the law requires an agency to consider and disclose the environmental consequences of a planned action before proceeding with it.  *See id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.  An agency's evaluation of environmental consequences—including the interplay between the natural and human environments, *see* 40 C.F.R. § 1508.14—must be based on science that is both "[a]ccurate" and of "high quality."  *Id.* § 1500.1(b).  An agency must notify the public of proposed actions and afford it the opportunity to comment on the environmental impacts of the agency's planned project.  *See id.* § 1506.6.

13

**A021**

46. An Environmental Impact Statement ("EIS") is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. The EIS provides a "full and fair discussion of significant environmental impacts and . . . inform[s] decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. As part of an EIS, an agency must identify direct, indirect, and cumulative impacts of its proposed action, *see id.* § 1508.8, as well as the impact of alternative actions. *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.14.

## The Regulatory Flexibility Act

47. The Regulatory Flexibility Act ("RFA") fits regulatory requirements to the scale of the businesses that are subject to them. It requires agencies to determine the economic impact of their planned actions on small entities and to explore alternatives that could reduce any significant economic impacts. These determinations must be included in an "initial regulatory flexibility analysis" ("IFRA"), which is made available to the public for comment at the time of a notice of proposed rulemaking. 5 U.S.C. § 603(a); *see generally id.* § 603(b)–(d).

48. When a final rule is promulgated, an agency is required to prepare a final regulatory flexibility analysis ("FRFA"), which must address, among other things, any "significant issues raised" during the public comment period, including responses to comments from the Small Business Administration, as well as steps the agency will take to minimize any "significant economic impact on small entities[.]" *Id.* § 604(a). The FRFA must be made publicly available and published in the *Federal Register*. *Id.* § 604(b).

49. The RFA affords a right to judicial review to any "small entity that is adversely affected or aggrieved by final agency action[.]" *Id.* § 611(a).

A022

### The Anti-Deficiency Act

50.     The Anti-Deficiency Act ("ADA") prohibits federal officers from either authorizing an "expenditure or obligation exceeding an amount available in an appropriation or fund for [an] expenditure or obligation" or involving the government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A)–(B).

### The Miscellaneous Receipts Act

51.     The Miscellaneous Receipts Act ("MRA") provides that any official "receiving money for the Government from any source shall deposit the money in the Treasury . . . without deduction for any charge or claim." *Id.* § 3302(b).

52.     The MRA further requires than an official "having custody or possession of public money shall keep the money safe without lending . . . [or] using [it]," unless otherwise permitted by law. *Id.* § 3302(a).

### The Independent Offices Appropriations Act

53.     The Independent Offices Appropriations Act ("IOAA") permits agencies to charge fees in the absence of specific statutory authority whenever a party—or "user"—is a special beneficiary of government services.  31 U.S.C. § 9701.

54.     The IOAA requires that fees be "fair" and "based on costs to the government, the value of the service or thing to the recipient, public policy or interested services, and other relevant facts." *Id.* § 9701(b).  Fees must be deposited directly into the U.S. Treasury's general fund.

55.     Specific statutes that prohibit the collection of fees, or otherwise proscribe their use, displace any general authorization under the IOAA. *See id.* § 9701(c).

A023

## STATEMENT OF FACTS

### The Atlantic Herring FMP

56.     Atlantic herring is a pelagic fish species of the family *Clupeidae*.  It swims in large schools throughout the water column and feeds on various zooplankton.

57.     The Atlantic herring is found across the Northern Atlantic Ocean, but western populations are concentrated in coastal areas ranging from Canada to North Carolina.  In domestic waters, herring are principally located between New England and New Jersey.

58.     The herring population crosses the jurisdictional boundaries of two regional fishery management councils: the NEFMC and MAFMC.

59.     Atlantic herring is one of the most conservatively managed fisheries in the New England and Mid-Atlantic regions.  In its most recent stock assessment in 2015, NOAA did not find the Atlantic herring population to be overfished or subject to overfishing.  *See* Ne. Fisheries Sci. Ctr., Nat'l Oceanic & Atmospheric Admin., Atlantic Herring Operational Assessment Report 2015 (Aug. 2015), *available at* http://bit.ly/2SF4X2P.  In 2018, NOAA's Northeast Regional Stock Assessment Committee confirmed this estimation.  *See* Ne. Fisheries Sci. Ctr., Nat'l Oceanic & Atmospheric Admin., 65th Northeast Regional Stock Assessment Workshop Assessment Summary Report, *available at* http://bit.ly/2OBnn34.

60.     The Atlantic herring fishery is regulated by the NEFMC under the Atlantic Herring FMP.  *See* N. Eng. Fishery Mgmt. Council, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999), *available at* http://bit.ly/2I2ilvL.  That plan was developed in consultation with the MAFMC, among others.  In coastal waters inward of the EEZ, Atlantic herring is regulated by the states and the Atlantic States Marine Fisheries Commission under the Interstate Fishery Management Plan for Atlantic Herring.

16

**A024**

61.     The NEFMC adopted the Atlantic Herring FMP in March 1999, and it was implemented by NOAA the following year.  Since its initial adoption, the Atlantic herring FMP has been revised through seven separate plan amendments, including the Omnibus Amendment, and four abbreviated rulemakings, also known as "framework adjustments."[2]

62.     Every three years, the herring fishery is subject to revised quota and management specifications.  The NEFMC and NMFS last approved a three-year specification rule in 2016.  *See* Nat'l Oceanic & Atmospheric Admin., Specification of Management Measures for Atlantic Herring for the 2016-2018 Fishing Years, 81 Fed. Reg. 75,731 (Nov. 1, 2016) (to be codified at 50 C.F.R. pt. 648).  Defendants have not finalized specifications for the 2019–2021 period, although a rulemaking is pending.  *See* Nat'l Oceanic & Atmospheric Admin., Framework Adjustment 6 and the 2019–2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 4,932 (proposed Jan. 28, 2020) (to be codified at 50 C.F.R. pt. 648).

63.     As a rule, the Atlantic Herring FMP achieves the NEFMC's management goals through a stock-wide annual catch limit ("ACL") that is allocated between four distinct geographic management areas ("sub-ACLs").  *See* 50 C.F.R. § 648.200(f).  These four areas include:

    a.     Area 1A – Inshore Gulf of Maine

    b.     Area 1B – Offshore Gulf of Maine

    c.     Area 2 – South Coastal Area

    d.     Area 3 – Georges Bank

---

[2] Another three framework adjustments and two amendments are under development.  Of note, Amendment 8, which would specify a long-term acceptable biological catch control rule for the fishery and address localized depletion and user group conflict, has attracted considerable attention and criticism from industry stakeholders.  *See* Nat'l Oceanic & Atmospheric Admin., Amendment 8, 84 Fed. Reg. 54,094 (proposed Oct. 9, 2019) (to be codified at 50 C.F.R. pt. 648).

17

**A025**



**Figure 1: Atlantic Herring Management Areas,** *available at* **http://bit.ly/36A5FTB**

64.     Specifications and sub-ACLs for the Atlantic herring fishery's four management areas may be adjusted in-season—*i.e.*, during the fishing year—by NMFS, in order to "achieve conservation and management objectives," following consultation with the NEFMC.  50 C.F.R. § 648.200(e).   This last occurred in early 2019.   *See* Nat'l Oceanic & Atmospheric Admin., Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648).

18

65.     The fishing year for the Atlantic herring fishery begins on January 1 and runs the length of the calendar year.  The bulk of prosecution and harvesting occurs in the late summer to early autumn for Areas 1A and 3, as well as other waters east of the Nantucket Shoals.  Fishery operations in Southern New England take place predominately during the winter and early spring.

66.     In addition to landings limits, the Atlantic herring FMP establishes additional management and accountability measures, including seasonal and (sub-)area closures, *see* 50 C.F.R. § 648.202; fishing gear restrictions, *id.* § 648.203; possession restrictions, *id.* § 648.204; and limited electronic vessel monitoring system ("VMS") requirements.  *Id.* § 648.205.

67.     Most vessels targeting, harvesting, and landing Atlantic herring are required to obtain a permit.  *Id.* § 648.4(a)(10)(i).  Permits are only granted to vessels of certain size and horsepower—*i.e.*, those of less than 165 feet in length, 750 gross registered tons, and 3,000 horsepower.  *Id.* § 648.4(a)(10)(iii).  Permits are divided into various categories that are subject to possession restrictions.  *See id.* § 648.204.  Additionally, there are four types of limited access permits that have different management area access rights and landing restrictions.  *See id.* § 648.4(a)(10)(iv)(A)(1)–(4).  Permits are available for vessels that incidentally catch herring, *see id.* § 648.4(a)(10)(iv)(C), or on an "open access" basis.  *See id.* § 648.4(a)(10)(v)–(vi).

68.     Relevant to this lawsuit, vessels holding Category A permits—including most, if not all, midwater trawlers, as well as some bottom trawlers—can fish in any of the Atlantic herring management areas.  Vessels with Category B permits are excluded from Area 1 (Gulf of Maine).  Category A and B permit holders are not restricted in the amount of herring they can catch per trip or land per calendar day.

69.     Many vessels that target herring concurrently prosecute mackerel, another pelagic fish that tends to mix with herring throughout Mid-Atlantic and Southern New England waters. Mackerel is managed under its own FMP, which is administered by the MAFMC.

## The Atlantic Herring Fleet

70.     The Atlantic herring fleet has been an integral part of the industry and culture of the New England and Mid-Atlantic regions for centuries.  Even today, the herring fishery and its participants are a major component of the domestic fishing industry.

71.     There are three types of fishing gear typically used in the Atlantic herring fishery. Purse seine vessels employ a purse-shaped net and encircle schools of fish.   Bottom trawlers fish both near the shore and offshore.  And midwater trawlers tow a net within the water column, either alone or paired with a second vessel.  The latter arrangement is known as a "pair trawl."

72.     Midwater trawlers make up the core of the herring fleet and land most of the annual catch.  As of 2016, there were fourteen midwater trawlers in the Atlantic herring fishery among a fleet of forty-three vessels possessing Category A or B permits.

73.     According to data available from Fishing Year 2016, Category A and B permit holders account for approximately 99% of total landings for the Atlantic herring fishery.

## The New England Industry-Funded Monitoring Omnibus Amendment

74.     The introduction of industry-funded at-sea monitoring in the Atlantic herring fishery and the creation of a standardized process for the introduction of similar industry-funding requirements in other fisheries has been a years-long process.  It started in 2013, when the NEFMC and the MAFMC initiated a joint process to design and implement an "omnibus" FMP amendment that would allow for the introduction of industry-funded monitoring in all the fisheries managed by the two councils.

A028

75.     The Omnibus Amendment arose from the councils' desire to increase monitoring—ostensibly to better assess catch, monitor limits, and collect management information—but without expending as much money as would be required under existing observing programs, such as the Northeast Fisheries Observer Program ("NEFOP").

76.     Indeed, industry-funded monitoring goals were intended to supplement mandatory, federally funded monitoring already required under the Standardized Bycatch Reporting Methodology ("SBRM"), the Endangered Species Act ("ESA"), and the Marine Mammal Protection Act ("MMPA").  *See* Omnibus Amendment at 28.

77.     From the outset, Defendants recognized that industry-funded monitoring would be a "complex and highly sensitive issue."  *Id.*  In 2016, the NEFMC and the MAFMC solicited feedback from stakeholders about the prospects of industry funding.  *See, e.g.*, Nat'l Oceanic & Atmospheric Admin., Public Hearings, 81 Fed. Reg. 64,426 (Sept. 20, 2016).  The response to that solicitation, as well as multiple public hearings held across the Eastern seaboard, was overwhelmingly negative.

78.     Industry stakeholders expressed concern about the sustainability of industry-funded monitoring, given existing regulatory burdens.  Lund's Fisheries explained in a November 2016 public comment that the Omnibus Amendment's "projected costs are steep and . . . likely to be unsustainable[.]"  *See* Exhibit 1 (Nov. 8, 2016 Comment Letter).

79.     Lund's Fisheries also commented that the Omnibus Amendment marked "a turning point in regional fishery management policy . . . by requiring significant industry funding for monitoring programs that have been funded by the federal government since the passage of the MSA in 1977."  *Id.*  Although Lund's Fisheries recognized that some reasonable regulation was unavoidable, it pointed out that the estimated cost of industry-funded monitoring was not

21

A029

"balanced with . . . biological benefits accruing to the herring and mackerel resource," and instead was the result of "stakeholder campaigns," such as those pressed by environmental groups.

80.     Fishery stakeholders and interested members of the public continued to provide adverse feedback to Defendants about the legality and economic feasibility of industry-funded at-sea monitoring in subsequent years.  *See Withdraw Unlawful Plan Forcing Fishermen to Pay for At-Sea Monitors*, Cause of Action Inst., Apr. 12, 2017, https://coainst.org/2SGcDk5; *see also Fishermen in New England Face Another Costly Regulation*, Cause of Action Inst., Apr. 26, 2017, http://coainst.org/2owyD5H.

81.     Nevertheless, in April 2017, the NEFMC finalized its selection of preferred alternatives for the Omnibus Amendment.   *See* N.-Eng. Fishery Mgmt. Council, April 2017 Council Meeting Final Motions at 8–11 (April 18–20, 2017), *available at* https://go.aws/39lZODk.

82.     The MAFMC, for its part, decided to postpone action on preferred alternatives for the mackerel fishery.  *See* Mid-Atl. Fishery Mgmt. Council, April 2017 Motions at 3, *available at* https://coainst.org/39p22Si.

83.     Despite widespread opposition, and notwithstanding the MAFMC's failure to finalize requirements for industry funding in the mackerel fishery, Defendants published a "notice of availability" for the Omnibus Amendment.   *See* Exhibit 2 (Nat'l Oceanic & Atmospheric Admin., Industry-Funded Monitoring, 83 Fed. Reg. 47,326 (Sept. 19, 2018)).

84.     The September 19, 2018 Notice of Availability included a description of the planned industry-funded monitoring measures to be introduced in the Atlantic herring fishery, as well as a description of the "omnibus" measures that would be introduced into other FMPs managed by the NEFMC—*viz.*, the Atlantic Salmon FMP, Atlantic Sea Scallop FMP, Deep-Sea Red Crab FMP, Northeast Multispecies FMP, and the Northeast Skate Complex FMP.

A030

85.     The Notice of Availability initiated a public comment period concerning the Secretary of Commerce's "approval/disapproval decision on the amendment." *Id.* at 47,327. That comment period was scheduled to close on November 19, 2018.

86.     The general response to the Notice of Availability was negative. Lund's Fisheries, for example, explained that the Omnibus Amendment would impose "an impossible financial burden" on the herring fleet, especially given substantial quota reductions that were then expected. *See* Exhibit 3 (Nov. 19, 2018 Comment Letter) (discussing potential "70% reduction in catch" over the "next 3 fishing years"); *cf. supra* ¶ 64 (finalizing 2019 in-season quota adjustment).

87.     Lund's Fisheries requested that the Omnibus Amendment be postponed while other accountability measures were explored, including electronic monitoring and shoreside monitoring. *Id.* Given the herring fishery's "very low bycatch rated and limited impact on bycatch species normally encountered," the monitoring rate outlined in the Omnibus Amendment would be both "excessive and statistically unnecessary[.]" *Id.*

88.     In October 2018, the MAFMC voted to withdraw from the Omnibus Amendment. The council tabled pending plans to approve industry-funded monitoring requirements for the mackerel fishery. *See* Mid-Atl. Fishery Mgmt. Council, October 2018 Council Meeting Summary at 1–2, (Oct. 1–4, 2018), *available at* http://bit.ly/2PYRMdA.

89.     On November 7, 2018—before the end of the public comment period on the approval decision for the Omnibus Amendment, and while secretarial approval of industry-funded monitoring was still pending—Defendants published proposed implementing regulations. *See* Exhibit 4 (Nat'l Oceanic & Atmospheric Admin., Industry-Funded Monitoring, 83 Fed. Reg. 55,665 (proposed Nov. 7, 2018) (to be codified at 50 C.F.R. pt. 648)).

A031

90.     The November 7, 2018 Proposed Rule included a request for public comments and indicated that all such comments would need to be received by December 24, 2018.  *See id.*

91.     Once again, stakeholders and other interested parties expressed concern over the legality and economic feasibility of industry-funded monitoring.  *See, e.g.*, *CoA Institute Highlights Deficiencies in Proposed Rule to Shift Burdensome Costs of At-Sea Monitoring to Commercial Fishermen*, Cause of Action Inst., Dec. 11, 2018, http://bit.ly/3bucjhZ; *Cause of Action Institute Defends Fisheries from New Proposed Rule*, Cause of Action Inst., Dec. 13, 2018, http://bit.ly/2SD0AFc.

92.     By letter, dated December 18, 2018, the Regional Administrator for NOAA's Greater Atlantic Regional Office, Michael Pentony, informed the NEFMC that the Secretary of Commerce had approved the "New England Industry-Funded Monitoring Omnibus Amendment, including all the management measures recommended by the Council[.]"  *See* Exhibit 5.

93.     The December 18, 2018 letter notifying the NEFMC of secretarial approval of the Omnibus Amendment was transmitted by NOAA before the close of the comment period for implementing regulations, and it did not address the various public comments that had been filed in response to the September 19, 2018 Notice of Availability.

94.     The December 18, 2018 letter was not published or otherwise publicized by Defendants.  Plaintiffs and other stakeholders only became aware of the letter after an agency employee provided them with a copy.

95.     The irregularities surrounding the secret approval of the Omnibus Amendment raise serious concerns about Defendants' process for approving and implementing industry-funded monitoring.  *See Government Officials Ignore Public Comment, Create New Financial Burden on Fishermen*, Cause of Action Inst., Jan. 8, 2019, https://coainst.org/2SIAxeN; *see also CoA Institute*

24

**A032**

*Sends Letter to Secretary Ross Requesting Public Confirmation of Controversial Fishery Regulation*, Cause of Action Inst., Feb. 14, 2019, https://coainst.org/2SLHfnu; Exhibit 6 (Feb. 12, 2019 Cause of Action Institute Letter).

96.     By letter, dated August 8, 2019, the Secretary of Commerce confirmed that he had approved the Omnibus Amendment sometime after the publication of the September 19, 2018 Notice of Availability and the November 7, 2018 Proposed Rule. *See* Exhibit 7.  The Secretary neither clarified why the government had not responded to public comments on the legality of the Omnibus Amendment prior to the publication of proposed implementing regulations nor explained why any notice of secretarial approval had not been made publicly available.

97.     On February 7, 2020, Defendants published the final rule implementing the Omnibus Amendment with an effective date of March 9, 2020. *See* Exhibit 8 (Nat'l Oceanic & Atmospheric Admin., Industry-Funded Monitoring, 85 Fed. Reg. 7,414 (Feb. 7, 2020) (to be codified at 50 C.F.R. pt. 648)).  Certain measures specific to the herring fishery are scheduled to become effective on April 1, 2020. *Id.*

98.     The "omnibus measures" of the February 7, 2020 Final Rule create a standardized process to implement and revise industry-funded monitoring programs across the various New England FMPs, clarify cost responsibilities, establish requirements for monitoring service providers, and set a prioritization process for distributing available funds for NMFS's cost responsibilities associated with industry-funded monitoring. *See* 85 Fed. Reg. at 7,414–17.  The Final Rule indirectly impacts existing at-sea monitoring programs in the Atlantic Sea Scallop FMP and Northeast Multispecies (Groundfish) FMP. *Id.* at 7,414–15.

99.     With respect to the Atlantic herring fishery, the February 7, 2020 Final Rule establishes, among other things, a 50% industry-funded monitoring coverage target for all declared

herring trips undertaken by a vessel possessing a Category A or B permit. *Id.* at 7,417. This coverage target will be calculated together with federally funded SBRM observing coverage targets. If, on any given trip, a vessel is notified that it will "need at-sea monitoring coverage," and it has not been assigned a NEFOP observer, then "[it] will be required to obtain and pay for an at-sea monitor to carry on that trip." *Id.* at 7,418.

100.     The Final Rule acknowledges that "[i]ndustry-funded monitoring w[ill] have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery," including estimated costs of $710 per sea day for monitors, as well as an overall reduction to "returns-to-owner" or "RTO" (effectively, profits) of "approximately 20 percent." *Id.* at 7,418.

101.     Midwater trawl vessels may choose to employ electronic monitoring and portside sampling through an exempted fishing permit ("EFP") scheme. *Id.* at 7,419; *id.* at 7,420 ("The EFP would exempt midwater vessels from the requirement for industry-funded at-sea monitoring coverage and allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target."). Defendants "estimate[] industry's cost for electronic monitoring and portside sampling at $515 per day," with an expected "reduction in annual TRO of up to 10 percent[.]" *Id.* at 7,420.

102.     To gain access to Groundfish Closed Areas, midwater trawl vessels will need to "purchase observer coverage," when available. *Id.* at 7,419. The cost of purchasing a NEFOP observer is expected to be $818 per day. *Id.* These costs would result in roughly a "5 percent reduction in RTO . . . in addition to any reduction . . . due to other types of industry-funded monitoring coverage." *Id.*

103.     Defendants "cautioned" that the estimated per day cost for either at-sea monitors or NEFOP observers was variable and would "largely depend on negotiated costs between vessels

and monitoring service providers." *Id.* at 7,420. In other words, Defendants may have *underestimated* the cost to industry of the new monitoring requirements.

104. Defendants cost predictions, as described in the foregoing paragraphs, also do not reflect the effect of quota reductions introduced in 2019, *cf. supra* ¶ 64, and Defendants decided to forego revising their economic analysis of the expected impacts of the Omnibus Amendment and its various monitoring provisions. *See* 85 Fed. Reg. at 7,421–22, 7,426.

## CLAIM ONE – INDUSTRY FUNDING IS UNLAWFUL

105. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

106. The MSA provides for judicial review of fishery regulations, insofar as a petition for such review is filed within thirty days after the date on which regulations are promulgated or action to implement an FMP is published in the *Federal Register*. 16 U.S.C. § 1855(f)(1)–(2).

107. The MSA, adopting the standards of the APA, authorizes this Court to hold unlawful and set aside any agency action, finding, or conclusion that is found to be arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. *Id.* § 1855(f)(1)(B); *cf.* 5 U.S.C. § 706(2)(A)–(D).

108. On February 7, 2020, Defendants promulgated a rule to implement the Omnibus Amendment. That act qualifies as final agency action under the APA, *see* 5 U.S.C. § 704, and constitutes the promulgation of a fishery regulation as contemplated by the MSA. *See* 16 U.S.C. § 1855(f)(1).

109. By finalizing the Omnibus Amendment and the February 7, 2020 Final Rule, Defendants violated the MSA and other applicable laws.

**A035**

110.    Requiring Plaintiffs to fund novel at-sea monitoring programs in the Atlantic herring fishery is arbitrary, capricious, and an abuse of discretion, 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity, *id.* § 706(2)(B); and in excess of statutory jurisdiction, authority, or limitations. *Id.* § 706(2)(C).

111.    Specifically, by requiring industry to fund an at-sea monitoring program in the Atlantic herring fishery, Defendants committed the following violations:

a.      Acting *ultra vires* in excess of any statutory authority granted by Congress in the MSA or otherwise;

b.      Improperly infringing on Congress's exclusive taxation authority and power to direct the use of public funds under the Tax and Spending and Appropriations Clauses of the U.S. Constitution;

c.      Violating the ADA and the MRA;

d.      Charging Plaintiffs improper fees in violation of the IOAA;

112.    Because Defendants have no authority to compel industry-funded at-sea monitoring in the Atlantic herring fishery, the Omnibus Amendment and the February 7, 2020 Final Rule are void and unenforceable to the extent they attempt to impose that requirement.

113.    Additionally, to the extent the Omnibus Amendment and the February 7, 2020 Final Rule revise other FMPs managed by the NEFMC in order to impose a standardized system for future introduction of industry-funded monitoring, those amendments are void and unenforceable.

**CLAIM TWO – THE FINAL RULE IS PROCEDURALLY INFIRM**

114.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

115.    The MSA, adopting the standards of the APA, authorizes this Court to hold unlawful and set aside any agency action, finding, or conclusions that was undertaken without observance of procedure required by law.  16 U.S.C. § 1855(f)(1)(B); *cf.* 5 U.S.C. 706(2)(D).

116.    The MSA requires that fishery regulations to be promulgated in accordance with NEPA, *see* 16 U.S.C. § 1854(i), and the RFA.  *See id.* § 1855(e).

117.    The Omnibus Amendment and the February 7, 2020 Final Rule are both procedurally infirm because they violate NEPA and the RFA.

118.    Defendants violated NEPA and relevant implementing regulations by:

a.      Failing to take a "hard look" at the environmental impact of the Omnibus Amendment, including the adverse impact of industry-funded monitoring on the human environment, both in the Atlantic herring fishery and other FMPs;

b.      Failing to adequately address potential mitigation measures or alternatives to Defendants' planned regulatory actions;

c.      Pre-judging the outcome of any and all environmental assessments and regulatory impact reviews in favor of the NEFMC's preferred alternatives;

d.      Refusing to revise or supplement any and all environmental assessments or regulatory impact reviews after significant herring catch reductions in early 2019.

119.    Defendants violated the RFA and relevant implementing regulations by failing to prepare adequate initial or final regulatory flexibility analyses that took into consideration the economic effects of industry-funded monitoring in the Atlantic herring fishery and other FMPs and, in particular, the adverse impact on small businesses.

120.    Defendants violated Plaintiffs' procedural due-process rights by (1) determining the legality of the Omnibus Amendment and approving it as consistent with the MSA and federal

A037

law without public notice and without addressing public comments filed in response to NMFS's notice of availability; (2) proposing implementing regulations for the Atlantic herring fishery before obtaining secretarial approval of the Omnibus Amendment; and (3) obtaining secretarial approval for the Omnibus Amendment during ongoing public comment on the proposed implementing regulations.

121.    The foregoing procedural violations constitute final agency action that is arbitrary, capricious, and an abuse of discretion in violation of NEPA, the RFA, the MSA, and the APA.

122.    Given these procedural infirmities, the Omnibus Amendment and the February 7, 2020 Final Rule are void and unenforceable.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request and pray that this Court:

a.    Permanently enjoin each Defendant from requiring Plaintiffs to fund or contract for at-sea monitors pursuant to the Omnibus Amendment and the February 7, 2020 Final Rule;

b.    Declare that industry funding requirements for at-sea monitoring in the Omnibus Amendment and the February 7, 2020 Final Rule are unlawful and void because they are *ultra vires* and violate applicable statutes and constitutional provisions;

c.    Hold unlawful and set aside the industry funding requirements for at-sea monitoring in the Omnibus Amendment and the February 7, 2020 Final Rule;

d.    Award such attorneys' fees and costs as Plaintiffs may be entitled to under law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.    Grant such other relief that the Court may deem just and proper.

A038

Dated: February 19, 2020

Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Phone: (571) 444-2841
ryan.mulvey@causeofaction.org
eric.bolinder@causeofaction.org

*Counsel for Plaintiffs*

**A039**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>WILBUR L. ROSS, JR., *et al.*, )<br>)<br>Defendants. )<br>) | Civil Action No. 20-466 |

**<u>COMPLAINT EXHIBIT 1</u>**

**A040**



*Wild caught product of USA*

*Managing the Needs of our Customers Through our Commitment to Sustainable Fisheries*

Thank you for the opportunity to provide some initial comments on the Joint-Council Omnibus Industry-Funded Monitoring Amendment.   Our comments focus on the types of monitoring being considered for the Atlantic herring and Atlantic mackerel fisheries.

This amendment came about following the partial disapproval of two previous Council amendments, which, combined, would have required our herring and mackerel vessels to have a Federally-approved observer on board, for every trip, with the vessel owners agreeing to limit their costs to $350/day, a sea-day cost for similar monitoring purposes on the West Coast, as understood at that time.

Lund's Fisheries agreed to this proposal in the hope that all of the questions about our pelagic fisheries could finally be answered and so that we could move ahead with meeting reasonable, biologically-based management goals and objectives in these important regional fisheries in the future.

Since that time, the Observer Committee has done a good job focusing on what is possible, and at what cost to both government and industry.  The projected costs are steep and most are likely to be unsustainable from our company's perspective.

Balancing the gathering of more data from these fisheries, with the cost of producing it and then  considering its' relative value, in terms of  comparable CV, accuracy and precision estimates that are used to monitor all of the other fisheries under Council management, is all rolled into the 579 page amendment with its 7 appendices.

It marks a turning point in regional fishery management policy, also, by requiring significant industry funding for monitoring programs that have been funded by the federal government since the passage of the MSA in 1977.  Assumingly, this would be forever, for every fishery, when agreed to at some point by the Councils and the Agency.

In the case of the herring and mackerel fisheries that we participate in, however, we realize we are going to have to incur some additional costs in the future but these costs need to sustainable and balanced with some biological benefits accruing to the herring and mackerel resources.  It does not appear that the government is seeking additional monitoring in these fisheries but, instead, stakeholder campaigns have created the need for this Omnibus Amendment.

At this time our herring and mackerel fishing vessels, the F/V Enterprise and the F/V Retriever, are working with the Observer Program to implement the pilot Electronic Monitoring (EM) program.  We sincerely appreciate the Agency's applying nearly a million dollars into this program to see if the concept works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-466 |
| | ) | |
| WILBUR L. ROSS, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>COMPLAINT EXHIBIT 2</u>**

**A042**

Replies to an opposition must be filed on or before October 1, 2018.

**ADDRESSES:** Federal Communications Commission, 445 12th Street SW, Washington, DC 20554.

**FOR FURTHER INFORMATION CONTACT:** Michele Berlove, Wireline Competition Bureau, at: (202) 418–1477; email: *Michele.Berlove@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's document, Report No. 3101, released September 4, 2018. The full text of the Petition is available for viewing and copying at the FCC Reference Information Center, 445 12th Street SW, Room CY–A257, Washington, DC 20554. It also may be accessed online via the Commission's Electronic Comment Filing System at: *http://apps.fcc.gov/ecfs/.* The Commission will not send a Congressional Review Act (CRA) submission to Congress or the Government Accountability Office pursuant to the CRA, 5 U.S.C. because no rules are being adopted by the Commission.

*Subject:* Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment, FCC 18–74, published at 83 FR 31659, July 9, 2018, in WC Docket No. 17–84. This document is being published pursuant to 47 CFR 1.429(e). *See also* 47 CFR 1.4(b)(1) and 1.429(f), (g).

*Number of Petitions Filed:* 1.

Federal Communications Commission.

**Katura Jackson,**
*Federal Register Liaison Officer, Office of the Secretary.*

[FR Doc. 2018–20238 Filed 9–18–18; 8:45 am]

**BILLING CODE 6712–01–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

**RIN 0648–BG91**

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Availability of proposed fishery management plan amendment; request for comments.

**SUMMARY:** The New England Fishery Management Council submitted the New England Industry-Funded Monitoring Omnibus Amendment, incorporating the Environmental Assessment and the Initial Regulatory Flexibility Analysis, for review by the Secretary of Commerce. NMFS is requesting comments from the public on the proposed amendment, which was developed to allow for industry-funded monitoring in New England Council fishery management plans and implement industry-funded monitoring in the Atlantic herring fishery. This amendment would ensure consistency in industry-funded monitoring programs across New England fisheries and increase monitoring in the Atlantic herring fishery.

**DATES:** Public comments must be received on or before November 19, 2018.

**ADDRESSES:** You may submit comments on this document, identified by NOAA–NMFS–2018–0109, by any of the following methods:

• *Electronic Submission:* Submit all electronic public comments via the Federal eRulemaking Portal.

1. Go to *www.regulations.gov/#!docketDetail;D=NOAA-NMFS-2018-0109;*

2. Click the "Comment Now!" icon and complete the required fields; and

3. Enter or attach your comments.

• *Mail:* Submit written comments to Michael Pentony, Regional Administrator, National Marine Fisheries Service, 55 Great Republic Drive, Gloucester, MA 01930. Mark the outside of the envelope, "Comments on the Industry-Funded Monitoring Amendment."

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered by us. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. We will accept anonymous comments (enter "N/A" in the required fields if you wish to remain anonymous).

Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

**FOR FURTHER INFORMATION CONTACT:** Carrie Nordeen, Fishery Policy Analyst, phone: (978) 281–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

In 2013, the Mid-Atlantic and New England Fishery Management Councils initiated a joint omnibus amendment to allow for industry-funded monitoring in all of the fishery management plans (FMPs) that the Councils manage. The joint omnibus amendment was intended to standardize the process to develop and administer future industry-funded monitoring programs for Council FMPs, and would have implemented industry-funded monitoring in the Atlantic herring and mackerel fisheries.

On September 20, 2016 (81 FR 64426), NMFS announced the public comment period for the draft joint omnibus amendment. The 45-day public comment period extended from September 23 through November 7, 2016. During that time, NMFS and the Councils hosted five public hearings on the draft joint omnibus amendment. NMFS and the Councils held public hearings in Gloucester, Massachusetts; Portland, Maine; Cape May, New Jersey; Narragansett, Rhode Island; and via webinar.

In April 2017, the New England Council finalized its selection of preferred alternatives and recommended that NMFS consider the joint omnibus amendment for approval and implementation, while the Mid-Atlantic Council decided to postpone action on the joint omnibus amendment. Therefore, the joint omnibus amendment, initiated by both Councils to allow for industry-funded monitoring, has become the New England Industry-Funded Monitoring Omnibus Amendment and would only apply to FMPs managed by the New England Council. Accordingly, this amendment would only implement industry-funded monitoring in the Atlantic herring fishery. At its October 2018 meeting, the Mid-Atlantic Council is scheduled to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs.

**Proposed Measures**

*1. Omnibus Measures*

This amendment would standardize the development and administration of

future industry-funded monitoring programs in New England Council FMPs. The proposed omnibus measures include:

• Standard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry;

• A process to implement FMP-specific industry-funded monitoring via an amendment and revise via a framework adjustment;

• Standard administrative requirements for industry-funded observers/monitors and monitoring service providers;

• A process to prioritize industry-funded monitoring programs in order to allocate available Federal resources across all FMPs; and

• A process for monitoring set-aside programs to be implemented via a future framework adjustment.

*2. Atlantic Herring Measures*

This amendment would implement industry-funded monitoring in the Atlantic herring fishery. The purpose of increased monitoring is to better understand the frequency of discarding in the herring fishery, as well as improve the tracking of the incidental catch of haddock and river herring/shad catch against their catch caps in the herring fishery. The proposed herring measures include:

• Implementing a 50-percent coverage target for industry-funded at-sea monitoring on vessels issued All Areas (Category A) or Areas ²/₃ (Category B) Limited Access Herring Permits; and

• Allowing midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas.

On April 19, 2018, the New England Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition data along with age and length information. Following discussion and public comment, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. An EFP would enable NMFS to further evaluate monitoring issues in the herring fishery that are of interest to the Council and herring industry and provide an opportunity to improve the electronic monitoring and portside program's efficacy and efficiency. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. Using the results of the EFP, the Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

**Public Comment Instructions**

Public comments on the Industry-Funded Monitoring Omnibus Amendment and its incorporated documents may be submitted through the end of the comment period stated in this notice of availability. A proposed rule to implement the Amendment, including draft regulatory text, will be published in the **Federal Register** for public comment. Public comments on the proposed rule must be received by the end of the comment period provided in this notice of availability to be considered in the approval/disapproval decision on the amendment. All comments received by November 19, 2018, whether specifically directed to Industry-Funded Monitoring Omnibus Amendment or the proposed rule for this amendment, will be considered in the approval/disapproval decision on the Industry-Funded Monitoring Omnibus Amendment. Comments received after that date will not be considered in the decision to approve or disapprove the Amendment. To be considered, comments must be received by close of business on the last day of the comment period.

**Authority:** 16 U.S.C. 1801 *et seq.*

Dated: September 13, 2018.

**Margo B. Schulze-Haugen,**

*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 2018–20259 Filed 9–18–18; 8:45 am]

**BILLING CODE 3510–22–P**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civil Action No. 20-466 |
| | ) |
| WILBUR L. ROSS, JR., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**<u>COMPLAINT EXHIBIT 3</u>**

**A045**

# LUND'S

## FISHERIES INCORPORATED

Phone:  (609) 884 - 7600  Fax:  (609) 884 - 0664   lundsfish@lundsfish.com
997 Ocean Drive,  Cape May,  New Jersey  08204,  U.S.A.

Email to: wreichle@lundsfish.com

November 19, 2018

Michael Pentony, Regional Administrator
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, MA 01930; www.regulations.gov

**Industry Funded Monitoring (IFM) Amendment NOA – NOAA-NMFS – 2018-0109**

Dear Administrator Pentony:

On behalf of our family-owned seafood harvesting and processing company and the 200 plant and vessel employees who assist us in producing sustainable seafood from the Atlantic Ocean, thank you for the opportunity to comment on the Notice of Availability of the NEFMC IFM Amendment.  We may provide additional comments prior to the end of the comment period on the proposed rule, next month.

Much has changed since the Councils first initiated IFM amendments and this one, approved by the NEFMC, has the potential to add an impossible financial burden on those herring vessels that may survive the coming, required 70% reduction in catch that we understand will be imposed in each of the next 3 fishing years.

For this reason and those outlined below, we ask that you set this amendment aside until at least the end of the 2021 fishing year, or until a new benchmark assessment of the herring resource takes place, in the hope that catches will increase in the future to a level to afford some level of IFM in the herring fishery, if determined to be necessary.  In the meantime, consider allowing the SBRM process to continue to allocate NEFOP observers, given the fishery's very low bycatch rate and limited impact on bycatch species normally encountered.  A 50% observer coverage target is excessive and statistically unnecessary in this fishery or, apparently, any other under Council management and represents a waste of scarce agency and industry resources particularly in a fishery with low bycatch rates as occur in the herring fishery.

We do appreciate the amendment allowing midwater trawl vessels to purchase fishery monitors, rather than have no NEFOP observer available, if a vessel intends to access a Groundfish Closed Area during a trip. We hope this can be accomplished through your discretion, rather than through this amendment. We also appreciate the suggestion to use an EFP to further evaluate a future EM and shoreside monitoring program, rather than proposing to implement such a program at this time.  We know that a 'critical mass' of vessel participants would be needed to fund such a combined program, however, which will likely now be lost for some time, with the significant loss of fishing opportunities ahead for the fleet.  At this time, our company and our fishermen prefer observers over cameras, if any additional monitoring is required in the future.

1

**A046**

**Administrator Pentony on NEFMC IFM Amendment NOA; November 16, 2018**


As you know, a shoreside monitoring program has been operated by SMAST and MADMF for several years, with the financial support of the herring midwater trawl fleet through the purchase of Area 1A RSA fish, in recent years.  Prior to our knowledge of the coming, disastrous quota cuts in the fishery, we had been working with these researchers to continue the shoreside monitoring program through Calendar Year 2021, using Area 1A RSA funds.

Now that the RSA quota in Area 1A may either not be available (the Council has yet to make this decision for fishing years 2020 & 2021) or too small to be of value as a result of the quota cuts, some other source of funding is needed to keep this program alive, even for fishing year 2019.  Bycatch data CVs are very low in this program, and comparable if not lower than those in the observer program.  We believe its continuation should be our first regional priority.  We do not go to sea to dump fish, as I believe the EM pilot project demonstrated, so it would seem that shoreside monitoring, combined with SBRM coverage that can still be prioritized to some degree by the Councils, is the best combined investment in learning more about what is taking place in the fishery although we know the biological implications of the bycatch in this fishery is limited.

It is our understanding that EM grant funds may be coming into the region.  We suggest that those dollars be used in the herring fishery to support the ongoing shoreside monitoring program during the next 3 years and, as requested above, set this amendment aside, or disapprove it, with reconsideration at a future period, perhaps, when the fishery may return to its recent level of productivity and profitability.

Thank you for your attention to and your consideration of our comments and concerns.  Please don't hesitate to contact me if I can provide you with any additional information.


With best regards,

*Wayne Reichle*

Wayne Reichle
President
Lund's Fisheries, Inc.
Cape May, NJ 08204

**A047**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) |
| Plaintiffs, | ) |
| v. | )     Civil Action No. 20-466 |
| WILBUR L. ROSS, JR., *et al.*, | ) |
| Defendants. | ) |

**COMPLAINT EXHIBIT 4**

A048


| Rule No. | Rule title | State effective date | EPA effective date | Final rule citation date | Comments |
|---|---|---|---|---|---|
| * | * | * | * | * | * |
| (32) XXXII ........... | Wyoming State Implementation Plan 5-Year Progress Report for Regional Haze, Appendix B: Alternative to BART for NO<sub>X</sub> and PM for PacifiCorp Naughton Unit 3. | November 28, 2017. | December 7, 2018. | [**Federal Register** citation], November 7, 2018. | Only includes Appendix B: Alternative to BART for NO$_X$ and PM for PacifiCorp Naughton Unit 3. |

■ 3. Section 52.2636 is amended by revising paragraph (a)(1)(vii) and amending paragraph(c)(1) by revising Table 1 to § 52.2636 to read as follows:

**§ 52.2636   Implementation plan for regional haze.**

(a) * * *

(1) * * *

(vii) PacifiCorp Naughton Power Plant Units 1 and 2 (PM and NO$_X$); and

*    *    *    *    *

(c) * * *

(1) * * *

TABLE 1 TO § 52.2636

[Emission limits for BART units for which EPA approved the State's BART and Reasonable Progress determinations]

| Source name/BART unit | PM emission limits—lb/MMBtu | NO$_X$ emission limits—lb/MMBtu (30-day rolling average) |
|---|---|---|
| FMC Westvaco Trona Plant/Unit NS–1A ................................................................ | 0.05 | 0.35 |
| FMC Westvaco Trona Plant/Unit NS–1B ................................................................ | 0.05 | 0.35 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler C ................ | 0.09 | 0.28 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler D ................ | 0.09 | 0.28 |
| Basin Electric Power Cooperative Laramie River Station/Unit 1 ..................................... | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 2 ..................................... | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 3 ..................................... | 0.03 | N/A |
| PacifiCorp Dave Johnston Power Plant/Unit 3 ......................................................... | 0.015 | N/A |
| PacifiCorp Dave Johnston Power Plant/Unit 4 ......................................................... | 0.015 | 0.15 |
| PacifiCorp Jim Bridger Power Plant/Unit 1 [1] ........................................................ | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 2 [1] ........................................................ | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 3 [1] ........................................................ | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 4 [1] ........................................................ | 0.03 | 0.26/0.07 |
| PacifiCorp Naughton Power Plant/Unit 1 ............................................................... | 0.04 | 0.26 |
| PacifiCorp Naughton Power Plant/Unit 2 ............................................................... | 0.04 | 0.26 |
| PacifiCorp Wyodak Power Plant/Unit 1 ................................................................. | 0.015 | N/A |

[1] The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3, and 4 shall comply with the NO$_X$ emission limit for BART of 0.26 lb/MMBtu and PM emission limit for BART of 0.03 lb/MMBtu and other requirements of this section by March 4, 2019. The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3 and 4 shall comply with the NO$_X$ emission limit for reasonable progress of 0.07 lb/MMBtu by: December 31, 2022, for Unit 1, December 31, 2021, for Unit 2, December 31, 2015, for Unit 3, and December 31, 2016, for Unit 4.

*    *    *    *    *

[FR Doc. 2018–24372 Filed 11–6–18; 8:45 am]

**BILLING CODE 6560–50–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

**50 CFR Part 648**

[Docket No. 170831847–8853–01]

**RIN 0648–BG91**

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Proposed rule, request for comments.

**SUMMARY:** This action proposes regulations to implement the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. The New England Council is considering ways to increase monitoring in certain fisheries to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment would implement a process to standardize future industry-funded monitoring programs in New England Council fishery management plans and industry-funded monitoring in the Atlantic herring fishery. This action would ensure consistency in industry-funded monitoring programs across fisheries and increase monitoring in the Atlantic herring fishery.

**DATES:** Public comments must be received by December 24, 2018.

**ADDRESSES:** You may submit comments, identified by NOAA–NMFS–2018–0109, by either of the following methods:

• *Electronic Submission:* Submit all electronic public comments via the Federal eRulemaking Portal.

1. Go to *www.regulations.gov/ #!docketDetail;D=NOAA-NMFS-2018- 0109;*

2. Click the ''Comment Now!'' icon and complete the required fields; and

3. Enter or attach your comments.

• *Mail:* Submit written comments to Michael Pentony, Regional Administrator, National Marine Fisheries Service, 55 Great Republic Drive, Gloucester, MA 01930. Mark the outside of the envelope, ''Comments on

**55666** **Federal Register** / Vol. 83, No. 216 / Wednesday, November 7, 2018 / Proposed Rules

the Proposed Rule for the Industry-Funded Monitoring Amendment.''

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered by us. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. We will accept anonymous comments (enter ''N/A'' in the required fields if you wish to remain anonymous).

Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this proposed rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:**
Carrie Nordeen, Fishery Policy Analyst, phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

In 2013, the Mid-Atlantic and New England Fishery Management Councils initiated a joint omnibus amendment to allow industry-funded monitoring in all of the fishery management plans (FMP) that the Councils manage. The joint amendment would provide a mechanism to support industry-funded monitoring and remedy issues that prevented NMFS from approving some of the Councils' previous industry-funded monitoring proposals. The industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). The Councils were interested in increasing monitoring

in certain FMPs to assess the amount and type of catch and to reduce uncertainty around catch estimates. Previous Council proposals for industry-funded monitoring either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

In their development of the joint amendment, the Councils needed to remedy disapproved monitoring measures in Amendment 5 to the Atlantic Herring FMP (Amendment 5) (79 FR 8786, February 13, 2014) and Amendment 14 to the Atlantic Mackerel, Squid, and Butterfish FMP (Amendment 14) (79 FR 10029, February 24, 2014). Those measures recommended 100-percent observer coverage for the herring and mackerel fisheries and that NMFS would fund the increased monitoring along with a contribution by the fishing industry. Because NMFS's spending is limited by its Congressional appropriations, NMFS could not approve the Councils' recommendation because it could not guarantee that it would have sufficient funds to pay for the required increase in monitoring. Amendments 5 and 14 also recommended that the fishing industry contribution for industry-funded monitoring would be no more than $325 per day. Similarly, Framework 48 to the Northeast Multispecies FMP (78 FR 53363, August 29, 2013) recommended limiting the types of costs that industry would be responsible for paying in an industry-funded program, such that the industry would only have to pay for observer salaries. NMFS disapproved these proposals because they proposed the industry share monitoring costs with the government in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the joint amendment would use a monitoring coverage target, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets would be specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the joint amendment

would define cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. Currently, that cost delineation is between administrative and sampling costs. The joint omnibus amendment would use that delineation to define cost responsibilities for future industry-funded monitoring programs.

The omnibus alternatives in the joint amendment, meaning those alternatives that would apply to all Council FMPs, considered measures to standardize the development and administration of future industry-funded monitoring programs. The joint amendment also included industry-funded monitoring coverage targets for the herring and mackerel fisheries. Information from industry-funded monitoring would primarily be used to help track catch (retained and discarded) against catch limits. The industry-funded monitoring types considered in the joint amendment for the herring and mackerel fisheries included observers, at-sea monitors, electronic monitoring, and portside sampling. To help the Councils evaluate the utility of electronic monitoring to verify catch retention and track discarded catch, NMFS conducted a voluntary electronic monitoring study in 2016 and 2017 with midwater trawl vessels that participate in the herring and mackerel fisheries.

At its April 2017 meeting, the Mid-Atlantic Council decided to postpone action on the joint amendment until the midwater trawl electronic monitoring study was completed. The Mid-Atlantic Council's decision was based, in part, on its desire to have more information on the use of electronic monitoring to track catch against catch limits and the monitoring costs associated with electronic monitoring that would be borne by the mackerel industry. The Mid-Atlantic Council is expected to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs at its October 2018 meeting. The New England Council selected preferred omnibus and herring coverage target alternatives at its April 2017 meeting, and recommended NMFS consider the amendment for approval and implementation. Therefore, the joint amendment initiated by both Councils to allow for industry-funded monitoring has become the New England Industry-Funded

Monitoring Omnibus Amendment and the proposed measures would only apply to FMPs that the New England Council manages.

The midwater electronic monitoring study concluded in January 2018. NMFS, New England Council, and Mid-Atlantic Council staff reviewed the study's final report in March 2018 and concluded that electronic monitoring was suitable for detecting discarding events aboard midwater trawl vessels. The study also evaluated costs associated with using EM in the herring fishery, especially the sampling costs that would be paid by the fishing industry. Based on the study, NMFS estimated the industry's costs for EM at approximately $296 per coverage day, not including the initial costs of purchasing and installing equipment. The EA for the amendment estimated the industry's annual costs for portside sampling at $96,000 for the midwater trawl fleet and $8,700 per vessel. Therefore, NMFS estimated the industry's costs for using electronic monitoring and portside sampling would be approximately $515 per coverage day.

A Notice of Availability (NOA) for the New England Industry-Funded Omnibus Amendment was published in the **Federal Register** on September 19, 2018 (83 FR47326). The comment period for the NOA ends on November 19, 2018. Comments submitted on the NOA and/or this proposed rule prior to November 19, 2018, will be considered in our decision to approve, partially approve, or disapprove the Industry-Funded Monitoring Omnibus Amendment. We will consider comments received by the end of the comment period for this proposed rule December 24, 2018 in our decision to implement measures proposed by the Council.

**Proposed Omnibus Measures**

This amendment would standardize the development and administration of future industry-funded monitoring programs for New England Council FMPs only. However, only the Atlantic Herring FMP would be subject to an industry-funded monitoring program resulting from this amendment. In the future, if the New England Council develops an industry-funded monitoring program, the New England Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by

this amendment. While proposed cost responsibilities and monitoring service provider requirements are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding. The New England Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the proposed omnibus measures.

As described previously, NMFS cannot approve and implement monitoring requirements for which it does not have available Federal funding to cover NMFS cost responsibilities. For that reason, this amendment proposes establishing industry-funded monitoring coverage targets in New England FMP with the understanding that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standardized structure for future industry-funded monitoring programs in New England fisheries would apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule proposes the following principles to guide the selection and implementation of future industry-funded monitoring programs. The Council's development of an industry-funded monitoring program must consider or include the following:

• A clear need or reason for the data collection;
• Objective design criteria;
• Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
• Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
• Prioritize the use of modern technology to the extent practicable; and
• Incentives for reliable self-reporting.

All proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-

aside programs, and do not directly affect fishing effort or amounts of fish harvested. However, the proposed omnibus measures may have indirect effects on New England FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process may help ensure that available Federal funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Lastly, monitoring set-aside programs may help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

*1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs*

This amendment would specify that future industry-funded monitoring programs would be implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:

• Level and type of coverage target;
• Rationale for level and type of coverage;
• Minimum level of coverage necessary to meet coverage goals;
• Consideration of waivers if coverage targets cannot be met;
• Process for vessel notification and selection;

**A051**

- Cost collection and administration;
- Standards for monitoring service providers; and
- Any other measures necessary to implement the industry-funded monitoring program.

This amendment would also specify that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

### 2. Standard Cost Responsibilities

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may help offset industry cost responsibilities through reimbursement if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment would codify NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS would be responsible for paying costs associated with setting standards for, monitoring the performance of, and administering, industry-funded monitoring programs. These program elements would include:

- The labor and facilities costs associated with training and debriefing of monitors;
- NMFS-issued gear (e.g., electronic reporting aids used by human monitors to record trip information);
- Certification of monitoring providers and individual observers or monitors;
- Performance monitoring to maintain certificates;
- Developing and executing vessel selection;
- Data processing (including electronic monitoring video audit, but

excluding service provider electronic video review); and
- Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS's costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry would be responsible for funding all other costs of the monitoring program, those costs would include, but are not limited to:

- Costs to the service provider for deployments and sampling (e.g., travel and salary for observer deployments and debriefing);
- Equipment, as specified by NMFS, to the extent not provided by NMFS (e.g., electronic monitoring system);
- Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;
- Costs to the service provider for installation and maintenance of electronic monitoring systems;
- Provider overhead and project management costs (e.g., provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and
- Other costs of the service provider to meet performance standards laid out by a FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment would codify NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it would not alter current requirements for existing industry-funded monitoring programs.

### 3. Standard Requirements for Monitoring Service Providers and Observers/Monitors

The SBRM Omnibus Amendment adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This action would modify existing observer and service provider requirements to apply more broadly to

monitoring by observers, at-sea monitors, portside samplers, and dockside monitors. Additionally, this amendment would apply those requirements to supplementing coverage required by SBRM, ESA, and MMPA. This rule proposes to expand and modify existing observer service provider requirements at § 648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule proposes to expand and modify existing observer requirements at § 648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/monitor requirements would serve as the default requirements for any future industry-funded monitoring programs in New England Council FMPs. The Council may specify new requirements or revise existing requirements for FMP-specific industry-funded monitoring programs, as part of the amendment developing those programs or the framework adjustment revising those programs.

### 4. Prioritization Process

This amendment would establish a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England Council FMPs. This prioritization process would allow the Council discretion to align Council monitoring priorities with available funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs would not be included in the proposed prioritization process, unless the New England Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover the government's costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage would not be affected by this prioritization process. Any industry-funded monitoring programs would be prioritized separately from and in addition to any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in

a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council would determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment would establish an equal weighting approach to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule proposes that the Council would adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach would be adjusted whenever a new industry-funded monitoring program is approved or whenever an existing industry-funded monitoring program is adjusted or terminated. The Council would revise the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS would then evaluate what Federal funding was available to cover its costs for meeting the industry-funded monitoring coverage targets for the next year. For example, once NMFS determines SBRM coverage for 2018, it would then evaluate what amount of

government coverage costs could be covered by available Federal funding to meet industry-funded monitoring coverage targets for 2019. NMFS would provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS would inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS would also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

*5. Monitoring Set-Aside Programs*

This amendment would standardize the process to develop future monitoring set-aside programs and would allow monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:

• The basis for the monitoring set-aside;
• The amount of the set-aside (*e.g.*, percentage of ACL, days-at-sea (DAS));
• How the set-aside is allocated to vessels required to pay for monitoring (*e.g.*, increased possession limit, differential DAS counting, additional trips against a percent of the ACL);
• The process for vessel notification;
• How funds are collected and administered to cover the industry's costs of monitoring coverage; and
• Any other measures necessary to develop and implement a monitoring set-aside.

**Proposed Atlantic Herring Measures**

This amendment would establish an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery would address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment would establish a 50-percent industry-funded monitoring coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100-percent, 75-percent, and 25-percent, but the 50-percent coverage target balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would greatly reduce the uncertainty around catch estimates, and likely result in a coefficient of variation less than 30 percent almost all of the time. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the industry-funded monitoring coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the herring fishing year, January through December, by

combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. For example, if there is 10-percent SBRM coverage in a given year, then 40-percent industry-funded monitoring coverage would be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip would not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year would fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the proposed standard monitoring and service provider requirements in the proposed omnibus measures, this amendment would specify that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

*1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits*

This rule proposes that vessels issued Category A or B herring permits would carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels would be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits would be required to notify NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer on the same trip that would carry an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they would then be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule proposes three reasons for issuing vessels waivers from industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intended to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 metric tons (mt) of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors would collect the following information on herring trips:
• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.,* operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors would collect would be length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively,

the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the APA.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule proposes that existing slippage requirements would also apply when vessels are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels would be required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels would be required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they would be required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual

operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for all vessels.

### 2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer by measures at § 648.202(b). When Amendment 5 established that requirement, the Groundfish Closed Areas included Closed Area I, Closed Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 percent to 40 percent from 2015 through 2017). This rule would maintain the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but it proposes that midwater trawl vessels would be able to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels would be required to provide notice to NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that an observer may be procured through a monitoring service provider. The vessel would be prohibited from fishing in the Groundfish Closed Areas without carrying an observer. Observers would collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);

• Tow-specific information (*i.e.,* depth, water temperature, wave height,

and location and time when fishing begins and ends);

• Species, weight, and disposition of all retained and discarded catch on observed hauls;

• Species, weight, and disposition of all retained catch on unobserved hauls;

• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

• Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae);

• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

• Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

The proposed measure to allow midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas would also have economic impacts on vessels participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in additional to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels would apply to the modified areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl

vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment (83 FR 15240, April 9, 2018) maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas, for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule proposes prioritizing industry-funded monitoring coverage on Category A and B vessels before supporting observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

## Atlantic Herring Exempted Fishing Permit

On April 19, 2018, the New England Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition

data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry. Lastly, NMFS could use an EFP to evaluate the utility of electronic monitoring and portside sampling when midwater trawl vessels switch to purse seining and/or fish in Groundfish Closed Areas.

The EFP would be developed concurrently with rulemaking for this amendment. If the proposed herring measures are approved, then midwater trawl vessels issued EFPs would be allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements in regulation via a framework adjustment at that time.

## Proposed Corrections and Clarification

NMFS proposes the following corrections and updates under the authority of section 305(d) to the Magnuson-Stevens Fishery

Conservation and Management Act (Magnuson-Stevens Act), which provides that the Secretary of Commerce may promulgate regulations necessary to carry out a FMP or the Magnuson-Stevens Act.

First, this rule proposes correcting the typographic error in § 648.7(b)(2)(i). This correction would correct "opn 9access" to "open access" and is necessary to clarify the intent of the regulation.

Second, this rule proposes updating outdated requirements for vessels operating under the midwater trawl and purse seine exempted fisheries. Regulations at § 648.80(d)(5) and (e)(5) require vessels to notify NMFS 72 hours in advance of a fishing trip to coordinate observer deployment. Amendment 5 replaced the 72-hour notification requirement with a 48-hour notification requirement to allow herring vessels more flexibility in their trip planning and scheduling. The 72-hour notification requirements for herring vessels in § 648.80 were overlooked in Amendment 5, so this rule proposes updating the 72-hour notification requirements with 48-hour notification requirements for midwater trawl and purse seine vessels to ensure consistent requirements across the herring fishery. Regulations at § 648.80(d)(5) also require midwater trawl vessels to inform NMFS if the vessels intends to fish in Groundfish Closed Area I. This requirement initially facilitated placing observers on midwater vessels fishing in Groundfish Closed Area I, but is no longer necessary. Therefore, this rule proposes removing the reference to Groundfish Closed Area I from the notification requirements so that requirements are consistent with proposed notification requirements at § 648.11(m)(2).

Third, this rule proposes allowing us to use both observer and monitor data to track catch against the haddock catch caps. Regulations at § 648.86(a)(3)(ii) state that the Regional Administrator shall use haddock catches observed by observers to estimate of total haddock catch in a given haddock stock area. However, the Council has spent the last several years considering additional monitoring types to increase monitoring in the herring fishery, particularly to track catch against haddock and river herring/shad catch caps. In a February 2016 letter, the Council requested that we use observer and portside sampling data to monitor fishery catch caps. Additionally, in this amendment, the Council recommended that vessels issued Category A and B herring permits carry at-sea monitors to meet a 50-percent industry-funded monitoring

coverage target. In § 648.2, this rule proposes defining observers or monitors to include NMFS-certified observers, at-sea monitors, portside samplers, and dockside monitors. For these reasons, this rule also proposes updating § 648.86(a)(3)(ii) to allow the Regional Administrator to use observer and monitor data to track catch against haddock catch caps.

**Classification**

Pursuant to section 304(a)(1)(A) of the Magnuson-Stevens Act, the NMFS Assistant Administrator has made a preliminary determination that this proposed rule is consistent with the Magnuson-Stevens Act and other applicable law. In making the final determination, we will consider the data, views, and comments received during the public comment period.

This proposed rule has been preliminarily determined to be not significant for purposes of Executive Orders (E.O.) 12866.

NMFS prepared an Initial Regulatory Flexibility Analysis (IRFA) for this proposed rule, as required by section 603 of the Regulatory Flexibility Act (RFA), 5 U.S.C. 603. The IRFA describes the economic impact that this proposed rule would have on small entities, including small businesses, and also determines ways to minimize these impacts. The proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the proposed omnibus measures have no direct economic impacts, they will not be discussed in this section. The proposed Atlantic herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

A description of the action, why it is being considered, and the legal basis for this action are contained at the beginning of this section in the preamble and in the **SUMMARY** section. The IRFA includes this section of the preamble to this rule and analyses contained in the Industry-Funded Monitoring Omnibus Amendment and its accompanying EA/RIR/IRFA. A copy of the full analysis is available from the Council (see **ADDRESSES**). A summary of the IRFA follows.

*Description of the Reason Why Action by the Agency Is Being Considered and Statement of the Objective of, and Legal Basis for, This Proposed Rule*

This action proposes management measures for New England Fishery Management Council FMPs. A complete description of the reasons why this action is being considered, and the objectives of and legal basis for this action, are contained in the preamble to this proposed rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Proposed Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 1.

TABLE 1—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from herring permitted firms | Gross receipts from herring fishing |
| --- | --- | --- |
| Mean | $1,847,392 | $422,210 |
| Median | $1,076,172 | $0 |
| 25th Percentile | $656,965 | $0 |
| 75th Percentile | $2,684,753 | $95,218 |
| Permitted Small Entities | 62 | 62 |

*Source:* NMFS.

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two firms are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 2 characterizes gross receipts and gross receipts from the herring fishery for the active firms.

TABLE 2—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from active herring permitted firms | Gross receipts from herring fishing |
| --- | --- | --- |
| Mean | $2,070,541 | $872,567 |
| Median | $1,030,411 | $95,558 |
| 25th Percentile | $554,628 | $6,570 |
| 75th Percentile | $2,955,883 | $1,696,758 |
| Active Small Entities | 30 | 30 |

*Source:* NMFS.

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This proposed rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a new collection. The proposed action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, NMFS estimates that each vessel would incur monitoring costs for

an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Since this option would be available on all trips not otherwise selected for SBRM or industry-funded at-sea monitoring coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls

to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

NMFS expects that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer

availability in advance of each trip; maintain an updated contact list of all industry-funded at-sea monitors/ observers that includes the monitor's/ observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is "in service" (*i.e.*, available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 3—BURDEN ESTIMATE FOR PROPOSED MEASURES

| Monitoring service provider requirements | Number of entities | Total number of items | Response time per response (minutes) | Total time burden (hours) | Cost per response ($) | Total annual public cost ($) |
|---|---|---|---|---|---|---|
| Monitor deployment report by email | 4 | 444 | 10 | 74 | 0.00 | 0.00 |
| Monitor availability report by email | 4 | 216 | 20 | 72 | 0.00 | 0.00 |
| Safety refusals by email | 4 | 40 | 30 | 20 | 0.00 | 0.00 |
| Raw monitor data by express mail | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports | 4 | 68 | 30 | 34 | 0.00 | 0.00 |
| Biological samples | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.49 | 2 |
| Applicant response to denial | 1 | 1 | 600 | 10 | 0.49 | 1 |
| Request to service provider to procure a monitor by web-portal | 90 | 360 | 10 | 60 | 0.00 | 0.00 |
| Notification of unavailability of monitors | 90 | 360 | 5 | 30 | 0.00 | 0.00 |
| Request to service provider to procure an observer for Groundfish Closed Areas | 21 | 84 | 10 | 14 | 1.00 | 84.00 |
| Notification of unavailability of observers for Groundfish Closed Areas | 21 | 84 | 5 | 7 | 0.50 | 42.00 |
| Request for monitor training | 4 | 12 | 30 | 6 | 1.80 | 21.60 |
| Rebuttal of pending removal from list of approved service providers | 1 | 1 | 480 | 8 | 0.49 | 1 |
| Monitor contact list updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Monitor availability updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Service provider material submissions | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Service provider contracts | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Total | ............... | ............... | ............... | 1,192 | ............... | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to *OIRA_Submission@ omb.eop.gov* or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of Significant Alternatives to the Proposed Action Which Accomplish the Stated Objectives of Applicable Statues and Which Minimize Any Significant Economic Impact on Small Entities*

None of the non-preferred herring alternatives would be expected to accomplish the stated objectives for monitoring in the herring fishery as well as the proposed action. The following are objectives for increased monitoring in the herring fishery: (1) Accurate estimates of catch (retained and discarded), (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad), and (3) affordable monitoring for the herring fishery. Herring alternatives considered different combinations of monitoring types (observers, at-sea monitors, electronic monitoring, portside sampling) and coverage targets (100 percent, 75 percent, 50 percent, 25 percent) on herring fleets (vessels with Category A or B permits, midwater trawl vessels). Non-preferred herring alternatives with coverage targets of 100 percent or 75 percent would have higher costs than the proposed action. Non-preferred herring alternatives for the midwater trawl fleet or those with 25-percent coverage targets may not have

improved monitoring in the herring fishery as well as the proposed action.

## List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: October 30, 2018.

**Samuel D. Rauch, III,**
*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is proposed to be amended as follows:

## PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, add the definition for "Observer or monitor" and revise the definitions for "Electronic monitoring" and "Slippage in the Atlantic herring fishery" and "Slip(s) or slipping catch in the Atlantic herring fishery" in alphabetical order to read as follows:

### § 648.2  Definitions.

\*    \*    \*    \*    \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations.

\*    \*    \*    \*    \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors, portside samplers, and dockside monitors.

\*    \*    \*    \*    \*

*Slippage in the Atlantic herring fishery* means catch that is discarded prior to it being brought aboard a vessel issued an Atlantic herring permit and/ or prior to making it available for sampling and inspection by a NMFS-certified observer or monitor. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in

the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-approved observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.

\*    \*    \*    \*    \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

### § 648.7  Record keeping and reporting requirements.

\*    \*    \*    \*    \*

(b) \* \* \*
(2) \* \* \*

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour

**55676** **Federal Register**/Vol. 83, No. 216/Wednesday, November 7, 2018/Proposed Rules

(hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

\* \* \* \* \*

■ 4. Revise § 648.11 and the section heading to read as follows:

### § 648.11 Monitoring coverage.

(a) The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas 2/3 Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a bluefish permit, a spiny dogfish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-Funded Monitoring Programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding Principles for New IFM Programs.* The Council's design of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process To Implement and Revise New IFM Programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target,

(ii) Rationale for level and type of coverage,

(iii) Minimum level of coverage necessary to meet coverage goals,

(iv) Consideration of waivers if coverage targets cannot be met,

(v) Process for vessel notification and selection,

(vi) Cost collection and administration,

(vii) Standards for monitoring service providers, and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS Cost Responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers, and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization Process to Cover NMFS IFM Cost Responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS IFM cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall

not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM Program Monitoring Service Provider Requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraphs (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring Set-Aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities*—(1) General. An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/ femad/fsb/.*

(2) [Reserved]

(3) *Contents of application.* An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a

conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/ or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers.* (i) A monitoring service provider must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of deployment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under paragraph (h) of this section are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several

deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/ training/*.

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/ FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) Deployment reports. The monitoring service provider must report to NMFS/ FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/ devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/scallop* .

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/ FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/ trip types assigned, and must include whether or not the observer or monitor is "in service," indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to most recent Information Technology Security Guidelines at *https:// www.nefsc.noaa.gov/fsb/memos/*. Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/ FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/ FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/ FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between

the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and

responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (h)(6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section;

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification.* (1) To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https:// www.nmfs.noaa.gov/op/pds/categories/ scienceandtechnology.html.* For further information, see *https:// www.st.nmfs.noaa.gov/observer-home/.*

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https:// www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/ training/.*

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this

section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) *Probation and decertification.* NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service providers via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is

revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program*—(1) *General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures*—(i) *Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through

Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https:// www.nefsc.noaa.gov/femad/fsb/.* The observer service provider may take up to 48 hr to arrange for observer

deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (*1*) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full "days."

(*2*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-

funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(*3*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on an LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded observer set-aside, a service provider shall charge dock to dock where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for

observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or specified by the Regional Administrator, the owner, operator, or manager of a vessel (*i.e.*, vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting 48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the

specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:

(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and

(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:

(A) Streamline data management and eliminate redundancy;

(B) Explore options for cost-sharing and deferment of cost to industry; and

(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:

(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and

(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:

(A) Reduce management and/or biological uncertainty; and

(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas

or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

(A) IFM HVF observers shall collect the following information:

(*1*) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(*2*) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(*3*) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(*4*) Species, weight, and disposition of all retained catch on unobserved hauls;

(*5*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(*6*) Whole specimens, photos, length information, and biological samples (*e.g.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

(*7*) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(*8*) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:

(*1*) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(*2*) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(*3*) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(*4*) Species, weight, and disposition of all retained catch on unobserved hauls;

(*5*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(*6*) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

(*7*) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(*8*) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(*9*) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:

(*1*) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;

(*2*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

(*3*) Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance of

the beginning of the fishing year. NMFS will provide vessels owners with selection forms no later than June 1 of each year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.,* midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and

portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m(2)(iii)(B) and (C) and paragraph (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/ training/*.

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit on a declared herring trip, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or names in the cases of paired midwater trawlers, permit category, and permit number; contact name for coordination of monitoring coverage; telephone number for contact; the date, time, and port of departure; gear type; target species; trip length and port of landing; and intended area of fishing.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the

Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 9 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/ femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/ FSB shall issue a waiver, if the

conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued an Atlantic herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel

operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) *Trip limits:* A vessel issued a limited access mackerel permit, as specified in § 648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per

calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel permit or a longfin squid/butterfish moratorium permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to

remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and indicate the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. Amend § 648.14 by revising paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(ix) through (xi) and adding paragraphs (r)(2)(xiii) and (xiv) to read as follows:

### § 648.14   Prohibitions.

\*     \*     \*     \*     \*

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in § 648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in § 648.11.

(4) Submit false or inaccurate data, statements, or reports.

\*     \*     \*     \*     \*

(r) \*  \*  \*

(1) \*  \*  \*

(vi) \*  \*  \*

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), pursuant to the requirements in § 648.80(d) and (e).

\*     \*     \*     \*     \*

(2) \*  \*  \*

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in § 648.81(a)(3),(4), (5), and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

\*  \*  \*

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(8)(iv) and (v) and § 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by § 648.11(m)(8)(vi) and § 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by § 648.11(m)(8)(iii) and § 648.202(b)(4)(ii).

\*  \*  \*

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

\*     \*     \*     \*     \*

■ 6. In § 648.80 revise paragraph (d)(5) and (e)(5) to read as follows:

**§ 648.80   NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.**

\*   \*   \*   \*   \*

(d) \* \* \*

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

\*   \*   \*   \*   \*

(e) \* \* \*

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

\*   \*   \*   \*   \*

■ 7. In § 648.86 revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

**§ 648.86   NE Multispecies possession restrictions.**

\*   \*   \*   \*   \*

(a) \* \* \*
(3) \* \* \*
(ii) \* \* \*
(A) \* \* \*

(*1*) 648.86(a)(3)(ii) *Haddock incidental catch cap.* (A)(*1*) When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.,* the Herring GOM Haddock Accountability Measure (AM) Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of area fished or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

\*   \*   \*   \*   \*

**§§ 648.10, 648.14, 648.51, 648.59, 648.80, and 648.86   [Amended]**

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
|---|---|---|
| 648.10(f)(4) | NMFS-approved | NMFS-certified. |
| 648.14(i)(3)(ix) | NMFS-approved | NMFS-certified. |
| 648.14(i)(3)(ix)(C) | 648.11(g) | 648.11(k). |
| 648.14(k)(2)(iii) | 648.11(k) | 648.11(l). |
| 648.14(k)(2)(iv) | 648.11(k) | 648.11(l). |
| 648.51(c)(4) | 648.11(g) | 648.11(k). |
| 648.51(e)(3)(iii) | 648.11(g) | 648.11(k). |
| 648.59(b)(2) | 648.11(g) | 648.11(k). |
| 648.80(d)(3) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.80(e)(2)(ii) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.86(a)(3)(ii) | NMFS-approved | NMFS-certified. |
| 648.202(b)(4)(iv) | 648.11(m)(4)(iv) and (v) | 648.11(m)(4)(iv) and (vi). |

[FR Doc. 2018–24087 Filed 11–6–18; 8:45 am]
**BILLING CODE 3510–22–P**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 20-466 |
| | ) |
| WILBUR L. ROSS, JR., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**<u>COMPLAINT EXHIBIT 5</u>**

**A072**



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

**DEC 1 8 2018**

Dr. John Quinn, Chairman
New England Fishery Management Council
50 Water Street
Newburyport, MA 01950

Dear John:

On behalf of the Secretary of Commerce, we approved the New England Industry-Funded Monitoring Omnibus Amendment, including all the management measures recommended by the Council in this amendment.

This amendment establishes a process to standardize future industry-funded monitoring programs for Council fishery management plans (FMPs) and establishes industry-funded monitoring in the Atlantic herring fishery.

*Omnibus Measures*

The omnibus measures amend all Council FMPs to standardize the development and administration of future industry-funded monitoring programs.

The omnibus measures establish:
- A process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and monitoring service providers;
- A process to prioritize monitoring coverage that may be provided by available Federal funding across FMPs for new industry-funded monitoring programs; and
- A process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

Standard cost responsibilities and administrative requirements would apply to the existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs, but the other omnibus measures would not apply to these existing programs. The Council may incorporate these existing industry-funded monitoring programs into the process to prioritize industry-funded monitoring programs for available Federal funding in a future action. Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.



**A073**

*Atlantic Herring Measures*

The herring measures establish an industry-funded monitoring program in the herring fishery. Increased monitoring in the herring fishery is designed to address the following goals: 1) Accurate estimates of catch (retained and discarded); 2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and 3) affordable monitoring for the herring fishery.  To achieve these goals, the measures require a 50-percent coverage target for at-sea monitoring coverage aboard vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit.  Approximately 40 vessels have Category A or B herring permits, but those vessels typically catch over 95 percent of the total herring harvest.

As recommended by the Council, the 50-percent coverage target includes a combination of Standardized Bycatch Reporting Methodology (SBRM) and industry-funded monitoring coverage.  Industry participants would pay for any additional monitoring coverage above SBRM to meet the 50-percent coverage target.  Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is unavailable.  Trips that land less than 50 mt of herring and vessels carrying no fish on pair trawling trips would be exempt from the amendment's coverage requirements.

During 2016 and 2017, we conducted an electronic monitoring project aboard herring vessels using midwater trawl gear.  The purpose of the project was to evaluate the feasibility of using electronic monitoring to verify catch retention and track discarded catch.  In April 2018, the Council reviewed results from the project and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels, instead of at-sea monitoring, to meet the 50-percent industry-funded monitoring coverage target.  The Council did not recommend requiring electronic monitoring and portside sampling as part of this action; instead it recommended we use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.  Additionally, the EFP would provide us with the flexibility to troubleshoot and react to problems, thus helping make the monitoring program more robust.  Using the results of the EFP, the Council may consider establishing electronic monitoring and portside sampling requirements via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

The herring measures maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer, but would allow herring vessels to purchase observer coverage to access these closed areas.  Herring midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are randomly selected to carry an observer to meet SBRM requirements.

As you are aware, industry-funded monitoring coverage in the herring fishery is contingent upon the availability of Federal funds to support our cost responsibilities.  Without additional funding, we would be unable to administer industry-funded monitoring for the herring fishery in a given year.  We were awarded funding to administer electronic monitoring for the herring fishery in 2020, but do not currently have funding to implement and administer the at-sea monitoring and portside sampling components.  We continue working toward securing funding to administer

industry-funded monitoring in the herring fishery, but the earliest we could implement industry-funded monitoring in the herring fishery is 2020.

We appreciate the Council's and Council staff's efforts to develop this amendment and ongoing efforts to improve monitoring in New England fisheries. Please contact me if you have any questions.

Sincerely,

Michael Pentony
Regional Administrator

Cc: Thomas A. Nies, Executive Director, New England Fishery Management Council
Michael Luisi, Chairman, Mid-Atlantic Fishery Management Council
Dr. Christopher M. Moore, Executive Director, Mid-Atlantic Fishery Management Council
Robert E. Beal, Executive Director, Atlantic States Marine Fisheries Commission

**A075**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 20-466 |
| ) | |
| WILBUR L. ROSS, JR., *et al.*, ) | |
| ) | |
| Defendants. ) | |

---

**<u>COMPLAINT EXHIBIT 6</u>**

**A076**



Pursuing Freedom and Opportunity through Justice and Accountability

February 12, 2019

**VIA CERTIFIED MAIL**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

Re:   Secretarial Approval of the New England Industry-Funded Monitoring
      Omnibus Amendment

Dear Secretary Ross:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government-oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]  Among other things, CoA Institute monitors the overregulation of our nation's fisheries and has represented clients in challenging past efforts to compel the regulated industry to pay for discretionary supplemental at-sea monitoring services.[2]

It recently came to our attention that your office has "approved" the New England Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment"), which includes a number of controversial measures sponsored by the New England Fishery Management Council ("NEFMC").[3] Specifically, the Omnibus Amendment would introduce provisions into all New England fishery management plans to allow for standardized implementation of mandatory industry-funded monitoring via future plan-specific amendment.  It also contains measures to create a new industry-funded monitoring program for the Atlantic herring fishery.

The fact of your approval of the Omnibus Amendment has not been widely disseminated. The Greater Atlantic Regional Fisheries Office ("GARFO") Administrator, Michael Pentony, informed the NEFMC of the development by letter, dated December 18, 2018.[4]  But that letter has not been publicly circulated by fishery authorities or the Council.  It cannot be found on the NEFMC or GARFO websites; it has not been posted any fishery bulletin boards; and, most importantly, neither the letter nor any other form of notice of secretarial approval has been published in the *Federal Register*. This failure of transparency confirms many of the suspicions that stakeholders have about the heavy-handed and prejudicial management of New England fisheries.

---

[1] *About Us*, CoA Inst., https://causeofaction.org/about (last visited Feb. 12, 2019).
[2] *See generally Free the Fisherhmen*, CoA Inst., https://coainst.org/2Dp200f (last visited Feb. 12, 2019).
[3] *See Government Officials Ignore Public Comment, Create New Financial Burden on Fishermen*, CoA Inst. (Jan. 8, 2019), https://coainst.org/2SIAxeN.
[4] Letter from Michael Pentony, Reg'l Adm'r, Greater Atl. Reg'l Fisheries Office, to Dr. John Quinn, Chairman, New Eng. Fishery Mgm't Council (Dec. 18, 2018) (attached as Exhibit 1), *available at* https://coainst.org/2DgBF3W.

The Hon. Wilbur L. Ross, Jr.
Feb. 12, 2019
Page 2

The secret and silent approval of the Omnibus Amendment is particularly alarming considering the irregularities that have plagued the ongoing process of drafting, proposing, and implementing its measures. In September 2018, the National Marine Fisheries Service ("NMFS") published a notice of availability for the Omnibus Amendment and solicited public comment on whether it should be approved.[5] CoA Institute was one of several commenters that voiced its opposition, pointing out serious issues with the lack of statutory authorization for industry funding and broader inconsistency with the Magnuson-Stevens Act's ("MSA") National Standards.[6] Before any approval decision was announced, NMFS then oddly proposed implementing regulations at the beginning of November 2018.[7] CoA Institute also filed a public comment opposing that rulemaking.[8]

As Secretary of Commerce, you were responsible for reviewing the Omnibus Amendment for compliance with applicable law and, in doing so, you were obliged to consider "the information, views, and comments received from interested persons."[9] CoA Institute raised several valid and pressing concerns about the lack of statutory authorization for industry-funded monitoring and the devastating economic consequences that are expected from its implementation. It is unclear whether careful review of these issues was undertaken because no reasoned responses have been provided to the NEFMC, NMFS, or the public. Given the publication of a notice of availability, and the solicitation of public comments, secretarial approval should have been similarly published in the *Federal Register*, along with these responses, regardless of whether it was statutorily required.[10]

The available facts strongly suggest that the NEFMC and NMFS prejudged the legality of the Omnibus Amendment and intend to force it through regardless of the public outcry, the clear (and unaddressed) legal infirmities, and the negative impact on the long-term viability of the commercial fishing fleet. It is unfortunate that the Department of Commerce was unable or unwilling to provide a check on this determined effort to overregulate a heritage industry out of existence.

I respectfully request that you publicly confirm your approval the Omnibus Amendment and publish responses to the issues raised during the initial comment period. I further request that you disapprove the implementing regulations for the Omnibus Amendment that have been transmitted by the NEFMC for review under Section 1854(b) of the MSA.[11] If you wish to discuss this further, please do not hesitate to contact me at ryan.mulvey@causeofaction.org or (202) 499-4232.

Sincerely,

RYAN P. MULVEY
COUNSEL

---

[5] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 47,326 (Sept. 19, 2018).
[6] Comment of CoA Inst. on 83 Fed. Reg. 47,326 (Nov. 19, 2018), *available at* https://coainst.org/2zWMBkW.
[7] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 55,665 (Nov. 7, 2018).
[8] Comment of CoA Inst. on 83 Fed. Reg. 55,665 (Dec. 24, 2018), *available at* https://coainst.org/2FiBiHt.
[9] 16 U.S.C. § 1854(a)(1)–(2).
[10] *See id.* § 1854(a)(3).
[11] *See id.* § 1854(b)(1).

The Hon. Wilbur L. Ross, Jr.
Feb. 12, 2019
Page 3

<u>Encl</u>.:

Letter from Michael Pentony to the New Eng. Fishery Mgm't Council (Dec. 18, 2018)

<u>CC</u>:

The Honorable Peggy E. Gustafson, Inspector General
U.S. Department of Commerce

The Honorable Timothy C. Gallaudet, Under Secretary of Commerce for Oceans and Atmosphere
Acting Administrator of the National Oceanic and Atmospheric Administration
U.S. Department of Commerce

Mr. Michael Pentony, Regional Administrator
Greater Atlantic Regional Fisheries Office
National Marine Fisheries Service

Dr. John F. Quinn, Chairman
New England Fishery Management Council

Mr. Tom Nies, Executive Director
New England Fishery Management Council

# EXHIBIT
# 1



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

## DEC 1 8 2018

Dr. John Quinn, Chairman
New England Fishery Management Council
50 Water Street
Newburyport, MA 01950

Dear John:

On behalf of the Secretary of Commerce, we approved the New England Industry-Funded Monitoring Omnibus Amendment, including all the management measures recommended by the Council in this amendment.

This amendment establishes a process to standardize future industry-funded monitoring programs for Council fishery management plans (FMPs) and establishes industry-funded monitoring in the Atlantic herring fishery.

*Omnibus Measures*

The omnibus measures amend all Council FMPs to standardize the development and administration of future industry-funded monitoring programs.

The omnibus measures establish:
- A process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and monitoring service providers;
- A process to prioritize monitoring coverage that may be provided by available Federal funding across FMPs for new industry-funded monitoring programs; and
- A process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

Standard cost responsibilities and administrative requirements would apply to the existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs, but the other omnibus measures would not apply to these existing programs. The Council may incorporate these existing industry-funded monitoring programs into the process to prioritize industry-funded monitoring programs for available Federal funding in a future action. Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.



**A081**

*Atlantic Herring Measures*

The herring measures establish an industry-funded monitoring program in the herring fishery. Increased monitoring in the herring fishery is designed to address the following goals: 1) Accurate estimates of catch (retained and discarded); 2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and 3) affordable monitoring for the herring fishery. To achieve these goals, the measures require a 50-percent coverage target for at-sea monitoring coverage aboard vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit. Approximately 40 vessels have Category A or B herring permits, but those vessels typically catch over 95 percent of the total herring harvest.

As recommended by the Council, the 50-percent coverage target includes a combination of Standardized Bycatch Reporting Methodology (SBRM) and industry-funded monitoring coverage. Industry participants would pay for any additional monitoring coverage above SBRM to meet the 50-percent coverage target. Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is unavailable. Trips that land less than 50 mt of herring and vessels carrying no fish on pair trawling trips would be exempt from the amendment's coverage requirements.

During 2016 and 2017, we conducted an electronic monitoring project aboard herring vessels using midwater trawl gear. The purpose of the project was to evaluate the feasibility of using electronic monitoring to verify catch retention and track discarded catch. In April 2018, the Council reviewed results from the project and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels, instead of at-sea monitoring, to meet the 50-percent industry-funded monitoring coverage target. The Council did not recommend requiring electronic monitoring and portside sampling as part of this action; instead it recommended we use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. Additionally, the EFP would provide us with the flexibility to troubleshoot and react to problems, thus helping make the monitoring program more robust. Using the results of the EFP, the Council may consider establishing electronic monitoring and portside sampling requirements via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

The herring measures maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer, but would allow herring vessels to purchase observer coverage to access these closed areas. Herring midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are randomly selected to carry an observer to meet SBRM requirements.

As you are aware, industry-funded monitoring coverage in the herring fishery is contingent upon the availability of Federal funds to support our cost responsibilities. Without additional funding, we would be unable to administer industry-funded monitoring for the herring fishery in a given year. We were awarded funding to administer electronic monitoring for the herring fishery in 2020, but do not currently have funding to implement and administer the at-sea monitoring and portside sampling components. We continue working toward securing funding to administer

2

**A082**

industry-funded monitoring in the herring fishery, but the earliest we could implement industry-funded monitoring in the herring fishery is 2020.

We appreciate the Council's and Council staff's efforts to develop this amendment and ongoing efforts to improve monitoring in New England fisheries. Please contact me if you have any questions.

Sincerely,

Michael Pentony
Regional Administrator

Cc: Thomas A. Nies, Executive Director, New England Fishery Management Council
Michael Luisi, Chairman, Mid-Atlantic Fishery Management Council
Dr. Christopher M. Moore, Executive Director, Mid-Atlantic Fishery Management Council
Robert E. Beal, Executive Director, Atlantic States Marine Fisheries Commission

3

A083

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-466 |
| | ) | |
| WILBUR L. ROSS, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>COMPLAINT EXHIBIT 7</u>**

**A084**



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

August 8, 2019

Mr. Ryan P. Mulvey
Counsel, Cause of Action Institute
1875 Eye Street, NW, Suite 800
Washington, DC  20006

Dear Mr. Mulvey:

Thank you for your letter regarding the approval of the New England Fishery Management Council's (Council) Industry-Funded Omnibus Amendment.  Let me assure you that resolving monitoring issues for the herring (and other) fisheries in New England is critical to both the National Oceanic and Atmospheric Administration and the Department of Commerce.

I appreciate your writing to express your concern for not only the process of developing and implementing these important measures, but also your belief that our approval of this amendment was not properly communicated.  As you know, the Council approved this amendment on April 20, 2017. The Department published the amendment for public comment on September 19, 2018, and the comment period ended on November 19, 2018.  By statute, I am required to either approve, disapprove, or partially approve the amendment within 30 days of the end of the comment period. According to 16 U.S.C. § 1854(a)(3), the statute states that this decision is to be made "…by written notice to the Council."  That determination was made, and the Council was appropriately notified, within the statutory timeframe.

I approved the Council's amendment based on our review and conclusion that the amendment is consistent with the Magnuson-Stevens Fishery Conservation and Management Act and other applicable law.  The approval of the amendment itself does not impose any regulatory requirement on the public, and the implementing regulations are still under review.  Specifically, on November 7, 2018, the Department published a proposed rule in the *Federal Register* that would implement this amendment.  The public comment period on the proposed rule concluded on December 24, 2018, and we are currently evaluating the comments prior to issuing any final rule.  Any final rule that we may issue would include a summary of all of the comments received on the proposed rule, as well as responses to those comments.  We will also assess whether to alter the proposed rule based on issues raised in those comments.  Any final rule will be published in the *Federal Register*, and we will broadly inform any affected industry, as well as the general public, of its contents.

I appreciate your continued interest in fishery management issues.  If you have any further questions, please contact Lawson Kluttz, Associate Director for Legislative and Intergovernmental Affairs, at (202) 482-3663.

Sincerely,

Wilbur Ross

**A085**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 20-466 |
| | ) |
| WILBUR L. ROSS, JR., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**<u>COMPLAINT EXHIBIT 8</u>**



# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

**50 CFR Part 648**

[Docket No. 200115–0017]

RIN 0648–BG91

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** This action implements the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. This amendment allows the New England Council flexibility to increase monitoring in certain fishery management plans to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment establishes a process to standardize future industry-funded monitoring programs in New England fishery management plans and establishes industry-funded monitoring in the Atlantic herring fishery. This action helps ensure consistency in industry-funded monitoring programs across fisheries and increases monitoring in the Atlantic herring fishery.

**DATES:** Effective March 9, 2020, except for §§ 648.11(m) and 648.14(r) which are effective April 1, 2020.

**ADDRESSES:** Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http:// www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Carrie Nordeen, Fishery Policy Analyst,

phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

The New England Fishery Management Council developed an amendment to allow industry-funded monitoring in its fishery management plans (FMPs), except those managed jointly with the Mid-Atlantic Fishery Management Council, and establish industry-funded monitoring in the Atlantic herring fishery. The amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs and increases monitoring in the herring fishery to help provide increased accuracy in catch estimates.

The New England Industry-Funded Monitoring Omnibus Amendment provides a mechanism to allow the Council flexibility to increase monitoring in its FMPs to assess the amount and type of catch and reduce uncertainty around catch estimates. Industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). This amendment remedies NMFS disapprovals of previous Council proposals for industry-funded monitoring that either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the amendment uses a monitoring coverage target, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets are specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the amendment defines cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner

that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. This amendment specifies that industry-funded monitoring costs are delineated between NMFS administrative costs and industry sampling costs.

The Industry-Funded Monitoring Amendment was adopted by the Council on April 20, 2017. The Council refined its recommendations for industry-funded monitoring in the herring fishery on April 19, 2018. We published a notice of availability (NOA) for the amendment in the **Federal Register** on September 19, 2018 (83 FR47326), with a comment period ending November 19, 2018. We published a proposed rule for the amendment in the **Federal Register** on November 7, 2018 (83 FR 55665), with a comment period ending December 24, 2018. After considering public comment, we approved the Industry-Funded Monitoring Amendment, on behalf of the Secretary of Commerce, on December 18, 2018. We informed the Council of the amendment's approval in a letter dated December 18, 2018. This final rule implements the Industry-Funded Monitoring Amendment as approved.

## Approved Omnibus Measures

This amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs, including the Atlantic Herring FMP, the Atlantic Salmon FMP, the Atlantic Sea Scallop FMP, the Deep-Sea Red Crab FMP, the Northeast Multispecies FMP, and the Northeast Skate FMP. In the future, if the Council develops an industry-funded monitoring programs, the Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by this amendment. While cost responsibilities and monitoring service provider requirements established in this amendment are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding.

**Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations   **7415**

The Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.

This amendment provides for industry-funded monitoring coverage targets in Council FMPs, noting that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standards for future industry-funded monitoring programs in New England fisheries apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule establishes the following principles to guide the Council's consideration when developing future industry-funded monitoring programs:

• A clear need or reason for the data collection;
• Objective design criteria;
• Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
• Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
• Prioritize the use of modern technology to the extent practicable; and
• Incentives for reliable self-reporting.

All of this amendment's omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs and do not directly affect fishing effort or amounts of fish harvested. However, the omnibus measures may have indirect effects on Council FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process is expected to help ensure that available Federal

funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Monitoring set-aside programs may also help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

*1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs*

This amendment specifies that future industry-funded monitoring programs are implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:

• Level and type of coverage target;
• Rationale for level and type of coverage;
• Minimum level of coverage necessary to meet coverage goals;
• Consideration of waivers if coverage targets cannot be met;
• Process for vessel notification and selection;
• Cost collection and administration;
• Standards for monitoring service providers; and
• Any other measures necessary to implement the industry-funded monitoring program.

This amendment also specifies that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

*2. Standard Cost Responsibilities*

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may help offset industry cost responsibilities if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment codifies NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS is responsible for paying costs associated with setting standards for, monitoring the performance of, and administering industry-funded monitoring programs. These program elements would include:

• The labor and facilities costs associated with training and debriefing of monitors;
• NMFS-issued gear (*e.g.*, electronic reporting aids used by human monitors to record trip information);
• Certification of monitoring providers and individual observers or monitors;
• Performance monitoring to maintain certificates;
• Developing and executing vessel selection;
• Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and
• Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry is responsible for funding all other monitoring program costs, including but not limited to:

• Costs to the service provider for deployments and sampling (*e.g.*, travel and salary for observer deployments and debriefing);
• Equipment, as specified by NMFS, to the extent not provided by NMFS (*e.g.*, electronic monitoring system);

• Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;

• Costs to the service provider for installation and maintenance of electronic monitoring systems;

• Provider overhead and project management costs (*e.g.*, provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and

• Other costs of the service provider to meet performance standards laid out by an FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment codifies NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it does not alter other current requirements for existing industry-funded monitoring programs.

*3. Standard Requirements for Monitoring Service Providers and Observers/Monitors*

The SBRM Omnibus Amendment (80 FR 37182; June 30, 2015) adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This amendment modifies and expands existing observer and service provider requirements and allows those requirements to apply to coverage supplemental to SBRM, ESA, and MMPA coverage. Specifically, this rule modifies and expands existing observer service provider requirements at § 648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule modifies and expands existing observer requirements at § 648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/monitor requirements serve as the default requirements for any future industry-funded monitoring programs in New England FMPs. The Council may add new requirements or revise existing requirements for FMP-

specific industry-funded monitoring programs as part of the amendment developing those programs or the framework adjustment revising those programs.

*4. Prioritization Process*

This amendment establishes a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England FMPs. This prioritization process allows the Council to align industry-funded monitoring programs with its monitoring priorities by recommending priorities for available NMFS funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs will not be included in the prioritization process, unless the Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover NMFS costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage is not be affected by this prioritization process. Any industry-funded monitoring programs will be prioritized separately from and, in addition to, any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in a given year will be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council will determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment establishes an equal weighting approach

to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule specifies that the Council will adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach will be adjusted whenever a new industry-funded monitoring program consistent with this amendment is approved or whenever an existing industry-funded monitoring program consistent with this amendment is adjusted or terminated. The Council will revise the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage levels in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS will then evaluate what Federal funding is available to cover its costs for meeting the industry-funded monitoring coverage targets for the upcoming year. NMFS will provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach, and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS will inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS will also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that

industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

*5. Monitoring Set-Aside Programs*

This amendment standardizes the process to develop future monitoring set-aside programs and allows monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:

• The basis for the monitoring set-aside;

• The amount of the set-aside (*e.g.*, percentage of ACL, days-at-sea (DAS));

• How the set-aside is allocated to vessels required to pay for monitoring (*e.g.*, increased possession limit, differential DAS counting, additional trips against a percent of the ACL);

• The process for vessel notification;

• How funds are collected and administered to cover the industry's costs of monitoring coverage; and

• Any other measures necessary to develop and implement a monitoring set-aside.

**Approved Atlantic Herring Measures**

This amendment establishes an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery will address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment establishes a 50-percent industry-funded monitoring

coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100 percent, 75 percent, and 25 percent, but determined that the 50-percent coverage target best balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would reduce the uncertainty around catch estimates, and likely result in a coefficient of variation (CV) less than 30 percent for the majority of catch caps. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the SBRM year, April through March, by combining SBRM and industry-funding monitoring coverage. NMFS will determine how to calculate the coverage target, in consultation with Council staff. For example, if there is an estimated 10-percent SBRM coverage in a given year (based on allocated sea days and anticipated effort), then 40-percent industry-funded monitoring coverage will be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip will not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year will be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year will fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage

targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the standard monitoring and service provider requirements in the omnibus measures, this amendment specifies that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices, and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment requires the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

*1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits*

This rule specifies that vessels issued Category A or B herring permits will carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels will be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits are required to notify NMFS for monitoring coverage. If an SBRM observer is not selected to

cover that trip, NMFS will notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not carry an SBRM observer on the same trip that carries an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they will be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule establishes three additional reasons for issuing vessels waivers for industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor is not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intends to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements for that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 mt of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels will notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS will issue a waiver for industry-funded monitoring requirements for that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors will collect the following information on herring trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);

• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

• Species, weight, and disposition of all retained and discarded catch on observed hauls;

• Species, weight, and disposition of all retained catch on unobserved hauls;

• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

• Vessel trip costs (*i.e.,* operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors will collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively, the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the Administrative Procedure Act.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule ensures that existing slippage requirements also apply when vessels

are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels are required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels are required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they are required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for vessels that choose to land more than 50 mt of herring on a trip.

## 2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer under the requirements at § 648.202(b). When Amendment 5 to the Herring FMP (79 FR 8786; February 13, 2014) established that requirement, the Groundfish Closed Areas included Closed Area I, Closed

Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 to 40 percent from 2012 through 2018). This rule maintains the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but allows midwater trawl vessels to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels are required to provide notice to NMFS for monitoring coverage. If neither an SBRM observer nor industry-funded monitoring is selected to cover that trip, NMFS will notify the vessel representative that an observer may be procured through a monitoring service provider. The vessel is prohibited from fishing in the Groundfish Closed Areas without carrying an observer. Observers will collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);

• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

• Species, weight, and disposition of all retained and discarded catch on observed hauls;

• Species, weight, and disposition of all retained catch on unobserved hauls;

• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

• Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae);

• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

• Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

The measure allowing midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas also has economic impacts on vessels participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer

coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in addition to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers for Groundfish Closed Area trips are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels apply to the modified areas, except for areas that are eliminated as Groundfish Closed Areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment) (83 FR 15240; April 9, 2018), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area and the southern portion of Closed Area 1 from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area and the southern

portion of what was formerly Closed Area 1. A recent Court Order (*Conservation Law Found.* v. *Ross, No. CV 18–1087 (JEB), 2019 WL 5549814 (D.D.C. Oct. 28, 2019)*) enjoined NMFS from allowing gillnet fishing in the Nantucket Lightship Closed Area and Closed Area I. This decision does not apply to fishing gears other than gillnet gear, and the rule implementing this order (84 FR 68799; December 17, 2019) is specific to gillnet gear and does not prohibit midwater trawl vessels from fishing in these areas.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas, for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule prioritizes industry-funded monitoring coverage on Category A and B vessels before observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

**Atlantic Herring Exempted Fishing Permit**

On April 19, 2018, the Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

The EFP would exempt midwater vessels from the requirement for industry-funded at-sea monitoring coverage and allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry, such as evaluating the utility of electronic monitoring and portside sampling when midwater trawl vessels fish in Groundfish Closed Areas or for other gear types (e.g., purse seine or bottom trawl) used in the herring fishery.

The supporting documentation for the EFP was developed concurrently with rulemakings for this amendment and midwater trawl vessels issued EFPs are allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

### Status of Industry-Funded Monitoring in 2020

Throughout the development of this amendment, we cautioned the Council that any additional coverage would be contingent upon us having sufficient funding to administer industry-funded monitoring. For 2020, we have sufficient Federal funding to pay NMFS cost responsibilities associated with fully implementing industry-funded monitoring in the herring fishery. We estimate industry-funded monitoring cost responsibilities for the herring fishery to total approximately $100,000 in 2020. Therefore, beginning April 1,

2020, vessels issued Category A or B herring permits will be required to pay for at-sea monitoring coverage on trips we select for industry-funded monitoring coverage. Alternatively, herring vessels will have the option of requesting an EFP to use electronic monitoring and portside sampling instead of at-sea monitoring coverage to satisfy industry-funded monitoring requirements in 2020. We cannot yet determine if we will have funding to administer industry-funded monitoring in the herring fishery in 2021. We will evaluate available Federal funding relative to the cost of administering industry-funded monitoring in the herring fishery during the upcoming year.

### Compliance With the National Environmental Policy Act

In light of recent catch reductions in the herring fishery, we evaluated whether the EA supporting the Industry-Funded Monitoring Amendment remained valid to support this amendment. In making a determination on the need for additional analysis under NEPA, we considered and were guided by the Council on Environmental Quality (CEQ) NEPA regulations and applicable case law. The CEQ's regulations state that ''[a]gencies shall prepare supplements to either draft or final environmental impact statements if: (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts'' (40 Code of Federal Regulations (CFR) § 1502.09(c)). In addition, we considered the CEQ's significance criteria at 40 CFR 1508.27 to determine if any new circumstances or information are significant, which could require a new EA.

The EA describes the economic impacts of herring measures on fishery-related businesses and human communities as negative and explained they result from paying for monitoring coverage. The economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries. The EA estimates industry's cost for at-sea monitoring

coverage at $710 per day and observer coverage at $818 per day, but cautioned those estimates would largely depend on negotiated costs between vessels and monitoring service providers. Less than half of the 50 vessels issued Category A or B herring permits are active in the herring fishery.

The impact of management measures on fishing-related businesses and communities is typically based on an analysis of revenue. But in an effort to better understand income from fishing trips, a survey of herring and mackerel vessels collected more detailed cost information for 2014, including payments to crew, repairs, maintenance, upgrades, and permitting costs. This additional information was used to calculate the vessel RTO for 2014 by subtracting fixed and operational costs from gross revenue, thereby providing a general framework for understanding the interaction between revenue and monitoring requirement costs.

Analysis in the EA estimates that at-sea monitoring coverage associated with the 50-percent coverage target has the potential to reduce annual RTO for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for midwater trawl access to Groundfish Closed Areas. Electronic monitoring and portside sampling may be a more cost effective way for herring vessels to satisfy industry-funded monitoring requirements. At the conclusion of our electronic monitoring project aboard midwater trawl vessels, we estimated industry's cost for electronic monitoring and portside sampling at $515 per day. Analysis in the EA estimates a reduction in annual RTO of up to 10 percent for electronic monitoring and portside sampling coverage.

At the Council's request, we reduced the herring ACL for 2018 (49,900 mt) on August 22, 2018, and reduced the herring ACL for 2019 (15,065 mt) on February 8, 2019, from the ACL that was in place during 2014 (104,088 mt).

To assess how a reduction in herring ACL may affect revenue, we compared herring revenue generated by Category A and B herring vessels from 2014 to 2018 (see Table 1). Even though the 2018 ACL was reduced by 52 percent (54,188 mt) from the 2014 ACL, the impact on 2018 revenue was not proportional to the reduction in ACL and differed by gear type.

TABLE 1—CHANGE IN CATEGORY A AND B HERRING REVENUE FROM 2014 TO 2018

| Gear type | 2014 herring revenue | 2018 herring revenue | Change in herring revenue |
|---|---|---|---|
| Midwater Trawl ............................................................................ | $13,439,000 | $7,886,000 | −$5,553,000 |
| Purse Seine ................................................................................. | 11,000,000 | 13,088,000 | +2,088,000 |
| Bottom Trawl ............................................................................... | 1,508,000 | 1,017,000 | −491,000 |

Source: NMFS.

The change in herring revenue between 2014 may have been affected by several factors, such as the availability of herring relative to the demand and vessel participation in other fisheries. The price of herring increased almost 70 percent between 2014 and 2018 from approximately $310 per mt to $525 per mt. While the price of herring is not likely to increase every year, we expect that a herring price increase would mitigate the negative economic impact of lowering the ACL. Total revenue from all fisheries for small-mesh bottom trawl vessels increased by approximately $25,000,000 between 2014 and 2018 suggesting vessels are expanding their participation in other fisheries. We expect that increases in total revenue from other fisheries would also mitigate the

negative economic impacts of reductions to the herring ACL and associated revenue.

At its September 2019 meeting, the Council recommended further reducing the herring ACL for 2020 and 2021 (11,621 mt). These catch levels are consistent with Council's new harvest policy for herring developed in Amendment 8 to the Herring FMP and recommendations from the Council's Scientific and Statistical Committee. If the 2020 herring stock assessment determines recruitment and biomass are higher than expected, the Council may request an increase to the 2021 ACL.

While the economic impact of industry-funded monitoring coverage on the herring fishery is affected by revenue, the level of fishing effort and SBRM coverage would also affect the economic impact of industry-funded

monitoring. Analyses in the EA estimate the coverage days to achieve the 50-percent coverage target in the herring fishery in 2014. In an effort to estimate the maximum number of coverage days, that particular analysis did not account for SBRM coverage or coverage waivers for trips landing less than 50 mt of herring. To assess how changes in the herring fishery may affect industry-funded monitoring coverage, we re-estimated the coverage days to achieve the 50-percent coverage target for 2020. Our updated analysis adjusts for recent vessel activity, low herring ACL, recent SBRM coverage, and coverage waivers for trips landing less than 50 mt of herring. The change in estimated average coverage days to achieve the 50-percent coverage target from 2014 to 2020 is shown in Table 2.

TABLE 2—ESTIMATED REDUCTION IN INDUSTRY-FUNDED MONITORING COVERAGE DAYS TO ACHIEVE A 50-PERCENT COVERAGE TARGET FROM 2014 TO 2020

| Gear type | 2014 | 2020 | Change in days |
|---|---|---|---|
| Midwater Trawl ........................................... | Up to 728 days (14 vessels) ................... | Up to 54 days (9–11 vessels) ................ | −674 |
| Purse Seine ............................................... | Up to 196 days (7 vessels) ..................... | Up to 67 days (5 vessels) ...................... | −129 |
| Bottom Trawl .............................................. | Up to 108 days (9 vessels) ..................... | Up to 29 days (2 vessels) ...................... | −79 |

Source: NMFS.

The reduction in expected industry-funded monitoring coverage days and vessels participating in the herring fishery from 2014 to 2020 is largely driven by changes in fishing behavior, likely linked to the availability of herring (distribution and seasonality) and a low herring ACL in 2020. Because the RTO analysis was, in part, based on economic data collected with a special cost survey that could not be repeated in a timely way for this action, it is not possible to update that analysis for 2020. However, fewer sea days required to achieve the 50-percent coverage target will result in lower industry costs in 2020 than what the EA estimated for 2014. Fewer coverage days and fewer active vessels in 2020 (and likely 2021) is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

We also expect midwater trawl fishing effort in Groundfish Closed Areas to be lower in 2020 than was estimated for 2014. Without considering SBRM coverage, the EA estimates midwater trawl vessels may purchase observer coverage for up to approximately 250 coverage days to access Groundfish Closed Areas in 2014. After adjusting for recent vessel activity and a low herring ACL and assuming recent SBRM coverage, we estimate that midwater trawl vessels may purchase coverage for up to 30 coverage days to access Groundfish Closed Areas in 2020 (and likely 2021). Even though purchasing observer coverage to access Groundfish Closed Areas is optional, few coverage days and fewer active vessels in 2020 is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

As recommended by the Council, we intend to offer an EFP in 2020 and 2021 to allow vessels to use electronic monitoring and portside sampling in lieu of at-sea monitoring coverage to achieve the 50-percent coverage target. Depending on vessel interest and sampling logistics, that same EFP may also allow midwater trawl vessels to access Groundfish Closed Areas or evaluate electronic monitoring for other gear types (e.g., purse seine or bottom trawl) used in the herring fishery. Analyses in the EA and updated estimates at the conclusion of our electronic monitoring project aboard midwater trawl vessels, suggest that electronic monitoring and portside sampling is likely less expensive and more cost effective than either at-sea monitoring or observer coverage. Excluding the initial cost associated with purchasing and installing

electronic monitoring equipment, video review and storage are likely the most substantial ongoing industry costs associated with using electronic monitoring. A portion of our Federal funding to administer industry-funded monitoring in the herring fishery is designated to help offset industry's video review and storage costs. Federal funding helping offset industry's electronic monitoring sampling costs is expected to minimize the economic impact of industry-funded monitoring coverage on the herring fishery. Participating in the EFP is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

High herring prices and low coverage days to achieve the 50-percent coverage target are likely short-term influences on the economic impact of industry-funded monitoring coverage on the herring fishery associated with a low herring ACL. If herring recruitment and biomass return to average levels, the long-term economic impact of industry-funded monitoring coverage on the herring fishery is likely consistent with estimated impacts analyzed and described in the EA.

Additionally, the EA analyzes a range of coverage targets for at-sea monitoring and electronic monitoring and portside sampling aboard Category A and B vessels, including 100 percent, 75 percent, 50 percent, and 25 percent. The EA estimates the reduction in annual RTO associated with these coverage target alternatives ranged from 42 percent to less than 1 percent. Despite reductions in expected revenue for 2020 and 2021, we expect the reduction of annual RTO associated with implementing a 50-percent coverage target for at-sea monitoring aboard Category A and B vessels to be within this analyzed range.

After considering the action, new information, and new circumstances, we determined that the action and its impacts fall within the scope of the existing EA. It is not necessary to develop a new NEPA analysis because (1) the action is identical to the proposed action analyzed in the EA and (2) no new information or circumstances relevant to environmental concerns or impacts of the action are significantly different from when the EA's finding of no significant impact was signed on December 17, 2018. Thus, the FONSI for existing EA for the New England Industry-Funded Monitoring Omnibus Amendment remains valid to support implementing this amendment.

**Changes From the Proposed Rule**

This rule includes minor changes from the proposed rule to clarify requirements. First, it revises the definition for *slippage in the Atlantic herring fishery* to make it consistent with the definition for *slips* and *slippage catch in the Atlantic herring fishery* and clarifies that slippage applies when a NMFS-certified observer or monitor is aboard the vessel.

Second, this rule aligns the herring coverage target with the SBRM year (April–March) instead of the fishing year (January–December) and adjusts the date by which the herring industry selects a monitoring type for the following year (October instead of July). This change ensures the coverage target will be more predictable for the entire year rather than changing with the SBRM year. NMFS will determine how to calculate the coverage target in consultation with Council staff.

Third, this rule removes "on a declared herring trip" from the criteria described at § 648.11(m)(2)(i) and revises the list of required information at § 648.11(m)(2)(i) to clarify when and how the owner, operator, or manager of a herring vessel must notify NMFS of a herring trip. The existing notification requirement describes that vessels issued certain herring permits or acting as herring carriers must notify NMFS of trips on which a vessel may harvest, possess, or land herring. Because pre-trip notifications are required at least 48 hours in advance of a trip and trip declarations are required just prior to a vessel leaving port on a trip, the existing criteria absent the reference to "on a declared herring trip" is a more logical descriptor of when a vessel is required to notify NMFS of a herring trip. The list of required information is revised to support NMFS selecting vessels for industry-funded monitoring coverage.

Fourth, this rule corrects references to § 648.11 to reflect provisions implemented in this rule.

**Comments and Responses**

We received 20 comment letters on the NOA and proposed rule: 5 from participants in the herring fishery (Seafreeze, Lund's Fisheries, Providian, O'Hara Corporation); 3 from fishing industry organizations (CHOIR Coalition, New England Purse Seiner's Alliance (NEPSA), and Cape Cod Commercial Fishermen's Alliance (CCCFA); 3 from environmental advocacy groups (Conservation Law Foundation (CLF) and Cause of Action Institute (COA)); and 9 from members of the public.

*Comment 1:* COA and Seafreeze commented that the Magnuson-Stevens

Fishery Conservation and Management Act (Magnuson-Stevens Act) does not authorize an industry-funded monitoring program as envisioned by the Industry-Funded Monitoring Amendment. They cautioned that the amendment intends to standardize the development of industry-funded monitoring programs, yet it fails to identify any specific provision in the Magnuson-Stevens Act granting it such authority. COA also commented that the Council does not have explicit statutory authorization to require the industry to fund discretionary supplemental at-sea monitoring programs. COA and Seafreeze explained that the Magnuson-Stevens Act only explicitly authorizes industry-funded monitoring for foreign fishing, limited access privilege programs (LAPPs), and the North Pacific fisheries research plan. They cautioned that because the Magnuson-Steven Act caps industry fees related to LAPPs at 3 percent of ex-vessel revenue, the agency does not have the ability to require the fishing industry to pay data collection and monitoring costs without limit.

*Response:* We disagree. The Magnuson-Stevens Act expressly authorizes onboard human monitors to be carried on fishing vessels "for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. 1853(b)(8). The requirement to carry observers, along with many other requirements under the Magnuson-Stevens Act, includes compliance costs on industry participants. For example, NMFS regulations require fishing vessels to install vessel monitoring systems for monitoring vessel positions and fishing, report catch electronically, fish with certain gear types or mesh sizes, or ensure a vessel is safe before an observer may be carried on a vessel. Vessels pay costs to third-parties for services or goods in order to comply with these regulatory requirements that are authorized by the Magnuson-Stevens Act. There are also opportunity costs imposed by restrictions on vessel sizes, fish sizes, fishing areas, or fishing seasons. These industry costs are not "fees." A fee is a form of "funding" where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency. This amendment does not address administrative costs that are charged in LAPPs and are subject to the 3 percent cap.

The need for monitoring and the data it provides is discussed in the amendment. Section 1.1 of the amendment explains that the Council is

establishing the framework for industry-funded monitoring programs because of its interest in increasing monitoring and/or other types of data collection in some FMPs to assess the amount and type of catch, to more accurately monitor annual catch limits, and/or provide other information for management. The Council's goals for industry-funded monitoring in the herring fishery are described in Section 2.2 of the amendment and include: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species for which catch caps apply; and (3) affordable monitoring for the herring fishery. The Council's rationale for increased monitoring through industry-funded monitoring programs is consistent with the Magnuson-Stevens Act provision ''for the purpose of collecting data appropriate for the conservation and management of the fishery.''

*Comment 2:* COA and Seafreeze claim that the amendment is inconsistent with Federal appropriations laws and the U.S. Constitution. They commented that Congress decides how to finance any program it establishes, stating that a Federal agency cannot spend money on a program without authorization from Congress and cannot add to its appropriations from sources outside the government without permission from Congress. COA and Seafreeze caution that the type of industry-funded program set forth in the amendment imposes a ''tax'' on regulated parties. COA raised additional concerns that the industry funded program may violate the Anti-Deficiency Act and Miscellaneous Receipts Statute. Further, COA stated the amendment violates the Fourth Amendment to, and the Commerce Clause in, the U.S. Constitution. Last, Seafreeze expressed concern that the amendment violates the Fifth Amendment to the Constitution because data collected using industry funds could be used in enforcement actions.

*Response:* The Magnuson-Stevens Act expressly authorizes measures, including monitoring, ''for the purpose of collecting data necessary for the conservation and management of the fishery.'' It also acknowledges such measures may result in costs to the fishing industry as evident by its requirement to, where practicable, minimize costs and adverse economic impacts on communities. The inherent cost of a requirement, like industry-funding monitoring, is not the same as a ''tax.'' A hallmark of a tax is that the government receives some revenue. The government receives no revenue from

industry-funded monitoring. Similar to arrangements between vessels and vessel monitoring system service providers, the payment for industry cost responsibilities associated with industry-funded monitoring would be made by the vessel to the monitoring service provider. Because the agency would not receive any payment from the vessel related to industry-funded monitoring, this amendment is consistent with the Anti-Deficiency Act and Miscellaneous Receipts Statue. Industry-funded monitoring in the herring fishery does not does not violate the Commerce Clause of the Constitution, which authorizes Congress to regulate commerce, because NMFS is regulating existing economic activity, which is permissible under the Commerce Clause. Industry-funded monitoring does not violate the Fourth Amendment protection against unreasonable searches and seizures because it is neither a search nor unreasonable if it was considered to be a search. At-sea monitors are not authorized officers conducting vessel searches for purposes of ensuring compliance with fisheries requirements. Further, the fishing industry is pervasively regulated, and monitoring is reasonable as authorized under the Magnuson-Stevens Act to receive critical fisheries data. Last, the amendment does not violate the Fifth Amendment to the Constitution because the monitoring requirement does not compel evidence that is testimonial in nature. An at-sea monitor simply records the results of the vessel's actions. An individual's participation in the fishery is voluntary, and an individual may choose to land less than the 50 mt of herring per trip threshold for requiring industry-funded monitoring. Further, monitoring is a regulatory reporting requirement, to which the Fifth Amendment privilege does not apply. Last, the information provided is not for purposes of discovering criminal violations. The herring fishery is a regulated industry under the Magnuson-Stevens Act, which provides for civil penalties for fisheries catch violations, not criminal sanctions. Any potentially incriminating evidence would be merely a byproduct of the requirement for industry-funded monitoring.

*Comment 3:* Seafreeze commented that because the amendment was initiated jointly by the New England and Mid-Atlantic Councils, it was led to believe that identical omnibus measures would need to be selected by both Councils. Seafreeze expressed concern that the potential of only one Council

adopting the amendment was not considered during the development of the amendment and, therefore, recommended the omnibus measures be disapproved.

*Response:* When the New England Council took final action on the Industry-Funded Monitoring Amendment in April 2017, it considered whether to make its recommendations contingent upon a similar action by the Mid-Atlantic Council, but decided against it. Instead, the Council overwhelmingly approved the omnibus measures for its FMPs, with the exception of FMPs managed jointly with the Mid-Atlantic Council (*i.e.,* Monkfish and Spiny Dogfish FMPs) and the herring measures in the amendment and recommended the amendment be submitted to the agency for review and approval. The Mid-Atlantic Council considered industry-funded monitoring for its FMPs at its April 2017 and October 2018 meetings, but decided not to pursue it. Mid-Atlantic fishermen had an opportunity to participate and submit their concerns to the Mid-Atlantic Council during those meetings. Mid-Atlantic representatives to the New England Council also had an opportunity to present the Mid-Atlantic Council's concerns to the New England Council during the amendment's development. Further, while the omnibus measures, especially the prioritization process, were designed to be appropriate for both Councils, they were never intended to obligate a Council to establish provisions for industry-funded monitoring. Therefore, as explained in the proposed rule (83 FR 55665; November 7, 2018), the joint amendment initiated by both Councils to allow for industry-funded monitoring became the New England Industry-Funded Monitoring Omnibus Amendment and, as such, omnibus measures only apply to New England Council FMPs. The omnibus measures do not impose any substantive burden on any Mid-Atlantic fishery. Rather, the amendment sets up the framework under which future potential monitoring programs for New England fisheries would be established. If the Mid-Atlantic Council reconsiders industry-funded monitoring it a future action, it may consider whether to adopt similar omnibus measures at that time.

*Comment 4:* COA commented that our publication of **Federal Register** notices for the Industry-Funded Monitoring Amendment caused confusion. It questioned why we published an NOA in September 2018 seeking public comment on the approval or disapproval of the amendment followed

**7424** **Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

by a proposed rule with implementing regulations in November 2018 prior to finalizing our decision on the amendment. COA suggested that by publishing the notices for the approval/ disapproval of the amendment and implementing regulations concurrently, that we had already made a decision on the amendment and would view public comments with prejudice. Additionally, the O'Hara Corporation was concerned that we approved the amendment in December 2018, prior to the closing of the public comment period on the proposed rule. O'Hara Corporation was disappointed in our process for notice and comment and wondered how public comments received after the amendment approval were considered.

*Response:* It is our practice to publish an NOA and proposed rule concurrently. The NOA for the Industry-Funded Monitoring Amendment was published on September 19, 2018, with a comment period ending November 19, 2018. The proposed rule for the amendment was published on November 7, 2018, with a comment period ending December 24, 2018. The comment periods for the NOA and proposed rule overlapped for 13 days. Both the NOA and proposed rule explained that any public comments we received on the amendment or the proposed rule during the NOA comment period would be considered in our decision to approve/disapprove the amendment.

We received seven comment letters during the NOA comment period. Those commenters expressed diverse views on the Industry-Funded Monitoring Amendment and recommended we approve, disapprove, and re-consider the amendment. We carefully reviewed and considered all of those comments prior to approving the amendment on December 18, 2018. NMFS must approve/disapprove an amendment within 30 days of the end of the comment period on the amendment. The decision date for the Industry-Funded Monitoring Amendment was December 19, 2018. Therefore, it would not have been possible to consider all public comments received through December 24, 2018, in the decision to approve/disapprove the Industry-Funded Monitoring Amendment.

The proposed rule explained that we would consider any public comment received after the NOA comment period but during the proposed rule comment period in our decision to implement proposed measures. We reviewed and considered all additional comments received during the proposed rule comment period prior to publishing this final rule. Commenters did not provide

any new or additional information during the public comment period on the proposed rule that would have prevented us from approving the Industry-Funded Monitoring Amendment.

*Comment 5:* Seafreeze disagreed with the conclusions in the EA regarding impacts of the omnibus measures on fishery-related business and human communities. Specifically, it questioned assertions that omnibus measures would have no direct impacts, that costs are too speculative to analyze, and that standardized industry-funded monitoring requirements would have a positive impact. Seafreeze also commented that the impact of any future industry-funded monitoring program on fishery-related business and communities would be negative.

*Response:* The EA explains that omnibus measures are tools for the Council to use when developing future industry-funded monitoring programs. The omnibus measures have no direct biological impacts because they do not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished. Additionally, the omnibus measures do not have any direct economic impacts on fishery-related business or human communities because they do not require the development of industry-funded monitoring programs nor do they directly impose any costs. Categorizing and characterizing industry cost responsibilities in this action could provide the industry with information to better understand and plan for their industry-funded monitoring cost responsibilities as well negotiate better contracts with industry-funded monitoring service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Improved catch information that results from the opportunity to align funding with the most critical industry-funded monitoring programs may lead to better management of biological resources, which may eventually lead to higher harvest levels.

In the future, if the Council developed an industry-funded monitoring program for a particular FMP, the EA acknowledges there would be direct negative economic impacts to fishing vessels provided vessels were required to pay for increased monitoring. Future industry-funded monitoring programs would be developed to achieve specific goals. Without knowing the goals or the details of the measures to achieve those goals, attempting to quantify in this amendment the impact or the specific benefits of a future industry-funded

monitoring program is too speculative. The economic impacts to fishing vessels and benefits resulting from a future industry-funded monitoring program would be evaluated in the amendment to establish that industry-funded monitoring program and cannot considered in this amendment.

*Comment 6:* COA commented that the introduction of industry-funded monitoring across the Greater Atlantic Region would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. As an example, COA referenced a 2016 letter by the Long Island Commercial Fishing Association in which the Association states the $800 per day cost of monitoring would force more than half of its fleet out of business.

*Response:* Generalizing economic impacts associated with industry-funded monitoring programs is often inaccurate. Members of the Long Island Commercial Fishing Association participate in a variety of fisheries, including vessels using small-mesh bottom trawl gear in the herring fishery. The $800 cost per covered day is the estimated cost for observer coverage in the herring fishery. The Industry-Funded Monitoring Amendment does not require observer coverage on small-mesh bottom trawl vessels in the herring fishery, instead it establishes a 50-percent coverage for at-sea monitoring coverage on declared herring trips at an estimated cost of $710 per day of coverage. Additionally, the Industry-Funded Monitoring Amendment does not require industry-funded monitoring coverage on trips intending to land less than 50 mt of herring. For those trips, the vessel owner/operator would request a waiver for industry-funded monitoring coverage and would not be responsible for industry-funded monitoring costs on that trip. The amendment estimated that waiving coverage on trips that land less than 50 mt of herring would result in industry-funded monitoring coverage on only 19 percent of trips by small-mesh bottom trawl vessels. More recently, when we only considered small-mesh bottom trawl vessels with Category A or B permits that had been active in the herring fishery in the last two years, we found that industry-funded monitoring requirements would likely only apply to only two small-mesh bottom trawl vessels. For these reasons, we disagree that the implementation of industry-funded monitoring in the herring fishery would lead to the elimination of small-scale fishing in the Greater Atlantic Region.

*Comment 7:* Seafreeze expressed concern that vessels participating in New England and Mid-Atlantic fisheries on the same trip may be subject to industry-funded monitoring requirements, even though the Mid-Atlantic Council did not adopt the this amendment. COA commented the EA fails to address the possibility of overlapping requirements for industry-funded monitoring in multiple fisheries.

*Response:* Similar to other measures in FMPs (*e.g.,* possession limits, gear restrictions, or reporting requirements), vessels are subject to the most restrictive requirements when participating in multiple fisheries on a single trip. With the understanding that vessels participate in multiple fisheries, the EA explicitly considers revenue and operational costs associated with participation in the herring, Atlantic mackerel, and squid fisheries. Because herring and mackerel are often harvested together on the same trip, the amendment specifies that the higher coverage target applies on trips declared into both fisheries. If the Council considers industry-funded monitoring in other fisheries in the future, the impacts of those programs relative to existing industry-funded monitoring programs will be considered at that time.

*Comment 8:* Several commenters expressed opinions on the relative costs and benefits of industry-funded monitoring. CLF, CCCFA, and CHOIR generally support the industry-funded monitoring requirements for the herring fishery, but are concerned that anything less than 100-percent coverage, especially when combined with coverage waivers, may undermine the effectiveness of additional monitoring. In contrast, Lund's cautioned that the 50-percent coverage target for the herring fishery is higher than necessary and wastes scarce agency and industry resources by monitoring a fishery with a low bycatch rate. COA commented that the amendment is inconsistent with National Standards 7 and 8 because it fails to explain why increased monitoring is necessary, in light of the financial burden it will place on the fishing industry, or how the amendment would minimize adverse economic impacts and provide for the sustained participation of communities.

*Response:* This amendment establishes industry-funded monitoring in the herring fishery to help increase the accuracy of catch estimates, especially for species with incidental catch caps (*i.e.,* haddock and river herring/shad). Our decision to approve this amendment included weighing the benefits of the measures relative to the

costs, especially the industry's cost associated with additional monitoring. We concluded that the Council's measures minimize costs to the extent practicable and take into account the importance of fishery resources to fishing communities to provide for their sustained participation in the fishery and minimize the adverse economic impacts of these measures on those communities.

The 50-percent coverage target for vessels with Category A or B herring permits has the potential to reduce uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management. SBRM coverage on vessels participating in the herring fishery is variable. Recent coverage has ranged from 2 percent to 40 percent during 2012 to 2018. Analysis in the EA suggests a 50-percent coverage target would reduce the uncertainty around estimates of catch tracked against catch caps, likely resulting in a CV of less than 30 percent for the majority of catch caps. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be more constrained by catch caps, thereby increasing accountability, or they may be less constrained by catch caps and better able to fully harvest herring sub-ACLs. Recent CVs associated with catch caps constraining the herring fishery have been as high as 86 percent. Improving our ability to track catch against catch limits is expected to support the herring fishery achieve optimum yield, minimize bycatch and incidental catch to the extent practicable, and support the sustained participation of fishing communities. Coverage waivers would only be issued under specific circumstances, when monitors are unavailable or trips have minimal to no catch, and are not expected to reduce the benefits of additional monitoring. This amendment does not require additional monitoring aboard herring vessels in Groundfish Closed Areas. Rather it maintains an existing requirement for 100-percent observer coverage on herring midwater trawl vessels fishing inside of Groundfish Closed Areas, but provides flexibility for vessels by allowing the purchase of observer coverage to access Groundfish Closed Areas.

While the economic impact of industry-funding monitoring on participants in the herring fishery may be substantial, we considered the nature and extent of these costs relative to the benefits of additional monitoring, such as reducing uncertainty around catch

estimates to improve management, and measures to mitigate costs.

Recognizing the potential economic impact of industry-funded monitoring on the herring industry, the Council recommended several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

The amendment also includes measures to ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. Additionally, if we find that coverage waivers undermine the benefits of

additional monitoring, the Council could restrict waivers when it reviews the industry-funded monitoring requirements two years after implementation.

*Comment 9:* Seafreeze and COA commented that industry-funding monitoring in the herring fishery disproportionately affects Seafreeze vessels and any other vessels that make multi-day trips processing catch at sea in violation of National Standard 6's requirement to take into account and allow for variations among fisheries, fishery resources, and catch. Seafreeze explained that despite a relatively low daily production capacity (57 mt), its vessels would not qualify for a coverage waiver, like other small-mesh bottom trawl vessels, because its vessels make longer than average trips processing and freezing catch from multiple fisheries. Seafreeze also commented that, according to the EA, the 50-percent coverage target would cost it $80,000 per year ($40,000 per vessel) on trips that do not land herring.

*Response:* We disagree. In an effort to minimize the economic impact of industry-funded monitoring, the Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels, including considering alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day. Ultimately, the Council determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring and chose the 50 mt per trip threshold. The EA estimates the effort and monitoring costs associated with declared herring trips that ultimately did not land herring. In 2014, there were 111 sea days for small-mesh bottom trawl vessels that had no herring landings. The cost of at-sea monitoring coverage on 50 percent of those trips was estimated at just under $40,000. That $40,000 is the total cost for monitoring all small-mesh bottom trawl vessels for the year. Therefore, it is highly unlikely that Seafreeze would be paying $80,000 per year for at-sea monitoring on trips that did not land herring. As described previously, the Council has the flexibility to recommend we not prioritize Federal funding for industry-funded monitoring in the herring fishery and/or adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous or do not allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

*Comment 10:* Several commenters (CLF, CCCFA, Lund's) support the

option to allow midwater trawl vessels to purchase observers to access Groundfish Closed Areas. However, CLF and CCCFA object to midwater trawl vessels having any additional access to Groundfish Closed Areas, including access to areas maintained as Groundfish Closed Areas in the recent Omnibus Habitat Amendment.

*Response:* We acknowledge the commenters support for the measure allowing midwater trawl vessels to purchase an observer to access Groundfish Closed Areas. This amendment does not relax any restrictions for Groundfish Closed Areas implemented in the recent Omnibus Habitat Amendment.

*Comment 11:* Several commenters were concerned with recent catch limit reductions in the herring fishery and how that affects the economic impact of industry-funded monitoring. The specifics of their comments are as follows:

• COA, Providian, and Seafreeze noted that economic impacts for the herring fishery were analyzed based on revenue and operating costs from 2014 and do not reflect the recent reductions in ACLs;

• Providian acknowledges that lower ACLs means fewer fishing trips and recommends continued SBRM coverage in the herring fishery;

• Lund's recommends SBRM coverage, in conjunction with the existing state-administered portside sampling program, as the best investment to understand catch in herring fishery; and

• Lund's, Providian, and O'Hara request the amendment be delayed, at least until after 2021, in hopes that future increases in herring harvest and revenue would be able to support industry-funded monitoring.

*Response:* As discussed in the preamble, we acknowledge that herring effort, catch, and resulting revenue will likely be lower in 2020 and 2021 than in prior years, such that the cost of industry-funded monitoring relative to herring catch and revenue may be high in the short-term. However, the magnitude of that impact on individual vessels and businesses is likely variable and would be mitigated by several factors, which are discussed in the preamble section addressing our NEPA considerations.

*Comment 12:* Four members of the public supported this amendment and believe increased monitoring is necessary for sustainable FMPs. For two of those individuals, their support is conditional on the economic impact of the amendment, specifically that the amendment does not overburden an

already struggling New England fishing industry.

*Response:* We appreciate the commenters' support for this amendment and note the amendment includes several measures to minimize the economic impact on the herring industry of paying for additional coverage.

*Comment 13:* Several commenters provided input on the EFP to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The specifics of their comments are as follows:

• NEPSA, CLF, CCCFA, and CHOIR supported us using an EFP to initially administer electronic monitoring and portside sampling in the herring fishery and urged us to quickly transition to electronic monitoring in the herring fishery because electronic monitoring provides a more cost effective and accurate means to monitor the herring fishery than human monitors;

• CHOIR and NEPSA urged us to allow purse seine vessels to participate in the EFP and explained that lessons learned from the midwater trawl electronic monitoring study would apply to purse seine vessels as both gear types capture fish in nets and bring those nets alongside the vessels to pump fish aboard;

• NEPSA asserted that electronic monitoring is easier for vessel operators than at-sea monitoring coverage because it does not involve the logistics of carrying a human monitor and noted that allowing purse seine vessels to participate in the EFP would increase the number of participants and help decrease the per-vessel cost of using electronic monitoring;

• Lund's commented that it supports us using an EFP to further evaluate an electronic monitoring and portside sampling program, but at this time prefers human monitors to electronic monitoring;

• CLF and CHOIR advocated that net sensors be incorporated into the EFP to help quantify the amount of slipped catch and CHOIR hoped that electronic monitoring can be developed to identify the contents and estimate the amount of slipped catch; and

• CLF requested the EFP include documenting all discards, verifying compliance with slippage requirements and consequence measures, 100-percent video review, documenting interactions with protected species, and complementary coverage by SBRM observers.

*Response:* We acknowledge commenters' support for the EFP and will consider these recommendations as

the terms and conditions of the EFP are finalized.

*Comment 14:* One member of the public supported developing future industry-funded monitoring programs via amendment to allow for public input and standardizing industry-funded monitoring programs to help ensure fairness across fisheries.

*Response:* We acknowledge the commenter's support for omnibus measures in the amendment.

*Comment 15:* One individual commented that additional monitoring, especially industry-funded monitoring for herring, is unnecessary because herring are numerous and not at risk of extinction. The individual is not convinced the Council considered its own criteria for the development of an industry-funded monitoring program, such as a clear need for the data collection, cost of collection, less data intensive methods, prioritizing modern technology, and incentive for reliable self-reporting. Instead, the commenter recommended tracking catch by using fishing industry reporting to NMFS of the weight of fish sold.

*Response:* We disagree. The Council identified and supported the need for additional monitoring as reducing uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management, as noted in the response to Comment 8. The Council considered less data intensive methods, prioritizing modern technology, and incentives for self-reporting by allowing vessels to use either at-sea monitoring or electronic monitoring and portside sampling coverage to satisfy industry-funded monitoring requirements. In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection for at-sea monitors compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to

address monitoring goals for the herring fishery. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

We currently track catch in the herring fishery using the weight of fish purchased by dealers, but those data are not robust enough to track catch against catch caps and would not help reduce the uncertainty associated with catch tracked against catch caps.

*Comment 16:* Three members of the public provided comments on forest management, keeping marine mammals in captivity, and NEPA requirements for terrestrial businesses.

*Response:* Because those comments are outside the scope of this amendment, we are not providing responses to those comments in this final rule.

**Classification**

The Administrator, Greater Atlantic Region, NMFS determined that this amendment is necessary for the conservation and management of New England Council FMPs and that it is consistent with the Magnuson-Stevens Act and other applicable law.

This final rule has been determined to be not significant for purposes of Executive Order (E.O.) 12866.

This final rule is not an E.O. 13771 regulatory action because this action is not significant under E.O. 12866.

NMFS prepared a final regulatory flexibility analysis (FRFA) in support of this action. The FRFA incorporates the initial RFA, a summary of the significant issues raised by the public comments in response to the initial RFA, NMFS responses to those comments, and a summary of the analyses completed in support of this action. A description of why this action was considered, the objectives of, and the legal basis for this rule is contained in in the preamble to the proposed and this final rule, and is not repeated here. All of the documents that constitute the FRFA and a copy of the EA/RIR/IRFA are available upon request (see **ADDRESSES**) or via the internet at: *http://www.nefmc.org.*

The omnibus measures are administrative, specifying a process to

develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the omnibus measures have no direct economic impacts, they will not be discussed in this section. The herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

*A Statement of the Significant Issues Raised by the Public in Response to the IRFA, a Statement of the Agency's Assessment of Such Issues, and a Statement of Any Changes Made in the Final Rule as a Result of Such Comments*

We received 18 comment letters on the NOA and proposed rule. Those comments, and our responses, are contained in the Comments and Responses section of this final rule and are not repeated here. Comments 1, 2, 5, 6, 8, 9, 11, and 12 discussed the economic impacts of the measures, but did not directly comment on the IRFA. All changes from the proposed rule, as well as the rationale for those changes, are described in the Changes from the Proposed Order section of this final rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 3.

TABLE 3—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

| | Gross receipts from all fishing by herring permitted small entities | Gross receipts from herring fishing by herring permitted small entities |
|---|---|---|
| Mean | $1,847,392 | $422,210 |
| Median | 1,076,172 | 0 |
| 25th Percentile | 656,965 | 0 |
| 75th Percentile | 2,684,753 | 95,218 |
| Permitted Small Entities | 62 | 62 |

Source: NMFS.

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two businesses are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 4 characterizes gross receipts and gross receipts from the herring fishery for the active small entities.

TABLE 4—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

| | Gross receipts from all fishing by active herring permitted small entities | Gross receipts from active herring permitted fishing by small entities |
|---|---|---|
| Mean | $2,070,541 | $872,567 |
| Median | 1,030,411 | 95,558 |
| 25th Percentile | 554,628 | 6,570 |
| 75th Percentile | 2,955,883 | 1,696,758 |
| Active Small Entities | 30 | 30 |

Source: NMFS.

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This final rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a revised collection under control number 0648–0674. The action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, we estimate that each vessel would incur monitoring costs for an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Because this option would be available on all trips not otherwise selected for SBRM or industry-funded coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden

estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

We expect that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer availability in advance of each trip; and maintain an updated contact list of all industry-funded at-sea monitors/observers that includes the monitor's/observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is "in service" (*i.e.,* available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 5—BURDEN ESTIMATE FOR MEASURES

| Monitoring service provider requirements | Number of respondents | Total number of annual responses | Response time per response (minutes) | Total annual burden (hours) | Cost per response | Total annual cost |
|---|---|---|---|---|---|---|
| Monitor deployment report | 4 | 444 | 10 | 74 | $0.00 | $0 |
| Monitor availability report | 4 | 216 | 20 | 72 | 0.00 | 0 |
| Safety refusals | 4 | 40 | 30 | 20 | 0.00 | 0 |
| Raw monitor data | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports | 4 | 68 | 30 | 34 | 0.00 | 0 |
| Biological samples | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.55 | 2 |
| Applicant response to denial | 1 | 1 | 600 | 10 | 0.55 | 1 |
| Request for monitor training | 4 | 12 | 30 | 6 | 1.80 | 22 |
| Rebuttal of pending removal from list of approved service providers | 1 | 1 | 480 | 8 | 0.55 | 1 |
| Request to service provider to procure a monitor | 90 | 360 | 10 | 60 | 0.00 | 0 |
| Notification of unavailability of monitors | 90 | 360 | 5 | 30 | 0.00 | 0 |
| Call to service provider to procure an observer for Groundfish Closed Areas by phone | 21 | 84 | 10 | 14 | 1.00 | 84 |
| Notification of unavailability of observers for Groundfish Closed Areas | 21 | 84 | 5 | 7 | 0.50 | 42 |
| Monitor contact list updates | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Monitor availability updates | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Service provider material submissions | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Service provider contracts | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Total | .................. | .................. | .................. | 1,192 | .................. | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to OIRA_Submission@ omb.eop.gov or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes*

Recognizing the potential economic impact of industry-funded monitoring

on the herring industry, this amendment contains several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl vessel, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in the herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. These measures ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 states that, for each rule or group of related rules for which an agency is required to prepare a FRFA, the agency shall publish one or more guides to assist small entities in complying with the rule, and shall designate such publications as "small entity compliance guides." The agency shall explain the actions a small entity is required to take to comply with a rule or group of rules. As part of this rulemaking process, a letter to permit holders that also serves as small entity compliance guide was prepared. Copies of this final rule are available from the Greater Atlantic Regional Fisheries Office (GARFO), and the compliance guide (*i.e.*, fishery bulletin) will be sent to all holders of permits for the herring fishery. The guide and this final rule will be posted on the GARFO website.

## List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: January 15, 2020.

**Samuel D. Rauch III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is amended as follows:

## PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, revise the definitions for "Electronic monitoring," "Observer/sea sampler," "Slippage in the Atlantic herring fishery," and "Slip(s) or slipping catch in the Atlantic herring fishery" to read as follows:

## § 648.2 Definitions.

\* \* \* \* \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations. With respect to the NE multispecies fishery, electronic monitoring means any equipment that is used to monitor area fished and the amount and identity of species kept and discarded in lieu of at-sea monitors as part of an approved Sector at-sea monitoring program.

\* \* \* \* \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors, portside samplers, and dockside monitors.

\* \* \* \* \*

*Slippage in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.

\* \* \* \* \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

**§ 648.7 Record keeping and reporting requirements.**

* * * * *

(b) * * *

(2) * * *

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour (hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

* * * * *

■ 4. Revise § 648.11 to read as follows:

**§ 648.11 Monitoring coverage.**

(a) *Coverage.* The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas ⅔ Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) *Facilitating coverage.* If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) *Safety waivers.* The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) *Vessel requirements associated with coverage.* An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other

space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) *Vessel requirements associated with protected species.* The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a spiny dogfish permit, a bluefish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) *Coverage funded from outside sources.* NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-funded monitoring programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of

Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding principles for new IFM programs.* The Council's development of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process to implement and revise new IFM programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target;

(ii) Rationale for level and type of coverage;

(iii) Minimum level of coverage necessary to meet coverage goals;

(iv) Consideration of waivers if coverage targets cannot be met;

(v) Process for vessel notification and selection;

(vi) Cost collection and administration;

(vii) Standards for monitoring service providers; and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS cost responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers,

and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization process to cover NMFS IFM cost responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS IFM cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where

public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM program monitoring service provider requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraph (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring set-aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities—*(1) *General.* An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/femad/fsb/.*

(2) [Reserved]

(3) *Contents of application*. An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to, owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/ or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to

display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers*—(i) *Certified observers or monitors.* A monitoring service provider must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) *Support for observers or monitors.* A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of deployment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all

necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under this paragraph (h) are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/ training/*.

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/ FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) *Deployment reports.* The monitoring service provider must report to NMFS/ FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/ devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/ scallop/*.

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/ FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/ trip types assigned, and must include whether or not the observer or monitor is ''in service,'' indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to

**A107**

most recent Information Technology Security Guidelines at *https://www.nefsc.noaa.gov/fsb/memos/*. Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has

received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such

monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section; and

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification—*
(1) *Requirements.* To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https://www.nmfs.noaa.gov/op/pds/categories/scienceandtechnology.html*. For further information, see *https://www.st.nmfs.noaa.gov/observer-home/*.

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor

must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https://www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/training/*.

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) *Probation and decertification.* NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service providers via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) *Coverage.* In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program*—(1) *General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures*—(i) *Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop

trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https:// www.nefsc.noaa.gov/femad/fsb/.* The observer service provider may take up to 48 hr to arrange for observer deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) *Cost of coverage.* Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (*1*) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full ''days.''

(*2*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(*3*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on an LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded

observer set-aside, a service provider shall charge dock to dock where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) *Coverage and cost requirements.* When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or notified by the Regional Administrator, the owner, operator, or manager of a vessel (*i.e.,* vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting

**7438** **Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:
(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and
(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:
(A) Streamline data management and eliminate redundancy;
(B) Explore options for cost-sharing and deferment of cost to industry; and
(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:
(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and
(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:
(A) Reduce management and/or biological uncertainty; and
(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

(A) IFM HVF observers shall collect the following information:
(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);
(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;
(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
(6) Whole specimens, photos, length information, and biological samples (*e.g.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);
(7) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:
(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);
(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;
(4) Species, weight, and disposition of all retained catch on unobserved hauls;
(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
(6) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
(7) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(9) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:
(1) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;
(2) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

(3) Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant to requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance (October 31) of the beginning of the SBRM year. NMFS will provide vessels owners with selection forms no later than September 1 in advance of the beginning of the SBRM year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.,* midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m)(2)(iii)(B) and (C) and (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/ training/.*

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or permit number; email and telephone number for contact; the date, time, and port of departure; trip length; and gear type.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must

arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/FSB shall issue a waiver, if the conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) *Vessels working cooperatively.* When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued a limited access herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified at § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes

**A113**

with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) A vessel issued a limited access mackerel permit, as specified in § 648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness; if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested

by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel permit or a longfin squid/butterfish moratorium permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and indicate the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. In § 648.14, revise paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(viii)

through (xii) and add paragraphs (r)(2)(xiii) and (xiv) to read as follows:

## § 648.14 Prohibitions.

\* \* \* \* \*

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in § 648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in § 648.11.

(4) Submit false or inaccurate data, statements, or reports.

\* \* \* \* \*

(r) \* \* \*

(1) \* \* \*

(vi) \* \* \*

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), pursuant to the requirements in § 648.80(d) and (e).

\* \* \* \* \*

(2) \* \* \*

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in § 648.81(a)(3) through (5) and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

\* \* \* \* \*

(viii) Slip catch, as defined at § 648.2, unless for one of the reasons specified at § 648.11(m)(7)(i).

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring

Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(7)(iv) and (v) and 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by §§ 648.11(m)(7)(vi) and 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(ii).

(xii) Fail to report or fail to accurately report a slippage event on the Atlantic herring daily VMS catch report, as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(iii).

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

* * * * *

■ 6. In § 648.80, revise paragraphs (d)(5) and (e)(5) to read as follows:

**§ 648.80 NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.**

* * * * *

(d) * * *

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

* * * * *

(e) * * *

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

* * * * *

■ 7. In § 648.86, revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

**§ 648.86 NE Multispecies possession restrictions.**

* * * * *

(a) * * *

(3) * * *

(ii) * * *

(A) * * *

(*1*) *Haddock incidental catch cap.* When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.,* the Herring GOM Haddock Accountability Measure (AM) Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of herring gear or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

* * * * *

**§§ 648.10, 648.14, 648.51, 648.59, 648.80, 648.86, and 648.202 [Amended]**

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
| --- | --- | --- |
| 648.10(f)(4)(i) introductory text | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(B) | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(C) | 648.11(g) | 648.11(k). |
| 648.14(k)(2)(iii) | 648.11(k) | 648.11(l). |
| 648.14(k)(2)(iv) | 648.11(k) | 648.11(l). |
| 648.51(c)(4) | 648.11(g) | 648.11(k). |
| 648.51(e)(3)(iii) | 648.11(g) | 648.11(k). |
| 648.59(b)(2) | 648.11(g) | 648.11(k). |
| 648.80(d)(3) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.80(e)(2)(ii) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.86(a)(3)(ii)(A)(*1*) | NMFS-approved | NMFS-certified. |
| 648.202(b)(4)(iv) | 648.11(m)(4)(iv) and (v) | 648.11(m)(7)(iv) and (vi). |

[FR Doc. 2020–00881 Filed 2–6–20; 8:45 am]

**BILLING CODE 3510–22–P**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOPER BRIGHT ENTERPRISES, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No: 1:20-cv-00466-EGS |
| ) | |
| WILBUR L. ROSS, in his official capacity as ) | |
| Secretary of the Department of Commerce, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' ANSWER TO COMPLAINT

Defendants, Wilbur Ross, in his official capacity as Secretary of Commerce, the U.S.

Department of Commerce, the National Oceanic and Atmospheric Administration ("NOAA"),

Neil Jacobs, in his official capacity as Acting Administrator of NOAA, the National Marine

Fisheries Service ("NMFS"), and Chris Oliver, in his official capacity as the Assistant

Administrator for NOAA Fisheries, by and through their undersigned counsel, answer the

Complaint (ECF 1) as follows:

1.      The allegations in Paragraph 1 consist of Plaintiffs' characterization of their

lawsuit, to which no response is required, and purport to characterize 85 Fed. Reg. 7,414 (Feb. 7,

2020) ("Final Rule") and the New England Fishery Management Council's ("NEFMC")

Industry-Funded Omnibus Amendment ("Omnibus Amendment"), which speak for themselves

and provide the best evidence of their contents.  Any allegations contrary to their plain language,

meaning, or context are denied.

A116

2.      The allegations in Paragraph 2 purport to characterize the Omnibus Amendment, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

3.      Defendants deny the allegations in Paragraph 3.

4.      Defendants deny the allegations in Paragraph 4.

5.      The allegations in Paragraph 5 purport to characterize Plaintiffs' lawsuit, to which no response is required.  To the extent a response is required, the allegations are denied.

6.      The allegations in Paragraph 6 purport to characterize Plaintiffs' lawsuit and are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

7.      The allegations in Paragraph 7 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

8.      The allegations in Paragraph 8 are conclusions of law to which no response is required, and purport to characterize 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

9.      The allegations in Paragraph 9 are conclusions of law, to which no response is required.  To the extent a response is required, Defendants admit that one or more of them reside in this judicial district.

10.     The allegations in Paragraph 10 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

11.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 11, and deny them

**A117**

on that basis.  Defendants admit the allegations in the fourth sentence of Paragraph 11 that Loper Bright holds a Category A permit for the Atlantic herring fishery.  Defendants admit the allegation in the fifth sentence of Paragraph 11 that Loper Bright will be subject to the industry-funded at-sea monitoring requirement, but deny the remaining allegations in that sentence.

12.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 12, and deny them on that basis.  Defendants admit the allegations in the fourth sentence of Paragraph 12 that H&L Axelsson holds two Category A permits for the Atlantic herring fishery.  Defendants admit the allegation in the fifth sentence of Paragraph 12 that H&L Axelsson will be subject to the industry-funded at-sea monitoring requirement set forth in the Final Rule, but deny the remaining allegations in that sentence.

13.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 13 and deny them on that basis.  Defendants deny the allegations in the fourth and fifth sentences of Paragraph 13.

14.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 14 and deny them on that basis.  Defendants admit the allegations in the fourth sentence of Paragraph 14 that Scombrus One holds a Category A permit for the Atlantic herring fishery.  Defendants admit the allegation in the fifth sentence of Paragraph 14 that Scombrus One will be subject to the industry-funded at-sea monitoring requirement set forth in the Final Rule, but deny the remaining allegations in that sentence.

15.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 15, and deny them

on that basis.  Defendants deny the allegations in the fourth and fifth sentences of Paragraph 15.

16.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 16, and deny them on that basis.  Defendants admit the allegations in the fourth sentence of Paragraph 16 that Lund Marr Trawlers holds a Category A permit for the Atlantic herring fishery.  Defendants admit the allegation in the fifth sentence of Paragraph 16 that Lund Marr Trawlers will be subject to the industry-funded at-sea monitoring requirement set forth in the Final Rule, but deny the remaining allegations in that sentence.

17.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 17 and deny them on that basis.  Defendants deny the allegations in the fourth and fifth sentences of Paragraph 17.

18.     Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations in the first, second, and third sentences of Paragraph 18, and deny them on that basis.  Defendants deny the allegations in the fourth and fifth sentences of Paragraph 18.

19.     Defendants lack knowledge or information sufficient to form a response to the allegations in the first, second, third, fourth, fifth, sixth, and seventh sentences of Paragraph 19 and deny them on that basis.  Defendants admit the allegation in the eighth sentence of Paragraph 19 that Lund's Fisheries is not a party to this case, but lacks knowledge or information sufficient to form a response to the remaining allegations in the eighth sentence of Paragraph 19 and deny them on that basis.

20.     Defendants admit the allegations in the first sentence of Paragraph 20 that Wilbur Ross is the Secretary of Commerce.  The remaining allegations in Paragraph 20 are conclusions

**A119**

of law, to which no response is required.  To the extent a response is required, the allegations are denied.

21.     Defendants admit the allegation in Paragraph 21.

22.     Defendants admit the allegations in the first sentence of Paragraph 22 that Timothy C. Gallaudet is the Assistant Secretary of Commerce for Oceans and Atmosphere. Defendants deny the allegations in the second sentence of Paragraph 22 and further aver that Assistant Secretary Gallaudet is not named in the caption as one of the defendants in this case.

23.     Defendants admit the allegations in the first sentence of Paragraph 23 that NOAA is a component agency of the Department of Commerce, but the remaining allegations in the first sentence of Paragraph 23 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.  Defendants admit the allegations in the second sentence of Paragraph 23.  Defendants deny the allegations in the third sentence of Paragraph 23 and aver that NMFS filed the Final Rule on behalf of NOAA and the Department of Commerce.

24.     Defendants admit the allegations in the first sentence of Paragraph 24.  The allegations in the second sentence of Paragraph 24 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

25.     Defendants admit the allegations in Paragraph 25 that NMFS is a sub-component of the Department of Commerce and that NMFS has sub-delegated responsibility from the NOAA Administrator to manage domestic fisheries, but deny the remaining allegations in Paragraph 25.

26.     The allegations in Paragraph 26 are conclusions of law to which no response is required, and purport to characterize the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), which speaks for itself and provides the best evidence of its

**A120**

contents.  Any allegations contrary to its plain language, meaning, or context are denied.

27.     The allegations in Paragraph 27 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

28.     Defendants admit the allegations in Paragraph 28.

29.     The allegations in Paragraph 29 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

30.     The allegations in Paragraph 30 and sub-paragraphs (a) through (d) are conclusions of law to which no response is required, and purport to characterize the MSA and its implementing regulations, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

31.     The allegations in Paragraph 31 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

32.     The allegations in Paragraph 32 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

33.     The allegations in Paragraph 33 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best

**A121**

evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

34.     The allegations in Paragraph 34 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

35.     The allegations in paragraph 35 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

36.     The allegations in Paragraph 36 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

37.     The allegations in Paragraph 37 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

38.     The allegations in Paragraph 38 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

**A122**

39.     The allegations in Paragraph 39 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

40.     The allegations in Paragraph 40 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

41.     The allegations in Paragraph 41 and footnote 1 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

42.     The allegations in Paragraph 42 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

43.     The allegations in Paragraph 43 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

44.     The allegations in Paragraph 44 purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

45.     The allegations in Paragraph 45 are conclusions of law to which no response is required, and purport to characterize the National Environmental Policy Act ("NEPA") and its implementing regulations, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

**A123**

46.     The allegations in Paragraph 46 are conclusions of law to which no response is required, and purport to characterize NEPA and its implementing regulations, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning or context are denied.

47.     The allegations in Paragraph 47 are conclusions of law to which no response is required and purport to characterize the Regulatory Flexibility Act ("RFA"), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning or context are denied.

48.     The allegations in Paragraph 48 are conclusions of law to which no response is required and purport to characterize the RFA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning or context are denied.

49.     The allegations in Paragraph 49 are conclusions of law to which no response is required and purport to characterize the RFA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning or context are denied.

50.     The allegations in Paragraph 50 are conclusions of law to which no response is required, and purport to characterize the Anti-Deficiency Act ("ADA"), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

51.     The allegations in Paragraph 51 purport to characterize the Miscellaneous Receipts Act ("MRA"), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

A124

52.     The allegations in Paragraph 52 are conclusions of law to which no response is required, and purport to characterize the MRA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

53.     The allegations in Paragraph 53 are conclusions of law to which no response is required, and purport to characterize the Independent Offices Appropriations Act ("IOAA"), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

54.     The allegations in Paragraph 54 are conclusions of law to which no response is required, and purport to characterize the IOAA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

55.     The allegations in Paragraph 55 are conclusions of law to which no response is required, and purport to characterize the IOAA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

56.     Defendants admit the allegations in the first sentence of Paragraph 56.  The allegations in the second sentence of Paragraph 56 are vague and ambiguous and are denied on that basis.

57.     Defendants admit the allegations in Paragraph 57.

58.     Defendants admit the allegations in Paragraph 58.

59.     The allegations in the first sentence of Paragraph 59 are vague and ambiguous and are denied on that basis.  The allegations in the second sentence of Paragraph 59 purport to

**A125**

characterize the Northeast Fisheries Science Center's Atlantic Herring Operational Assessment Report (Aug. 2015), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.  Defendants further aver that the Northeast Fisheries Science Center's most recent stock assessment was prepared in 2018.  The allegations in the third sentence of Paragraph 59 purport to characterize the Northeast Fisheries Science Center's 65th Northeast Regional Stock Assessment Workshop Assessment Summary Report (2018), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

60.     The allegations in Paragraph 60 purport to characterize the Final Atlantic Herring Fishery Management Plan (Mar. 8, 1999), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

61.     Defendants admit the allegations in the first sentence of Paragraph 61.  The allegations in the second sentence of Paragraph 61 purport to characterize amendments to the Atlantic herring FMP and framework adjustments, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.  The allegations in footnote 2 purport to characterize 84 Fed. Reg. 54,094 (Oct. 9, 2019), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

62.     The allegations in the first sentence of Paragraph 62 purport to characterize, without citation or attribution, final rules, which speak for themselves and are the best evidence of their contents. Any allegations contrary to their plain language, meaning, or context are denied.  Defendants admit the allegations in the second sentence of Paragraph 62 that a three-year specification rule was approved in 2016, but deny the remaining allegations in the second

sentence of Paragraph 62.  The allegations in the third sentence of Paragraph 62 purport to characterize 85 Fed. Reg. 4,932 (Jan. 28, 2020), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

63.     The allegations in Paragraph 63 purport to characterize 50 C.F.R. § 648.200(f), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

64.     The allegations in the first sentence of Paragraph 64 purport to characterize 50 C.F.R. § 648.200(e), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied. The allegations in the second sentence of Paragraph 64 purport to characterize 84 Fed. Reg. 2,760 (Feb. 8, 2019), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

65.     Defendants admit the allegations in the first sentence of Paragraph 65. The allegations in the second and third sentences of Paragraph 65 are vague and ambiguous and are denied on that basis.

66.     The allegations in Paragraph 66 purport to characterize the Atlantic herring FMP, 50 C.F.R. §§ 648.202, 648.203, 648.204, and 648.205, which speak for themselves and provide the best evidence of their contents. Any allegations contrary to their plain language, meaning, or context are denied.

67.     The allegations in Paragraph 67 purport to characterize 50 C.F.R. §§ 648.4 and 648.204, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

**A127**

68.     Defendants admit the allegations in the first sentence of Paragraph 68 that vessels holding Category A permits can fish in any of the Atlantic herring management areas, but aver that midwater trawlers are restricted seasonally in Management Area 1A, and deny the remaining allegations in the first sentence of Paragraph 68.  Defendants admit the allegations in the second and third sentences of Paragraph 68.

69.     Defendants admit the allegations in the first sentence of Paragraph 69 that mackerel-permitted vessels are authorized to fish for herring if permitted to do so, subject to permit restrictions.  The remaining allegations in the first sentence of Paragraph 69 are denied. Defendants admit the allegation in the second sentence of Paragraph 69 that mackerel is managed under its own fishery management plan, but deny the remaining allegations in the second sentence of Paragraph 69.

70.     The allegations in Paragraph 70 are vague and ambiguous and are denied on that basis.

71.     Defendants admit the allegations in the first, second, fourth, and fifth sentences of Paragraph 71.  The allegations in the third sentence of Paragraph 71, including the use of the terms "near the shore and offshore," are vague and ambiguous and are denied on that basis.

72.     The allegations in the first sentence of Paragraph 72 are vague and ambiguous and are denied on that basis.  Defendants admit the allegations in the second sentence of Paragraph 72 that there were fourteen permitted vessels that used midwater trawl gear in the Atlantic herring fishery in 2016, but deny the remaining allegations in the second sentence of Paragraph 72.

73.     The allegations in Paragraph 73 purport to characterize, without citation or attribution, "data" which speaks for itself and provides the best evidence of its contents.  Any

**A128**

allegations contrary to its plain language, meaning or context are denied.  Defendants further aver that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73 regarding the percentage of "total landings," and deny them on that basis.

74.     The allegations in Paragraph 74 purport to characterize, without citation or attribution, documents that speak for themselves and provide the best evidence of their contents. Any allegations contrary to their plain language, meaning, or context are denied.

75.     The allegations in Paragraph 75 purport to characterize the Omnibus Amendment, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

76.     The allegations in Paragraph 76 purport to characterize the Omnibus Amendment, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

77.     The allegations in the first sentence of Paragraph 77 purport to characterize the Omnibus Amendment, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to its plain language, meaning, or context are denied.  The allegations in the second sentence of Paragraph 77 purport to characterize 81 Fed. Reg. 64,426 (Sept. 20, 2016), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.  The allegations in the third sentence of Paragraph 77 purport to characterize, without citation or attribution, documents reflecting "[t]he response" to 81 Fed. Reg. 64,246 (Sept. 20, 2016), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to its plain language, meaning, or context are denied.

**A129**

78.     The allegations in the first sentence of Paragraph 78 purport to characterize,
without citation or attribution, documents reflecting the "expressed concern[s]" of "[i]ndustry
stakeholders" regarding industry-funded monitoring, which speak for themselves and provide the
best evidence of their contents.  Any allegations contrary to their plain language, meaning, or
context are denied.  The allegations in the second sentence of Paragraph 78 purport to
characterize a public comment submitted by Lund's Fisheries, which speaks for itself and
provides the best evidence of its contents.  Any allegations contrary to its plain language,
meaning, or context are denied.

79.     The allegations in Paragraph 79 purport to characterize a public comment
submitted by Lund's Fisheries, which speaks for itself and provides the best evidence of its
contents.  Any allegations contrary to its plain language, meaning, or context are denied.

80.     The allegations in Paragraph 80 purport to characterize articles available on Cause
of Action's website, which speak for themselves and provide the best evidence of their contents.
Any allegations contrary to their plain language, meaning, or context are denied.

81.     Defendants admit the allegation in Paragraph 81 that the NEFMC held a meeting
in April 2017, but the remaining allegations in Paragraph 81 purport to characterize motions
finalized by the NEFMC, which speak for themselves and provide the best evidence of their
contents.  Any allegations contrary to their plain language, meaning, or context are denied.

82.     The allegations in Paragraph 82 purport to characterize decisions by the Mid-
Atlantic Fishery Management Council ("MAFMC"), which speak for themselves and provide the
best evidence of their contents.  Any allegations contrary to their plain language, meaning, or
context are denied.

**A130**

83.     Defendants admit the allegation in Paragraph 83 that 83 Fed. Reg. 47,326 (Sept. 19, 2018) was published in the Federal Register, but deny the remaining allegations in Paragraph 83.

84.     The allegations in Paragraph 84 purport to characterize 83 Fed. Reg. 47,326 (Sept. 19, 2018), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

85.     The allegations in Paragraph 85 purport to characterize 83 Fed. Reg. 47,326 (Sept. 19, 2018), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

86.     The allegations in the first sentence of Paragraph 86 are vague and ambiguous and are denied on that basis.  The allegations in the second sentence of Paragraph 86 purport to characterize a public comment submitted by Lund's Fisheries, as well as the allegations in Paragraph 64 of the Complaint, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

87.     The allegations in Paragraph 87 purport to characterize a public comment submitted by Lund's Fisheries, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

88.     The allegations in the first sentence of Paragraph 88 purport to characterize proceedings held by the MAFMC at an October 2018 Meeting, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.  The allegations in the second sentence of Paragraph 88 purport to characterize proceedings described in a MAFMC council meeting summary, which speak for

**A131**

themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

89.     Defendants admit the allegation in Paragraph 89 that 83 Fed. Reg. 55,665 was published in the Federal Register on Nov. 7, 2018, but the remaining allegations in Paragraph 89 purport to characterize 83 Fed. Reg. 55,665 (Nov. 7, 2018), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

90.     The allegations in Paragraph 90 purport to characterize 83 Fed. Reg. 55,665 (Nov. 7, 2018), which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

91.     The allegations in Paragraph 91 purport to characterize articles on Cause of Action's website, which speak for themselves and provide the best evidence of their contents. Any allegations contrary to their plain language, meaning, or context are denied.

92.     The allegations in Paragraph 92 purport to characterize a December 18, 2018 letter from the Regional Administrator for NOAA's Greater Atlantic Regional Office to the NEFMC, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

93.     The allegations in Paragraph 93 purport to characterize a December 18, 2018 letter from the Regional Administrator for NOAA's Greater Atlantic Regional Office to the NEFMC, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

94.     Defendants deny the allegations in the first sentence of Paragraph 94.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the

**A132**

second sentence of Paragraph 94 and deny them on that basis.

95.     Defendants deny the allegations in Paragraph 95.

96.     The allegations in the first sentence of Paragraph 96 purport to characterize an August 8, 2019 letter from Secretary Ross to Ryan P. Mulvey, counsel of record for Plaintiffs, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.  Defendants deny the allegations in the second sentence of Paragraph 96.

97.     The allegations in Paragraph 97 purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

98.     The allegations in Paragraph 98 purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

99.     The allegations in Paragraph 99 purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

100.     The allegations in Paragraph 100 purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

101.     The allegations in Paragraph 101 purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

**A133**

102.     The allegations in Paragraph 102 purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

103.     The allegations in Paragraph 103 purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

104.     The allegations in Paragraph 104 regarding "Defendants' cost predictions" purport to characterize the Final Rule, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied. Defendants deny the remaining allegations in Paragraph 104.

**Claim One**

105.     Defendants incorporate by reference each and every response to the allegations in the paragraphs numbered 1 through 104 above.

106.     The allegations in Paragraph 106 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

107.     The allegations in Paragraph 107 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

108.     Defendants admit the allegations in the first sentence of Paragraph 108.  The allegations in the second sentence of Paragraph 108 are conclusions of law to which no response

A134

is required, and purport to characterize the APA and the MSA, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

109.   The allegations in Paragraph 109 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

110.   The allegations in Paragraph 110 are conclusions of law to which no response is required, and purport to characterize the APA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

111.   The allegations in Paragraph 111 and sub-paragraphs (a) through (d) are conclusions of law to which no response is required, and purport to characterize the MSA, the U.S. Constitution, the ADA, the MRA, and the IOAA, which speak for themselves and provide the best evidence of their contents.  Any allegations contrary to their plain language, meaning, or context are denied.

112.   The allegations in Paragraph 112 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

113.   The allegations in Paragraph 113 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

**Claim Two**

114.   Defendants incorporate by reference each and every response to the allegations in the paragraphs numbered 1 through 113 above.

115.   The allegations in Paragraph 115 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best

**A135**

evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

116.    The allegations in Paragraph 116 are conclusions of law to which no response is required, and purport to characterize the MSA, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to its plain language, meaning, or context are denied.

117.    The allegations in Paragraph 117 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

118.    The allegations in Paragraph 118 and sub-paragraphs (a) through (d) are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

119.    The allegations in Paragraph 119 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

120.    The allegations in Paragraph 120 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

121.    The allegations in Paragraph 121 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

122.    The allegations in Paragraph 122 are conclusions of law, to which no response is required.  To the extent a response is required, the allegations are denied.

## RESPONSE TO REQUEST FOR RELIEF

The remainder of the Complaint consists of Plaintiffs' Request for Relief, to which no response is required. To the extent a response is required, Defendants deny that Plaintiffs are

**A136**

entitled to any of the relief requested in Prayer for Relief, including subparagraphs (a)-(e), or to any relief whatsoever.

## GENERAL DENIAL

Defendants deny each and every allegation of the Complaint not otherwise expressly admitted, qualified or denied herein.

## AFFIRMATIVE DEFENSES

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      Plaintiffs lack standing as to some or all of their claims.

3.      Some or all of the Plaintiffs' claims are barred by the doctrines of ripeness, laches, or failure to exhaust administrative remedies.

4.      Defendants reserve their right to assert additional affirmative defenses during the course of this litigation.

Dated: April 9, 2020                    Respectfully submitted,

                                        JEAN E. WILLIAMS, Deputy Assistant Attorney General
                                        SETH M. BARSKY, Chief
                                        MEREDITH L. FLAX, Assistant Chief

                                        /s/ Alison C. Finnegan
                                        Alison C. Finnegan, Senior Trial Attorney
                                        (Pennsylvania Bar No. 88519)
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division
                                        Wildlife and Marine Resources Section
                                        Ben Franklin Station, P.O. Box 7611
                                        Washington, D.C. 20044-7611
                                        Tel: (202) 305-0500;  Fax: (202) 305-0275
                                        alison.c.finnegan@usdoj.gov

                                        Attorneys for Defendants

**A137**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2020, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Alison C. Finnegan

**A138**

Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)

April 2020

Index to Administrative Record

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000000001 | _0000000001 | February 07, 2013 PDTFMAT Conference Call Meeting Materials: FW 48 proposed measure for call | 130207 PDT-FMAT Conference Call |
| _0000000002 | _0000000003 | February 07, 2013 PDTFMAT Conference Call Meeting Materials: Observer Funding Meeting Minutes | 130207 PDT-FMAT Conference Call |
| _0000000004 | _0000000009 | December 05, 2013 PDTFMAT Conference Call Meeting Materials: Observer Funding Omnibus Alternatives | 131205 PDT-FMAT Conference Call |
| _0000000010 | _0000000014 | December 05, 2013 PDTFMAT Conference Call Meeting Materials: PDT FMAT meeting summary | 131205 PDT-FMAT Conference Call |
| _0000000015 | _0000000016 | January  02, 2014 PDTFMAT Conference Call Meeting Materials: Alternative Set 3 | 140102 PDT-FMAT Conference Call |
| _0000000017 | _0000000020 | January  02, 2014 PDTFMAT Conference Call Meeting Materials: Meeting Summary | 140102 PDT-FMAT Conference Call |
| _0000000021 | _0000000024 | January  06, 2014 Herring PDT Meeting Materials: 130109 Meeting Summary 20130102 | 140106 Herring PDT |
| _0000000025 | _0000000025 | January  06, 2014 Herring PDT Meeting Materials: 140106 Meeting Notice | 140106 Herring PDT |
| _0000000026 | _0000000026 | January  14, 2014 Herring Committee Meeting Materials: meeting notice140114 | 140114 Herring Committee Meeting |
| _0000000027 | _0000000027 | _0000000027 _0000000027 | 140114 Herring Committee Meeting |
| _0000000028 | _0000000029 | January  14, 2014 Herring Committee Meeting Materials: September 20, 2013 Observer Funding Omnibus Letter to Bullard Karp | 140114 Herring Committee Meeting |
| _0000000030 | _0000000034 | January  14, 2014 Herring Committee Meeting Materials: 131231 December 5 2013 PDT FMAT meeting summary final | 140114 Herring Committee Meeting |
| _0000000035 | _0000000038 | January  14, 2014 Herring Committee Meeting Materials: 140102 Meeting Summary Final 140109 | 140114 Herring Committee Meeting |
| _0000000039 | _0000000047 | January  14, 2014 Herring Committee Meeting Materials: AIS Observer Omnibus Recommendation 12 27 2013 | 140114 Herring Committee Meeting |
| _0000000048 | _0000000113 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: GTW Report January  30 71 attendees | 14012830 NEFMC Council Meeting |
| _0000000114 | _0000000117 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: Council Report January  2014 | 14012830 NEFMC Council Meeting |
| _0000000118 | _0000000118 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: Audience attendance | 14012830 NEFMC Council Meeting |
| _0000000119 | _0000000119 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: Attendance for Council Members January  2014 Sheraton Portsmouth | 14012830 NEFMC Council Meeting |
| _0000000120 | _0000000130 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: January uary 28-30, 2014 final motions | 14012830 NEFMC Council Meeting |
| _0000000131 | _0000000158 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: 6 Presentation Industry Funded Monitoring Melissa Hooper | 14012830 NEFMC Council Meeting |
| _0000000159 | _0000000161 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: 5 130920 AM5 Followup Letter Bullard | 14012830 NEFMC Council Meeting |
| _0000000162 | _0000000166 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: 4 131231 December 5 2013 PDTFMAT meeting summary final | 14012830 NEFMC Council Meeting |
| _0000000167 | _0000000175 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: 3 AIS Observer Omnibus Recommendation 12272013 | 14012830 NEFMC Council Meeting |
| _0000000176 | _0000000179 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: 2 140102 Meeting Summary Final 140109 | 14012830 NEFMC Council Meeting |
| _0000000180 | _0000000198 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: 1 Industry Funded Monitoring Omnibus | 14012830 NEFMC Council Meeting |
| _0000000199 | _0000000199 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: Status Sheet Industry Funding Amendment | 14012830 NEFMC Council Meeting |
| _0000000200 | _0000000201 | January 28-30, 2014 NEFMC Council Meeting Meeting Materials: Agenda 1 281 30 14 Sheraton Harborside, Portsmouth, NH | 14012830 NEFMC Council Meeting |
| _0000000202 | _0000000202 | February 13, 2014 Advisory Panel Meeting Materials: MeetingNotice140213 reschedule | 140213 Advisory Panel Meeting |
| _0000000203 | _0000000203 | February 13, 2014 Advisory Panel Meeting Materials: 1 Agenda Herring AP 2 13 14 Danvers | 140213 Advisory Panel Meeting |
| _0000000204 | _0000000205 | February 12, 2014 Advisory Panel Meeting Materials: 130920 Obs Funding Omnibus Letter Bullard Karp | 140213 Advisory Panel Meeting |
| _0000000206 | _0000000210 | February 13, 2014 Advisory Panel Meeting Materials: 131231 December 5 2013 PDT FMAT meeting summary final | 140213 Advisory Panel Meeting |
| _0000000211 | _0000000214 | February 13, 2014 Advisory Panel Meeting Materials: 140102 Meeting Summary Final 140109 | 140213 Advisory Panel Meeting |
| _0000000215 | _0000000223 | February 13, 2014 Advisory Panel Meeting Materials: AIS Observer Omnibus Recommendation 12 27 2013 | 140213 Advisory Panel Meeting |
| _0000000224 | _0000000234 | February 13, 2014 Advisory Panel Meeting Materials:140114 Presentation Omnibus Baseline Am | 140213 Advisory Panel Meeting |
| _0000000235 | _0000000240 | February 13, 2014 Advisory Panel Meeting Materials: 5 Draft Herring OS Summary 1 14 14 Portsmouth | 140213 Advisory Panel Meeting |
| _0000000241 | _0000000262 | February 13, 2014 Advisory Panel Meeting Materials: FW4 Discussion Document January  2014 OS AP | 140213 Advisory Panel Meeting |
| _0000000263 | _0000000266 | February 13, 2014 Advisory Panel Meeting Materials: Meeting Summary herring feb14 ape 1 | 140213 Advisory Panel Meeting |
| _0000000267 | _0000000283 | March 06, 2014 Herring PDT Meeting Materials: Slippage Summary 20122013 NEFMC | 140306 Herring PDT |
| _0000000284 | _0000000287 | March 06, 2014 Herring PDT Meeting Materials: February 13 2014 Herring Advisory Panel Summary of Discussion | 140306 Herring PDT |

A139

Case 1:20-cv-00466-EGS   Document 13-1   Filed 04/09/20   Page 3 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)

April 2020

Index to Administrative Record

| BegDoc | EndDoc | Title | Documents related to: |
|--------|--------|-------|----------------------|
| _0000000288 | _0000000288 | March 06, 2014 Herring PDT Meeting Materials: March 6 2014 Herring PDT Agenda GARFO | 140306 Herring PDT |
| _0000000289 | _0000000306 | March 06, 2014 Herring PDT Meeting Materials: March 6 2014 Draft FW4 Alts Herring PDT | 140306 Herring PDT |
| _0000000307 | _0000000307 | March 07, 2014 PDTFMAT Conference Call Meeting Materials: Additional cost definition alternative draft | 140307 PDT-FMAT Conference Call |
| _0000000308 | _0000000309 | March 07, 2014 PDTFMAT Conference Call Meeting Materials: Industry Funded FMAT econ | 140307 PDT-FMAT Conference Call |
| _0000000310 | _0000000316 | March 07, 2014 PDTFMAT Conference Call Meeting Materials: PDT notes | 140307 PDT-FMAT Conference Call |
| _0000000317 | _0000000317 | March 07, 2014 PDTFMAT Conference Call Meeting Materials: Work Notes | 140307 PDT-FMAT Conference Call |
| _0000000318 | _0000000319 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: Audience attendance | 14042224 NEFMC Council Meeting |
| _0000000320 | _0000000320 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: Attendance for Council Members April 2014 Hilton Mystic, CT | 14042224 NEFMC Council Meeting |
| _0000000321 | _0000000322 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: Agenda 4 224 24 14 Hilton Mystic tabbed | 14042224 NEFMC Council Meeting |
| _0000000323 | _0000000385 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: 140423 Report 86 attendees | 14042224 NEFMC Council Meeting |
| _0000000386 | _0000000396 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: April 22-24, 2014 final motions | 14042224 NEFMC Council Meeting |
| _0000000397 | _0000000397 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: 5 Draft SBRM Omnibus Amendment September 2013 | 14042224 NEFMC Council Meeting |
| _0000000398 | _0000000399 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: 4 Correspondence NEFSC to NEFMC re PreTrip Notification System | 14042224 NEFMC Council Meeting |
| _0000000400 | _0000000400 | April 22-24, 2014 NEFMC Council Meeting Meeting Materials: Status Sheet Industry Funded Monitoring | 14042224 NEFMC Council Meeting |
| _0000000401 | _0000000695 | August 05, 2014 PDTFMAT Meeting Meeting Materials: crd1109 | 140805 PDT-FMAT Meeting |
| _0000000696 | _0000000704 | August 05, 2014 PDTFMAT Meeting Meeting Materials: Holliday MAFMC Research Prioritization Mechanism | 140805 PDT-FMAT Meeting |
| _0000000705 | _0000000710 | August 05, 2014 PDTFMAT Meeting Meeting Materials: Draft Outline for Industry Funded Monitoring Amendment | 140805 PDT-FMAT Meeting |
| _0000000711 | _0000000719 | August 05, 2014 PDTFMAT Meeting Meeting Materials: Industry funded Monitoring Action Plan | 140805 PDT-FMAT Meeting |
| _0000000720 | _0000000720 | August 05, 2014 PDTFMAT Meeting Meeting Materials: 140801 Terry to Observer Committee TORs | 140805 PDT-FMAT Meeting |
| _0000000721 | _0000000727 | August 05, 2014 PDTFMAT Meeting Meeting Materials: HA Industry Funded Observer Amendment FINAL 8 4 14 | 140805 PDT-FMAT Meeting |
| _0000000728 | _0000000730 | August 05, 2014 PDTFMAT Meeting Meeting Materials: Notes on prioritization PDT draft | 140805 PDT-FMAT Meeting |
| _0000000731 | _0000000737 | August 05, 2014 PDTFMAT Meeting Meeting Materials: RH IncidentalCatchSlides 08 05 14 Meeting | 140805 PDT-FMAT Meeting |
| _0000000738 | _0000000760 | August 05, 2014 PDTFMAT Meeting Meeting Materials: Draft Discussion Document August 2014 | 140805 PDT-FMAT Meeting |
| _0000000761 | _0000000763 | August 05, 2014 PDTFMAT Meeting Meeting Materials: Prioritization timelines draft v2 | 140805 PDT-FMAT Meeting |
| _0000000764 | _0000000764 | August 05, 2014 PDTFMAT Meeting Meeting Materials: table final | 140805 PDT-FMAT Meeting |
| _0000000765 | _0000000774 | August 05, 2014 PDTFMAT Meeting Meeting Materials: PDT Report | 140805 PDT-FMAT Meeting |
| _0000000775 | _0000000775 | August 05, 2014 PDTFMAT Meeting Meeting Materials: fleet by fmp grid | 140805 PDT-FMAT Meeting |
| _0000000776 | _0000000787 | August 19, 2014 Observer Policy Committee Meeting Materials: Observer Committee Prez 8 19 Meeting LLS | 140819 Observer Policy Committee |
| _0000000788 | _0000000788 | August 19, 2014 Observer Policy Committee Meeting Materials: meeting notice | 140819 Observer Policy Committee |
| _0000000789 | _0000000795 | August 19, 2014 Observer Policy Committee Meeting Materials: HA Industry Funded Observer Amendment FINAL 8 4 14 | 140819 Observer Policy Committee |
| _0000000796 | _0000000818 | August, 2014 Observer Policy Committee Meeting Materials: Draft Discussion Document August 2014 | 140819 Observer Policy Committee |
| _0000000819 | _0000000820 | August 19, 2014 Observer Policy Committee Meeting Materials: Attendance sheet | 140819 Observer Policy Committee |
| _0000000821 | _0000000821 | August 19, 2014 Observer Policy Committee Meeting Materials: Agenda | 140819 Observer Policy Committee |
| _0000000822 | _0000000845 | August 19, 2014 Observer Policy Committee Meeting Materials: 140819Management Alternatives Presentation final Hooper | 140819 Observer Policy Committee |
| _0000000846 | _0000000853 | August 19, 2014 Observer Policy Committee Meeting Materials: 140819 Observer Committee Summary Final | 140819 Observer Policy Committee |
| _0000000854 | _0000000866 | August 19, 2014 Observer Policy Committee Meeting Materials: 140815Memo to Observer Committee Re Service Provider Regs | 140819 Observer Policy Committee |
| _0000000867 | _0000000873 | August 19, 2014 Observer Policy Committee Meeting Materials: 140815Draft Industry funded Monitoring Action Plan | 140819 Observer Policy Committee |
| _0000000874 | _0000000877 | August 19, 2014 Observer Policy Committee Meeting Materials: 140811 Bullard re Cost confidentiality | 140819 Observer Policy Committee |
| _0000000878 | _0000000896 | August 19, 2014 Observer Policy Committee Meeting Materials: 140805 FMAT PDT Meeting Report | 140819 Observer Policy Committee |

Case 1:20-cv-00466-EGS Document 13-1 Filed 04/09/20 Page 4 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-cv-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000000897 | _0000000897 | August 19, 2014 Observer Policy Committee Meeting Materials: 140801 Terry to Observer Committee TORs | 140819 Observer Policy Committee |
| _0000000898 | _0000000901 | August 19, 2014 Observer Policy Committee Meeting Materials: 140102 FMAT Meeting Summary Final | 140819 Observer Policy Committee |
| _0000000902 | _0000000913 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials: GTW attendees | 1409021002 NEFMC Council Meeting |
| _0000000914 | _0000000916 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials: attendance Council | 1409021002 NEFMC Council Meeting |
| _0000000917 | _0000000922 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials: attendance Audience | 1409021002 NEFMC Council Meeting |
| _0000000923 | _0000000924 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials: Agenda 9 3010 2 2014CapeCodder,Hyannis, MA | 1409021002 NEFMC Council Meeting |
| _0000000925 | _0000000932 | September 1-October 2, 2014 NEFMC Council Meeting Meeting Materials: 141002 S Altenburger Comment on Omnibus Vessel Baselines Amend | 1409021002 NEFMC Council Meeting |
| _0000000933 | _0000000948 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials: 1409102 final motions | 1409021002 NEFMC Council Meeting |
| _0000000949 | _0000000949 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials: 15 Obs Committee SEPT 2014 Status | 1409021002 NEFMC Council Meeting |
| _0000000950 | _0000000959 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials: 6 OBS POLICY CTE Correspondence | 1409021002 NEFMC Council Meeting |
| _0000000960 | _0000000966 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials:5 OBS POLICY CTE140815 Draft Industry funded Monitoring Action Plan | 1409021002 NEFMC Council Meeting |
| _0000000967 | _0000000985 | September 30-October 2, 2014 NEFMC Council Meeting Meeting Materials:3 OBS POLICY CTE140815 FMAT PDT Meeting Memo | 1409021002 NEFMC Council Meeting |
| _0000000986 | _0000000993 | September 1-October 2, 2014 NEFMC Council Meeting Meeting Materials:2 OBS POLICY CTE 140819 Obs Committee Summary Final | 1409021002 NEFMC Council Meeting |
| _0000000994 | _0000001016 | September 1-October 2, 2014 NEFMC Council Meeting Meeting Materials:1 OBS POLICY CTE Draft Discussion Document August 19 2014 | 1409021002 NEFMC Council Meeting |
| _0000001017 | _0000001026 | October 28, 2014 PDTFMAT Conference Call Meeting Materials: RHS Summary Tables Abridged | 141028 PDT-FMAT Conference Call |
| _0000001027 | _0000001042 | October 28, 2014 PDTFMAT Conference Call Meeting Materials: RHS Sample Size Figures Run2 | 141028 PDT-FMAT Conference Call |
| _0000001043 | _0000001054 | October 28, 2014 PDTFMAT Conference Call Meeting Materials: Draft Herring Coverage Target Alternatives | 141028 PDT-FMAT Conference Call |
| _0000001055 | _0000001060 | October 28, 2014 PDTFMAT Conference Call Meeting Materials: PDT FMAT Meeting Report | 141028 PDT-FMAT Conference Call |
| _0000001061 | _0000001076 | October 29, 2014 Herring PDT Meeting Materials: RHS Sample Size Figures Run2 | 141029 Herring PDT |
| _0000001077 | _0000001110 | October 29, 2014 Herring PDT Meeting Materials: October 27 2014RHS SOF Discussion Paper Draft | 141029 Herring PDT |
| _0000001111 | _0000001111 | October 29, 2014 Herring PDT Meeting Materials: October 2014 Herring Priorities Letter | 141029 Herring PDT |
| _0000001112 | _0000001112 | October 29, 2014 Herring PDT Meeting Materials: October 29 2014 Herring PDT Agenda GARFO | 141029 Herring PDT |
| _0000001113 | _0000001122 | October 29, 2014 Herring PDT Meeting Materials: Copy of 14102014 RHS Summary Tables Abridged | 141029 Herring PDT |
| _0000001123 | _0000001123 | October 29, 2014 Herring PDT Meeting Materials: 141029 Attendance | 141029 Herring PDT |
| _0000001124 | _0000001135 | October 29, 2014 Herring PDT Meeting Materials: 141027 Herring Alternatives | 141029 Herring PDT |
| _0000001136 | _0000001138 | October 29, 2014 Herring PDT Meeting Materials: 140817 Grout Final 2015 Herring Priorities Memo | 141029 Herring PDT |
| _0000001139 | _0000001140 | November 03, 2014 Advisory Panel Meeting Meeting Materials - Agenda Herring AP OS Nov2014 Portsmouth | 141103 Advisory Panel Meeting |
| _0000001141 | _0000001142 | November 03, 2014 Advisory Panel Meeting Meeting Materials: 141103 meeting notice | 141103 Advisory Panel Meeting |
| _0000001143 | _0000001151 | November 03, 2014 Advisory Panel Meeting Meeting Materials: 141029 DRAFT Herring PDT Report | 141103 Advisory Panel Meeting |
| _0000001152 | _0000001157 | November 03, 2014 Advisory Panel Meeting Meeting Materials: 141031 PDT FMAT Meeting Report | 141103 Advisory Panel Meeting |
| _0000001158 | _0000001167 | November 03, 2014 Advisory Panel Meeting Meeting Materials: 141103 PDT FMAT Report presentation | 141103 Advisory Panel Meeting |
| _0000001168 | _0000001172 | November 03, 2014 Advisory Panel Meeting Materials: 141103 Herring AP Report Final | 141103 Advisory Panel Meeting |
| _0000001173 | _0000001181 | November 03, 2014 Advisory Panel Meeting Materials: 141029 DRAFT Herring PDT Report V2 APOS | 141103 Advisory Panel Meeting |
| _0000001182 | _0000001191 | November 03, 2014 Advisory Panel Meeting Materials Revised Herring Coverage Target Alternatives November 2014 | 141103 Advisory Panel Meeting |
| _0000001192 | _0000001198 | November 04, 2014 Herring Committee Meeting Materials: 141104 Herring Committee Summary Final | 141104 Herring Committee Meeting |
| _0000001199 | _0000001199 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: Recusals November 1720 2014 | 14111720 NEFMC Council Meeting |
| _0000001200 | _0000001200 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: council attendance | 14111720 NEFMC Council Meeting |
| _0000001201 | _0000001202 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: Agenda11171120NewportMarriot | 14111720 NEFMC Council Meeting |
| _0000001203 | _0000001212 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 141120 NEFMC Council Meeting GTW | 14111720 NEFMC Council Meeting |

A141

Case 1:20-cv-00466-EGS   Document 13-1   Filed 04/09/20   Page 5 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)

April 2020

Index to Administrative Record

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000001213 | _0000001215 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 141120 attendance Audience | 14111720 NEFMC Council Meeting |
| _0000001216 | _0000001216 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 141119 Rollcall Vote Motion7 purpose and need statement of GF FW 53 | 14111720 NEFMC Council Meeting |
| _0000001217 | _0000001235 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: November 17-20, 2014 final motions | 14111720 NEFMC Council Meeting |
| _0000001236 | _0000001236 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 15 Obs Committee November 2014 | 14111720 NEFMC Council Meeting |
| _0000001237 | _0000001248 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 5 Correspondence2 | 14111720 NEFMC Council Meeting |
| _0000001249 | _0000001255 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 4 140815 Draft Industry funded Monitoring Action Plan | 14111720 NEFMC Council Meeting |
| _0000001256 | _0000001274 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 3 140815 FMAT PDT Meeting Memo | 14111720 NEFMC Council Meeting |
| _0000001275 | _0000001282 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 2 140819 Obs Committee Summary Final | 14111720 NEFMC Council Meeting |
| _0000001283 | _0000001305 | November 17-20, 2014 NEFMC Council Meeting Meeting Materials: 1 Draft Discussion Document August 19 2014 | 14111720 NEFMC Council Meeting |
| _0000001306 | _0000001306 | December 17, 2014 Observer Policy Committee Meeting Materials: 141211 Ind Fund Monitoring Projec CommentDonald Fox, Lightning Bay | 141217 Observer Policy Comm |
| _0000001307 | _0000001307 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 IFM Am Timeline December 2014 | 141217 Observer Policy Comm |
| _0000001308 | _0000001328 | December 17, 2014 Observer Policy Committee Meeting Materials: Funding for NEFSC Monitoring Programsfrom April 2014 | 141217 Observer Policy Comm |
| _0000001329 | _0000001329 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 FR Notice Observer Comm | 141217 Observer Policy Comm |
| _0000001330 | _0000001330 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 attendance | 141217 Observer Policy Comm |
| _0000001331 | _0000001387 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Management Alternatives Presentation GARFO | 141217 Observer Policy Comm |
| _0000001388 | _0000001393 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Observer Committee Summary Final | 141217 Observer Policy Comm |
| _0000001394 | _0000001399 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Observer Committee Summary Draft | 141217 Observer Policy Comm |
| _0000001400 | _0000001400 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Observer Committee Agenda Final | 141217 Observer Policy Comm |
| _0000001401 | _0000001401 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Observer Committee Agenda DRAFT | 141217 Observer Policy Comm |
| _0000001402 | _0000001402 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 DRAFT Observer Committee Meeting Notice Wakefield | 141217 Observer Policy Comm |
| _0000001403 | _0000001408 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Observer Committee Summary Final | 141217 Observer Policy Comm |
| _0000001409 | _0000001409 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Observer Committee Meeting Notice Wakefield | 141217 Observer Policy Comm |
| _0000001410 | _0000001445 | December 17, 2014 Observer Policy Committee Meeting Materials: 141217 Draft Omnibus IFM Discussion Document | 141217 Observer Policy Comm |
| _0000001446 | _0000001451 | December 17, 2014 Observer Policy Committee Meeting Materials: 141202 Draft NMFS Weighting Scheme | 141217 Observer Policy Comm |
| _0000001452 | _0000001453 | December 17, 2014 Observer Policy Committee Meeting Materials: 141113 JBullard to TStockwell&RRobinsobserver Committee motions | 141217 Observer Policy Comm |
| _0000001454 | _0000001461 | December 17, 2014 Observer Policy Committee Meeting Materials: 140819 Observer Committee Summary Final | 141217 Observer Policy Comm |
| _0000001462 | _0000001474 | January 05, 2015 Herring PDT Meeting Meeting Materials: 150105 Herring Alternatives | 150105 Herring PDT Meeting |
| _0000001475 | _0000001476 | January 15, 2015 Advisory Panel Meeting Meeting Materials:150115 meeting notice | 150115 Advisory Panel Meeting |
| _0000001477 | _0000001510 | January 15, 2015 Advisory Panel Meeting Meeting Materials:150115 Draft Discussion Document | 150115 Advisory Panel Meeting |
| _0000001511 | _0000001518 | January 15, 2015 Advisory Panel Meeting Meeting Materials: 150116 Herring Comm AP Summary Final | 150115 Advisory Panel Meeting |
| _0000001519 | _0000001519 | January 15, 2015 Advisory Panel Meeting Materials:Agenda Herring AP Portsmouth | 150115 Advisory Panel Meeting |
| _0000001520 | _0000001533 | January 15, 2015 Advisory Panel Meeting- Materials150115 Revised Draft Impact Analysis for Discussion Document | 150115 Advisory Panel Meeting |
| _0000001534 | _0000001540 | January 15, 2015 Advisory Panel Meeting Materials150105 Herring EBFM PDTs Summary DRAFT | 150115 Advisory Panel Meeting |
| _0000001541 | _0000001541 | January 22, 2015 Observer Policy Committee Meeting Materials: attendance | 150122 Observer Policy Comm |
| _0000001542 | _0000001542 | January 22, 2015 Observer Policy Committee Meeting Materials: January uary 22, 2015 Observer Committee Agenda Final | 150122 Observer Policy Comm |

Case 1:20-cv-00466-EGS Document 13-1 Filed 04/09/20 Page 6 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-cv-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000001543 | _0000001566 | January 22, 2015 Observer Policy Committee Meeting Materials: January uary 22, 2015 Practical Application of Prioritization alternatives | 150122 Observer Policy Comm |
| _0000001567 | _0000001599 | January 22, 2015 Observer Policy Committee Meeting Materials: January uary 22, 2015 Observer Policy Com Meeting Presentation with notes | 150122 Observer Policy Comm |
| _0000001600 | _0000001608 | January 22, 2015 Observer Policy Committee Meeting Materials: January uary 22, 2015 Observer Committee Summary Final | 150122 Observer Policy Comm |
| _0000001609 | _0000001609 | January 22, 2015 Observer Policy Committee Meeting Materials: January uary 22, 2015 Observer Committee Meeting Notice Danves MA | 150122 Observer Policy Comm |
| _0000001610 | _0000001761 | January 22, 2015 Observer Policy Committee Meeting Materials: 8Observer Amendment Comments | 150122 Observer Policy Comm |
| _0000001762 | _0000001763 | January 22, 2015 Observer Policy Committee Meeting Materials: 5141113 GARFO to NEFMC MAFMC observer committee motions | 150122 Observer Policy Comm |
| _0000001764 | _0000001771 | January 22, 2015 Observer Policy Committee Meeting Materials: 4140819 Observer Committee Summary Final 1 | 150122 Observer Policy Comm |
| _0000001772 | _0000001777 | January 22, 2015 Observer Policy Committee Meeting Materials: 3141217 Observer Committee SummaryFinal | 150122 Observer Policy Comm |
| _0000001778 | _0000002082 | January 22, 2015 Observer Policy Committee Meeting Materials: 1 Draft IFM Omnibus Amendment with Appendixes | 150122 Observer Policy Comm |
| _0000002083 | _0000002095 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: webinar attendance | 15012729 NEFMC Council Meeting |
| _0000002096 | _0000002097 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: RevisedAgenda January 2015 | 15012729 NEFMC Council Meeting |
| _0000002098 | _0000002098 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: Obs Comm Status January 2015 | 15012729 NEFMC Council Meeting |
| _0000002099 | _0000002100 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: FinalAGENDA January 2015 | 15012729 NEFMC Council Meeting |
| _0000002101 | _0000002101 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 150129 Council Attendance | 15012729 NEFMC Council Meeting |
| _0000002102 | _0000002103 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 150129 Audience Attendance | 15012729 NEFMC Council Meeting |
| _0000002104 | _0000002139 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 150129 NEFMC Presentation | 15012729 NEFMC Council Meeting |
| _0000002140 | _0000002145 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 15012829 final motions | 15012729 NEFMC Council Meeting |
| _0000002146 | _0000002297 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 8 Observer Amendment Comments | 15012729 NEFMC Council Meeting |
| _0000002298 | _0000002299 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 5 141113 GARFO to NEFMC MAFMC observer committee motions | 15012729 NEFMC Council Meeting |
| _0000002300 | _0000002307 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 4 140819ObsCommSummaryFinal | 15012729 NEFMC Council Meeting |
| _0000002308 | _0000002313 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 3 141217 Obs Comm Summary Final | 15012729 NEFMC Council Meeting |
| _0000002314 | _0000002316 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 2 150122 Obs Comm Summary Draft | 15012729 NEFMC Council Meeting |
| _0000002317 | _0000002621 | January 27-29, 2015 NEFMC Council Meeting Meeting Materials: 1 Draft IFM Omnibus Amendment with Appendixes January uary 2015 | 15012729 NEFMC Council Meeting |
| _0000002622 | _0000002622 | March 03, 2015 PDTFMAT meeting Meeting Materials: Updated timeline for IFM analysis and rulemaking | 150303 PDT-FMAT meeting |
| _0000002623 | _0000002623 | March 03, 2015 PDTFMAT meeting Meeting Materials: IFM PDT FMAT meeting Agenda | 150303 PDT-FMAT meeting |
| _0000002624 | _0000002635 | March 03, 2015 PDTFMAT meeting Meeting Materials: Portside and EM working paper | 150303 PDT-FMAT meeting |
| _0000002636 | _0000002638 | March 03, 2015 PDTFMAT meeting Meeting Materials: IFM EA assignments | 150303 PDT-FMAT meeting |
| _0000002639 | _0000002651 | March 03, 2015 PDTFMAT meeting Meeting Materials: Options for Herring IFM DRAFT FMAT 3 3 15 | 150303 PDT-FMAT meeting |
| _0000002652 | _0000002652 | March 03, 2015 PDTFMAT meeting Meeting Materials: MADMF Portside Costs 2 Feb2015 | 150303 PDT-FMAT meeting |
| _0000002653 | _0000002743 | March 03, 2015 PDTFMAT meeting Meeting Materials: Herring IFM Options Info DRAFT FMAT 3 3 15 | 150303 PDT-FMAT meeting |
| _0000002744 | _0000002744 | March 03, 2015 PDTFMAT meeting Meeting Materials: February MAFMC Motion re At Sea Monitors for Mackerel | 150303 PDT-FMAT meeting |
| _0000002745 | _0000002746 | March 03, 2015 PDTFMAT meeting Meeting Materials: 150204 NEFMC to MAFMC re Council Motions IFM | 150303 PDT-FMAT meeting |
| _0000002747 | _0000002752 | March 03, 2015 PDTFMAT meeting Meeting Materials: IFM Amendment PDT FMAT Report | 150303 PDT-FMAT meeting |
| _0000002753 | _0000002754 | April 03, 2015 PDTFMAT Meeting Meeting Materials: Herring Monitoring Matrix | 150403 PDT-FMAT Meeting |
| _0000002755 | _0000002755 | April 03, 2015 PDTFMAT Meeting Meeting Materials: Mackerel Monitoring Matrix | 150403 PDT-FMAT Meeting |
| _0000002756 | _0000002758 | April 03, 2015 PDTFMAT Meeting Meeting Materials: EM and Portside Program | 150403 PDT-FMAT Meeting |
| _0000002759 | _0000002766 | April 03, 2015 PDTFMAT Meeting Meeting Materials: VMP example from new england em project phase3 final aug15 2014 | 150403 PDT-FMAT Meeting |

Case 1:20-cv-00466-EGS Document 13-1 Filed 04/09/20 Page 7 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)

April 2020

Index to Administrative Record

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000002767 | _0000002798 | April 03, 2015 PDTFMAT Meeting Meeting Materials: Draft Herring IFM Discussion Document Thursday 3 26 15 | 150403 PDT-FMAT Meeting |
| _0000002799 | _0000002801 | April 03, 2015 PDTFMAT Meeting Meeting Materials: IFM Amendment PDT FMAT Report for April 3 Meeting | 150403 PDT-FMAT Meeting |
| _0000002802 | _0000002809 | April 16, 2015 Observer Policy Committee Meeting Materials: Observer Committee Update 4 16 05 | 150416 Observer Policy Comm |
| _0000002810 | _0000002850 | April 16, 2015 Observer Policy Committee Meeting Materials: MRAGNE Herring monitoringJune2012 | 150416 Observer Policy Comm |
| _0000002851 | _0000002881 | April 16, 2015 Observer Policy Committee Meeting Materials: Draft Herring IFM Options Observer Committee 4 16 | 150416 Observer Policy Comm |
| _0000002882 | _0000002885 | April 16, 2015 Observer Policy Committee Meeting Materials: 150416 Observer Committee Summary Final | 150416 Observer Policy Comm |
| _0000002886 | _0000002886 | April 16, 2015 Observer Policy Committee Meeting Materials: 150416 Observer Committee Agenda Final | 150416 Observer Policy Comm |
| _0000002887 | _0000002890 | April 16, 2015 Observer Policy Committee Meeting Materials: 150416 Observer Committee Summary Final 002 | 150416 Observer Policy Comm |
| _0000002891 | _0000002911 | April 16, 2015 Observer Policy Committee Meeting Materials: 150416 Observer Com Presentation GARFO Staff | 150416 Observer Policy Comm |
| _0000002912 | _0000002920 | April 16, 2015 Observer Policy Committee Meeting Materials: 15January uary 22, 2015 Observer Committee Summary Final | 150416 Observer Policy Comm |
| _0000002921 | _0000002921 | April 16, 2015 Observer Policy Committee Meeting Materials: 14150227NEMFC to NMFS re Draft IFM Amendment | 150416 Observer Policy Comm |
| _0000002922 | _0000002923 | April 16, 2015 Observer Policy Committee Meeting Materials: 13150204 NEFMC to MAFMC re Council Motions IFM | 150416 Observer Policy Comm |
| _0000002924 | _0000003307 | April 16, 2015 Observer Policy Committee Meeting Materials: 12 Draft IFM Omnibus Amendment w Appendices February 2015 | 150416 Observer Policy Comm |
| _0000003308 | _0000003328 | April 16, 2015 Observer Policy Committee Meeting Materials: 11150416 Observer Com Presentation GARFO Staff | 150416 Observer Policy Comm |
| _0000003329 | _0000003359 | April 16, 2015 Observer Policy Committee Meeting Materials: 10Draft Herring IFM Options Observer Committee 4 16 15 | 150416 Observer Policy Comm |
| _0000003360 | _0000003398 | April 16, 2015 Observer Policy Committee Meeting Materials: 9Draft Herring IFM Discussion Document Observer Committee 4 16 15 | 150416 Observer Policy Comm |
| _0000003399 | _0000003404 | April 16, 2015 Observer Policy Committee Meeting Materials: 7150306 IFM Amendment PDTFMAT ReportFINAL | 150416 Observer Policy Comm |
| _0000003405 | _0000003406 | April 16, 2015 Observer Policy Committee Meeting Materials: 6CouncilLetterObserverConcerns | 150416 Observer Policy Comm |
| _0000003407 | _0000003409 | April 16, 2015 Observer Policy Committee Meeting Materials: 5150403 IFM Amendment PDTFMAT ReportDRAFT | 150416 Observer Policy Comm |
| _0000003410 | _0000003416 | April 16, 2015 Observer Policy Committee Meeting Materials: 4150409Industryfunded Monitoring Action Plan draft | 150416 Observer Policy Comm |
| _0000003417 | _0000003436 | April 16, 2015 Observer Policy Committee Meeting Materials: 2150416 EM and Portside Discussion Document | 150416 Observer Policy Comm |
| _0000003437 | _0000003444 | April 16, 2015 Observer Policy Committee Meeting Materials: 0Observer Committee Update 4 16 05 | 150416 Observer Policy Comm |
| _0000003445 | _0000003453 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: GTM Attendees Tues April 21 | 15042123 NEFMC Council Meeting |
| _0000003454 | _0000003455 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: AGENDA APRIL 2015 | 15042123 NEFMC Council Meeting |
| _0000003456 | _0000003470 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: April 21-23, 2015 final motions2 | 15042123 NEFMC Council Meeting |
| _0000003471 | _0000003471 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 150421 Council Member Attendance | 15042123 NEFMC Council Meeting |
| _0000003472 | _0000003473 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 150421 Audience Attendance | 15042123 NEFMC Council Meeting |
| _0000003474 | _0000003474 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 15 Obs Comm April 2015 | 15042123 NEFMC Council Meeting |
| _0000003475 | _0000003476 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 6a Additional Correspondence | 15042123 NEFMC Council Meeting |
| _0000003477 | _0000003484 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 6 Correspondence | 15042123 NEFMC Council Meeting |
| _0000003485 | _0000003487 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 5 150408 IFM Amendment PDTFMAT Report DRAFT | 15042123 NEFMC Council Meeting |
| _0000003488 | _0000003494 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 4 150409 Industryfunded Monitoring Action Plan draft | 15042123 NEFMC Council Meeting |
| _0000003495 | _0000003506 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 3 150421 NEFMC Meeting IFM Presentation | 15042123 NEFMC Council Meeting |
| _0000003507 | _0000003526 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 2 150416 EM and Portside Discussion Document | 15042123 NEFMC Council Meeting |
| _0000003527 | _0000003528 | April 21-23, 2015 NEFMC Council Meeting Meeting Materials: 1 150416 Obs Comm Summary Draft | 15042123 NEFMC Council Meeting |
| _0000003529 | _0000003559 | May 13, 2015 Herring PDT Meeting Materials: Draft Herring IFM Options Observer Committee 4 16 15 | 150513 Herring PDT |
| _0000003560 | _0000003560 | May 13, 2015 Herring PDT Meeting Materials: 150513 Herring PDT Meeting agenda | 150513 Herring PDT |
| _0000003561 | _0000003580 | May 13, 2015 Herring PDT Meeting Materials: 150416 EM and Portside Discussion Document | 150513 Herring PDT |
| _0000003581 | _0000003582 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Herring Monitoring Matrix | 150529 PDT-FMAT Meeting |

Case 1:20-cv-00466-EGS   Document 13-1   Filed 04/09/20   Page 8 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)                      April 2020
Index to Administrative Record

| BegDoc | EndDoc | Title | Documents related to: |
|--------|--------|-------|------------------------|
| _0000003583 | _0000003583 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Mackerel Monitoring Matrix | 150529 PDT-FMAT Meeting |
| _0000003584 | _0000003590 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Herring Mackerel Alternative Bundles | 150529 PDT-FMAT Meeting |
| _0000003591 | _0000003591 | May 29, 2015 PDTFMAT Meeting Meeting Materials: PDT FMAT Meeting Agenda | 150529 PDT-FMAT Meeting |
| _0000003592 | _0000003593 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Survey cover letter | 150529 PDT-FMAT Meeting |
| _0000003594 | _0000003608 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Herr mack Instrument 2014 | 150529 PDT-FMAT Meeting |
| _0000003609 | _0000003610 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Herring Alt Matrix | 150529 PDT-FMAT Meeting |
| _0000003611 | _0000003611 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Mackerel Alt Matrix | 150529 PDT-FMAT Meeting |
| _0000003612 | _0000003618 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Revised Range of IFM Alternatives and Impacts Summary | 150529 PDT-FMAT Meeting |
| _0000003619 | _0000003621 | May 29, 2015 PDTFMAT Meeting Meeting Materials: IFM EA assignments | 150529 PDT-FMAT Meeting |
| _0000003622 | _0000003624 | May 29, 2015 PDTFMAT Meeting Meeting Materials: Monitoring RFP | 150529 PDT-FMAT Meeting |
| _0000003625 | _0000003627 | May 29, 2015 PDTFMAT Meeting Meeting Materials: FM PDT FMAT Meeting Summary | 150529 PDT-FMAT Meeting |
| _0000003628 | _0000003628 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150701 meeting notice | 150701 Joint OBS Policy_Comm Meeting |
| _0000003629 | _0000003629 | July 01, 2015 Joint Observer PolicyHerring Committee Meeting Meeting Materials:150701 Agenda | 150701 Joint OBS Policy_Comm Meeting |
| _0000003630 | _0000003655 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150701 IFM Amendment Discussion Document | 150701 Joint OBS Policy_Comm Meeting |
| _0000003656 | _0000003727 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150701 Discussion Document Appendix | 150701 Joint OBS Policy_Comm Meeting |
| _0000003728 | _0000003731 | July 01, 2015 Joint Observer Policy HerringCommittee Meeting Meeting Materials:150416 Observer Committee Summary Final | 150701 Joint OBS Policy_Comm Meeting |
| _0000003732 | _0000003733 | July 01, 2015 Joint Observer Policy Committee Meeting Meeting Materials:150204 NEFMC to MAFMC re Council Motions IFM | 150701 Joint OBS Policy_Comm Meeting |
| _0000003734 | _0000003772 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150416 Draft Herring IFM Discussion Document Observer Committee 4 16 15 | 150701 Joint OBS Policy_Comm Meeting |
| _0000003773 | _0000003774 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150701 Council Letter Observer Concerns Seafreeze | 150701 Joint OBS Policy_Comm Meeting |
| _0000003775 | _0000003776 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150623 R Ruhle to NEFMC re Herring ObserverCoverage | 150701 Joint OBS Policy_Comm Meeting |
| _0000003777 | _0000003779 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150408 IFM Amendment PDT FMAT Report for April 3 Meeting FINAL | 150701 Joint OBS Policy_Comm Meeting |
| _0000003780 | _0000003782 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150622 IFM PDT FMAT Meeting Summary for May 29 2015 Meeting | 150701 Joint OBS Policy_Comm Meeting |
| _0000003783 | _0000003800 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150701 HER Observer Committee Update LLS | 150701 Joint OBS Policy_Comm Meeting |
| _0000003801 | _0000003834 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:150701 Observer Policy and Herring Com Meeting Presentation | 150701 Joint OBS Policy_Comm Meeting |
| _0000003835 | _0000003836 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials:Cape Cod Fishermens Alliance Comment Letter 6 29 2015 | 150701 Joint OBS Policy_Comm Meeting |
| _0000003837 | _0000003844 | July 01, 2015 Joint Observer Policy Herring Committee Meeting Meeting Materials: final Meeting summary observer herring | 150701 Joint OBS Policy_Comm Meeting |
| _0000003845 | _0000003848 | September 14, 2015 Advisory Panel Meeting Materials: 150914 Herring AP Report FINAL 1 | 150914 Asvisory Panel Meeting |
| _0000003849 | _0000003850 | September 14, 2015 Advsory Panel Meeting Materials15091415 Meeting Notice Boston AP CTE | 150914 Asvisory Panel Meeting |
| _0000003851 | _0000003851 | September 14, 2015 Advisory Panel MaterialsFINAL Agenda Herring AP Sept 14 Boston | 150914 Asvisory Panel Meeting |
| _0000003852 | _0000003881 | September 14, 2015 Advisory Panel Materials150914 Herring AP and Committee Meeting Presentation | 150914 Asvisory Panel Meeting |
| _0000003882 | _0000004416 | September 14, 2015 Advisory Panel Materials150924 Draft IFM Omnibus Amendment EA with Appendix v2 | 150914 Asvisory Panel Meeting |
| _0000004417 | _0000004417 | September 28, 2015 Observer Policy Committee Meeting Materials: meeting notice | 150928 Observer Policy Comm |

Case 1:20-cv-00466-EGS   Document 13-1   Filed 04/09/20   Page 9 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)

April 2020

Index to Administrative Record

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000004418 | _0000004425 | September 28, 2015 Observer Policy Committee Meeting Materials: July 1 final Meeting summary observer herring | 150928 Observer Policy Comm |
| _0000004426 | _0000004952 | September 28, 2015 Observer Policy Committee Meeting Materials: industyfunded Monitoring Report | 150928 Observer Policy Comm |
| _0000004953 | _0000004960 | September 28, 2015 Observer Policy Committee Meeting Materials: Final Meeting summary 11 24 15 | 150928 Observer Policy Comm |
| _0000004961 | _0000004968 | September 28, 2015 Observer Policy Committee Meeting Materials: Final Meeting summary | 150928 Observer Policy Comm |
| _0000004969 | _0000004969 | September 28, 2015 Observer Policy Committee Meeting Materials: correspondence | 150928 Observer Policy Comm |
| _0000004970 | _0000004971 | September 28, 2015 Observer Policy Committee Meeting Materials: attendance | 150928 Observer Policy Comm |
| _0000004972 | _0000004972 | September 28, 2015 Observer Policy Committee Meeting Materials: agenda | 150928 Observer Policy Comm |
| _0000004973 | _0000004980 | September 28, 2015 Observer Policy Committee Meeting Materials: 150928Final Observer Committee Summary | 150928 Observer Policy Comm |
| _0000004981 | _0000005013 | September 28, 2015 Observer Policy Committee Meeting Materials: 150928 Doc 2C Observer Policy Committee Discussion Document IFM supplement | 150928 Observer Policy Comm |
| _0000005014 | _0000005033 | September 28, 2015 Observer Policy Committee Meeting Materials: 150928 Supplemental Observer Pol Committee Presentation without notes | 150928 Observer Policy Comm |
| _0000005034 | _0000005072 | September 28, 2015 Observer Policy Committee Meeting Materials: 150921 Stand Alone Economic impact analysis herring | 150928 Observer Policy Comm |
| _0000005073 | _0000005082 | September 28, 2015 Observer Policy Committee Meeting Materials: 150817 DRAFT GF Closed Area Observer Data Summary IFM | 150928 Observer Policy Comm |
| _0000005083 | _0000005617 | September 28, 2015 Observer Policy Committee Meeting Materials: 1 Industy funded Monitoring Report Version 2 | 150928 Observer Policy Comm |
| _0000005618 | _0000005638 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: Tuesday Attendee Report | 1509291001 NEFMC Council Meeting |
| _0000005639 | _0000005640 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: FinalAGENDA Sept2015 | 1509291001 NEFMC Council Meeting |
| _0000005641 | _0000005643 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: CouncilAttendance | 1509291001 NEFMC Council Meeting |
| _0000005644 | _0000005644 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: AudienceAttendance | 1509291001 NEFMC Council Meeting |
| _0000005645 | _0000005685 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 150929 NEFMC Meeting Presentation without notes 2 | 1509291001 NEFMC Council Meeting |
| _0000005686 | _0000005695 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: September 29-October 01, 2015 final motions | 1509291001 NEFMC Council Meeting |
| _0000005696 | _0000005696 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 15 Obs Comm SEPT 2015 | 1509291001 NEFMC Council Meeting |
| _0000005697 | _0000005697 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 8 correspondence | 1509291001 NEFMC Council Meeting |
| _0000005698 | _0000005705 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 7 July 1 final mtg summary observer herring | 1509291001 NEFMC Council Meeting |
| _0000005706 | _0000005746 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 4 150929 NEFMC Meeting Presentation without notes | 1509291001 NEFMC Council Meeting |
| _0000005747 | _0000005750 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 3 Observer Committee Motions 9 28 15 | 1509291001 NEFMC Council Meeting |
| _0000005751 | _0000005783 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 2c 150928 Observer Policy Committee Discussion Document IFM supplement | 1509291001 NEFMC Council Meeting |
| _0000005784 | _0000005793 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 2b 150817 DRAFT GF Closed Area Obs Data Summary IFM | 1509291001 NEFMC Council Meeting |
| _0000005794 | _0000005832 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 2a 150921 Stand Alone Economic impact analysis herring | 1509291001 NEFMC Council Meeting |
| _0000005833 | _0000006367 | September 29-October 01, 2015 NEFMC Council Meeting Meeting Materials: 1 industyfunded Monitoring ReportVersion 2 | 1509291001 NEFMC Council Meeting |
| _0000006368 | _0000006376 | November 30, 2015 PDTFMAT Meeting Meeting Materials: Econ supplement | 151130 PDT-FMAT Meeting |
| _0000006377 | _0000006400 | November 30, 2015 PDTFMAT Meeting Meeting Materials: Economic impact analysis mackerel | 151130 PDT-FMAT Meeting |
| _0000006401 | _0000006431 | November 30, 2015 PDTFMAT Meeting Meeting Materials: Economic impact analysis herring | 151130 PDT-FMAT Meeting |

Case 1:20-cv-00466-EGS  Document 13-1  Filed 04/09/20  Page 10 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)
April 2020

Index to Administrative Record

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000006432 | _0000006433 | November 30, 2015 PDTFMAT Meeting Meeting Materials: EM and PS cost trimming | 151130 PDT-FMAT Meeting |
| _0000006434 | _0000006434 | November 30, 2015 PDTFMAT Meeting Meeting Materials: PDT FMAT Meeting Agenda for November 30 2015 | 151130 PDT-FMAT Meeting |
| _0000006435 | _0000006438 | November 30, 2015 PDTFMAT Meeting Meeting Materials: Data Interest Tables | 151130 PDT-FMAT Meeting |
| _0000006439 | _0000006464 | November 30, 2015 PDTFMAT Meeting Meeting Materials: HERRING IMPACTS ON HUMAN COMMUNITIES | 151130 PDT-FMAT Meeting |
| _0000006465 | _0000006493 | November 30, 2015 PDTFMAT Meeting Meeting Materials: IFM Presentation with notes | 151130 PDT-FMAT Meeting |
| _0000006494 | _0000006495 | November 30, 2015 PDTFMAT Meeting Meeting Materials: Next Steps for December 2015 | 151130 PDT-FMAT Meeting |
| _0000006496 | _0000006526 | November 30, 2015 PDTFMAT Meeting Meeting Materials: Economic impact analysis herring workingdl | 151130 PDT-FMAT Meeting |
| _0000006527 | _0000006529 | November 30, 2015 PDTFMAT Meeting Meeting Materials: PDT FMAT Meeting Summary | 151130 PDT-FMAT Meeting |
| _0000006530 | _0000006540 | December 10, 2015 Herring PDT Meeting Materials: IFM Slides | 151210 Herring PDT |
| _0000006541 | _0000006543 | December 10, 2015 Herring PDT Meeting Materials: Data Utility Tables | 151210 Herring PDT |
| _0000006544 | _0000006544 | December 10, 2015 Herring PDT Meeting Materials: Audience Attendance | 151210 Herring PDT |
| _0000006545 | _0000006545 | December 10, 2015 Herring PDT Meeting Materials: Attendance | 151210 Herring PDT |
| _0000006546 | _0000006563 | December 10, 2015 Herring PDT Meeting Materials: 151210 Herring PDT Meeting summary | 151210 Herring PDT |
| _0000006564 | _0000006581 | December 10, 2015 Herring PDT Meeting Materials: 151210 Herring PDT Meeting summary REVISED | 151210 Herring PDT |
| _0000006582 | _0000006582 | December 10, 2015 Herring PDT Meeting Materials: 151210 Herring PDT Meeting agenda REVISED | 151210 Herring PDT |
| _0000006583 | _0000006583 | December 10, 2015 Herring PDT Meeting Materials: 21b Appendix II Herring cooperative research priorities 201618 | 151210 Herring PDT |
| _0000006584 | _0000006589 | December 10, 2015 Herring PDT Meeting Materials: 21a Appendix I NEFMC Research Priorities and Data Needs 2010 to 2014 | 151210 Herring PDT |
| _0000006590 | _0000006603 | December 10, 2015 Herring PDT Meeting Materials: 19 1511 update to TEWG Fisheries data gaps | 151210 Herring PDT |
| _0000006604 | _0000006611 | December 10, 2015 Herring PDT Meeting Materials: 18 DRAFT Herring PDT memo to Committee re portside data | 151210 Herring PDT |
| _0000006612 | _0000006620 | December 10, 2015 Herring PDT Meeting Materials: 17 Herring 1618 DRAFT specs Appendix I | 151210 Herring PDT |
| _0000006621 | _0000006629 | December 10, 2015 Herring PDT Meeting Materials: 16 141029 Final Herring PDT Report | 151210 Herring PDT |
| _0000006630 | _0000006645 | December 10, 2015 Herring PDT Meeting Materials: 14 Herring A5 V III Appendix IIB | 151210 Herring PDT |
| _0000006646 | _0000006669 | December 10, 2015 Herring PDT Meeting Materials: 13 Herring A5 V III Appendix IIA | 151210 Herring PDT |
| _0000006670 | _0000006671 | December 10, 2015 Herring PDT Meeting Materials: 12 Pages from Final A1 DSEIS Volumel Aug 4 2005 | 151210 Herring PDT |
| _0000006672 | _0000006674 | December 10, 2015 Herring PDT Meeting Materials: 3 Timeline for herring work | 151210 Herring PDT |
| _0000006675 | _0000006675 | December 10, 2015 Herring PDT Meeting Materials: 2 NEFMC 2016 priorities for Atlantic herring | 151210 Herring PDT |
| _0000006676 | _0000006676 | December 10, 2015 Herring PDT Meeting Materials: 1 151210 Herring PDT Meeting agenda REVISED | 151210 Herring PDT |
| _0000006677 | _0000006685 | December 14, 2015 PDTFMAT Meeting Meeting Materials: Econ supplement | 151214 PDT-FMAT Meeting |
| _0000006686 | _0000006709 | December 14, 2015 PDTFMAT Meeting Meeting Materials: Economic impact analysis mackerel | 151214 PDT-FMAT Meeting |
| _0000006710 | _0000006740 | December 14, 2015 PDTFMAT Meeting Meeting Materials: Economic impact analysis herring | 151214 PDT-FMAT Meeting |
| _0000006741 | _0000006742 | December 14, 2015 PDTFMAT Meeting Meeting Materials: EM and PS cost trimming | 151214 PDT-FMAT Meeting |
| _0000006743 | _0000006744 | December 14, 2015 PDTFMAT Meeting Meeting Materials: Next Steps for December 2015 | 151214 PDT-FMAT Meeting |
| _0000006745 | _0000006747 | December 14, 2015 PDTFMAT Meeting Meeting Materials: Data Utility Tables | 151214 PDT-FMAT Meeting |
| _0000006748 | _0000006753 | December 14, 2015 PDTFMAT Meeting Meeting Materials: Data Utility Tables II | 151214 PDT-FMAT Meeting |
| _0000006754 | _0000006754 | December 14, 2015 PDTFMAT Meeting Meeting Materials: PDT FMAT Meeting Agenda | 151214 PDT-FMAT Meeting |
| _0000006755 | _0000006770 | December 14, 2015 PDTFMAT Meeting Meeting Materials: HERRING IMPACTS ON HUMAN COMMUNITIES Table Only | 151214 PDT-FMAT Meeting |
| _0000006771 | _0000006772 | December 14, 2015 PDTFMAT Meeting Meeting Materials: CFN IFM Article | 151214 PDT-FMAT Meeting |
| _0000006773 | _0000006775 | December 14, 2015 PDTFMAT Meeting Meeting Materials: BoxPlotsHerring | 151214 PDT-FMAT Meeting |
| _0000006776 | _0000006779 | December 14, 2015 PDTFMAT Meeting Meeting Materials: Next Steps for January uary 2016 | 151214 PDT-FMAT Meeting |
| _0000006780 | _0000006782 | December 14, 2015 PDTFMAT Meeting Meeting Materials: PDT FMAT Meeting Summary | 151214 PDT-FMAT Meeting |
| _0000006783 | _0000006783 | December 17, 2015 Observer Policy Committee Meeting Materials: meeting notice | 151217 Observer Policy Comm |
| _0000006784 | _0000006836 | December 17, 2015 Observer Policy Committee Meeting Materials: IFM Omnibus AlternativesDiscussion Document | 151217 Observer Policy Comm |

Case 1:20-cv-00466-EGS Document 13-1 Filed 04/09/20 Page 11 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000006837 | _0000007371 | December 17, 2015 Observer Policy Committee Meeting Materials: IFM AmendmentEAVersion 2 | 151217 Observer Policy Comm |
| _0000007372 | _0000007372 | December 17, 2015 Observer Policy Committee Meeting Materials: Final Meeting Agenda | 151217 Observer Policy Comm |
| _0000007373 | _0000007376 | December 17, 2015 Observer Policy Committee Meeting Materials: EmailSissenwine Thoughts on Estimating Discards | 151217 Observer Policy Comm |
| _0000007377 | _0000007381 | December 17, 2015 Observer Policy Committee Meeting Materials: Draft Decision Document | 151217 Observer Policy Comm |
| _0000007382 | _0000007382 | December 17, 2015 Observer Policy Committee Meeting Materials: Draft Agenda12 7 15 | 151217 Observer Policy Comm |
| _0000007383 | _0000007384 | December 17, 2015 Observer Policy Committee Meeting Materials: attendance sheet | 151217 Observer Policy Comm |
| _0000007385 | _0000007397 | December 17, 2015 Observer Policy Committee Meeting Materials: Appendix 3 Service Provider Requirements | 151217 Observer Policy Comm |
| _0000007398 | _0000007411 | December 17, 2015 Observer Policy Committee Meeting Materials: Appendix 2 Cost Estimates | 151217 Observer Policy Comm |
| _0000007412 | _0000007429 | December 17, 2015 Observer Policy Committee Meeting Materials: Appendix 1 Background Information | 151217 Observer Policy Comm |
| _0000007430 | _0000007434 | December 17, 2015 Observer Policy Committee Meeting Materials: 151217 Omnibus Decision Document | 151217 Observer Policy Comm |
| _0000007435 | _0000007435 | December 17, 2015 Observer Policy Committee Meeting Materials: 151217 Observer Committee Motions | 151217 Observer Policy Comm |
| _0000007436 | _0000007440 | December 17, 2015 Observer Policy Committee Meeting Materials: 151217 Final Meeting Summary | 151217 Observer Policy Comm |
| _0000007441 | _0000007445 | December 17, 2015 Observer Policy Committee Meeting Materials: 151217 Draft Observer Committee Summary | 151217 Observer Policy Comm |
| _0000007446 | _0000007447 | December 17, 2015 Observer Policy Committee Meeting Materials: 151217 CommitteeMotionsDRAFTJMC | 151217 Observer Policy Comm |
| _0000007448 | _0000007451 | December 17, 2015 Observer Policy Committee Meeting Materials: 7Marine Instruments HD still camera Electronic Monitoring system | 151217 Observer Policy Comm |
| _0000007452 | _0000007455 | December 17, 2015 Observer Policy Committee Meeting Materials: 6EmailDr Sissenwine Thoughts on Estimating Discards | 151217 Observer Policy Comm |
| _0000007456 | _0000007480 | December 17, 2015 Observer Policy Committee Meeting Materials: 5Observer Policy Committee Meeting Presentation | 151217 Observer Policy Comm |
| _0000007481 | _0000007488 | December 17, 2015 Observer Policy Committee Meeting Materials: 4Final Meeting summarySept 2015 | 151217 Observer Policy Comm |
| _0000007489 | _0000007501 | December 17, 2015 Observer Policy Committee Meeting Materials: 3DAppendix 3 Service Provider Requirements | 151217 Observer Policy Comm |
| _0000007502 | _0000007514 | December 17, 2015 Observer Policy Committee Meeting Materials: 3CAppendix 2 Cost Estimates | 151217 Observer Policy Comm |
| _0000007515 | _0000007532 | December 17, 2015 Observer Policy Committee Meeting Materials: 3BAppendix 1 Background Information | 151217 Observer Policy Comm |
| _0000007533 | _0000007585 | December 17, 2015 Observer Policy Committee Meeting Materials: 3AIFM Omnibus AlternativesDiscussion Document | 151217 Observer Policy Comm |
| _0000007586 | _0000007590 | December 17, 2015 Observer Policy Committee Meeting Materials: 02Decision Document | 151217 Observer Policy Comm |
| _0000007591 | _0000007593 | December 17, 2015 Observer Policy Committee Meeting Materials: 1151217 ObserverCommitteemeetingmemo | 151217 Observer Policy Comm |
| _0000007594 | _0000007596 | December 17, 2015 Observer Policy Committee Meeting Materials: 01Observer Committee Meeting Memo | 151217 Observer Policy Comm |
| _0000007597 | _0000008131 | December 17, 2015 Observer Policy Committee Meeting Materials: 00IFM AmendmentDraft EASeptember 2015 | 151217 Observer Policy Comm |
| _0000008132 | _0000008155 | December 17, 2015 Observer Policy Committee Meeting Materials: Drew Kits Analysis Economicimpactanalysismackerel | 151217 Observer Policy Comm |
| _0000008156 | _0000008186 | December 17, 2015 Observer Policy Committee Meeting Materials: Drew Kits Analysis Economic impact analysis herring | 151217 Observer Policy Comm |
| _0000008187 | _0000008195 | December 17, 2015 Observer Policy Committee Meeting Materials: Drew Kits Analysis Econsupplement | 151217 Observer Policy Comm |
| _0000008196 | _0000008196 | December 17, 2015 Observer Policy Committee Meeting Materials: Drew Kits Analysis Draft Agenda | 151217 Observer Policy Comm |
| _0000008197 | _0000008198 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: Final January 2016CouncilAgenda With Tabs | 16012628 NEFMC Council Meeting |
| _0000008199 | _0000008212 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 160127 NEFMC Council Meeting Attendeet | 16012628 NEFMC Council Meeting |
| _0000008213 | _0000008213 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 160127 Council Attendance | 16012628 NEFMC Council Meeting |
| _0000008214 | _0000008214 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 160127 Audience Attendance | 16012628 NEFMC Council Meeting |
| _0000008215 | _0000008220 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 16012629 Final CouncilMtgMotions | 16012628 NEFMC Council Meeting |
| _0000008221 | _0000008221 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 15 Obs Comm January  2016 | 16012628 NEFMC Council Meeting |
| _0000008222 | _0000008231 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 9 Presentation Observer IFM Amendment | 16012628 NEFMC Council Meeting |
| _0000008232 | _0000008255 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 8 IFM Omnibus Alternatives | 16012628 NEFMC Council Meeting |

Case 1:20-cv-00466-EGS   Document 13-1   Filed 04/09/20   Page 12 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-cv-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000008256 | _0000008264 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 7 Omnibus IFM Amendment Draft Action Plan 1 15 16 | 16012628 NEFMC Council Meeting |
| _0000008265 | _0000008270 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 6 PDTFMAT Meeting Summaries 9 30 15 and 11 30 15 | 16012628 NEFMC Council Meeting |
| _0000008271 | _0000008275 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 5 Draft Observer Committee Summary 12 17 15 | 16012628 NEFMC Council Meeting |
| _0000008276 | _0000008279 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 4 Background Observer Committee Motions on Omnibus Alts 1 12 16 | 16012628 NEFMC Council Meeting |
| _0000008280 | _0000008814 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 3 Draft Environmental Assessment Version 2 Sept 2015 | 16012628 NEFMC Council Meeting |
| _0000008815 | _0000008821 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 2 Decision Document 01 12 15 | 16012628 NEFMC Council Meeting |
| _0000008822 | _0000008922 | January 26-28, 2016 NEFMC Council Meeting Meeting Materials: 1 Discussion Document and Appendix 13 01 12 16 | 16012628 NEFMC Council Meeting |
| _0000008923 | _0000008929 | March 15, 2016 Advisory Panel Meeting Materials: 160315 Herring AP Mtg Summary Final | 160315 Advisory Panel Meeting |
| _0000008930 | _0000008931 | March 15, 2016 Advisory Panel Meeting Materials: 16031516 Herring AP CTE ntce DanversMA 1 | 160315 Advisory Panel Meeting |
| _0000008932 | _0000008934 | March 15, 2016 Advisory Panel Meeting Materials: 116031 5 Herring AP mtg memo | 160315 Advisory Panel Meeting |
| _0000008935 | _0000008935 | March 15, 2016 Advisory Panel Meeting Materials: 2160315 Herring AP mtg agenda | 160315 Advisory Panel Meeting |
| _0000008936 | _0000009470 | March 15, 2016 Advisory Panel Meeting Materials: 3A IFM Draft EA Sept 2015 1 | 160315 Advisory Panel Meeting |
| _0000009471 | _0000009661 | March 15, 2016 Advisory Panel Meeting Materials: 3B IFM Amendment Discussion Document Appendices | 160315 Advisory Panel Meeting |
| _0000009662 | _0000009667 | March 15, 2016 Advisory Panel Meeting Materials: 3C IFM Amendment Decision Document 1 | 160315 Advisory Panel Meeting |
| _0000009668 | _0000009728 | March 15, 2016 Advisory Panel Meeting Materials: 3D Staff Presentationon Herring Alternatives | 160315 Advisory Panel Meeting |
| _0000009729 | _0000009748 | March 15, 2016 Advisory Panel Meeting Materials: 5Correspondence1 1 | 160315 Advisory Panel Meeting |
| _0000009749 | _0000009750 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160315 Meeting Notice APCommittee | 160316 Comm Meeting |
| _0000009751 | _0000009753 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160315Herring Committee Meeting memo | 160316 Comm Meeting |
| _0000009754 | _0000009754 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160316 agenda | 160316 Comm Meeting |
| _0000009755 | _0000010289 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160316 3 IFM Draft EA Sept2015 | 160316 Comm Meeting |
| _0000010290 | _0000010480 | March 16, 2016 Herring Committee Meeting Meeting Materials: 1603163 IFM Amendment Discussion Document Appendices | 160316 Comm Meeting |
| _0000010481 | _0000010486 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160316 IFM Amendment Decision Document | 160316 Comm Meeting |
| _0000010487 | _0000010547 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160316 Staff Presentationon Herring Alternatives | 160316 Comm Meeting |
| _0000010548 | _0000010567 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160316 Correspondence | 160316 Comm Meeting |
| _0000010568 | _0000010583 | March 16, 2016 Herring Committee Meeting Meeting Materials: 160316 Herring Committee meeting summary | 160316 Comm Meeting |
| _0000010584 | _0000010584 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Consensus Statement | 160331 PDT-FMAT Meeting |
| _0000010585 | _0000010588 | March 31, 2016 PDTFMAT Meeting Meeting Materials: 160316 Herring Committee Meeting motions | 160331 PDT-FMAT Meeting |
| _0000010589 | _0000010591 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Attachment 1a Biological Impacts | 160331 PDT-FMAT Meeting |
| _0000010592 | _0000010601 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Attachment 2a Groundfish Closed Area Analysis | 160331 PDT-FMAT Meeting |
| _0000010602 | _0000010639 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Attachment 3 Analysis of ASM Costs | 160331 PDT-FMAT Meeting |
| _0000010640 | _0000010641 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Attachment 5 RTO Calculation | 160331 PDT-FMAT Meeting |
| _0000010642 | _0000010651 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Attachment 1b RHS SummaryTables Abridged | 160331 PDT-FMAT Meeting |
| _0000010652 | _0000010657 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Attachment 2b A5 Analysis | 160331 PDT-FMAT Meeting |
| _0000010658 | _0000010660 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Attachment 4 Draft language for RTO Info | 160331 PDT-FMAT Meeting |
| _0000010661 | _0000010663 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Discussion Document | 160331 PDT-FMAT Meeting |
| _0000010664 | _0000010673 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Herring IFM Offload Sites in Mass RI B&W | 160331 PDT-FMAT Meeting |
| _0000010674 | _0000010682 | March 31, 2016 PDTFMAT Meeting Meeting Materials: Industry Funded Monitoring Action Plan | 160331 PDT-FMAT Meeting |
| _0000010683 | _0000010687 | March 31, 2016 PDTFMAT Meeting Meeting Materials: IFM PDT FMAT Meeting Summary | 160331 PDT-FMAT Meeting |
| _0000010688 | _0000010705 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: Rec'd at meeting, IFM GARFO Presentation | 16041921 NEFMC Council Meeting |
| _0000010706 | _0000010707 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: Final CMAgenda APR2016 | 16041921 NEFMC Council Meeting |
| _0000010708 | _0000010714 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: Apri 19-21, 2016 Council Motions final | 16041921 NEFMC Council Meeting |

Case 1:20-cv-00466-EGS   Document 13-1   Filed 04/09/20   Page 13 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-cv-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000010715 | _0000010715 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: 15a Observer Status April 2016 | 16041921 NEFMC Council Meeting |
| _0000010716 | _0000010716 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: 7 MAFMC Motions on IFM Amendment April 13, 2016 | 16041921 NEFMC Council Meeting |
| _0000010717 | _0000010717 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: 4 Plan Development Team Memo April 11 2016 | 16041921 NEFMC Council Meeting |
| _0000010722 | _0000010727 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: 2 IFM Amendment Decision Document April 8, 2016 | 16041921 NEFMC Council Meeting |
| _0000010728 | _0000010921 | Apri 19-21, 2016 NEFMC Council Meeting Meeting Materials: 1 IFM Amendment Discussion Document and Appendices March 15, 2016 | 16041921 NEFMC Council Meeting |
| _0000010922 | _0000010929 | May 04, 2016 PDTFMAT Meeting Meeting Materials: NEFOP Suggested Edits to 648 11 at sea sampler and observer coverage Regulations | 160504 PDT-FMAT Meeting |
| _0000010930 | _0000010933 | May 04, 2016 PDTFMAT Meeting Meeting Materials: Suggested Text for Box Plots | 160504 PDT-FMAT Meeting |
| _0000010934 | _0000010934 | May 04, 2016 PDTFMAT Meeting Meeting Materials: Discussion Points | 160504 PDT-FMAT Meeting |
| _0000010935 | _0000010936 | May 04, 2016 PDTFMAT Meeting Meeting Materials: Slippage consequences? | 160504 PDT-FMAT Meeting |
| _0000010937 | _0000010940 | May 04, 2016 PDT FMAT Meeting Meeting Materials: 160527 May 4 PDT FMAT Meeting Summary | 160504 PDT-FMAT Meeting |
| _0000010941 | _0000010948 | June 01, 2016 Advisory Panel Meeting Materials160601HerringAPmtgsummary | 160601 Advisory Panel Meeting |
| _0000010949 | _0000010950 | June 01, 2016 Advisory Panel Meeting Materials16060102HerringAPCTEntcewakefield 1 | 160601 Advisory Panel Meeting |
| _0000010951 | _0000010953 | June 01, 2016 Advisory Panel Meeting Materials1160601HerringAPmtgmemo | 160601 Advisory Panel Meeting |
| _0000010954 | _0000010954 | June 01, 2016 Advisory Panel Meeting Materials2160601HerringAPmtgagenda | 160601 Advisory Panel Meeting |
| _0000010955 | _0000010964 | June 01, 2016 Advisory Panel Meeting Materials3b160523HerringPDTmtgsummary | 160601 Advisory Panel Meeting |
| _0000010965 | _0000010971 | June 01, 2016 Advisory Panel Meeting Materials4a160315HerringAPmtgsummary 2 | 160601 Advisory Panel Meeting |
| _0000010972 | _0000010976 | June 01, 2016 Advisory Panel Meeting Materials4b160411IFMPDTmemo 2 | 160601 Advisory Panel Meeting |
| _0000010977 | _0000010980 | June 01, 2016 Advisory Panel Meeting Materials4cIFMPlanDevelopmentTeammeetingsummaryMay142016 | 160601 Advisory Panel Meeting |
| _0000010981 | _0000010986 | June 01, 2016 Advisory Panel Meeting Materials4d160526IFMAmendmentDecisionDocument 2 | 160601 Advisory Panel Meeting |
| _0000010987 | _0000011523 | June 01, 2016 Advisory Panel Meeting Materials4eDraftEnvironmentalAssessmentMay272016 3 | 160601 Advisory Panel Meeting |
| _0000011524 | _0000011554 | June 01, 2016 Advisory Panel Meeting Materials4f160601HerringAPandCommitteeMeetingPresentationforwebsite 1 | 160601 Advisory Panel Meeting |
| _0000011555 | _0000011565 | June 01, 2016 Advisory Panel Meeting Materials4gHerringSupplementtoDraftEAforIFM 1 | 160601 Advisory Panel Meeting |
| _0000011566 | _0000011567 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160601 Meeting Notice Herring AP | 160602 Comm Meeting |
| _0000011568 | _0000011570 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160602 Meeting Memo | 160602 Comm Meeting |
| _0000011571 | _0000011571 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160602 Agenda | 160602 Comm Meeting |
| _0000011572 | _0000011578 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160315 Herring AP Meeting 'summary | 160602 Comm Meeting |
| _0000011579 | _0000011583 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160411 IFM PDT memo | 160602 Comm Meeting |
| _0000011584 | _0000011593 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160527 Groundfish PDT memo | 160602 Comm Meeting |
| _0000011594 | _0000011599 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160526 IFM Amendment Decision Document | 160602 Comm Meeting |
| _0000011600 | _0000012136 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160602 Draft Environmenta IAssessment May 27 2016 | 160602 Comm Meeting |
| _0000012137 | _0000012167 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160601 Herring AP and Committee Meeting Presentation | 160602 Comm Meeting |
| _0000012168 | _0000012178 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160602 Herring Supplement to Draft EA for IFM | 160602 Comm Meeting |
| _0000012179 | _0000012179 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160601 Herring AP meeting Motions | 160602 Comm Meeting |
| _0000012180 | _0000012198 | June 02, 2016 Herring Committee Meeting Meeting Materials: 160602 Herring Committee Meeting summary final | 160602 Comm Meeting |
| _0000012199 | _0000012242 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 160623 NEFMC Presentation | 16062123 NEFMC Council Meeting |
| _0000012243 | _0000012253 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: June 21-23, 2016 Council Motions | 16062123 NEFMC Council Meeting |
| _0000012254 | _0000012254 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 15a Observer Status June 2016 | 16062123 NEFMC Council Meeting |
| _0000012255 | _0000012263 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 8 Correspondence | 16062123 NEFMC Council Meeting |
| _0000012264 | _0000012264 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 7 Draft MAFMC Motions on IFM June 15 2016 | 16062123 NEFMC Council Meeting |
| _0000012265 | _0000012268 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 6 IFM Amendment FMATPDT Memo May 27 2016 | 16062123 NEFMC Council Meeting |
| _0000012269 | _0000012276 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 5 IFM Amendment Decision Document | 16062123 NEFMC Council Meeting |

Case 1:20-cv-00466-EGS  Document 13-1  Filed 04/09/20  Page 14 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000012277 | _0000012278 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 4 Summary Document Update on EM Pilot Project | 16062123 NEFMC Council Meeting |
| _0000012279 | _0000012289 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 3 IFM Amendment Supplement to Draft EA May 27 2016 | 16062123 NEFMC Council Meeting |
| _0000012290 | _0000012826 | June 21-23, 2016 NEFMC Council Meeting Meeting Materials: 2 IFM Amendment Draft EA and Appendices May 27 2016 | 16062123 NEFMC Council Meeting |
| _0000012827 | _0000012828 | July 20, 2016 PDTFAT Meeting Meeting Materials: June 2016 Council Report on IFM | 160720 PDT-FMAT Meeting |
| _0000012829 | _0000012830 | July 20, 2016 PDTFMAT Meeting Meeting Materials: MAFMC June Motions | 160720 PDT-FMAT Meeting |
| _0000012831 | _0000012841 | July 20, 2016 PDTFMAT Meeting Meeting Materials: NEFMC June Motions | 160720 PDT-FMAT Meeting |
| _0000012842 | _0000012842 | July 20, 2016 PDTFMAT Meeting Meeting Materials: Discussion Topics | 160720 PDT-FMAT Meeting |
| _0000012843 | _0000012846 | July 20, 2016 PDTFMAT Meeting Meeting Materials: 160720 July 20 PDT FMAT Meeting Summary | 160720 PDT-FMAT Meeting |
| _0000012847 | _0000012848 | September 20-22, 2016 NEFMC Council Meeting Meeting Materials: FinalAgenda SEPT2016 Danvers | 16092022 NEFMC Council Meeting |
| _0000012849 | _0000012855 | September 20-22, 2016 NEFMC Council Meeting Meeting Materials: 16092022 Council Motions | 16092022 NEFMC Council Meeting |
| _0000012856 | _0000012856 | September 20-22, 2016 NEFMC Council Meeting Meeting Materials: 15a Observer Status September 2016 | 16092022 NEFMC Council Meeting |
| _0000012857 | _0000012858 | September 20-22, 2016 NEFMC Council Meeting Meeting Materials: 3 160912 Information Sheet on HerringMackerel EM Project | 16092022 NEFMC Council Meeting |
| _0000012859 | _0000012860 | September 20-22, 2016 NEFMC Council Meeting Meeting Materials: 2 Update on HerringMackerel EM Project | 16092022 NEFMC Council Meeting |
| _0000012861 | _0000012866 | September 20-22, 2016 NEFMC Council Meeting Meeting Materials: 1 Presentaton Update on HerringMackerel EM Project | 16092022 NEFMC Council Meeting |
| _0000012867 | _0000012893 | October 04, 2016 Public Hearing Meeting Materials: 161004 IFM Amendment Public Hearing Document | 161004 Public Hearing |
| _0000012894 | _0000012919 | October 04, 2016 Public Hearing Meeting Materials: 161004 GARFO Public Hearing Presentation | 161004 Public Hearing |
| _0000012920 | _0000012921 | October 04, 2016 Public Hearing Meeting Materials: attendance | 161004 Public Hearing |
| _0000012922 | _0000012948 | October 17, 2016 Public Hearing Meeting Materials: 161017 IFM Amendment Public Hearing Document | 161017 Public Hearing |
| _0000012949 | _0000012984 | October 17, 2016 Public Hearing Meeting Materials: 161017 Webinar Public Hearing Presentation | 161017 Public Hearing |
| _0000012985 | _0000013011 | October 20, 2016 Public Hearing Meeting Materials: 161020 IFM Amendment Public Hearing Document | 161020 Public Hearing |
| _0000013012 | _0000013047 | October 20, 2016 Public Hearing Meeting Materials: 161020 Portland Public Hearing Presentation | 161020 Public Hearing |
| _0000013048 | _0000013049 | October 20, 2016 Public Hearing Meeting Materials: attendance | 161020 Public Hearing |
| _0000013050 | _0000013076 | November 01, 2016 Public Hearing Meeting Materials: 161101 IFM Amendment Public Hearing Document | 161101 Public Hearing |
| _0000013077 | _0000013112 | November 01, 2016 Public Hearing Meeting Materials: 161101 Narragansett Public Hearing Presentation | 161101 Public Hearing |
| _0000013113 | _0000013114 | November 15-17, 2016 NEFMC Council Meeting Meeting Materials: NEFMC Agenda November 2016 Newport | 16111517 NEFMC Council Meeting |
| _0000013115 | _0000013129 | November 15-17, 2016 NEFMC Council Meeting Meeting Materials: November 15-17, 2016 CouncilMotions November 2016 | 16111517 NEFMC Council Meeting |
| _0000013130 | _0000013130 | November 15-17, 2016 NEFMC Council Meeting Meeting Materials: 15 Observer Status November 2016 | 16111517 NEFMC Council Meeting |
| _0000013131 | _0000013137 | November 15-17, 2016 NEFMC Council Meeting Meeting Materials: 3 correspondence | 16111517 NEFMC Council Meeting |
| _0000013138 | _0000013139 | November 15-17, 2016 NEFMC Council Meeting Meeting Materials: 2 Flyer for observer surveyOCT16 | 16111517 NEFMC Council Meeting |
| _0000013140 | _0000013151 | November 15-17, 2016 NEFMC Council Meeting Meeting Materials: 1 Garfo Presentation Observer Safety program | 16111517 NEFMC Council Meeting |
| _0000013152 | _0000013153 | January 10, 2017 Advisory Panel Meeting Meeting Materials: 17011011 Meeting notice | 170110 Advisory Panel Meeting |
| _0000013154 | _0000013155 | January 10, 2017 Advisory Panel Meeting Meeting Materials: AP cover memo | 170110 Advisory Panel Meeting |
| _0000013156 | _0000013157 | January 10, 2017 Advisory Panel Meeting Meeting Materials: 170110 Herring AP mtg agenda | 170110 Advisory Panel Meeting |
| _0000013158 | _0000013252 | January 10, 2017 Advisory Panel Meeting Meeting Materials: 2 Omnibus Public Hearing doc and summary of public comments | 170110 Advisory Panel Meeting |
| _0000013253 | _0000013278 | January 10, 2017 Advisory Panel Meeting Meeting Materials: 2a 170110 Meeting Presentation | 170110 Advisory Panel Meeting |
| _0000013279 | _0000013280 | January 11, 2017 Herring Committee Meeting Meeting Materials: 170110 Meeting notice | 170111 Comm Meeting |
| _0000013281 | _0000013282 | January 11, 2017 Herring Committee Meeting Meeting Materials: Meeting Memo | 170111 Comm Meeting |
| _0000013283 | _0000013284 | January 11, 2017 Herring Committee Meeting Meeting Materials:170111 Meeting agenda | 170111 Comm Meeting |
| _0000013285 | _0000013379 | January 11, 2017 Herring Committee Meeting Meeting Materials: 17011omnibus PH documentand summary of public comments | 170111 Comm Meeting |
| _0000013380 | _0000013405 | January 11, 2017 Herring Committee Meeting Meeting Materials: 170110 Meeting Presentation | 170111 Comm Meeting |

Case 1:20-cv-00466-EGS  Document 13-1  Filed 04/09/20  Page 15 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000013406 | _0000013447 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 170124 IFM Amendment Presentation | 17012426 NEFMC Council Meeting |
| _0000013448 | _0000013448 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 15 Observer Status January  2017 | 17012426 NEFMC Council Meeting |
| _0000013449 | _0000013464 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 9a additional correspondence | 17012426 NEFMC Council Meeting |
| _0000013465 | _0000013468 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 9 Correspondence 7 | 17012426 NEFMC Council Meeting |
| _0000013469 | _0000013472 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 8 160720 July 20 PDT FMAT Meeting Summary | 17012426 NEFMC Council Meeting |
| _0000013473 | _0000013544 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 7 Public Hearing Comments | 17012426 NEFMC Council Meeting |
| _0000013545 | _0000013556 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 6 Public Comment ssubmitted to Council | 17012426 NEFMC Council Meeting |
| _0000013557 | _0000013800 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 5 IFM All Written Public Comments | 17012426 NEFMC Council Meeting |
| _0000013801 | _0000013801 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 4d MAFMC FMPs Summarized | 17012426 NEFMC Council Meeting |
| _0000013802 | _0000013803 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 4c NEFMC FMPs Summarized | 17012426 NEFMC Council Meeting |
| _0000013804 | _0000013806 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 4b All Public Hearing Comments | 17012426 NEFMC Council Meeting |
| _0000013807 | _0000013816 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 3 NEFMC Decision Document | 17012426 NEFMC Council Meeting |
| _0000013817 | _0000014462 | January 24-26, 2017 NEFMC Council Meeting Meeting Materials: 2 IFM Amendment dated Sept 16 | 17012426 NEFMC Council Meeting |
| _0000014463 | _0000014463 | February 15, 2017 PDTFMAT Conference Call Meeting Materials: Agenda | 170215 PDT-FMAT Conference Call |
| _0000014464 | _0000014477 | February 15, 2017 PDTFMAT Conference Call Meeting Materials: NEFMC Preferred Alternatives | 170215 PDT-FMAT Conference Call |
| _0000014478 | _0000014481 | February 15, 2017 PDTFMAT Conference Call Meeting Materials: 170215 PDT FMAT Conference Call Summary | 170215 PDT-FMAT Conference Call |
| _0000014482 | _0000014483 | April 04, 2017 Advisory Panel Meeting Materials: 170405 meeting notice 04 | 170404 Advisory Panel Meeting |
| _0000014484 | _0000014485 | April 04, 2017 Advisory Panel Meeting Materials: 170404 Herring AP mtg agenda | 170404 Advisory Panel Meeting |
| _0000014486 | _0000014488 | April 04, 2017 Advisory Panel Meeting Materials: 1 17040405 Cmte tasking memo | 170404 Advisory Panel Meeting |
| _0000014489 | _0000015058 | April 04, 2017 Advisory Panel Meeting Materials: 6 170404 Draft EA for IFM Omnibu sAmendment | 170404 Advisory Panel Meeting |
| _0000015059 | _0000015072 | April 04, 2017 Advisory Panel Meeting Materials: 6a Description of the proposed action for IFM | 170404 Advisory Panel Meeting |
| _0000015073 | _0000015075 | April 04, 2017 Advisory Panel Meeting Materials: 6b Memo with IFM PDT FMAT Proposed Clarifications to ProposedAction | 170404 Advisory Panel Meeting |
| _0000015076 | _0000015080 | April 04, 2017 Advisory Panel Meeting Materials: 6c Memo of 170317 IFM PDT FMAT Conf Call Summary | 170404 Advisory Panel Meeting |
| _0000015081 | _0000015084 | April 04, 2017 Advisory Panel Meeting Materials: 6d Memo of 170215 IFM PDT FMAT Conf Call Summ | 170404 Advisory Panel Meeting |
| _0000015085 | _0000015088 | April 04, 2017 Advisory Panel Meeting Materials: 6e 170404 NMFS Comments on Proposed Action for Herring Fishery | 170404 Advisory Panel Meeting |
| _0000015089 | _0000015105 | April 04, 2017 Advisory Panel Meeting Materials: 6f 170404 IFM Presentation | 170404 Advisory Panel Meeting |
| _0000015106 | _0000015150 | April 04, 2017 Advisory Panel Meeting Materials: 9 17040-05 herring correspondence | 170404 Advisory Panel Meeting |
| _0000015151 | _0000015153 | April 05, 2017 Herring Committee Meeting Meeting Materials: 170405 Council Meeting Material 170405 tasking memo | 170405 Committee Meeting |
| _0000015154 | _0000015723 | April 05, 2017 Herring Committee Meeting Meeting Materials: 170404 Draft EA for IFM Omnibus Amendment | 170405 Committee Meeting |
| _0000015724 | _0000015737 | April 05, 2017 Herring Committee Meeting Meeting Materials: 170405 Description of the proposed action for IFM | 170405 Committee Meeting |
| _0000015738 | _0000015740 | April 05, 2017 Herring Committee Meeting Meeting Materials: 170405 Memo with IFM PDT FMAT Proposed Clarifications to NEFI | 170405 Committee Meeting |
| _0000015741 | _0000015745 | April 05, 2017 Herring Committee Meeting Meeting Materials: 170405 Memo of 170317IFM PDT FMAT Conference Call Summary | 170405 Committee Meeting |
| _0000015746 | _0000015749 | April 05, 2017 Herring Committee Meeting Meeting Materials: 070405 Memo of 170215 IFM PDT FMAT Conference Call Summar | 170405 Committee Meeting |
| _0000015750 | _0000015753 | April 05, 2017 Herring Committee Meeting Meeting Materials: 170405 NMFS Comments on Proposed Action for Herring Fishery | 170405 Committee Meeting |
| _0000015754 | _0000015755 | April 04, 2018 Joint Committee Advisory Panel Meetingmeeting meeting Materials180404 Herring Meeting notice | 180404 Joint Committee Advisory Panel meeting 170405 Committee Meeting |
| _0000015756 | _0000015757 | April 04, 2018 Joint Committee Advisory Panel Meeting Meeting Materials180404 Agenda | 170405 Committee Meeting 180404 Joint Committee Advisory Panel meeting |
| _0000015758 | _0000015872 | April 04, 2018 Joint Committee Advisory Panel Meeting Materials: 180404 Herring and Mackerel Fishery Electronic Monitoring Project Final Report | 180404 Joint Committee Advisory Panel meeting 170405 Committee Meeting |
| _0000015873 | _0000015897 | April 04, 2018 Joint Committee Advisory Panel Meeting Meeting Materials180404 IFM Amendment and EM Presentation 1 | 180404 Joint Committee Advisory Panel meeting 170405 Committee Meeting |
| _0000015898 | _0000015902 | April 04, 2018 Joint Committee Advisory Panel Meeting Meeting Materials180404 Memo from EM review panel | 180404 Joint Committee Advisory Panel meeting 170405 Committee Meeting |

A152

Case 1:20-cv-00466-EGS   Document 13-1   Filed 04/09/20   Page 16 of 17
Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000015903 | _0000015904 | April 04, 2018 Joint Committee Advisory Panel Meeting Meeting Materials180404 Letter to NEFMC on EM Portside April 2 2018 | 170405 Committee Meeting 180404 Joint Committee Advisory Panel meeting |
| _0000015905 | _0000015905 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: Analysis for Herring Sub Option 550mt exemption | 17041820 NEFMC Council Meeting |
| _0000015906 | _0000015935 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 170420 IFM Amendment t Presentation | 17041820 NEFMC Council Meeting |
| _0000015936 | _0000015936 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 15 Observer Status April 2017 | 17041820 NEFMC Council Meeting |
| _0000015937 | _0000015945 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 9a Additional Correspondence | 17041820 NEFMC Council Meeting |
| _0000015946 | _0000015956 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 9 correspondence 170410 125318 | 17041820 NEFMC Council Meeting |
| _0000015957 | _0000015960 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 7 170404 NMFS Comments on Proposed Action for Herring Fishery | 17041820 NEFMC Council Meeting |
| _0000015961 | _0000015964 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 6 Memo of 170215 IFM PDT FMAT Conference Call Summary | 17041820 NEFMC Council Meeting |
| _0000015965 | _0000015969 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 5 Memo of 170317 IFM PDT FMAT Conference Call Summary | 17041820 NEFMC Council Meeting |
| _0000015970 | _0000015972 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 4 Memo IFM PDT FMAT Proposed Clarifications to NEFMC Prop Action | 17041820 NEFMC Council Meeting |
| _0000015973 | _0000015986 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 3 Description of the proposed action for IFM | 17041820 NEFMC Council Meeting |
| _0000015987 | _0000016556 | April 18-20, 2018 NEFMC Council Meeting Meeting Materials: 2 170404 Draft EA for I FM Omnibus Amendment | 17041820 NEFMC Council Meeting |
| _0000016557 | _0000016557 | January 30-31, 2018 NEFMC Council Meeting Meeting Materials: 2 EM Vendors how Flyer | 18013031 NEFMC Council Meeting |
| _0000016558 | _0000016567 | January 30-31, 2018 NEFMC Council Meeting Meeting Materials: 1 180130 Update on IFM Presentation | 18013031 NEFMC Council Meeting |
| _0000016568 | _0000016568 | January 30-31, 2018 NEFMC Council Meeting Meeting Materials: 0 Observer Status January  2018 | 18013031 NEFMC Council Meeting |
| _0000016569 | _0000016570 | April 17-19, 2018 NEFMC Council Meeting Meeting Materials: 4 Letter to NEFMC on EM Portside April 2 2018 | 18041719 NEFMC Council Meeting |
| _0000016575 | _0000016575 | April 17-19, 2018 NEFMC Council Meeting Meeting Materials: 3 Memo from EM review panel | 18041719 NEFMC Council Meeting |
| _0000016576 | _0000016690 | April 17-19, 2018 NEFMC Council Meeting Meeting Materials: 2 Herring and Mackerel Fishery EM Project Final Report | 18041719 NEFMC Council Meeting |
| _0000016691 | _0000016716 | April 17-19, 2018 NEFMC Council Meeting Meeting Materials: 1 180419 IFM Amendment and EM Presentation | 18041719 NEFMC Council Meeting |
| _0000016717 | _0000016717 | April 17-19, 2018 NEFMC Council Meeting Meeting Materials: 0 Observer Status Sheet April 2018 | 18041719 NEFMC Council Meeting |
| _0000016718 | _0000016720 | April 17-19, 2018 NEFMC Council Meeting Meeting Materials: 5 correspondence 180412 130620 | 18041719 NEFMC Council Meeting |
| _0000016721 | _0000016722 | September 20, 2016 Notice of Public Hearings - 81 FR 64426 | 2016 Public Hearing |
| _0000016723 | _0000016724 | September 20, 2016 Fishery Bulletin for Public Hearings | 2016 Public Hearing |
| _0000016725 | _0000016968 | September 23, 2016 Public Comment During Public Hearings | 2016 Public Hearing |
| _0000016969 | _0000016991 | November 07, 2018 Proposed Rule - 83 FR 55665 | 2018 Proposed Rule |
| _0000016992 | _0000016998 | September 11, 2018 Decision Memo from Pentony (NMFS) to Oliver (NMFS) Regarding Proposed Rule | 2018 Proposed Rule |
| _0000016999 | _0000016999 | November 06, 2018 Memo from Risenhoover (NMFS) to Clark (SBA) Regarding Initial Regulatory Flexibility Analysis | 2018 Proposed Rule |
| _0000017000 | _0000017637 | December 17, 2018 Environmental Assessment for the New England Industry-Funded Monitoring Omnibus Amendment | 2018 Proposed Rule |
| _0000017638 | _0000017638 | December 17, 2018 Memo from Ferguson (NMFS) to Nordeen (NMFS) Regarding Clearance of Environmental Assessment for Amendment | 2018 Proposed Rule |
| _0000017639 | _0000017640 | September 19, 2018 Notice of Availability - 83 FR 47326 | 2018 Proposed Rule |
| _0000017641 | _0000017641 | September 11, 2018 Clearance Memo from Pentony (NMFS) to Risenhoover (NMFS) Regarding Notice of Availability | 2018 Proposed Rule |
| _0000017642 | _0000017646 | July 26, 2018 Information Quality Form for Proposed Rule | 2018 Proposed Rule |
| _0000017647 | _0000017718 | September 19, 2018 Public Comment on Notice of Availability and Proposed Rule | 2018 Proposed Rule |
| _0000017719 | _0000017719 | October 27, 2017 Clearance of Regulatory Impact and Regulatory Flexibility Act Review | 2018 Proposed Rule |
| _0000017720 | _0000017729 | December 17, 2018 Memo from Ruccio (NMFS) to the Record Regarding Section 7 Assessment of the Proposed Rule | 2018 Proposed Rule |

A153

Loper Bright Enterprises et al. v. Ross et al., Case No. 20-CV-00466 (D.D.C.)
Index to Administrative Record

April 2020

| BegDoc | EndDoc | Title | Documents related to: |
|---|---|---|---|
| _0000017731 | _0000017759 | February 07, 2020 Final Rule - 85 FR 7414 | 2020 Final Rule |
| _0000017760 | _0000017762 | December 18, 2018 Letter from Pentony (NMFS) to Quinn (NEFMC) Regarding Amendment Approval | 2020 Final Rule |
| _0000017763 | _0000017767 | October 18, 2019 Information Quality Form for Final Rule | 2020 Final Rule |
| _0000017768 | _0000017768 | February 07, 2020 Fishery Bulletin | 2020 Final Rule |
| _0000017769 | _0000017784 | December 18, 2019 Decision Memo from Pentony (NMFS) to Oliver (NMFS) Regarding Final Rule | 2020 Final Rule |
| _0000017785 | _0000017798 | December 17, 2018 Decision Memo from Pentony (NMFS) to Oliver (NMFS) Regarding Amendment Approval | 2020 Final Rule |
| _000017799 | _0000017800 | April 19, 2019 Letter to NEFMC on IFM Amendment Timing | 2020 Final Rule |

A154

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Loper Bright Enterprises, Inc., *et al.*, | |
| Plaintiffs, | |
| v. | Civ. Action No. 20-466 (EGS) |
| GINA RAIMONDO, in her official capacity, Secretary, U.S. Department of Commerce, *et al.*, | |
| Defendants. | |

<u>**ORDER**</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 18, is **DENIED**; and it is further

**ORDERED** that Defendants' Cross-Motion for Summary Judgment, ECF No. 20, is **GRANTED**; and it is further

**ORDERED** that Defendants' Motion to Exclude Plaintiffs' Extra-Record Declaration, ECF No. 24, is **GRANTED**.

**SO ORDERED.**

**Signed:   Emmet G. Sullivan
          United States District Judge
          June 15, 2021**

**A155**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Loper Bright Enterprises, Inc., *et al.*,<br><br>                Plaintiffs,<br><br>v.<br><br>GINA RAIMONDO, in her official capacity, Secretary, U.S. Department of Commerce, *et al.*,<br><br>                Defendants. | Civ. Action No. 20-466 (EGS) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, "a collection of commercial fishing firms headquartered in southern New Jersey that participate regularly in the Atlantic herring fishery," challenge the U.S. Department of Commerce Secretary's final rule promulgating the New England Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment") and its implementing regulations, which establish a process for administering future industry-funded monitoring in Fishery Management Plans governing certain New England fisheries and implement a required industry-funded monitoring program in the Atlantic herring fishery. Pls.' Mem. P. & A. Supp. Mot. Summ. J. ("Pls.' Mot."), ECF No. 18-1 at 22-23.[1] Plaintiffs

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

allege that the Omnibus Amendment suffers from procedural flaws and violates the directives of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*; and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq. See* Compl., ECF No. 1. Plaintiffs further contend that the industry-funded monitoring requirement constitutes an unconstitutional tax and violates the Anti-Deficiency Act, 31 U.S.C. § 1341; the Independent Offices Appropriations Act, 31 U.S.C. § 9701; and the Miscellaneous Receipts Act, 31 U.S.C. § 3302. *See* Pls.' Mot., ECF No. 18-1 at 38-40. Defendants—Gina Raimondo,[2] Secretary of the U.S. Department of Commerce; the U.S. Department of Commerce; Benjamin Friedman,[3] Deputy Under Secretary for Operations, performing the duties of Under Secretary of Commerce for Oceans and Atmosphere and National Oceanic and Atmospheric Administration ("NOAA") Administrator; the NOAA; Chris Oliver, Assistant Administrator for NOAA

---

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as defendant the United States Secretary of Commerce, Gina Raimondo, for the former United States Secretary of Commerce, Wilbur L. Ross.

[3] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as defendant the current Official Performing the Duties of NOAA Administrator, Benjamin Friedman, for the former Acting NOAA Administrator, Neil Jacobs.

**A157**

Fisheries; and the National Marine Fisheries Service ("NMFS")—dispute Plaintiffs' claims.

Pending before the Court are Plaintiffs' Motion for Summary Judgment, ECF No. 18; Defendants' Cross-Motion for Summary Judgment, ECF No. 20; and Defendants' Motion to Exclude Plaintiffs' Extra-Record Declaration, ECF No. 24. Upon consideration of the parties' submissions, the applicable law, and the entire record herein, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, **GRANTS** Defendants' Cross-Motion for Summary Judgment, and **GRANTS** Defendants' Motion to Exclude.

## I. Background

### A. Statutory and Regulatory Background

#### 1. The Magnuson-Stevens Fishery Conservation and Management Act of 1976

The MSA "balances the twin goals of conserving our nation's aquatic resources and allowing U.S. fisheries to thrive." *Oceana, Inc. v. Pritzker*, 26 F. Supp. 3d 33, 36 (D.D.C. 2014). Congress enacted the MSA to, among other things, "conserve and manage the fishery resources found off the coasts of the United States," and "promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(1), (3). The MSA tasks the Secretary of Commerce with the pursuit of these goals, and the Secretary has in turn delegated her responsibility to the National Marine

**A158**

Fisheries Service ("NMFS" or the "Service").[4] *See* 16 U.S.C. §
1855(d). In addition, the MSA divides the country into eight
regions, and establishes a Fishery Management Council in each
region to manage the region's marine fisheries.[5] *See id.* § 1852.
"Together, the Service and the Councils act to address
imbalances in aquatic ecosystems." *Oceana, Inc.*, 26 F. Supp. 3d
at 37.

Each Fishery Management Council must prepare and submit to
the Secretary of the U.S. Department of Commerce a Fishery
Management Plan ("FMP"), which is approved by the Service. 16
U.S.C. §§ 1852(h), 1854(a). As is most relevant here, the New
England Fishery Management Council ("NEFMC" or the "Council") is
responsible for developing and recommending FMPs for fisheries
in the Atlantic Ocean seaward of Maine, New Hampshire,
Massachusetts, Rhode Island, and Connecticut, including the
Atlantic herring fishery. *See id.* §§ 1852(a)(1)(A), 1852(h)(1).

FMPs contain "conservation and management measures" that
are "necessary and appropriate for the conservation and
management of the fishery, to prevent overfishing and rebuild

---

[4] The Service is a federal agency within the Department of
Commerce's NOAA.
[5] The MSA defines a "fishery" as "one or more stocks of fish
which can be treated as a unit for purposes of conservation and
management and which are identified on the basis of
geographical, scientific, technical, recreational, and economic
characteristics" and "any fishing for such stocks." 16 U.S.C. §
1802(13).

overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A). FMPs must also be consistent with the ten "national standards" provided for in the MSA, as well as all other provisions of the MSA, and "any other applicable law." *Id.* § 1853(a)(1)(C); *see also id.* § 1851 (setting forth National Standards). In this case, Plaintiffs claim that the Omnibus Amendment violates two of those national standards:

> ["National Standard Seven":] Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

> ["National Standard Eight":] Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

*Id.* § 1851(a)(7)-(8).

FMPs may also include additional discretionary provisions to conserve and manage fisheries. *Id.* § 1853(b). Among other things, FMPs may "require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of

5

**A160**

the fishery." *Id.* § 1853(b)(8). FMPs may also "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(b)(14).

After a council prepares an FMP or amendment and any proposed implementing regulations, it submits them to the Service, which acts on behalf of the Commerce Secretary, for review. *See generally id.* § 1854. The Service reviews the submission for consistency with applicable law and solicits public comments for sixty days. *Id.* § 1854(a)(1)(A)–(B). Within thirty days of the end of the comment period, the Service shall approve, disapprove, or partially approve the submission. *Id.* § 1854(a)(3). If the Service approves, a final rule is published in the Federal Register. *See id.* § 1854(b)(3). Approved FMPs or amendments are subject to judicial review under the APA within thirty days. *See id.* § 1855(f)(1).

### 2. The National Environmental Policy Act

Congress enacted NEPA "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b). To comply with these obligations, agencies must prepare

**A161**

an Environmental Impact Statement ("EIS") in which the agency takes a "hard look" at the environmental consequences before taking major action. *Id.* § 4332(c). An EIS must "inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts . . . of the human environment." 40 C.F.R. § 1502.1.

To determine whether an EIS must be prepared, the agency must first prepare an environmental assessment ("EA"), which must (1) "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* § 1501.5(c). Even if the agency performs only an EA, it must still briefly discuss the need for the proposal, the alternatives, and the environmental impacts of the proposed action and the alternatives. *Id.* If the agency determines, after preparing an EA, that a full EIS is not necessary, it must prepare a Finding of No Significant Impact ("FONSI") setting forth the reasons why the action will not have a significant impact on the environment. *Id.* § 1501.6. An EA and FONSI alone will not be sufficient, however, in certain circumstances. Agencies must prepare a supplement to a draft or final EIS when: (1) "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns"; or (2) "[t]here are significant new circumstances or information relevant to

7

**A162**

environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1).

## B. Factual Background

Plaintiffs—a "collection of commercial fishing firms headquartered in southern New Jersey that participate regularly in the Atlantic herring fishery," Pls.' Mot., ECF No. 18-1 at 23—challenge the Omnibus Amendment, which the NEFMC finalized in 2018 to establish a standardized process for the development of industry-funded monitoring in FMPs across New England fisheries and to establish industry-funded monitoring in the Atlantic herring fishery. *See* Administrative R. ("AR") at 17769-71. The approved Omnibus Amendment measures include the following "core elements":

> First, the omnibus measures establish a process for FMP-specific industry monitoring to be implemented through an FMP amendment and revised through a framework adjustment. . . .
>
> Second, the omnibus measures identify standard cost responsibilities for industry-funded monitoring for NMFS and the fishing industry, dividing those responsibilities by cost category. . . .
>
> Third, the omnibus measures establish standard administrative requirements for monitoring service providers and industry-funded observers/monitors as set forth in 50 C.F.R. § 648.11(h) and (i), respectively. . . .
>
> Fourth, the omnibus measures establish a Council-led process for prioritizing [industry-funded monitoring] programs for available federal funding across New England FMPs. . . .

> Fifth, the omnibus measures standardize the
> process to develop future monitoring set-aside
> programs, and allow monitoring set-aside
> programs to be developed in a framework
> adjustment to the relevant FMP.

Defs.' Opp'n, ECF No. 20-1 at 18-19; *see also* Pls.' Mot., ECF
No. 18-1 at 22-23.

In addition, there are approved measures establishing
industry-funded monitoring in the Atlantic herring fishery,[6]
which is managed through the Atlantic Herring FMP. *See* Defs.'
Opp'n, ECF No. 20-1 at 20-21; Pls.' Mot., ECF No. 18-1 at 22-23.
In other words, this mandate "requires herring fishermen along
the eastern seaboard of the United States to carry [NOAA]
contractors—called 'at-sea monitors'—on their vessels during
fishing trips and, moreover, to pay out-of-pocket for"
associated costs. Compl., ECF No. 1 ¶ 1. Among other things, the
measures establish a 50 percent monitoring coverage target for
all declared herring trips undertaken by a vessel possessing a
Category A or B limited access herring permit.[7] *See* Defs.' Opp'n,

---

[6] Atlantic herring inhabit the Atlantic Ocean off of the East
coast of the United States and Canada, ranging from North
Carolina to the Canadian Maritime Provinces. AR 17103. Atlantic
herring play an important role in the Northwest Atlantic
ecosystem, serving as a "forage species" for a number of other
fish, marine mammals, and seabirds. *Id.* at 17070, 17161, 17511.
There is also a directed fishery for Atlantic herring, composed
primarily of vessels using midwater trawl gear, small-mesh
bottom trawl vessels, and purse seines. *Id.* at 17104.
[7] "The Atlantic Herring FMP achieves the NEFMC's management goals
through a stock-wide annual catch limit ('ACL') that is
allocated between four distinct geographic management areas . .

9

**A164**

ECF No. 20-1 at 20; Pls.' Mot., ECF No. 18-1 at 22-23. The
monitoring coverage target includes a combination of both
industry-funded monitoring, as well as NMFS-funded Standardized
Bycatch Reporting Methodology ("SBRM") coverage. Defs.' Opp'n,
ECF No. 20-1 at 20; Pls.' Mot., ECF No. 18-1 at 23. "Vessel
owners would pay for any additional monitoring coverage above
SBRM coverage requirements to achieve the 50% coverage target,
which is calculated by combining SBRM and [industry-funded
monitoring] coverage, thus a vessel will not have SBRM and
[industry-funded monitoring] coverage on the same trip." Defs.'
Opp'n, ECF No. 20-1 at 20-21. "On any given trip, if a vessel is
notified that it will 'need at-sea monitoring coverage' and it
has not already been assigned an observer, '[it] will be
required to obtain and pay for an at-sea monitor on that trip.'"
Pls.' Mot., ECF No. 18-1 at 23 (quoting AR 17735). "Any
additional coverage above SBRM is contingent on NMFS having
appropriated funds to pay for its administrative costs for

_____

. ." Compl., ECF No. 1 ¶ 63 (citing 50 C.F.R. § 648.200(f)). The
four areas include: "Area 1A – Inshore Gulf of Maine"; "Area 1B
– Offshore Gulf of Maine"; "Area 2 – South Coastal Area"; and
"Area 3 – Georges Bank." *Id.* A Category A permit is an All Areas
Limited Access permit that allows vessels with such permits to
fish in all areas. *See* AR 17135, AR 17152. A Category B permit
is an Areas 2/3 Limited Access permit that allows vessels to
fish in areas 2 and 3. *Id.* Category A and B permit holders are
not restricted in the amount of herring they can catch per trip
or land per calendar day. Compl., ECF No. 1 ¶ 68.

[industry-funded monitoring] coverage." Defs.' Opp'n, ECF No. 20-1 at 21 (quoting AR 17737).

There are some exceptions to the coverage requirements. On a trip-by-trip basis, coverage requirements may be waived if: (1) "monitoring coverage is unavailable"; (2) "vessels intend to land less than 50 metric tons (mt) of herring"; or (3) "wing vessels carry no fish on pair trawling trips." *Id.* (citing AR 17735). Furthermore, the Service may "issue an exempted fishing permit (EFP) to midwater trawl vessels that choose to use electronic monitoring together with portside sampling. . . . The EFP exempts midwater trawl vessels from at-sea monitoring coverage, and allows use of electronic monitoring and portside sampling to comply with the 50% [industry-funded monitoring] coverage target." *Id.* (citing AR 17736-37).

NMFS has acknowledged that "[i]ndustry-funded monitoring w[ill] have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery," including an estimated cost responsibility of up to $710 per day and an approximately 20% reduction in annual returns-to-owner in some situations. AR 17735.

**C. Procedural History**

The NEFMC adopted the Omnibus Amendment on April 20, 2017, and finalized the recommendations for industry-funded monitoring in the Atlantic herring fishery on April 19, 2018. AR 17731. On

**A166**

September 19, 2018, Defendants published a "notice of availability" in the Federal Register, opening a sixty-day comment period for the Secretary of Commerce's decision on the Omnibus Amendment. *Id.* On December 18, 2018, NEFMC was informed by letter that NMFS had approved the Omnibus Amendment on behalf of the Secretary of Commerce. *Id.*

On November 7, 2018, Defendants also published in the Federal Register a proposed rule to implement the Omnibus Amendment and opened a public comment period ending on December 24, 2019. *Id.* Defendants published the final rule implementing the Omnibus Amendment on February 7, 2020. *Id.* at 17731-59. The regulations associated with establishing the standard for developing industry-funded monitoring programs ("omnibus measures") became effective on March 9, 2020, and the regulations associated with industry-funded monitoring in the Atlantic herring fishery became effective on April 1, 2020. *See* Defs.' Opp'n, ECF No. 20-1 at 23.

Plaintiffs filed suit against Defendants on February 19, 2020. *See* Compl., ECF No. 1. Defendants filed their Answer on April 9, 2020, along with a certified list of the contents of the administrative record. *See* Answer, ECF No. 12; Notice, ECF No. 13. On May 4, 2020, the Court granted Plaintiffs' unopposed motion to expedite the case "in every possible way," pursuant to the MSA, 16 U.S.C. § 1855(f)(4). *See* Min. Order (May 4, 2020).

**A167**

Plaintiffs filed their motion for summary judgment on June 8, 2020, seeking a Court order "declar[ing] industry-funding monitoring unlawful, enjoin[ing] Defendants from pursuing it, and vacat[ing] the Omnibus Amendment." Pls.' Mot., ECF No. 18-1 at 14. Defendants filed their opposition and cross-motion for summary judgment on July 24, 2020. *See* Defs.' Opp'n, ECF No. 20. Plaintiffs filed their reply brief and opposition to Defendants' cross-motion on August 14, 2020, *see* Pls.' Reply, ECF No. 22; and Defendants filed their reply brief on September 4, 2020, *see* Defs.' Reply, ECF No. 26. In addition, on August 25, 2020, Defendants filed a motion to exclude Plaintiffs' extra-record declaration (ECF No. 22-1). Defs.' Mot. Exclude, ECF No. 24. Plaintiffs opposed Defendants' motion on September 3, 2020, *see* Pls.' Opp'n Exclude, ECF No. 25; and Defendants replied on September 10, 2020, *see* Defs.' Reply Exclude, ECF No. 27. The cross-motions for summary judgment and the motion to exclude extra-record evidence are ripe for adjudication.

On May 17, 2021, Plaintiffs filed a notice of factual development, informing the Court that Defendants had "pushed back implementation" of the industry-funded monitoring requirement to July 1, 2021. *See* Notice Factual Development, ECF No. 35.

**A168**

## II. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts review agency decisions under the MSA and NEPA pursuant to Section 706(2) of the APA. *See Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240-41 (D.C. Cir. 2011); *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1562 (D.C. Cir. 1991). Accordingly, the Court's review on summary judgment is limited to the administrative record. *See* 5 U.S.C. § 706; *Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record."); *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d. 150, 155 (D.D.C. 2012) ("When reviewing agency actions under the APA, the Court's review is limited to the administrative record, either 'the whole record or those parts of it cited by a party.'" (citation omitted)).

Under the APA, courts must set aside agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by

14

**A169**

law." 5 U.S.C. § 706(2)(A)-(D); *see also* 16 U.S.C. § 1855(f)(1) (stating that a court "shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of [the APA]"). Under the APA's "narrow" standard of review, "a court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); and "will defer to the [agency's] interpretation of what [a statute] requires so long as it is 'rational and supported by the record.'" *Oceana, Inc.*, 670 F.3d at 1240 (quoting *C & W Fish Co.*, 931 F.2d at 1562).

Although "[j]udicial review of agency action under the MSA is especially deferential," *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007); to meet the APA standard an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F.3d 1194, 1198 (D.C.Cir.2005) (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). An agency acts arbitrarily and capriciously when the agency (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision

15

**A170**

that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to difference in view or the product of agency expertise." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1144-45 (D.C. Cir. 2005) (quoting *State Farm*, 463 U.S. at 43). In addition, when a party challenges an FMP, plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 16 U.S.C. § 1851(a), a court's "task is not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co.*, 931 F.2d at 1562 (citing 16 U.S.C. § 1855(d)). "Fisheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 80; *see also Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) ("Courts defer to NMFS decisions that are supported in the record and reflect reasoned decision making, especially where, as here, the dispute involves technical legal issues that implicate substantial agency expertise."), *aff'd*, 488 F.3d 1020 (D.C. Cir. 2007).

However, the "deferential standard cannot permit courts merely to rubber stamp agency actions, nor be used to shield the

16

**A171**

agency's decision from undergoing a thorough, probing, in-depth review." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 47 (D.D.C. 2012) (internal citations and quotation marks omitted). The court should evaluate "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bloch v. Powell*, 348 F.3d 1060, 1070 (D.C.Cir.2003)).

## III. Analysis

### A. The Court Will Not Consider Plaintiffs' Extra-Record Declaration

As an initial matter, Defendants seek to exclude a declaration signed by Jeffrey Howard Kaelin—the Director of Sustainability and Government Relations at Lund's Fisheries[8]—and any portion of Plaintiffs' reply brief that relies on it. Defs.' Mot. Exclude, ECF No. 24-1 at 1-2; Kaelin Decl., ECF No. 22-1 ¶ 1. Mr. Kaelin's declaration, which Plaintiffs attached to their reply brief, discusses the costs associated with Lund's Fisheries' efforts to install video monitoring system ("VMS") units on several vessels during the months of January, February,

---

[8] Lund's Fisheries is not a plaintiff in this case. However, according to Plaintiffs, several Plaintiffs have the same owners and managers as Lund's Fisheries, and, as such, they are operated together as a "single family of businesses." *See* Compl., ECF No. 1 ¶ 19; Pls.' Opp'n Exclude, ECF No. 25 at 6. For example, Plaintiff Loper Bright Enterprises, Inc., co-owns and operates a vessel with the owners of Lund's Fisheries. *See* Compl., ECF No. 1 ¶ 11; Pls.' Opp'n Exclude, ECF No. 25 at 6.

**A172**

and March 2020. *See* Kaelin Decl., ECF No. 22-1 ¶¶ 7-12. The
declaration also discusses the economic feasibility of Lund's
Fisheries converting three vessels so that they qualify for the
Omnibus Amendment's waiver for vessels that catch less than 50
metric tons. *Id.* ¶¶ 13-18. According to Plaintiffs, "Mr.
Kaelin's declaration is offered principally for illustrative
purposes and to give the Court the full context behind costs
associated with vessel monitoring and the nature of several of
the boats owned and operated by Plaintiffs." Pls.' Reply, ECF
No. 22 at 23 n.8. Thus, because Plaintiffs "do not rely on Mr.
Kaelin's declaration in their discussion of Defendants' failure
to properly consider the costs of industry-funded monitoring,"
Plaintiffs argue that the Court may consider the information
contained in the declaration. Pls.' Opp'n Exclude, ECF No. 25 at
7, 10-11.

However, there is no "illustrative purposes" exception to
the general rule that review of an agency's action under the APA
"is to be based on the full administrative record that was
before [the agency] at the time [it] made [its] decision."
*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,
420 (1971). While a court may consider extra-record evidence in
reviewing agency action in limited circumstances, the party
seeking admittance of the extra-record evidence must
"demonstrate unusual circumstances justifying a departure from

**A173**

[the] general rule." *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has identified only three such unusual circumstances: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information [is] needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'" *Id.* (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). Accordingly, given that "[t]hese narrow exceptions must be applied sparingly to maintain incentives for interested parties to present their evidence and views fully before an agency renders a final decision and to ensure that courts limit their role to the review of what occurred before the agency," *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, No. 20-cv-103, 2020 WL 5642287, at *9 (D.D.C. Sept. 22, 2020) (citations omitted); the Court declines to review the declaration, even for "illustrative purposes."

Plaintiffs next argue, however, that even if the Court declines to consider the declaration for "illustrative purposes," the Court may consider the declaration under an exception to the general rule precluding extra-record evidence.

19

**A174**

First, Plaintiffs argue that "Mr. Kaelin's declaration provides information that is absent from the administrative record and would otherwise 'enable the court to understand the issues [at hand more] clearly.'" Pls.' Opp'n Exclude, ECF No. 25 at 12 (citing *Esch*, 876 F.2d at 991). In making this argument, Plaintiffs rely on the D.C. Circuit case *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989), which recognized eight exceptions to the general rule, including an exception "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly." *Id.* at 991. However, since the D.C. Circuit decided *Esch* in 1989, the case has been "given a limited interpretation." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)). According to the D.C. Circuit, "at most [*Esch*] may be invoked to challenge gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review." *Id.*; *see also Butte Cnty., Calif. v. Chaudhuri*, 887 F.3d 501, 507 (D.C. Cir. 2018) ("[T]hose narrow and rarely invoked exceptions apply when evidence is excluded from the record because of some 'gross procedural deficiency.'" (quotation marks and alteration omitted)). Indeed, "the Circuit has gradually winnowed the number of circumstances in which courts may consider extra-record evidence" to only the

**A175**

three exceptions recited above. *Oceana, Inc. v. Ross*, 454 F.
Supp. 3d 62, 68 n.5 (D.D.C. 2020) (citing *Dania Beach*, 628 F.3d
at 590). Thus, in view of the D.C. Circuit's restricted view of
*Esch*, courts in this Circuit may no longer consider extra-record
information solely "to understand the issues [at hand more]
clearly." And even if the Court did consider it to be a valid
exception, the facts in this case are not so complex that it
would require extra-record evidence to clearly understand them.

Second, Plaintiffs contend that the declaration should be
admitted as extra-record evidence because they "have highlighted
serious procedural irregularities in Defendants' approval of the
Omnibus Amendment, which suggest prejudgment of the legality of
industry-funded monitoring." Pls.' Opp'n Exclude, ECF No. 25 at
12. Specifically, Plaintiffs note that Defendants published the
Omnibus Amendment's implementing regulations in November 2018,
prior to the Commerce Secretary's approval of the Omnibus
Amendment in mid-December 2018. Pls.' Mot., ECF No. 18-1 at 54.
In addition, following the Secretary's approval of the Omnibus
Amendment, "NOAA informed the NEFMC of that approval in a non-
public letter that it never officially disseminated." *Id.*
Plaintiffs' contend that these alleged procedural
irregularities, coupled with the fact that Plaintiffs raise
claims under NEPA and the Regulatory Flexibility Act, are
sufficient reasons to justify admitting extra-record evidence.

**A176**

Pls.' Opp'n Exclude, ECF No. 25 at 12. But this argument also
fails. To the extent that evidence of procedural irregularities
remains an exception following the D.C. Circuit's narrowing of
*Esch*, a review of the MSA's provisions governing the Secretary's
review of FMPs and proposed regulations shows that Defendants
followed proper procedures, as this Court more fully discusses
in Section III.I below. And in any event, Plaintiffs fail to
explain how a declaration discussing various costs related to
fishing vessels would assist the Court's analysis of any alleged
procedural irregularities in promulgating the final rule and
regulations.

Third, Plaintiffs appear to seek to include the declaration
as "background information," which is an exception to the
general rule when the information is needed "to determine
whether the agency considered all the relevant factors." Pls.'
Opp'n Exclude, ECF No. 25 at 12. The Court remains unpersuaded.
"To satisfy the relevant factors exception, the document in
question must do more than raise nuanced points about a
particular issue; it must point out an *entirely new* general
subject matter that the defendant agency failed to consider."
*Ross*, 454 F. Supp. 3d at 70 (quoting *Pinnacle Armor, Inc. v.
United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013))
(quotation marks omitted). "In a complicated, scientific
analysis, . . . consideration of the intermediary evidentiary

A177

factors which lead to the ultimate conclusion are the very means by which the agency renders its decision and, generally speaking, any of them can be a 'relevant factor' justifying supplementation of the administrative record if ignored." *Id.* (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 2d 1, 8 (D.D.C. 2001)).

Here, the administrative record is clear that Defendants considered VMS installation costs and how the 50-metric-ton exemption would affect midwater trawl vessels. *See, e.g.*, AR 17742 ("Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring [for certain smaller vessels]. . . . Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage."); *id.* at 10821 (noting the "highly variable" costs of installing electronic video monitoring systems); *see also id.* at 17250; *id.* at 17264. Plaintiffs also appear to concede as much. *See, e.g.*, Pls.' Opp'n Exclude, ECF No. 25 at 13 ("Here, Defendants and the NEFMC considered VMS and other operating costs. . . . Industry stakeholders presented them with concerns about the limited impact of the proposed 50-metric-ton exemption and the viability of fish[er]men simply moving to a different

23

**A178**

fishery. Mr. Kaelin's testimony merely provides more concrete detail that shows Defendants failed to adequately consider these issues."). Thus, the Court finds that Mr. Kaelin's declaration "does not add factors that [the agency] failed to consider as much as it questions the manner in which [the agency] went about considering the factors it did." *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 31-32 (D.D.C. 2001).

Finally, Plaintiffs argue that "[i]f the Court excludes Mr. Kaelin's declaration, it may still consider the cost survey and order Defendants to complete the record with the data compiled by" the Mid-Atlantic Fishery Management Council regarding compliance cost information. Pls.' Opp'n Exclude, ECF No. 25 at 15-16. As Plaintiffs did not object to Defendants' compilation of the administrative record and have not filed a motion requesting that the Court supplement the administrative record with such information, the Court declines to order Defendants to produce the information now.

Accordingly, the Court finds that Plaintiffs have not demonstrated exceptional circumstances justifying departure from the general rule against extra-record evidence.

## B. The MSA Authorizes Industry-Funded Monitoring

Plaintiffs first contend that Defendants exceeded their statutory authority under the MSA in promulgating the industry-funded monitoring measures within the Omnibus Amendment. *See*

24

Pls.' Mot., ECF No. 18-1 at 27. Plaintiffs argue that the MSA does not authorize industry-funded monitoring in the Atlantic herring fishery or in the other New England fisheries contemplated in the amendment. *Id.* at 28. And because the expected economic impact of such monitoring programs is "possibly disastrous for the herring fleet," Plaintiffs contend that Congress would not grant authority for such significant measures through an implicit delegation. *Id.* Defendants, in opposition, argue that "Congress has spoken directly to the precise question at issue by including multiple provisions in the MSA that presuppose" industry-funded monitoring. Defs.' Opp'n, ECF No. 20-1 at 26. Even if the Court finds that Congress has not directly spoken on the issue, Defendants argue that NMFS's interpretation of the MSA was reasonable. *Id.*

    In reviewing an agency's interpretation of a statute Congress has entrusted it to administer, courts' analyses are governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under step one of the *Chevron* analysis, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43. Courts utilize "traditional tools of statutory construction" to determine whether Congress has unambiguously expressed its intent. *Serono Lab'ys, Inc. v.*

25

**A180**

*Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998) (quoting *Chevron*,
467 U.S. at 843 n.9). "When the statute is clear, the text
controls and no deference is extended to an agency's
interpretation in conflict with the text." *Adirondack Med. Ctr.
v. Sebelius*, 29 F. Supp. 3d 25, 36 (D.D.C. 2014) (citing *Chase
Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011)). Under step two of
the *Chevron* analysis, if Congress "has not directly addressed
the precise question" at issue, the agency's interpretation of
the statute is entitled to deference so long as it is
"reasonable" and not otherwise "arbitrary, capricious, or
manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-
44.

"An agency is owed no deference if it has no delegated
authority from Congress to act." *N.Y. Stock Exch. LLC v. Secs. &
Exch. Comm'n*, 962 F.3d 541, 553 (D.C. Cir. 2020); *see also La.
Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n
agency literally has no power to act . . . unless and until
Congress confers power upon it."). Furthermore, "[a]gency
authority may not be lightly presumed," and "[m]ere ambiguity in
a statute is not evidence of congressional delegation of
authority." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir.
2001) (citing *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d
640, 645 (D.C. Cir. 1998)). "Not only must an agency's decreed
result be within the scope of its lawful authority, but the

**A181**

process by which it reaches that result must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *State Farm*, 463 U.S. at 43).

The Court's analysis begins with the statutory text. *See S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 22-23 (D.C. Cir. 1999). Here, Section 1853 of the MSA explicitly provides that FMPs may require that at-sea monitors "be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. § 1853(a)(8). In the same section, the MSA provides that FMPs may also "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(a)(14). Significantly, the MSA also states that each FMP "shall contain the conservation and management measures" it finds are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A).

Taken together, these statutory provisions "vest[] broad authority in the Secretary to promulgate such regulations as are necessary to carry out the conservation and management measures

**A182**

of an approved FMP." *Nat'l Fisheries Inst., Inc. v. Mosbacher*,
732 F. Supp. 210, 216 (D.D.C. 1990). Indeed, the Supreme Court
has recognized that the phrase "necessary and appropriate" is
"capacious[]" and "leaves agencies with flexibility." *Michigan*,
576 U.S. at 752 (2015); *see also Coastal Conservation Ass'n v.
U.S. Dep't of Commerce*, No. 15-1300, 2016 WL 54911, at *4 (E.D.
La. Jan. 5, 2016) (describing "necessary and appropriate" phrase
in Section 1853(a)(1)(A) as "empowering language represent[ing]
a delegation of authority to the agency"). Moreover, "the MSA
defines 'conservation and management' measures in relevant part
as 'all of the rules, regulations, conditions, methods, and
other measures . . . required to rebuild, restore, or maintain,
and which are useful in rebuilding, restoring, or maintaining,
any fishery resource and the marine environment.'" *Groundfish
Forum v. Ross*, 375 F. Supp. 3d 72, 84 (D.D.C. 2019) (quoting 16
U.S.C. § 1802(5)). Given that the MSA expressly authorizes FMPs
to contain provisions requiring that vessels carry at-sea
monitors, as well any "necessary and appropriate" conservation
and management requirements, the Court declines to read the MSA
as narrowly as Plaintiffs urge. *See* 16 U.S.C. § 1853(a)(1)(A),
(b)(8), (b)(14); *see also Groundfish Forum*, 375 F. Supp. 3d at
84 (D.D.C. 2019) (finding that, given the "broad" definition of
"conservation and management" measures, "the Court has no basis

28

**A183**

to recognize a strict yet unspoken limitation on the Service's authority").

Plaintiffs, however, contend that, though the MSA authorizes placement of at-sea monitors on vessels, the MSA is silent on whether Defendants may further require that vessel operators pay for the monitoring services. *See* Pls.' Reply, ECF No. 22 at 13. According to Plaintiffs, courts have rejected the "nothing-equals-something argument," based entirely on the existence of the phrase "necessary and appropriate" in a statute, "that presumed congressional silence left the agency a 'mere gap' . . . to fill.'" Pls.' Reply, ECF No. 22 at 13 (quoting *Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020)). Plaintiffs primarily rely on the D.C. Circuit's decision in *New York Stock Exchange, LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020), and the Supreme Court's decision in *Michigan v. EPA*, 576 U.S. 743 (2015), in support of their argument. *See* Pls.' Reply, ECF No. 22 at 19.

However, both cases are distinguishable. In *New York Stock Exchange, LLC*, the D.C. Circuit concluded that the Securities and Exchange Commission inappropriately relied on the phrase "necessary and appropriate" under section 23(a) of the Securities and Exchange Act in implementing a rule without any regulatory agenda and without any other statutory authority. 962 F.3d at 557. The D.C. Circuit explained that the Commission had

**A184**

adopted the program "without explaining what problems with the existing regulatory requirements it meant to address." *Id.* Moreover, the costly program was adopted despite the Exchange Act's command "forbid[ding] the Commission from adopting a rule that will unnecessarily burden competition." *Id.* at 555. Here, in contrast, Defendants have tethered the Omnibus Amendment measures to the congressionally authorized purpose of "conservation and management of the fishery." 16 U.S.C. § 1853(b)(8). For example, the record reflects that Defendants considered the economic impacts to the fishing community as well as the environmental impacts, concluding that the preferred alternatives "may lead to direct positive impacts on the herring resource and non-target species if herring fishing effort is limited, by increased information on catch tracked against catch limits, and that increases the reproductive potential of the herring resource and non-target species." AR 17318.

Similarly, in *Michigan*, the Supreme Court concluded that, among other things, the "established administrative practice" to "treat cost as a centrally relevant factor" and the "[s]tatutory context" requiring consideration of costs in reference to various actions, made it unreasonable for the EPA to read the phrase "appropriate and necessary" to mean that it could ignore cost when deciding whether to regulate power plants. 576 U.S. at 752-57. Here, however, the established administrative practice

30

and statutory context both favor Defendants. First, as
Plaintiffs concede, since 1990, the North Pacific Council has
managed an observer program that is "funded through a
combination of fees and third-party contracts between observer
providers and fishing industry members." Pls.' Mot., ECF No. 18-
1 at 35. Second, regarding the statutory context, in addition to
the provision explicitly authorizing mandatory at-sea monitors,
the MSA recognizes the existence of an at-sea monitoring program
in which a vessel may hire and directly provide payment for
monitoring services. In Section 1858(g), the MSA authorizes the
Commerce Secretary to issue sanctions "[i]n any case in which .
. . any payment required for observer services provided to or
*contracted by an owner or operator* . . . has not been paid and
is overdue." 16 U.S.C. § 1858(g)(1) (emphasis added). "This
provision would be unnecessary if the MSA prohibited the very
type of industry funding at issue in this case." *See Goethel v.
Pritzker*, No. 15-cv-497, 2016 WL 4076831, at *5 (D.N.H. July 29,
2016) (finding that Section 1858(g) "demonstrates beyond
peradventure that the MSA contemplates—and most certainly does
not prohibit—the use of industry funded monitors"). And while
Plaintiffs argue that Section 1858(g) must only refer to other
provisions of the MSA establishing fee-based monitoring
programs, *see* Pls.' Mot., ECF No. 18-1 at 36-37 (citing 16
U.S.C. §§ 1862, 1821(h)(4), 1853a(e)(2)); Plaintiffs' argument

A186

lacks a textual basis. Moreover, by mandating that conservation and management measures, where practicable, "minimize costs" and "minimize adverse economic impacts" on fishing communities, the MSA acknowledges that such measures may result in costs to the fishing industry. *See* 16 U.S.C. § 1851(a)(7), (8).

The Court is mindful that "the mere reference to 'necessary' or 'appropriate' in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit with respect to all matters covered by the agency's authorizing statute." *N.Y. Stock Exch. LLC*, 962 F.3d at 554 (citing *Michigan*, 576 U.S. at 749-51). But, as demonstrated above, the MSA contains more than only the phrase "necessary and appropriate."

Plaintiffs further argue that certain canons of statutory interpretation demonstrate that Defendants have exceeded their authority. First, Plaintiffs invoke the anti-surplusage canon, "which encourages courts to give effect to 'all of [a statute's] provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Gulf Fishermen's Ass'n*, 968 F.3d at 464-65 (quoting *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (en banc)). Plaintiffs contend that if Congress had intended to grant Defendants "implied authority" to require industry-funded monitoring, it would not have

32

**A187**

specifically authorized the collection of fees or surcharges to
cover the cost of three monitoring programs elsewhere in the
statute. *See* Pls.' Mot., ECF No. 18-1 at 29-30. Plaintiffs
specifically refer to: (1) the "limited access privilege
program," which authorizes the Council to collect "fees" to
"cover the costs of management, data collection and analysis,
and enforcement activities," 16 U.S.C. § 1853a(e)(2); (2) the
monitoring program for foreign fishing vessels, which authorizes
the Secretary to impose a "surcharge" to "cover all the costs of
providing a United States observer aboard that vessel," *id.* §
1821(h)(4); and (3) the North Pacific Council program, which
"establishes a system . . . of fees, which may vary by fishery,
management area, or observer coverage level, to pay for the cost
of implementing the plan," *id.* § 1862(a). Second, Plaintiffs
argue that the *expressio unius est exclusio alterius* canon
applies for the same reasons: that the inclusion of provisions
governing fee-based monitoring programs impliedly excludes other
types of industry-funded monitoring programs. Pls.' Mot., ECF
No. 18-1 at 30; *see also* Pls.' Reply, ECF No. 22 at 14.

The Court is unpersuaded. A fee-based program—"where the
industry is assessed a payment by the agency, authorized by
statute, to be deposited in the U.S. Treasury and disbursed for
administrative costs otherwise borne by the agency," AR 17739—is
different from the industry-funded observer measures at issue

33

here, in which the fishing vessels contract with and make
payments directly to third-party monitoring service providers.
Because the Omnibus Amendment does not involve fees or
surcharges, the Court cannot not find that the MSA's provisions
governing cost recovery are made "superfluous, void or
insignificant," *Citizens for Responsibility & Ethics in Wash. v.
FEC*, 316 F. Supp. 3d 349, 391 (D.D.C. 2018) (quoting *Rubin v.
Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018)); nor do
the circumstances "support a sensible inference that the term
left out must have been meant to be excluded." *Del. Riverkeeper
Network v. FERC*, 857 F.3d 388, 398 (D.C. Cir. 2017) (citing
*N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017)); *see also
Goethel*, 2016 WL 4076831, at *5 (finding that "the Pacific
Northwest fee mechanism is a substantively different animal than
A16's industry funding requirement for at-sea monitoring").

Plaintiffs also assert that "[t]here is no evidence of
congressional recognition of any sort of pre-existing, implied
authority to impose monitoring costs on the regulated industry."
Pls.' Mot., ECF No. 18-1 at 31. The Court disagrees. Rather, the
legislative history further supports the conclusion that
Defendants have acted within the scope of the MSA.

As Defendants point out, prior to Congress adding to the
MSA the provisions authorizing the mandatory placement of at-sea
monitors on fishing vessels (16 U.S.C. § 1853(b)(8)) and the

34

**A189**

fee-based observer program in the North Pacific region (16 U.S.C. § 1862), the Secretary had issued regulations implementing an observer program in the North Pacific's FMP in which the vessel operator directly paid a third-party monitoring services provider. *See Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea & Aleutian Islands Area*, 55 Fed. Reg. 4839-02, 4840 (Feb. 12, 1990) (providing that "[a]ny vessel operator or manager of a shoreside processing facility who is required to accommodate an observer is responsible for obtaining a NMFS-certified observer . . . . [and] *will pay the cost of the observer directly to the contractor*" (emphasis added)). As Plaintiffs acknowledge, to this day, "the North Pacific observer program is still funded through a combination of fees and third-party contracts between observer providers and fishing industry members." Pls.' Mot., ECF No. 18-1 at 35. Congress was thus aware of the industry-funded monitoring program in the North Pacific when it authorized the at-sea monitoring requirement located in Section 1853(b)(8), and, indeed, the Committee on Merchant Marine and Fisheries noted that "the Councils already have—*and have used*—such authority; the amendment makes the authority explicit." *See* Defs.' Opp'n, ECF No. 20-1 at 31-32 (quoting Comm. on Merchant Marine & Fisheries, H.R. Rep. No. 101-393 at 38 (1990)). Congressional committees have continued to take note of such industry-funded

35

**A190**

programs. *See, e.g.*, S. Rep. No. 114-66 at 31-32 (June 16,
2015); S. Rep. No. 114-239 at 31-32 (Apr. 21, 2016); H. Rpt. No.
114-605 at 17 (June 7, 2016); S. Rep. No. 115-139 at 34 (July
27, 2017); S. Rep. No. 115-275 at 36 (June 14, 2018); S. Rpt.
No. 116-127 at 42 (Sept. 26, 2019).

Accordingly, the Court concludes that Defendants acted
within the bounds of their statutory authority in promulgating
the Omnibus Amendment. Even if Plaintiffs' arguments were enough
to raise an ambiguity in the statutory text, the Court, for the
same reasons identified above, would conclude that Defendants'
interpretation is a reasonable reading of the MSA. *See
Groundfish Forum*, 375 F. Supp. 3d at 85.

### C. Industry-Funded Monitoring Does Not Violate Agency Financing and Expenditure Statutes

Plaintiffs next argue that the Omnibus Amendment "impliedly
repeals" the Anti-Deficiency Act, 31 U.S.C. § 1341; the
Miscellaneous Receipts Statute, 31 U.S.C. § 3302; and the
Independent Offices Appropriations Act, 31 U.S.C. § 9701. Pls.'
Mot., ECF No. 18-1 at 38-40. According to Plaintiffs, the
amendment inappropriately "offload[s] costs" of Defendants'
observer programs onto the industry when Defendants exceed
appropriated funds. *Id.* at 39. For the reasons stated below, the
Court disagrees and concludes that the industry-funded

36

monitoring requirement does not violate the statutes governing agency expenditures and obligations.

Plaintiffs first argue that the industry-funded monitoring requirement violates the Anti-Deficiency Act, 31 U.S.C. § 1341. Pls.' Mot., ECF No. 18-1 at 38. The Anti-Deficiency Act provides that a federal officer may not "(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"; or "(B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A)-(B). Here, however, Defendants are not expending government funds without authorization from Congress. Nor do the monitoring requirements contemplate that NFMS will enter into any contracts or obligations for the payment of money. Rather, it is the vessels that directly make payments to the monitoring service providers, subject to any terms provided for in contracts between the two private parties. Accordingly, based upon the statute's plain language, Defendants have not violated the Anti-Deficiency Act. *See Goethel*, 2016 WL 4076831, at *6 (holding that an industry funding requirement did not violate the Anti-Deficiency Act because "the effect of industry funding is a cessation of government spending").

37

**A192**

Plaintiffs also contend that the monitoring requirement violates the Miscellaneous Receipts Act, 31 U.S.C. § 3302, which provides that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). The D.C. Circuit has explained that this provision "derives from and safeguards a principle fundamental to our constitutional structure, the separation-of-powers precept embedded in the Appropriations Clause, that '[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'" *Scheduled Airlines Traffic Offs., Inc. v. U.S. Dep't of Def.*, 87 F.3d 1356, 1361-62 (D.C. Cir. 1996) (quoting U.S. Const. art. I, § 9, cl. 7). "By requiring government officials to deposit government monies in the Treasury, Congress has precluded the executive branch from using such monies for unappropriated purposes." *Id.* at 1362. Here, the service providers are not government officials and do not otherwise receive money for the government, and thus industry-funded monitoring does not involve an "official or agent of the Government" receiving money. *See Carver v. United States*, 16 Ct. Cl. 361, 381 (1880) ("The Treasurer is the official custodian [of public money] for Congress, and unless money is in his custody, or in the hands of the persons authorized by law to receive it on behalf of the

38

**A193**

United States, it is not in the possession of the United States."), *aff'd*, 111 U.S. 609 (1884). Under the Omnibus Amendment, the vessels pay the monitoring service providers for services rendered under contracts between the vessels and the service providers. "Mindful of both the plain language of the Miscellaneous Receipts statute and its underlying purpose to preserve congressional control of the appropriations power," *Scheduled Airlines Traffic Offs., Inc.*, 87 F.3d at 1362; the Court concludes that the statute is not implicated.

Plaintiffs next argue that the industry funding requirements of the Omnibus Amendment violate the Independent Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701, which "generally governs user fees collected by the federal government." *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 181 n.1 (D.C. Cir. 1996). "Under the Act, the 'head of each agency . . . may prescribe regulations establishing the charge for a service or thing of value provided by the agency.'" *Montrois v. United States*, 916 F.3d 1056, 1062 (D.C. Cir. 2019) (quoting 31 U.S.C. § 9701(b)). Here, Defendants are not collecting a fee from any party related to industry-funded monitoring, and Defendants are not providing a "service or thing of value." 31 U.S.C. § 9701(b). As Defendants point out, instead, "a private entity (a monitoring provider) collects a vessel's payment for the service provider's at-sea monitoring,

39

an arrangement under which no government agent or official ever has custody or possession of any public money." Defs.' Opp'n, ECF No. 20-1 at 47. Accordingly, the Court concludes that industry-funded monitoring does not violate the IOAA.

Despite the above, Plaintiffs assert that it is "a distinction without a difference" that "Defendants and the Council seek to require the industry to contract directly with monitoring service providers, in lieu of the government paying those companies." Pls.' Reply, ECF No. 22 at 29. According to Plaintiffs, "the law looks past superficial structures to the heart of what an agency is trying to accomplish." *Id.* The Court is unpersuaded. First, Plaintiffs fail to specify to which "law" they are referring, and they fail to cite any case law in support of their argument. Second, the plain language of the three statutes unambiguously demonstrates that they are not applicable to this case. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342 (1974) (cautioning that the IOAA should be read "narrowly to avoid constitutional problems"); *Davis & Assocs., Inc. v. District of Columbia*, 501 F. Supp. 2d 77, 80 (D.D.C. 2007) ("The relevant language of the Anti-Deficiency Act is unambiguous."); *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (2003) ("All the [Miscellaneous Receipts] Act literally requires is that miscellaneous money received by government officials be deposited in the general

**A195**

Treasury."); *see also Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) ("[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.").

Plaintiffs also argue that "it is incorrect for Defendants to assert that NMFS does not closely 'control' monitoring service providers or the contractual relationships they enter with vessel owners" because: (1) "the market for monitoring service providers is highly regulated and controlled by NMFS"; (2) "NMFS must certify the companies permitted to provide monitors," of which there are only four such companies; and (3) of the certified companies, "[n]ot all these companies operate in the same geographic regions." Pls.' Reply, ECF No. 22 at 29. However, none of these details regarding Defendants' regulation and oversight of the required standards set by the Council change the fact that Defendants do not receive any payments related to industry-funded monitoring and do not "maintain control over the contractual relationship between the vessel and the service provider that the vessel itself selects." Defs.' Reply, ECF No. 26 at 23.

Accordingly, industry-funded monitoring does not violate the Anti-Deficiency Act, the Miscellaneous Receipts Act, or the IOAA.

**A196**

**D. The Omnibus Amendment Is Not an Unconstitutional Tax**

Plaintiffs argue that the industry-funded monitoring measures—which they characterize as "a government program created by the NEFMC and Defendants, regulated by them in detail, and which they will continue to fund in-part themselves"—are an unconstitutional tax. *See* Pls.' Mot., ECF No. 18-1 at 40. Defendants disagree with Plaintiffs' characterization of the industry-funded monitoring requirement and contend that there is "no resemblance" between the industry-funded monitoring requirement and a tax levied and collected by Congress. *See* Defs.' Opp'n, ECF No. 20-1 at 49. The Court agrees with Defendants.

"A payment made to a third party vendor (in this case, an at-sea monitor) is not a tax simply because the law requires it." *Goethel*, 2016 WL 4076831, at *6. As the Supreme Court has explained, the "essential feature" of a tax is that it "produces at least some revenue for the Government." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012); *see also* Black's Law Dictionary (11th ed. 2019) (defining "tax" as "a charge, [usually] monetary, imposed by the government on persons, entities, transactions or property to yield public revenue"). Here, it is undisputed that the payment for industry-funded monitoring flows from the vessels directly to the monitoring service providers. *See* Pls.' Mot., ECF No. 18-1 at 40; Defs.'

**A197**

Opp'n, ECF No. 20-1 at 46-47. The government receives no funds related to the requirement, nor are the funds available to the government to be expended for any public purpose. And the government's role is limited to approving at-sea monitors employed by private companies to serve as the monitoring service providers.

Accordingly, because industry-funded monitoring generates no public revenue, it does not constitute an unlawful tax.

### E. The Omnibus Amendment Does Not Violate National Standard 7 and National Standard 8

Plaintiffs contend that the Omnibus Amendment violates National Standards 7 and 8 because any demonstrated scientific or conservation benefits resulting from increased monitoring services do not outweigh the economic consequences to the fishing community. Pls.' Mot., ECF No. 18-1 at 41.

In reviewing the Omnibus Amendment, the Court's "task is not to review *de novo* whether the amendment complies with [the National Standards] but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C&W Fish Co.*, 931 F.2d at 1562.

For the reasons explained below, the Court concludes that the Omnibus Amendment does not violate National Standards 7 and 8.

A198

### 1. National Standard 7

National Standard 7 provides that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). The regulations concerning National Standard 7 instruct that management measures should not impose "unnecessary burdens on the economy, on individuals, on private or public organizations, or on Federal, state, or local governments. Factors such as fuel costs, enforcement costs, or the burdens of collecting data may well suggest a preferred alternative." 50 C.F.R. § 600.340(b). "Any analysis for fishery management plans 'should demonstrate that the benefits of fishery regulation are real and substantial relative to the added research, administrative, and enforcement costs, as well as costs to the industry of compliance.'" *Burke v. Coggins*, No. 20-667, 2021 WL 638796, at *5 (D.D.C. Feb. 18, 2021) (quoting 50 C.F.R. § 600.340(c)). The regulations also provide that "an evaluation of effects and costs, especially of differences among workable alternatives, including the status quo, is adequate." 50 C.F.R. § 600.340(c).

Plaintiffs first argue that "[a]t a cost upwards of $710 per day, many small business herring fishermen will suffer severe economic consequence." Pls.' Mot., ECF No. 18-1 at 41. Plaintiffs contend that "[a]t no point did Defendants justify

44

the Omnibus Amendment by describing less costly alternatives that the NEFMC seriously considered." *Id.* at 42.

The administrative record reflects, however, that Defendants did consider less costly alternatives and included exemptions to the amendment to minimize costs. NMFS recognized that while industry-funded monitoring coverage would cause "direct economic impacts" on vessels participating in the herring fishery, the requirement also would have positive impacts, including ensuring "(1) [a]ccurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species for which catch caps apply; and (3) affordable monitoring for the herring fishery." AR 17740, 17744. The record also demonstrates that Defendants considered alternatives to determine which monitoring target goal would best achieve the agency's goals while minimizing the economic impact on fishing communities. The analysis within the EA indicates Defendants considered a "no coverage target," a 25% coverage target, a 50% coverage target, and a 75% coverage target. AR 17075, 17082-83; *see also id.* at 17097 ("Different coverage targets (25%, 50%, 75%, or 100%) were analyzed for each gear type (midwater trawl, purse seine, bottom trawl), but the Council selected a 50% coverage target for all gear types."). After weighing the benefits against the costs, Defendants concluded that "[t]he 50% coverage target selected by the

45

**A200**

Council for vessels with a Category A or B herring permit provides for the benefits of collecting additional information on biological resources while minimizing industry cost responsibilities, especially when compared to non-preferred coverage targets of 100% and 75%." *Id.* at 17315.

The Omnibus Amendment also provides for exemptions from the coverage requirements to minimize costs where practicable. For example, waivers are available if: (1) "monitoring coverage is unavailable"; (2) "vessels intend to land less than 50 metric tons (mt) of herring"; or (3) "wing vessels carry no fish on pair trawling trips." *Id.* at 17735. Furthermore, the EFP "exempt[s] midwater vessels from the requirement for industry-funded at-sea monitoring coverage and allow[s] midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the" 50% monitoring coverage target. *Id.* at 17736-37. Finally, Defendants found that "[a]llowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry." *Id.* at 17742. Accordingly, Plaintiffs' contention that Defendants "at no point" discussed less costly alternatives is belied by the record. *See Nat'l Coal. for Marine Cons. v. Evans*, 231 F. Supp. 2d 119, 133 (D.D.C. 2002) (dismissing plaintiffs' arguments that NMFS failed to analyze alternative conservation measures, explaining that they "ha[d] not specified any record

46

**A201**

evidence showing that NMFS ignored a less costly, practicable approach . . . , as National Standard Seven prohibits").

Plaintiffs, however, argue that Defendants' discussion of alternatives is conclusory and that "[m]ore detailed analysis is required, particularly when the proposed regulation will harm most of the herring fleet." Pls.' Reply, ECF No. 22 at 32. Plaintiffs assert that the Council failed to note that midwater trawlers will bear the brunt of the industry-funded monitoring costs because: (1) they have low observer coverage rates due to differences in SBRM coverage among gear types; and (2) the majority of them would not qualify under the 50-metric-ton exemption. *Id.* However, it is settled law that "in making a decision on the practicability of a fishery management amendment, the Secretary does not have to conduct a formal cost/benefit analysis of the measure." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987); *see also Nat'l Fisheries*, 732 F. Supp. at 222. As stated above, there is ample evidence in the record that Defendants considered the costs and benefits of choosing a 50% coverage target, which was neither the most nor the least severe plan considered, and took action to minimize the economic impacts of the industry-funded monitoring measures. *E.g.*, AR at 17005-06, 17030, 17070-71, 17075, 17082-83, 17315, 17346. In addition, the record reflects that Defendants made efforts to minimize the economic

47

**A202**

impacts by tailoring the industry-funded monitoring requirement to that portion of the industry most in need of regulatory controls. Thus, though Plaintiffs assert that midwater trawls will end up bearing a greater share of the costs, as Defendants assert, the monitoring coverage target is intended to encompass those vessels with the largest herring catch. *See e.g.*, *id.* at 17742 ("Coverage waivers would only be issued under specific circumstances, when monitors are unavailable *or trips have minimal to no catch*, and are not expected to reduce the benefits of additional monitoring." (emphasis added)); *id.* at 17743 ("Ultimately, the Council determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring."). Furthermore, in view of the fact that these midwater trawl vessels would be less likely to fall under the 50-metric-ton exception, Defendants found that, via the EFP exemption, "[e]lectronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage." *Id.* at 17742.

Plaintiffs also contend that the omnibus measures, which establish a standardized process for developing industry-funded monitoring programs across other New England FMPs, "may lead to the sort of 'duplication' that National Standard Seven aims to avoid" because "vessels in non-herring fisheries could become

subject to concurrent monitoring requirements." Pls.' Reply, ECF
No. 22 at 30. Plaintiffs assert that the Omnibus Amendment fails
to address this potential future duplication with other NEFMC-
administered fisheries. *Id.* at 30-31. But Plaintiffs' argument
fails. Defendants explained that "[b]ecause herring and mackerel
are often harvested together on the same trip," the Omnibus
Amendment "specifies that the higher coverage target applies on
trips declared into both fisheries. If the Council considers
industry-funded monitoring in other fisheries in the future, the
impacts of those programs relative to existing industry-funded
monitoring programs will be considered at that time." AR 17742.
Further, because the 50% monitoring coverage target is
calculated by combining both SBRM and industry-funded
monitoring, a vessel will not have SBRM and industry-funded
monitoring coverage on the same trip. *See id.* at 17315, 17734.
Thus, the industry-funded monitoring requirement in the Atlantic
herring fishery "avoid[s] unnecessary duplication." 16 U.S.C. §
1851(a)(7).

Accordingly, the Omnibus Amendment does not violate
National Standard 7.

### 2. National Standard 8

National Standard 8 requires that FMPs and plan amendments
"take into account the importance of fishery resources to
fishing communities . . . in order to (A) provide for the

**A204**

sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). The agency "must give priority to conservation measures." *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000). "It is only when two different plans achieve similar conservation measures that the [Department] takes into consideration adverse economic consequences." *Id.* But where two alternatives in fact achieve similar conservation goals, the preferred option will be the alternative that provides the greater potential for sustained participation of fishing communities and that minimizes adverse economic impacts. *See* 50 C.F.R. § 600.345(b)(1). "These sometimes conflicting goals of conservation on the one hand and minimizing harm to fishing communities on the other mean that the Secretary has substantial discretion to strike what he deems an appropriate balance." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 92 (citing *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996)). "In striking that balance, moreover, the Secretary need not conduct an official or numerical cost/benefit analysis." *Id.* (citing *Nat'l Fisheries Inst.*, 732 F. Supp. at 222).

Plaintiffs argue that the Omnibus Amendment violates National Standard 8 because Defendants have failed to establish its scientific and conservation need. Pls.' Reply, ECF No. 22 at

**A205**

34; *see also* Pls.' Mot., ECF No. 18-1 at 41. The Court disagrees. It is clear from the administrative record that Defendants explained the scientific and conservation benefits of the Omnibus Amendment. Defendants explained that the amendment establishes industry-funded monitoring "to help increase the accuracy of catch estimates," which in turn will "improv[e] catch estimation for stock assessments and management." AR 17742 ("Analysis in the EA suggests a 50-percent coverage target would reduce the uncertainty around estimates of catch tracked against catch caps, likely resulting in a CV of less than 30 percent for the majority of catch caps."); *see also id.* at 17316. "If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be more constrained by catch caps, thereby increasing accountability, or they may be less constrained by catch caps and better able to fully harvest herring sub-ACLs." *Id.* at 17742; *see also id.* at 17789. Furthermore, Defendants explained that "[i]mproving [the] ability to track catch against catch limits is expected to support the herring fishery achieve optimum yield, minimize bycatch and incidental catch to the extent practicable, and support the sustained participation of fishing communities." *Id.* at 17742; *see also id.* at 17789-90. As explained above, those conservation needs were weighed against the associated costs to the industry, and the Council considered

significant alternatives and selected measures to minimize adverse economic impacts on the fishing industry and communities. *See id.* at 17316.

Plaintiffs also argue that the cost-minimization efforts "impermissibly benefit a select number of fishing communities where that sliver of the fleet berths and does business." Pls.' Reply, ECF No. 22 at 34. Plaintiffs further contend that "differences in SBRM coverage among different gear types will lead to the midwater trawl fleet carrying more of the financial burden in meeting the herring monitoring coverage target." *Id.* But, as stated above, the administrative record demonstrates that Defendants took into account the negative economic impacts upon participants in the herring fishery "to the extent practicable." 16 U.S.C. § 1851(a)(8). In taking into account the economic impacts, Defendants weighed the alternatives and reasonably concluded that the 50% monitoring coverage target best met the balance of the costs and benefits of additional monitoring. AR 17257, 17734.

"[C]ourts have consistently rejected challenges under this standard where the administrative record reveals that the Secretary was aware of potentially devastating economic consequences, considered significant alternatives, and ultimately concluded that the benefits of the challenged regulation outweighed the identified harms." *N.C. Fisheries*

*Ass'n*, 518 F. Supp. 2d at 92 (citing cases). Accordingly, the Court concludes that there is no violation of National Standard Eight.

### F. The February 7, 2020 Final Rule Is Not Substantively Deficient

Plaintiffs argue that Defendants' responses to comments submitted in connection with the final rule were "substantively deficient." Pls.' Mot., ECF No. 18-1 at 43.

"The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). "An agency violates this standard if it 'entirely fail[s] to consider an important aspect of the problem.'" *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *State Farm*, 463 U.S. at 43). "An agency also violates this standard if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Id.* (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977)). "The fundamental purpose of the response requirement is, of course, to show that the agency has indeed considered all significant points articulated by the public." *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988). However, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was

**A208**

not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (internal quotations and citations omitted).

First, Plaintiffs argue that Defendants' failed to cite statutory authority supporting its statement that Section 1853(b)(8)'s requirement "to carry observers . . . includes compliance costs on industry participants" because "there is no statutory authorization for industry-funded monitoring." Pls.' Mot., ECF No. 18-1 at 43 (emphasis omitted) (quoting AR 17739). Plaintiffs contend that Defendants never addressed the argument that if authorization for industry-funded monitoring were "implied, then Congress's efforts to allow it elsewhere would be rendered surplusage." *Id.*

However, the Service explained in its response that its authority derives from Section 1853(b)(8) of the MSA, which authorizes at-sea monitors to be placed on fishing vessels, and explained its view that "[t]he requirement to carry observers, along with many other requirements under the [MSA], includes compliance costs on industry participants." AR 17739 (explaining that "NMFS regulations require fishing vessels to install vessel monitoring systems for monitoring vessel positions and fishing, report catch electronically, fish with certain gear types or mesh sizes, or ensure a vessel is safe before an observer may be carried on a vessel. Vessels pay costs to third-parties for

**A209**

services or goods in order to comply with these regulatory requirements that are authorized by the Magnuson-Stevens Act. There are also opportunity costs imposed by restrictions on vessel sizes, fish sizes, fishing areas, or fishing seasons."). Defendants' response is not "substantively deficient" for failing to expressly mention the surplusage canon, as Defendants had already noted their disagreement with the premise that industry-funded monitoring was unauthorized. *Cf. Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (stating that an agency need not "discuss every item of fact or opinion included in the submissions made to it" (citation omitted)).

Plaintiffs also assert that "there is a key distinction between regulatory costs—often enumerated by statute—and effectively paying the salary of your direct, government minder." Pls.' Mot., ECF No. 18-1 at 43-44. Plaintiffs contend that the measures within the Omnibus Amendment are more comparable to *inspection* costs than *compliance* costs. *Id.* at 44. Finally, Plaintiffs argue that Defendants "tried to dismiss arguments that industry funding is an unlawful tax." *Id.* at 45.

However, Defendants also sufficiently responded to these concerns raised in submitted comments. Defendants explained that the purpose of monitoring programs was to "collect[] data necessary for the conversation and management of the fishery"

55

**A210**

and that "[a]t-sea monitors are not authorized officers conducting vessel searches for purposes of ensuring compliance with fisheries requirements." AR 17740. Defendants further explained that industry funding is not a tax because the government receives no revenue. *Id.*

Accordingly, the Court concludes that the record indicates that Defendants sufficiently considered the relevant factors raised by the submitted comments and provided reasonable explanations in response. *See Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540.

## G. Defendants Did Not Violate NEPA

Plaintiffs further argue that Defendants' EA violates NEPA. *See* Pls.' Mot., ECF No. 18-1 at 46.

While NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," 42 U.S.C. § 4321; "NEPA itself does not mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756–57 (2004). In reviewing an agency's decision not to issue an EIS, the court's role is a "'limited' one, designed primarily to ensure 'that no

**A211**

arguably significant consequences have been ignored.'" *Taxpayers of Mich. Against Casinos v. Norton* ["*TOMAC*"], 433 F.3d 852, 860 (D.C. Cir. 2006) (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988)). Thus, courts apply "a 'rule of reason' to an agency's NEPA analysis" and decline to "'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015) (quoting *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

Plaintiffs argue that Defendants violated NEPA because: (1) Defendants failed to take a "hard look" at the Omnibus Amendment's impacts; (2) Defendants did not adequately consider regulatory alternatives or potential mitigation measures; (3) Defendants did not seriously consider alternatives to industry-funded monitoring; and (4) Defendants did not submit a supplement to their environmental impact analysis despite reductions in herring catch. *See* Pls.' Mot., ECF No. 18-1 at 46-51. For the reasons explained below, the Court rejects Plaintiffs' arguments.

### 1. Plaintiffs Do Not Have a Cause of Action Under NEPA

As a threshold matter, the Court first addresses whether Plaintiffs' interests fall within NEPA's "zone of interests."

A212

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015).

"In addition to constitutional standing, a plaintiff must have a valid cause of action for the court to proceed to the merits of its claim." *Id.* (citing *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1018 (D.C. Cir. 2014)). As the Supreme Court has explained, courts "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

"The zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone." *Gunpowder Riverkeeper*, 807 F.3d at 274. "To be sure, a [party] is not disqualified from asserting a claim under the NEPA simply because it has an economic interest in defeating a challenged regulatory action." *Id.* (citing *Realty Income Trust v. Eckerd*, 564 F.2d 447, 452 (D.C. Cir. 1977). But a party "must assert an environmental harm in order to come within the relevant zone of interests," and that zone of interests "does not encompass monetary interests alone," *id.* (quoting *Eckerd*, 564 F.2d at 452 & n.10, n.11).

Here, while Plaintiffs refer generally to unspecified "environmental impacts," Plaintiffs have not alleged that they

will suffer any environmental injury as a result of the Omnibus Amendment. Rather, Plaintiffs' sole concern is with the financial burden on fishing vessels and companies as a result of industry-funded monitoring. In their motion briefing and in their Complaint, Plaintiffs have detailed their fears regarding the economic impact of the Omnibus Amendment. *See, e.g.*, Pls.' Mot., ECF No. 18-1 at 48-51; Pls.' Reply, ECF No. 22 at 36-42; Compl., ECF No. 1 ¶¶ 3-5, 45, 78-80, 86, 91, 98. However, Plaintiffs have failed to name any specific harms to the environment and have not "linked [their] pecuniary interest to the physical environment or to the environmental impacts." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (holding that plaintiff failed to establish prudential standing under NEPA because plaintiff's "sole interest is in selling phosphate to Agrium").

Accordingly, because Plaintiffs' interest in challenging the Omnibus Amendment is a purely economic interest, and economic concerns are "not within the zone of interests protected by NEPA," *ANR Pipeline Co v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000); Plaintiffs cannot sustain a claim under NEPA, *see Goethel*, 2016 WL 4076831, at *8 (dismissing plaintiffs' NEPA claim because their "argument appears limited to the claim that NMFS failed to adequately assess the economic impact of industry funding").

A214

### 2. Plaintiffs' NEPA Claims Fail on the Merits

Even if the Court found that NEPA was applicable to Plaintiffs' claims, Plaintiffs' arguments would still fail on the merits for the reasons stated below.

### a. Defendants Took a "Hard Look" at Environmental Impacts

Plaintiffs argue that Defendants failed to take a "hard look" at the "complete environmental impact" of the omnibus measures, which created a process to implement future industry-funded monitoring programs in other New England FMPs. Pls.' Mot., ECF No. 18-1 at 47. Plaintiffs contend that despite recognizing that future industry-funded monitoring programs will have an "economic impact" if implemented, Defendants undertook no analysis of these future costs. *Id.* at 47-48. In Plaintiffs' view, Defendants' inclusion of these measures into the Omnibus Amendment "suggests an improper attempt to 'artificially divid[e] a major federal action into smaller components, each without significant impact.'" *Id.* at 48 (quoting *Jackson City v. FERC*, 589 F.3d 1284, 1290 (D.C. Cir. 2009)).

Under NEPA, the EA must "take[] a hard look at the problem." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011). "Although the contours of the 'hard look' doctrine may be imprecise," a court must at a minimum "'ensure that the agency has adequately considered and disclosed the environmental

**A215**

impact of its actions and that its decision is not arbitrary or capricious.'" *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983)). A "hard look" includes "considering all foreseeable direct and indirect impacts . . . . [It] should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (internal quotation marks and citation omitted).

Here, the Court notes at the outset that while Plaintiffs broadly claim that Defendants failed to take a "hard look" at the *environmental* impacts of the future industry-funded monitoring programs, Plaintiffs only identify alleged *economic* impacts. *See* Pls.' Mot., ECF No. 18-1 at 48 (stating that NEFMC recognized the "economic impact" of future monitoring programs); *id.* (noting that NEFMC had suggested a potential rise in "monitoring costs" due to overlapping requirements); *id.* at 49 (arguing a NEPA violation because the "final EA provides no detail about the potential economic impact"); *id.* (citing to "meager evidence" in the administrative record regarding the economic impact on the non-herring fleet); Pls.' Reply, ECF No. 22 at 36 (arguing the Council refused to "recognize[] the uniformly negative expected economic pact of future" monitoring programs). As explained above, a party "must assert an

61

**A216**

environmental harm in order to come within [NEPA's] zone of interests." *Gunpowder Riverkeeper*, 807 F.3d at 274 (citing *Eckerd*, 564 F.2d 447, 452 & n.10 (D.C. Cir. 1977); *see Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 606 (9th Cir. 2018) ("We have 'consistently held that purely economic interests do not fall within NEPA's zone of interests.'" (quoting *Ashley Creek Phosphate*, 420 F.3d at 940)).

However, even if NEPA was applicable here, the Court's conclusion would remain the same. Plaintiffs dispute Defendants' determination that the omnibus measures "do not have any direct economic impacts on fishery-related business or human communities because they do not require the development of [industry-funded monitoring] programs nor do they directly impose any costs." AR 17179. Plaintiffs contend that because Defendants are aware of which New England FMPs are in the position to implement industry-funded programs and "have access to extensive information about the demographics and operation of New England fisheries," Defendants could conduct an analysis of economic impact of future monitoring programs. Pls.' Reply, ECF No. 22 at 37. Defendants, on the other hand, argue that such future costs are too speculative to include in the EA "[w]ithout knowing the goals or the details of the measures to achieve [future industry-funded monitoring] goals." Defs.' Opp'n, ECF No. 20-1 at 50 (quoting AR 17741). Defendants state that "[t]he

economic impacts to fishing vessels and benefits resulting from
a future . . . program would be evaluated in the amendment to
establish that . . . program." *Id.* (quoting AR 17741).

The Court agrees with Defendants. "The 'rule of reason'
requires that consideration be given to practical limitations on
the agency's analysis, such as the information available at the
time." *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 61
(D.D.C. 2009) (citing *Transmission Access Policy Study Group v.
FERC*, 225 F.3d 667, 736 (D.C. Cir. 2000)). Because the omnibus
measures do not require the development of industry-funded
monitoring programs in all FMPs but rather set up a process to
be used if such programs are developed in the future, Defendants
did not know the location of any future monitoring program or
the future program's specific goals at the time of the EA's
preparation. Furthermore, "[t]hat [D]efendants may continue to
assess impacts as more information becomes available does not
indicate that defendants failed to take a 'hard look' at the
environmental consequences of its proposed action." *Id.* at 62.
Requiring Defendants to analyze future industry-funded
monitoring programs without knowing where the programs will be
implemented would be unreasonable and beyond NEPA's mandate. *See
id.; see also WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41,
66-67 (D.D.C. 2019) (finding that defendant agency did not
violate NEPA when the agency "could not reasonably foresee the

**A218**

projects to be undertaken on specific leased parcels, nor could it evaluate the impacts of those projects on a parcel-by-parcel basis"). For the same reasons the Court finds that Defendants did not improperly segment the Omnibus Amendment. *See Jackson Cnty.*, 589 F.3d at 1291 (finding it reasonable that FERC treated two projects separately when, among other thing, the projects were geographically distinct and triggered separate agency approval decisions).

### b. Defendants Adequately Considered Alternatives and Potential Mitigation Measures

Plaintiffs next argue that Defendants violated NEPA because they did not adequately address potential mitigation measures or alternatives to the Omnibus Amendment. Pls.' Mot., ECF No. 18-1 at 49. The Court disagrees.

An EA "must include a 'brief discussion[]' of reasonable alternatives to the proposed action." *Myersville*, 783 F.3d at 1323 (citation omitted). "An alternative is reasonable if it is objectively feasible as well as reasonable in light of the agency's objectives." *Id.* (alterations and quotation marks omitted) (quoting *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72). An agency's specification of the range of reasonable alternatives is entitled to deference. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Furthermore, an agency's consideration of alternatives in

A219

an EA "need not be as rigorous as the consideration of alternatives in an EIS." *Myersville*, 783 F.3d at 1323. "In assessing whether an agency has shown that a project's environmental impacts are adequately addressed by mitigation measures, a court must ask . . . whether the agency discussed the mitigation measures 'in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *Food & Water Watch v. U.S. Dep't of Agric.*, 451 F. Supp. 3d 11, 37 (D.D.C. 2020) (quoting *Indian River Cnty., Fla. V. U.S. Dep't of Transp.*, 945 F.3d 515, 522 (D.C. Cir. 2019)). "NEPA does not, however, 'require agencies to discuss any particular mitigation plans that they might put in place.'" *Id.* (quoting *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503).

First, regarding consideration of alternatives, the Court finds that Defendants have complied with NEPA's requirements. The EA included a brief discussion of seven alternatives to the omnibus measures, including an option preserving the status quo, "that would modify all the FMPs managed by the Council to allow standardized development of future FMP-specific industry-funded monitoring programs." AR 17046-47. The EA also included a discussion of multiple alternatives regarding increasing monitoring in the Atlantic herring fishery specifically, including a "no additional coverage" alternative, electric monitoring options, and portside sampling options. *See* AR 17069-

65

101. Plaintiffs do not explain how the EA's discussion of these alternatives is inadequate, nor do they argue that there were any alternatives that Defendants improperly excluded from consideration. To the extent that Plaintiffs suggest that "at-sea monitoring under the Omnibus Amendment in the herring fishery is discretionary," "unnecessary to advance conservation goals," and "*less* efficient than shoreside alternatives," Pls.' Opp'n, ECF No. 22 at 34-35; "NEPA does not compel a particular result," *Myersville*, 783 F.3d at 1324. "Even if an agency has conceded that an alternative is environmentally superior, it nevertheless may be entitled under the circumstances not to choose that alternative." *Id.*; *see also Robertson*, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."). Thus, in view of the cursory nature of Plaintiffs' argument, the Court finds that Defendants' discussion of alternatives is sufficient to meet the NEPA obligations. *Cf. Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 205 (1st Cir. 1999) (noting arguments raised "in a perfunctory manner, unaccompanied by some effort at developed argumentation" are waived when they "do not attempt to explain the manner in which the environment will be significantly affected").

66

**A221**

Second, regarding mitigation measures, the Court finds that Defendants' EA satisfies the relevant standard. Plaintiffs contend that although the EA contains information regarding the negative effects that industry-funded monitoring will have on businesses and communities, the EA "downplays" such impacts "by referring to the waiver of coverage for vessels that land less than 50 metric tons of herring per trip—a mitigation measure that applies to an especially small portion of the herring fleet . . . —and by vaguely referring to potential adjustments by the NEFMC in the next two years." Pls.' Mot., ECF No. 18-1 at 49 (citing AR 17250, 17327); *see also* Pls.' Reply, ECF No. 22 at 38 (arguing that "the exemption for vessels landing under 50 metric tons of herring will favor a sliver of the fleet and therefore impermissibly benefit a select number of fishing communities").

Again, Plaintiffs' argument regards economic interests, not environmental ones. *See Gunpowder Riverkeeper*, 807 F.3d at 274. Furthermore, Plaintiffs' challenge to the 50-metric-ton exemption is ultimately based on a disagreement with the substance of the exemption rather than on Defendants' compliance with NEPA's procedural requirements. It is well established that "[w]here NEPA analysis is required, its role is 'primarily information-forcing.'" *Mayo v. Reynolds*, 875 F.3d 11, 15-16 (D.C. Cir. 2017) (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017)). "As the Supreme Court has explained,

**A222**

'[t]here is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.'" *Id.* (quoting *Robertson*, 490 U.S. at 352). In other words, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Id.* (quoting *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015)).

To the extent that Plaintiffs refer to environmental impacts in arguing that the Council's plan to re-evaluate the Atlantic herring monitoring program in two years is "vague," Pls.' Mot., ECF No. 18-1 at 49; the EA reflects that Defendants were aware of the environmental impacts of the Omnibus Amendment and its alternatives and the need to incorporate mitigation efforts to reduce any negative impacts. *See, e.g.*, AR 17177-241.

The omnibus measures were determined to have "no direct impacts" on biological resources or the physical environment. *Id.* at 17179. The industry-funded monitoring program in the Atlantic herring fishery was determined to have a "negligible" impact on the physical environment and an "indirect" impact on biological resources because "they affect levels of monitoring

68

**A223**

rather than harvest specifications or gear requirements." *Id.* at 17179, 17316; *see also id.* at 17326 ("The proposed action is not expected to cause significant environmental impacts because it establishes a monitoring program, rather than specifying harvest specifications, gear requirements, or changes in fishing behavior."). The EA then took into account "variations and contingencies in [the Atlantic herring] fishery by adapting coverage levels to available funding or logistics and allowing vessels to choose electronic monitoring and portside sampling coverage, if it is suitable for the fishery and depending on a vessel owner's preference." *Id.* at 17315. The EA explained that one of the "preferred" alternatives "would require the Council to revisit the preferred Herring Alternatives two years after implementation and evaluate whether changes to management measures are necessary." *Id.* "This requirement to evaluate the impacts of increased monitoring in the herring fishery takes into account and allows for variations and contingencies in the fishery, fishery resources, and catches." *Id.* Given that the Omnibus Amendment's measures may "increase monitoring and that may improve management of the fishery and provide a better opportunity for achieving optimum yield," resulting in indirect benefits for the environment, *id.* at 17312; Plaintiffs have failed to show that the two-year re-examination provision is an inadequate mitigant under NEPA.

Finally, Plaintiffs contend that Defendants have used the "uncertainty of future management efforts," particularly the two-year re-examination provision, "as a shield to avoid fuller environmental impact analysis." Pls.' Reply, ECF No. 22 at 38 (quotation marks omitted). This argument is without merit. As explained above, the EA includes a thorough description of potential environmental impacts, and Plaintiffs fail to point to any specific deficiencies in Defendants' discussion of environmental impacts or mitigation measures.

Accordingly, the Court finds that, even if the Court found that NEPA was applicable to Plaintiffs' claims, the EA's discussion of environmental impacts and mitigation measures complies with NEPA's mandate.

### c. Defendants Did Not Predetermine the Outcome

Plaintiffs next argue that "Defendants pre-judged the outcome of the EA in favor of the NEFMC's preferred alternatives." Pls.' Mot., ECF No. 18-1 at 49. According to Plaintiffs, "[n]othing in the administrative record suggests that NEFMC and Defendants seriously considered preserving the status quo." *Id.* at 50. As evidence, Plaintiffs point to sections of the administrative record in which Defendants state that a cost-benefit analysis could not be "completed" before the Council selected its preferred alternatives, and that the Omnibus Amendment's purpose was to "establish[] a clear

70

**A225**

delineation of costs for monitoring between the industry and
NMFS for all FMPs." *Id.*; Pls.' Reply, ECF No. 22 at 39.
Plaintiffs also assert that Defendants received "overwhelmingly
negative feedback from stakeholders and regulated parties,"
which they argue would cause a "reasonable regulator" to "think
twice." Pls.' Mot., ECF No. 18-1 at 50; *see also* Pls.' Reply,
ECF No. 22 at 39.

The standard for demonstrating predetermination is high.
*See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d
692, 714 (10th Cir. 2010); *Stand Up for Calif.! v. U.S. Dep't of
the Interior*, 204 F. Supp. 3d 212, 304 (D.D.C. 2016).
"[P]redetermination occurs only when an agency *irreversibly and
irretrievably* commits itself to a plan of action that is
dependent upon the NEPA environmental analysis producing a
certain outcome, *before* the agency has completed that
environmental analysis." *Forest Guardians*, 611 F.3d at 714.
Indeed, "NEPA does not require agency officials to be
'subjectively impartial,'" *id.* at 712 (quoting *Env't Def. Fund,
Inc. v. Corps of Eng'rs of the U.S. Army*, 470 F.2d 289, 295 (8th
Cir. 1972)); and "[b]ias towards a preferred outcome does not
violate NEPA so long as it does not prevent full and frank
consideration of environmental concerns," *Comm. of 100 on the
Fed. City v. Foxx*, 87 F. Supp. 3d 191, 205-06 (D.D.C. 2015).
Thus, in determining what is an "irreversible and irretrievable"

commitment, courts in this Circuit have looked "to the practical effects of [an] agency's conduct rather than whether the conduct suggests subjective agency bias in favor of the project." *Id.* at 207.

Defendants' actions do not rise to the level of predetermination. Regardless of whether Defendants had a bias toward implementing some type of increased monitoring program in the region, the extensive administrative record demonstrates that any preferred outcome did not "prevent full and frank consideration of environmental concerns." *Id.* at 205-06. Furthermore, while Plaintiffs note that Defendants received negative feedback during the comment periods for the Omnibus Amendment and its implementing regulations, Plaintiffs do not contend that Defendants ignored these comments or provided insufficient responses. *See* Pls.' Mot., ECF No. 18-1 at 49-50. And as Defendants point out, Defendants likewise received positive feedback advocating for greater monitoring coverage than the alternative that was selected. Defs.' Opp'n, ECF No. 20-1 at 54 (citing AR 17668-71, 17742). Put simply, an agency "may work toward a solution, even its preferred one," *Stand Up for Calif.!*, 410 F. Supp. 3d at 61; and here, Defendants did not "irreversibly and irretrievably" commit itself to the measures within the amendment prior to conducting its environmental analysis, *see Wyo. Outdoor Council v. U.S. Forest Serv.*, 165

F.3d 43, 49 (D.C. Cir. 1999) (explaining that issuing leases such that agency no longer retains "the authority to preclude all surface disturbing activities" constitutes an irretrievable commitment of resources (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)); *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 71 (D.D.C. 2012) ("An administrator's statement of an opinion, based upon review of the action's subject matter and relevant regulatory guidance, suggests conscious thought rather than prejudgment, and does not lead to the conclusion that the administrator would not change his or her mind upon review of the full EA.").

Accordingly, the Court concludes that Defendants did not predetermine the outcome of the EA.

### d. Defendants Were Not Required to Supplement the EA

Plaintiffs also argue that Defendants violated NEPA because they did not supplement the EA following herring catch reductions in 2019 and 2020, which Plaintiffs contend "will significantly impact the economics of the fishery and the viability of the fleet under an industry-funded monitoring regime." Pls.' Reply, ECF No. 22 at 39. Plaintiffs argue that the EA "contains no data" supporting Defendants' finding that "increases in total revenue from other fisheries" would "mitigate the negative impacts of reductions to the herring ACL

**A228**

and associated revenue." Pls.' Mot., ECF No. 18-1 at 51; *see also* Pls.' Reply, ECF No. 22 at 42.

Under NEPA, an agency must prepare a supplement to an EA when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii). However, as the Supreme Court has explained, under the "rule of reason," an agency need not supplement an EA "every time new information comes to light" after the EA is finalized. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). Rather, "if the new information shows that the remaining action will affect the quality of the environment 'in a significant manner or to a significant extent not already considered,'" a supplemental must be prepared. *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (quoting *Marsh*, 490 U.S. at 374). In addition, the D.C. Circuit has instructed that a supplement "is only required where new information 'provides a *seriously different picture* of the environmental landscape.'" *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002); *see also Pub. Emps. for Env't Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 29–30 (D.D.C. 2011) ("[W]hether a change is 'substantial' so as to warrant [a supplement] is determined not by the modification in the abstract, but rather

**A229**

by the significance of the environmental effects of the changes.").

Here, Defendants reasonably concluded that the herring catch reductions did not "significantly transform the nature of the environmental issues raised in the [EA]." *Nat'l Comm. for the New River*, 373 F.3d at 1330-31 (finding that new information did not "seriously change[] the environmental landscape" where the agency's process for evaluating the environmental impact was "comprehensive"). First, Plaintiffs do not point to any evidence that herring catch reductions will have significant *environmental* impacts on industry-funded monitoring programs. *See* Pls.' Mot., ECF No. 18-1 at 51; Pls.' Reply, ECF No. 22 at 39-42. Plaintiffs refer solely to the "economics of the fishery and the viability of the fleet" and do not attempt to show how the fleet's revenue stream is "interrelated" with "natural or physical environmental effects." 40 C.F.R. § 1508.1(m) (defining "human environment"); *cf. Blue Ridge*, 716 F.3d at 198 (rejecting argument that new environmental reports were required because the argument "relie[d] on Petitioners' elision of 'safety significance' with 'environmental significance'"). Because "NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment," *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983); Defendants did not run afoul

of NEPA's requirements in deciding a supplemental EA was not needed, *see Stand Up for Calif.!*, 410 F. Supp. 3d at 55-56 (finding that alleged impacts to the public safety did not fall within the Court's NEPA review because it was not an "environmental concern").

Second, the record indicates that Defendants undertook a careful evaluation of the significance of the herring catch reductions prior to determining whether a supplement was needed. *See Marsh*, 490 U.S. at 378 (instructing that when reviewing an agency's decision not to supplement an environmental impact statement, courts must be satisfied that "the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information"). Defendants explained that "[t]he EA describes the economic impacts of herring measures on fishery-related businesses and human communities as negative," but that "[t]he economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries." AR 17737. Defendants estimated that "at-sea monitoring coverage associated with the 50-percent coverage target has the potential to reduce annual [returns-to-owner] for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for

76

**A231**

midwater trawl access to Groundfish Closed Areas," and noted
that "[e]lectronic monitoring and portside sampling may be a
more cost effective way for herring vessels to satisfy industry-
funded monitoring requirements." *Id.*

Defendants then compared herring revenue generated by
Category A and B herring vessels from 2014 to 2018 to assess the
economic impact of a reduction in herring catch. *Id.* Based on
this assessment, Defendants determined that "[e]ven though the
2018 [annual catch limit ("ACL")] was reduced by 52 percent
(54,188 mt) from the 2014 ACL, the impact on 2018 revenue was
not proportional to the reduction in ACL and differed by gear
type." *Id.* Defendants explained that the change in revenue
between 2014 and 2018 was affected by several factors, "such as
the availability of herring relative to the demand and vessel
participation in other fisheries." *Id.* at 17738. Defendants also
considered how the level of fishing effort, SBRM coverage, and
certain mitigation measures would affect the economic impact of
industry-funded monitoring. *Id.* at 17738-39. After analyzing
these factors, Defendants determined that reduced herring catch
and its impacts fell within the initial EA's scope and that a
supplement was unnecessary because: "(1) the action is identical
to the proposed action analyzed in the EA and (2) no new
information or circumstances relevant to environmental concerns
or impacts of the action are significantly different from when

**A232**

the EA's finding of no significant impact was signed on December 17, 2018." *Id.* at 17739.

As the D.C. Circuit has explained, "[t]he determination as to whether information is either new or significant 'requires a high level of technical expertise'; thus, [courts] 'defer to the informed discretion of the [agency].'" *Blue Ridge*, 716 F.3d at 196-97 (quoting *Marsh*, 490 U.S. at 377); *Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) ("[C]ourts are not authorized to second-guess agency rulemaking decisions . . . ."). In view of Defendants' considered analysis, Plaintiffs simply have not demonstrated how Defendants' conclusion was arbitrary or capricious. Accordingly, the Court does not find that the Defendants' conclusion was so deficient as to suffer from "want of reasoned decisionmaking." *Advocates for Hwy. & Auto Safety*, 429 F.3d at 1150.

## H. The Omnibus Amendment Does Not Violate the Regulatory Flexibility Act

Plaintiffs next argue that Defendants failed to meet their obligations under the Regulatory Flexibility Act ("RFA") when promulgating the Omnibus Amendment.

Under the RFA, agencies must "consider the effect that their regulation will have on small entities, analyze effective alternatives that may minimize a regulation's impact on such

78

A233

entities, and make their analyses available for public comment." *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 99 (D.D.C. 2006). The RFA requires agencies issuing regulations likely to have an "impact" on "small entities" to prepare an initial regulatory flexibility analysis ("IRFA") describing the effect of the proposed rule on small businesses and discussing alternatives that might minimize adverse economic consequences upon publishing a notice of proposed rulemaking. *See* 5 U.S.C. § 603. Then, when promulgating the final rule, the agency must prepare a final regulatory flexibility analysis ("FRFA"), to be made available to the public and published in the Federal Register. *See id.* § 604.

"Although the RFA compels an agency to make substantive determinations, a court cannot find an agency violated the RFA merely because it disagrees with those determinations." *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 67 (D.D.C. 2017). The D.C. Circuit has explained that the RFA is "[p]urely procedural." *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001) (stating that "RFA section 604 requires nothing more than that the agency file a FRFA demonstrating a 'reasonable, good-faith effort to carry out [RFA's] mandate.'" (quoting *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000)). A court does not "evaluate whether the agency got the required analysis right, but instead examines whether the agency

**A234**

has followed the procedural steps laid out in the statute. What is required of the agency is not perfection, but rather a reasonable, good-faith effort to take those steps and therefore satisfy the statute's mandate." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 95. "Thus, in assessing the adequacy of an FRFA, courts look to see whether the agency made a reasonable attempt to address all five required elements in its FRFA, and do not measure the FRFA under a standard of 'mathematical exactitude.'" *Alfa Int'l Seafood*, 264 F. Supp. 3d at 67 (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997)).

Here, Plaintiffs argue that the NEFMC and Defendants failed to comply with the RFA because the IRFA and the FRFA contained "conclusory findings" regarding the economic effects of the Omnibus Amendment that are "facially unreasonable." Pls. Mot., ECF No. 18-1 at 52. Specifically, Plaintiffs contend that Defendants failed to consider: (1) "economic impacts associated with the omnibus alternatives," *id.* (citing AR 17339); (2) "the full set of costs" that the industry-funded monitoring alternatives would "impose on regulated entities," including "the danger of overlapping monitoring requirements, the effect of significant quota cuts . . . , and the actual feasibility of alternatives," *id.* (citing AR 17341-46); and (3) an "explanation for their conclusion that certain businesses 'were more likely

80

**A235**

to exit the fishery if the cost of monitoring [were] perceived as too expensive,'" *id.* at 52-53 (citing AR 17342).

As an initial matter, the Court notes that Plaintiffs' arguments appear to be a "non-starter" because Plaintiffs' motion only cites to alleged compliance failures within the IRFA and do not point to any alleged deficiencies within the FRFA. *Alfa Int'l Seafood*, 264 F. Supp. 3d at 67. Pursuant to section 611(a) of the RFA, the adequacy of an agency's IRFA is not reviewable. *See* 5 U.S.C. § 611(a) ("[A] small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with chapter 7."). Thus, the Court lacks jurisdiction to consider Plaintiffs' challenge to Defendants' IRFA. *See Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000).

Even if the Court construed Plaintiffs' three arguments as "attack[ing] the overall adequacy of Defendants' economic impact analysis," Pls.' Reply, ECF No. 22 at 42; the arguments would still fail. First, while Plaintiffs contend that Defendants did not consider the economic impacts of the omnibus measures, the IRFA and the FRFA explain that those measures are "administrative and have no direct economic impacts." AR 17339, 17744. Indeed, the measures explicitly set out the

A236

administrative process to develop and maintain future industry-funded monitoring programs in other New England FMPs. Plaintiffs' contention that "Defendants and the NEFMC conceded its omnibus measures will have 'direct negative economic impacts to fishing vessels," Pls.' Reply, ECF No. 22 at 43, is misleading. In making that statement, Defendants were referring to potential future programs and explained that "any direct negative economic impacts to fishing vessels resulting from a future [industry-funded monitoring] program would be evaluated in the amendment to establish that [industry-funded monitoring] program." AR 17179; *cf. Associated Fishers of Me.*, 127 F.3d 104 at 110 n.5 (finding that, because "the Secretary considered the Coast Guard's estimate to be budgetary in nature and not rooted in cost increases which were likely to accompany the implementation of Amendment 7," "[t]he Secretary must be accorded some latitude to make such judgment calls"). Defendants' conclusion is reasonable.

Second, regarding Plaintiffs' argument that Defendants did not consider the "full set of costs" that would be imposed on regulated entities, Pls.' Mot., ECF No. 18-1 at 52; the record demonstrates that Defendants underwent a reasoned analysis of the economic impacts that vessels would face upon the implementation of the Omnibus Amendment and that Defendants had taken steps to minimize economic impacts on affected entities.

82

**A237**

*See* AR 17341-46. While it is possible that the agency could have included further detail or more study, the record nonetheless demonstrates that Defendants engaged in a "reasonable, good faith effort" to carry out the RFA's mandate. *U.S. Cellular Corp.*, 254 F.3d at 89; *see also Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 471 (1st Cir. 2003) (noting that the RFA does not include a requirement as to the amount of detail with which an agency must address specific comments).

Third, Plaintiffs argue that Defendants failed to explain their conclusion that certain businesses "were more likely to exit the fishery if the cost of monitoring [were] perceived as too expensive." Pls.' Mot., ECF No. 18-1 at 52-53 (citing AR 17342). "[W]here the agency has addressed a range of comments and considered a set of alternatives to the proposal adopted, the burden is upon the critic to show why a brief response on one set of comments or the failure to analyze one element as a separate alternative condemns the effort." *Little Bay Lobster Co.*, 352 F.3d at 471. Plaintiffs have failed to make such a showing here.

Additionally, *Southern Offshore Fishing Association v. Daley*, 995 F. Supp. 1411 (M.D. Fla. 1998), upon which Plaintiffs rely, is distinguishable. In that case, the United States District Court for the Middle District of Florida found that an FRFA prepared by NMFS did not comply with the requirements of

**A238**

the RFA. Unlike in *Southern Offshore Fishing*, however, Defendants here prepared both an IRFA and a FRFA. *See id.* at 1436 ("NMFS could not possibly have complied with § 604 by summarizing and considering comments on an IRFA that NMFS never prepared."); AR 17744 ("NMFS prepared a final regulatory flexibility analysis (FRFA) in support of this action. The FRFA incorporates the initial RFA, a summary of the significant issues raised by the public comments in response to the initial RFA, NMFS responses to those comments, and a summary of the analyses completed in support of this action."). And unlike in *Southern Offshore Fishing*, Plaintiffs here have not "point[ed] to plentiful record evidence undermining NMFS's certifications." *Id.* Instead, Plaintiffs' motion merely points to three pages in the IRFA. "Such a meager citation to the record simply cannot upend the deference due to the Department under the RFA." *Alfa Int'l Seafood*, 264 F. Supp. 3d at 68.

Accordingly, the Court finds that Defendants fulfilled the requirements of the RFA in promulgating the Omnibus Amendment.

## I. The Approval and Finalization of the Omnibus Amendment Was Procedurally Proper

Finally, Plaintiffs argue that the process of approving and finalizing the Omnibus Amendment was procedurally irregular and raises "procedural due process concerns." Pls.' Mot., ECF No. 18-1 at 54. However, a review of the MSA's provisions governing

**A239**

the Secretary's review of FMPs, amendments, and proposed regulations demonstrates that Defendants followed the proper procedure.

Under the MSA's regulatory framework, once the Council transmits an FMP or amendment to the Secretary, the Secretary must do two things: (1) "immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law"; and (2) "immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published." 16 U.S.C. § 1854(a)(1). Once the comment period has closed, the Secretary then has 30 days to approve, disapprove, or partially approve an FMP or amendment. *Id.* § 1854(a)(3). "If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved." *Id.*

Proposed regulations implementing an FMP or amendment that the Council deems "necessary or appropriate" must be submitted to the Secretary "simultaneously" with the FMP or amendment. *Id.* § 1853(c). Once the Secretary receives the proposed regulations,

85

"the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the [FMP], plan amendment, [the MSA] and other applicable law." *Id.* § 1854(b)(1). The Secretary must make a determination within 15 days of initiating such evaluation, and, if the Secretary approves the proposed regulations, she must publish the regulations for comment in the Federal Register, "with such technical changes as may be necessary for clarity and an explanation of those changes." *Id.* § 1854(b)(1)(A). There must be a public comment period of between 15 to 60 days, and, after the public comment period has expired, the Secretary must then promulgate the final regulations within 30 days, consulting with the Council on any revisions and explaining the changes in the Federal Register. *Id.* § 1854(b)(3).

Here, it is "undisputed" that Defendants "followed the statutorily prescribed timelines for approval of an FMP amendment and implementing regulations." *See* Pls.' Reply, ECF No. 22 at 44. Instead, Plaintiffs argue that "[t]he irregularities and due process concerns arise from Defendants presuming the legality of the Omnibus Amendment and proposing implementing regulations *before* any final approval decision for the underlying FMP amendment." *Id.* at 44-45. However, Plaintiffs' argument is belied by the text of the statute. The MSA clearly contemplates such a situation given its mandate that

**A241**

proposed regulations be submitted "simultaneously with the plan or amendment under section 1854 of this title," 16 U.S.C. § 1853(c); and the agency also confirms that this is its usual practice, *see* AR 17741 ("It is our practice to publish an NOA and proposed rule concurrently."). Furthermore, Defendants appropriately set a 60-day comment period for the FMP amendment and a 45-day comment period for the proposed regulations, with the public comments for both overlapping for 13 days. *See id.* Both the notice of the amendment and the proposed regulations included a statement explaining that any public comments received on the amendment or the proposed rule during the amendment's comment period would be considered in the decision on the amendment. *Id.* The public thus had fair notice and a meaningful opportunity to participate in the process. *See, e.g.*, *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982).

Finally, Plaintiffs' description of an inappropriate "secret approval" of the Omnibus Amendment "in a non-public letter [to the Council] that [NOAA] never officially disseminated," Pls.' Mot., ECF No. 18-1 at 54; lacks any basis. Rather, NOAA acted as the MSA requires: upon approval of an FMP or amendment, there must be "written notice to the Council" of the Secretary's decision. 16 U.S.C. § 1854(a)(3). No further publication is statutorily required.

## IV. Conclusion

For the aforementioned reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, **GRANTS** Defendants' Cross-Motion for Summary Judgment, and **GRANTS** Defendants' Motion to Exclude. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**June 15, 2021**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| Loper Bright Enterprises, Inc., *et al.*, |
| Plaintiffs, |
| v. |
| GINA RAIMONDO, in her official capacity, Secretary, U.S. Department of Commerce, *et al.*, |
| Defendants. |

Civ. Action No. 20-466 (EGS)

**<u>FINAL JUDGMENT</u>**

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated in the accompanying Memorandum Opinion and Order, it is hereby

**ORDERED** that the Clerk shall enter final judgment in favor of Defendants Gina Raimondo, Secretary of the U.S. Department of Commerce; the U.S. Department of Commerce; Benjamin Friedman, Deputy Under Secretary for Operations, performing the duties of Under Secretary of Commerce for Oceans and Atmosphere and National Oceanic and Atmospheric Administration ("NOAA") Administrator; the NOAA; Chris Oliver, Assistant Administrator for NOAA Fisheries; and the National Marine Fisheries Service; and against Plaintiffs Loper Bright Enterprises, Inc.; H&L Axelsson, Inc.; Cape Trawlers, Inc.; Scombrus One LLC; Golden Nugget LLC; Lund Marr Trawlers LLC; Mount Vernon LLC; and Nancy

**A244**

Elizabeth LLC. This is a final appealable Order. *See* Fed. R.

App. P. 4(a).

     **SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
             **United States District Judge**
             **June 23, 2021**

**A245**

AO 450 (Rev. 01/09; DC-03/10)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the ·

District of Columbia



FILED

JUN 2 4 2021

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| Loper Bright Enterprises, Inc., et al., | ) |
| *Plaintiff* | ) |
| v. | ) |
| Gina Raimondo, et al | ) |
| *Defendant* | ) |

Civil Action No.  20-466 (EGS)

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus postjudgment interest at the rate of _____ %, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____

☑ other:   Ordered that the Clerk shall enter final judgment in favor of Defendants against Plaintiffs.

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision
was reached.

☑ decided by Judge  EMMET G. SULLIVAN _____ on a motion for
Summary Judgment  by Plaintiffs

Date:   06/24/2021 _____

*ANGELA D. CAESAR, CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

**A246**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Loper Bright Enterprises, Inc., et al.
_____
                         Plaintiff

                    vs.                              Civil Action No. 20-0466 (EGS)
                                                                      _____

Gina Raimondo, et al.
_____
                         Defendant

## NOTICE OF APPEAL

Notice is hereby given this   15th   day of   July   , 20 21   , that

Plaintiffs Loper Bright Enterprises, Inc; H&L Axelsson, Inc.; Scombrus One LLC; and Lund Marr Trawlers LLC

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the judgment of this Court entered on the   23d   day of   June   , 20 21

in favor of   Defendants Gina Raimond, in her official capacity as Secretary of Commerce, et al.

against said   Plaintiffs

                                        /s/ Ryan P. Mulvey
                              _____
                                        Attorney or Pro Se Litigant

                              Cause of Action Institute
                              1310 N. Courthouse Road, Ste. 700
                              Arlington, VA 22201-2961
                              (571) 444-2841                        ⊞
                                        Address and Phone Number

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil action must be filed within 30 days after the date of entry of judgment or 60 days if the United States or officer or agency is a party)

**CLERK**   Please mail copies of the above Notice of Appeal to the following at the addresses indicated:

Alison C. Finnegan
U.S. Department of Justice - Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

Kristine S. Tardiff
U.S. Department of Justice - Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301

**A247**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2021, I filed the foregoing Appendix (Volume I) in the United States Court of Appeals for the District of Columbia Circuit using the Appellate CM/ECF system. Service will be accomplished by the Appellate CM/ECF System. As required by Circuit Rule 30(a), I will also cause to be filed seven paper copies of the Appendix (Volume I) with the Court.

/s/ Ryan P. Mulvey
Ryan P. Mulvey

*Counsel for Appellants*