No. 21-5166

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

LOPER BRIGHT ENTERPRISES, INC., et al.,
*Plaintiffs/Appellants*,

v.

GINA RAIMONDO, et al.,
*Defendants/Appellees*.

---

Appeal from the United States District Court for the District of Columbia
No. 1:20-cv-466 (Hon. Emmet G. Sullivan)

---

**BRIEF FOR APPELLEES**

---

Of Counsel:

MITCH MACDONALD
*Attorney*
Office of the General Counsel
National Oceanic & Atmospheric
   Administration

TODD KIM
*Assistant Attorney General*
RACHEL HERON
ALISON C. FINNEGAN
KRISTINE S. TARDIFF
DANIEL HALAINEN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-4081
daniel.j.halainen@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

## C.    Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C). A related challenge to the same government action is pending in *Relentless, Inc. v. Department of Commerce*, No. 21-1886 (1st Cir.).

/s/ *Daniel Halainen*
DANIEL HALAINEN
Counsel for Appellees

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ......................................................................................... i

TABLE OF AUTHORITIES ................................................. v

GLOSSARY ....................................................................... xii

INTRODUCTION ................................................................ 1

STATEMENT OF JURISDICTION....................................... 2

STATEMENT OF THE ISSUES............................................ 3

PERTINENT STATUTES AND REGULATIONS .................. 3

STATEMENT OF THE CASE............................................... 3

    A.    Statutory and regulatory background ................... 3

    B.    Factual background ............................................... 7

        1.    The Omnibus Amendment ............................ 8

        2.    Omnibus measures ...................................... 10

        3.    Atlantic herring measures .......................... 13

    C.    Proceedings below............................................... 16

SUMMARY OF ARGUMENT .............................................. 18

STANDARD OF REVIEW .................................................. 20

ARGUMENT ...................................................................... 20

I.    The Magnuson-Stevens Act authorizes industry-funded monitoring requirements in fishery management plans. ................. 20

A.    The text, context, and legislative history of the Magnuson-Stevens Act all compel the conclusion that the Fisheries Service may require industry-funded monitoring. ...............................................................22

    1.    Section 1853(b)(8) authorizes the Fisheries Service to require vessels to carry observers at their own expense...........................................................................22

    2.    Industry-funded monitoring is authorized as a necessary and appropriate measure for fishery conservation and management..................................................26

    3.    The permit sanction and penalty provisions of the Magnuson-Stevens Act presuppose industry-funded monitoring.....................................................29

    4.    History confirms that the Magnuson-Stevens Act authorizes industry-funded monitoring......................................30

B.    Plaintiffs' contrary reading of the statute is not supportable. ......................................................................33

    1.    Fee-based monitoring programs are consistent with general authority to require industry-funded monitoring.......................................................................33

    2.    Plaintiffs' resort to legislative history is unpersuasive...........................................................................40

C.    In the alternative, the Court should defer to the Fisheries Service's reasonable interpretation of the statute. .............................42

II.    The Fisheries Service's approval of the Omnibus Amendment and its implementing regulations was procedurally proper...........................48

A.    The Fisheries Service's process was proper........................................49

B.    Plaintiffs' claims of irregularity are baseless. ......................................50

CONCLUSION ...............................................................................57

CERTIFICATE OF COMPLIANCE........................................................................58

ADDENDUM ..............................................................................................59

# TABLE OF AUTHORITIES*

## Cases

*Adirondack Med. Ctr. v. Sebelius*,
  740 F.3d 692 (D.C. Cir. 2014).......................................37

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021)..............................................38

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008).................................................24

*Am. Hosp. Ass'n v. Azar*,
  983 F.3d 528 (D.C. Cir. 2020).......................................26

*Bullcreek v. Nuclear Regulatory Comm'n*,
  359 F.3d 536 (D.C. Cir. 2004).......................................44

*Catawba Cnty. v. Env't Prot. Agency*,
  571 F.3d 20 (D.C. Cir. 2009)........................................44

*Chapman v. United States*,
  500 U.S. 453 (1991).................................................37

*Cheney R.R. Co. v Interstate Com. Comm'n*,
  902 F.2d 66 (D.C. Cir. 1990)........................................44

* *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984).................................................21

*Children's Hosp. Ass'n of Tex. v. Azar*,
  933 F.3d 764 (D.C. Cir. 2019).......................................40

*Comm'ns Imp. Exp. S.A. v. Republic of the Congo*,
  757 F.3d 321 (D.C. Cir. 2014).......................................24

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*,
    673 F.2d 525 (D.C. Cir. 1982)......................................................................54

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)..................................................................................24

*Conservation L. Found. of New Eng., Inc. v. Franklin*,
    989 F.2d 54 (1st Cir. 1993).......................................................................27

*Consumer Elecs. Ass'n v. Fed. Commc'ns Comm'n*,
    347 F.3d 291 (D.C. Cir. 2003)............................................................31, 46

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009)..................................................................................43

*Equal Emp. Opportunity Comm'n v. Abercrombie & Fitch Stores,
    Inc.*,
    575 U.S. 768 (2015)..................................................................................24

*Fla. Health Scis. Ctr., Inc. v. Dep't of Health & Human Servs.*,
    830 F.3d 515 (D.C. Cir. 2016)..................................................................39

*Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*,
    635 F.3d 106 (3rd Cir. 2011)...................................................................5, 6

*Goethel v. Pritzker*,
    No. 15-cv-497, 2016 WL 4076831 (D.N.H. July 29, 2016) ...........................9

*Grossmont Hosp. Corp. v. Burwell*,
    797 F.3d 1079 (D.C. Cir. 2015).................................................................52

*Grunewald v. Jarvis*,
    776 F.3d 893 (D.C. Cir. 2015)..................................................................43

*Humane Soc'y of the U.S. v. Perdue*,
    935 F.3d 598 (D.C. Cir. 2019)..................................................................51

* *In re Sealed Case*,
    932 F.3d 915 (D.C. Cir. 2019)............................................................21, 23

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transportation*,
  724 F.3d 206 (D.C. Cir. 2013)......................................................56

*King v. St. Vincent's Hosp.*,
  502 U.S. 215 (1991)......................................................................29

*Kornitzky Grp., LLC v. Elwell*,
  912 F.3d 637 (D.C. Cir. 2019)....................................................55

*Lovgren v. Byrne*,
  787 F.2d 857 (3d Cir. 1986) ........................................................27

*Lovgren v. Locke*,
  701 F.3d 5 (1st Cir. 2012)............................................................45

*Mead Corp. v. Tilley*,
  490 U.S. 714 (1989)......................................................................41

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014)..................................................54

*Michigan v. Env't Prot. Agency*,
  576 U.S. 743 (2015)......................................................................38

*Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005)......................................................................43

*Nat'l Mining Ass'n v. Kempthorne*,
  512 F.3d 702 (D.C. Cir. 2008)....................................................45

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013)....................................................30

*Nevada v. Dep't of Energy*,
  457 F.3d 78 (D.C. Cir. 2006)......................................................56

*N.Y. Stock Exch. LLC v. Secs. & Exch. Comm'n*,
  962 F.3d 541 (D.C. Cir. 2020)....................................................38

*Nijhawan v. Holder*,
  557 U.S. 29 (2009)........................................................................25

*Niz-Chavez v. Garland*,
    141 S. Ct. 1474 (2021) .................................................................... 23

*Oceana, Inc. v. Locke*,
    670 F. Supp. 3d 1238 (D.C. Cir. 2011) ......................................... 8

*Oceana, Inc. v. Ross*,
    275 F.3d 270 (D.D.C. 2017) ........................................................... 6

*Pac. Choice Seafood Co. v. Ross*,
    976 F.3d 932 (9th Cir. 2020) ....................................................... 45

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    912 F.3d 641 (D.C. Cir. 2019) ..................................................... 55

*Pharm. Rsch. & Mfrs. of Am. v. Fed. Trade Comm'n*,
    790 F.3d 198 (D.C. Cir. 2015) ..................................................... 46

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ...................................................................... 36

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ...................................................................... 30

*Relentless, Inc. v. U.S. Dep't of Commerce*,
    No. 20-108, 2020 WL 5016923 (D.R.I. Aug. 25, 2020) .............. 17

*Relentless, Inc. v. U.S. Dep't of Commerce*,
    No. 20-108, 2021 WL 4256067 (D.R.I. Sept. 20, 2021) ........ 17, 21

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) .................................................................. 21-22

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017) ..................................................... 20

*Shafer & Freeman Lakes Env't Conservation Corp. v. Fed. Energy
    Regulatory Comm'n*,
    992 F.3d 1071 (D.C. Cir. 2021) ................................................... 52

*Shinseki v. Sanders,*
  556 U.S. 396 (2009)...................................................................56

*Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs,*
  531 U.S. 159 (2001)...................................................................41

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)...................................................................50

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)...................................................................50

*Trumpeter Swan Soc'y v. Env't Prot. Agency,*
  774 F.3d 1037 (D.C. Cir. 2014)...........................................52, 55

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009)...................................................................42

*Utility Air Regulatory Grp. v. Env't Prot. Agency,*
  573 U.S. 302 (2014)...................................................................44

*Va. Uranium v. Warren,*
  139 S. Ct. 1894 (2019)...............................................................24

*Wolf Run Mining Co. v. Fed. Mine Safety & Health Rev. Comm'n,*
  659 F.3d 1197 (D.C. Cir. 2011)................................................28

**Statutes**

5 U.S.C. § 706............................................................................51

5 U.S.C. § 551..............................................................................5

5 U.S.C. § 701..............................................................................2

16 U.S.C. § 1801..........................................................3, 4, 28, 43

16 U.S.C. § 1802.............................................8, 23-24, 27, 30, 35

16 U.S.C. § 1821.....................................................................7, 34

16 U.S.C. § 1851 .................................................................26, 28, 46

16 U.S.C. § 1852 ........................................................................4, 7

* 16 U.S.C. § 1853 ..................................................................passim

16 U.S.C. § 1854 ................................................................5, 49, 56

16 U.S.C. § 1857 ...........................................................................39

* 16 U.S.C. § 1858 ..............................................................29, 32, 39

Pub L. No. 94-265, 90 Stat. 331 (1976) .......................................3

Pub. L. No. 101-627, 104 Stat. 4436 (1990) .....................6, 32, 42

Pub. L. No. 102-251, 106 Stat. 60 (1992) ...................................42

Pub. L. No. 104-297, 110 Stat. 3559 (1996) ...............................42

Pub. L. No. 106-554, 114 Stat. 2763 (2000) ...............................42

Pub. L. No. 109-479, 120 Stat. 3575 (2007) ...............................42

## Rules and Regulations

50 C.F.R. § 600.105 ......................................................................8

50 C.F.R. § 600.305 ......................................................................5

50 C.F.R. § 600.746 ......................................................................7

50 C.F.R. § 648.9 .........................................................................25

50 C.F.R. § 648.10 .......................................................................25

50 C.F.R. § 648.11 ........................................... 9, 10-12, 15, 21, 23

55 Fed. Reg. 4839 ........................................................................31

65 Fed. Reg. 77450 (Dec. 11, 2000) ...........................................13

83 Fed. Reg. 47326 (Sept. 19, 2018) ........................................10

83 Fed. Reg. 55665 (Nov. 7, 2018)...........................................10

85 Fed. Reg. 7414 (Feb. 7, 2020) .............................10, 11, 48

Fed. R. App. P. 4(a)(1)(B) ........................................................2

## Other Authorities

H.R. 5018, 109th Cong. (2006).................................................41

H.R. Rep. No. 101-393 (1990)..................................................32

H.R. Rep. No. 114-605 (2016)..................................................33

S. Rep. No. 101-414 (1990) ......................................................32

S. Rep. No. 114-66 (2015) ........................................................33

S. Rep. No. 114-239 (2016) ......................................................33

S. Rep. No. 115-139 (2017) ......................................................33

S. Rep. No. 115-275 (2018) ......................................................33

S. Rep. No. 116-127 (2019) ......................................................33

# GLOSSARY

| | |
|---|---|
| Fisheries Service | National Marine Fisheries Service |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation and Management Act |
| New England Council | New England Fishery Management Council |
| Omnibus Amendment | Industry-Funded Monitoring Omnibus Amendment |
| Secretary | U.S. Secretary of Commerce |

**INTRODUCTION**

The Magnuson-Stevens Act broadly authorizes the National Marine Fisheries Service to require fishing vessels operating in regulated fisheries to comply with conservation and management measures set forth in fishery management plans. The statute more specifically authorizes the Fisheries Service to require industry vessels to carry observers who collect data necessary for the conservation and management of the fishery. In 2018, the Fisheries Service approved an omnibus amendment to New England fishery management plans that establishes a process for determining how and when industry vessels must cover the costs of complying with these observer requirements, which the amendment calls "industry-funded monitoring." Plaintiffs, a group of fishing companies, contend that the Fisheries Service's authority to require them to carry observers excludes situations where they would be required to bear their own compliance costs. They also challenge the process of the amendment's adoption.

The district court correctly rejected these arguments. The plain language of the Magnuson-Stevens Act authorizes the Fisheries Service to require industry vessels to carry observers at their own expense. This conclusion is consistent with—indeed, compelled by—the statute's context and structure, which make clear that the collection of data is essential to effective conservation and management of fisheries and that Congress provided for industry-funded monitoring. The statute's

history only reinforces this conclusion.  Plaintiffs' argument to the contrary rests

on the flawed premise that Congress's decision to specifically authorize separate

fee-collection programs precludes the Fisheries Service from requiring vessels to

procure monitors at their own expense.  In light of the statute's clear meaning, the

Court need not decide whether deference to the agency is warranted, but the

government's interpretation is, at a minimum, reasonable.  Plaintiffs' procedural

challenge, meanwhile, is partly forfeited and wholly wrong.

This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331

because Plaintiffs' claims arose under the Administrative Procedure Act, 5 U.S.C.

§§ 701 et seq.; the Magnuson-Stevens Act, 16 U.S.C. §§ 1801 et seq.; and other

statutes not at issue in the appeal.  Joint Appendix (J.A.) 9.  This Court has

jurisdiction under 28 U.S.C. § 1291 because the district court entered a final

judgment that disposes of all parties' claims.  J.A. 246.  That judgment was entered

on June 24, 2021.  J.A. 246.  Plaintiffs timely filed their notice of appeal on July

15, 2021.  J.A.247.

## STATEMENT OF THE ISSUES

1.  Whether the Magnuson-Stevens Act authorizes the National Marine Fisheries Service to provide for industry-funded monitoring in fishery management plan regulations.

2.  Whether the National Marine Fisheries Service followed proper procedure in approving the regulations implementing the omnibus amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Addendum attached to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

The Magnuson-Stevens Act Fishery Conservation and Management Act ("Magnuson-Stevens Act") governs the conservation and management of fishery resources off the coasts of the United States.  16 U.S.C. § 1801(b)(1).[2]  Congress enacted the Magnuson-Stevens Act "to take immediate action to conserve and manage the fishery resources found off the coasts" and "to promote domestic commercial and recreational fishing under sound conservation and management principles."  *Id.* § 1801(b)(1), (3).  To accomplish these goals, the Magnuson-

---

[2] Congress first enacted the statute as the Fishery Conservation and Management Act, Pub L. No. 94-265, 90 Stat. 331 (1976), and later renamed it the Magnuson-Stevens Act.

Stevens Act authorizes the Secretary of Commerce to implement a comprehensive

fishery management program "to prevent overfishing, to rebuild overfished stocks,

to ensure conservation, to facilitate long-term protection of essential fish habitats,

and to realize the full potential of the Nation's fishery resources." *Id*. § 1801(a)(6);

*see also id.* §§ 1854, 1855(d). The Secretary has delegated authority to administer

the statute to the National Marine Fisheries Service ("Fisheries Service"), a

division of the National Oceanic and Atmospheric Administration.

To assist in fishery management, the Magnuson-Stevens Act established

eight Regional Fishery Management Councils to develop measures consistent with

these policies. 16 U.S.C. § 1852. Each council includes federal, state, and

territorial fishery management officials, and individuals nominated by state

governors and appointed by the Secretary who are "knowledgeable" about fishery

resources within the council's geographic area. *Id.* § 1852(b)(1), (2)(A). Regional

Fishery Management Councils are required to prepare and submit to the Fisheries

Service fishery management plans "for each fishery under [their] authority that

requires conservation and management" and, from time to time, any amendments

that are "necessary," 16 U.S.C. § 1852(h)(1), as well as proposed regulations that

the council "deems necessary or appropriate" to implement the plan, *id*.

§§ 1852(h)(1), 1853(c). These plans are prepared and implemented in accordance

with ten national standards for fishery conservation and management.  *Id*.
§ 1851(a); *see also* 50 C.F.R. § 600.305(a)(3).

When a council transmits a fishery management plan amendment to the
Fisheries Service, the agency publishes a notice of availability in the Federal
Register and opens a comment period.  16 U.S.C. § 1854(a)(1)(B).  After the
comment period closes, the Fisheries Service must approve, disapprove, or
partially approve the plan based on its consistency with law on a set schedule.  *Id*.
§ 1854(a)(3).  The Fisheries Service also publishes proposed rules, solicits public
comment, and promulgates final rules to implement plan amendments, also on a set
timetable.  *Id*. § 1854(b).  Councils cannot promulgate regulations and are not
considered federal agencies for purposes of the Administrative Procedure Act, 5
U.S.C. §§ 551 et seq.  *See, e.g.*, *Gen. Category Scallop Fishermen v. Sec'y, U.S.
Dep't of Commerce*, 635 F.3d 106, 112 n.15 (3rd Cir. 2011).

The Magnuson-Stevens Act sets forth a number of required provisions for
fishery management plans, including that plans must contain measures "necessary
and appropriate for the conservation and management of the fishery, to prevent
overfishing and rebuild overfished stocks, and to protect, restore, and promote the
long-term health and stability of the fishery."  *Id.* § 1853(a)(1)(A).  "The collection
of reliable data" is "essential" to the "effective conservation [and] management"
required by the statute.  *Id.* § 1801(a)(8); *see also id.* §§ 1801(c)(3), 1851(a)(2),

(a)(5). There are also a range of discretionary provisions that "may" be included in fishery management plans, *id.* § 1853(b), for example, requiring that fishing vessels obtain permits, *id.* § 1853(b)(1). The Fisheries Service also may "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(b)(14).

In the Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436 ("1990 Amendments"), Congress codified specific authority for the Fisheries Service to require industry vessels to carry observers. 16 U.S.C. § 1853(b)(8). Observers include "at-sea monitors" who collect information about regulated fisheries and monitor fishing practices on board industry vessels. NOAA Fisheries, Fishery Observers, https://www.fisheries.noaa.gov/topic/fishery-observers (last accessed Dec. 16, 2021). They are "professionally trained biological technicians gathering first-hand data on what's caught and discarded by U.S. commercial fishing vessels." *Id.*; *see also, e.g.*, *Oceana, Inc. v. Ross*, 275 F.3d 270, 276 (D.D.C. 2017) (describing observers as "scientists who board fishing vessels" to "obtain data").

Although fishery management plans had utilized observers to collect data before the 1990 Amendments, including observers procured at vessels' expense, Congress explicitly authorized the Fisheries Service to require vessels to carry

observers "for the purpose of collecting data necessary for the conservation and management of the fishery." 104 Stat. 4448 (codified at 16 U.S.C. § 1853(b)(8)). Under the statute, "observers" may include "any person"—whether individual, corporate, or governmental—carried on a vessel for such a purpose. *Id.* §§ 1802(31), (32), (36). The Fisheries Service has adopted detailed regulations providing general rules for observer programs, 50 C.F.R. § 600.746, and observers are used in fisheries throughout the waters off the coasts of the United States. *See, e.g.*, *id.* §§ 635.7(a), 648.11(a), 660.16, 679.51.

In addition to delegating broad authority to the Fisheries Service, Congress also devised comprehensive schemes for regulating particular issues—for example, foreign vessels, limited access privilege programs, and the North Pacific fisheries research plan. 16 U.S.C. §§ 1821, 1853a, 1862. In establishing these particular programs, Congress made individual decisions about funding, including the adoption of specific fee-based funding mechanisms. *See id.* §§ 1821(h)(4), 1853a(e), 1862(a). Where these programs authorize observers, *id.* §§ 1821(h)(4), 1862(a), they may be funded through these fee-based funding mechanisms.

## B.  Factual background

The New England Fishery Management Council ("New England Council") has authority over fisheries in the Atlantic Ocean seaward of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. 16 U.S.C.

§ 1852(a)(1)(A); *see also* 50 C.F.R. § 600.105(a) (describing boundaries).  The

council has fishery management plans in effect for nine fisheries, including

Atlantic herring.  *See generally* New England Fishery Management Council,

Management Plans (2021), https://www.nefmc.org/management-plans.

### 1.      The Omnibus Amendment

In 2013, the New England Council began a process for allowing industry-

funded monitoring in all of its fishery management plans.  J.A. 340.  The council

was interested in "increas[ing] monitoring in certain fisheries to assess the amount

and type of catch and to reduce uncertainty around catch estimates."  J.A. 250; *see*

*also* J.A. 296.  The Fisheries Service may itself pay to provide observers for these

purposes in some limited circumstances and for particular programs, but their

coverage is limited.  For example, the Fisheries Service funds at-sea observers to

gather data on bycatch, 16 U.S.C. § 1853(a)(11),[3] but that coverage is determined

by a specific methodology adopted in a plan amendment on bycatch reporting.

J.A. 333.  The Fisheries Service may allocate additional funding to support

monitoring programs, when available, but cannot be obligated to spend money that

has not been appropriated by Congress.  *See, e.g.*, J.A. 251, 296-97.

---

[3] "Bycatch" refers to "fish which are harvested in a fishery, but which are not sold
or kept for personal use, and includes economic discards and regulatory discards."
16 U.S.C. § 1802(2).  Fishery plans must establish a "standardized reporting
methodology" to assess bycatch.  *Id.* § 1853(a)(11).  This Court addressed this
requirement in *Oceana, Inc. v. Locke*, 670 F. Supp. 3d 1238 (D.C. Cir. 2011).

The New England Council thus initiated an amendment to its fishery management plans to address industry-funded monitoring programs, through which industry directly funds observer services. J.A. 340. Industry-funded monitoring was not new to the New England Council; two fishery management plans in the region (for the Atlantic sea scallop and for groundfish) already included fishery-specific industry-funded monitoring. J.A. 299; *see also* 50 C.F.R. §§ 648.11(k)(4), 648.87(b).[4] Rather, the amendment was intended to standardize the development and administration of industry-funded monitoring programs, including by differentiating government- and industry-funded monitoring, dividing the cost responsibilities between the government and industry, and providing a process for prioritizing industry-funded monitoring. J.A. 340.

In late 2018, the New England Council adopted the Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment"). J.A. 280. This Omnibus Amendment standardized industry-funded monitoring in the New England Council's fishery management plans generally and provided for industry-funded monitoring in the Atlantic herring fishery specifically. J.A. 377. The Fisheries Service published a notice of availability for the New England Council's

---

[4] A court rejected a challenge to the groundfish industry-funded monitoring amendment on many of the grounds raised here. *Goethel v. Pritzker*, No. 15-cv-497, 2016 WL 4076831 (D.N.H. July 29, 2016), *aff'd sub nom. Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106 (1st Cir.), *cert. denied*, 138 S. Ct. 221 (2017).

amendment in the Federal Register on September 19, 2018, providing a 60-day comment period.  Industry-Funded Monitoring, 83 Fed. Reg. 47326 (Sept. 19, 2018).  After considering comments, the Fisheries Service approved the amendment and informed the council.  J.A. 377, 406-08.

The Fisheries Service published a proposed rule to implement the Omnibus Amendment on November 7, 2018, providing a 45-day comment period.  Industry-Funded Monitoring, 83 Fed. Reg. 55665 (Nov. 7, 2018).  Just before the comment period closed, a lapse in appropriations caused a partial government shutdown that lasted 35 days.  J.A. 439.  After the restoration of appropriations, the Fisheries Service explained to the New England Council that completion of the rulemaking would be delayed.  *Id.*; *see also* J.A. 409.  In due course, the Fisheries Service considered public comments and published a final rule.  Industry-Funded Monitoring, 85 Fed. Reg. 7414 (Feb. 7, 2020).  The main omnibus measures are codified at 50 C.F.R. § 648.11(g), and the main Atlantic herring monitoring coverage requirements are codified at 50 C.F.R. § 648.11(m).

### 2.    Omnibus measures

The omnibus measures "standardize[] the development and administration of future industry-funded monitoring programs" in New England Council fishery management plans.  J.A. 377; *see also* 50 C.F.R. § 648.11(g)(1).  These measures are "administrative" in nature, "specifying a process" for administering industry-

funded monitoring without "directly affect[ing] fishing effort or amounts of fishing harvested." J.A. 378. The standardized process is intended to "help reduce the administrative burden associated with implementing new programs" and yield "greater consistency in the information collected," which can in turn "lead to better management of biological resources." *Id.*

There are five key provisions in the omnibus measures. *First*, the measures create a standardized process for implementing and revising industry-funded monitoring programs in fishery management plans. J.A. 378; *see also* 50 C.F.R. § 648.11(g)(2).

*Second*, the omnibus measures "divide[]" the "[c]ost responsibilities for industry-funded monitoring" between the fishing industry and the Fisheries Service. J.A. 378; *see also* 50 C.F.R. § 648.11(g)(3). The Fisheries Service is responsible for program costs "for which the benefit of the expenditure accrues to the government." J.A. 378. Specifically, the Fisheries Service is responsible for "paying costs associated with setting standards for, monitoring the performance of, and administering industry-funded monitoring programs," like training observers and monitoring observer performance. J.A. 378; *see also* 50 C.F.R. § 648.11(g)(3)(i)-(vi). Industry is directly responsible for other monitoring costs, like "travel and salary" for monitoring deployments and overhead incurred by observer service providers. J.A. 378-79; *see also* 50 C.F.R. § 648.11(g)(3)(vii).

*Third*, the omnibus measures establish a process for prioritizing monitoring programs if funding is limited. J.A. 379; *see also* 50 C.F.R. § 648.11(g)(4). Because the Fisheries Service is responsible for administrative costs, these observers programs proceed only when sufficient federal funds are available to operate the program, even though the observers are themselves funded by industry. J.A. 379; *see also* 50 C.F.R. § 648.11(g)(4)(i). If there are industry-funded monitoring programs in multiple fisheries and federal funding is limited, the New England Council will lead a process to determine which programs to prioritize; if there is no available federal funding for a particular program, then no industry-funded program will be administered or operate that year and industry would not need to pay its monitoring costs. J.A. 379; *see also* 50 C.F.R. § 648.11(g)(4)(iii).

*Fourth*, the omnibus measures include standards for industry-funded observers and observer service providers. J.A. 379; *see also* 50 C.F.R. § 648.11(g)(5), (h), (i).

*Fifth*, the omnibus measures standardize the process for developing future monitoring set-aside programs. J.A. 380; *see also* 50 C.F.R. § 648.11(g)(6). A set-aside program uses a portion of the fishery's annual catch limit to help limit the costs of meeting industry-funded monitoring coverage targets. J.A. 380.

Adoption of these omnibus measures did not, on its own, result in implementation of industry-funded monitoring in any of the New England

Council's fishery management plans. The council must develop a program for each particular fishery, amend (or adopt) the relevant fishery management plan (or plans) consistent with the specifications set out in the omnibus measures, and submit the plan and proposed regulations to the Fisheries Service for review and action. J.A. 377; *see also* 50 C.F.R. § 648.11(g)(1)-(2).

### 3. Atlantic herring measures

In conjunction with the omnibus measures, the Omnibus Amendment established an industry-funded monitoring program for the Atlantic herring fishery. J.A. 411. Atlantic herring are found in the Atlantic Ocean and serve as a forage species for a number of other fish, marine mammals, and seabirds. The New England Council submitted the operative fishery management plan for the Atlantic herring fishery in 1999, in response to concerns about overfishing, and the Fisheries Service adopted a final rule the following year. Atlantic Herring Fishery Management Plan, 65 Fed. Reg. 77450 (Dec. 11, 2000); *see also* Atlantic Herring Fishery Management Plan, 11956, 11956-57 (Mar. 7, 2000).

The New England Council adopted the Atlantic herring industry-funded monitoring program with a goal of improving accuracy in estimates of catch in the fishery and to provide affordable monitoring for the fishery. J.A. 380; *see also* J.A. 320-21. Industry-funded monitors collect data on, among other things, fishing

gear, tow, trip costs, and catch—including things like the species, weight, disposition, and length of catch.  J.A. 381; *see also* 50 C.F.R. § 648.11(m)(1)(i)(B).

The Fisheries Service, in consultation with New England Council staff, sets coverage targets that determine how much monitoring will be industry-funded.  50 C.F.R. § 648.11(m)(1)(ii)(B).  The amendment established a 50-percent coverage target—that is, at-sea monitoring on 50 percent of vessels—for vessels issued two kinds of herring permits, called Category A and Category B limited access permits.  *See* J.A. 380 (explaining these categories in more detail).  The coverage target would be achieved through a combination of Fisheries Service observers under its bycatch reporting program and industry-funded at-sea monitoring at whatever level is needed to meet the overall 50-percent coverage target.  J.A. 380.

Because federally funded monitoring supplements industry-funded monitoring, the level of industry-funded monitoring in a given year will vary based on the level of federal funding.  J.A. 380.  For example, if the Fisheries Service estimates 10-percent observer coverage through the federally funded bycatch reporting program, then an additional 40-percent coverage through the industry-funded monitoring program would be needed to meet the overall 50-percent monitoring coverage target.  J.A. 380.  But the industry-funded monitoring program would also be subject to the prioritization process laid out in the Omnibus Amendment.  J.A. 380.  If the Fisheries Service lacks funding to support the

administrative costs of the program (or prioritizes a program in a different fishery), there might be no industry-funded monitoring requirements that year, even if federally funded observer coverage does not meet the 50-percent target.  J.A. 380. For example, in a year where the bycatch reporting program provides 10-percent observer coverage, there might only be 10-percent coverage in total if the Fisheries Services cannot pay the administrative costs of an industry-funded monitoring program for the additional 40-percent coverage.  J.A. 380.  Thus, the 50-percent coverage target is essentially a ceiling, not a mandate; its administration depends on the amount of federal funding available.

If industry-funded monitoring is required in a given year, the Fisheries Service selects vessels that were issued Category A or B herring permits to carry an industry-funded at-sea monitor on herring trips.  J.A. 380; *see also* 50 C.F.R. § 648.11(m)(3).  Vessel owners are then responsible for paying the costs of the at-sea monitor.  J.A. 380; *see also* 50 C.F.R. § 648.11(m)(4).  Coverage requirements may be waived on a trip-by-trip basis under specified circumstances, including for vessels intending to land smaller quantities of herring per trip.  J.A. 381.  The New England Council also recommended that the Fisheries Service issue permits exempting certain vessels from observer coverage if they use electronic monitoring.  J.A. 382-83.

The Fisheries Service acknowledged that the industry-funded monitoring program would have "direct economic impacts" on vessels holding Category A or B permits in the Atlantic herring fishery, including the potential "cost responsibility associated with carrying an at-sea monitor [of] $710 per day." J.A. 381. These costs could reduce the annual return-to-owner for these vessels by up to 20 percent. J.A. 381. But the Fisheries Service noted that waiving monitoring coverage for vessels landing smaller amounts of herring would help address this concern. J.A. 381. The amendment also requires the New England Council to revisit the industry-funded monitoring coverage targets after two years of implementation to consider the results of increased coverage (if any) and determine whether adjustments are warranted. J.A. 380; *see also* 50 C.F.R. § 648.11(m)(1)(ii)(F).

## C. Proceedings below

Plaintiffs, fishing companies with Atlantic herring fishing permits, filed suit in February 2020 to challenge the Omnibus Amendment and the final rule implementing it. J.A. 9. Their complaint alleged that the Magnuson-Stevens Act did not authorize industry-funded monitoring; that the Omnibus Amendment did not comply with two of the national standards for fishery management plans; that the Fisheries Service's approval and rulemaking process was irregular; and that the

Omnibus Amendment violated a variety of other federal laws.  J.A. 35-38.  The parties moved for summary judgment.

In a well-reasoned 88-page decision, the district court rejected Plaintiffs' claims across the board.  J.A. 243.  As relevant to this appeal, the district court concluded that the Magnuson-Stevens Act unambiguously authorizes the Fisheries Service to impose observer requirements and to require vessels to bear the costs.  J.A. 182-91.  The district court rejected Plaintiffs' arguments that the adoption of separate fee-collection programs to fund observers invalidates the Fisheries Service's authority plainly conferred by the statute.  J.A. 187-91.  The district court concluded that there was no need to reach questions of deference to the agency's interpretation because the statute is clear, but noted that deference would be appropriate.  J.A. 191.  The district court also rejected the claim that the approval process for the Omnibus Amendment was irregular.  J.A. 239-42.

During the pendency of these proceedings, a different group of plaintiffs brought a similar challenge to the Omnibus Amendment in *Relentless, Inc. v. U.S. Department of Commerce*, No. 20-108 (D.R.I.).  The Rhode Island federal district court denied the government's motion to transfer that case to the district court before which this case was pending.  *Relentless, Inc. v. U.S. Dep't of Commerce*, No. 20-108, 2020 WL 5016923, at *2 (D.R.I. Aug. 25, 2020).  That court then ruled for the government on the merits; an appeal is now pending.  *Relentless, Inc.*

*v. U.S. Dep't of Commerce*, No. 20-108, 2021 WL 4256067, at *7 (D.R.I. Sept. 20, 2021), *appeal docketed*, No. 21-1886 (1st. Cir. Nov. 4, 2021).

Plaintiffs now appeal, seeking reversal only of the district court's rulings that the Magnuson-Stevens Act authorizes industry-funded monitoring and that the approval of the Omnibus Amendment and final rule was procedurally sound.

## SUMMARY OF ARGUMENT

1. The Magnuson-Stevens Act authorizes the Fisheries Service to establish industry-funded monitoring programs in New England fisheries. The statute expressly permits fishery management plans to include observer requirements and any necessary and appropriate measures for the conservation and management of the fishery. Under the plain language of these provisions, industry participants in New England fisheries may be required to bear the costs of compliance with a monitoring coverage requirement. The monitoring measures are also consistent with the Magnuson-Stevens Act's overall structure and purpose by advancing the interest in collecting data that is essential to conservation and management of the fisheries. If the statute's plain language, context, and structure were not enough, the legislative history confirms that Congress intended to authorize industry-funded monitoring, which existed before, during, and after enactment of the relevant provisions.

Plaintiffs' argument that the Fisheries Service alone must bear any and all costs of meeting vessels' observer requirements has no footing in the text or purpose of the statute. Nor can Plaintiffs' argument be reconciled with provisions of the statute that presuppose the existence of industry-funded observers, including provisions authorizing sanctions and penalties related to industry-contracted observers. Plaintiffs' reliance on statutory provisions authorizing fee-based monitoring programs—where the government pays for data collection and recovers costs through fees—is misplaced. Under no canon of statutory construction can these programs be interpreted to deprive the Fisheries Service of its authority to require industry vessels to carry observers at their own expense.

Even if the Court concludes that the Fisheries Service's authority is ambiguous, the Court should defer to the agency's reasonable construction of its own statute under the familiar *Chevron* framework. Plaintiffs' argument that the Fisheries Service's interpretation is unreasonable in light of cost considerations is belied by the record.

2.     The Fisheries Service approved the Omnibus Amendment and promulgated the final rule through a proper process. Plaintiffs challenge the initiation of the rulemaking process while approval of the amendment was pending, but that overlap is envisioned by the Magnuson-Stevens Act itself. The statute lays out accelerated timelines for the submission, review, and approval of

amendments and implementing regulations, and directs that these processes should go forward simultaneously.  Plaintiffs seek to disclaim the applicability of these statutory timelines for the first time on appeal, but their arguments are unsupported by the record and largely amount to flyspecking the procedural history without any demonstration of prejudice.  The Fisheries Service engaged in an appropriate process, and Plaintiffs fail to identify anything other than complaints about issues that were reasonably explained and—at most—harmless.

## STANDARD OF REVIEW

This Court reviews de novo an order granting summary judgment.  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017).  When reviewing an agency action, the Court will "review the administrative action directly, according no particular deference to the judgment of the District Court."  *Id.*

## ARGUMENT

### I. The Magnuson-Stevens Act authorizes industry-funded monitoring requirements in fishery management plans.

The Magnuson-Stevens Act authorizes the industry-funded monitoring measures in the Omnibus Amendment and the final rule.  Plaintiffs argue that the Omnibus Amendment is unlawful because the Magnuson-Stevens Act cannot reasonably be interpreted to permit any form of industry-funded monitoring.  Brief 23-59.  But industry-funded monitoring is well-established in domestic fisheries and has been upheld against similar legal challenges.  *See* 50 C.F.R.

§§ 648.11(k)(4), 648.87(b), 660.16(a); *Relentless*, No. 20-108, 2021 WL 4256067, at *7; *Goethel*, No. 15-cv-497, 2016 WL 4076831, at *5. As the final rule explains, the industry-funded monitoring measures in the Omnibus Amendment fall well within the Fisheries Service's authority to require vessels to carry observers. 85 Fed. Reg. at 7422 (citing 16 U.S.C. § 1853(b)(8)).

This statutory interpretation question is subject to the familiar two-step *Chevron* framework. *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 5 F.4th 68, 76-77 (D.C. Cir. 2021) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). At *Chevron*'s first step, the Court determines whether Congress spoke directly to the issue and gives effect to the unambiguous statutory meaning. *See id.* at 77. If the statute is ambiguous, the Court examines the government's interpretation and defers to any "permissible construction of the statute" under *Chevron*'s second step. *Id.* (quoting *Chevron*, 467 U.S. at 843.).

Here, the inquiry ends at the first step. The "statutory language is unambiguous and the statutory scheme is coherent and consistent." *In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)) (quotation marks omitted). The plain text of the relevant provisions, read in the context of the Magnuson-Stevens Act and its structure as a whole, authorize industry-funded monitoring of the type challenged here. Neither the fee-collection programs nor the legislative history cited by Plaintiffs override

the ordinary meaning of the words Congress enacted in the statute. To the

contrary, the legislative history supports authority for industry-funded monitoring.

Even if the Court reaches *Chevron*'s second step, the Fisheries Services'

interpretation of the Magnuson-Stevens Act, a statute it is charged with

administering, is more than reasonable.

A. **The text, context, and legislative history of the Magnuson-Stevens Act all compel the conclusion that the Fisheries Service may require industry-funded monitoring.**

1. **Section 1853(b)(8) authorizes the Fisheries Service to require vessels to carry observers at their own expense.**

The Magnuson-Stevens Act expressly authorizes the Fisheries Service to

require industry-funded monitoring. Section 1853(b)(8) authorizes fishery

management councils to adopt fishery management plans that "require that one or

more observers be carried on board a vessel of the United States engaged in fishing

for species that are subject to the plan." 16 U.S.C. § 1853(b)(8). The only relevant

qualification to this authority is a description of the purpose of the observer

requirement: "collecting data necessary for the conservation and management of

the fishery." *Id.* The Fisheries Service exercised this statutory authority in

approving the Omnibus Amendment and its implementing regulations. The

omnibus measures provide that fishery management plans may, under certain

circumstances, require industry vessels to carry observers to collect data, and the

Atlantic herring measures require vessels holding Category A and B limited access herring permits to carry observers and at-sea monitors as necessary to meet monitoring coverage targets.  50 C.F.R. § 648.11(g), (m).

When interpreting a provision like § 1853(b)(8), the plain text of the statute is, as always, the starting point.  *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 982-83 (D.C. Cir. 2021); *see also, e.g.*, *In re Sealed Case*, 932 F.3d at 928.  The statute's terms must be given their "ordinary meaning," as informed by any other textual "clues."  *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021) (quoting *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021)) (quotation marks omitted).  Here, it is beyond dispute that the plain meaning of § 1853(b)(8) authorizes the Fisheries Service to approve the observer coverage requirements in the omnibus and Atlantic herring measures.

Plaintiffs object only to the funding mechanism.  Brief 41-47.  They construe § 1853(b)(8) to permit fishery management councils to adopt observer coverage requirements only where those observers are funded by the government.  But that limitation appears nowhere in the text, nor does the term "observer" carry that connotation.  "Observer" is defined to mean, simply, "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter."  16 U.S.C. § 1802(31).  "Person" is similarly defined broadly to include "any individual" or "any" of a list of business

or government entities. *Id.* § 1802(36). The term "any" has "an expansive meaning" that ordinarily lacks limitation. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219-21 (2008) (quotation marks omitted). Industry-funded monitors are clearly "observers" within the meaning of the statute.

Plaintiffs ask the Court, in effect, to read the phrase "government-funded" into this provision of the statute before the word "observer." Brief 41 ("Congress assumed the government would pay[.]"). "The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks [the Court] to add words to the law to produce what is thought to be a desirable result." *Equal Emp. Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). Drafting statutes is "Congress's province." *Id.* "The court must 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 327 (D.C. Cir. 2014) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)); *see also Va. Uranium v. Warren*, 139 S. Ct. 1894, 1900 (2019) (noting courts' duty "to respect not only what Congress wrote but, as importantly, what it didn't write").

The statute's plain language authorizes the Fisheries Service to require that industry vessels meet a substantive observer coverage requirement, regardless who funds the observers. 16 U.S.C. § 1853(b)(8). This clear statutory authority

necessarily imposes on the regulated vessels any costs incidental to compliance with the observer requirement.  As the Fisheries Service explained in the final rule, the "requirement to carry observers, along with many other requirements under the Magnuson-Stevens Act, includes compliance costs on industry participants."  85 Fed. Reg. at 7422.  It is far from unusual for Congress to authorize agencies to adopt regulations that require a regulated industry to bear compliance costs, particularly where, as here, regulated entities are subject to permitting requirements.  *See* 16 U.S.C. § 1853(b)(1).

Indeed, many of the Magnuson-Stevens Act's provisions authorizing conservation and management measures necessarily entail compliance costs.  *See generally* 16 U.S.C. § 1853(a), (b).  These adjoining provisions properly inform the understanding of § 1853(b)(8) under basic canons of statutory interpretation.  *See, e.g.*, *Nijhawan v. Holder*, 557 U.S. 29, 39 (2009).  For example, a fishery management plan may "require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter."  16 U.S.C. § 1853(b)(4).  By regulation, vessels in many fisheries are required to carry vessel monitoring systems that electronically monitor their positions, 50 C.F.R. §§ 648.9-.10, and vessels "pay costs to third-parties for services or goods in order to comply with these regulatory requirements."  85 Fed. Reg. at 7422.  If Plaintiffs' reading

of § 1853(b)(8) were correct, there would be no obvious basis to distinguish responsibility for the compliance costs of this or any other requirement.

If there were any doubt on this point, the Magnuson-Stevens Act, as amended, elsewhere makes clear that Congress anticipated that conservation and management measures would impose costs on industry. Two of the statutory national standards, with which fishery management plans must comply, address economic impacts. 16 U.S.C. § 1851(a)(7)-(8). National Standard 7 directs the Fisheries Service to "minimize costs" of conservation and management measures "where practicable," and National Standard 8 is an analogous direction to "minimize adverse economic impact on [fishing] communities." *Id.* These standards would be superfluous if the Fisheries Service had no authority to adopt measures that entail compliance costs for industry vessels. *See Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 534 (D.C. Cir. 2020) (statutes should be construed to give effect to every clause and word).

### 2. Industry-funded monitoring is authorized as a necessary and appropriate measure for fishery conservation and management.

The Fisheries Service also has authority to require industry-funded monitoring under provisions of the Magnuson-Stevens Act that permit plan measures "necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(a)(1)(A), (b)(14). This authority, by its terms, is broad.

*Conservation L. Found. of New Eng., Inc. v. Franklin*, 989 F.2d 54, 61 (1st Cir. 1993) (describing "broad discretion" under the identically phrased provision); *Lovgren v. Byrne*, 787 F.2d 857, 864 (3d Cir. 1986) (similarly describing "broad authority" under 16 U.S.C. § 1853(b)(14)).  Although broad, the Fisheries Service's authority under these provisions is not all-purpose.  The statute defines the term "conservation and management" in a manner addressed to particular sustainability functions.  16 U.S.C. § 1802(5).

These provisions work in tandem with § 1853(b)(8), authorizing the Fisheries Service to adopt regulations necessary and appropriate to ensure that observer requirements fulfill their purpose of "collecting data necessary for the conservation and management of the fishery."  *Id.* § 1853(b)(8).  Requiring industry-funded monitoring falls within the ambit of this authority to meet the conservation and management needs of a fishery, as the New England Council and the Fisheries Service discussed in the Omnibus Amendment and the final rule.  *See, e.g.*, 85 Fed. Reg. at 7414.  Thus, even if the authority to require observers did not clearly authorize the measures adopted in the Omnibus Amendment, the authority under § 1853(a)(1)(A) and (b)(14) to adopt appropriate measures does.

Indeed, the Magnuson-Stevens Act, when viewed as a whole, makes clear that the industry-funded monitoring requirements are a proper exercise of the Fisheries Service's authority to prescribe necessary and appropriate measures to

ensure the collection of data necessary for conservation and management. *Wolf Run Mining Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 659 F.3d 1197, 1200 (D.C. Cir. 2011) ("In deciding whether the text resolves the meaning of a statutory provision," the Court considers "the language and design of the statute as a whole." (quotation marks omitted)). Congress specifically codified a finding that the "collection of reliable data is *essential* to the effective conservation, management, and scientific understanding" of fishery resources. 16 U.S.C. § 1801(a)(8) (emphasis added); *see also id.* § 1851(a)(2) (national standard requiring measures to "be based upon the best scientific information available"); *id.* § 1801(c)(3) (policy of using "best scientific data available").

To that end, the Magnuson-Stevens Act requires fishery management plans to specify pertinent data that shall be submitted to the Fisheries Service about commercial fishing in the fishery, including "information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in," and other data. 16 U.S.C. § 1853(a)(5). Observer programs generally are an important and statutorily recognized means of collecting this data about a fishery. *Id.* § 1853(b)(8). And the Atlantic herring measures specifically provide that observers will collect information about fishing gear, species weights, and catch, as required by the statute. 50 C.F.R. § 648.11(m). The adoption of industry-funded monitoring thus furthers the broader conservation

and management goals of the Magnuson-Stevens Act by ensuring the collection of data Congress deemed necessary for those purposes.

### 3. The permit sanction and penalty provisions of the Magnuson-Stevens Act presuppose industry-funded monitoring.

In addition to these authorizing provisions, the Magnuson-Stevens Act also includes two provisions—16 U.S.C. §§ 1858(g)(1)(D) and 1857(1)(L)—that expressly contemplate industry-funded monitoring in fisheries and provide authority for the regulation of vessels' contracting of monitors. The existence of these provisions reinforces the Fisheries Services' authority to require industry-funded monitoring in a fishery management plan. *See, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("a statute is to be read as a whole").

The relevant provisions provide for adverse legal consequences for certain actions related to observers that are contracted for or paid by industry, rather than by the Fisheries Service. *First*, the Fisheries Service may impose permit sanctions on vessels for failure to make "any payment required for observer services provided to *or contracted by* an owner or operator who has been issued a permit," expressly contemplating that industry-contracted monitoring is authorized. 16 U.S.C. § 1858(g)(1)(D) (emphasis added). *Second*, the statute similarly makes it unlawful to "forcibly assault, resist, oppose, impede, intimidate, sexually harass, bribe, or interfere with any observer on a vessel under [the Magnuson-Stevens

Act], or any data collector employed by the National Marine Fisheries Service or *under contract to any person* to carry out responsibilities under [the statute]." *Id.* § 1857(1)(L) (emphasis added). "Observer," as used in this provision, is defined to mean "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits." *Id*. § 1802(31).

These provisions necessarily presuppose that the Fisheries Service may require industry-funded monitoring. If the Fisheries Service could not require industry to pay for monitoring, then all monitoring services would be provided directly by the Fisheries Service. There would be no need to regulate payments for "observer services" by industry vessels if those vessels could not be required to fund monitoring under the Magnuson-Stevens Act. The permit sanctions provision necessarily is premised on vessels directly contracting with observers that are required or authorized by regulation to be carried by the vessel—in short, industry-funded monitoring. These provisions thus support the conclusion that the Magnuson-Stevens Act authorizes industry-funded monitoring.

### 4. History confirms that the Magnuson-Stevens Act authorizes industry-funded monitoring.

This Court need not go beyond the text of these provisions of the statute in order to conclude that the Magnuson-Stevens Act authorizes industry-funded monitoring. *See, e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 212 (D.C. Cir. 2013). But the

legislative history and historical context lend further weight to this conclusion. *Consumer Elecs. Ass'n v. Fed. Commc'ns Comm'n*, 347 F.3d 291, 298-99 (D.C. Cir. 2003). Plaintiffs suggest that, to the contrary, the legislative history of the Magnuson-Stevens Act supports a different reading of § 1853. Brief 47-49. But there is no conflict between the statute and the legislative history.

After the Fishery Conservation and Management Act was enacted in 1976, 90 Stat. 331, the Fisheries Service began exercising its statutory authority to require industry vessels to carry observers and pay their own costs. In 1989, for example, the Fisheries Services adopted an industry-funded observer program. *See* Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea and Aleutian Islands Area, 55 Fed. Reg. 4839, 4840 (Feb. 12, 1990) (providing that the "vessel operator . . . will pay the cost of the observer directly to the contractor"). During hearings on the statute that year, witnesses discussed these existing industry-funded observers in the North Pacific fishery and testified to the observer requirements, where "[i]n all cases" industry "pays the cost of the observer." *Oversight of Marine Fisheries Management: Hearings Before the National Ocean Policy Study of the Committee on Commerce, Science, and Transportation, U.S. Senate*, 101st Cong. 464 (1989) (written testimony of Chris Blackburn); *see also Magnuson Fishery Conservation and Management Act of 1976, Reauth.—Part II, Hearing Before the Subcommittee on Fisheries and Wildlife Conservation and the*

*Environment, Committee on Merchant Marine and Fisheries, House of Representatives*, 101st Cong. 33 (1989) (testimony of John Peterson).

Congress confirmed this authority in the 1990 Amendments, 104 Stat. 4448, which added to the statute the observer provision now codified at 16 U.S.C. § 1853(b)(8). A committee report accompanying the bill explained that this provision "allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes," noting that "the Councils already have—and have used—such authority." H.R. Rep. No. 101-393, at 28 (1990). Enactment of the observer provision simply "makes the authority explicit." *Id.* Another committee report similarly confirmed that the amendment "clarif[ies] the existing authority." S. Rep. No. 101-414, at 8, 20 (1990). The existing observer practices that Congress sought to expressly authorize included the use of industry-funded monitoring. Moreover, Congress's later addition of 16 U.S.C. § 1858(g)(1)(D)—the permit sanctions provision—confirms that Congress continued to contemplate that industry-funded monitoring was statutorily authorized. *See* Pub. L. No. 104-297, § 114(c), 110 Stat. 3599.

Consistent with this history, the Fisheries Service has interpreted its authority under § 1853(b)(8) to permit the adoption of industry-funded monitoring programs. During the intervening three decades, the agency has promulgated regulations implementing industry-funded monitoring programs in several

fisheries.  *See, e.g.*, 50 C.F.R. §§ 648.11(g)(5), (k)(4), 648.87(b), 660.16(a).  And

Congress is aware that these industry-funded monitoring programs have been

proceeding under the Magnuson-Stevens Act.  In recent years, congressional

committees have on several occasions addressed monitoring questions and directed

the Fisheries Service to look into policies that would be cost-effective for industry

participants.  *See, e.g.*, S. Rep. No. 116-127, at 42 (2019); S. Rep. No. 115-275, at

36 (2018); S. Rep. No. 115-139, at 34 (2017); H.R. Rep. No. 114-605, at 17

(2016); S. Rep. No. 114-239, at 31-32 (2016); S. Rep. No. 114-66, at 31-32 (2015).

In sum, Congress's actions in connection with this statute only reinforce the

understanding that it provides authority for industry-funded monitoring.

### B.     Plaintiffs' contrary reading of the statute is not supportable.

#### 1.     Fee-based monitoring programs are consistent with general authority to require industry-funded monitoring.

Plaintiffs' principal argument that the Magnuson-Stevens Act does *not*

authorize industry-funded monitoring—despite the foregoing evidence in the

statutory text, context, and history—rests on provisions of the statute that create

three specific programs.  Brief 26-34, 37-40.  In addition to delegating general

authority to administer the Magnuson-Stevens Act to the Fisheries Service in

§ 1853, Congress specifically devised comprehensive schemes for regulating these

three particular issues—foreign vessels, limited access privilege programs, and the

North Pacific's fisheries research plan. 16 U.S.C. §§ 1821, 1853a, 1862. In these programs, Congress made its own decisions about how to allocate responsibility for providing services and how to fund them, including specific fee-based funding mechanisms. *See id.* §§ 1821(h)(4), 1853a(e), 1862(a). The enactment of fee-based funding provisions for these three programs does not foreclose the Fisheries Service's authority to require industry-funded monitoring.

These programs all involve fees paid to the government rather than payments made directly to observers, but they have distinct structures. *First*, the Magnuson-Stevens Act authorizes the Fisheries Service to require observers on foreign fishing vessels and directs the agency to "impose" on foreign permit holders "a surcharge in an amount sufficient to cover all the costs of providing a United States observer aboard that vessel." *Id.* § 1821(h)(4).

*Second*, the Magnuson-Stevens Act authorizes the North Pacific Fishery Management Council to prepare, in consultation with the Fisheries Service, fisheries research plans that, among other things, "require[] that observers be stationed on fishing vessels" and "establish[] a system of fees" to "pay for the cost of implementing the plan." *Id.* § 1862(a). The statute then outlines a "system of fees" to cover costs that include "stationing observers." *Id.* § 1862(b)(2)(A)(i); *see also id.* § 1862(b)(2)(E), (I).

*Third*, Congress authorized limited access privilege programs (discretionary programs under which a quantity of fish is allocated to a person for exclusive use), and required, among other things, "a program of fees paid" by privilege holders to "cover the costs of management, data collection and analysis, and enforcement activities." *Id.* § 1853a(e)(2); *see also id.* § 1802(26) (defining limited access privilege). This provision generally provides for recovery of certain costs for data collection, which could include—among many other means—observer coverage. *See id.* This program is largely irrelevant to Plaintiffs' argument, as Congress did not address funding for observers—indeed, observers are not mentioned at all.

Plaintiffs' arguments about these fee-collection programs rest on a mischaracterization of the Omnibus Amendment as seeking to "collect fees" for observer services in a fashion similar to that authorized for foreign fishing and the North Pacific program. Brief 29, 37-40. But industry-funded monitoring, as defined by the Omnibus Amendment, does not involve fees. A "fee is a form of 'funding' where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency." 85 Fed. Reg. at 7422. Fees are thus distinct from compliance costs, both in operation and as a matter of law; for example, the Magnuson-Stevens Act contains specific authorities on fees. *See, e.g.*, 16 U.S.C.

§ 1853(b)(1). The industry-funded monitoring program does not involve "fees" paid to the government and is not comparable to a fee-collection program.

This basic error undermines Plaintiffs' statutory analysis. Plaintiffs rely on this "general/specific canon" to argue against "the superfluity of a specific provision that is swallowed by a general one"—a surplusage argument, essentially. Brief 27 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). But their invocation of §§ 1821(h)(4), 1853a(e), and 1862(a) does not implicate concerns about surplusage because these provisions do not bear on the meaning of the provisions authorizing the Fisheries Service to require industry vessels to carry observers at their own cost. This is not a case where, for example, the Court must reconcile two competing grants of authority by treating the specific grant of authority as an exception to the general. *See, e.g.*, *RadLAX*, 566 U.S. at 646. There is no conflict to reconcile.

Put simply, Congress was accomplishing different things in § 1853, a broad delegation of authority to the Fisheries Service, and in these fee-collection provisions. In enacting §§ 1821(h)(4) and 1862(a), Congress established a system of fees to fund specific Fisheries Service operations that include observers. And in § 1853a(e), Congress was funding the limited access privilege program while saying nothing in particular about observers at all. Congress was not stepping in to fill a void left by the fishery management provisions in § 1853, but rather,

legislating specific solutions tailored to specific issues. That is not a question of general and specific authority but of different legislative tasks.

In addition to the general/specific canon, Plaintiffs invoke the expressio unius canon of construction to draw negative inferences from §§ 1821, 1853a and 1862 about the Fisheries Service's authority under § 1853. Brief 30-32; *see also, e.g.*, *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696 (D.C. Cir. 2014) (discussing expressio unius). That argument is totally divorced from the text. There is no textual hook in any of the provisions at issue—§§ 1821, 1853, 1853a, or 1862—to draw negative inferences from fee provisions. There is, instead, a very broadly worded delegation of authority in § 1853. Plaintiffs effectively ask the court to read a limitation into the otherwise plain language of § 1853 based on unexpressed congressional intent. That is not the purpose of the expressio unius canon, which is "a poor indicator of Congress' intent" when "countervailed by a broad grant of authority" like § 1853. *Adirondack Med. Ctr.*, 740 F3d at 697. Plaintiffs seek to deploy the canons of construction to muddy a clear delegation rather than to clarify an ambiguous one, and canons of construction do not provide "a license for the judiciary to rewrite language enacted by the legislature." *Chapman v. United States*, 500 U.S. 453, 464 (1991).

For similar reasons, Plaintiffs' argument that the adoption of industry-funded monitoring programs cannot be considered "necessary and appropriate" in

the context of the broader statutory scheme fails.  Brief 42-47.  Plaintiffs rely on

several cases from the Supreme Court and this Court, but these cases all involve

agencies exercising authority under broad delegations that courts have held to be

inconsistent with express limitations or prohibitions in the same statutory scheme.

These cases are thus easily distinguishable.

For example, the Supreme Court concluded in *Alabama Association of*

*Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485, 2488

(2021), that the Centers for Disease Control and Prevention's statutory authority to

adopt regulations "necessary" to prevent the spread of disease did not authorize an

eviction moratorium where a subsequent sentence listing examples like fumigation

and pest extermination constrained the scope of that authority to similar contexts.

In *Michigan v. Environmental Protection Agency*, 576 U.S. 743, 752 (2015), the

Court held that the agency could not rely on its authority to adopt "appropriate and

necessary" regulations to prohibit cost considerations where the statutory scheme

otherwise required it.  And in *New York Stock Exchange LLC v. Securities &*

*Exchange Commission,* 962 F.3d 541, 554-557 (D.C. Cir. 2020), this Court held

that terms like "necessary" and "appropriate" do not authorize regulations "with

respect to all matters covered by the agency's authorizing statute" where the

regulations run afoul of a statutory command.  Here, in contrast, the Fisheries

Service adopted measures that are anchored in the express language of

§ 1853(b)(8), as reinforced by other statutory language, and there is no textual limitation or prohibition. Unlike in the cases Plaintiffs cite, there can be no question that the subject matter is in the agency's substantive wheelhouse.

Finally (and crucially), Plaintiffs' argument cannot be squared with the permit sanctions and penalty provisions involving observers. In Plaintiffs' view of the statute, the government would always pay observers directly, but the permit sanctions and penalty provisions presuppose that industry vessels will be directly contracting with observers. 16 U.S.C. §§ 1857(1)(L), 1858(g)(1)(D). Plaintiffs' reading would therefore run afoul of the canon against surplusage. *See generally Fla. Health Scis. Ctr., Inc. v. Dep't of Health & Human Servs.*, 830 F.3d 515, 520 (D.C. Cir. 2016).[5] For example, the sanction for failure to pay observers "contracted by an owner or operator" would be meaningless unless vessel operators may be required to contract observers. 16 U.S.C. § 1858(g)(1)(D).

Plaintiffs explain away this inconsistency in their argument by suggesting that these sanctions and penalty provisions apply to participants in the programs established by §§ 1821, 1853a and 1862. Brief 34-37. But the sanctions and penalty provisions have nothing to do with fee collection. Plaintiffs' argument boils down to speculation that it is "entirely possible" that these programs "*could*

---

[5] Although that canon generally comes into play only when interpreting ambiguous text, the basic principle weighs against Plaintiffs' far-fetched justifications for effectively ignoring the permit sanction and penalty provisions.

include third-party contracting." *Id.* at 35 (emphasis added). Plaintiffs cite no authority for any of their arguments on this front, whether in the statute or in the administrative record. In any event, Plaintiffs seem to implicitly acknowledge that the Fisheries Service "could" require industry-funded monitoring in some circumstances, which undermines their argument that the Magnuson-Stevens Act does not authorize industry-funded monitoring.

In sum, the three fee-based programs are easily reconciled with the plain language of the § 1853, and the statutory scheme is coherent on its face. Because there is a plausible explanation for the function of all of the provisions Congress enacted, there is no need to employ canons of construction to adopt Plaintiffs' alternative reading. *See, e.g.*, *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 771 (D.C. Cir. 2019).

### 2. Plaintiffs' resort to legislative history is unpersuasive.

Plaintiffs' resort to legislative history also cannot save its flawed interpretation of the statute's text. Despite the ample legislative history in support of the government's reading, Plaintiffs suggest that the legislative history of the Magnuson-Stevens Act unsettles the plain meaning of § 1853. Brief 47-49. But there is no such conflict.

Plaintiffs contend that Congress "considered and rejected bills" that "would have created blanket authority for mandatory industry-funded monitoring

programs." Brief 48. But bills that are not enacted into law generally are a poor guide to the meaning of enacted statutes. *See, e.g.*, *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). In any event, proposals to expand on the Fisheries Service's authority by creating particularized new funding provisions—specifically, additional *fee*-based funding provisions—do not unsettle the plain authority that already exists under the statute. *See, e.g.*, H.R. 5018, § 9(b), 109th Cong. (2006) (unenacted bill describing funding mechanism involving "system of fees" or other "cost recovery mechanism[s]"). Moreover, even if Congress proposed to essentially codify the provisions in the Omnibus Amendment, that would not mean the Fisheries Service lacked authority already. For example, the legislative history to the 1990 Amendments makes clear that Congress was simply codifying existing authority.

Plaintiffs also contend that the legislative history of the North Pacific fee-collection provisions in § 1862 supports their view. Brief 48-49. Both §§ 1853(b)(8) and 1862 were enacted in the 1990 Amendments, and Plaintiffs contend that the decision to include a funding mechanism for North Pacific fisheries in § 1862 and not for fishery management plans generally in § 1853(b)(8) is telling. *Id.* But it is perfectly reasonable for Congress to adopt a general-

purpose provision in § 1853(b)(8) that leaves the Fisheries Services discretion in application while also choosing a specific funding mechanism for the North Pacific fisheries in § 1862. Moreover, Congress spelled out fee-collection authority in § 1862 specifically to ensure that the Fisheries Service had authority for an "equitable" fee program. *See* S. Rep. No. 101-414, at 8 (discussing authority).

This background supports the conclusion that § 1853(b)(8) authorizes industry-funded monitoring. Despite amending the Magnuson-Stevens Act several times since the 1990 Amendments, Congress has neither limited the statutory language nor overridden the Fisheries Service's adoption of industry-funded monitoring programs. *See, e.g.*, Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (2007); Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 1(a)(4), 114 Stat. 2763 (2000); Sustainable Fisheries Act, Pub. L. No. 104-297, 110 Stat. 3559 (1996); Flower Garden Banks National Marine Sanctuary Act, Pub. L. No. 102-251, 106 Stat. 60 (1992). Instead, Congress enshrined and reinforced existing authority in the 1990 Amendments, *see* Pub. L. No. 101-627, § 114(a)(3), 104 Stat. at 4454, and the statute never deviated from that language or approach.

C. **In the alternative, the Court should defer to the Fisheries Service's reasonable interpretation of the statute.**

Even assuming that the statute did not unambiguously demonstrate that the Fisheries Service may require industry-funded monitoring and foreclose the

Plaintiffs' contrary interpretation, the agency's "interpretation governs" under these circumstances. *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). At *Chevron* step two, any reasonable interpretation will suffice: "not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009); *accord Grunewald v. Jarvis*, 776 F.3d 893, 900 (D.C. Cir. 2015). After all, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

Here, the Fisheries Service reasonably construed § 1853 to authorize industry-funded monitoring for all the reasons already discussed. The text of § 1853(b)(8) authorizes observer coverage requirements and the agency's determination that industry should bear its own compliance costs in service of that obligation is, at the very least, a reasonable exercise of the agency's authority to adopt necessary and appropriate measures under § 1853(a)(1)(A) and (b)(14). The Fisheries Service reasonably explained the need for industry-funded monitoring to meet data collection needs if government-funded observers for bycatch reporting were not sufficient to meet coverage targets. *See, e.g.*, 85 Fed. Reg. at 7414, 7422-23. That reasoning is fully consistent with the purpose of the Magnuson-Stevens Act, which emphasizes the collection of biological data to support conservation

and management needs.  *See, e.g.*, 16 U.S.C. § 1801(a)(8), (c)(3).  And the

agency's interpretation is also consistent with congressional intent to codify and

clarify existing authority, which included industry-funded monitoring, in the 1990

Amendments.  *See Bullcreek v. Nuclear Regulatory Comm'n*, 359 F.3d 536, 542

(D.C. Cir. 2004) ("legislative history can assist the court in identifying legislative

intent where the statute is unclear").

The government's interpretation also reads the various provisions of the

Magnuson-Stevens Act as a coherent whole; Plaintiffs' competing interpretation

does not.  *Utility Air Regulatory Grp. v. Env't Prot. Agency*, 573 U.S. 302, 321

(2014) (a "reasonable statutory interpretation must account for both the specific

context in which language is used and the broader context of the statute as a

whole" (quotation marks omitted)).  The references to industry-contracted

observers in the permit sanctions and penalty provisions of the Magnuson-Stevens

Act have meaning only if the agency can require industry to contract observers in

the first place.  The fee-collection provisions in §§ 1821, 1853a, and 1862,

meanwhile, at most represent a decision to authorize a particular solution in those

specific contexts.  In this situation, "the contrast between Congress's mandate in

one context with its silence in another suggests not a prohibition but simply a

decision *not to mandate* any solution in the second context, i.e., to leave the

question to agency discretion."  *Cheney R.R. Co. v Interstate Com. Comm'n*, 902

F.2d 66, 69 (D.C. Cir. 1990); *see also Catawba Cnty. v. Env't Prot. Agency*, 571 F.3d 20, 36 (D.C. Cir. 2009) ("Silence, in other words, may signal permission rather than proscription."). The agency reasonably exercised that discretion.

Plaintiffs' two contrary arguments both fail. *First*, they argue that the Fisheries Service's interpretation is not amenable to *Chevron* deference because Congress did not delegate to the Fisheries Service the authority to interpret the Magnuson-Stevens Act. Brief 49-55. This argument must be rejected. Congress explicitly delegated to the Fisheries Service the authority to administer and interpret the Magnuson-Stevens Act through binding regulations. 16 U.S.C. §§ 1853(a)(1)(A), (b)(14), (c), 1854; *see also, e.g.*, *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 940 (9th Cir. 2020) (noting Magnuson-Stevens Act gives Fisheries Service " 'broad discretion' to carry out its provisions"); *Lovgren v. Locke*, 701 F.3d 5, 29-30 (1st Cir. 2012) ("Congress has expressly delegated responsibility to NMFS to implement FMPs through binding regulations.").

Thus, there can be no question that Congress delegated authority to the Fisheries Service to "give meaning" to the observer provision by binding regulation. *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 709 (D.C. Cir. 2008) (quotation marks omitted). That is the whole point of § 1853(a)(1)(A) and (b)(14), which expressly delegate the authority to "prescribe such other measures, requirements or conditions" as are "necessary and appropriate," and §§ 1853(c)

and 1854, which authorize the implementation of those measures by regulation. Congress could hardly have been more explicit. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Fed. Trade Comm'n*, 790 F.3d 198, 207 (D.C. Cir. 2015). Congress enacted a textbook delegation of authority to the Fisheries Service in the Magnuson-Stevens Act.

*Second*, Plaintiffs argue that the Fisheries Service's interpretation of § 1853(b)(8) to authorize industry-funded monitoring is impermissible because it imposes costs on industry. Brief 55-59. As an initial matter, broadly worded statutes are reasonably construed to have broad application. *Cf. Consumer Elecs. Ass'n*, 347 F.3d at 298 ("statutes written in broad, sweeping language should be given broad, sweeping application"). The statute authorizes the Fisheries Service to require vessels to carry observers and expressly contemplates that observers may be contracted for directly by the vessel. That broad language is amenable to the Fisheries Service's reasonable construction.

The statute unquestionably comprehends that participation in regulated fisheries will impose costs on industry. As Plaintiffs recognize, the national standards expressly contemplate that industry will incur costs and thus provide a means of determining whether costs are appropriate. 16 U.S.C. § 1851(a)(7)-(8). The existence of these provisions belies the claim that industry-funded monitoring is not a permissible interpretation of § 1853(b)(8) simply because it imposes costs

on industry.  And although the fee-collection provisions are substantively distinct for all the reasons already discussed, they, too, illustrate that Congress contemplated that industry would bear some of the economic burden of fulfilling the statutory goals of the Magnuson-Stevens Act, including monitoring and data collection.

At bottom, Plaintiffs are unhappy because they believe the costs of compliance are too high.  Plaintiffs have abandoned most of their challenges to the rule on this front, though, and the only issue on appeal is whether the Fisheries Service has authority under the statute to require industry-funded monitoring. Brief 16 n. 3, 57.  And on that point, their argument boils down to an assertion that the Fisheries Service's interpretation of its statutory authority is arbitrary and capricious because agencies cannot entirely fail to consider costs.  Brief 57-59. Regardless whether Plaintiffs' understanding of the role of costs at *Chevron* step two is accurate, the Fisheries Service *did* consider costs—extensively—and its analysis of these issues is entirely reasonable.  *See, e.g.*, 85 Fed. Reg. at 7417-22 (discussing economic impacts of Atlantic herring measures), 7424-26 (responding to comments on economic impacts), 7428-29 (discussing compliance costs), 7429-30 (discussing minimization of economic impacts).[6]  The agency balanced the

_____

[6] Plaintiffs also fault the Fisheries Service for allegedly failing to address two issues in particular, but the agency provided the analysis they claim is missing. Specifically, the agency explained the basis for the 50% coverage target and

benefits of additional monitoring against the additional costs and determined that industry-funded monitoring at these levels was appropriate to meet monitoring and data-collection needs under the statute. *Id.* at 7422-23, 7425.

In short, the Fisheries Service considered the issue of costs throughout its decisionmaking process and took pains to minimize costs to industry where possible. The agency is not obligated to reduce those costs to zero. Congress conferred discretion on the agency to implement observer requirements, and the decision to adopt industry-funded monitoring is a reasonable exercise of that prerogative.

## II. The Fisheries Service's approval of the Omnibus Amendment and its implementing regulations was procedurally proper.

The Fisheries Service followed proper procedure in approving the Omnibus Amendment and its implementing regulations. Plaintiffs contend that the Fisheries Service's review process did not comport with legal requirements and insinuate that the agency's approval of regulations was irregular. Brief 59-67. But the Magnuson-Stevens Act prescribes a specific review process, which the Fisheries Service followed. Plaintiffs' arguments should be rejected.

---

addressed minimizing impacts to midwater trawl vessels. *See, e.g.*, 85 Fed. Reg. at 7425, 7430 (explaining that setting the coverage target at 50 percent "balances the benefit of additional monitoring with the costs associated with additional monitoring"); *id.* at 7419-20, 7425, 7430 (discussing means of reducing costs for midwater trawl vessels through exempted fishing permit and waivers).

## A. The Fisheries Service's process was proper.

The Magnuson-Stevens Act lays out a structured process for the submission, review, and approval of fishery management plans and amendments that includes accelerated deadlines. 16 U.S.C. § 1854. The council transmits to the Fisheries Service (on behalf of the Secretary) a plan or amendment, and the agency must "immediately" commence a review to determine whether it is consistent with law and publish a notice in the Federal Register with a 60-day comment period. *Id.* § 1854(a)(1); *see also id.* § 1854(a)(5) (defining "immediately" to mean within five days of receipt). The Fisheries Service must then "approve, disapprove, or partially approve" the plan within 30 days of the comment period closing and transmit its decision to the council. *Id.* § 1854(a)(2), (3). The process for reviewing implementing regulations proceeds in parallel. The council must submit proposed implementing regulations "simultaneously" with the plan or amendment. *Id.* § 1853(c)(1). The Fisheries Service then "immediately" commences its review, makes a determination within 15 days, publishes the proposed regulations, and sets a comment period of no more than 60 days. *Id.* § 1854(b). The agency reviews the comments and promulgates the rule (or notifies the council otherwise) within 30 days of the comment period closing. *Id.* § 1854(b)(1)(B), (3).

Here, the Fisheries Service's adoption of the Omnibus Amendment and final rule followed an appropriate and largely unremarkable process. The agency

published a notice of availability for the Omnibus Amendment on September 19, 2018. 83 Fed. Reg. at 47326. After a 60-day comment period, the Fisheries Service reviewed the comments and approved the amendment by letter to the New England Council on December 18, 2018. J.A. 406-08; *see also* 85 Fed. Reg. at 7414. In tandem with this process, the Fisheries Service published a proposed implementing rule for the Omnibus Amendment on November 7, 2018, with a 45-day comment period. 83 Fed. Reg. at 55665. Final action on the rule was delayed by a partial government shutdown spanning from late 2018 through early 2019, and the Fisheries Service notified the council accordingly. J.A. 439. In due course, the Fisheries Service considered the comments and promulgated a final rule on February 7, 2020. 85 Fed. Reg. at 7414.

**B. Plaintiffs' claims of irregularity are baseless.**

Plaintiffs complain that this process was irregular for various reasons. Brief 59-67. These arguments generally amount to little more than flyspecking of a process that yielded a decision that Plaintiffs dislike, untethered from any claim of harm. But Plaintiffs cannot litigate claims that the Fisheries Service violated procedural requirements in a vacuum. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Complaints of "a bare procedural violation, divorced from any concrete harm," do not create a controversy the federal courts are empowered to resolve. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016). If an agency misses a

statutory deadline, for example, that might support a claim seeking to compel the agency to act promptly. 5 U.S.C. § 706(1). But after the fact, Plaintiffs must point to some actual consequence, not just a generalized interest in Magnuson-Stevens Act compliance. *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 604 (D.C. Cir. 2019).

Plaintiffs' chief argument on this front is that the Fisheries Service improperly initiated the rulemaking before the close of the comment period on the Omnibus Amendment. Brief 61, 64. The comment periods thus overlapped for thirteen days. 83 Fed. Reg. at 55667. In Plaintiffs' view, the Fisheries Service rushed the process by initiating the rulemaking before approving the amendment. Brief 64. They would instead sequence these two processes, appealing to "common sense." *Id.* The problem with this argument is not only that Congress made a judgment at odds with Plaintiffs' view of "common sense," but also that there was no actual detriment to the notice-and-comment function for either the amendment or the rule.

As an initial matter, Congress expressly provided that councils should submit plan amendments and proposed implementing regulations "simultaneously" on similar accelerated timelines. 16 U.S.C. § 1853(c)(1). Plaintiffs cannot complain that the comment periods overlap when that is what Congress envisioned. Plaintiffs seem to have recognized this flaw in their argument, which

the district court rejected, J.A. 240, and now present an entirely new claim.  In this

Court, Plaintiffs claim for the first time that the Fisheries Service's review of the

implementing regulation was not subject to the accelerated timelines in § 1854(b)

because these were not, in fact, proposed implementing regulations submitted by

the council.  Brief 62.  The statutory process applies to regulations the council

"deems necessary or appropriate," *id.* § 1853(c), and Plaintiffs claim that the

council did not make this "deeming" decision.  Brief 62.

This claim is forfeited.  *Trumpeter Swan Soc'y v. Env't Prot. Agency*, 774

F.3d 1037, 1043-44 (D.C. Cir. 2014).  Plaintiffs did not raise this issue before the

agency.  *See, e.g.*, *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1083-84

(D.C. Cir. 2015) (failure to raise issue before agency can constitute waiver).  Nor

did they raise it at any point in the district court proceedings, either in their

complaint or their briefing.  Plaintiffs criticize the district court for not addressing

the issue, Brief 59, but that is because they did not ask the court to do so.  And

importantly, that failure is prejudicial to the government.  Plaintiffs claim that there

is no evidence of "deeming" in the administrative record, but the agency compiles

the agency record in support of the actions that Plaintiffs actually challenge.  *Cf.*

*Shafer & Freeman Lakes Env't Conservation Corp. v. Fed. Energy Regulatory*

*Comm'n*, 992 F.3d 1071, 1087 (D.C. Cir. 2021).  This was not one of them.

In any event, Plaintiffs' arguments are meritless for several reasons. *First*, the proposed implementing regulations were indeed deemed "necessary and appropriate" by the council and subject to review under § 1853(c) and § 1854(b), including the direction that the regulations should be submitted (and reviewed) simultaneously. Throughout the administrative record, the regulations are repeatedly and consistently discussed as the implementing regulations for the Omnibus Amendment. *See, e.g.*, J.A. 252, 294. The notice of availability for the amendment references the forthcoming proposed rule to implement the amendment, 83 Fed. Reg. at 47327, and the notice of proposed rulemaking similarly draws no distinction between the amendment and the implementing regulations, *see, e.g.*, 83 Fed. Reg. at 55665. Plaintiffs have no plausible alternative explanation for the nature and origin of the regulations.

*Second*, even if these regulations were not subject to the statutory review timelines in § 1853(c) and § 1854(b), Plaintiffs offer no explanation for why the Fisheries Services would act improperly by relying on them. Congress concluded that an accelerated, concurrent timeline is appropriate in this context. The Fisheries Service has thus explained that the agency's "practice" is to publish the notice of availability for an amendment and the proposed rule "concurrently." 85 Fed. Reg. at 7424. And that was no surprise to the public. The agency was forthright about its process, which was explained in both notices inviting comment.

83 Fed. Reg. at 55667; *see also* 85 Fed. Reg. at 7424.  Plaintiffs cite no law prohibiting the agency from designing its comment procedures this way; they argue only that the public did not have meaningful input.

The public did indeed have a meaningful opportunity to participate in the comment process, which was carefully coordinated to ensure that comments on the amendment would inform the rulemaking.  83 Fed. Reg. at 55667.  The Fisheries Service received seven comment letters for the amendment and considered all of those comments in the rulemaking.  J.A. 377, 413.  The agency also engaged in an appropriate public participation process for the rulemaking, including a lengthy discussion of the 20 comments received.  85 Fed. Reg. at 7422-28.  Plaintiffs emphasize the importance of comment periods and agency consideration of the comments, but the final rule makes clear that the public had exactly the sort of meaningful input described in the cases Plaintiffs cite.  Brief 65 (citing *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982), and *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014)).

*Third*, none of the alleged procedural errors Plaintiffs cite had any adverse consequences.  Plaintiffs make much of the fact that the final rule did not issue until 2020, more than a year after the amendment was approved.  85 Fed. Reg. at 7414.  One would think that this year-long gap would please Plaintiffs, who argue that rulemaking should come after the amendment process, but Plaintiffs instead

cite this timeline as evidence that the Fisheries Service was not complying with § 1854(b), which directs the agency to promulgate a final rule 30 days after the comment period closes. Brief 63. The statute does so require, but the Fisheries Service clearly explained why a year passed before the final rule issued.

In a letter to the New England Council, the Fisheries Service explained that the final rule had been delayed by a 35-day lapse in appropriations that resulted in a partial government shutdown. J.A. 439-40; *see also, e.g.*, *Kornitzky Grp., LLC v. Elwell*, 912 F.3d 637, 639-41 (D.C. Cir. 2019) (Randolph, J., dissenting) (discussing lapse in appropriations); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture*, 912 F.3d 641, 641-42 (D.C. Cir. 2019) (Katsas, J., concurring) (same). Even after the restoration of appropriations, the agency was not able to conform the rulemaking to the statutory timeline in light of several competing priorities and uncertainty over whether there would be sufficient appropriations to fund the agency's administration of the industry-funded monitoring program for Atlantic herring. J.A. 439-40. The one-year delay in publishing a final rule had nothing to do with the applicability of § 1854(b).

Plaintiffs also argue that the Fisheries Service was late in publishing a notice of availability for the Omnibus Amendment. Brief 60-61. This argument once again was not raised previously and should be considered forfeited. *Trumpeter Swan Soc'y*, 774 F.3d at 1043-44. The Fisheries Service declared a "transmittal

date" for the Omnibus Amendment of September 11, 2018, *see* J.A. 342, and the statute provides that the Fisheries Service should "immediately" publish a notice in the Federal Register, where "immediately" means within five days. 16 U.S.C. § 1854(a)(1)(B), (5). The notice of availability prepared by the Fisheries Service was dated September 13, just two days later; was filed with the Federal Register on September 18; and was published the following day. J.A. 341. The agency immediately prepared the notice, but there was a delay of a few days (over a weekend) in the publication process. Plaintiffs do not raise any claim for relief on this issue, and the statute does not provide for one.

Indeed, Plaintiffs seem to raise these timing issues to insinuate that the Fisheries Service is lawless or that there is otherwise some broader impropriety at work that should undermine the Court's confidence in the agency. But Plaintiffs never identify why foot faults on timing or reasonably explained delays render anything about the Omnibus Amendment or the final rule legally infirm. Plaintiffs have no explanation for why publishing the notice of availability a few days late or taking additional time after a government shutdown is anything other than harmless procedural error. *See, e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transportation*, 724 F.3d 206, 217 (D.C. Cir. 2013); *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).

In sum, the Fisheries Service followed an appropriate process for approving both the Omnibus Amendment and the final rule, and Plaintiffs have identified no actual harm or adverse consequences from perceived procedural errors. The Court should reject Plaintiffs' request to set aside a significant government action to cure alleged procedural issues that have been overtaken by events and make no difference to the policy or process.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Respectfully submitted,

/s/ *Daniel Halainen*
TODO KIM
*Assistant Attorney General*
RACHEL HERON
Of Counsel:                                        ALISON C. FINNEGAN
                                                   KRISTINE S. TARDIFF
MITCH MACDONALD                                    DANIEL HALAINEN
*Attorney*                                         *Attorneys*
Office of the General Counsel                      Environment and Natural Resources Division
National Oceanic & Atmospheric                     U.S. Department of Justice
    Administration

December 16, 2021
DJ 90-8-8-08349

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,835 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Daniel Halainen*
DANIEL HALAINEN

Counsel for Appellees

**ADDENDUM**

16 U.S.C. § 1801 (excerpts)................................................1a

16 U.S.C. § 1802 (excerpts)................................................2a

16 U.S.C. § 1821(h)(4).....................................................3a

16 U.S.C. § 1853 (excerpts)................................................4a

16 U.S.C. § 1853a(e).......................................................5a

16 U.S.C. § 1854(a), (b)...................................................6a

16 U.S.C. § 1857(1)(L).....................................................8a

16 U.S.C. § 1858(g)(1).....................................................8a

16 U.S.C. § 1862 (excerpts)................................................9a

# 16 U.S.C. § 1801 (excerpts)

## § 1801. Findings, purposes and policy

### (a) Findings
The Congress finds and declares the following:

**(6)** A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources.

**(8)** The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States.

### (b) Purposes
It is therefore declared to be the purposes of the Congress in this chapter—

**(1)** to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States, by exercising (A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983, and (B) exclusive fishery management authority beyond the exclusive economic zone over such anadromous species and Continental Shelf fishery resources;

**(3)** to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

### (c) Policy
It is further declared to be the policy of the Congress in this chapter—

**(3)** to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in

carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

## 16 U.S.C. § 1802 (excerpts)

## § 1802. Definitions

As used in this chapter, unless the context otherwise requires—

**(2)** The term "bycatch" means fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. Such term does not include fish released alive under a recreational catch and release fishery management program.

**(5)** The term "conservation and management" refers to all of the rules, regulations, conditions, methods, and other measures **(A)** which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment; and **(B)** which are designed to assure that—
    **(i)** a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis;
    **(ii)** irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and
    **(iii)** there will be a multiplicity of options available with respect to future uses of these resources.

**(31)** The term "observer" means any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter.

**(32)** The term "observer information" means any information collected, observed, retrieved, or created by an observer or electronic monitoring system pursuant to authorization by the Secretary, or collected as part of a cooperative research initiative, including fish harvest or processing observations, fish sampling or weighing data, vessel logbook data, vessel or processor-specific information (including any safety, location, or operating condition observations), and video, audio, photographic, or written documents.

**(36)** The term "person" means any individual (whether or not a citizen or national of the United States), any corporation, partnership, association, or other entity (whether or not organized or existing under the laws of any State), and any Federal, State, local, or foreign government or any entity of any such government.

**16 U.S.C. § 1821(h)(4)**

## § 1821. Foreign fishing

## (h) Full observer coverage program

**(4)** In addition to any fee imposed under section 1824(b)(10) of this title and section 1980(e) of Title 22 with respect to foreign fishing for any year after 1980, the Secretary shall impose, with respect to each foreign fishing vessel for which a permit is issued under such section 1824 of this title, a surcharge in an amount sufficient to cover all the costs of providing a United States observer aboard that vessel. The failure to pay any surcharge imposed under this paragraph shall be treated by the Secretary as a failure to pay the permit fee for such vessel under section 1824(b)(10) of this title. All surcharges collected by the Secretary under this paragraph shall be deposited in the Foreign Fishing Observer Fund established by paragraph (5).

**16 U.S.C. § 1851(a)(7)-(8)**

## § 1851. National standards for fishery conservation and management

## (a) In general
Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

**(7)** Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

**(8)** Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A)

provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

## 16 U.S.C. § 1853 (excerpts)

### § 1853. Contents of fishery management plans

**(a) Required provisions**
Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—

> **(1)** contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are—
> **(A)** necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;

> **(5)** specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational,1 charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of, and the actual processing capacity utilized by, United States fish processors[;]

> **(11)** reserve a portion of the allowable biological catch of the fishery for use in scientific research;

**(b) Discretionary provisions**
Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may—

> **(1)** require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to—
> **(A)** any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone or for anadromous species or Continental Shelf fishery resources beyond such zone;
> **(B)** the operator of any such vessel; or

**(C)** any United States fish processor who first receives fish that are subject to the plan;

**(4)** prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter;

**(8)** require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

**(14)** prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery.

## (c) Proposed regulations

Proposed regulations which the Council deems necessary or appropriate for the purposes of—

**(1)** implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment under section 1854 of this title; and

**(2)** making modifications to regulations implementing a fishery management plan or plan amendment may be submitted to the Secretary at any time after the plan or amendment is approved under section 1854 of this title.

## 16 U.S.C. § 1853a(e)

## § 1853a. Limited access privilege programs

**(e)** Cost recovery

In establishing a limited access privilege program, a Council shall—

**(1)** develop a methodology and the means to identify and assess the management, data collection and analysis, and enforcement programs that are directly related to and in support of the program; and

**(2)** provide, under section 1854(d)(2) of this title, for a program of fees paid by limited access privilege holders that will cover the costs of management, data collection and analysis, and enforcement activities.

**16 U.S.C. § 1854(a), (b)**

## § 1854. Action by Secretary

**(a) Review of plans**
    **(1)** Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall—
        (A) immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law; and
        (B) immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

    **(2)** In undertaking the review required under paragraph (1), the Secretary shall—
        (A) take into account the information, views, and comments received from interested persons;
        (B) consult with the Secretary of State with respect to foreign fishing; and
        (C) consult with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea and to fishery access adjustments referred to in section 1853(a)(6) of this title.

    **(3)** The Secretary shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period under paragraph (1) by written notice to the Council. A notice of disapproval or partial approval shall specify—
        (A) the applicable law with which the plan or amendment is inconsistent;
        (B) the nature of such inconsistencies; and

(C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.

If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved.

**(4)** If the Secretary disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review under this subsection.

**(5)** For purposes of this subsection and subsection (b), the term "immediately" means on or before the 5th day after the day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final.

## (b) Review of regulations

**(1)** Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and—

    **(A)** if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes, for a public comment period of 15 to 60 days; or

    **(B)** if that determination is negative, the Secretary shall notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the fishery management plan, plan amendment, this chapter, and other applicable law.

**(2)** Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation under paragraph (1).

**(3)** The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (1)(A). The Secretary shall consult with the Council before making any revisions to the proposed regulations, and must

publish in the Federal Register an explanation of any differences between the proposed and final regulations.

## 16 U.S.C. § 1857(1)(L)

### § 1857. Prohibited acts

It is unlawful—

**(1)** for any person—

**(L)** to forcibly assault, resist, oppose, impede, intimidate, sexually harass, bribe, or interfere with any observer on a vessel under this chapter, or any data collector employed by the National Marine Fisheries Service or under contract to any person to carry out responsibilities under this chapter;

## 16 U.S.C. § 1858(g)(1)

### § 1858. Civil penalties and permit sanctions

**(g) Permit sanctions**

**(1)** In any case in which **(A)** a vessel has been used in the commission of an act prohibited under section 1857 of this title, **(B)** the owner or operator of a vessel or any other person who has been issued or has applied for a permit under this chapter has acted in violation of section 1857 of this title, **(C)** any amount in settlement of a civil forfeiture imposed on a vessel or other property, or any civil penalty or criminal fine imposed on a vessel or owner or operator of a vessel or any other person who has been issued or has applied for a permit under any marine resource law enforced by the Secretary has not been paid and is overdue, or **(D)** any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit under any marine resource law administered by the Secretary has not been paid and is overdue, the Secretary may—

**(i)** revoke any permit issued with respect to such vessel or person, with or without prejudice to the issuance of subsequent permits;

**(ii)** suspend such permit for a period of time considered by the Secretary to be appropriate;

**(iii)** deny such permit; or

**(iv)** impose additional conditions and restrictions on any permit issued to or applied for by such vessel or person under this chapter and, with respect to

foreign fishing vessels, on the approved application of the foreign nation involved and on any permit issued under that application.

## 16 U.S.C. § 1862 (excerpts)

### § 1862. North Pacific fisheries conservation

**(a) In general**
The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which—

> **(1)** requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and

> **(2)** establishes a system, or system, of fees, which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

**(b) Standards**

> **(2)** Any system of fees established under this section shall—
> **(A)** provide that the total amount of fees collected under this section not exceed the combined cost of (i) stationing observers, or electronic monitoring systems, on board fishing vessels and United States fish processors, (ii) the actual cost of inputting collected data, and (iii) assessments necessary for a risk-sharing pool implemented under subsection (e) of this section, less any amount received for such purpose from another source or from an existing surplus in the North Pacific Fishery Observer Fund established in subsection (d) of this section;

> **(E)** be expressed as a fixed amount reflecting actual observer costs as described in subparagraph (A) or a percentage, not to exceed 2 percent, of the unprocessed ex-vessel value of fish and shellfish harvested under the jurisdiction of the Council, including the Northern Pacific halibut fishery;

**(I)** provide that fees collected will be credited against any fee for stationing observers or electronic monitoring systems on board fishing vessels and United States fish processors and the actual cost of inputting collected data to which a fishing vessel or fish processor is subject under section 1854(d) of this title; and