**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 8, 2022**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

**No. 21-5166**

———————————————

**Loper Bright Enterprises, Inc., *et al.***
***Plaintiffs-Appellants,***

**v.**

**Gina Raimondo, in her official capacity**
**as Secretary of Commerce, *et al.***
***Defendants-Appellees.***

———————————————

On Appeal from the United States District Court
for the District of Columbia
Civil Action No. 20-0466 (Hon. Emmet G. Sullivan)

———————————————

**REPLY BRIEF OF APPELLANTS**

———————————————

RYAN P. MULVEY
ERIC R. BOLINDER
CAUSE OF ACTION INSTITUTE
1310 N. Courthouse Rd., Ste. 700
Arlington, VA 22201
Telephone: (571) 444-4182

*Counsel for Plaintiffs-Appellants*

January 6, 2022

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

GLOSSARY ...................................................................................vii

PERTINENT STATUTORY PROVISIONS ........................................... 1

SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT ................................................................................... 3

I.    Congress knew how to, and in some instances did, delegate
authority to charge fishermen for monitors—but not here ........... 3

    A.   There is no difference between the fee provisions
and the Omnibus Amendment's industry-funding
requirement ............................................................. 4

    B.   The government's claim to direct, textual authority
is baseless. ............................................................... 7

    C.   The statute's "necessary and appropriate" clause
does not help the government. ............................... 10

    D.   The specific/general and *expressio unius* canons
resolve the question in this case. ......................... 10

    E.   Carrying a live person as an observer is unique
and not a mere "compliance cost." ...................... 13

    F.   The cost of industry funding is significantly more
than any compliance cost. .................................... 15

    G.   The sanctions and penalty provisions apply
to existing, statutory fee authority. ..................... 17

    H.   The government mischaracterizes the
legislative history ................................................. 18

    I.   National Standards Seven and Eight are not
superfluous in the fishermen's reading of the statute. ...... 24

    J.   The government has mischaracterized the
fishermen's arguments, creating strawmen
which require no response. .................................... 25

II.  The Omnibus Amendment and its implementing regulations
     were not approved in a procedurally correct manner. ................26

     A.   The government's insinuation that the fishermen lack
          standing to pursue their procedural claim is baseless.......26

     B.   The fishermen have not forfeited their argument.............29

     C.   The government has not demonstrated the
          procedural soundness of its rulemakings. .........................32

CONCLUSION ...........................................................................35

CERTIFICATE OF COMPLIANCE

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\* *American Petroleum Institute v.*
*Environmental Protection Agency*,
52 F.3d 1113 (D.C. Cir. 1995) ............................................................ 11

*Bunker Hill Co. Lead & Zinc Smelter v.*
*Environmental Protection Agency*,
658 F.2d 1280 (9th Cir. 1981) ............................................................ 14

*Chevron, U.S.A., Inc. v.*
*Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ............................................................................ 25

*City of Arlington v. Federal Communications Commission*,
569 U.S. 290 (2013) .............................................................................. 8

*Commissions Export Import S.A. v. Republic of the Congo*,
757 F.3d 321 (D.C. Cir. 2014) .............................................................. 8

*Consumer Product Safety Commission v. GTE Sylvania, Inc.*,
447 U.S. 102 (1980) ............................................................................ 23

*District of Columbia v. Air Florida, Inc.*,
750 F.2d 1077 (D.C. Cir. 1984) .......................................................... 31

*Encino Motorcars, LLC. v. Navarro*,
579 U.S. 211 (2016) ............................................................................ 25

*Engine Manufacturers Ass'n v.*
*Environmental Protection Agency*,
20 F.3d 1177 (D.C. Cir. 1994) ..................................................... 13, 14

\* Authorities on which Appellants chiefly rely are marked
with an asterisk.

*Equal Employment Opportunity Commission v.*
  *Abercrombie & Fitch Stores, Inc.,*
  575 U.S. 768 (2015) ................................................................. 8

*Food & Drug Administration v.*
  *Brown & Williamson Tobacco,*
  529 U.S. 120 (2000) ............................................................... 23

\* *Genus Medical Technologies LLC v.*
  *Food & Drug Administration,*
  994 F.3d 631 (D.C. Cir. 2021) ............................................... 10

*Gulf Fishermen's Ass'n v. National Marine Fisheries Service,*
  968 F.3d 454 (5th Cir. 2020) ................................................... 9

*Humane Society of the United States v. Perdue,*
  935 F.3d 598 (2019) ............................................................... 28

*Independent Insurance Agents of America, Inc. v. Hawke,*
  211 F.3d 638 (D.C. Cir. 2000) ............................................... 12

*Louisiana Public Service Commission v.*
  *Federal Communications Commission,*
  476 U.S. 355 (1986) ................................................................. 8

*Merck & Co. v. Department of Health & Human Services,*
  385 F. Supp. 3d 81 (D.C. Cir. 2019) ....................................... 9

*Mexican Gulf Fishing Co. v. Department of Commerce,*
  No. 20-2312 (E.D. La. filed Aug. 20, 2020) ........................... 15

\* *Michigan v. Environmental Protection Agency,*
  576 U.S. 743 (2015) ............................................................... 15

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ............................................................... 28

*Summers v. Earth Island Institute,*
  555 U.S. 488 (2009) ............................................................... 28

*Virginia Uranium, Inc. v. Warren*,
   139 S. Ct. 1894 (2019) .................................................................. 7

**Statutes**

16 U.S.C. § 1821(h)(4) .................................................................. 5

16 U.S.C. § 1853(a)(1) ................................................................ 24

16 U.S.C. § 1853(a)(1)(c) ............................................................ 24

16 U.S.C. § 1853(a)(4) ................................................................ 24

16 U.S.C. § 1853(a)(6) ................................................................ 24

16 U.S.C. § 1853(a)(15) .............................................................. 24

16 U.S.C. § 1853(b)(8) .................................................................. 6

16 U.S.C. § 1853(c) ..................................................................... 29

16 U.S.C. § 1853(c)(1) ................................................................ 32

16 U.S.C. § 1853a(e) ................................................................... 22

16 U.S.C. § 1853a(e)(1) ................................................................ 6

16 U.S.C. § 1853a(e)(2) ............................................................ 5, 6

16 U.S.C. § 1854(b)(3) ................................................................ 33

16 U.S.C. § 1854(d)(2)(B) ............................................................. 5

16 U.S.C. § 1855(f)(1) ................................................................ 34

16 U.S.C. § 1858(g)(1)(d) ........................................................... 18

33 U.S.C. § 1318(a)(B) ............................................................... 14

42 U.S.C. § 7414(a)(2) ............................................................... 14

**Regulations**

50 C.F.R. § 648.11(d) ................................................................ 13

50 C.F.R. § 648.11(g)(5) ............................................................. 22

50 C.F.R. § 648.11(h)(5)(vii) ..................................................... 13

50 C.F.R. § 648.11(k) ............................................................. 6, 22

50 C.F.R. § 648.87(b) ................................................................ 22

85 Fed. Reg. 44005 (Nov. 2, 2021) ............................................ 16

**Legislative Materials**

136 Cong. Rec. H229 (daily ed. Feb. 6, 1990) .......................... 21

136 Cong. Rec. S14953 (daily ed. Oct. 11, 1990) ..................... 21

H.R. Rep. No. 101-393 (Dec. 15, 1989) .................................... 21

*Reauthorization of the Magnuson Fishery Conservation
    and Management Act of 1976-Part II, Hearing on H.R.
    2061 Before the H. Comm. on Merch. Marine & Fisheries,
    Subcomm. on Fisheries & Wildlife Conservation & the
    Env't*, 101st Cong. 86 (1989) (Serial No. 101-37) ......................... 19, 20

S. Rep. No. 101-414 (Aug. 2, 1990) .......................................... 21

**Other Authorities**

*Fee*, Black's Law Dictionary (9th ed. 2009) .............................. 4

## GLOSSARY

NOAA        National Oceanic and Atmospheric Administration

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum attached to the Opening Brief of Appellants.

## SUMMARY OF ARGUMENT

The Omnibus Amendment sets the stage for implementation of industry-funded monitoring across the Northeast.  It also requires a portion of the Atlantic herring fleet to pay for monitors at the cost of roughly $710 per sea day.  The Magnuson-Stevens Act does not authorize this requirement.  Although the Act provides authority for the *placement* of monitors, it strictly limits when the government can force monitoring costs onto regulated parties.

Faced with the obvious result when applying the specific/general and *expressio unius* canons, the government attempts to move the goalposts.  It tries to distinguish between "fees" assessed against vessel operators for monitoring and the costs of those operators directly contracting with monitoring service providers.  But there is no difference between charging fishermen for monitors the government provides and forcing fishermen to pay monitors directly.  Congress knew how to delegate authority to NOAA and the councils to require fishermen to pay for monitoring.  It did so in three instances, but not here.

The government alternatively argues the cost of carrying a monitor is a "compliance cost" like any other incidental expense needed to abide

2

by fishery regulations.  But paying a human observer—at $710 per sea day—that eats, sleeps, and lives on your boat to watch you fish is unlike any other "compliance cost."

Finally, on the procedural irregularity of the Omnibus Amendment and its implementing regulations, the government relies on distracting arguments about standing and forfeiture.  It cannot point to anything in the record to justify the overlapping of its rulemakings.  The conclusion is clear: the government prejudged the Omnibus Amendment and sought to impose industry funding no matter the cost.

## ARGUMENT

## I.    Congress knew how to, and in some instances did, delegate authority to charge fishermen for monitors—but not here.

In the Magnuson-Stevens Act, Congress gave NOAA and the regional councils the ability to charge fishermen for monitors/observers in three situations: the North Pacific, foreign fishery, and limited access privilege programs.  *See* Appellants' Br. at 25–26.  The canons of construction, as well as a plain reading of the statute's silence, *see id.* at 26–33, show Congress withheld this authority elsewhere.

The government tries to move the goalposts.  It argues that with these specific provisions "Congress made its own decisions about how to

allocate responsibility for providing services and how to fund them, [with] fee-based funding mechanisms," and otherwise left NOAA and the councils discretion to pursue direct industry funding in other cases. Appellees' Br. at 34. Not so. Congress has decided whether and when industry must pay. The power to regulate does not entail freestanding authority to devise independent sources of funding for an agency's preferred programs. That is the key principle behind each of Congress's specific grants: the ability to bill the industry.

## A.    There is no difference between the fee provisions and the Omnibus Amendment's industry-funding requirement.

The government attempts to draw a distinction between "fees" paid to the government and direct payments for contracted observer services. *See* Appellees' Br. at 34. This distinction is ineffective. A "fee" is, "[a] charge for labor or services, esp. professional services." *Fee*, Black's Law Dictionary (9th ed. 2009).[1] A system of fees and a requirement to directly contract for observers both accomplish the same end-goal of industry funding. Congress's ultimate concern has always been specifying when

---

[1] The government relies on its own definition of "fee" from the final rule. Appellees' Br. at 35; *see* A385.

and how NOAA and the councils could require regulated parties to bear the costs of monitoring.

Whenever Congress has delegated such authority, it has done so with great care for the impact it will have on fishermen. For example, the Act caps permitting costs related to data collection and management in limited access privilege programs to "3 percent of the ex-vessel value of fish harvested[.]" 16 U.S.C. § 1854(d)(2)(B); *see id.* § 1853a(e)(2). The North Pacific and foreign vessel observer programs are, of course, limited to a certain geographic area or class of fishermen. *Id.* §§ 1821(h)(4), 1862(a). Thus, the government's argument that Congress was merely "legislating specific solutions tailored to specific issues" falls flat. Appellees' Br. at 37. Rather, Congress was legislating specific powers tailored to specific fisheries, and not others. This is not a mere question of "different legislative tasks." *Id.* It is a question of the same task: shifting cost for monitors from taxpayers and onto industry. To accept the government's premise that the power to require monitoring necessarily includes the power to force fishermen to pay for that monitoring offends Congress's sensitivity to the fleet's economic burdens. It would also create a nullity of the fee provisions elsewhere in the Act.

5

Consider the government's argument that limited access privilege programs do not implicate observers. *See* Appellees' Br. at 35. This is wrong. *First*, at least one limited access privilege program in New England—the Atlantic sea scallop fishery—includes an observer program funded with special "set aside" quota allocations. 50 C.F.R. § 648.11(k); *see* A299–300; A303–04.[2] *Second*, Section 1853a(e) specifically calls for "data collection and analysis[.]" 16 U.S.C. § 1853a(e)(1). This is worded almost identically to Section 1853(b)—the provision the government uses to claim authority to require industry funding here—which broadly permits observing "for the purpose of collecting data[.]" *Id.* § 1853(b)(8). The only difference is that Section 1853a(e)(1) is followed by (e)(2), which requires a council to maintain "a program of fees paid by limited access privilege holders that will cover the costs of management, data collection and analysis, and enforcement activities." *Id.* § 1853a(e)(2). Section 1853(b) is followed by nothing of the sort. Stakeholders ensured the government was aware of this point during public comment on the Omnibus Amendment. *See* A372–73.

---

[2] The legality of the "set aside" quota funding mechanism in light of Section 1853a(e) is beyond the scope of this lawsuit.

6

When Congress wants to grant the government authority to charge fishermen for data collection, it does so. Congress's clear intent in the Magnuson-Stevens Act was to limit any industry-funding to specific situations. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) ("[I]t is our duty to respect not only what Congress wrote but, as importantly, what it didn't write."). This Court should hold the government lacks authority to require industry-funded monitoring here.

**B.    The government's claim to direct, textual authority is baseless.**

The government compounds its error by claiming expansive authority—arguing it does not even need the Act's "necessary and appropriate" clause, but that the mere authority to regulate implies authority to charge costs to fishermen. *See* Appellee's Br. at 22–26. It claims the fishermen are asking the Court "to read the phrase 'government-funded' into . . . the statute before the word 'observer.'" *Id.* at 24. But it is the government that is reading the word "industry-funded" into the statute. The fishermen are not the government; they are not the ones implementing the Omnibus Amendment. And they are not the ones limited by the well-known maxim that an agency has "literally no power to act . . . unless and until Congress confers power

7

upon it." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986). The government's "power to act and how [it is] to act is authoritatively prescribed by Congress, so that when [it] act[s] improperly . . . what [it] do[es] is *ultra vires*." *City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 297 (2013).

The government cites this Court's holding that it "must 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" Appellees' Br. at 24 (citing *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 327 (D.C. Cir. 2014)). Yet in *Republic of the Congo*, this Court declined to adopt a broader reading of a congressional authorization (in that case, preemption) than the text permitted, just as the Court should here. *Id.* at 327. Similarly, the government correctly recites this Court's determination that flawed approaches ask "to add words to the law to produce what is thought to be a desirable result." Appellees' Br. at 24 (citing *Equal Emp't Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015)). But it leaves out the next two sentences of the opinion, which are crucial: "That is Congress's province. We construe [a statute's] silence as exactly that: silence." *Abercrombie & Fitch*, 575 U.S. at 774.

Silence in the Magnuson-Stevens Act is not an invitation for agencies to "fill" a "mere 'gap'" however they please. *Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020). Congress spoke clearly: the government can require boats to carry observers. But it stopped there. And "the *mere absence of an express statutory restriction* is not a blank check to regulate on any subject matter that might conceivably advance a legislative purpose." *Merck & Co. v. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 94 (D.C. Cir. 2019) (emphasis added).

There is a necessary limit to how far an agency can go when delegated authority by Congress, which both the plain text and canons supply here. If this were not the case, Congress would need to play "whack-a-mole" with any statute that grants the government regulatory authority—going to great pains to exclude any sort of funding or cost-shifting mechanism the agency could dream of. To hold to the government's interpretation of the Magnuson-Steven Act would create an implicit delegation of unfettered cost-shifting authority to *any* agency that has *any* authority to regulate or inspect.

9

## C.    The statute's "necessary and appropriate" clause does not help the government.

The fishermen have addressed the government's "necessary and appropriate" arguments, *see* Appellants' Br. at 26–30, but one point is worth observing: the government's argument seems to rest entirely on the authority to *collect* data, not charge for it.   For example, the government highlights how Congress stressed the importance of data collection and argues "[o]bserver programs generally are an important and statutorily recognized means of collecting . . . data about a fishery." Appellees' Br. at 28.   But the fishermen are not challenging the government's ability to require observers.   They challenge the claimed authority to *bill* the fishermen for observers—a power found in three parts of the statute but not here.

## D.    The specific/general and *expressio unius* canons resolve the question in this case.

The government does not grapple with the fishermen's direct application of the specific/general or *expressio unius* canons, except to say they should not apply because the government is not attempting to require industry-funded monitoring through a system of "fees."   That claim is specious.   *See Genus Med. Techs. LLC v. Food & Drug Admin.*,

994 F.3d 631 (D.C. Cir. 2021); *Am. Petroleum Inst. v. Envt'l Prot. Agency*, 52 F.3d 1113 (D.C. Cir. 1995). If this Court holds the government has created an artificial distinction and is indeed trying to mandate the same sort of cost shifting implicated by Sections 1862(a), 1853a(e), and 1821(h), then the government has effectively conceded the general/specific or *expressio unius* canons carry the day.

The government attempts to distinguish three key cases the fishermen rely on—*Alabama Association of Realtors*, *Michigan*, and *New York Stock Exchange LLC*—while ignoring others. Appellees' Br. at 38. If the Court holds the three specific delegations of authority are simply "charging fishermen for observer costs," then these cases (including ones the government does not grapple with) control. And arguments like those in *Alabama Association of Realtors*—when the court looked at a list of authorities and defined the general grant by the items in the list—carry special relevance. Appellants' Br. at 46–47. Section 1853(b) has thirteen items in its list, none of which contemplate industry-funded monitoring; reading in the ability to require industry funding goes beyond the contours of the text. *Id*.

The government also claims its interpretation views the statute as a "coherent whole," rendering its reading reasonable, and that silence need not imply proscription of agency authority. Appellees' Br. at 44 (citing *Cheney R.R. Co. v. Interstate Commerce Comm'n*, 902 F.2d 66, 69 (D.C. Cir. 1990)). But *Cheney Railroad Company* was later distinguished when this Circuit held that "where the context shows that the 'draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives,' [*expressio unius*] is a useful aid." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (citation omitted). That is the case here, where three separate explicit delegations of authority preclude an implicit delegation elsewhere.

If the Court applies the canons of construction and finds Congress expressly granted industry-funding authority elsewhere in the Act—thus withholding it here—that ends the case and there is no need to go further and differentiate between compliance costs. Even so, there is more than one "obvious basis to distinguish responsibility for . . . compliance costs [for] this or any other requirement." Appellees' Br. at 26.

### E.  Carrying a live person as an observer is unique and not a mere "compliance cost."

Asking industry to bear the cost of human observers on their boats is different than any compliance cost, including the expense of maintaining an electronic vessel monitoring system. A physical observer is another person on your boat, who takes up a bunk (displacing a regular crew member), who must be fed, who is permitted unfettered access to the bridge and communications equipment, who is always with you, and who observes far more than fishing. *See* 50 C.F.R. § 648.11(d). Observers are required to file extensive reports beyond counting fish or observing bycatch and must make themselves available to "debrief" with NOAA law enforcement, presumably on any matter. *Id.* § 648.11(h)(5)(vii). In short, merely requiring monitoring is already a careful, congressionally delegated intrusion into the privacy of fishermen, and a significant cost. Forcing fishermen to pay an observer's salary and travel costs goes too far. The Court should take Congress's serious treatment of the matter to heart, particularly because Congress has declined to shift full monitoring costs to fishermen outside of three enumerated instances.

Consider an Environmental Protection Agency compliance program that allows for engine testing, including by the agency itself. *Engine*

13

*Mfrs. Ass'n v. Envtl. Prot. Agency*, 20 F.3d 1177, 1179 (D.C. Cir. 1994) (citing 42 U.S.C. §§ 7525(a), 7525(b)(1), 7541(b)). The Clean Air Act explicitly authorizes "the EPA to promulgate regulations . . . 'establishing fees to recover all reasonable costs' it incurs in connection with [its] three-stage Compliance Program.'" *Id.* (citation omitted). Other analogies include the inspection provisions of the Clean Water and Clean Air Acts. 42 U.S.C. § 7414(a)(2); 33 U.S.C. § 1318(a)(B). These statutes explicitly permit the "Administrator or his authorized representative" access to inspect premises, equipment, or records. *Id.* And in a situation like this case, the EPA "sought and received appropriations from Congress for the use of private contractors to provide technical support for stationary source inspections." *Bunker Hill Co. Lead & Zinc Smelter v. Envtl. Prot. Agency*, 658 F.2d 1280, 1284 (9th Cir. 1981) (referring to contractors contemplated by 42 U.S.C. § 7414). Specific delegations, including on cost, both granted the government authority and necessarily limited any further authority. These comparisons to other administrative agencies reveal that it is not standard practice for Congress to bundle the authority to place inspectors with the authority to charge the regulated community for the cost of those inspectors, as the government claims.

14

**F.    The cost of industry funding is significantly more than any compliance cost.**

Another distinguishing factor is cost.  As the fishermen have repeatedly argued, both here and below, *Michigan v. Environmental Protection Agency* demands an agency assessment of cost: "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate.  Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."  576 U.S. 743, 752–53 (2015).  And here, like in *Michigan*, "[s]tatutory context reinforces the relevance of cost."  *Id.*; *see* Appellants' Br. at 55–57.

By the government's own admission, monitors cost about "$710 per day" and "reduce the annual return-to-owner . . . by up to 20 percent."  Appellees' Br. at 16.  This will have a significant, and potentially disastrous, impact on fishermen.  These costs are far different from the static costs of compliance, like installing a vessel monitoring system,[3] or

---

[3] The fishermen do not challenge the legality of vessel monitoring systems.  However, there is a pending case involving such a challenge.  *See Mexican Gulf Fishing Co., v. Dep't of Commerce*, No. 20-2312 (E.D. La. filed Aug. 20, 2020).

15

being compelled to buy things fishermen would ordinarily purchase anyway, like ecologically compliant nets or safety equipment.

Consider the government's preferred analogy: vessel monitoring systems. In a recent rulemaking for a different fishery, NOAA estimated vessel monitoring would cost "approximately $3000 per unit" with monthly fees ranging "from approximately $40 to $75." 85 Fed. Reg. 44005, 44013 (Nov. 2, 2021). These costs, like many other compliance measures, are incidental to the operation of a vessel. They are quite different from a $710-per-day cost for monitors expected to ride along on up to 50% of all declared fishing trips. Paying observers to watch you fish is far from incidental and different in kind from *any other* compliance measure. That is why Congress drew such tight contours around industry-funded monitoring.

Imagine a scenario where the government requires a specially designed vessel monitoring system that costs $1,000,000 per day to operate. This would end commercial fishing in any fishery where it applied, effectively banning an entire industry. It cannot be the government's contention that such a cost is justifiable under the near-unlimited authority it claims here. Such a measure, like industry-funded

monitoring, would go beyond the merely incidental compliance costs imposed by regulation.

### G.    The sanctions and penalty provisions apply to existing, statutory fee authority.

The government's surplusage argument also comes up short.  It argues the Act's sanctions and penalty provisions have nothing to do with fee collection, stating further that "Plaintiffs cite no authority for any of their arguments on this front," namely, that other provisions of the statute contemplate third-party contracting.  Appellees' Br. at 40.  This is false.  In their opening brief, the fishermen cited the text of the foreign fishing provision, which explicitly calls for "observers or their agents" to be paid directly "by the owners or operators of the foreign fishing vessels for observer services[.]"    Appellants' Br. at 39 (citing 16 U.S.C. § 1821(h)(6)(c)).    That provision contemplates a direct payment relationship between vessel owners and observers.  Not only does this implicate the penalty provisions, but it is evidence Congress knew how to delegate authority to require direct monitoring payments by the industry when it wanted to.

The government further alleges the Act contains a "sanction for failure to *pay observers*" and thus the fishermen's reading—that vessel

17

operators may still need to contract with observers, even if the government is footing the bill—is unsustainable. Appellees' Br. at 39 (emphasis added). That conflicts with the relevant text, which reads fishermen may be fined for "any payment *required for* observer services." 16 U.S.C. § 1858(g)(1)(d) (emphasis added). The penalty provision says nothing about paying observers directly, contrary to the government's claim.[4] Such payments "*for observers*" are already required under the three fee-based industry-monitoring programs anticipated by the Act, no matter if the government can require fishermen to contract directly. *See* Appellants' Br. at 34–37. The text thus supports the fishermen's proper reading of the statute and does not violate any canons of construction.

## H. The government mischaracterizes the legislative history.

The relevant legislative history confirms the lack of broad authorization for industry-funded monitoring and undercuts the government's expansive reading of Section 1853(b)'s incidental-powers

---

[4] The foreign fishing provision includes specific situations in which fishermen may pay observers directly. So even if the government's reading of the statute were true, the text still would not be superfluous.

clause. *See* Appellants' Br. at 47–49. The government's interpretation of the history is misleading and untenable.

*First*, the government equivocates about *what* Congress did with the Fishery Conservation Amendments of 1990. *See* Appellees' Br. at 41–42. Congress's decision to authorize the *placement* of observers nationwide is distinct from its concurrent decision to allow *industry funding* in specific Alaskan fisheries. The government blurs this distinction by claiming "Congress sought to expressly authorize" "existing observer practices that . . . included the use of industry-funded monitoring." *Id.* at 32. If that were so, and Congress had intended to allow for shifting monitoring costs onto regulated parties in *all* fisheries, it could have stopped with Section 1853(b)(8). It would have had *no* reason to draft Section 1862.

*Second*, the government wrongly suggests Congress confirmed "existing" authority to impose industry funding. In fact, NOAA's decision to require vessel operators to pay directly for monitoring in the Alaskan region was controversial. In the lead-up to the 1990 Amendments, multiple witnesses testified that, in their view, the North Pacific Council lacked clear authority to require industry funding. *See Reauthorization*

19

*of the Magnuson Fishery Conservation and Management Act of 1976—Part II, Hearing on H.R. 2061 Before the H. Comm. on Merch. Marine & Fisheries, Subcomm. on Fisheries & Wildlife Conservation & the Env't,* 101st Cong. 86 (1989) (Serial No. 101-37) at 86 (statement of Ron Hegge, President, Alaskan Longline Fishermen's Ass'n) ("We urge that the Councils be given authority by region to assess cost recovery fees for the observer program[.]"); *id.* at 326 (written testimony of Gov. Steve Cowper, State of Alaska) ("Fishing organizations in Washington and Alaska have developed a proposal that would establish a way to pay for observer programs."); *id.* at 431 (written testimony of Henry Mitchell, Exec. Dir., Bering Sea Fishermen's Ass'n) ("Currently, councils appear to be unable to charge fees to cover such costs, and appear merely to be left now to mandating their existence.").

At least one stakeholder proposed Congress codify the sort of industry-funding power the government now claims was preexisting, namely, "[r]equir[ing] each vessel to pay for the observer it carries as a cost of doing business." *Id.* at 365 (written testimony of Kate Graham, Exec. Dir., United Fishermen of Alaska). But Congress decided against that approach, turning instead to a fee-based system. Regardless of the

20

specifics, Congress understood the 1990 Amendments to create a *novel* funding power. *See, e.g.*, 136 Cong. Rec. H229, 237 (daily ed. Feb. 6, 1990) (statement of Rep. John Miller); 136 Cong. Rec. S14953, 14968 (daily ed. Oct. 11, 1990) (statement of Sen. Robert Packwood).

Even the principal authorities on which the government relies tell a different story than the one set out in its brief. Senate Report No. 101-414, for example, does not speak to costs or funding. It reads that Section 1853(b)(8) "clarif[ed] the existing authority . . . for fishery management plans to require that *observers be carried on board domestic* fishing vessels[.]" S. Rep. No. 101-414 at 20 (Aug. 2, 1990) (emphasis added). The cited House report likewise says nothing about fees or funding; it refers only to "existing" authority for "Councils to require that observers *be carried on board* domestic fishing [vessels] for data collection purposes." H.R. Rep. No. 101-393 at 28 (Dec. 15, 1989) (emphasis added).

The legislative history shows Congress only recognized broad "existing authority" to require fishermen to carry an observer or monitor. All parties to the legislative process treated Section 1862 as granting the North Pacific Council a special, additional authority to require industry to pay for observers. That authority would not have been available to

21

any other council.  Indeed, if any council, as a rule, could require industry funding, the importance attached to Section 1862 would make no sense.

*Third*, the more recent legislative and regulatory history cited by the government is unhelpful.  The government points to three extant industry-funded monitoring programs to insinuate its position is well-accepted.  But it fails to acknowledge one of these programs—set out at 50 C.F.R. § 648.11(g)(5)—is part of the Omnibus Amendment and under challenge here.  The second, in the Atlantic sea scallop fishery, is not a true industry-funded regime but exists as part of a limited access privilege program, *see* 16 U.S.C. § 1853a(e), where observing costs are offset by additional "set aside" quota allocations.  *See* 50 C.F.R. § 648.11(k); *see also* A299–300; A303–04; A309–10.  And the third is the New England groundfish monitoring program, *see* 50 C.F.R. § 648.87(b), which escaped review on a procedural technicality in *Goethel v. Pritzker*.  *See* Appellants' Br. at 35–36.  The slew of committee reports cited by the government, *see* Appellees' Br. at 33, all relate to this last program and reflect Congress's continued directive that NOAA pay the industry's monitoring costs.  That is hardly a ringing endorsement of the government's position.

*Fourth*, the government insists failed legislation is a "poor guide to the meaning of enacted statutes." *Id.* at 41. But the same can be said of "mere statement[s] in a conference report," such as those cited by the government, offered to suggest what Congress "believe[d] an earlier statute meant." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). Legislative history is a treacherous basis for statutory interpretation and reference to it is not necessary for the fishermen to prevail. But here it points *against* the government's view.

Congress has repeatedly declined opportunities to permit industry funding nationwide. The Magnuson-Stevens Act has been reauthorized three times since 1989, and each time Congress considered and rejected proposals that would have created express blanket authority for industry funding. *See* Appellants' Br. at 48. In concert with the decision to authorize industry funding in three limited circumstances, the obvious inference is that Congress did not intend to do so nationwide. *See Food & Drug Admin. v. Brown & Williamson Tobacco*, 529 U.S. 120, 160 (2000) ("Given this history and the breadth of the authority that the [agency] has asserted, we are obliged to defer not to the agency's expansive

23

construction of the statute, but to Congress' consistent judgment to deny the [agency] this power.").

## I. National Standards Seven and Eight are not superfluous in the fishermen's reading of the statute.

The government argues the existence of National Standards Seven and Eight would be superfluous but for an implied authority to require fishermen to pay for monitoring.  *See* Appellees' Br. at 26.  But this ignores the reality of why National Standards Seven and Eight exist, and the greatest power NOAA has over fishermen: catch limits.  The Magnuson-Stevens Act gives the regional councils and NOAA the ability, among other things, to set quota or catch allocations, size limits, and regional closures—effectively, to determine how much and what type of fish fishermen can catch.  *See, e.g.*, 16 U.S.C. §§ 1853(a)(1), (4), (6), (15).  The statute even explicitly requires these management measures be "consistent with the national standards."  *Id.* § 1853(a)(1)(c).  Nothing presents a greater threat to a fisherman's livelihood than telling him he cannot fish.  And this is on top of other explicit grants of cost authority, as discussed above.  There is nothing superfluous about the National Standards if this Court correctly declines to read implicit authority for NOAA to pass costs onto the fishermen.

24

**J.    The government has mischaracterized the fishermen's arguments, creating strawmen which require no response.**

The government severely mischaracterizes two of the fishermen's arguments. *First*—citing a large range of pages—it alleges the fishermen have argued "Congress did not delegate to the Fisheries Service the authority to interpret the Magnuson-Stevens Act." Appellees' Br. at 45. The fishermen never argued that. They argued that Congress never delegated the authority to *impose the sort of industry-funded monitoring costs* required by the Omnibus Amendment. This position holds even if the Court decides the statute is ambiguous because the agency's proposed statutory interpretation is unreasonable. *See Encino Motorcars, LLC. v. Navarro*, 579 U.S. 211, 220 (2016); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

*Second*, again citing a range of pages, the government claims the fishermen "argue that the Fisheries Service's interpretation of § 1853(b)(8) to authorize industry-funding monitoring is impermissible because it imposes cost on industry." Appellees' Br. at 46. Again, the fishermen never made such a claim. Their argument was, instead, that the government failed to "*adequately account for the economic cost* the

25

[Omnibus Amendment] will impose on a large swath of the Atlantic herring fleet." Appellants' Br. at 55 (emphasis added). Thus, while the fishermen maintain there is no statutory authority, if the Court disagrees, the Omnibus Amendment should still be vacated because the government failed to adequately consider the costs and alternatives to industry-funded monitoring. *See id.* at 58.

## II. The Omnibus Amendment and its implementing regulations were not approved in a procedurally correct manner.

The government musters several arguments in defense of the procedural regularity of the Omnibus Amendment and its implementing regulations. They are unavailing.

### A. The government's insinuation that the fishermen lack standing to pursue their procedural claim is baseless.

The government insists the fishermen are "flyspecking . . . a process" that, at best, resulted in "harmless procedural error" and is otherwise "untethered from any claim of harm." Appellees' Br. at 50 & 56. The government has never objected to the fishermen's ability to prosecute their procedural claim, and the court below saw no issue with standing. The fishermen do not have a mere "generalized interest in Magnuson-Stevens Act compliance." *Id.* at 51. They have a concrete

interest in meaningful participation in the notice-and-comment process, especially given the substantial economic impact of monitoring.

The overlapping of the separate rulemakings to approve the Omnibus Amendment and its implementing regulations extends beyond technical violation of the Magnuson-Stevens Act.  It emphasizes how the government "prejudged the legality of the Omnibus Amendment and committed itself to proceeding with implementation," regardless of stakeholder opposition.  Appellants' Br. at 64.  The government musters a single response on this front, averring it *eventually* published responses to comments on the notice of availability.  Appellees' Br. at 54.  But publication, by itself, does not prove the government considered the substance of those comments and afforded parties the meaningful input expected in informal rulemaking.  That "[t]he Secretary may have superficially 'considered' comments . . . 'as a matter of grace is not enough.'"  Appellants' Br. at 67 (citing *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988)).  Approval of industry-funded monitoring was a *fait accompli*, and that is the irregularity implicating the fishermen's due-process rights.  A037–38.

27

The authorities cited by the government do not advance its case. *Summers v. Earth Island Institute*, for example, concerned "regulations . . . [that] neither require[d] nor forb[ade] any action on the part of the [plaintiff]" and involved procedural claims relating to agency action that was no longer under substantive challenge. 555 U.S. 488, 493, 496–97 (2009). Here, the fishermen have not conceded the legality of industry-funded monitoring, and they continue to suffer "direct economic impact" so long as the Omnibus Amendment is in force. A381.

*Spokeo, Inc. v. Robins* and *Humane Society of the United States v. Perdue* are similarly inapt. The fishermen do not allege "a bare procedural violation[.]" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). And they do not predicate their claim on generalized "'grievance about government.'" *Humane Soc'y of the United States v. Perdue*, 935 F.3d 598, 604 (2019). They insist instead the government's prejudgment of the Omnibus Amendment unfairly deprived them of meaningful participation in the rulemaking process and resulted in the imposition of significant economic costs. This goes beyond what *Spokeo* expected vis-à-vis concreteness. *See* 578 U.S. at 342.

28

**B.  The fishermen have not forfeited their argument.**

The government wrongly claims aspects of the fishermen's argument are waived because they were "not raise[d] . . . before the agency" or "in the district court proceedings[.]" Appellees' Br. at 52.  It is unsurprising the government would attempt to argue forfeiture.  The procedural soundness of the Omnibus Amendment and implementing regulations depends on the availability of the review process contemplated by Sections 1853(c) and 1854(b).  The availability of that process depends, in turn, on the New England Council having "deem[ed] necessary or appropriate" the "[p]roposed regulations" at issue.  *See* 16 U.S.C. § 1853(c).  Such deeming never occurred.

In the district court, the fishermen stated their position that Section 1853(c) did not control because the Omnibus Amendment's regulations were *not* designed and proposed by the New England Council:

> When a council "deems" regulations "necessary or appropriate" for implementation of an [fishery management plan] or plan amendment, it must submit those draft regulations to [the National Marine Fisheries Service] "simultaneously with the plan or amendment."  16 U.S.C. § 1853(c)(1).  Submitting draft regulations—or modifying them, *see id.* § 1853(c)(2)—is distinct from the *Federal Register* process contested by the parties.

29

Pls.' Reply in Supp of Mot. for Summ. J. & In Opp'n to Defs.' Cross-Mot. for Summ. J. at 39 n.21, ECF No. 22; *id.* at 38–39 (citing 50 C.F.R. § 600.140(a)–(b)). The government appeared to recognize this argument and addressed the possible relevance of Section 1853(c), though in conclusory fashion and with no citation to the record. *See* Reply Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. at 19, ECF No. 26; *id.* 19–20.

It is disingenuous for the government to protest the fishermen's arguments as "prejudicial." *See* Appellees' Br. at 52–53. The Complaint broadly alleged irregularity in the overlapping of the government's rulemakings. A037–38. The relevance of Section 1853(c) is plain enough. If there were any doubt as to the government's cognizance of the issue, stakeholders advised the Secretary about procedural problems *before* promulgation of the final rule. *See, e.g.*, A077–078; A085. The government even addressed the overlapping rulemakings in the *Federal Register*, but referred only to NOAA's regular "practice to publish a[] [notice of availability] and proposed rule concurrently," rather than Section 1853(c). A387.

Even assuming the fishermen had not adequately articulated the import of Section 1853(c), that should still not result in forfeiture. The

30

question of "deeming" is part-and-parcel of the fishermen's procedural claim. Moreover, "in exceptional circumstances, where injustice might otherwise result, [the Court] ha[s] the discretion to consider questions of law that were neither raised below nor passed upon by the District Court[.]" *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1085 (D.C. Cir. 1984). Here, important aspects of the Omnibus Amendment's approval were kept secret, including final action on the notice of availability. A406–08. The public could not have been privy to the intricacies of what the New England Council and NOAA were doing; no one could have alleged in detail *all* aspects of the procedural irregularities with the Omnibus Amendment.

Finally, as for the administrative record, the government has not convincingly explained why evidence of "deeming" would *not* be in the record below, A139–54, or the current appendix. *See* Appellees' Br. at 52. Every relevant document pertaining to the transmission and approval of the Omnibus Amendment is available. A342, A406–08, A425–38. This includes the clearance memoranda for the implementing regulations. A273–76, A409–42.

## C.     The government has not demonstrated the procedural soundness of its rulemakings.

The government's remaining arguments for the procedural soundness of the Omnibus Amendment and regulations come up short.

*First*, the government claims its regulations "were indeed deemed 'necessary and appropriate,'" but it offers no citation to support that argument.  The few cites the government does provide make clear the New England Council only drafted and approved the Omnibus Amendment itself.  *See* A293–94.  The government cannot seriously maintain there is "no distinction between the amendment and the implementing regulations."  Appellees' Br. at 53.  The regulatory language is found nowhere in the Omnibus Amendment, and the clearance memoranda for the regulations make *no* mention of the council's involvement in preparing the rule.  A273–76, A409–42.

*Second*, the government claims it would have been appropriate to rely on the concurrent review process of Section 1854(b), even if regulations were not "deemed" under Section 1853(c), and such a practice would be "no surprise to the public."  Appellees' Br. at 53–54.  There is no basis for such an argument—the statute is clear.  16 U.S.C. § 1853(c)(1).  As far as "surprise" is concerned, NOAA was *not* forthright about its

rulemakings, which is precisely why stakeholders raised concerns about the Omnibus Amendment's approval during the comment period and afterward.    A354, A359; A077–79.    The fishermen have provided a plausible "explanation" for why the government forced through the Omnibus Amendment with such alacrity—prejudgment of the legal issues and a predetermined outcome.    Appellants' Br. at 64–65.    Others have ventured the same explanation.    A354 ("NMFS has already determined its course of action and will view public comments with prejudice.").

*Third*, the government incorrectly suggests any irregularity was "harmless" and without "adverse consequences."    Appellees' Br. at 54–56. But the government concedes it failed to publish a final rule within thirty days of the end of the second comment period and instead waited thirteen months.    *See id.* at 55.    It knew it was not dealing with council-"deemed" regulations.    Neither the decision memorandum for the final rule, A409, nor the April 2019 letter to the New England Council explaining "delay[ed] completion," A439, provided *any* indication the implementing regulations were prepared *by* the council or otherwise subject to a statutorily prescribed timeline.    *See* 16 U.S.C. § 1854(b)(3).    The proposed

33

rule also failed to mention Section 1853(c) *or* Section 1854(b). *See* A250–72. The delay, at the least, kept the fishermen in legal limbo, unable to file a challenge to the Omnibus Amendment and uncertain about the timeline for implementation. *See* 16 U.S.C. § 1855(f)(1). More importantly, the delay reflects the government's prejudgment of the legality of industry-funded monitoring. Finally, as an aside, a "35-day lapse in appropriations that resulted in a partial government shutdown" in January 2019, Appellees' Br. at 55, cannot justify delaying the final rule *a full year* until February 2020. A377. Such a brief shutdown would not implicate the Anti-Deficiency Act concerns relevant in the cases cited by the government. *See* Appellees' Br. at 55. The same can be said of the "competing priorities" in the government's regulatory agenda.

There was nothing "appropriate" or "unremarkable" about the approval of the Omnibus Amendment. The decision to overlap the comment periods and approval processes for the notice of availability, A340–41, and implementing regulations, A250–72, was (and remains) unsupported by the statute and underscores the government's prejudgment of the legality of industry-funded monitoring.

## CONCLUSION

For these reasons, this Court should reverse the judgment of the district court, vacate the Omnibus Amendment, and declare its industry-funded monitoring provisions unlawful.

Dated: January 6, 2022                    Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
Eric R. Bolinder

CAUSE OF ACTION INSTITUTE
1310 N. Courthouse Rd., Ste. 700
Arlington, VA 22201
Telephone: (571) 444-4182

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,484 words, as counted by the word-processing system used to prepare the document and excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: January 6, 2022            /s/ Ryan P. Mulvey
                                  Ryan P. Mulvey

                                  *Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2022, I filed the foregoing Reply Brief of Appellants in the United States Court of Appeals for the District of Columbia Circuit using the Appellate CM/ECF system.  Service will be accomplished by the Appellate CM/ECF System.  As required by Circuit Rule 31(b), I will also cause to be filed eight paper copies of the brief with the Court.

/s/ Ryan P. Mulvey
Ryan P. Mulvey

*Counsel for Appellants*