**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 4, 2024**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

**No. 21-5166**

———————————————

**Loper Bright Enterprises, Inc.,** *et al.*
*Plaintiffs-Appellants,*

**v.**

**Gina Raimondo, in her official capacity
as Secretary of Commerce,** *et al.*
*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the District of Columbia
Civil Action No. 20-0466 (Hon. Emmet G. Sullivan)

———————————————

**SUPPLEMENTAL BRIEF FOR APPELLANTS**

———————————————

RYAN P. MULVEY
CAUSE OF ACTION INSTITUTE
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
Telephone: (571) 444-4182

*Counsel for Plaintiffs-Appellants*

August 28, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................ii

GLOSSARY.......................................................................................viii

PERTINENT STATUTORY PROVISIONS ..............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT...........................2

ARGUMENT ......................................................................................4

I.   The Court must resolve all relevant legal questions *de novo*. ......4

II.   The Court should abide by its prior holding that the Act does not "unambiguously" authorize industry funding for the Atlantic herring fishery. ......................................................8

III.   The plain text of the Act forecloses the type of industry-funded monitoring required by the Omnibus Amendment.........12

    A.   The authority to place monitors on vessels does not entail the power to require fishermen to pay those monitors' salaries.................................................12

    B.   Industry-funded monitoring is not a "necessary and appropriate" regulatory measure.......................................16

IV.   The Act's overall context counsels against the government's understanding of its authority to require industry funding. ......20

    A.   Congress's express authorization of industry funding in three limited situations is vitally informative. .............21

    B.   The Act's penalty provisions cannot bear the weight of the government's position.................................28

V.   The Act's history supports the fishermen's position. .................31

CONCLUSION .................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Alliance of Senior Citizens*
*of Greater Philadelphia v. Sullivan*,
930 F.2d 77 (D.C. Cir. 1991) ............................................................... 11

*Alabama Ass'n of Realtors v.*
*Department of Health & Human Services*,
594 U.S. 758 (2021) ........................................................................ 18

*Bais Yaakov of Spring Valley v.*
*Federal Communications Commission*,
852 F.3d 1078 (D.C. Cir. 2017) ........................................................ 10

*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023) ......................................................................... 20

*Chevron, U.S.A., Inc. v.*
*Natural Resources Defense Council*,
467 U.S. 837 (1984) ......................................................................... 3

*Environmental Defense Center v. Babbitt*,
73 F.3d 867 (9th Cir. 1995) .............................................................. 27

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) ....................................................................... 29

*Graham County & Water Conservation District v.*
*U.S. ex rel. Wilson*,
559 U.S. 280 (2010) ....................................................................... 20

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009) ....................................................................... 23

\* Authorities on which Appellants chiefly rely are marked
    with an asterisk.

*Gulf Fishermens Ass'n v.*
   *National Marine Fisheries Service,*
   968 F.3d 454 (5th Cir. 2020) ............................................................ 10

\* *Harrington v. Purdue Pharma L.P.,*
   144 S. Ct. 2071 (2024) ........................................... 17, 18, 20, 31

*Helmerich & Payne International Drilling Co. v.*
   *Bolivarian Republic of Venezuela,*
   784 F.3d 804 (D.C. Cir. 2015) ............................................................ 12

*Intel Corp. Investment Policy Committee v. Sulyma,*
   589 U.S. 178 (2020) ............................................................ 31

\* *Loper Bright Enterprises v. Raimondo,*
   144 S. Ct. 2244 (2024) ............................................ 3, 4, 5, 6, 7, 8, 17

\* *Loper Bright Enterprises v. Raimondo,*
   45 F.4th 359
   (D.C. Cir. 2022) .. 2, 3, 8, 9, 10, 11, 13, 14, 15, 19, 20, 23, 24, 25, 28, 29

*Louisiana Public Service Commission v.*
   *Federal Communications Commission,*
   476 U.S. 355 (1986) ............................................................ 2

*Maine Lobstermen's Ass'n v.*
   *National Marine Fisheries Service,*
   70 F.4th 582 (D.C. Cir. 2023) ............................................................ 16

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803) ............................................................ 5

*Marx v. General Revenue Corp.,*
   568 U.S. 371 (2013) ............................................................ 22

*Michigan v. Environmental Protection Agency,*
   576 U.S. 743 (2015) ............................................................ 7

*NASDAQ Stock Market LLC v.*
   *Securities & Exchange Commission,*
   38 F.4th 1126 (D.C. Cir. 2022) ............................................................ 21

*National Federation of Independent Business v.*
*Department of Labor, Occupational Safety &*
*Health Administration,*
  595 U.S. 109 (2022) ................................................................ 32

*New York Stock Exchange LLC v.*
*Securities & Exchange Commission,*
  962 F.3d 541 (D.C. Cir. 2020) .............................................. 17

*Rosenkrantz v. Inter-American Development Bank,*
  35 F.4th 854 (D.C. Cir. 2022) .............................................. 11

*Simon v. Republic of Hungary,*
  579 F. Supp. 3d 91 (D.D.C. 2021) ....................................... 11

*United States v. Adewani,*
  467 F.3d 1340 (D.C. Cir. 2006) ............................................ 10

*Utility Air Regulatory Group v.*
*Environmental Protection Agency,*
  134 S. Ct. 2427 (2014) ......................................................... 27

*Virginia Uranium, Inc. v. Warren,*
  587 U.S. 761 (2019) .............................................................. 13

**Statutes**

5 U.S.C. § 706 .......................................................................... 5

11 U.S.C. § 1123(b)(6) ........................................................... 17

16 U.S.C. § 1387 ..................................................................... 30

16 U.S.C. § 1821(h)(1)(A) ...................................................... 27

* 16 U.S.C. § 1821(h)(4) ................................................... 21, 26

16 U.S.C. § 1821(h)(6) ........................................................... 21

16 U.S.C. § 1821(h)(6)(C) ...................................................... 26

16 U.S.C. § 1853(a)(1)(A) ...................................................... 16

16 U.S.C. § 1853(a)(3) ................................................................ 19

16 U.S.C. § 1853(a)(5) ................................................................ 19

16 U.S.C. § 1853(a)(6) ................................................................ 19

16 U.S.C. § 1853(a)(9)(A) ........................................................... 19

16 U.S.C. § 1853(a)(15) .............................................................. 19

16 U.S.C. § 1853(b)(1) ......................................................... 14, 19

16 U.S.C. § 1853(b)(3) ................................................................ 19

16 U.S.C. § 1853(b)(4) ......................................................... 15, 19

16 U.S.C. § 1853(b)(8) ................................................... 12, 15, 25

16 U.S.C. § 1853(b)(14) .............................................................. 16

16 U.S.C. § 1853a(c)(1)(H) ................................................... 21, 26

16 U.S.C. § 1853a(e)(1) .............................................................. 25

* 16 U.S.C. § 1853a(e)(2) ..................................................... 21, 25

16 U.S.C. § 1854(d)(2)(A)(i) ....................................................... 25

16 U.S.C. § 1854(d)(2)(B) .......................................................... 25

16 U.S.C. § 1854(d)(2)(C) .......................................................... 26

16 U.S.C. § 1857(1)(L) ............................................................... 28

16 U.S.C. § 1858(g)(1)(D) .......................................................... 30

* 16 U.S.C. § 1862(a) ......................................................... 21, 22

16 U.S.C. § 1862(a)(1) ......................................................... 22, 27

16 U.S.C. § 1862(a)(2) ................................................................ 27

16 U.S.C. § 1862(b)(2)(e) ........................................................... 22

16 U.S.C. § 5501 ................................................................. 30

Fishery Conservation Amendments of 1990,
    Pub. L. No. 101-627, 104 Stat. 4436
    (Nov. 28, 1990) ............................................................ 23, 31

Sustainable Fisheries Act,
    Pub. L. No. 104-297, 110 Stat. 3559
    (Oct. 11, 1996) .................................................................. 29

## Regulations

50 C.F.R. § 300.338 ............................................................ 30

50 C.F.R. § 648.11(i) .......................................................... 24

50 C.F.R. § 648.11(d)(1) ..................................................... 14

50 C.F.R. § 648.11(d)(2) ..................................................... 14

50 C.F.R. § 648.11(d)(3) ..................................................... 14

50 C.F.R. § 648.11(d)(6) ..................................................... 14

50 C.F.R. § 648.11(d)(7) ..................................................... 14

50 C.F.R. § 648.11(h)(1) ..................................................... 24

50 C.F.R. § 648.11(h)(5) ..................................................... 24

## Legislative Materials

H.R. 39, 104th Cong. (1995) ............................................... 32

H.R. 1554, 101st Cong. (1989) ........................................... 32

H.R. 5018, 109th Cong. (2006) .......................................... 32

## Other Authorities

Antonin Scalia & Bryan A. Garner, Reading Law: The
    Interpretation of Legal Texts (2012) ............................. 20, 28

Approved Industry-Funded Monitoring Service Providers,
  87 Fed. Reg. 9040 (Feb. 17, 2022) ...................................................... 24

Government Accountability Office, 2 Principles of Federal
  Appropriations Law (3d ed. 2006) ...................................................... 25

NOAA Fisheries, Protected Species Observers,
  https://www.fisheries.noaa.gov/national/endangered-
  species-conservation/protected-species-observers ............................. 30

# GLOSSARY

APA        Administrative Procedure Act

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum attached to the Opening Brief of Appellants.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court previously ruled that the Magnuson-Stevens Act does not "unambiguously resolve whether the [National Marine Fisheries] Service can require industry-funded monitoring" in the Atlantic herring fishery. *Loper Bright Enters. v. Raimondo*, 45 F.4th 359, 365 (D.C. Cir. 2022) [hereinafter "*Loper Bright*"].  The panel majority concluded that, while the Act's "text makes clear the Service may direct vessels *to carry* at-sea monitors," it "leaves unanswered whether the Service . . . may require *industry to bear the costs*[.]"  *Id.* (emphasis added); *id.* at 366 (describing the Act as "not . . . wholly unambiguous").

That ought to have been the end of the case.  It is well-established that "an agency literally has no power to act . . . unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986); *see Loper Bright*, 45 F.4th at 374 (Walker, J., dissenting) ("[A]ll else equal, silence indicates a lack of authority.").  Without express authorization for industry funding—that is, a clear grant of power to force fishermen to contract directly with monitoring-service providers—the Omnibus Amendment and its novel funding scheme should have been set aside as unlawful.

2

Unfortunately, that did not happen. The Court instead construed the absence of explicit permission for industry funding as an invitation to find discretionary power to force fishermen to pay for their inspectors, at least when the government sees it as "necessary and appropriate" to achieve "conservation and management goals." *See Loper Bright*, 45 F.4th at 368–69 (The Act "leaves room for agency discretion as to the design of [monitoring] programs."); *see also id.* at 368 ("[T]he Act contains no bar on industry-funded monitoring programs[.]"). That result was only possible because of deference to agencies under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*. 467 U.S. 837, 842–43 (1984).

But *Chevron* is no more. The Supreme Court, exercising the "'prerogative of overruling its own decisions,'" *Loper Bright*, 45 F.4th at 369 (citation omitted), has rejected the two-step *Chevron* framework. It has directed instead that, "under the APA," courts may no longer "defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Courts must independently construe the law and provide their best judgment of its meaning.

3

Silence, ambiguity, and implied delegations of "gap-filling" discretion are now consigned to the dustbin of jurisprudential history. Without those artifacts, the government's defense of the Omnibus Amendment and industry-funded monitoring must fail. The plain text of the Act, its structure, context, and history all compel that conclusion.

The Court should reverse the district court, declare the Omnibus Amendment unlawful, and vacate the Final Rule.

## ARGUMENT

## I.    The Court must resolve all relevant legal questions *de novo.*

The end of *Chevron* deference marks a return to an older tradition of judicial responsibility for resolving cases involving disputes over legal meaning. At the beginning of the Republic, the Framers "envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts,'" and that it would proceed "independent of influence from the political branches." *Loper Bright*, 144 S. Ct. at 2257. Although courts might have at times afforded "respect" to the Executive Branch's construction of a statute, such respect never required displacing a court's best judgment of legal meaning with the views of a coordinate branch of government. *Id.* at 2258. Nor did it invite discovering

4

ambiguities with the hope of avoiding meaningful judicial review. Even the tremendous growth of the administrative state after the New Deal did not disturb this approach. *See id.* at 2258–60.

That hardly changed when Congress enacted the Administrative Procedure Act ("APA"), which codified the received understanding of a judge's "duty . . . to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). To wit: Section 706 commands that a "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The Supreme Court has now confirmed that "[t]he text of the APA means what it says." *Loper Bright*, 144 S. Ct. at 2262. *Chevron*, by contrast, "triggered a marked departure from the traditional approach" to statutory interpretation, as well as the plain meaning of Section 706. *Id.* at 2264; *see id.* at 2265 ("*Chevron* . . . [never] attempted to reconcile its framework with the APA.").

Apart from various constitutional concerns, *see, e.g., id.* at 2274–75 ("*Chevron* deference also violates our Constitution's separation of powers[.]") (Thomas, J., concurring), the most serious problem with

5

*Chevron* deference was that the doctrine mandated judicial abdication. After identifying "ambiguity" or "silence," a court would "mechanically afford *binding* deference to agency interpretations," even when such an interpretation conflicted with the court's best reading of the law, *id.* at 2265, as it might reach in cases not involving an agency. *Id.* at 2271 ("[T]he basic nature and meaning of a statute does not change when an agency happens to be involved.").

*Chevron* "turn[ed] the statutory scheme for judicial review . . . upside down." *Id.* Courts neglected the commonsense starting points for statutory interpretation—"What is the best reading of the law? Is the challenged agency action lawful on that reading?"—and replaced them with an often-convoluted inquiry into whether a particular provision was ambiguous—or at least ambiguous enough—to find an implied delegation triggering deference to the government.[1]

To be sure, statutory context matters. Congress can direct an agency to "exercise a degree of discretion" by "giv[ing] meaning to a

---

[1] This aspect of *Chevron*'s Step One was a major reason the methodology was "unworkable." "The defining feature of [*Chevron*'s] framework [was] the identification of statutory ambiguity, which require[d] deference at the doctrine's second step. But the concept of ambiguity has always evaded meaningful definition." *Loper Bright*, 144 S. Ct. at 2270.

particular statutory term," "prescrib[ing] rules to fill up the details of a statutory scheme," or even regulating "subject to the limits imposed by a term or phrase," including inherently capacious terms like "reasonable." *Id.* at 2263 (cleaned up). But acknowledging an express delegation of policymaking discretion hardly entails deference to legal determinations made by an agency as part of that policymaking, especially when it comes to "the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate." *Id.* at 2266.

Courts, in other words, still police the "outer statutory boundaries" of Congress's delegations to "ensure that agencies exercise their discretion consistent with the APA." *Id.* at 2268; *cf. Michigan v. Envtl. Prot. Agency*, 576 U.S. 743, 750 (2015) ("'Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" (citation omitted)). It is not enough for an agency to claim it is engaged in policymaking or fact-finding. Courts must ensure an agency's assertion of power conforms with the best reading of the law, especially when that assertion is novel or far-reaching. Thus, "[i]t makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying

7

all relevant interpretative tools, concludes is best." *Loper Bright*, 144 St. Ct. at 2266. "In . . . statutory interpretation, if it is not the best, it is not permissible." *Id.*

## II. The Court should abide by its prior holding that the Act does not "unambiguously" authorize industry funding for the Atlantic herring fishery.

*Chevron*'s demise is consequential in this case. The Court's prior judgment rested in large part on its determination that the Act was "not . . . wholly unambiguous" regarding the purported authority to require industry funding under the Omnibus Amendment:

> [T]he court cannot presume that Section 1853(b)(8), even paired with the Act's "necessary and appropriate" and penalty provisions, unambiguously affords the Service power to mandate that vessels pay for monitors.

*Loper Bright*, 45 F.4th at 366; *see id.* at 365 ("[T]he Act [does] not unambiguously resolve whether the service can require industry-funded monitoring[.]"); *id.* at 368 ("Congress has thus provided no wholly unambiguous answer[.]").[2] The existence of this purported ambiguity—

---

[2] The Court identified a great deal of "ambiguity" in the Act. On top of construing the absence of express authorization for industry funding as ambiguous, it concluded most of the statutory provisions cited by the parties were ambiguous. *See Loper Bright*, 45 F.4th at 366 ("The inference that the Service may require [industry funding as a compliance

really, an instance of silence—prompted the Court to find an implied delegation granting the government authority to "fill this gap with a reasonable interpretation" of the scope of its own power. *Id.* at 368 (the Act "through its silence, leaves room for agency discretion").

Without *Chevron*, the government should not win. As the Court may no longer defer to the government's reading of the law, it must resolve any ambiguity on its own, according to its best judgment and after employing all the tools of statutory interpretation. The Court previously (and correctly) observed that "[n]either Section 1853(b)(8), *nor any other provision of the Act*, explicitly allows the Service to pass on to industry the costs of monitoring requirements included in fishery management plans." *Id.* (emphasis added). Because the Act "does not authorize the agency's action, the analysis [should] end[] and the agency lose[]." *Id.* at 374 (Walker, J., dissenting). Any other conclusion would commit the Court to presuming Congress's failure to prohibit industry funding amounts to an indirect authorization. That presumption, however, is

---

cost] . . . is not . . . wholly unambiguous."); *id.* at 367 (Section 1862 "does not unambiguously demonstrate" industry funding is prohibited outside the North Pacific.); *id.* at 367–68 (Section 1821 "has no unambiguous consequences for the Service's authority to implement industry-funded monitoring.").

"backwards as a matter of basic separation of powers and administrative law." *Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*, 852 F.3d 1078, 1082 (D.C. Cir. 2017). Agencies "may only take action that Congress has *authorized.*" *Id.*; *accord Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 456 (5th Cir. 2020) ("Congress does not delegate authority merely by not withholding it."). And express authorization is absent here.

As the Court revisits its construction of the Act, it should be guided by its prior holding that the Act neither (1) expressly authorizes industry-funded monitoring nor (2) "unambiguously" confers power to require industry funding as a compliance cost or "necessary and appropriate" management measure. *See Loper Bright*, 45 F.4th at 366. These conclusions, which initially triggered *Chevron* deference, should be binding. *See United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) ("When the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding in the panel opinion, that holding 'continue[s] to have precedential weight,'" at least in the "absence of contrary authority." (citation omitted)).

Although the Supreme Court discarded the *Chevron* framework when it vacated this Court's prior judgment, it did not provide an overriding opinion on the proper construction of the Act. *See Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 866 n.4 (D.C. Cir. 2022) (noting that when the Supreme Court grants certiorari on one issue but not another from the same case, the latter holding is left undisturbed); *see also Action All. of Senior Citizens of Greater Phil. v. Sullivan*, 930 F.2d 77, 83–84 (D.C. Cir. 1991); *see generally Simon v. Rep. of Hungary*, 579 F. Supp. 3d 91, 137 (D.D.C. 2021), *aff'd in part, vacated in part, remanded*, 77 F.4th 1077 (D.C. Cir. 2023) (surveying this Court's practice of adhering to undisturbed holdings in otherwise vacated cases).

So far as the Court's past inability to find express and unambiguous authorization for industry funding is binding, then, the Court can resolve the case without much additional interpretative legwork. *See Loper Bright*, 45 F.4th at 374 (Walker, J., dissenting) ("[I]f it's clear that the text does not authorize the agency's action, the analysis ends and the agency loses."). But even if the vacated judgment is *not* controlling as law-of-the-case, the Court's demonstrated reluctance to accept the government's reading should be treated as "powerfully persuasive" and

11

should color these proceedings on remand.  *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venezuela*, 784 F.3d 804, 821 (D.C. Cir. 2015), *vacated on other grounds*, 581 U.S. 170 (2017).  The government's position is foreclosed in a *Chevron*-less world.

## III.    The plain text of the Act forecloses the type of industry-funded monitoring required by the Omnibus Amendment.

There is no textual basis for industry-funded monitoring in the Atlantic herring fishery.  The government previously argued that either of two sections in the Act authorizes the Omnibus Amendment.  But neither provision gets the job done.  Without *Chevron*, the question is no longer whether the government's position is "reasonable," but if it is the *best* reading of the Act.  It is not.  That honor goes to the fishermen.

### A.    The authority to place monitors on vessels does not entail the power to require fishermen to pay those monitors' salaries.

In the Final Rule, the government cited a single statutory provision as the basis for its power to impose industry-funded monitoring: Section 1853(b)(8).  *See* A385.  But Section 1853(b)(8) does not mention industry funding.  It only grants the government the option of designing fishery management plans that "require . . . observers *be carried on board* a vessel [.]"  16 U.S.C. § 1853(b)(8) (emphasis added).  The lack of reference

12

to *any* kind of funding mechanism is not trivial. Courts have a "duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019).

Congress's decision to authorize fishery management plans that require monitors to "be carried" on boats does not self-evidently entail the "authority to make the fishermen pay the monitors' wages." *Loper Bright*, 45 F.4th at 375–76 (Walker, J., dissenting) ("[T]here is no inherent, or even intuitive, connection between paying a monitor's wage and providing him passage."). The more natural reading of Section 1853(b)(8) is that it authorizes only the *placement* of monitors, a power the fishermen have never challenged. And, in fact, this Court has already concluded the express language of Section 1853(b)(8) "leaves unanswered whether the Service . . . may require industry to bear the costs of at-sea monitoring[.]" *Id.* at 365.

Section 1853(b)(8) is relevant only if industry funding can be characterized as a compliance cost. But it cannot. *Paying a monitor's salary* is altogether different from the costs inherent to *carrying* the monitor. *See* Reply Br. of Appellants at 13–17. The government concedes as much in its regulations, which describe compliance with a monitoring

13

program to include things like "[p]roviding accommodations and food"; granting the monitor "access to and use of the vessel's communications equipment and personnel"; allowing the monitor to use on-board "navigation equipment"; and providing the monitor with "free and unobstructed access" to the bridge, holds, and communications logs. 50 C.F.R. § 648.11(d)(1)–(3), (6)–(7); *see Loper Bright*, 45 F.4th at 376 (Walker, J., dissenting) ("A cost incidental to *carrying* an observer might include the additional fuel costs of a marginally heavier boat or the opportunity cost of giving to the monitor a bunk that would otherwise be occupied by a working fisherman."). The government makes a category error when it describes industry funding as a compliance cost.

There are two more reasons to doubt industry funding is defensible as a compliance cost. *First*, the design of other provisions in Section 1853 undermines the government's position. Section 1853(b)(1), for example, allows a fishery management plan to "require a permit to be obtained from, *and fees to be paid to*, the Secretary, with respect to" any vessel, operator, or processor. 16 U.S.C. § 1853(b)(1) (emphasis added). That language suggests Congress knows how to delegate authority to require payment from fishermen for something non-incidental—*i.e.*, a stand-

14

alone permit fee—and distinct from the reasonably expected costs of regulatory compliance—*e.g.*, the time and effort spent filling out a permit application. Similarly, that Section 1853(b)(8) only mandates monitors "be carried," *id.* § 1853(b)(8), undercuts any analogy to the government's authority to "require the use" of certain equipment or services, including "devices . . . to facilitate enforcement[.]" *Id.* § 1853(b)(4).

*Second*, despite years of litigating this issue, the Appellees still cannot point to a single context anywhere across the entire government where "an agency, without express direction from Congress, requires an industry to fund its inspection regime." *Loper Bright*, 45 F.4th at 376 (Walker, J., dissenting). More to the point, "[n]othing in the record definitively establishes whether at-sea monitors are the type of regulatory cost that might fall on fishing vessels by default or whether Congress would have legislated with that assumption." *Id.* at 366.

In truth, the costs associated with industry-funded monitoring are staggering. By the government's own estimates—which are several years old and likely too conservative—monitors will cost upwards of "$710 per day" and "may reduce the annual [returns-to-owner] for vessels . . . by up

to 20 percent." A381; *see* A382–83 (describing other impacts). These costs are qualitatively different from the more static costs of compliance.

The best reading of the Act is that any power to impose debilitating costs on an already beleaguered fleet would have been explicitly delegated by Congress—and, here, it wasn't. *Cf. Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 600 (D.C. Cir. 2023) ("We may reasonably expect the Congress at least to speak, not to be silent, when it delegates this power to destroy.").

**B.    Industry-funded monitoring is not a "necessary and appropriate" regulatory measure.**

The government insists Section 1853's "necessary and appropriate" clauses also give it authority to require industry funding. *See* 16 U.S.C. § 1853(b)(14) (plans may "prescribe such . . . requirements . . . determined to be necessary and appropriate for the conservation and management of the fishery."); *see also id.* § 1853(a)(1)(A). But that line of argument fares no better than the "compliance cost" theory under Section 1853(b)(8). The Act's catchall provisions, while undoubtedly elastic, cannot be stretched as far as the government wishes.

At first glance, the words "necessary" or "appropriate" may seem quite expansive, even to the point of allowing an agency to pursue its own

policy preferences.  But when faced with such capacious terms, the importance of the canons of interpretation, as well as a court's duty to definitively construe legal text, reaches its apex.  Why?  Because the judicially determined meaning of statutory language sets the boundaries of what an agency may do, subject to reasoned and explained decision-making.  *See Loper Bright*, 144 S. Ct. at 2263.  Capacious terms cannot escape judicial construction and meaningful review without creating nondelegation and void-for-vagueness concerns.  *See, e.g.*, *N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 554 (D.C. Cir. 2020).

The Supreme Court recently reiterated the proper approach to understanding catchall provisions just two months ago, building on cases and approaches already mentioned by the fishermen.  *See, e.g.*, Opening Br. of Appellants at 43–47; Reply Br. at 10–11.  In *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024), the Supreme Court considered language that authorized a bankruptcy reorganization plan to "include any other appropriate provisions not inconsistent with the applicable provisions" of the bankruptcy code.  11 U.S.C. § 1123(b)(6).  Proponents of an almost unbounded reading of the provision argued that, so long as a possible term of reorganization was "not 'expressly forbid[den]'" by

17

Congress, then it was impliedly authorized, subject only to a judge's determination that it was "appropriate." *Harrington*, 144 S. Ct. at 2082. The Supreme Court rejected that view, and applying the same interpretative approach here, the fishermen should win.

*Harrington* emphasizes that, "[w]hen faced with a catchall phrase," "courts do not necessarily afford it the broadest possible construction it can bear." *Id.* (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018)). On the contrary, they "generally appreciate that the catchall must be interpreted in light of its surrounding context and read to 'embrace only objects similar in nature' to the specific examples preceding it." *Id.* (citation omitted); *accord Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 763–64 (2021). *Harrington* also underlines the importance of avoiding an interpretation so broad as to permit anything not expressly forbidden. When "Congress set[s] out a detailed list of powers, followed by a catchall that is qualified with the term 'appropriate,'" that phrase needs to "draw[] its meaning from surrounding provisions." *Harrington*, 144 S. Ct. at 2083 (citation omitted). Congress would otherwise have written the statute differently.

Read in context, Section 1853's "necessary and appropriate" clauses do not empower the government to impose industry-funded monitoring. So far as other provisions within Section 1853 speak to regulatory obligations that can be imposed on fishermen, they include things like quotas, catch-limits, or other capacity restrictions, 16 U.S.C. § 1853(a)(3) (a)(15), (b)(3); mandatory data submissions, *id.* § 1853(a)(5); weather-based access restrictions to a fishery, *id.* § 1853(a)(6); permitting requirements, *id.* § 1853(b)(1); and rules about the "types and quantities of fishing gear, fishing vessels, or equipment" that can be used. *Id.* § 1853(b)(4). "[N]one of the[se] measures . . . look anything like the funding scheme" in the Omnibus Amendment. *Loper Bright*, 45 F.4th at 377 (Walker, J., dissenting). In fact, apart from permit fees, *see* 16 U.S.C. § 1853(b)(1); *supra* at pp. 14–15, the only express reference (though indirect) to stand-alone costs is the requirement that "mitigation measures" be adopted to *limit* the economic impact of regulations on fishermen and their communities. 16 U.S.C. § 1853(a)(9)(A).

One final point. As Judge Walker observed in his dissent, "the logic of the Fisheries Service's argument could lead to strange results." *Loper Bright*, 45 F. 4th at 377. The government's position invites an absurdity

where there are *no* limits to its ability to compel action by regulated parties. If fishermen can be forced to pay for the monitors that ride their boats, what else can they be ordered to do *or to pay for*? What feasible check is there for such a "generous interpretation of 'necessary and appropriate,'" especially when it "undermine[s] Congress's power of the purse"? *Id.* (citations omitted). The government has never offered any limiting principle for its reading of the law.

## IV. The Act's overall context counsels against the government's understanding of its authority to require industry funding.

"When resolving a dispute about a statute's meaning," courts often "look for guidance not just in its immediate terms but in related provisions as well." *Harrington*, 144 S. Ct. at 2084. That makes sense, because courts "'construe statutes and not isolated provisions.'" *Graham Cty. & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (citation omitted). Congress's decision to authorize industry funding in three specific contexts other than the one at issue cuts against any implied general authorization. When "Congress includes particular language in one section of a statute but omits it in another . . . [courts] generally take the choice to be deliberate." *Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023) (cleaned up and citation omitted); *see, e.g.*, Antonin

20

Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107–111 (2012) (describing *expressio unius* canon).

### A. Congress's express authorization of industry funding in three limited situations is vitally informative.

As the Court has recognized, the Act does not expressly authorize industry-funded monitoring in the Atlantic herring fishery. And implied authorization cannot be found in Section 1853(b)(8) or the Act's "necessary and appropriate" clauses. Congress's omission of a general authorization for industry funding is telling, especially because it specifically addressed it in three specific contexts: the North Pacific Council, 16 U.S.C. § 1862(a); limited access privilege programs, *id.* § 1853a(c)(1)(H), (e)(2); and foreign vessels. *Id.* § 1821(h)(4), (6).

These three sections provide a compelling negative implication against the general authority to impose industry funding, including in the Atlantic herring fishery. *See NASDAQ Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) (When "'a grant of authority . . . reasonably impl[ies] the preclusion of alternatives,' the [*expressio unius*] canon is a useful aide." (citation omitted)). Indeed, they show Congress knows how to give the government the power to require some flavor of industry-funded monitoring but intentionally limited it to

21

those situations explicitly addressed in the Act.  *See* Opening Br. of Appellants at 25–34; Reply Br. of Appellants at 3–7.

On the whole, it is "fair to suppose the Congress considered the unnamed possibility" here—the Omnibus Amendment's broad understanding of an industry-funding power—"'and meant to say no to it,'" otherwise it would have provide a single, all-encompassing authorization for such funding within all monitoring programs.  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (citation omitted).

### Section 1862

*First*, and most damningly for the government, the Act authorizes the North Pacific Council, on a discretionary basis, to propose "fisheries research plans" that fund observers through mandatory fees.  16 U.S.C. § 1862(a).  These fees, however, are capped and must either "be expressed as a fixed amount reflecting observing costs," or instead be calculated as "a percentage, *not to exceed 2 percent*, of the unprocessed ex-vessel value" of the harvested catch.  *Id.* § 1862(b)(2)(e) (emphasis added).  Section 1862 observers are functionally identical to the monitors required by the Omnibus Amendment.  *Cf. id.* § 1862(a)(1) (observers are placed "for the purpose of collecting data necessary for the conservation, management,

and scientific understanding of the any fisheries under the Council's jurisdiction") *with* A385 ("onboard monitors [are] to be carried on fishing vessels 'for the purpose of collecting data necessary for the conservation and management of the fishery'").

The negative implication of Section 1862 is particularly strong because that provision was enacted at the same time as Section 1853(b)(8), which authorizes the placement of monitors. *See* Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436, 4448 (codified at 16 U.S.C. § 1853(b)(8)) (Nov. 28, 1990); *id.* § 118(a), 104 Stat. 4457–59 (codified at 16 U.S.C. § 1862). This concurrent enactment cannot be overlooked. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("'[N]egative implications raised by disparate provisions are strongest where the provisions were considered simultaneously.'" (citation omitted)); *infra* at p. 31. "It is hard to believe that, when Congress decided to *explicitly* allow industry-funding for observers in one way (fees) in one place (the North Pacific), it also decided to *silently* allow all fisheries to fund observers in any way they choose." *Loper Bright*, 45 F.4th at 378 (Walker, J., dissenting).

Still, the Court has expressed doubt whether Section 1862 is relevant because it establishes a "system of fees," rather than burdening fishermen with an obligation to pay directly for monitoring. *See id.* at 367. But that doubt depends on a distinction without a difference. *See id.* at 379 n.47 (Walker, J., dissenting). Herring fishermen only have contracts with monitoring-service providers because of the Omnibus Amendment's industry-funding requirement. It should not matter whether the money they pay out passes through government's coffers or is directed by fiat to a government-approved contractor.[3]

The Omnibus Amendment was ultimately designed to achieve the same "system of fees" authorized by Section 1862 in all but name. This type of regulatory mischief is especially pernicious because it raises constitutional concerns vis-à-vis evasion of Congress's power of the purse. An agency cannot avoid limits on funding its desired programs by

---

[3] The monitoring market is highly regulated and controlled. *See, e.g.*, 50 C.F.R. § 648.11(h)(5). The government certifies the companies allowed to offer services. *See id.* § 648.11(h)(1), (i). There are only three at-sea monitoring providers for the Atlantic herring fishery, with a fourth approved to conduct portside sampling. *See* Approved Industry-Funded Monitoring Service Providers, 87 Fed. Reg. 9040 (Feb. 17, 2022). Those companies do not operate in the same geographic regions. The fishermen are therefore limited in their ability to negotiate a favorable rate, and the monitors have no incentive to cater to a captured clientele.

"authorizing a contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations."   Gov't Accountability Office, 2 Principles of Federal Appropriations Law at 6-177 (3d ed. 2006).   Yet that unlawful design is exactly what the Omnibus Amendment commands.

## Section 1853a

*Second*, when a fishery is managed as a limited access privilege program—which is not the case here—Congress permits cost recovery through the collection of fees to "cover . . . management, data collection, and analysis, and enforcement activities."   *Id.* § 1853a(e)(2); *see id.* § 1854(d)(2)(A)(i).   Similar to its treatment of fisheries research plans in the North Pacific, Congress has capped the maximum fee that can be assessed against limited access permit holders to no more than "3 percent of the ex-vessel value of fish harvested[.]"   *Id.* § 1854(d)(2)(B).

Contrary to the Court's previous suggestion, Section 1853a(e)(2) does foresee the use of monitors.   *See Loper Bright*, 45 F.4th at 367.   For starters, when the Act calls for "data collection and analysis," 16 U.S.C. § 1853a(e)(1), it elsewhere charges observers with "collecting data[.]"   *Id.* § 1853(b)(8).   And Section 1853a also requires plans to "include an

effective system for enforcement, monitoring, and management . . . including the *use of observers* or electronic monitoring systems." *Id.* § 1853a(c)(1)(H) (emphasis added). Finally, so far as there is any objection to the negative implication of Section 1853a(e) on grounds that it requires the collection and depositing of "fees" in a Treasury fund, *id.* § 1854(d)(2)(C), the same arguments raised with Section 1862 apply. *See supra* at pp. 22–25.

## Section 1821

*Third*, the Act requires foreign fishing vessels to carry and pay for observers through a special surcharge deposited in a "Foreign Fishing Observer Fund." 16 U.S.C. § 1821(h)(4). What is more, Section 1821 anticipates direct payment for observers whenever "insufficient appropriations" prevent normal operation of the observer program. *Id.* § 1821(h)(4), (6)(C). This specific authorization for industry funding demonstrates Congress did not impliedly intend to authorize passing costs off to industry on a broader basis, especially with domestic vessels.

Section 1821 is informative in other ways, too. That Congress created a special surcharge to fund observing in the normal course, along with a back-up authorization for direct industry funding, demonstrates

26

how a provision providing for *placement* of monitors should be read. Section 1821(h) first directs the government to "establish a program under which a[n] . . . observer will be stationed aboard each foreign fishing vessel[.]" *Id.* § 1821(h)(1)(A). Yet that provision is silent about funding, just like Section 1853(b)(8)'s authorization for observers in domestic fisheries. Congress's decision to add separate provisions greenlighting surcharges *or* direct payment through a system of fees underscores the default presumption that non-incidental costs associated with monitoring are not fairly characterized as "compliance costs." (This is also borne out by Section 1862, which is structured similarly. *Cf.* 16 U.S.C. § 1862(a)(1) *with id.* § 1862(a)(2).)

Further still, agencies are always responsible for paying for their regulatory programs with appropriated funds unless Congress directs otherwise. When appropriations run out, many mandatory agency activities lapse. *See Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995); *see also Util. Air Reg. Grp. v. Envtl. Prot. Agency*, 134 S. Ct. 2427, 2445 (2014). Congress saw fit to remedy that possibility in the foreign fishing context by creating an alternative funding mechanism. It did not do likewise for the Atlantic herring fishery.

27

**B.    The Act's penalty provisions cannot bear the weight of the government's position.**

The Court suggested before that "the Act's penalty provisions offset negative inferences that might be drawn from Section 1821." *Loper Bright*, 45 F.4th at 368.  This reading of the law should be reconsidered.  The penalty provisions are a thin reed on which to hang the government's claimed authority.

Start with Section 1857, which makes it unlawful "to forcibly assault, resist, oppose, impede, intimidate, sexually harass, bribe, or interfere with any observer . . . or any data collector employed by the National Marine Fisheries or *under contract to any person* to carry out responsibilities under this chapter[.]"  16 U.S.C. § 1857(1)(L) (emphasis added).  The Court presumably understood the phrase "under contract" to be an oblique reference to industry-funded monitors.  But Section 1857 does not clarify *which* contracted monitors Congress had in mind.  It could just as well be monitors who are paid on a contractual basis *by monitoring-service providers*.  *See* Scalia & Garner at 273 ("person" includes non-natural persons, such as corporate entities).

There is also no reasonable basis to expect Congress to have "specifically referenced foreign vessels or included a cross-reference to

28

the foreign fishing provision" when it drafted Section 1857, or even Section 1858. *Loper Bright*, 45 F.4th at 368. But even if it *were* necessary to find some semblance of a cross-reference, it exists. Congress created Sections 1857(1)(L) and 1858(g)(1)(D) at the same time it modified aspects of the Section 1821 observer program and set guidelines for all statutorily authorized observer programs. *See* Sustainable Fisheries Act, Pub. L. No. 104-297, §§ 105, 113–14, 204, 110 Stat. 3559, 3563–69, 3597–98, 3599, 3609 (codified at 16 U.S.C. §§ 1821–24, 1857–58, 1881b) (Oct. 11, 1996); *cf. Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

More importantly, the most natural reading of the penalty provisions remains the one advanced by the fishermen. *See* Opening Br. of Appellants at 34–37; Reply Br. of Appellants at 17–18. Congress likely understood the government would have some flexibility, within statutory bounds, to implement industry-funded monitoring programs expressly authorized by the Act. That much is clear with Section 1858, for example, which speaks of "observer services provided to or contracted by an owner or operator" but does not otherwise specify whether the overdue or

unpaid "payment" is due to the government or to a monitoring company. 16 U.S.C. § 1858(g)(1)(D).  Congress simply expected Sections 1857(1)(L) and 1858(g)(1)(d) to apply broadly, not only to foreign fishing—which is plain given the Act's history—but to *any* monitoring program where payment of some kind is expressly required of the fishermen.

Finally, Section 1858 is unlikely to be relevant because it applies to the enforcement of "*any* marine resource law."  *Id.* § 1858(g)(1)(D) (emphasis added).  And there are marine resource laws other than the Magnuson-Stevens Act that independently require observers, including the High Seas Fishing Compliance Act, *see* 16 U.S.C. § 5501 *et seq.*; 50 C.F.R. § 300.338; the Marine Mammal Protection Act, *see, e.g.*, 16 U.S.C. § 1387; and the Endangered Species Act.  *See* NOAA Fisheries, Protected Species Observers, https://www.fisheries.noaa.gov/national/endangered-species-conservation/protected-species-observers (last visited Aug. 28, 2024).  Given these other "marine resource" statutes may foresee contracting observers and paying for their services, the Act's penalty provisions—or, at least, Section 1858—would apply.  There is little to be gleaned from that in terms of offsetting the negative implications of the Magnuson-Stevens Act's express industry-funded monitoring programs.

**V.    The Act's history supports the fishermen's position.**

"If text and context supply two strikes against" the industry-funding requirement, "history offers a third" and fatal blow. *Harrington*, 144 S. Ct. at 2086. The evolution of the Act demonstrates how Congress intentionally declined to authorize industry-funded monitoring outside the three specific programs mentioned in the statute: North Pacific research plans, limited access privilege programs, and foreign fishing.

The creation of the first of these programs is especially informative. As noted above, Congress explicitly granted the North Pacific Council discretion to establish an industry-funded observer program as part of the Fishery Conservation Amendments of 1990. *See* § 118(a), 104 Stat. at 4447. In the same legislation, Congress created Section 1853(b)(8) to allow for observers to "be carried" on boats. *See* § 109(b)(2), 104 Stat. at 4448. If Congress had intended impliedly to provide the government with broad discretion to impose industry funding under Section 1853(b)(8), it would have been entirely unnecessary to provide a separate, specific grant of authority to the North Pacific Council. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020) ("'When Congress acts to

31

amend a statute, we presume it intends its amendment to have real and substantial effect.'" (citation omitted)).

If that were not enough, Congress has repeatedly considered proposed amendments over the years that, if enacted into law, would have provided expanded authority for industry-funded monitoring, including the sort of blanket authority the government claims now. *See, e.g.*, H.R. 5018, 109th Cong. § 9(b) (2006); H.R. 39, 104th Cong. § 9(b)(4) (1995); H.R. 1554, 101st Cong. § 2(a)(3) (1989). But "the most noteworthy action" Congress has taken with respect to these proposals is to reject them. *Nat'l Fed. of Ind. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022). This has left the government in the precarious position of trying to claim unprecedented authority—authority repeatedly withheld by Congress—without textual foundation.

//

//

//

32

## CONCLUSION

For these reasons, and those set out in the fishermen's previous briefs, the Court should reverse the judgment of the district court, declare the Omnibus Amendment unlawful, and vacate the Final Rule.

Dated: August 28, 2024                    Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey

CAUSE OF ACTION INSTITUTE
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
Telephone: (571) 444-4182

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in the Court's August 6, 2024 Order because it contains 6,265 words, as counted by the word-processing system used to prepare the document and excluding those parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: August 28, 2024                    /s/ Ryan P. Mulvey
                                          Ryan P. Mulvey

                                          *Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, I filed the foregoing Supplemental Brief for Appellants in the United States Court of Appeals for the District of Columbia Circuit using the Appellate CM/ECF system. Service will be accomplished by the Appellate CM/ECF System. As required by Circuit Rule 31(b), I will also cause to be filed eight paper copies of the brief with the Court.

/s/ Ryan P. Mulvey
Ryan P. Mulvey

*Counsel for Plaintiffs-Appellants*