No. 21-5166

# In the United States Court of Appeals
# for the District of Columbia Circuit

LOPER BRIGHT ENTERPRISES, INC., et al.,

*Plaintiffs-Appellants,*

*v.*

GINA RAIMONDO, in her official capacity as
Secretary of Commerce, et al.,

*Defendants-Appellees.*

On Remand from the Supreme Court of the
United States

**BRIEF *AMICI CURIAE* OF RELENTLESS INC.,
HUNTRESS INC. AND SEAFREEZE FLEET LLC
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

John J. Vecchione
*Counsel of Record*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Ste. 300
Arlington, VA 22203
(202) 869-5210
john.vecchione@ncla.legal
*Counsel for* Amici Curiae

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
PURSUANT TO CIRCUIT RULE 28(a)(1)**

A.     ***Parties and Amici***. As of September 4, 2024, the date on
which this *amicus* brief was filed, *amici curiae* Relentless Inc., Huntress
Inc. and Seafreeze Fleet LLC are aware of no other parties, intervenors,
or *amici* who have entered an appearance in this Court, other than those
listed in the Brief of Plaintiffs-Appellants and disclosed by other *amici* to
date.  Nor is the New Civil Liberties Alliance aware of any other parties,
intervenors, or *amici* who have entered an appearance in this Court,
other than those listed in the Brief of Plaintiffs-Appellants and disclosed
by other *amici* to date.

B.     ***Ruling Under Review***. *Amici curiae* are aware of no rulings
under review other than those listed in the Brief of Plaintiffs-Appellants
and disclosed by other *amici* to date.

C.     ***Related Cases***. *Amici curiae* are aware of no pending related
case.  However, a case dealing with similar issues, remanded from the
Supreme Court of the United States along with this one, is now pending
in the United States District Court for the District of Rhode Island. That
case involves a similar challenge to the legality of the New England

Omnibus Amendment and the Industry-Funded Monitoring Final Rule.

*See Relentless, Inc. v. U.S. Dep't of Com.*, No. 1:20-cv-108 (D.R.I.).

September 4, 2024
/s/ John J. Vecchione
John J. Vecchione

*Counsel for* Amici Curiae

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel states that *Amici* Relentless Inc., Huntress Inc., and Seafreeze Fleet LLC provide the following disclosure statement. *Amici* Relentless Inc. and Huntress Inc. are wholly owned by *Amicus* Seafreeze Fleet LLC. *Amicus* Seafreeze Fleet is a limited liability company with no parent corporation, and no publicly held corporation holds 10% or more of its stock.

/s/ John J. Vecchione
John J. Vecchione

## STATEMENT REGARDING CONSENT TO FILE AND
## SEPARATE BRIEFING

All parties have consented to the filing of this brief.* Pursuant to Circuit Rule 29(d), NCLA certifies that a separate brief is necessary to provide the Court with an analysis of the Magnuson Stevens Act particularly the 1990 amendments in the absence of the *Chevron* doctrine.

---

* NCLA states that no counsel for a party authored this brief in whole or in part; and that no person or entity, other than NCLA and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief. *See* Fed. R. App. P. 29(c)(5).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1) .............................................i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING .........................................................................................iv

TABLE OF CONTENTS ....................................................................... v

TABLE OF AUTHORITIES ..................................................................vi

GLOSSARY ..........................................................................................ix

INTEREST OF AMICI CURIAE............................................................ 1

STATEMENT OF THE CASE ............................................................... 2

ARGUMENT ......................................................................................... 3

    I. "THE INDUSTRY FUNDED MONITORING" SOUGHT BY THE GOVERNMENT IS INSUPPORTABLE WITHOUT *CHEVRON* DEFERENCE.............................................................................. 3

        A.   Courts Have Had to Use *Chevron* Deference to Uphold the Regulation as the Statute Does Not Support Industry Funding as the Best Interpretation of the Statute ............... 5

        B.   The Lack of Objection When the 1990 Amendments Were Proposed Demonstrates They Did Not Intend to Have Fishermen Generally Pay for Monitors ............................... 10

        C.   "Necessary and Appropriate" Cannot Do the Work of *Chevron*, Nor Should It ......................................................... 14

    II. THERE IS NO GENERAL RULE THAT REGULATED INDUSTRIES PAY FOR THE GENERAL GOVERNMENT FUNCTION OF THEIR REGULATORS .................................................................................. 17

CONCLUSION ..................................................................................... 19

CERTIFICATE OF COMPLIANCE....................................................... 20

CERTIFICATE OF SERVICE................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. HHS*,
141 S.Ct. 2485 (2021) ............................................................7

*Ala. Power Co. v. OSHA*,
89 F.3d 740 (11th Cir. 1996) ......................................... 16, 17

*AMG Capital Mgmt. LLC, v. FTC*,
141 S.Ct. 1341 (2021) ............................................................7

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .............................................................6

*Chisom v. Roemer*,
501 U.S. 380 (1991) ...........................................................13

*Edwards' Lessee v. Darby*,
12 Wheat. 206 (1827).........................................................10

*Ethyl Corp. v. EPA*,
51 F.3d 1053 (D.C. Cir. 1995).............................................6, 7

*FDA v. Brown & Williamson Tobacco*,
529 U.S. 120 (2000) ...........................................................12

*Gulf Fishermans' Ass'n v. Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020) ..............................................15

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
281 F. Supp.2d 1 (D.D.C. 2003) .........................................15

*In re MCP No. 165, OSHA Admin Rule on Covid-19 Vaccination and Testing 86 Fed Reg. 61402*,
21 F.4th 357 (6th Cir. 2021).................................................17

*Loper Bright Enters., Inc. v. Raimondo*,
144 S.Ct. 2244 (2024) ............................... 2, 3, 4, 5, 10

*Loper Bright Enters., Inc. v. Raimondo*,
45 F.4th 359 (D.C. Cir. 2022) ...............................................6

*Mexican Gulf Fishing Co. v. Dep't of Com.*,
 60 F.4th 956 (5th Cir, 2023) ............................................................. 15

*Michigan v. EPA*,
 576 U.S. 743 (2015) ........................................................................ 16

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
 142 S.Ct. 661 (2022) ......................................................................... 7

*Nat'l Grain & Feed Ass'n v. OSHA*,
 866 F.2d 717 (5th Cir. 1988) ..................................................... 16, 17

*Relentless, Inc. v. Dept. of Com.*,
 561 F. Supp.3d 226 (D.R.I. 2021) ....................................................... 5

*Relentless, Inc. v. Dept. of Com.*,
 62 F.4th 621 (1st Cir. 2023) ............................................................... 5

*The Ocean Conservancy v. Gutierrez*,
 394 F. Supp.2d 147 (D.D.C. 2005) .................................................... 16

*United States v. Cusik*,
 No. 11-cr-10066, 2012 WL 442005 (D. Mass. Feb. 9, 2012) ................. 18

**Constitutional Provisions**

U.S. Const. art. I, § 1 ........................................................................... 9

U.S. Const. art. I, § 7 ........................................................................... 9

U.S. Const. art. I, § 8 ........................................................................... 9

**Statutes**

16 U.S.C. § 1853 ................................................... 4, 6, 14, 17

16 U.S.C. § 1854 ................................................................................. 8

16 U.S.C. § 1857 ............................................................................... 18

**Other Authorities**

NOAA, Alaska Fisheries Science Center,
 About Us (last accessed Sept. 3,
 2024), https://www.fisheries.noaa.gov/about/alaska-fisheries-science-
 center ................................................................................................. 9

NOAA,
   At-Sea Monitoring in the Northeast (updated Jan. 26, 2023) (last
   accessed Sept. 3, 2024), https://bit.ly/3LWBbzQ ................................. 18

*Reauthorization of the Magnuson Fishery Conservation and
   Management Act of 1976—Part II, Hearing on H.R. 2061 Before the H.
   Comm. On Merch. Marine & Fisheries, Subcomm. On Fisheries &
   Wildlife Conservation & Env't,*
   101st Cong. (1989) ................................................................................ 11

## GLOSSARY

APA        Administrative Procedure Act

NCLA     New Civil Liberties Alliance

IFM        Industry Funded Monitoring Final Rule

MSA       Magnuson-Stevens Act

# INTEREST OF AMICI CURIAE

*Amici* are all involved in herring fishing in New England. Specifically, both Relentless Inc. and Huntress Inc. are corporations organized and operating under the laws of the State of Rhode Island and headquartered in North Kingstown. Relentless Inc. owns and operates F/V *Relentless* (collectively, "Relentless"), a high-capacity freezer trawler that alternatively, but sometimes simultaneously, harvests Atlantic herring (*Culpea harengus*), Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*). Huntress Inc. owns and operates F/V *Persistence* (collectively, "Huntress") and fishes in the same manner as Relentless. For Atlantic herring, Relentless and Huntress use small-mesh bottom trawl gear, and each holds a Category A permit. They are subject to the rule challenged by Plaintiffs-Appellants here. Relentless and Huntress are small businesses whose primary industry is commercial fishing. They are subject to the Omnibus Amendment and the Industry Funded Monitoring Final Rule ("IFM").

Seafreeze Fleet LLC ("Seafreeze") is a limited liability company organized and operating under the laws of the Commonwealth of Massachusetts. Seafreeze is headquartered in Ipswich, MA. Seafreeze owns *amici* Relentless and Huntress.

*Amici* were Petitioners in *Relentless Inc., et al. v. Department of Commerce, et al.,* 144 S.Ct. 2244 (2024). After issuance of the mandate by the Supreme Court, and vacatur and remand by the First Circuit, that case is now before the District of Rhode Island once again.

## STATEMENT OF THE CASE

This is an *amicus* brief for supplemental briefing the Court has directed. The key question presented to the Court is whether the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") sanctions the New England Omnibus Amendment (the "Omnibus Amendment") without applying *Chevron* deference which no longer exists. *Loper Bright Enters., Inc. v. Raimondo* and *Relentless, Inc. v. Dept. of Commerce, et al.*, 144 S.Ct. 2244 (2024). The answer is that it does not.

The key record facts necessary to the arguments in this *amicus* brief are found in the Plaintiffs-Appellants Opening Brief ("Opening Br.") at 8-14. Particularly the following undisputed record facts: 1) "Public feedback on the Omnibus Amendment has always been overwhelming[ly] negative." Opening Br. at 10 (citing A349); 2) the industry funded "monitoring programs had been funded by the federal government since the passage of the [MSA] in 1977." Opening Br. at 10-11 (citing A041); and 3) the Government acknowledged direct economic impacts on vessels issued category A and B permits were "upwards of $710 per sea day, as well as reduction in 'return-to-owner' of 'approximately 20 percent.'" Opening Br. at 14 (citing A381).

## ARGUMENT

I. **"THE INDUSTRY FUNDED MONITORING" SOUGHT BY THE GOVERNMENT IS INSUPPORTABLE WITHOUT *CHEVRON* DEFERENCE**

*Amici* here were the Petitioners in the case argued the same day as *Loper Bright* and decided alongside it. *See Relentless, Inc. et al v. Department of Commerce et al.*, 144 S.Ct. at 2256 (Describing *amici* and their vessels F/V *Relentless* and F/V *Persistence*). The Supreme Court declined to grant *certiorari* to either group of Petitioners on the question

presented of whether the IFM was consistent with the MSA. *Id.* at 2257 n.2. That is the question addressed by this round of supplemental briefing in this Court.

While *amici* agree with the arguments found in Plaintiffs-Appellants' Supplemental Memorandum, they write separately to highlight several points for consideration. First, nearly every court that has looked at this regulatory scheme has had to defer to the agency to find any such regulation lawful. Second, at the time of the 1990 amendments, *amici* were in the fishing industry. The 1990 amendment that allowed the agencies to require that applicable vessels "carry" observers (the "Observer Amendment") was unchallenged by them, or, to their knowledge, anyone else at the time. *See* 16 U.S.C. § 1853(b)(8). This contrasts sharply with the deluge of hostile comments the agencies drew when they proposed the instant regulation. Third, "necessary and appropriate," as used in the MSA and as interpreted in courts of this Circuit, cannot support the Government's action and cannot be used as a substitute for *Chevron* deference. Finally, these observers perform no non-governmental functions, and the government's attempts to treat the salary of government workers as "compliance costs" is pernicious. If its

interpretation of the statute prevails, it would have broad negative consequences.  It should be rejected.

### A. Courts Have Had to Use *Chevron* Deference to Uphold the Regulation as the Statute Does Not Support Industry Funding as the Best Interpretation of the Statute

As the Plaintiffs-Appellants note, this Court previously upheld the Omnibus Amendment only by application of *Chevron* deference because the MSA did not provide for the industry-funded monitors *expressly*, and other aspects of the MSA were equally ambiguous.  Supplemental Brief of Appellants at 8-12.  But this Court is not alone.  Other than the district court this Court overruled, all the Courts to look at this rule have only upheld it using deference.  *See Loper Bright*, 144 S.Ct. at 2273 ("Because the D.C. and First Circuits relied on *Chevron* in deciding whether to uphold the Rule, their judgments are vacated, … ."); *Relentless, Inc. v. Dept. of Com.*, 62 F.4th 621, 634 (1st Cir. 2023) (citing reasonableness of agency's interpretation of statute); *Relentless, Inc. v. Dept. of Com.*, 561 F. Supp.3d 226, 236-37 (D.R.I. 2021) (ambiguous statutory commands allow court to simply assess reasonableness of agency interpretation).  The only outlier to the view that the MSA does not expressly provide such power to the agencies was reversed by this Court, noting that the

"necessary and appropriate" language of the statute does not unambiguously provide the agencies such power. *Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359, 366 (D.C. Cir. 2022); *and see id.* at 368 ("Congress has thus provided no wholly unambiguous answer[.]").

What are we to make of this near unanimity of Courts which have looked at this regulation? What it means is that the statute does not give the agencies this power, certainly not through a clarifying amendment that the agencies can require properly outfitted vessels (but not others) to carry observers. 16 U.S.C. § 1853(b)(8). *Chevron* notoriously allowed agencies to provide reasonable interpretations of "silence." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). That has been overruled. As explained by Plaintiffs-Appellants, the better interpretation of the statute is that it does not provide this power to the agencies, chiefly because other portions of the statute provide it in specific circumstances not applicable here. S*ee also Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) (*Chevron* deference not created by congressional silence on an

issue).  Congress must implicitly or explicitly assign the power.  *Id*.  Here it did neither.  In fact, the D.C. Circuit's holding in *Ethyl Corp*. also notes that silence does not get an agency to *Chevron* step two.  51 F.3d at 1060 (allowing agency power "absent an express withholding of such power" would give agencies "virtually limitless hegemony.").  That is what the Government is attempting here post-*Chevron,* and the Court should forbid it.

The Supreme Court, in addition to overruling *Chevron* deference, has also in recent terms thoroughly rejected claims of broad authority by agencies to create their own power to impose new and novel regulations based on vague and ambiguous language in a statute.  *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S.Ct. 661 (2022) (statutory authority to regulate workplace safety was not authority to regulate general health); *Ala. Ass'n of Realtors v. HHS*, 141 S.Ct. 2485 (2021) (statutory grant of authority to prevent spread of communicable diseases via quarantine did not include a moratorium on evictions); *AMG Capital Mgmt., LLC v. FTC*, 141 S.Ct. 1341 (2021) (rejecting FTC's 40-year claim of disgorgement remedy based on the statutory grant of ability to obtain injunctions).  Again and again, the Supreme Court has admonished the agencies (and

some lower courts) not to infer power when none is given. Not only is there no language granting the power to require the herring fishery in New England to fund the monitors, but statutes that do allow such cost-shifting limit analogous costs, fees, and impositions of this kind to amounts far below what the Appellees inflicted here. *See, e.g.,* Opening Br. at 25-26 (citing 16 U.S.C. § 1854(d)(2)(B)) (3% limit of ex-vessel value of fish harvested). It is undisputed that Congress capped the costs of monitors in the Northern Pacific and through LAPPs. There is no such cap in the Omnibus Amendment, and to claim such vast power without reference to what Congress did allow, where it specifically authorized industry funding, is strong evidence the agencies were not granted such implicit power by silence.

This is not a case of mere statutory silence but of active congressional intent to prevent the agencies from imposing such costs on the New England fishery while allowing them (with certain protections including caps on costs) in more lucrative fisheries. Fisheries like those in the Northern Pacific off the coast of Alaska include "some of the largest and most valuable commercial fisheries in the world[.]" NOAA, Alaska Fisheries Science Center, About Us (last accessed Sept. 3,

2024), https://www.fisheries.noaa.gov/about/alaska-fisheries-science-center.

The impressive efforts by Congress to prevent agencies in general, and Defendants-Appellees in particular, from seeking revenue or services from the regulated would be stymied if this Court were to interpret the statute here to require Congress to continue to play "whack-a-mole" with agency attempts to evade the actual limits on their power that Congress has delegated. The Government asserts that it can require a regulated party to pay for monitors of the fish stocks that belong to the government when: 1) Congress has explicitly authorized it by statute; and 2) when Congress has not authorized it by statute but has allowed the placement of such monitors on private vessels. This position, were it to prevail, would allow the Government to evade Congressional controls constitutionally assigned via its powers to lay and collect taxes, to appropriate, and to spend. U.S. Const. art. I, §§ 1, 7, 8. The Supreme Court has clarified that the plain language of the statute governs, not the desire or will of the agency. Here the statute plainly allows on-board monitors to be placed on vessels, but it nowhere states the Government

can create analogous unfunded monitors to provide a service for the government and charge the regulated vessels for them.

The evidence before this Court of what the Observer Amendment meant when promulgated demonstrates that the original meaning of the Amendment was not for the industry to fund such observers.

## B. The Lack of Objection When the 1990 Amendments Were Proposed Demonstrates They Did Not Intend to Have Fishermen Generally Pay for Monitors

*Loper Bright* noted that courts still may respect "contemporaneous construction" of ambiguous laws by the executive (though not to defer to them). *See* 144 S.Ct. at 2257 (cleaned up) (quoting *Edwards' Lessee v. Darby*, 12 Wheat. 206, 210 (1827)). But such respect was only "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 2258. Here the contemporaneous interpretation of the MSA, as commentators noted, was that the Government paid for the observers allowed by the observer amendments. This was the case for more than 20 years.

The Government has usually relied on the Observer Amendment to bolster its argument. But the contemporaneous original meaning of that amendment was understood to relate to government agents, not observers paid by industry. The power of the agency even to place observers on vessels was in doubt, so Congress acted to make it clear they could be placed. The authority to do so was in fact denied by some, if not most.[1]

So, Congress added section 1853(b)(8) to make clear that observers were allowed to be placed on vessels in all the fisheries. But Congress permitted *industry*-funded observers only in the Northern Pacific, just as Plaintiffs-Appellants have argued. Nothing in that recitation is anything but Congress making what it approved of statutorily explicit. Congress did not approve cost shifting of observers in other fisheries, unless they were foreign vessels or approved LAPPS. If Congress does grant such

---

[1] *See Reauthorization of the Magnuson Fishery Conservation and Management Act of 1976—Part II, Hearing on H.R. 2061 Before the H. Comm. On Merch. Marine & Fisheries, Subcomm. On Fisheries & Wildlife Conservation & Env't*, 101st Cong. (1989) (Serial No. 101-37) at 431 (written testimony of Henry Mitchell, Exec. Dir., Bering Sea Fishermen's Ass'n) ("Currently, councils appear to be unable to charge fees to cover such costs, and appear merely to be left now to mandating their existence.").

power, it says so in statutes, not colloquies. The MSA has been reauthorized three times since 1989, and Congress has rejected the authority asserted here by the agencies each time. When an agency asserts broad power, courts "are obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the [agency] this power." *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120, 160 (2000).

As noted, *Amici* were in the fishing industry when the observer amendments were adopted. As far as their knowledge and the contemporaneous record demonstrates, there was no opposition by anyone to the amendments, and no one articulated opposition to them on the idea that they might allow charging vessels for such observers. Congress's silence—and that of the fishing industry as a whole—is the "dog that didn't bark" and that silence provides strong evidence that the understanding at the time was that no charging danger lurked. The Supreme Court has noted what such silence means:

> 'Congress' silence in this regard can be likened to the dog that did not bark. See A. Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927). Cf. *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 602, 100 S.Ct. 1889, 1902, 64 L.Ed.2d 525 (1980) (REHNQUIST, J., dissenting) ("In a case

where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night").

*Chisom v. Roemer*, 501 U.S. 380, 396 n. 23 (1991).

This contemporaneous understanding is powerfully bolstered by the fact that the agency did not begin to plan the Omnibus Amendment until more than 20 years had passed from the Observer Amendment. And when the agency proposed the Omnibus Amendment requiring industry funded monitoring, the immediate outpouring of negative commentary and resistance from the fishing community was overwhelming, as the record reveals. To hold this interpretation lawful, the Court would also be striking at democratic accountability. *Amici* never had an opportunity to oppose proposed legislation concerning industry-paid observers in the New England fisheries. The agencies presented the idea to them as a *fait accompli*. The Court should reject this novel interpretation of the MSA, asserted two decades after passage of the amendment relied upon to support it.

## C. "Necessary and Appropriate" Cannot Do the Work of *Chevron*, Nor Should It

As noted, section 1853 requires that all fishery management plans contain "conservation and management measures ..." "necessary and appropriate for the conservation and management of the fishery" and that they be consistent with the National Standards, "the other provisions of this chapter," and "any other applicable law." 16 U.S.C. § 1853 (a)(1)(A)-(C).

The district court in this matter interpreted the "necessary and appropriate" language as providing clear authority, but as this Court found, it does not. Those words have meaning and do not derogate from the other portions of the MSA. The MSA delineates Fishing Management Plans ("FMPs") and states they shall "contain the conservation and management measures, ... which are ... necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery[.]" *Id.* § 1853(a)(1).

But Courts have held that that language does not allow the Government to do whatever it wants at sea. *Gulf Fishermans' Ass'n v.*

*Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 468 (5th Cir. 2020) ("necessary and appropriate" language did not grant NMFS authority over aquaculture). That precedent also notes that the agencies cannot point to the absence of authority and then say *Chevron* deference allows them to assert authority because the failure of language makes the statute "vague." *Id.* at 461 nn. 12-13; *and see Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023) (emphasis in the original) ("As an initial matter, we stress that the adjectives *necessary* and *appropriate* limit the authorization contained in this provision."). Such an attempt at asserting authority is even less lawful given *Chevron's* demise.

Courts in this Circuit have likewise concluded that those adjectives have meaning other than "the agency gets to do whatever it wishes." *See, e.g., Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp.2d 1, 3 (D.D.C. 2003) (rule struck as Commerce did not properly determine whether regulation was "necessary and appropriate" despite argument adopted rule was consistent with "other applicable law[.]"); *id.* at 37 ("To reach a contrary holding would be to allow Defendants to flout the procedural rights of Plaintiff, circumvent judicial review, and ignore

some of the most basic tenets of administrative law."). The adjectives 'necessary' and 'appropriate' have been held to "temper"—not expand—agency power. *The Ocean Conservancy v. Gutierrez*, 394 F. Supp.2d 147, 156 (D.D.C. 2005) ("This broad discretion is tempered by substantive elements of the [MSA] that require all regulations to be 'necessary and appropriate for the conservation and management of the fishery,' and consistent with the ten National Standards defined by statute.").

In *Michigan v. EPA*, 576 U.S. 743 (2015), the Supreme Court held that a requirement under the Clean Air Act for regulations to be "appropriate" required the agency to ensure a reasonable relationship between costs imposed on the industry as against air quality benefits before promulgating such a regulation. *Id.* at 752 ("One would not say that it is even rational, never mind 'appropriate,' to impose [exorbitant] economic costs in return for [marginal] health or environmental benefits."). Courts likewise have concluded that "necessary or appropriate" language "encompasses a specie of cost-benefit justification[.]" *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 733 (5th Cir. 1988); s*ee also Ala. Power Co. v. OSHA*, 89 F.3d 740, 746 (11th Cir. 1996) (interpreting "necessary or appropriate" language). *National*

*Grain* and *Alabama Power* had language that allowed regulation to be "necessary or appropriate" that is *either* of those two alternatives. The MSA requires that all FMP's be *both*. The "necessary and appropriate" language thus cabins rather than expands the Defendants-Appellees' power. *See In re MCP No. 165, OSHA Admin Rule on Covid-19 Vaccination and Testing 86 Fed Reg. 61402*, 21 F.4th 357, 391-97 (6th Cir. 2021) (Larsen, J., dissenting) (distinguishing "necessary" from "necessary or appropriate").

## II. THERE IS NO GENERAL RULE THAT REGULATED INDUSTRIES PAY FOR THE GENERAL GOVERNMENT FUNCTION OF THEIR REGULATORS

The Government has in the past attempted to analogize forced contracting with observers to the normal regulatory costs of complying with a regulation. As the Plaintiffs-Appellants note, the actual regulatory costs of the observers are acknowledged by statute as the berths and other accoutrements a vessel assigned observers must have. *See* 16 U.S.C. § 1853(b)(8). The MSA says that observers may be placed on commercial vessels. *Id.* But that statute explicitly excludes observers from vessels without adequate berths or adequate places to carry out observer functions. *Id.* So, the very statute relied on by the Government

contemplates the regulatory cost to the vessel being the berths and the place to perform observer functions. It does not contemplate the salary of the observer. Nor does it say the commercial vessels can be forced to pay for them whether by designating such payment a "fee," a "cost," a "contract" or anything else.

Nothing the observers do is for the benefit of the fishing vessels or the fishers. They collect scientific, management, regulatory compliance, and economic data. NOAA, At-Sea Monitoring in the Northeast (updated Jan. 26, 2023) (last accessed Sept. 3, 2024), https://bit.ly/3LWBbzQ. That is a government function for which Congress appropriates funds. Monitors are defined as equivalent to federally employed data collectors under federal criminal law. *See United States v. Cusik*, No. 11-cr-10066, 2012 WL 442005 (D. Mass. Feb. 9, 2012) (citing penalties under 16 U.S.C. § 1857(1)(L) for interfering with an at-sea-monitor).

To hold that a statute saying that a regulated industry will be monitored or measured by individuals performing government functions allows an agency, without Congress's explicit or clear direction, to hire as many functionaries as it wishes would mark a sea-change in federal

regulation and power.  It would not only weaken congressional control of the agencies but also vastly increase the burdens on the regulated.

## CONCLUSION

For all the foregoing reasons, this Court should declare unlawful, set aside, and vacate the Omnibus Amendment and the IFM.

Respectfully submitted,

/s/ John J. Vecchione
John J. Vecchione
    *Counsel of Record*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Ste. 300
Arlington, VA 22203
(202) 869-5210
john.vecchione@ncla.legal

Dated: September 4, 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 3,525 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface. This *amicus* brief for a supplemental filing has applied the foregoing rules for its submission.

/s/ John J. Vecchione
John J. Vecchione

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record. Furthermore, I caused 8 paper copies of the foregoing to be sent to the Clerk of this Court on the day of electronic filing.

/s/ John J. Vecchione
John J. Vecchione