ORAL ARGUMENT SCHEDULED FOR NOVEMBER 4, 2024

No. 21-5166

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

LOPER BRIGHT ENTERPRISES, INC., et al.,
*Plaintiffs/Appellants*,

v.

GINA RAIMONDO, et al.,
*Defendants/Appellees*.

_____

Appeal from the United States District Court for the District of Columbia
No. 1:20-cv-466 (Hon. Emmet G. Sullivan)

_____

**SUPPLEMENTAL BRIEF FOR APPELLEES**

_____

<table>
<tr><td></td><td>TODD KIM<br>*Assistant Attorney General*<br>RACHEL HERON</td></tr>
<tr><td>Of Counsel:</td><td>KRISTINE S. TARDIFF<br>ALISON C. FINNEGAN</td></tr>
<tr><td>MITCH MACDONALD<br>*Attorney*<br>Office of the General Counsel<br>National Oceanic & Atmospheric<br>   Administration</td><td>DANIEL HALAINEN<br>*Attorneys*<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>Post Office Box 7415<br>Washington, D.C. 20044<br>(202) 514-4081<br>daniel.j.halainen@usdoj.gov</td></tr>
</table>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iii

GLOSSARY ................................................................................ vii

INTRODUCTION .........................................................................2

PERTINENT STATUTES AND REGULATIONS ..................................2

STATEMENT OF THE CASE ...........................................................2

ARGUMENT ...............................................................................4

I.     The Court should abide by its earlier analysis of the Magnuson-
       Stevens Act's meaning. .......................................................4

II.    The best reading of the Magnuson-Stevens Act is that Congress
       authorized the Service to require vessels to carry at-sea
       monitors at their own expense. ...........................................7

       A.     The Magnuson-Stevens Act's text and context establish
              that section 1853(b)(8) authorizes observer requirements
              and the resulting compliance costs......................................9

       B.     Historical practice and legislation confirm that the
              Service's authority includes cost allocation. ......................16

       C.     The provisions establishing fee programs are structurally
              distinct and serve different purposes...................................18

III.   The Service properly exercised its authority to adopt necessary
       and appropriate measures for conservation and management of
       the fishery. ......................................................................22

       A.     Congress conferred a degree of discretion on the Service
              in implementing Magnuson-Stevens Act measures. ...........22

       B.     The Service reasonably exercised its authority to adopt
              necessary and appropriate measures. .................................26

CONCLUSION .................................................................................30

CERTIFICATE OF COMPLIANCE ....................................................31

# TABLE OF AUTHORITIES*

## Cases

*Action All. of Senior Citizens of Greater Phila. v. Sullivan*,
  930 F.2d 77 (D.C. Cir. 1991)................................................................4

*Adirondack Med. Ctr. v. Sebelius*,
  740 F.3d 692 (D.C. Cir. 2014)............................................................18

*Broudy v. Mather*,
  460 F.3d 106 (D.C. Cir. 2006)..............................................................4

*Chevron U.S.A. Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984)..............................................................................5

*Conservation L. Found. of New Eng., Inc. v. Franklin*,
  989 F.2d 54 (1st Cir. 1993)................................................................24

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)............................................................................11

*Goethel v. Pritzker*,
  No. 15-cv-197, 2016 WL 4076831 (D.N.H. July 29, 2016) ........................19

*Harrington v. Purdue Pharma L.P.*,
  144 S. Ct. 2071 (2024)..................................................................25, 29

* *Loper Bright Enters. v. Raimondo*,
  45 F.4th 359 (D.C. Cir. 2022).........3, 5-8, 12-14, 16, 18, 20-22, 24-25, 28-30

*Loper Bright Enters. v. Raimondo*,
  143 S. Ct. 2429 (2023)..........................................................................5

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024)........................................ 3, 5-6, 16, 22-23, 25-26, 29

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Loper Bright Enters. v. Raimondo*,
    544 F. Supp. 3d 82 (D.D.C. 2021)............................................................16, 19

*Lovgren v. Byrne*,
    787 F.2d 857 (3d Cir. 1986) ...........................................................................24

*Metro. Wash. Airports Auth. Pro. Fire Fighter's Ass'n Local 3217, Inc.*
    *v. United States*,
    959 F.2d 297 (D.C. Cir. 1992)..........................................................................4

*Michigan v. EPA*,
    576 U.S. 743 (2015)................................................................................. 23-24

*N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*,
    962 F.3d 541 (D.C. Cir. 2020)........................................................................25

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)........................................................................................10

*Relentless, Inc. v. U.S. Dep't of Commerce*,
    62 F.4th 621 (1st Cir. 2023) .......................................................................3, 17

*Rosenkrantz v. Inter-Am. Dev. Bank*,
    35 F.4th 854 (D.C. Cir. 2022)..........................................................................5

*United States v. Adewani*,
    467 F.3d 1340 (D.C. Cir. 2006)...................................................................4, 18

*Wayman v. Southard*,
    10 Wheat. 1 (1825) ........................................................................................23

## Statutes

5 U.S.C. § 706.............................................................................16, 23, 29

16 U.S.C. § 1801 ..............................................................................2, 27

16 U.S.C. § 1802.................................................................. 9-10, 15, 25

16 U.S.C. § 1821 ...............................................................................7, 21

16 U.S.C. § 1827 ................................................................................................10

16 U.S.C. § 1851 .................................................................... 6, 14-15, 25, 27

16 U.S.C. § 1853 ...................................................................12, 23, 25, 27

* 16 U.S.C. § 1853(b)(8) ........................................... 6-10, 15, 17-22, 26-29

* 16 U.S.C. § 1853(b)(14) ................................................................ 6, 22-29

16 U.S.C. § 1853a ................................................................................ 20-21

16 U.S.C. § 1857 ................................................................................. 11-12

16 U.S.C. § 1858 ................................................................................. 11-12

16 U.S.C. § 1862 .......................................................................................20

31 U.S.C. § 3302 .......................................................................................19

42 U.S.C. § 7412 ..................................................................................23, 24

Pub. L. No. 94-265, 90 Stat. 331 (1976)...................................................13

Pub. L. No. 101-627, 104 Stat. 4436 (1990)............................................17

Pub. L. No. 117-328, 136 Stat. 4459 (2023)............................................18

## Regulations

50 C.F.R. § 648.11(g) ........................................................................... 3-4

50 C.F.R. § 648.11(k) ...............................................................................17

50 C.F.R. § 648.11(*l*) ...............................................................................17

50 C.F.R. § 648.11(m) ..............................................................................28

55 Fed. Reg. 4839 (Feb. 12, 1990) .........................................................17

77 Fed. Reg. 23,326 (Apr. 17, 2012) .......................................................19

85 Fed. Reg. 7417 (Feb. 7, 2020) ..................................................2, 19, 26

**GLOSSARY**

| | |
|---|---|
| Service | National Marine Fisheries Service |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation and Management Act |

**INTRODUCTION**

Plaintiffs challenge the National Marine Fisheries Service's authority under the Magnuson-Stevens Act to require at-sea monitoring and associated costs for vessels that participate in the Atlantic herring fishery. In its earlier decision, the Court examined the statute at *Chevron*'s first step and found that the text and context supported the government's construction. But because the statute was not "wholly unambiguous," the Court proceeded to *Chevron*'s second step and upheld the government's reading as permissible. *Chevron*'s deference framework is now overruled, and on remand, the Court is tasked with determining the best reading of the statute. The Court already completed much of this interpretive work in its earlier decision, and there is no reason to depart from that analysis. The Court should now exercise its independent judgment to resolve any remaining ambiguity and hold that the Magnuson-Stevens Act is best read to authorize the rule.

**PERTINENT STATUTES AND REGULATIONS**

Pertinent statutes are set forth in the addendum to the answering brief.

**STATEMENT OF THE CASE**

The background of this case is presented in the government's December 2021 answering brief. *See* Answering Brief 3-18. In short, the Service adopted a rule under the Magnuson-Stevens Act, 16 U.S.C. § 1801 et seq., authorizing an at-sea monitoring program in the Atlantic herring fishery. *See generally* 85 Fed. Reg.

7417 (Feb. 7, 2020). Plaintiffs challenged provisions of this "industry-funded monitoring" rule, specifically objecting to industry vessels bearing certain costs of complying with at-sea monitoring coverage requirements. This Court upheld the rule in August 2022, and the First Circuit rejected a similar challenge in March 2023. *Relentless, Inc. v. U.S. Dep't of Commerce*, 62 F.4th 621 (1st Cir. 2023); *Loper Bright Enters. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022). The Supreme Court then vacated and remanded both courts' judgments in June 2024. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).[1]

In practice, the at-sea monitoring rule has had no financial impact on vessels in the Atlantic herring fishery. The Service began operating the program in July 2021 and ceased monitoring coverage in April 2023, when the agency no longer had funds available to cover administrative costs. NOAA Fisheries, Atlantic Herring Industry-Funded Monitoring Program Suspended Beginning in April 2023 (Nov. 2, 2022), https://www.fisheries.noaa.gov/bulletin/atlantic-herring-industry-funded-monitoring-program-suspended-beginning-april-2023; *see* 50 C.F.R. § 648.11(g)(4)(i). Although not required to do so, the Service allowed owners of vessels that incurred costs during this period to seek federal reimbursement. The Service ultimately "reimburse[d] 100 percent of the industry's at-sea monitoring

---

[1] The First Circuit remanded the *Relentless* case to the district court for further proceedings. The parties agreed to a supplemental briefing schedule. *Relentless v. U.S. Dep't of Commerce*, ECF No. 56, No. 20-cv-108 (D.R.I.).

costs" incurred under the rule. NOAA Fisheries, Status of Industry Cost Reimbursement for Atlantic Herring Industry-Funded Monitoring (Sept. 7, 2023), https://www.fisheries.noaa.gov/bulletin/status-industry-cost-reimbursement-atlantic-herring-industry-funded-monitoring; *see* 50 C.F.R. 648.11(g)(4)(iii)(A). Thus, although the Service retains authority under the rule to implement at-sea monitoring prospectively, the Service currently is not exercising that authority.

**ARGUMENT**

## I.    The Court should abide by its earlier analysis of the Magnuson-Stevens Act's meaning.

The Court should not revisit issues that the Supreme Court did not address in its decision. Absent "contrary authority," this Court generally does not "disturb" its prior resolution of issues the Supreme Court does not reach. *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006); *cf. id.* ("When the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding in the panel opinion, that holding 'continue[s] to have precedential weight.'" (quoting *Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991))); *Broudy v. Mather*, 460 F.3d 106, 120 & n.8 (D.C. Cir. 2006); *Metro. Wash. Airports Auth. Pro. Fire Fighter's Ass'n Local 3217, Inc. v. United States*, 959 F.2d 297, 304-05 (D.C. Cir. 1992). The Supreme Court's decision not to grant certiorari on an issue in the case may properly inform this

Court's analysis on this point. *See, e.g.*, *Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 865 n.4 (D.C. Cir. 2022).

The Supreme Court took up the question whether to overrule the holding of *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), and declined to review the Magnuson-Stevens Act question. *Compare Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (mem.) (granting only *Chevron* question), *with* Pet. for Writ of Cert. at i, *Loper Bright*, No. 22-451 (U.S. Nov. 10, 2022) (seeking certiorari on question whether Magnuson-Stevens Act authorizes rule). The Supreme Court's decision overrules the *Chevron* framework but does not apply its holding to the rule at issue or otherwise interpret the Magnuson-Stevens Act, which is discussed in the majority opinion only in its recounting of the case background. *Loper Bright*, 144 S. Ct. at 2254-56. Thus, the case returns to this Court for review under a different interpretive framework, but without further elaboration on the Magnuson-Stevens Act. *See id.* at 2273 ("Because the D.C. and First Circuits relied on *Chevron* in deciding whether to uphold the Rule, their judgments are vacated, and the cases are remanded for further proceedings consistent with this opinion.").[3]

---

[3] The Court need not address questions in this appeal beyond statutory authority. Plaintiffs do not press those arguments in their supplemental brief, and the Supreme Court did not take them up. *See Loper Bright*, 45 F.4th at 370-72.

On remand, the Court is charged with exercising its "independent judgment in deciding whether [the] agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273. Where the statute is ambiguous, the Court should "use every tool at [its] disposal to determine the best reading of the statute" and may not "defer to an agency interpretation of the law." *Id.* at 2266, 2273. The Court already has completed much of this interpretive work. In the earlier proceedings on appeal, the government argued that the Magnuson-Stevens Act is best read to authorize the Service to adopt rules requiring vessels in regulated fisheries to bear the costs of complying with at-sea monitoring measures. *See* Answering Brief 21-42. Because the government argued that this question of agency authority could be resolved at *Chevron*'s first step, without reaching issues of deference at *Chevron*'s second step, this Court applied the traditional tools of statutory interpretation to determine whether the Magnuson-Stevens Act unambiguously authorized the rule.

The Court's analysis began with the ordinary meaning of the language Congress used in the Magnuson-Stevens Act to authorize the Service to adopt measures requiring vessels to carry observers. *Id.* at 365 (discussing 16 U.S.C. § 1853(b)(8)). The Court then turned to the broader statutory context and other provisions to inform its understanding of statutory meaning and agency authority. *Id.* at 365-66 (discussing 16 U.S.C. §§ 1851(a)(7)-(8), 1853(a)(1)(A), 1853(b)(14), 1857(1)(L), and 1858(g)(1)(D)). The Court then rejected Plaintiffs' arguments that

three fee programs separately authorized in the statute "give rise by negative implication" to an "inference" that Congress unambiguously "deprive[d]" the Service of the authority to require vessels to bear the costs of complying with an observer measure. *Id.* at 366-68 (discussing 16 U.S.C. §§ 1821, 1853a, 1862). But the Court concluded that Congress "provided no wholly unambiguous answer" as to whether the Service may require vessels to bear compliance costs and thus proceeded to resolve the issue at *Chevron*'s second step. *Id.* at 368-69

There is no cause for the Court to revisit most of this statutory analysis. The Supreme Court's decision forecloses only the final move to *Chevron*'s second step. The Court therefore should follow its earlier step one analysis crediting many of the government's arguments and rejecting Plaintiffs' arguments. And for the reasons that follow, the Court should resolve any remaining ambiguity in favor of the conclusion that the statute is best read to authorize the rule.

## II.    The best reading of the Magnuson-Stevens Act is that Congress authorized the Service to require vessels to carry at-sea monitors at their own expense.

The Magnuson-Stevens Act authorizes the Service to adopt "observer" requirements in regulated fisheries, 16 U.S.C. § 1853(b)(8), and that authority encompasses the industry-funded monitoring rule. Plaintiffs' cost-based objection cannot be squared with the text, context, and history of the statute. Nothing in section 1853(b)(8) suggests an exception to the default norm that regulated parties

7

may be required to bear the costs of complying with a rule that Congress has authorized an agency to adopt. The statute is best read to authorize requiring vessels to carry observers and bear any compliance costs.

This Court previously held that section 1853(b)(8) did not unambiguously authorize the industry-funded monitoring rule. *Loper Bright*, 45 F.4th at 368. The Court concluded that Congress did not directly speak to the question whether the Service may require vessels to bear the costs of complying with an observer requirement under section 1853(b)(8). But contrary to Plaintiffs' argument, Plaintiffs' Supplemental Brief 9-12, the Court's conclusion does not resolve the question whether section 1853(b)(8) is best read to authorize the rule. Applying the *Chevron* framework, the Court concluded only that section 1853(b)(8)'s "silence on the issue of cost of at-sea monitoring" warranted proceeding to the second step of the *Chevron* analysis. *Loper Bright*, 45 F.4th at 370. But without the *Chevron* framework, the Court must exercise its independent judgment to resolve the interpretive question "in the context of [the] comprehensive statutory fishery management program." *Id.*[4]

---

[4] This case does not implicate the major questions doctrine, as this Court already held. *Loper Bright*, 45 F.4th at 364-65. The Supreme Court did not suggest otherwise, and Plaintiffs have not pressed that argument.

A.     **The Magnuson-Stevens Act's text and context establish that section 1853(b)(8) authorizes observer requirements and the resulting compliance costs.**

**1.** Section 1853(b)(8) plainly authorizes the Service to adopt measures implementing the use of "observers" in regulated fisheries. Fishery management plans may "require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan." 16 U.S.C. § 1853(b)(8). Observers are used in programs designed "for the purpose of collecting data necessary for the conservation and management of the fishery," consistent with the overall purpose of the Magnuson-Stevens Act and other vessel reporting requirements. There are no further limitations located directly in section 1853(b)(8). The provision does, however, contain an exception that vessels are not "required to carry an observer" if the facilities for "quartering" an observer or "carrying out observer functions" create health and safety issues. *Id.*

The scope of these provisions is informed by the statute's definitional section. The statute defines "observer" as "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter." 16 U.S.C. § 1802(31). There is no definition of "carried" or the other significant terms in section 1853(b)(8), but the definition of the term "observer information" illustrates the type of data observers may collect, including "fish harvest or processing observations, fish sampling or weighing data,

9

vessel logbook data, vessel or processor-specific information . . . and video, audio, photographic, or written documents." *Id.* § 1802(32).

Plaintiffs do not dispute that these provisions, collectively, authorize the use of observers in the Nation's fisheries to collect a wide variety of information used for conservation and management purposes. But they protest that section 1853(b)(8)'s authority to require that observers "be carried" does not speak directly to costs. Plaintiffs' Supplemental Brief 13-14. Notably, section 1853(b)(8)'s use of the term "carry" is juxtaposed with the distinct notion of "quartering" an observer; the second clause of the provision provides that a vessel is not required to "carry" an observer if "quartering" the observer is unsafe. Because Congress intentionally used two different terms, the most natural reading is that "carrying" an observer includes, but is not limited to, simply "quartering" the observer. *Cf.* Plaintiffs' Supplemental Brief 13 (discussing "*placement* of monitors"); 16 U.S.C. § 1827(b) (providing that U.S. observers must be "stationed" on some foreign vessels).

**2.** The meaning of section 1853(b)(8) is also properly informed by the broader context of the Magnuson-Stevens Act and its accompanying provisions. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (cleaned up)). When determining the best meaning of a statutory provision, the

10

"reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). The "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Id.* (emphasis added).

The Magnuson-Stevens Act contains two provisions that expressly contemplate the existence of industry-funded monitoring. 16 U.S.C. §§ 1857(1)(L), 1858(g)(1)(D). First, section 1858(g)(1)(D) authorizes the Service to impose permit sanctions on vessels in cases where "any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit" under a marine resource law "has not been paid and is overdue." The reference to observer services "contracted by" the vessel is predicated on authority to require vessels to obtain observer services at their own expense—to "contract" for those services—rather than to simply quarter an observer "provided to" the vessel by the Service. *See id.*[5]

Second, section 1857(1)(L) makes it unlawful to commit various offenses against "any observer on a vessel" or "any data collector employed by the National Marine Fisheries Service or under contract to any person to carry out

_____

[5] Plaintiffs suggest that this provision could be referring to other observer programs administered under other statutes. Plaintiffs' Supplemental Brief 30. But tellingly, Plaintiffs do not cite a statute under any other marine resource law that expressly authorizes industry-funded monitoring, rather than—like the Magnuson-Stevens Act—authorizing observers and the compliance costs they entail.

11

responsibilities" under the Magnuson-Stevens Act. Again, this section presumes observers "under contract" to a "person" other than the Service. *See id.* As the Court explained, both provisions "indicate that Congress anticipated industry's use of private contractors." *Loper Bright*, 45 F.4th at 366.

More generally, the Magnuson-Stevens Act makes clear that vessels may be required to bear the costs of complying with conservation and management measures. Congress conferred broad authority on the Service to adopt a wide variety of conservation and management measures. In section 1853(a), Congress provided that fishery management plans must include measures necessary to prevent overfishing and rebuild stocks to protect, restore, and promote the long-term health of the fishery (§ 1853(a)(1)(A)); describe costs likely to be incurred in management (§ 1853(a)(2)); specify data required to be submitted by vessels (§ 1853(a)(1)(5)); minimize adverse effects of fishing on essential fish habitat (§ 1853(a)(7)); include impact statements that assess economic impacts and mitigation measures for participants in the fishery (§ 1853(a)(9)(A)); minimize bycatch by industry vessels (§ 1853(a)(11)(A)); and consider the economic impact of harvest restrictions (§ 1853(a)(14)). All these measures authorize or are predicated on regulation that imposes economic costs on vessels. In section 1853(b)—where the observer programs are found—Congress similarly authorized fishery management plans to include a variety of measures that necessarily

implicate industry costs. The Service's regulations may limit fishing in particular areas or for particular periods of time (§ 1853(b)(2)); impose limitations on the catch of fish (§ 1853(b)(3)); and require the "use" of specified types and quantities of fishing vessels, fishing gear, and equipment (§ 1853(b)(4)).

All of these provisions permit the agency to enact measures for which compliance has a financial cost. Yet none explicitly state that the Service may require industry to incur costs.[6] Section 1853(b)(4)—the authority to require the "use" of specified vessels, gear, and equipment—is salient. The most natural reading of "use" does not connote payment of costs. *See, e.g.*, *Use*, Black's Law Dictionary (4th ed. 1968) (first definition as noun: "Act of employing everything, or state of being employed; application; employment, as the use of a pen, or his machines are in use"); *Use*, Webster's Third New Int'l Dictionary (1976 ed.) (first definition as noun: "the act of employing, using, or putting into service").[7] *But see Loper Bright* 45 F.4th at 375 (Walker, J., dissenting). Congress did not use a word like "purchase," "obtain," or "buy." Yet in order to comply with a requirement to

---

[6] The only place in section 1853 where Congress specified a financial obligation is in subsection (b)(1), which authorizes fees paid to the government for permits. But fees are distinct from compliance costs. *Infra* 19. Congress had to specifically authorize fees, which (unlike compliance costs) are paid to the government to cover its administrative costs. *Cf.* Plaintiffs' Supplemental Brief 14-15.

[7] Section 1853(b)(4) was adopted in 1976. Pub. L. No. 94-265, § 303(b)(4), 90 Stat. 331, 352.

"use" specified vessels, gear, or equipment, a person must first obtain it—and bear the costs of doing so. There is no good reason to assume that, by not explicitly stating that the Service may require industry to incur costs, Congress intended that the Service would provide all vessels, gear, and equipment needed to comply with the regulations it is empowered to enact under these provisions.

As the Court explained, "[w]hen an agency establishes regulatory requirements, regulated parties generally bear the costs of complying with them." *Loper Bright*, 45 F.4th at 366. The Magnuson-Stevens Act reflects this default norm, not by inserting cost-related language into each of these authorizing provisions, but by adopting overarching cost-related standards to govern fishery measures implemented under section 1853. All fishery regulations must comply with ten "national standards," 16 U.S.C. § 1851, and two of these standards expressly require the Service to consider industry costs. National Standard 7 directs the Service to "minimize costs" of conservation and management measures "where practicable," and National Standard 8 directs the Service to "minimize adverse economic impact on [fishing] communities." *Id.* § 1851(a)(7), (8). These two provisions demonstrate that Congress plainly understood that the Service's exercise of regulatory authority conferred in section 1853 frequently requires

14

industry participants to incur compliance costs.[8] In adopting these standards, however, Congress also provided a substantive limit on those costs.

**3.** In sum, the broader context of the comprehensive regulatory scheme Congress adopted in the Magnuson-Stevens Act illustrates both that vessels may be required to comply with at-sea monitoring measures that entail contracting for observer services and that Congress authorized the costs of this kind of regulatory requirement to be borne by industry, subject to substantive limits in the statute. Plaintiffs do not appear to dispute that observer programs may properly require vessels to pay some costs, like lodging and feeding an observer. *See* Plaintiffs' Supplemental Brief 13-14. Rather, Plaintiffs contend that the costs of complying with the Atlantic herring fishery's industry-funded monitoring rule are too significant to be authorized by section 1853(b)(8). But that argument mistakes authority for policy.

If the Magnuson-Stevens Act authorizes at least *some* costs, then the question of cost is one of degree, not statutory interpretation. The Court reviews the degree or extent of the costs imposed for compliance with the Magnuson-

---

[8] Further, National Standard 1 provides that the Service's rules "shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). "Optimum" yield is "prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social, or ecological factor." *Id.* § 1802(33). This overarching mandate also implicates cost considerations throughout the national standards.

Stevens Act's national standards and for reasonableness under the Administrative Procedure Act's deferential arbitrary-and-capricious standard. 5 U.S.C. § 706(2)(A). Plaintiffs brought such a challenge to this rule: they argued in district court that the Service did not comply with National Standards 7 and 8. *Loper Bright Enters. v. Raimondo*, 544 F. Supp. 3d 82, 110-14 (D.D.C. 2021), *vacated*, 144 S. Ct. 2244 (2024). But Plaintiffs did not present those arguments to this Court. Plaintiffs did argue to this Court that the Service did not adequately consider costs, but this Court rejected that argument, *Loper Bright*, 45 F.4th at 370-71, and Plaintiffs do not ask this Court to reconsider that issue.

### B.    Historical practice and legislation confirm that the Service's authority includes cost allocation.

In addition to the text and context of the statute, the legislative backdrop and the agency's past practice both support the conclusion that Congress authorized the Service to implement observer programs that require industry to bear its compliance costs. The Court need not reach these points, given that the broader statutory context supports the Service's interpretation and the Court previously determined that the record does not "definitively establish[]" how Congress approached the issue, but they bolster the Service's interpretation as the best reading of the statute.

As explained in the government's brief, *see* Answering Brief 30-33, the modern Magnuson-Stevens Act originates with a statute enacted in 1976, but

Congress added the provision codified as section 1853(b)(8) in 1990. Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436, 4448. By that time, the Service already had adopted an industry-funded monitoring program in Alaska, 55 Fed. Reg. 4839, 4840 (Feb. 12, 1990), and Congress legislated against that backdrop. *See, e.g.*, H.R. Rep. No. 101-393, at 28 (1989). During proceedings on the 1990 amendments, the congressional record shows testimony addressing the existence of this kind of program where industry pays the cost of an observer directly. Answering Brief 31-32. Committee reports indicated that Congress intended to simply codify existing authority—authority that included industry-funded monitoring. Answering Brief 32-33. *See generally Relentless, Inc. v. U.S. Dep't of Commerce*, 62 F.4th 621, 633 (1st Cir. 2024).[9]

Consequently, the Service has maintained the view that the Magnuson-Stevens Act authorizes industry-funded monitoring programs and has adopted regulations to that effect. *See, e.g.*, 50 C.F.R. §§ 648.11(k), 648.11(*l*). Congress also is plainly aware that the Service continues to operate observer programs that include industry-funded monitoring components. *See, e.g.*, S. Rep. No. 116-127, at 42 (2019). Just last year, Congress directed the Service to use certain appropriated funds to pay for industry vessels' costs under the industry-funded monitoring

---

[9] Like this Court's earlier decision, the First Circuit's analysis in *Relentless* still carries persuasive value notwithstanding the Supreme Court's decision vacating the judgment and remanding for further proceedings.

program for the northeast multispecies fishery. Explanatory Statement, Division B, at 263, Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459, *available at* https://www.congress.gov/117/cprt/HPRT50347/CPRT-117HPRT50347.pdf. That direction is incongruous with Plaintiffs' premise that the statute does not authorize industry to incur these costs in the first instance. If Congress disagreed that the Service had authority to implement industry-funded monitoring—or intended to preclude that authority—Congress could have made that clear.

## C. The provisions establishing fee programs are structurally distinct and serve different purposes.

Plaintiffs argue that section 1853(b)(8) should not be construed to authorize the industry-funded monitoring rule because the Magnuson-Stevens Act separately authorizes three fee-based programs, thereby implicitly depriving the Service of authority to impose regulations with compliance costs. Plaintiffs' Supplemental Brief 21-27. The Court already rejected these arguments. *Loper Bright*, 45 F.4th at 367-68. Indeed, the Court not only rejected the specific program-based arguments Plaintiffs now reiterate but also doubted the baseline expressio unius reasoning underlying the argument. *Loper Bright*, 45 F.4th at 367-68 (citing *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014)). The Court should not revisit its conclusions on this issue, which the Supreme Court did not disturb. *Adewani*, 467 F.3d at 1342. Plaintiffs offer no reason for the Court to diverge from

18

its earlier analysis other than their own disagreement. *See, e.g.*, Plaintiffs'
Supplemental Brief 24.

In any case, as explained in the government's brief, Plaintiffs misunderstand
the nature of the fee authorities in the Magnuson-Stevens Act and the important
distinctions—substantive, structural, and administrative—between fees and
compliance costs. Answering Brief 33-40. A "fee is a form of 'funding' where the
industry is assessed a payment by the agency, authorized by statute, to be deposited
in the U.S. Treasury and disbursed for administrative costs otherwise borne by the
agency." 85 Fed. Reg. at 7422. Fee programs may implicate specific rules and
restrictions that govern the government's receipt of funds. *See, e.g.*, 31 U.S.C.
§ 3302; *Loper Bright Enters.*, 544 F. Supp. 3d at 108; *Goethel v. Pritzker*, No. 15-
cv-197, 2016 WL 4076831, at *7 (D.N.H. July 29, 2016), *aff'd sub nom. Goethel v.
U.S. Dep't of Commerce*, 854 F.3d 106 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 221
(2017). And fee programs may assess fees on regulated industry participants
generally rather than based on the amount of participation in a regulated activity.
*See, e.g.*, 77 Fed. Reg. 23,326, 23,339 (Apr. 18, 2012) (describing program where
fees "would not be linked to the actual level of observer coverage for individual
vessels" and participants would instead "pay an equal percentage").

The three fee programs Plaintiffs cite are thus distinct from the program the
rule implements. *First*, Plaintiffs point to authority for the North Pacific Council—

one of the regional councils that prepare fishery management plans for the

Service's review—to develop a fee-based research program to fund observers. 16

U.S.C. § 1862. As the Court explained, this provision authorizes a "different

funding mechanism" that "does not suggest that the Service lacks authority to

require industry-funded observers in all other fisheries." *Loper Bright*, 45 F.4th at

367; *see also, e.g.*, 16 U.S.C. § 1862(b)(2)(G), (d). The comparison also is not

apples-to-apples because the pool of activities covered by the fee program is

broader. *See, e.g.*, 16 U.S.C. § 1862(b)(2)(A). Plaintiffs insist that the structure of

the program "should not matter," Plaintiffs' Supplemental Brief 24, but they

cannot dispute that section 1862 grants the Service broader and different authority

than section 1853(b)(8)'s regulatory requirement. *See, e.g.*, 16 U.S.C.

§ 1862(b)(2)(F) (authorizing collection of fees from vessels and fish processors

that do not carry an observer).

    *Second*, Plaintiffs point to the provision authorizing the Service to establish

limited-access-privilege programs, a special type of market-based fishery

management not implicated by this case. 16 U.S.C. § 1853a. The statute authorizes

cost recovery for these programs through the collection of fees from privilege

holders. *Id.* § 1853a(e)(2). These fees help recover the Service's costs for

"management, data collection and analysis, and enforcement activities" *generally*,

or in other words, the statutory provision authorizes a funding scheme for the

government's costs for an entire management program. *Id.* Plaintiffs contend that
this is equivalent to an industry-funded monitoring program because limited-
access-privilege programs may include observers, *id.* § 1853a(c)(1)(H). But as the
Court explained, *Loper Bright*, 45 F.4th at 367, this program and the funding
structure are so substantively distinct from section 1853(b)(8) that there can be no
conflict giving rise to a negative implication.

   *Third*, Plaintiffs point to the foreign-fishing program. 16 U.S.C. § 1821. The
foreign-fishing program requires foreign vessels to pay "a surcharge in an amount
sufficient to cover all the costs of providing a United States observer aboard that
vessel," a system that is yet again structured differently from industry-funded
monitoring. 16 U.S.C. § 1821(h)(4). Plaintiffs point to a residual authority in the
statute that permits the Service to require foreign vessels to pay their fee directly to
the observer service provider in the event the Service does not have funds to cover
administrative overhead. *Id.* § 1821(h)(6). But this is just a "contingency plan," as
the Court explained, *Loper Bright*, 45 F.4th at 608-09, and regardless, the payment
is still a "fee" pursuant to a schedule set by the government rather than a
compliance obligation. 16 U.S.C. § 1821(h)(6)(C).

* * *

   In sum, the Court already considered and rejected Plaintiffs' arguments
about the best meaning of the Magnuson-Stevens Act, and although the Court did

21

not conclusively resolve the best meaning without deferring to the government's interpretation, the Court's earlier decision points squarely in the direction of that interpretation. The Court should now hold that the best meaning of section 1853(b)(8) is that the Magnuson-Stevens Act authorized the industry-funded monitoring rule.

**III.    The Service properly exercised its authority to adopt necessary and appropriate measures for conservation and management of the fishery.**

Even if section 1853(b)(8) were not enough to authorize the rule, the Service properly exercised its discretionary authority to adopt the cost-allocation provisions of the rule as a measure "necessary and appropriate" to implement the at-sea monitoring program. 16 U.S.C. § 1853(b)(14). The Court previously concluded that section 1853(b)(14) supported the Service's adoption of the rule, *Loper Bright*, 45 F.4th at 366, and the Supreme Court's decision makes clear that Congress may properly assign the Service this kind of discretion to adopt implementing measures in furtherance of its statutory authority.

**A.    Congress conferred a degree of discretion on the Service in implementing Magnuson-Stevens Act measures.**

Courts evaluating an agency's authority must exercise their independent judgment to determine a statute's meaning, but in "a case involving an agency," the "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Loper Bright*, 144 S. Ct. at 2263. For example, a statute may

22

be best read to "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme." *Id.* (quoting *Wayman v. Southard*, 10 Wheat. 1, 43 (1825)). Congress may authorize the agency to "regulate subject to the limits imposed by a term or phrase that 'leaves the agencies with flexibility.'" *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). When Congress "delegates discretionary authority" in this fashion, the reviewing court should "stay out of discretionary policymaking left to the political branches" and "need only . . . independently identify and respect such delegations of authority, police the statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with" the Administrative Procedure Act, 5 U.S.C. § 706. *Id.* at 2263, 2268.

Congress authorized the Service to prescribe "measures, requirements or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14); *see also id.* § 1853(a)(1)(A). The Magnuson-Stevens Act's "necessary and appropriate" authority fits comfortably within the category of statutes that authorize agencies to regulate subject to the limits of a term or phrase that leaves the agency with flexibility. 144 S. Ct. at 2263. In discussing this type of statutory delegation, the Supreme Court cited as an example a provision of the Clean Air Act authorizing "appropriate and necessary" regulation, 42 U.S.C. § 7412(n)(1)(A), along with the Supreme Court's decision in *Michigan v. EPA*

23

interpreting that provision. *Id.* Although the statutory schemes are distinct, the delegatory language is plainly a close match.

Indeed, this Court already drew an express analogy between the Magnuson-Stevens Act's "necessary and appropriate" authority and the structure of the statutory delegation at issue in *Michigan v. EPA*. In describing the Service's authority under section 1853(b)(14), the Court explained that this language is "a 'capacious[]' grant of power that 'leaves agencies with flexibility'"—quoting the same passage that the Supreme Court quoted. *Loper Bright*, 45 F.4th at 366 (quoting *Michigan*, 576 U.S. at 752). Courts generally have recognized that section 1853(b)(14) conferred discretion and flexibility on the agency to "achieve the Act's conservation and management goals." *Id.*; *see also, e.g.*, *Conservation L. Found. of New Eng., Inc. v. Franklin*, 989 F.2d 54, 61 (1st Cir. 1993) (describing "broad discretion" under identically phrased provision); *Lovgren v. Byrne*, 787 F.2d 857, 864 (3d Cir. 1986) (similarly describing "broad authority" under section 1853(b)(14)).

Although the policy delegation in section 1853(b)(14) is flexible, the Service's authority is not limitless. The courts determine the outer bounds of the terms "necessary" and "appropriate," and that inquiry is informed not only by the ordinary meaning of those terms, but also by the statutory context. As this Court explained, "an agency may not rely on a 'necessary and appropriate' clause to

claim implicitly delegated authority beyond its regulatory lane or inconsistent with statutory limitations or directives." *Loper Bright*, 45 F.4th at 368; *see also Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2082 (2024); *N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 554 (D.C. Cir. 2020). The Magnuson-Stevens Act provides substantive standards to guide and circumscribe the exercise of that discretion, including a detailed definition of the phrase "conservation and management" that identifies specific policy goals focused on sustaining fishery resources and the marine environment. 16 U.S.C. § 1802(5). Conservation and management measures also must comply with the national-standard mandates that provide substantive limits on the agency's rulemaking authority, including the cost-related standards. *Id.* § 1851. Congress placed section 1853(b)(14)'s necessary-and-appropriate authority within a list of enumerated provisions authorizing specific conservation and management measures, including the authority to require vessels to carry observers. *See generally id.* § 1853.

Thus, in reviewing the Service's exercise of its authority under section 1853(b)(14) to adopt necessary and appropriate measures, the Court's interpretive task is to "police the outer statutory boundaries" of this statutory delegation in the context of the broader statutory scheme and the substantive standards that govern the Service's policy discretion. *Loper Bright*, 144 S. Ct. at 2268. Within that zone of discretion, the Service is empowered to choose among reasonable options, and

the Court reviews that choice under the familiar arbitrary-and-capricious standard of the Administrative Procedure Act. *Id.* at 2263, 2268.

### B.     The Service reasonably exercised its authority to adopt necessary and appropriate measures.

The Service reasonably exercised its policy discretion under section 1853(b)(14) to adopt the industry-funded monitoring rule as necessary and appropriate to implement the at-sea monitoring program in the Atlantic herring fishery. Section 1853(b)(8) authorizes the Service to implement observer programs generally for conservation and management purposes, and section 1853(b)(14) works in tandem with that authority to permit the Service to adopt reasonable policies that are necessary and appropriate to the implementation of those programs. In the rule, the Service explained the importance of fishery data to the conservation and management of the Atlantic herring fishery and the benefits to fishery participants from increased accuracy of catch data. 85 Fed. Reg. at 7423, 7425. The Service concluded that the rule's cost-allocation structure was thus necessary and appropriate to implementing an at-sea monitoring program that serves these purposes.

The Magnuson-Stevens Act makes clear that the collection of data about the fishery is critical to conservation and management of the fishery. Section 1853(b)(8) provides for the implementation of an observer program "for the purpose of collecting data necessary for the conservation and management of the

fishery," 16 U.S.C. § 1853(b)(8), and the premise of this authority is that some data is in fact *necessary* to meeting the statute's conservation and management purposes. Indeed, Congress specifically found that the "collection of reliable data is *essential* to the effective conservation, management, and scientific understanding" of fishery resources. *Id.* § 1801(a)(8) (emphasis added); *see also id.* §§ 1801(c)(3), 1851(a)(2). To that end, Congress required fishery management plans to specify data and "information" about commercial fishing trips that vessels must submit to the Service. *Id.* § 1853(a)(5).

Section 1853(b)(14), in turn, authorizes the Service to adopt measures "necessary and appropriate" for the conservation and management of the fishery. Sections 1853(b)(8) and (b)(14) thus fit together neatly. Section 1853(b)(8) authorizes observer programs to obtain data about the fishery, and section 1853(b)(14) authorizes additional measures that are necessary and appropriate to collecting that data. Of course, those measures must comply with the substantive limitations on conservation and management measures, including the two national standards expressly requiring the Service to consider industry costs. 16 U.S.C. § 1851(a)(7)-(8). But the Service's adoption of industry-funded monitoring programs like the Atlantic herring rule falls well within the outer statutory boundaries of the necessary-and-appropriate authority under section 1853(b)(14).

27

The Atlantic herring measures, in particular, expressly provide for the kind of data collection discussed in the statute. *See* 50 C.F.R. § 648.11(m).

Plaintiffs nonetheless contend that the Service's necessary-and-appropriate authority—while "undoubtedly elastic"—is too narrow to accommodate the monitoring rule. Plaintiffs' Supplemental Brief 16-20. The Court already rejected this argument. The Court explained that the Service's "interpretation falls within the boundaries set by the Act" in section 1853(b)(14). *Loper Bright*, 45 F.4th at 368. The Magnuson-Stevens Act "expressly envisions that monitoring programs will be created" under section 1853(b)(8), "leaves room for agency discretion as to the design of such programs," and "contains no bar on industry-funded monitoring" as one such permissible design; to the contrary, as discussed above, the statute plainly contemplates that the Service *may* impose costs on industry. *Id.* Thus, the exercise of "necessary and appropriate" authority under section 1853(b)(14) "encompass[es] industry-funded monitoring" and does not "exceed statutory limits." *Id.*

Plaintiffs assert that the Court's analysis is simply wrong, contending that other conservation and management measures authorized under section 1853 look different from section 1853(b)(8) and that the Service is claiming unbounded authority to impose costs on industry. Plaintiffs' Supplemental Brief 19-20. But there can be no question that the Service's exercise of its section 1853(b)(14)

discretion is connected both to the conservation-and-management purposes of the statute and the express authority to require observers under section 1853(b)(8), bounded by other statutory constraints. This connection between the "catchall" of section 1853(b)(14) and the specific authority of section 1853(b)(8) is what matters when discerning the outer statutory boundaries of section 1853(b)(14), not the connection between section 1853(b)(8) and its neighboring provisions. *Cf. Harrington*, 144 S. Ct. at 2083. In any event, the Service's authority to adopt regulatory measures that entail compliance costs is evident in the cost-related provisions of the Magnuson-Stevens Act, *supra* 14-15, and Plaintiffs' suggestion that the Service is asserting limitless authority to impose costs simply ignores these express limitations—along with the limitation that agency action not be arbitrary or capricious, 5 U.S.C. § 706(2)(A).

For these reasons, the industry-funded monitoring rule is well within the "outer statutory bounds" of the Service's authority under section 1853(b)(14) to adopt necessary and appropriate measures. *Loper Bright*, 144 S. Ct. at 2268. The Court's role in reviewing this "discretionary policymaking" is thus to ensure that the Service exercises its discretion reasonably, consistent with arbitrary-and-capricious review under the Administrative Procedure Act. *Id.* at 2263, 2268. The Court already rejected Plaintiffs' argument on appeal that the rule is arbitrary and capricious. *Loper Bright*, 45 F.4th at 370-71. Plaintiffs contended that the Service

failed to account for the costs of the program for vessels participating in the

Atlantic herring fishery, but this Court held that the Service had "evaluated the

economic impacts of the program in detail," "responded to comments raising cost-

related concerns," and "described its efforts to minimize economic impacts on

herring fishery participants." *Id.* at 371-72. Thus, "the Service's decision to

proceed with an industry-funded monitoring requirement after extensive

deliberations on the question of cost was not arbitrary and capricious." *Id.* at 371.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Respectfully submitted,

/s/ *Daniel Halainen*
TODD KIM
*Assistant Attorney General*
RACHEL HERON

Of Counsel:                                      KRISTINE S. TARDIFF
                                                 ALISON C. FINNEGAN
MITCH MACDONALD                                  DANIEL HALAINEN
*Attorney*                                       *Attorneys*
Office of the General Counsel                    Environment and Natural Resources Division
National Oceanic & Atmospheric                   U.S. Department of Justice
    Administration

September 18, 2024
DJ 90-8-8-08349

**CERTIFICATE OF COMPLIANCE**

This document complies with the Court's briefing order because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,478 words. The document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Daniel Halainen*
DANIEL HALAINEN

*Counsel for Appellees*