**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————————

**No. 21-5166**

————————————————

**Loper Bright Enterprises, Inc.,** *et al.*
*Plaintiffs-Appellants,*

**v.**

**Gina Raimondo, in her official capacity
as Secretary of Commerce,** *et al.*
*Defendants-Appellees.*

————————————————

On Appeal from the United States District Court
for the District of Columbia
Civil Action No. 20-0466 (Hon. Emmet G. Sullivan)

————————————————

**SUPPLEMENTAL REPLY BRIEF FOR APPELLANTS**

————————————————

RYAN P. MULVEY
CAUSE OF ACTION INSTITUTE
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
Telephone: (571) 444-4182

*Counsel for Plaintiffs-Appellants*

September 25, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

PERTINENT STATUTORY PROVISIONS .............................................. 1

SUMMARY OF ARGUMENT ..................................................................... 2

ARGUMENT ............................................................................................... 2

  I.    The government attempts to rewrite history. .............................. 2

  II.   The Act's plain text forecloses the government's argument. ........ 5

      A.    The requirement to "carry" a monitor does not
            entail responsibility for paying the monitor's salary. .......... 5

      B.    Industry funding is not a compliance cost. ........................... 7

      C.    Whether industry funding is "necessary and
            appropriate" is a question of law ......................................... 9

  III.  The Act's overall context supports the fishermen. ..................... 11

      A.    Congress's three express authorizations for industry
            funding are probative. ......................................................... 11

      B.    The Act's penalty provisions cannot bear the weight
            of the government's position ............................................... 17

  IV.  The government ignores the relevant statutory history. ............ 18

CONCLUSION .......................................................................................... 19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adirondack Medical Center v. Sebelius,*
    740 F.3d 692 (D.C. Cir. 2014) ........................................................ 12, 13

*American Petroleum Institute v.*
    *Environmental Protection Agency,*
    52 F.3d 1113 (D.C. Cir. 1995) ................................................................ 4

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ......................................................................... 17

*Bittner v. United States,*
    598 U.S. 85 (2023) ............................................................................... 13

*Buffington v. McDonough,*
    143 S. Ct. 14 (2022) ............................................................................... 3

*Cheney Railroad Co. v. Interstate Commerce Commission,*
    902 F.2d 66, 69 (D.C. Cir. 1990) ......................................................... 13

*Ethyl Corp. v. Environmental Protection Agency,*
    51 F.3d 1053 (D.C. Cir. 1995) ....................................................... 4, 5, 9

*Federal Election Commission v. Ted Cruz for Senate,*
    596 U.S. 289 (2022) ................................................................................ 5

*Gulf Fishermens Ass'n v. National Marine Fisheries Service,*
    968 F.3d 454 (5th Cir. 2020) ............................................................ 5, 10

*Harrington v. Purdue Pharma, L.P.,*
    144 S. Ct. 2071 (2024) ......................................................................... 10

\* Authorities on which Appellants chiefly rely are marked
with an asterisk.

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ................................................. 4

* *Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ................................... 3, 4, 9, 10, 12, 13, 14, 18

* *Loper Bright Enterprises v. Raimondo*,
  45 F.4th 359 (D.C. Cir. 2022) ............................... 3, 4, 5, 8, 12

*Mexican Gulf Fishing Co. v. Department of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ................................. 10

*Michigan v. Environmental Protection Agency*,
  576 U.S. 743 (2015) ........................................... 10

*NASDAQ Stock Market LLC v.
  Securities & Exchange Commission*,
  38 F.4th 1126 (D.C. Cir. 2022) ............................... 12

*New York Stock Exchange LLC v.
  Securities & Exchange Commission*,
  962 F.3d 541 (D.C. Cir. 2020) ................................ 4

*Perrin v. United States*,
  444 U.S. 37 (1979) ............................................ 6

*SAS Institute Inc. v. Iancu*,
  584 U.S. 357 (2018) ........................................... 3

*United States v. Griffin*,
  549 F. Supp. 3d 49 (D.D.C. 2021) ............................. 18, 19

*Whitman v. American Trucking Ass'ns., Inc.*,
  531 U.S. 457 (2001) ........................................... 17

**Statutes**

16 U.S.C. § 1821(h)(4) ............................................. 11

16 U.S.C. § 1821(h)(6) ............................................. 11

16 U.S.C. § 1821(h)(6)(C) .......................................... 14

16 U.S.C. § 1851(a)(7) .......................................................... 8

16 U.S.C. § 1851(a)(8) .......................................................... 8

16 U.S.C. § 1853(a)(1) .......................................................... 9

16 U.S.C. § 1853(b)(4) .......................................................... 8

16 U.S.C. § 1853(b)(8) .......................................................... 5

16 U.S.C. § 1853(b)(14) ........................................................ 9

16 U.S.C. § 1853a(c)(1)(H) .................................................. 11

16 U.S.C. § 1853a(e)(2) ...................................................... 11

16 U.S.C. § 1862(a) ............................................................ 11

**Regulations**

50 C.F.R. § 600.506(h)(1) ................................................... 14

50 C.F.R. § 600.506(h)(2) ................................................... 14

50 C.F.R. § 600.506(h)(3) ................................................... 14

50 C.F.R. § 600.506(h)(4) ................................................... 14

50 C.F.R. § 648.11(a) ........................................................... 7

50 C.F.R. § 648.11(b) ........................................................... 7

50 C.F.R. § 648.11(d)(1) ....................................................... 6

50 C.F.R. § 648.11(d)(2) ....................................................... 6

50 C.F.R. § 648.11(d)(3) ....................................................... 6

50 C.F.R. § 648.11(d)(6) ....................................................... 6

50 C.F.R. § 648.11(d)(7) ....................................................... 6

50 C.F.R. § 648.11(h)(3)(vii) .............................................. 17

50 C.F.R. § 648.11(h)(7) ................................................................ 17

50 C.F.R. § 648.11(k)(4)(i) ............................................................... 7

50 C.F.R. § 648.11(m)(4) ................................................................. 7

50 C.F.R. § 648.87(b)(2)(xi) ............................................................. 7

## Other Authorities

Black's Law Dictionary (5th ed. 1979) ........................................... 8

Black's Law Dictionary (6th ed. 1990) ........................................... 6

Cause of Action Institute, "Congress Throws Fishermen a
    Lifeline" (Mar. 27, 2018) ...................................................... 18

Government Accountability Office, Federal Fisheries
    Management, Efforts to Reduce and Monitor
    Unintentional Catch and Harm Need Better Tracking,
    No. GAO-24-106336 (June 2024) .......................................... 16

Henry Monoghan, Marbury *and the Administrative State*,
    83 Colum. L. Rev. 1, 27 (1983). ............................................. 9

Merriam-Webster (1990 ed.) ....................................................... 6

National Marine Fisheries Service, National Observer
    Program FY 2019 Annual Report (July 2021) ................... 15, 16

William Shakespeare, Hamlet ................................................... 12

# PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum attached to the Opening Brief of Appellants.

## SUMMARY OF ARGUMENT

"*Chevron* does not matter now; *Chevron* never really mattered." That seems to be the overarching theme of the government's supplemental brief. On its telling, the government won this case two years ago. Even now it struggles to recognize the central issue at hand: it cannot rely on silence in the Magnuson-Stevens Act to assume an unbounded authority to require industry-funded monitoring in any fishery. The government bears the burden of justifying the Omnibus Amendment; it cannot find that justification in the Act—doubly so without *Chevron*. Plain text, context, and statutory history all point to the government losing. The Court should reverse the district court, declare the Omnibus Amendment unlawful, and vacate the Final Rule.

## ARGUMENT

### I. The government attempts to rewrite history.

The government offers a curious interpretation of the posture of this case. On its view, *Chevron* mattered little. *See* Appellees' Suppl. Br. at 6–7 ("The Supreme Court's decision forecloses only the final move to *Chevron*'s second step."). The government even suggests the Court has "rejected Plaintiffs' arguments," *id.* at 6, while blessing the government's

"'interpretation [as] fall[ing] within the boundaries set by the Act.'" *Id.*
at 28; *see id.* at 22 ("The Court previously concluded that section
1853(b)(14) supported the Service's adoption[.]").  If it were true, the
parties would not be back on remand, and the government would have
won at *Chevron* Step One.  But it didn't.

When it scrapped the *Chevron* "two-step," the Supreme Court was
at pains to correct this Circuit's interpretive presumptions.  *See Loper
Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2265 (2024).  Even during
the *ancien régime*, courts never "owe[d] an agency's interpretation . . .
deference unless, after 'employing traditional tools of statutory
construction,'" they found themselves "unable to discern Congress's
meaning." *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 369 (2018).  Yet many
courts too-readily identified deference-triggering ambiguity.  *Cf.
Buffington v. McDonough*, 143 S. Ct. 14, 21 (2022) (Gorsuch, J.,
dissenting from denial of certiorari) (bemoaning "*Chevron* maximalism").
The Court here, for example, determined that because "there may be
some question as to Congress's intent" deference was appropriate.  *Loper
Bright Enters. v. Raimondo*, 45 F.4th 359, 369 (D.C. Cir. 2022).

Courts do "confront statutory ambiguities." *Loper Bright*, 144 S. Ct. at 2266. But they cannot "throw up their hands because 'Congress's instructions have' supposedly 'run out.'" *Id.* Law rarely "runs out." *Cf. Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Gorsuch, J., concurring). "[S]tatutes, no matter how impenetrable, . . . have a single, best meaning." *Loper Bright*, 144 S. Ct. at 2266.

Courts were also never supposed to treat silence as an "ambiguity" providing agencies with "gap-filling" authority. *See Am. Petroleum Inst. v. Envtl. Prot. Agency*, 52 F.3d 1113, 1120 (D.C. Cir. 1995). This Circuit once recognized that principle. *See Ethyl Corp. v. Envtl. Prot. Agency*, 51 F.3d 1053, 1060 (D.C. Cir. 1995); *see also N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 553 (D.C. Cir. 2020) ("'Mere ambiguity . . . is not evidence of congressional delegation of authority."). The Supreme Court has confirmed the matter. Ambiguities do not function as implicit delegations. *See Loper Bright*, 144 S. Ct. at 2265.

This case should have ended once the Court concluded that "[n]either Section 1853(b)(8), nor any other provision of the Act, explicitly allows the Service to pass on to industry the costs of monitoring requirements[.]" *Loper Bright*, 45 F.4th at 368. "An agency, after all,

'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Ted Cruz for Sen.*, 596 U.S. 289, 301 (2022) (citation omitted). To hold otherwise and "*presume* a delegation of power absent an express *withholding* of such power," provides the government "virtually limitless hegemony." *Ethyl Corp.*, 51 F.3d at 1060; *accord Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 456 (5th Cir. 2020).

## II.   The Act's plain text forecloses the government's argument.

### A.   The requirement to "carry" a monitor does not entail responsibility for paying the monitor's salary.

The government contends the plain language of Section 1853(b)(8), which authorizes an observer "be carried" on a vessel, 16 U.S.C. § 1853(b)(8), provides concurrent authority for industry funding. Not so. "[T]here is no inherent, or even intuitive, connection between paying a monitor's wage and providing him passage." *Loper Bright*, 45 F.4th at 376 (Walker, J., dissenting).

The government notes the absence of a statutory definition of "carried," Appellees' Suppl. Br. at 9, but errs by not delving into the common usage of that term. It is a "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted

as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Section 1853(b)(8) was part of the 1990 Amendments, so we must look to the understanding of "carry" at that time. To "carry," in relevant part, meant "[t]o bear, bear about, sustain, transport, remove, or convey." Black's Law Dictionary (6th ed. 1990); *accord* Merriam-Webster (1990 ed.) (defining "carry" as "to move while supporting: transport, convey, take"). None of those senses suggests anything about payment of non-incidental costs.

The government claims the statutory definition of "observer information" is relevant. Appellees' Suppl. Br. at 9–10 (citing 16 U.S.C. § 1802(32)). But that definition supports the fishermen. The tasks involved in acquiring "observer information"—such as retrieving sampling data or confirming vessel location—directly implicate inherent costs described in regulation. *See* 50 C.F.R. § 648.11(d)(1)–(3), (6)–(7). Nothing in the definition hints at salary or employment costs.

Those same regulations are informative in other ways. The rules for monitoring in Northeastern fisheries are found in a single section of the Code. Yet that section fails to distinguish between funding schemes whenever the government "request[s] any vessel . . . to carry a fisheries

observer." *Id.* § 648.11(a). And they elsewhere refer to "the responsibility of the vessel . . . to arrange for and facilitate observer or monitor placement," but, again, without mention of funding. *Id.* § 648.11(b).

When the regulations *do* specify industry cost obligations, they employ different terminology. *See id.* § 648.11(k)(4)(i) ("scallop vessels shall be responsible for paying the cost of the observer")[1]; *id.* § 648.11(m)(4) ("[p]rocurement" and "arrange[ment]" of herring monitors); § 648.87(b)(2)(xi) ("third-party service providers employed by the [groundfish] sector to provide at-sea/electronic monitoring"). These provisions undermine the government's position by showing how its promulgated understanding of "carrying" contradicts its arguments here.

Finally, the government argues the term "quartering" expands the meaning of "carry" beyond common usage. *See* Appellees' Suppl. Br. at 10. But to quarter or provide accommodations for an observer is within the meaning of "carrying," even if not coextensive with the term.

**B.** **Industry funding is not a compliance cost.**

As to whether industry funding is a compliance cost, the government still has identified no context in which "an agency, without

_____

[1] The scallop fishery is organized as a limited access privilege program.

express direction from Congress, requires an industry to fund its inspection regime." *Loper Bright*, 45 F.4th at 376 (Walker, J., dissenting).

Two other arguments warrant a response. *First*, the government focuses on the meaning of "use" in Section 1853(b)(4). *See* Appellees' Suppl. Br. at 13–14. But, in context, "use" should be understood with "require." *See* 16 U.S.C. § 1853(b)(4). To "require" means "[t]o direct, order, demand, instruct, command, claim, request, need, exact." Black's Law Dictionary (5th ed. 1979). Theses imperative senses cannot accommodate the government's absurd suggestion that "use" anticipates the government purchasing vessels, gear, or equipment for fishermen.

*Second*, the government argues National Standards 7 and 8 are relevant. *See* Appellees' Suppl. Br. at 14–15. Although these standards require regulators to "minimize costs" and "adverse economic impacts," 16 U.S.C. § 1851(a)(7), (8), they do not cabin the *meaning* of a compliance cost. A management measure might cost very little, and comply with the National Standards, while still being unlawful. Industry-funded monitoring is not the *kind* of cost the government can shift onto regulated parties without explicit authorization.

## C. Whether industry funding is "necessary and appropriate" is a question of law.

The government concedes that, while Congress's use of "necessary and appropriate" in Section 1853(b)(14) confers discretionary authority, *see* 16 U.S.C. § 1853(b)(14),[2] the boundaries of those terms are subject to judicial interpretation. *See* Appellees' Suppl. Br. at 23–24. But the government fights the conclusion, implying that statutory purpose can short-circuit review. *See id.* at 24–25.

Abstract goals like "conservation" cannot override statutory text. *See, e.g.*, *Ethyl Corp.*, 51 F.3d at 1060 n.9. Nor can vague policy goals defy the specific design of the Act's funding schemes. *See id.* More importantly, when Congress delegates with terms like "necessary" and "appropriate," *see Loper Bright*, 144 S. Ct. at 2263, courts retain a vital four-fold interpretative responsibility: *First*, they must determine whether a delegation exists. *Id. Second*, they must ensure the delegation is constitutional. *Id. Third*, they must "fix[] the boundaries of [the] delegated authority," *id.*, and "defin[e] the range of permissible criteria" according to which an agency may act. Henry Monoghan, Marbury *and*

---

[2] The government has abandoned any detailed argument for the authority to impose industry funding under 16 U.S.C. § 1853(a)(1).

9

*the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983). *Fourth*, they must ensure the agency "engage[s] in reasoned decisionmaking" when regulating within those "boundaries." *Loper Bright*, 144 S. Ct. at 2263 (cleaned up).

The government skirts discussion of the third responsibility, which involves "polic[ing] the outer statutory boundaries" of Section 1853(b)(14). *Id.* at 2268. None of its authorities meaningfully engages with the scope of Section 1853(b)(14)'s delegation. The government also continues to avoid articulating any principled limit to what it can require as a "necessary and appropriate" measure. And it fails to recognize how that phrase must be construed narrowly. *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071, 2082 (2024). Other courts have emphasized that point in the context of Section 1853(b)(14)—but none are cited by the government. *See Mexican Gulf Fishing Co. v. Dep't of Commerce*, 60 F.4th 956, 965 (5th Cir. 2023); *Gulf Fishermens Ass'n*, 968 F.3d at 465.

The National Standards offer little guidance on this front. Although they delineate some limits to the government's authority, they are not *definitional boundaries*, as previously noted. Thus, quite apart from whether an agency has "considered cost," *Michigan v. Envtl. Prot.*

*Agency*, 576 U.S. 743, 752 (2015), or sought to minimize adverse impacts, courts must discern what "necessary" and "appropriate" mean.

In this respect, the Court should consider *all* the provisions in Section 1853 proceeding subsection (b)(14). *See* Appellants' Suppl. Br. at 19. The government balks at that suggestion, claiming the only relevant provisions are subsections (b)(8) and (b)(14). *See* Appellees' Suppl. Br. at 26, 29. But the government omits any serious argument substantiating that position. Whether or not collection of observer data is "necessary" and "appropriate," or the placement of a monitor permitted by Section 1853(b)(8), it is strictly a *legal* question whether industry can be compelled to cover the monitor's salary. The government cannot short-circuit review by claiming unrestricted discretion.

## III.  The Act's overall context supports the fishermen.

### A.  Congress's three express authorizations for industry funding are probative.

Congress's decision to deny the government a general power to require industry funding is evident from its express authorization in three specific contexts, none of which includes the Atlantic herring fishery. *See* 16 U.S.C. §§ 1821(h)(4), (6) (foreign fishing); 1853a(c)(1)(H), (e)(2) (limited access privilege programs); 1862(a) (North Pacific). The

government rejects the negative implication of these provisions, insisting they are "structurally distinct," and that reliance on the *expressio unius* canon is inappropriate. Appellees' Suppl. Br. at 18–19. But such counterarguments recall Shakespeare's famous line: "The lady doth protest too much[.]" Hamlet, art. III, sc. 2.

A brief point about *expressio unius*: Although this Court suggested the canon was "'a poor indicator of Congress' intent,'" *Loper Bright*, 45 F.4th at 366–67, it arguably misread its cited authority—*Adirondack Medical Center v. Sebelius*—which is severely undermined by the end of *Chevron* deference. The *Adirondack* court treated *expressio unius* as a "poor indicator" only "when countervailed by a broad grant of authority within the same statutory scheme." 740 F.3d 692, 697 (D.C. Cir. 2014). Here, however, the government cannot identify a "broad grant of authority," *id.*, and the Court has doubted such a grant's existence. *See Loper Bright*, 45 F.4th at 366. On the other hand, this Circuit has employed *expressio unius* when "the 'draftsmen's mention of one thing . . . does really necessarily, or at least reasonably, imply the preclusion of alternatives[.]'" *NASDAQ Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126, 1137 (D.C. Cir. 2022).

*Adirondack* must also be understood in its original context—
*Chevron* Step One. The entire line of cases declining to use *expressio
unius* in the administrative-law context is grounded in *Chevron*'s original
sin: the presumption that "Congress . . . [has] left to reasonable agency
discretion questions that it has not directly resolved." *Cheney R.R. Co. v.
Interstate Commerce Comm'n*, 902 F.2d 66, 69 (D.C. Cir. 1990); *see
Adirondack*, 740 F.3d at 166. Without *Chevron*, there is no basis to doubt
the validity of *expressio unius,* a "traditional rule of statutory
construction." *Bittner v. United States*, 598 U.S. 85, 94 (2023). "The very
point of the traditional tools of statutory construction . . . is to resolve
statutory ambiguities." *Loper Bright*, 144 S. Ct. at 2266.

The government also focuses on supposed "distinctions . . . between
fees and compliance costs." Appellees' Suppl. Br. at 19; *see id.* at 19–21.
Those arguments fall flat. A fee system accomplishes the same objective
as a requirement to directly contract with an observer.[3] The government
finds itself in a Catch-22: either defend the novelty of the Omnibus

---

[3] The Supreme Court acknowledged as much. *See Loper Bright*, 144 S.
Ct. at 2255 (describing the Act as "specif[ying] three groups that must
cover costs associated with observers," while avoiding "similar terms
addressing . . . Atlantic herring fishermen[.]").

Amendment's funding scheme, which cuts against its interpretative arguments,[4] or concede the fishermen's reading of the law, which would be fatal. *See Loper Bright*, 45 F.4th at 378–79 (Walker, J., dissenting).

But there's more. Consider the provision directing foreign vessels to pay directly for supplemental observers. 16 U.S.C. § 1821(h)(6)(C). The government claims this program is funded by "fees," which it insists must be "'deposited in the U.S. Treasury.'" Appellees' Suppl. Br. at 19. Yet that position contradicts the plain language of the Act, as well as relevant regulations. *See* 50 C.F.R. § 600.506(h)(1) ("[V]essels must pay directly to the contractor the costs of supplementary observer coverage."); *id.* § 600.506(h)(4) ("Fees collected by the contractor . . . [are sometimes] refunded . . . or kept on deposit [with the observer company].")). None of these "fees"—except those paid to the government for administrative costs, *see id.* § 600.506(h)(3)—ever hit the Treasury. They are also designed to vary by provider, rather than according to a uniform schedule, as the government suggests. *See id.* § 600.506(h)(2).

---

[4] The government foregoes any explicit request for *Skidmore* deference. It also fails to explain how its understanding of its authority was either "issued contemporaneously" with the Act or is long-standing. *See Loper Bright*, 144 S. Ct. at 2262 & 2267.

If any doubt remained that the government treats industry funding as indistinguishable from the "fee" systems prescribed by the Act, then the annual report on the National Observer Program published shortly after this case was appealed is the nail in the coffin. That report does not distinguish between the types and sources of industry funding, whether fees or "compliance costs." The charts below demonstrate how *any* payment by industry for observing is treated by the government as "funding" on par with congressional appropriations.



Nat'l Marine Fisheries Serv., Nat'l Observer Program FY 2019 Annual Report at 4 (July 2021), *available at* https://www.fisheries.noaa.gov/resource/document/2019-national-observer-program-annual-reports.

| Region | Appropriated | Industry | Total |
|---|---|---|---|
| Alaska | $8.3 | $19.2 | $27.5 |
| Greater Atlantic | $22.8 | $2.2 | $25.0 |
| Pacific Islands | $8.5 | $0 | $8.5 |
| Southeast | $6.3 | $0 | $6.3 |
| West Coast | $8.4 | $3.7 | $12.1 |
| NOAA Fisheries Headquarters | $0.7 | $0 | $0.7 |
| **Totals** | **$55.0** | **$25.1** | **$80.1** |

Table 1: **FY 2019 Observer Funding Summary (in millions).** *Appropriated amount shown includes funds allocated to regions from FY 2019 enacted funding.*

*Id.* at 5.

The Government Accountability Office noted the same in a report to the House Committee on Natural Resources: "[I]ndustry funding can involve 'pay-as-you-go' programs, in which vessels pay each time they have an observer onboard, or fee-based programs in which a fee is levied across all vessels in a fishery." Gov't Accountability Office, Fed. Fisheries Mgmt., Efforts to Reduce and Monitor Unintentional Catch and Harm Need Better Tracking, No. GAO-24-106336, at 19 (June 2024), *available at* https://www.gao.gov/assets/gao-24-106336.pdf. Any formal distinction between fees and contracting collapses in the face of agency practice.

**B.     The Act's penalty provisions cannot bear the weight of the government's position.**

The Act's penalty provisions are "'wafer-thin reeds'" on which to ground a general power to require industry funding. *Biden v. Nebraska*, 143 S. Ct. 2355, 2382 (2023) (citation omitted); *cf. Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes."). Their reference to contracting likely referred to the foreign-fishing context at the time of their introduction. *See* Appellants' Suppl. Br. at 29. The government ignored that argument, along with others on this front. *See id.* at 29–30.

Finally, the government disregarded the fishermen's argument that "under contract" could "just as well [mean] monitors who are paid on a contractual basis *by monitoring-service providers*." *Id.* at 28. This deserved a rebuttal, particularly since several regulatory provisions refer to monitors as a class, no matter if they are "contracted or directly employed by the service provider." 50 C.F.R. § 648.11(h)(3)(vii) (injury, liability, and accidental death coverage); *see id.* § 648.11(h)(7) ("Observers and monitors under contract with observer monitoring service provider[s] . . . must complete their assigned duties," even if provider approval is revoked.).

In any event, these provisions should be construed against the government. *Cf. Loper Bright*, 144 S. Ct. at 2286 n.5 (Gorsuch, J., concurring).

## IV. The government ignores the relevant statutory history.

Legislative history is a poor source of statutory meaning. Such "extratextual arguments" are "usually unavailing." *United States v. Griffin*, 549 F. Supp. 3d 49, 55 (D.D.C. 2021). Still, the government appeals to legislative purpose and committee reports. *See* Appellees' Suppl. Br. at 16–18. The Court should "not invoke the [Act's] supposed purpose or legislative history to create ambiguity where none exists." *Griffin*, 549 F. Supp. 3d at 55. Yet if the Court does find legislative history relevant, the fishermen have addressed the government's arguments. *See* Opening Br. at 48–49; Reply Br. at 18–22.

Turning to Congress's decision to provide a line-item appropriation to cover industry costs for the Northeast multispecies sector monitoring program, *see* Appellees' Suppl. Br. at 17–18, that is hardly news. *See, e.g.*, Cause of Action Inst., "Congress Throws Fishermen a Lifeline" (Mar. 27, 2018), *available at* https://causeofaction.org/congress-throws-fishermen-a-lifeline (describing similar appropriation for 2018). The

appropriation is also open to interpretation. It is reasonable to presume Congress's direction that the government pay for monitoring was a criticism of the program's existence.

Finally, with respect to statutory history, *see Griffin*, 549 F. Supp. 3d at 55 ("Unlike legislative history, the Court will consider *statutory* history."), the government ignores the fishermen's arguments. *See* Appellants' Suppl. Br. at 31–32.

## CONCLUSION

For these reasons, and those set out in the fishermen's previous briefs, the Court should reverse the judgment of the district court, declare the Omnibus Amendment unlawful, and vacate the Final Rule.

Dated: September 25, 2024

Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey

CAUSE OF ACTION INSTITUTE
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
Telephone: (571) 444-4182

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation set forth in the Court's August 6, 2024 Order because it contains 3,245 words, as counted by the word-processing system used to prepare the document and excluding those parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: September 25, 2024          /s/ Ryan P. Mulvey
                                   Ryan P. Mulvey

                                   *Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2024, I filed the foregoing Supplemental Reply Brief for Appellants in the United States Court of Appeals for the District of Columbia Circuit using the Appellate CM/ECF system. Service will be accomplished by the Appellate CM/ECF System. As required by Circuit Rule 31(b), I will also cause to be filed eight paper copies of the brief with the Court.

/s/ Ryan P. Mulvey
Ryan P. Mulvey

*Counsel for Plaintiffs-Appellants*