No. 21-5166

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

LOPER BRIGHT ENTERPRICES, INC., et al.

*Plaintiff-Appellants*,

v.

GINA RAIMONDO, in her official capacity as Secretary of Commerce, et al.,

*Defendants-Appellees.*

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

**BRIEF OF AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES**

Stephen D. Mashuda
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 | Telephone
415-217-2040 | Fax
smashuda@earthjustice.org

Andrea A. Treece
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
415-217-2000 | Telephone
415-217-2040 | Fax
atreece@earthjustice.org

*Counsel for Amici Curiae Conservation Law Foundation, Ocean Conservancy, Save the Sound, and Oceana, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by Circuit Rule 28(a)(1), counsel for Conservation Law Foundation, Ocean Conservancy, Save the Sound, and Oceana, Inc. certify as follows:

## Parties and Amici

All parties, intervenors, and amici appearing in this court are listed in the Brief for Plaintiffs-Appellants and disclosed by other *amici* to date.

## Rulings under review

References to the final agency action under review and related and consolidated cases appear in the Brief for Plaintiffs-Appellants.

## Related Cases

To the best of counsel's knowledge, no related cases are pending in this Court.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to the Federal Rule of Appellate Proc. 26.1 and D.C. Cir. R. 26.1 and 28(a), *Amici Curiae* Conservation Law Foundation, Ocean Conservancy, Save the Sound, and Oceana, Inc. respectfully submit the following corporate disclosure statement: Conservation Law Foundation, Ocean Conservancy, Save the Sound, and Oceana, Inc. have no parent corporation, nor does any person or corporate entity own ten percent or more of the respective associations.

**STATEMENT REGARDING CONSENT TO FILE**

All parties have consented to the filing of this brief as stated in the Notice of

Intent by Conservation Groups to File *Amicus Curiae* Brief in Support of

Defendants-Appellees, Doc. # 2071465.[1]

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

## INTEREST OF AMICI CURIAE AND AUTHORITY TO FILE

*Amici curiae* Conservation Law Foundation, Ocean Conservancy, Save the Sound, and Oceana, Inc. are nonprofit organizations with longstanding interests and expertise in fishery conservation and management. They recognize that the federal government's ability to effectively manage our fisheries depends on the availability of accurate, timely scientific data and is essential to preventing the collapse of those fisheries and to protecting all who depend on them.

Conservation Law Foundation is a nonprofit environmental advocacy organization with offices in Maine, Massachusetts, Vermont, New Hampshire, Rhode Island, and Connecticut. Its mission is to protect New England's environment for the benefit of all people for generations to come. In order to protect and restore New England's endangered landscapes, wildlife, and waters, Conservation Law Foundation has worked for decades to end overfishing, protect ecologically important habitat, and restore key forage species that support groundfish and other marine wildlife by pushing for strong state and federal management measures.

Ocean Conservancy is a national nonprofit organization which seeks a healthier ocean protected by a more just world. For more than 50 years, it has used science-based advocacy, research, and education to tackle some of the greatest global challenges facing the ocean, including climate change, plastic pollution, and

overfishing.  Ocean Conservancy has a longstanding, demonstrated commitment to securing healthy fisheries which support the well-being of coastal communities. Its goal is to ensure the best available science is used in fisheries management, including innovations in fish catch monitoring, reporting, and data management.

Save the Sound is a nonprofit organization with over 4,480 member households and 19,000 activists in Connecticut and New York.  It works to protect and improve the land, air, and water of the entire Long Island Sound region.  Save the Sound uses legal and scientific expertise and brings citizens together to restore ecosystem function and connectivity and ensure our waters and coastal habitats can support thriving populations of fish, shellfish, and other wildlife.

Oceana, Inc. is a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education. Oceana campaigns to stop overfishing, reduce the incidental catch of non-targeted marine life (called bycatch), and protect important marine habitat. For over twenty years, Oceana has campaigned for science-based fisheries management, including establishing observer coverage in Northeast fisheries sufficient to give precise and accurate data about bycatch.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT ....................................................... iii

STATEMENT REGARDING CONSENT TO FILE ............................................... iv

INTEREST OF AMICI CURIAE AND AUTHORITY TO FILE ........................... v

TABLE OF AUTHORITIES ................................................................................. viii

GLOSSARY ......................................................................................................... xi

STATEMENT OF THE CASE ............................................................................... 1

ARGUMENT .......................................................................................................... 5

I.     CONGRESS HAS RECOGNIZED RELIABLE DATA IS
       ESSENTIAL FOR EFFECTIVE FISHERY MANAGEMENT. ................... 5

       A.     Before the Magnuson-Stevens Act, U.S. fisheries frequently
              collapsed. ........................................................................................... 5

       B.     The Magnuson-Stevens Act created a data-driven fishery
              management system that relies partly on observers. ........................... 8

       C.     Fishermen benefit from reliable observer data. ................................. 11

II.    CONGRESS HAS CONSISTENTLY EMBRACED INDUSTRY-
       FUNDED OBSERVER PROGRAMS AFTER FISHERY
       MANAGERS CREATED THEM. ............................................................... 13

       A.     Fishery managers have consistently read the Act to allow them
              to require vessels to bear observer costs. ......................................... 14

       B.     Congress has embraced, and expanded, fishery managers'
              authority to use these programs. ....................................................... 19

III.   THE HERRING FISHERY OBSERVER PROGRAM FOLLOWS
       THIS ESTABLISHED PRACTICE. ........................................................... 25

CONCLUSION .................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Loper Bright Enterprises v. Raimondo,*
--- U.S. ----, 144 S. Ct. 2244, 219 L.Ed.2d 832(2024) ........................................4

*Loper Bright Enters. v. Raimondo,*
45 F.4th 359 (D.C. Cir. 2022)......................................................................19, 20

*Pension Benefit Guaranty Corp. v. LTV Corp.,*
496 U.S. 633 (1990)........................................................................................21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
566 U.S. 639 (2012)........................................................................................20

*The Volant,*
59 U.S. 71 (1855)...............................................................................................2

**Statutes**

16 U.S.C. § 1801 ..............................................................................2, 3, 8, 9, 10

16 U.S.C. § 1802 ....................................................................................................8, 9

16 U.S.C. §§ 1851 ...............................................................................................4, 8

16 U.S.C. § 1852 ..................................................................................................4

\* 16 U.S.C. § 1853 ............................................ 3, 4, 9, 10, 15, 19, 22, 27

16 U.S.C. § 1854.................................................................................................24

16 U.S.C. § 1855.............................................................................................24, 25

16 U.S.C. § 1858.................................................................................................3

16 U.S.C. § 1862.................................................................................................24

42 U.S.C. § 7410................................................................................................11

Pub. L. No. 84-1024, 70 Stat. 1119 (1956).............................................................7

\* Authorities upon which we chiefly rely are marked with asterisks.

Pub. L. No. 94-265, 90 Stat. 331 (1976)......................................................15

Pub. L. No. 96-561, 94 Stat. 3275 (1980)...................................................20

Pub. L. No. 97-453, 96 Stat. 2481 (1983)...................................................20

Pub. L. No. 101-627, 104 Stat. 4436 (1990)..........................................22, 23

Pub. L. No. 104-297, 110 Stat. 3559 (1996)..........................................22, 24

**Regulations**

50 C.F.R. § 600.310 ...........................................................................8

50 C.F.R. § 600.335 .........................................................................12

50 C.F.R. § 648.7 .............................................................................11

50 C.F.R. § 648.86 ...........................................................................11

50 C.F.R. § 660.314 (2006) ..............................................................18

42 Fed. Reg. 8813 (Feb. 11, 1977) ...................................................15

48 Fed. Reg. 5560 (Feb. 7, 1983) .....................................................15

48 Fed. Reg. 22606 (May 19, 1983) ..................................................15

49 Fed. Reg. 30946 (Aug. 2, 1984)....................................................16

52 Fed. Reg. 8592 (Mar. 19, 1987).....................................................16

55 Fed. Reg. 3416 (Feb. 1, 1990) ......................................................24

55 Fed. Reg. 4839 (Feb. 12, 1990) ...............................................16, 17

55 Fed. Reg. 24184 (June 14, 1990) ..................................................16

56 Fed. Reg. 63685 (Dec. 6, 1991) ....................................................17

56 Fed. Reg. 65007 (Dec. 13, 1991) ..................................................17

58 Fed. Reg. 21931 (Apr. 26, 1993) ..................................................17

59 Fed. Reg. 9872 (Mar. 1, 1994).......................................................17

59 Fed. Reg. 46126 (Sep. 6, 1994) .......................................................24

60 Fed. Reg. 65618 (Dec. 20, 1995) .....................................................18

69 Fed. Reg. 31751 (June 7, 2004) .......................................................18

72 Fed. Reg. 32549 (June 13, 2007) .....................................................18

80 Fed. Reg. 39731 (July 10, 2015) ......................................................12

85 Fed. Reg. 7414 (Feb. 7, 2020) .........................................................27

41 Res. No. 22, 16 Stat. 593 (1871) .......................................................7

**Other Authorities**

H.R. Rep. No. 393, 101st Cong., 1st Sess. 28 (1989) ...........................21

S. Rep. No. 414, 101st Cong., 2d Sess. 8 (1990) ..................................21

S. Rep. No. 414, 101st Cong., 2d Sess. 20 (1990) ................................21

# GLOSSARY

Magnuson-Stevens Fishery Conservation
and Management Act

Magnuson-Stevens Act or Act

## STATEMENT OF THE CASE

Appellants claim the industry-funded observer program they have challenged is a "novel funding scheme" that is only possible because of *Chevron* deference. Appellants' Suppl. Br. 2-3. To the contrary, the program reflects the best reading of the Magnuson-Stevens Fishery Conservation and Management Act: that it authorizes the National Marine Fisheries Service to require industry-funded monitoring. The history of observer funding programs carried out under the Act supports that reading. Fishery management councils and the National Marine Fisheries Service have long interpreted the Act to authorize observer programs that require domestic vessels to bear the costs of obtaining and accommodating observers, and Congress has repeatedly taken action consistent with that understanding. Rather than being novel, the challenged industry-funded monitoring program in the Atlantic herring fishery is the latest application of a consistently held view that the Act allows fishery managers to collect the data they need to carry out the Act's data-driven approach to fishery management.

This country realized the value of effective fishery management the hard way. Early in its history, scarce information about fisheries thwarted effective management, leading to fishery collapses that had disastrous consequences for fishing communities.

To protect these "valuable and renewable natural resources" on a

"continuing basis," the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or the "Act") enacted a comprehensive fishery management system. 16 U.S.C. § 1801(a)(1), (b)(4). The Act requires fishery managers to meet a series of data-driven requirements and recognizes "[t]he collection of reliable data is essential" to effective management under the Act. *Id*. § 1801(a)(8).

Fishery managers have long relied on observer programs to obtain data they need to implement the Act. Observers are trained technicians who collect information while on board a vessel. They address a problem inherent to fisheries: Self-reported data can be unreliable, so being on a vessel is often the only way to verify certain important data—such as what species of fish were caught or what type of gear was used.

Fishery managers have also long relied on industry-funded observer programs. These programs reflect a commonsense principle. Fisheries are a public resource managed for the entire public's benefit. *See The Volant*, 59 U.S. 71, 74-75 (1855). But the fishermen who take (and profit) from fisheries see the most direct benefit from observer data. Observer data allows fishery managers to keep fisheries healthy (preserving the industry's existence) and to take specific actions like raising catch limits (increasing the industry's profits). Consistent with the norm of requiring regulated entities to bear the costs complying with regulatory

requirements, Appellees' Suppl. Br. 14, the Act allows the Fisheries Service to require the fishing industry to share the cost of obtaining this "essential" data. 16 U.S.C. § 1801(a)(8).

The first industry-funded observer program applied to foreign vessels that once dominated U.S. fisheries. After foreign vessels exited U.S. fisheries and domestic vessels took their place, councils developed multiple industry-funded observer programs to collect data from domestic vessels. Congress has embraced these programs by occasionally amending the Act to confirm, and sometimes expand, fishery managers' general authority to create and implement them. In three specific contexts, Congress determined that observer data was so essential that it required industry to cover both the costs of obtaining observer data *and* the government's administrative costs associated with processing and analyzing that data costs to administer observer programs. It also set up a stable, fee-based funding scheme to insulate those programs from appropriations lapses. More generally, Congress confirmed fishery managers' authority to require observers to "be carried on board . . . for the purpose of collecting data necessary for the conservation and management of the fishery," *id*. § 1853(b)(8), and to impose permit sanctions on vessels that fail to pay for observer services "contracted by" the vessel, *id*. § 1858(g)(1)(D). In other words, Congress granted the Fisheries Service authority to require vessels to carry and pay for observers in all fisheries.

In the three specific instances Appellants cite, Appellants' Suppl. Br. 21, Congress went farther by prescribing the mechanism for collecting payment and expanding the types of costs the Fisheries Service could recover. Appellants' attempts to draw a negative inference from instances where Congress expanded the Fisheries Service's general authority is incorrect and has already been rejected. Appellees' Suppl. Br. 6-7.

The Magnuson-Stevens Act delegated comprehensive management authority to the Fisheries Service. It tasked federal fishery managers at the agency and Councils with balancing a wide array of concerns in making a multitude of highly technical, fact-specific decisions under constantly changing circumstances. *See, e.g.*, 16 U.S.C. §§ 1851(a) (National Standards), 1853(a)-(b) (fishery management plan contents), 1854(e) (rebuilding overfished stocks). The Act requires fishery management decisions to reflect scientific expertise. *See* 16 U.S.C. § 1851(a)(2) (requiring measures to "be based upon the best scientific information available"); *id*. § 1852(b) (council membership requirements). Recognizing that fishery managers face unique and complex issues in each fishery, Congress gave them broad authority to determine what management requirements are "necessary and appropriate" to conserve and manage fisheries. *See, e.g.*, 16 U.S.C. §§ 1853(a)(1), (b)(3), (14); *Loper Bright Enterprises v. Raimondo*, --- U.S. ----, 144 S. Ct. 2244, 2263, 219 L.Ed.2d 832(2024).

The New England Fishery Management Council's observer program for the herring fishery follows the course set by prior councils over decades. The Atlantic herring fishery has a significant bycatch problem, meaning vessels targeting Atlantic herring incidentally catch numerous other species like river herring (a keystone forage species) and haddock (a commercially valuable species). That bycatch threatens the viability of these species and the fisheries and marine predators that depend on them. The Council identified a clear need for additional and improved observer data in the fishery given the significant uncertainty around catch rates of Atlantic herring and a need to better assess bycatch rates of depleted bycatch species such as river herring. To meet that need, fishery managers exercised their authority to require vessels to pay for obtaining the data necessary to manage the fishery.

In sum, the herring observer program is firmly rooted in a longstanding interpretation of the Magnuson-Stevens Act's text, context, and history authorizing fishery managers to require industry-funded monitoring.

## ARGUMENT

## I. Congress Has Recognized Reliable Data Is Essential for Effective Fishery Management.

### A. Before the Magnuson-Stevens Act, U.S. fisheries frequently collapsed.

The history of U.S. fisheries management illuminates the essential nature of observer information and why Congress chose to give the Fisheries Service broad

authority to the fishing industry to pay for it.

The lack of basic information proved disastrous for early U.S. fisheries. In the 1800s, we did not know when important fish matured; where they bred, spawned, traveled, and were caught; or how quickly they were being caught.[2] Even the question whether "fishing could destroy" stocks was up for debate. *Id*. at 178. "Scientific regulation" of fisheries was "impossible in the absence of such knowledge." *Id*. at 122.

The result was that fisheries collapsed one after the other, wreaking "economic disaster" on communities that depended on them. *Id*. at 177. Collapses followed a "typical" sequence, shown by the menhaden's example. *Id*. at 181. In the 1850s, these fish offered a new source of oil after whale stocks collapsed. Smaller fishermen first drove the new economy that grew up around menhaden, investing in gear and vessels to catch the plentiful fish. Then industrial-scale technology developed, allowing whole schools of fish to be caught at once. Vessels were soon forced to go far out to sea to search for the fish, which had once "swarm[ed] near the shore." *Id*. at 179. Within "thirty years," menhaden were overfished. *Id*. at 181; *see also id*. at 133-139 (describing the 1850s collapse of the

---

[2] *See* W. Jeffrey Bolster, *The Mortal Sea: Fishing the Atlantic in the Age of Sail* 122 (2012).

New England cod fishery). The small fishermen who had built the market were left with now-useless gear and vessels and no way to recover. *Id*. at 177.

In a first step towards fisheries regulation, Congress created the U.S. Commission of Fish and Fisheries and tasked it with determining "whether any and what diminution" of fisheries had occurred and "what causes the same." H.R.J. Res. 22, 41st Cong., § 2, 16 Stat. 593, 594 (1871). Congress also directed the Commission to use those findings to report on "whether any and what protective, prohibitory, or precautionary measures should be adopted." *Id*. This was not enough to stop the fishery collapses, as Congress sometimes did not, or could not, react to the Commission's reports in time. *See, e.g.*, Bolster, *supra*, at 262.

Congress thus created a federal Bureau of Commercial Fisheries in the 1950s to provide research and "management to assure the maximum sustainable production." Fish and Wildlife Act of 1956, Pub. L. No. 84-1024, § 2(3), 70 Stat. 1119, 1119 (1956). Given "the need for authority to execute" the "Act effectively," Congress authorized the agency to "exercise such general administrative authority . . . necessary to carry out the . . . Act." *Id*. § 3(f), 70 Stat. at 1120–121. This statute, along with other statutes and treaties, made up the patchwork of federal fishery management.

These early "fishery resource conservation and management practices and controls" were insufficient and by the 1970s, important stocks had "declined to the

point where their survival [was] threatened." 16 U.S.C. § 1801(a)(2). Congress

determined that a "national program for the conservation and management of the

fishery resources" was "necessary" to stop overfishing, conserve stocks, and

"realize the full potential" of fisheries. *Id*. § 1801(a)(6).

### B. The Magnuson-Stevens Act created a data-driven fishery management system that relies partly on observers.

In 1976, Congress enacted a comprehensive fishery conservation and

management program in the Magnuson-Stevens Act to end overfishing and ensure

sustainable fisheries. *See id*. § 1801(b)(4). The Act is structured to "assure" that

management will be based on "the best scientific information available." *Id*. §

1801(c)(3).

The Act requires fishery management to meet two overriding goals using the

best scientific information available: to "prevent overfishing" and achieve "the

optimum yield" from the fishery. 16 U.S.C. § 1851(a)(1), (2). Both relate to

"maximum sustainable yield," the largest amount of fish that can be caught under

current conditions in the fishery. 50 C.F.R. § 600.310(e)(1)(i). Overfishing occurs

when the rate of fishing threatens a fishery's ability to produce the maximum

sustainable yield; preventing it requires restricting catch limits to let the fishery

recover. *See* 16 U.S.C. § 1802(34). Optimum yield is the amount of catch that "will

provide the greatest overall benefit to the Nation" and reflects maximum

sustainable yield, as reduced "by any relevant social, economic, or ecological

factor." *Id*. § 1802(33). The Act also recognizes that "bycatch"—non-targeted species caught but not kept or sold—contributes to overfishing of those non-target fish and impedes optimum yield, and requires fishery managers to track, assess, and minimize it. *Id*. §§ 1801(c)(3), 1851(a)(9).

The Act prescribes measures that must be in every plan to prevent overfishing and achieve optimum yield. For example, plans must contain "measures . . . necessary and appropriate for the conservation and management of the fishery" and "to prevent overfishing and rebuild overfished stocks" *Id*. § 1853(a)(1). A plan must "establish a mechanism for specifying annual catch limits . . . such that overfishing does not occur," including accountability measures. *Id*. § 1853(a)(15). And plans must "establish a standardized reporting methodology to assess . . . bycatch" in the fishery and develop measures to "minimize bycatch" and "the mortality" of unavoidable bycatch." *Id*. § 1853(a)(11). Recognizing each of these measures requires the continual collection and analysis of fisheries data, Congress specified that plans must also "assess and specify the nature and extent of scientific data . . . needed for effective implementation." *Id*. § 1853(a)(8).

The Act also lists measures that may be included in a plan based on a fishery's needs. Plans may, for example, obtain "data necessary for the conservation and management of the fishery" from fishing vessels by "requir[ing] that one or more observers be carried on board," subject to certain minimum safety

requirements. *Id*. § 1853(b)(7)-(8). And plans may include any other measures that "are determined to be necessary and appropriate for the conservation and management of the fishery." *Id*. § 1853(b)(14).

As Congress expressly found, "[t]he collection of reliable data is essential to the effective conservation, management, and scientific understanding of [] fishery resources." *Id*. § 1801(a)(8). Fishery managers cannot avoid overfishing unless they know how many fish are in the fishery, how quickly they reproduce, and how catch rates affect that reproduction. Nor can they minimize bycatch without knowing how the fishing gear being used affects bycatch, where and when bycatch occurs, and the rate at which different measures may reduce bycatch.[3]

At-sea observers are a "crucial" source of the reliable data that fishery managers need to carry out the Act.[4] Very often, "the only independent data" that fisheries managers have comes from observers. *Id*. at 1. These observers are trained biological technicians who record data on catch, bycatch, gear, location, timing, biological characteristics, and more while onboard a vessel. *See id*. at 1, 3.

---

[3] *See* Eric Gilman et al., *Ecological data from observer programs underpin ecosystem-based fisheries management*, 74 ICES J. Mar. Sci. 1481, 1485 (2017).

[4] Yuntao Wang & Jane DiCosimo, *National Observer Program 2016 Fishery Observer Attitudes and Experiences Survey* 3, NOAA Tech. Mem. NMFS-F/SPO-186 (Apr. 2019), bit.ly/noaa16.

## C.     Fishermen benefit from reliable observer data.

The need for observer data reflects the unusual regulatory context fisheries present. In other settings, a regulator may be able to impose reporting requirements and check reported data against its own monitoring. *See, e.g.*, 42 U.S.C. § 7410(a)(2)(F) (requiring monitoring and reporting of air pollutant emissions). Because fishing occurs at sea on moving vessels, obtaining accurate, verifiable data about vessels' activities often requires being on the vessel itself. For example, a vessel fishing for herring can be required to report where it fished, the gear it used, what it caught, and how much it caught. *See* 50 C.F.R. § 648.7. But crews have a limited capacity to record data and may have incentives to misreport.[5] Or the vessel can be required to report whether it also caught haddock, whether the haddock were alive or dead when caught, and what gear it used. *See* 50 C.F.R. § 648.86(a). But the only way to verify which fish were discarded, why, in what quantities, or the mortality of discarded fish is by actually seeing and documenting what took place on the vessel.[6]

---

[5] *See* NOAA Fisheries, *Evaluating Bycatch: A National Approach to Standardized Bycatch Monitoring Programs* 28-31 (2004), bit.ly/noaasbrm (discussing inaccuracies in self-reported data).

[6] *See* Samantha G. Brooke, *Federal Fisheries Observer Programs in the United States: Over 40 Years of Independent Data Collection*, 76 Mar. Fisheries Rev. 35 (2014) (noting "observers are highly trained and lack incentives for misreporting" and address "scientific concerns" about "using fishermen to report data").

Fishermen reap the benefits when fishery managers have access to reliable observer data. Fishery managers can, for example, set higher catch limits when they have better data. To comply with the Act's requirement to prevent overfishing, fishery managers adjust annual catch limits to address "scientific uncertainty," for example about the size of the stock or the effects of factors on the stock, and "management uncertainty," for example about actual catch rates in light of vessel underreporting.[7] Observers produce more reliable data about a fishery (reducing scientific uncertainty) and catch rates (reducing management uncertainty). That reliable data helps "reduce the need for substantial buffers." 50 C.F.R. § 600.335(b). Fishery managers with access to sufficient observer data can therefore set higher annual catch limits.[8] But where observer coverage is low and less data is available, managers need to decrease catch limits. *See* 80 Fed. Reg. 39731, 39733 (July 10, 2015) (declining to increase observer coverage and explaining "significant additional uncertainty buffers" already "mitigate[d] any lack of absolute precision and accuracy in estimating overall catch").

---

[7] *Setting an Annual Catch Limit*, NOAA Fisheries, bit.ly/aclnoaa (last visited Sept. 23, 2024).

[8] *See, e.g.*, U.S. Government Accountability Office, *Federal Fisheries Management: Overfishing Determinations Vary Across Regions, and Data Challenges Complicate Management Efforts* 18 (Oct. 2022) (reporting that "setting a buffer . . . is not a significant focus in the Alaska region because of the region's robust observer participation program").

Better data also allows fishery managers to protect fish populations and the fishermen who rely on them. When vessels catch non-target species, they "contribute to overfishing and slow efforts to rebuild" those species.[9] And when vessels catch or kill non-targeted species, they harm the fishermen who do target those species. For example, if an Atlantic herring vessel's football-field sized net catches another commercially important species such as haddock, those fish count against the annual catch limit for haddock, leaving fewer for the haddock fishing vessels. Observers are "the primary source for discard data" on bycatch rates that allows fishery managers to know whether their bycatch minimization measures are working.[10]

## II. Congress Has Consistently Embraced Industry-Funded Observer Programs After Fishery Managers Created Them.

Congress's attention to the use of observer programs under the Magnuson-Stevens Act has followed a pattern. After fishery managers implement an observer program, Congress amends the Act to confirm or strengthen their authority to do so. In three contexts—for foreign vessels, in the North Pacific region, and for limited-access privilege programs—Congress's amendments reflect a conclusion

---

[9] *Understanding Bycatch*, NOAA Fisheries, bit.ly/noaabycatch (last visited Sept. 23, 2024).

[10] *Using Observer Data*, NOAA Fisheries, bit.ly/noaadatause (last updated Dec. 13, 2018).

that observer data is always needed and create stable funding mechanisms under which industry pays for observer costs and the government's administrative costs to run the program. For remaining fisheries, Congress's amendments reflect a conclusion that fishery managers may sometimes need observer programs to address the data needs in their fisheries and can obtain that data by relying on industry-funded observers, subject to available appropriations for implementing the observer program. Over the thirty years since these amendments, fishery managers have continued to create observer programs and to require industry to bear observer costs when needed to implement the Act. Congress has not returned to the Act to restrict their authority to do so.

A. **Fishery managers have consistently read the Act to allow them to require vessels to bear observer costs.**

Appellants suggest that the herring observer program represents a novel reading of the Act. Appellants' Suppl. Br. 2. In reality, councils first read the Act to authorize them to create industry-funded observer programs for domestic vessels as early as 1990. In the decades since then, councils have continued to use industry-funded observer programs when they have a specific need for observer data. The driving force behind these programs was not *Chevron*, but a long-held view that the Act authorizes fishery managers to collect the data they need to meet its data-driven requirements.

In the mid-1980s, fishery management councils realized that they needed reliable data from observers aboard domestic vessels.[11] When the Act was passed in 1976, foreign vessels dominated U.S. waters. The Secretary of Commerce included an observer program in the first foreign fishery management plan in 1977. *See* 42 Fed. Reg. 8813, 8817 (Feb. 11, 1977). When domestic vessels later displaced foreign vessels in U.S. waters, the councils needed reliable data about those vessels. As enacted, the Act required fishery management plans to contain "necessary and appropriate" measures but did not expressly address observer programs for domestic vessels. *See* 16 U.S.C. § 1853 (1988). Relying on this general authority, councils created observer programs as needed to address the specific needs of their fisheries.[12]

Some of these programs relied on industry funding. For example, the Mid-Atlantic Fishery Management Council created an observer program in 1990 for the

---

[11] The Act conditioned foreign vessel permits on, among other things, an agreement to permit U.S. observers "on board" and to reimburse the United States "for the cost of such observer." Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, § 201(c)(2)(D), 90 Stat. 331, 338 (1976).

[12] *See* 48 Fed. Reg. 22606, 22607 (May 19, 1983) (Pacific Coast Groundfish Fishery, allowing the Regional Director to "assign an observer to permitted vessels" to "collect[] scientific data and carry[] out other management and compliance activities"); 48 Fed. Reg. 5560, 5565 (Feb. 7, 1983) (Western Pacific Spiny Lobster Fisheries, requiring vessels to carry an observer on request).

Atlantic Surf Clam and Ocean Quahog Fishery to allow vessels to shuck at sea.[13] Shoreside shucking had become expensive, and observers allowed the council to authorize at-sea shucking and still "monitor the actual harvest." 55 Fed. Reg. at 24186. Vessel owners were required to pay "all reasonable expenses of carrying the observer on board." *Id*. at 24196.

The North Pacific Regional Management Council needed an observer program to obtain much-needed data. In the 1980s, domestic vessels replaced foreign vessels (which had been covered by the Secretary's foreign vessel observer program) in the fishery. This caused "a loss of observer data considered critical for fisheries management."[14] The Council formally declared that "the lack of observer data" prevented it "from meeting its obligation" under the Act.[15]

To address the problem, the Council created an observer program and required vessels to pay observer costs.[16] It required all large vessels (and a lower

---

[13] *See* 55 Fed. Reg. 24184, 24196 (June 14, 1990); *see also* 49 Fed. Reg. 30946, 30948 (Aug. 2, 1984) (Atlantic Surf Clam and Ocean Quahog Fishery, allowing fishing for research purposes to be conditioned on "[e]mbarkation of observers").

[14] Mem. from Clarence G. Pautzke, Exec. Dir., to Council, SCC, and AP Members Re: Fishery Observer Programs 1 (Jan. 10, 1989), bit.ly/jan89mem.

[15] N. Pac. Fishery Mgmt. Council, Meeting Minutes, 85th Plenary Session, Jan. 16-19, 1989 at 15 (June 20, 1989), bit.ly/jan89min.

[16] *See* 55 Fed. Reg. 4839, 4848 (Feb. 12, 1990); *see also* 52 Fed. Reg. 8592, 8596 (Mar. 19, 1987) (discussing an interim program under which the council "may rely" on industry-funded observers for "data necessary for conservation and management").

percentage of smaller vessels) in the North Pacific groundfish fishery "to carry an observer." 55 Fed. Reg. at 4842. Vessels were required to pay "the cost of the observer directly to the [observer] contractor" and were also responsible for paying the day-to-day "costs of deploying observers," like room and board. *Id.* at 4840. The government was responsible for administering the program and managing the collected data (and funding those activities). *Id.*

Over the following decades, fishery managers continued to create observer programs and require fishery users to bear observer costs.[17] These programs varied in scope and duration, based on the needs of the fishery. For example, in 1993, the Secretary responded to evidence of overfishing in the Atlantic Shark Fishery by requiring vessels to accept observers onboard and pay associated observer costs.[18] After being left to act "based upon incomplete . . . information," the New England Fishery Management Council concluded in 1994 that an observer program was "necessary for the management program [in the Northeast Multispecies Fishery] to be effective."[19] In 1995, Mid-Atlantic Fishery Management Council used

---

[17] *See, e.g.*, 56 Fed. Reg. 63685, 63690 (Dec. 6, 1991) (Summer Flounder Fishery, requiring vessels "to arrange for and facilitate observer placement" and "[p]rovid[e] adequate accommodations and food"); 56 Fed. Reg. 65007, 65012 (Dec. 13, 1991) (Atlantic Swordfish Fishery, noting "costs associated with observer coverage would be shared by NMFS and vessel owner/operators").

[18] *See* 58 Fed. Reg. 21931, 21935, 21940, 21947 (Apr. 26, 1993).

[19] 59 Fed. Reg. 9872, 9878, 9903 (Mar. 1, 1994) (requiring operators to "[p]rovide accommodations and food" to the observer).

monitoring measures that included observers to address a growing risk of overfishing in the Squid and Butterfish Fisheries.[20] In 2004, the Pacific Fishery Management Council required at-sea processing vessels in the Pacific Coast Groundfish Fishery to "arrange for observer services from an observer provider" to generate data the Council needed to carry out the Act's bycatch minimization requirements.[21] And the New England Fishery Management Council created an observer program in the Atlantic Sea Scallop Fishery in 2007 because its specific bycatch restrictions "require close monitoring to achieve specified mortality targets."[22]

Rather than breaking new ground, the New England Fishery Management Council's herring observer program follows the path Congress laid in the Magnuson-Stevens Act.

---

[20] *See* 60 Fed. Reg. 65618, 65619, 65630 (Dec. 20, 1995) (requiring operators to "[p]rovide accommodations and food").

[21] 69 Fed. Reg. 31751, 31752, 31756 (June 7, 2004); *see also* 50 C.F.R. § 660.314(d)(1), (e)(1) (2006).

[22] 72 Fed. Reg. 32549, 32551, 32555 (June 13, 2007) (making vessels responsible for "arrang[ing] for carrying" the observer and "paying the cost of the observer," in return for being allowed additional fishing days at sea and a higher catch allowance).

**B.**   **Congress has embraced, and expanded, fishery managers' authority to use these programs.**

The legislative history of Magnuson-Stevens Act observer provisions demonstrates two key points: (1) Congress has affirmed the Fisheries Service's general authority to require vessels to pay for observers, and (2) in specific contexts, it has expanded that authority to provide durable funding to cover the government's administrative costs as well as direct observer costs.

Over time, Congress has responded to fishery managers' need for observer data by providing a variety of ways to require industry to accommodate and pay for observer monitoring. To cover all fisheries, it provided broad authority in sec. 1853(b)(8) and (14) to require vessels to carry observers and to establish additional requirements necessary and appropriate for the conservation and management of the fishery. 16 U.S.C. § 1853(b)(8), (14). In three specific contexts—foreign vessels, the North Pacific region, and limited-access privilege programs, Congress gave fishery managers expanded authority to cover additional costs associated with observer monitoring and to establish specific fee mechanisms to collect those costs.

The history of these fishery-specific provisions belies Appellants' argument that they "provide a compelling negative implication" that Congress did not otherwise authorize fishery managers to impose observer costs on vessels, Appellants' Suppl. Br. 21. *See also Loper Bright Enters. v. Raimondo*, 45 F.4th

359, 368-69 (D.C. Cir. 2022) (rejecting argument); Appellee Suppl. Br. 6-7. In

1980, when foreign vessels dominated fishing effort in U.S. waters, Congress

amended the Act to strengthen the Secretary's existing program requiring foreign

vessels to pay for observers.[23] In 1990, after foreign vessels were excluded and

domestic vessels took their place, Congress enacted a general provision affirming

observer requirements *and* specific provisions affirming and expanding

requirements in the North Pacific and limited access privilege programs.

Congress's decision to endorse programs in these fisheries that fund both direct

observer costs and government administrative costs through fees on all industry

members does not suggest that it prohibited fishery managers from requiring

vessels to bear only observer costs in other fisheries. *See RadLAX Gateway Hotel,*

*LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (discussing use of the

---

[23] Congress required U.S. observers to be "stationed aboard each foreign fishing vessel" and required foreign vessels to cover the government's costs to implement the program. Salmon and Steelhead Conservation and Enhancement Act of 1980, Pub. L. No. 96-561, § 236, 94 Stat. 3275, 3299-3300 (1980); *see also* Pub. L. No. 97-453, § 2(a), 96 Stat. 2481, 2481 (1983) (requiring vessels to pay "all of the costs incurred incident to such stationing [of monitors], including the costs of data editing and entry and observer monitoring"). To address a risk that observer coverage would lapse due to "insufficient appropriations," Congress directed the Secretary to create a "supplementary" fee program to ensure stable funding during appropriations lapses. § 2(a), 96 Stat. at 2483. Because the Magnuson-Stevens Act, along with later statutes, succeeded in ending foreign fishing in U.S. waters, this program has become obsolete. *See* Cong. Research Serv., *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* 31 (May 22, 2014).

general/specific canon to avoid a contradiction or superfluity). Rather, it merely reflects that Congress so strongly agreed that observer data is crucial in these fisheries that it guaranteed stable funding for the program through industry fees, and made industry responsible for both observer costs and the government's administrative costs. The most that can be inferred from Congress' decision to provide specific, expanded programs for some fisheries and general authority for others is that Congress was comfortable making fishery managers' ability to establish observer programs in the remaining fisheries contingent on their having sufficient appropriations to cover their own administrative costs.[24]

**General Observer Programs.** As detailed above, fishery managers created a number of domestic vessel observer programs to carry out their duties under the Magnuson-Stevens Act. Congress amended the Act in 1990 to confirm that authority.[25] Using the same "carrying" language as the administrative programs,

---

[24] Appellants argue otherwise, citing bills that would allow fees to fund the government's administrative costs to run observer programs. Appellants' Suppl. Br. 32. These unenacted bills do not inform statutory meaning. *See, e.g.*, *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Moreover, the interpretive question their challenge raises involves a more limited set of costs associated with obtaining and accommodating observers.

[25] S. Rep. No. 414, 101st Cong., 2d Sess. 20 (1990) (The amendment "clarif[ied] the existing authority . . . to require that observers be carried on board domestic fishing vessels for conservation and management purposes."); H.R. Rep. No. 393, 101st Cong., 1st Sess. 28 (1989) (stating that "Councils already have—and have used—such authority" and that "the amendment makes the authority explicit"); *see also* S. Rep. No. 414, 101st Cong., 2d Sess. 8 (1990) (noting that the authority to

*see supra* at 16-17, Congress stated that fishery management plans may "require that one or more observers be carried on board a [domestic] vessel . . . for the purpose of collecting data necessary for the conservation and management of the fishery." § 109(b)(2), 104 Stat. at 4448 (codified at 16 U.S.C. § 1853(b)(8)). It limited that authority only where requiring an observer would put the "health or safety of the observer" or the "operation of the vessel" at risk. *Id*. In the same amendment, Congress made a new finding that recognized the importance of the kind of reliable data that observers provide. *See* § 101(a), 104 Stat. at 4437; *id*. at 4437 ("The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States."). And after fishery managers had continued to create observer programs and require users to bear observer costs, *see supra* at 15-18, Congress amended the Act to impose sanctions (like permit revocation) on those who fail to make "any payment required for observer services . . . contracted by an owner or operator." Sustainable Fisheries Act, Pub. L. No. 104-297, § 114(c), 110 Stat. 3559, 3599 (1996). The only logical reading of the amendment penalizing owners and operators for failing to pay for observer costs is that Congress understood those

---

"require[e] U.S. vessels to carry observers" was "implicit in the Magnuson Act," that the North Pacific Council had used it, and that the Council-specific amendments provided additional authority to spread costs among all fishery users, not just vessels carrying observers).

entities could be required to pay observer costs in the first place. Appellees' Suppl. Br. 11-13. Rather than foreclosing the Fisheries Service's ability to require industry to pay for observer services, Congress endorsed that authority and reinforced the agency's ability to ensure those payments are made.

**North Pacific.** Further reflecting Congress' support for observer programs, Congress strengthened the pre-existing North Pacific Council's observer program, *supra* at 16-17, when codifying it. Congress authorized the Council to design "a fisheries research plan" that "requires" observers to "be stationed on fishing vessels" for "collecting data necessary for [] conservation, management, and scientific understanding." Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 118(a), 104 Stat. 4436, 4457 (1990). Congress also responded to the concern that "data gathering, research, and enforcement" was "seriously handicapped . . . by a lack of stable funding" for the government's side of the costs.[26] It allowed the Council to raise the permit fee for all vessels or processors in the fishery to cover the costs of obtaining observer data and the government's costs, and it created a fund for the fees and allowed the fund to be used for the plan

---

[26] *Oversight of Marine Fisheries Management: Hearing Before the S. Commerce, Science, and Transportation Comm.*, S. Hrg. 101-465, 101st Cong. 23 (1989) (Testimony of William E. Evans, Under Secretary for Oceans and Atmosphere, U.S. Department of Commerce).

"without appropriation or fiscal year limitation." *See* 16 U.S.C. § 1862(a)(2), (b)(2), (d).[27]

**Limited Access Privilege Programs.** Fishery managers turned to these programs, which allocate the fishery's quota among individual entities, in response to conditions like overcapitalization. In an overcapitalized fishery, there are too many vessels and too few fish, creating a rush to fish where "a very few" vessels end up "tak[ing] the entire fleet's annual quota."[28] These programs often included industry-funded observer requirements as part of the enforcement and management measures to make sure that no entity took more than its quota.[29] When codifying and expanding these programs, Congress carried forward the requirement for adequate observer coverage. *See* § 108(e), 110 Stat. at 3576–577. It then took an additional step and required fishery managers to charge permit fees for vessels in the limited-access privilege program that cover "the actual costs"—including the government's costs—"directly related to the management, data collection, and enforcement" of the program. 16 U.S.C. §§ 1854(d), 1855(h)(5)(B). Congress

---

[27] "Agency costs to administer and operate . . . observer programs are authorized recoverable costs." 59 Fed. Reg. 46126, 46127 (Sep. 6, 1994). The increased fees are capped at either the actual costs of the research plan or 2% of the fishery's harvest. 16 U.S.C. § 1862(b)(2)(E).

[28] 55 Fed. Reg. 3416, 3417 (Feb. 1, 1990).

[29] *Id.* (using industry-funded observer coverage to manage a catch-share program in the Atlantic Surf Clam and Ocean Quahog Fishery).

created a fund for those fees and allowed the Secretary to use those funds to carry out the programs "without appropriation." *Id*. § 1855(h)(5)(B).

As this statutory history shows, Congress has always understood the Act to authorize industry funding of observers. When addressing the general need for observer data that might arise in other fisheries, Congress confirmed fishery managers' authority to create observer programs and gave them the tools to sanction operators who failed to pay for those observers. In the limited instances where it has specifically enhanced those programs, it echoed fishery managers' understanding that, under this authority, they can create observer programs and require users to pay observer costs.

## III. The Herring Fishery Observer Program Follows This Established Practice.

Like others before it, the industry-funded monitoring program at issue here developed because a lack of accurate data on bycatch and catch in the Atlantic herring fishery hobbled management and put other fish populations and fisheries at risk. The midwater trawl fleet participating in the Atlantic herring fishery, and the regulated party in the industry-funded monitoring at issue here, uses very large nets capable of catching 100 metric tons of marine life in a single tow. The scale of this fleet makes the risks associated with unintended catch particularly high, with impacts to other fisheries and the ecosystem as a whole.

As fishermen in other fisheries have noted, the lack of observer data in the herring fishery harms their bottom line. For example, when observer coverage is low, the estimate of how quickly herring fishermen catch haddock (a commercially important groundfish stock caught as a bycatch species in the herring fishery) may be based on unrepresentative data. Herring fishermen themselves may argue that when estimates of bycatch caught are incorrect, the directed herring fishery may be shut down based on a premature conclusion that the haddock bycatch limit was met.[30] And because the vessels that fish for herring can catch a large amount of haddock on any given trip, low observer coverage can cause the haddock bycatch rate to be exceeded well before fishery managers can react. That leaves fewer haddock for the groundfishermen that depend upon haddock for their livelihoods.[31]

The New England Fishery Management Council determined that robust monitoring of the herring fishery was necessary to conserve and manage vital public resources (i.e., Atlantic herring, mackerel, river herring, shad, and other species incidentally caught). The Council recognized that it could not meet its responsibilities under the Act to minimize bycatch, prevent overfishing, or ensure

---

[30] *See* Letter from Shaun M Gehan, Counsel for the Sustainable Fisheries Coalition, to Terry Stockwell III, Chair, N.E. Fishery Mgmt. Council 2-3 (Jan. 15, 2016), bit.ly/sfcletter (criticizing low observer coverage).

[31] *See* Cape Cod Commercial Fishermen's Alliance, *Comments on Industry Funded Monitoring Amendment* 1 (Dec. 21, 2018), bit.ly/cccfacomment (supporting 100% observer coverage on larger vessels to address haddock bycatch).

accountability without comprehensive monitoring. 16 U.S.C. § 1853(a)(1)(A), (5), (11), (15). Accordingly, it developed the Atlantic herring observer program to provide "affordable monitoring for the herring fishery" to address its data needs. 85 Fed. Reg. 7414, 7417 (Feb. 7, 2020). It stated that it needs the data to obtain "[a]ccurate estimates of catch" and "accurate catch estimates for incidental species for which catch caps apply" (like haddock). *Id*. at 7423, 7425 (estimating catch uncertainty will be as low as 30%). Under the program, observers collect data on, among other things, catch, bycatch, and gear, and also collect samples. *See id*. at 7418.[32]

The Council required industry to bear some costs of the program, following the model of prior programs. Vessels covered by the program would bear the costs of obtaining the observer data if not reimbursed; and the government would be responsible for the administrative costs of running the program. *See id*. at 7415-16. The government decided to reimburse vessels for all observer costs until the program was discontinued in 2023. Appellees' Suppl. Br. 3-4. When the government lacks appropriations to fund its responsibilities under the program, the program goes dormant.[33]

---

[32] The program refers to "at-sea monitors" because monitors, unlike observers, collect "whole specimens, photos, or biological samples" in only limited circumstances." *Id.* For simplicity's sake, this brief refers to observers throughout.

[33] *See Atlantic Herring Industry-Funded Monitoring Program Suspended*

In the end, the Council's observer program rests on the same kind of reasonable judgments that other fishery managers have made for decades. The Council identified a specific need for reliable observer data to meet its responsibilities under the Magnuson-Stevens Act. It read the Act to authorize vessels to bear the costs of obtaining and accommodating observers (but not the government's administrative costs). It carefully considered the burden the program would impose on fishermen and took steps to minimize them. The result is a program designed to produce data that would help the Council improve its management of the fishery and, in doing so, avoid fish population crashes that—unlike the cost of complying with observer requirements—actually pose an existential threat to the region's fisheries.

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,

/s/ Andrea A. Treece
ANDREA A. TREECE
CADC Bar No. 237639
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
atreece@earthjustice.org

---

*Beginning in April 2023*, NOAA Fisheries (Nov. 2022), bit.ly/noaaifm (last updated Nov. 2, 2022).

STEPHEN D. MASHUDA
D.C. Bar No. 60505
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
smashuda@earthjustice.org

*Counsel for Conservation Law Foundation,
Ocean Conservancy, Save the Sound, and
Oceana, Inc.*

Dated: September 25, 2024

# CERTIFICATE OF COMPLIANCE

In accordance with Rule 29(a)(5) and Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies that the accompanying brief has been prepared using 14-point Times New Roman typeface, and is double-spaced (except for headings and footnotes).

The undersigned further certifies that the brief is proportionally spaced and contains 6,478 words, exclusive of signature lines and certificate of compliance.

The undersigned used Microsoft Word 2016 to compute the word count.

*/s/ Andrea A. Treece*
ANDREA A. TREECE
CADC Bar No. 237639
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
atreece@earthjustice.org

*Counsel for Amici Curiae Conservation Law Foundation, Ocean Conservancy, Save the Sound, and Oceana, Inc.*