

**U.S. Department of Justice**
Environment and Natural Resources Division

---

*Appellate Section*                                        *Telephone (202) 514-4081*
*P.O. Box 7415*
*Washington, DC  20044*

---

## Via CM/ECF

June 10, 2025

Clifton Cislak, Clerk
U.S. Court of Appeals for the D.C. Circuit
333 Constitution Ave NW
Washington, DC 20001

      Re:    *Loper Bright Enterprises, Inc. v. Lutnick*, No. 21-5166, argued
               November 4, 2024 – Rule 28(j) notice of supplemental authority

Dear Mr. Cislak:

On May 29, 2025, the Supreme Court issued an opinion in *Seven County Infrastructure Coalition v. Eagle County*, No. 23-975, addressing judicial review under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. The Court's decision in *Seven County* applies the framework for statutory interpretation set out in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), consistent with the government's approach here.

In *Seven County*, the Court reiterated that judicial review of an agency's interpretation of a statute is de novo. "But when an agency exercises discretion granted by statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Seven County*, slip op. at 8-9. The Court illustrated this distinction between legal interpretation and policy determination through the example of NEPA's requirement that agencies prepare a "detailed" environmental impact statement. 42 U.S.C. § 4332(2)(C). Although "the meaning of 'detailed' is a question of law to be decided by a court," the determination of "what details need to be included" in an environmental impact statement "does not turn on the meaning of 'detailed.'" Slip op. at 9-10. That determination is primarily fact-based, and "[t]he agency is better equipped to assess what facts are relevant to the agency's own decision than a court is." *Id.* at 10. Thus,

the "question of whether a particular report is detailed enough in a particular case requires the exercise of agency discretion." *Id.*

Here, the Court's interpretive task on remand is to determine the best reading of the text in the provisions authorizing observer measures, 16 U.S.C. § 1853(b)(8), and measures that are "necessary and appropriate for the conservation and management of the fishery," *id.* § 1853(b)(14). Although the Court determines the best reading of the terms "necessary" and "appropriate," the factual determination of what measures are necessary and appropriate in the context of a particular program "requires the exercise of agency discretion." Slip op. at 10. And here, the National Marine Fisheries Service reasonably exercised its policy discretion to determine that the at-sea monitoring measures for the Atlantic herring fishery were necessary and appropriate.

Sincerely,

*/s/ Daniel Halainen*
Daniel Halainen
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-4081
daniel.j.halainen@usdoj.gov

Counsel for Federal Appellees

cc: Counsel of record (via CM/ECF)

**CERTIFICATE OF COMPLIANCE**

This letter complies with the word limitations of Federal Rule of Appellate Procedure 28(j) because, excluding the parts of the document exempted by Rule 32(f), the document contains 347 words. This letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because the letter has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Daniel Halainen*
Daniel Halainen

Counsel for Federal Appellees

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SEVEN COUNTY INFRASTRUCTURE COALITION ET AL. *v.* EAGLE COUNTY, COLORADO, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23–975. Argued December 10, 2024—Decided May 29, 2025

Under federal law, new railroad construction and operation must first be approved by the U. S. Surface Transportation Board. 49 U. S. C. §10901. In 2020, the Seven County Infrastructure Coalition applied to the Board for approval of an 88-mile railroad line connecting Utah's oil-rich Uinta Basin to the national freight rail network, facilitating the transportation of crude oil to refineries along the Gulf Coast. As part of its project review, the Board prepared an environmental impact statement (EIS) that addressed significant environmental effects of the project and identified feasible alternatives that could mitigate those effects, as required by the National Environmental Policy Act (NEPA). The Board issued a draft EIS and invited public comment. After holding six public meetings and collecting more than 1,900 comments, the Board prepared a 3,600-page EIS that analyzed numerous impacts of the railway's construction and operation. Relevant here, the EIS noted, but did not fully analyze, the potential environmental effects of increased upstream oil drilling in the Uinta Basin and increased downstream refining of crude oil. The Board subsequently approved the railroad line, concluding that the project's transportation and economic benefits outweighed its environmental impacts. Petitions challenging the Board's action were filed in the D. C. Circuit by a Colorado county and several environmental organizations. The D. C. Circuit found "numerous NEPA violations arising from the EIS." 82 F. 4th 1152, 1196. Specifically, the D. C. Circuit held that the Board impermissibly limited its analysis of the environmental effects from upstream oil drilling and downstream oil refining projects, concluding that those effects were reasonably foreseeable impacts that the EIS should have analyzed more extensively. Based on the deficiencies it

found in the EIS, the D. C. Circuit vacated both the EIS and the
Board's final approval order.

*Held*: The D. C. Circuit failed to afford the Board the substantial judicial
deference required in NEPA cases and incorrectly interpreted NEPA
to require the Board to consider the environmental effects of upstream
and downstream projects that are separate in time or place from the
Uinta Basin Railway. Pp. 6–22.

(a) NEPA ensures that agencies and the public are aware of the en-
vironmental consequences of certain proposed infrastructure projects.
As a purely procedural statute, NEPA "does not mandate particular
results, but simply prescribes the necessary process" for an agency's
environmental review of a project. *Robertson* v. *Methow Valley Citi-
zens Council*, 490 U. S. 332, 350. Some federal courts reviewing NEPA
cases have assumed an aggressive role in policing agency compliance
with NEPA, and have not applied NEPA with the judicial deference
demanded by the statutory text and the Court's cases.

When, as here, a party argues that an agency action was arbitrary
and capricious due to a deficiency in an EIS, the "only role for a court"
is to confirm that the agency has addressed environmental conse-
quences and feasible alternatives as to the relevant project. *Strycker's
Bay Neighborhood Council, Inc.* v. *Karlen*, 444 U. S. 223, 227. Further,
the adequacy of an EIS is relevant only to the question of whether an
agency's final decision (here, to approve the railroad project) was rea-
sonably explained.

Judicial deference in NEPA cases extends to an agency's determina-
tion of what details are relevant in an EIS. While NEPA requires an
EIS to be "detailed," 42 U. S. C. §4332(2)(C), and the meaning of "de-
tailed" is a legal question, see *Loper Bright Enterprises* v. *Raimondo*,
603 U. S. 369, 391–392, what details need to be included in any given
EIS is a factual determination for the agency. The textual focus of
NEPA is the "proposed action"—the project at hand—not other sepa-
rate projects. §4332(2)(C). Courts should defer to agencies' discretion-
ary decisions about where to draw the line when considering indirect
environmental effects and whether to analyze effects from other pro-
jects separate in time or place. See *Department of Transportation* v.
*Public Citizen*, 541 U. S. 752, 767. In sum, when assessing significant
environmental effects and feasible alternatives for purposes of NEPA,
an agency will invariably make a series of fact-dependent, context-spe-
cific, and policy-laden choices about the depth and breadth of its in-
quiry—and also about the length, content, and level of detail of the
resulting EIS. Courts should afford substantial deference and should
not micromanage those agency choices so long as they fall within a
broad zone of reasonableness. Even a deficient EIS does not neces-
sarily require vacating an agency's project approval, absent reason to

believe that the agency might disapprove the project if it added more
to the EIS. Cf. 5 U. S. C. §706. Pp. 6–15.

(b) Contrary to the D. C. Circuit's NEPA analysis, the Board's determination that its EIS need not evaluate possible environmental effects from upstream and downstream projects separate from the Uinta Basin Railway complied with NEPA's procedural requirements, particularly NEPA's textually mandated focus on the "proposed action" under agency review. While indirect environmental *effects* of the project itself may fall within NEPA's scope even if they might extend outside the geographical territory of the project or materialize later in time, the fact that the project might foreseeably lead to the construction or increased use *of a separate project* does not mean the agency must consider that separate project's environmental effects. See *Public Citizen*, 541 U. S., at 767. This is particularly true where, as here, those separate projects fall outside the agency's regulatory authority. Pp. 15–21.

(c) NEPA does not allow courts, "under the guise of judicial review" of agency compliance with NEPA, to delay or block agency projects based on the environmental effects of other projects separate from the project at hand. *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 558. Pp. 21–22.

82 F. 4th 1152, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and BARRETT, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which KAGAN and JACKSON, JJ., joined. GORSUCH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–975
_____

## SEVEN COUNTY INFRASTRUCTURE COALITION, ET AL., PETITIONERS *v.* EAGLE COUNTY, COLORADO, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[May 29, 2025]

JUSTICE KAVANAUGH delivered the opinion of the Court.

Some 55 years ago, Congress passed and President Nixon signed the National Environmental Policy Act, known as NEPA. For certain infrastructure projects that are built, funded, or approved by the Federal Government, NEPA requires federal agencies to prepare an environmental impact statement, or EIS. The EIS must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects.

NEPA was the first of several landmark environmental laws enacted by Congress in the 1970s. Subsequent statutes included the Clean Air Amendments of 1970, the Clean Water Act of 1972, and the Endangered Species Act of 1973, among others.

Unlike those later-enacted laws, however, NEPA imposes no substantive environmental obligations or restrictions. NEPA is a purely procedural statute that, as relevant here, simply requires an agency to prepare an EIS—in essence, a report. Importantly, NEPA does not require the agency to weigh environmental consequences in any particular way.

Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws.

Simply stated, NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it.

In this case, the U. S. Surface Transportation Board considered a proposal by a group of seven Utah counties for the construction and operation of an approximately 88-mile railroad line in northeastern Utah. Under federal law, the Board determines whether to approve construction of new railroad lines. The railroad line here would connect Utah's oil-rich Uinta Basin—a rural territory roughly the size of the State of Maryland—to the national rail network. By doing so, the new railroad line would facilitate the transportation of crude oil from Utah to refineries in Louisiana, Texas, and elsewhere. And the project would bring significant economic development and jobs to the isolated Uinta Basin by better connecting the Basin to the national economy.

For that proposed 88-mile Utah railroad line, the Board prepared an extraordinarily lengthy EIS, spanning more than 3,600 pages of environmental analysis. The Board's EIS addressed the environmental effects of the railroad line. But the U. S. Court of Appeals for the D. C. Circuit nonetheless faulted the EIS for not sufficiently considering the environmental effects of projects separate from the railroad line itself—primarily, the environmental effects that could ensue from (i) increased oil drilling upstream in the Uinta Basin and (ii) increased oil refining downstream along the Gulf Coast of Louisiana and Texas.

On that basis, the D. C. Circuit vacated the Board's EIS and the Board's approval of the 88-mile railroad line. As a result, construction still has not begun even though the Board approved the project back in December 2021.

We reverse. First, the D. C. Circuit did not afford the

Board the substantial judicial deference required in NEPA cases. Second, the D. C. Circuit ordered the Board to address the environmental effects of projects separate in time or place from the construction and operation of the railroad line. But NEPA requires agencies to focus on the environmental effects of the project at issue. Under NEPA, the Board's EIS did not need to address the environmental effects of upstream oil drilling or downstream oil refining. Rather, it needed to address only the effects of the 88-mile railroad line. And the Board's EIS did so.

## I

Under federal law, new railroad construction and operation must first be approved by the U. S. Surface Transportation Board. 49 U. S. C. §10901. After receiving an application for a new railroad line, the Board issues a public notice and initiates an agency proceeding to review the proposal; alternatively, the Board may streamline approval through a statutory exemption process. §§10101, 10502, 10901. In addition, for covered projects, NEPA compels the Board to prepare an environmental impact statement, or EIS.

In 2020, the Seven County Infrastructure Coalition—a group of seven Utah counties—applied to the Board for approval of an 88-mile railroad line in northeastern Utah. The new railroad line would connect the Uinta Basin with the interstate freight rail network—and via that network, to refineries in Louisiana, Texas, and other destinations.

The Uinta Basin contains significant quantities of crude oil and other fossil fuels. The Uinta Basin Railway would provide oil producers a more efficient option for transporting oil out of the Basin to refineries. As of now, oil from the Basin is carried by trucks that must navigate mountain passes on narrow roads, a difficult and slow journey in any season.

The Board's environmental review of the Uinta Basin

Railway followed standard NEPA procedures.  In October
2020, the Board issued a draft EIS and invited public
comment.  During the public comment period, the Board
held six public meetings and collected more than 1,900
comments.  In August 2021, the Board published its final
EIS.

All told, the Board's final EIS clocked in at more than
3,600 pages.  The EIS identified and analyzed numerous
"significant and adverse impacts that could occur as a
result" of the railroad line's construction and operation—
including disruptions to local wetlands, land use, and
recreation. App. 121; see *id.*, at 94–105, 121–126, 206–347.
The EIS likewise addressed several "minor impacts," such
as air pollution and big-game movement around the
construction site.  *Id.*, at 126; see *id.*, at 126–134, 251–259,
309–325.

The EIS also noted, but did not fully analyze, the
potential effects of increased upstream oil drilling in the
Uinta Basin and increased downstream refining of crude oil
carried by the railroad.  *Id.*, at 135, 348–482, 511–516, 520–
534, 539–543.

As to the environmental effects of upstream oil drilling,
the EIS explained why further analysis of those "potential
future, as yet unplanned, oil and gas development projects"
was not needed.  *Id.*, at 520.  To begin with, the project at
issue was an 88-mile railroad line, not an oil well or a
drilling permit in the Uinta Basin.  Moreover, the Board
possesses "no authority or control over potential future oil
and gas development" in the Basin.  *Id.*, at 522.  Future
projects would be "subject to the approval processes of other
federal, state, local, and tribal agencies."  *Ibid.*  In any
event, the environmental effects of future oil and gas
development in the Basin are "speculative" and attenuated
from the project at hand.  *Id.*, at 525; see *id.*, at 525–527
(citing *Department of Transportation* v. *Public Citizen*, 541
U. S. 752, 767–768, 770 (2004)).

As for the environmental effects of downstream oil refining projects, the Board recognized that "trains originating on the proposed rail line would transport crude oil to markets in other regions of the United States," such as Louisiana and Texas, and that oil refining (and the associated effects on the environment) could increase in those locations as a result. App. 477; see *id.*, at 477–482. But the identity of specific destinations "would depend on the ability and willingness of refineries in other markets to receive rail cars carrying Uinta Basin crude oil and process the oil in their refineries." *Id.*, at 477. Moreover, the Board "would have no role in approving or regulating the production, refining, or use" of Uinta Basin crude oil. *Id.*, at 540–541. So the Board did not fully evaluate the effects of additional oil refining along the Gulf Coast.

In December 2021, a few months after issuing the final EIS, the Board approved the construction and operation of the Uinta Basin Railway. Recognizing that "rail construction projects are in the public interest," the Board concluded that the new railroad line would "have substantial transportation and economic benefits," and that those benefits outweighed the environmental impacts identified in the EIS. App. to Pet. for Cert. 121a, 119a; see *id.*, at 118a–121a.

In the wake of the Board's final approval, a Colorado county and several environmental organizations sued by filing petitions for review in the U. S. Court of Appeals for the D. C. Circuit.

The D. C. Circuit found "numerous NEPA violations arising from the EIS." *Eagle Cty.* v. *Surface Transp. Bd.*, 82 F. 4th 1152, 1196 (2023). In the court's view, the Board "failed" to take "the requisite 'hard look' at all of the environmental impacts of the Railway." *Id.*, at 1175.

Specifically, the Court of Appeals held that the Board impermissibly limited its analysis of upstream and downstream projects. The court concluded that the

environmental effects from oil drilling in the Uinta Basin
and oil refining along the Gulf Coast were "'reasonably
foreseeable impacts'" that the EIS should have analyzed
more extensively. *Id.*, at 1177. The court rejected the
Board's argument that those effects would arise from other
projects (upstream oil drilling, downstream oil refining, and
the like) that are separate from the current project and
regulated by other agencies. *Id.*, at 1177–1180 (citing
*Sierra Club* v. *FERC*, 867 F. 3d 1357, 1372–1375 (CADC
2017) (*Sabal Trail*)).

Based on the deficiencies it found in the EIS, the Court of
Appeals vacated the EIS and the Board's final approval
order. 82 F. 4th, at 1196. The Coalition and the Uinta
Basin Railway sought review in this Court, and we granted
certiorari. 602 U. S. ___ (2024).

## II

For certain infrastructure projects that are built, funded,
or approved by the Federal Government, NEPA requires
federal agencies to prepare an environmental impact
statement, or EIS, identifying significant environmental
effects of the projects, as well as feasible alternatives. The
law ensures that the agency and the public are aware of the
environmental consequences of proposed projects. Properly
applied, NEPA helps agencies to make better decisions and
to ensure good project management.

Importantly, however, NEPA is purely procedural. In
ultimately deciding whether to build, fund, or approve a
project, an "agency is not constrained by NEPA from
deciding that other values outweigh the environmental
costs." *Robertson* v. *Methow Valley Citizens Council*, 490
U. S. 332, 350 (1989). Otherwise stated, NEPA "does not
mandate particular results, but simply prescribes the
necessary process" for an agency's environmental review of
a project. *Ibid.*; see *Department of Transportation* v. *Public
Citizen*, 541 U. S. 752, 756–757 (2004); *Marsh* v. *Oregon*

*Natural Resources Council*, 490 U. S. 360, 370–372 (1989); *Baltimore Gas & Elec. Co.* v. *Natural Resources Defense Council, Inc.*, 462 U. S. 87, 97–98 (1983); *Strycker's Bay Neighborhood Council, Inc.* v. *Karlen*, 444 U. S. 223, 227–228 (1980); *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 558 (1978); *Kleppe* v. *Sierra Club*, 427 U. S. 390, 410, n. 21 (1976).[1]

Here, the Board's EIS evaluated the environmental effects of the proposed 88-mile railroad line in Utah's rural Uinta Basin. But the D. C. Circuit, following Circuit precedent applying NEPA, concluded that the EIS did not sufficiently address the reasonably foreseeable environmental impacts of increased upstream oil drilling in the Uinta Basin, as well as the environmental effects of

_____

[1] As it was phrased at the time of the Board's EIS (before a 2023 amendment to the statute, see n. 3, *infra*), NEPA directed federal agencies to

"include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." §102(2)(C), 83 Stat. 853, as amended, 42 U. S. C. §4332(2)(C) (2018).

increased downstream oil refining along the Gulf Coast. 82
F. 4th, at 1196.

As we will explain, we disagree with the D. C. Circuit's
decision on two grounds. First, the court did not afford the
Board the substantial judicial deference required in NEPA
cases. Second, the court incorrectly interpreted NEPA to
require the Board to consider the environmental effects of
upstream and downstream projects that are separate in
time or place from the Uinta Basin Railway.

                            A

Since the early 1970s, federal courts have reviewed
NEPA cases. Over time, some courts have assumed an
aggressive role in policing agency compliance with NEPA.
Other courts have adopted a more restrained approach. In
light of the continuing confusion and disagreement in the
Courts of Appeals over how to handle NEPA cases, we think
it important to reiterate and clarify the fundamental
principles of judicial review applicable in those cases. As
we will explain, the central principle of judicial review in
NEPA cases is deference.[2]

As a general matter, when an agency interprets a statute,
judicial review of the agency's interpretation is *de novo*.
See *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369,
391–392 (2024). But when an agency exercises discretion

─────────────

[2] Some have debated whether Congress and the President in 1970
actually intended or anticipated judicial review of agency compliance
with NEPA. See R. Lazarus, The National Environmental Policy Act in
the U.S. Supreme Court: A Reappraisal and a Peek Behind the Curtains,
100 Geo. L. J. 1507, 1515 (2012) (describing the history). In any event,
an early D. C. Circuit case concluded that an agency's compliance with
NEPA was judicially reviewable. See *Calvert Cliffs' Coordinating
Comm., Inc.* v. *U. S. Atomic Energy Comm'n*, 449 F. 2d 1109 (1971). And
this Court's cases have treated NEPA compliance as judicially
reviewable. That said, courts must conduct their review with significant
deference to the agency. When reviewing compliance with NEPA, "courts
are to play only a limited role." *Vermont Yankee Nuclear Power Corp.* v.
*Natural Resources Defense Council, Inc.*, 435 U. S. 519, 558 (1978).

granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard. Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained. See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983); *FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423 (2021).

When a party argues that an agency action was arbitrary and capricious due to a deficiency in an EIS, the reviewing court must account for the fact that NEPA is a *purely procedural statute.* Under NEPA, an agency's only obligation is to prepare an adequate report. "NEPA requires no more." *Strycker's Bay Neighborhood Council*, 444 U. S., at 228. Unlike a plethora of other federal environmental statutes (such as the Clean Air Act, the Clean Water Act, etc.), NEPA imposes no *substantive* constraints on the agency's ultimate decision to build, fund, or approve a proposed project. So when reviewing an agency's EIS, "the only role for a court" is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project. *Id.*, at 227; see *Vermont Yankee*, 435 U. S., at 551, 555. Because an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision (here, to approve the railroad) was reasonably explained.

In short, when determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency.

In practice, judicial deference in NEPA cases can take several forms. For example, NEPA says that the EIS should be "detailed." 42 U. S. C. §4332(2)(C). Of course, the meaning of "detailed" is a question of law to be decided by

a court. *Loper Bright*, 603 U. S., at 391–392. But what details need to be included in any given EIS? For the most part, that question does not turn on the meaning of "detailed"—instead, it "involves primarily issues of fact." *Marsh*, 490 U. S., at 377. The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is. As a result, "agencies determine whether *and to what extent* to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Public Citizen*, 541 U. S., at 767 (emphasis added). So the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court. Brevity should not be mistaken for lack of detail. A relatively brief agency explanation can be reasoned and detailed; an EIS need not meander on for hundreds or thousands of pages. So courts should not insist on length as a prerequisite for finding an EIS to be detailed.[3]

The EIS also must identify significant environmental impacts and feasible alternatives. But there too, an agency exercises substantial discretion. An agency must make predictive and scientific judgments in assessing the relevant impacts (what are the likely impacts; do they rise to the level of "significant"?) and alternatives (what are the

_____

[3] Indeed, federal law now strictly *prohibits* an agency's EIS from going on endlessly. In 2023, two years after the Board issued its final EIS for the Uinta Basin Railway, Congress passed and President Biden signed an Act amending NEPA meaningfully titled the "Building United States Infrastructure through Limited Delays and Efficient Reviews Act of 2023." Pub. L. 118–5, Div. C, Tit. III, §321, 137 Stat. 38–39. Under that BUILDER Act, an EIS "shall not exceed 150 pages" and must be completed in "2 years" or less. *Id.*, at 41–42 (42 U. S. C. §§4336a(e)(1)(A), (g)(1)(A)). That Act strongly reinforces the basic principles that NEPA, correctly interpreted, already embodied but that have been too often overlooked. The analysis in this opinion thus applies to NEPA as amended by the BUILDER Act.

potential alternatives; are they really "feasible"?).  As this Court has said, "the term 'alternatives' is not self-defining," and "[c]ommon sense" should be brought to bear.  *Vermont Yankee*, 435 U. S., at 551.  Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its "most deferential."  *Baltimore Gas & Elec.*, 462 U. S., at 103; see *Marsh*, 490 U. S., at 378; *State Farm*, 463 U. S., at 43.

In preparing an EIS, an agency also must determine the scope of the environmental effects that it will address.  The textual focus of NEPA is the "proposed action"—that is, the project at hand.  42 U. S. C. §4332(2)(C) (2018).  The agency therefore will obviously seek to assess significant effects from the project at issue.  But how far will the agency go in considering the indirect effects that might occur outside the area of the immediate project—for example, due to emissions or run off from the project carried elsewhere by air or water?   And will the agency evaluate the environmental effects from other future or geographically separate projects that may be initiated (or expanded) as a result of or in the wake of the current project?  And what if another agency also possesses regulatory authority over a related project?

In analyzing those scope questions, it is critical to disaggregate the agency's role from the court's role.  So long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line—including (i) how far to go in considering indirect environmental effects from the project at hand and (ii) whether to analyze environmental effects from other projects separate in time or place from the project at hand.  On those kinds of questions, as this Court has often said, agencies possess discretion and must have broad latitude to draw a "manageable line."  *Public Citizen*,

541 U. S., at 767 (quoting *Metropolitan Edison Co.* v. *People Against Nuclear Energy*, 460 U. S. 766, 774, n. 7 (1983)).

To tie all of this together: When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness. As the Court has emphasized on several occasions, and we doubly underscore again today, "inherent in NEPA . . . is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Public Citizen*, 541 U. S., at 767. A reviewing court may not "substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe*, 427 U. S., at 410, n. 21.

Some courts have strayed and not applied NEPA with the level of deference demanded by the statutory text and this Court's cases. Those decisions have instead engaged in overly intrusive (and unpredictable) review in NEPA cases. Those rulings have slowed down or blocked many projects and, in turn, caused litigation-averse agencies to take ever more time and to prepare ever longer EISs for future projects.

The upshot: NEPA has transformed from a modest procedural requirement into a blunt and haphazard tool employed by project opponents (who may not always be entirely motivated by concern for the environment) to try to stop or at least slow down new infrastructure and construction projects. Some project opponents have invoked NEPA and sought to enlist the courts in blocking or delaying even those projects that otherwise comply with

all relevant substantive environmental laws. Indeed, certain project opponents have relied on NEPA to fight even clean-energy projects—from wind farms to hydroelectric dams, from solar farms to geothermal wells. See, *e.g.*, Brief for Chamber of Commerce of the United States of America, et al. as *Amici Curiae* 19–20.

All of that has led to more agency analysis of separate projects, more consideration of attenuated effects, more exploration of alternatives to proposed agency action, more speculation and consultation and estimation and litigation. Delay upon delay, so much so that the process sometimes seems to "borde[r] on the Kafkaesque." *Vermont Yankee*, 435 U. S., at 557. Fewer projects make it to the finish line. Indeed, fewer projects make it to the starting line. Those that survive often end up costing much more than is anticipated or necessary, both for the agency preparing the EIS and for the builder of the project. And that in turn means fewer and more expensive railroads, airports, wind turbines, transmission lines, dams, housing developments, highways, bridges, subways, stadiums, arenas, data centers, and the like. And that also means fewer jobs, as new projects become difficult to finance and build in a timely fashion.

A 1970 legislative acorn has grown over the years into a judicial oak that has hindered infrastructure development "under the guise" of just a little more process. *Id.*, at 558. A course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense. *Id.*, at 525. Congress did not design NEPA for *judges* to hamstring new infrastructure and construction projects. On the contrary, as this Court has stressed, courts should and "must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh*, 490 U. S., at 377.

Critically, as the Government and the Coalition explained at oral argument, courts not only must defer to

the agency's reasonable choices regarding the scope and contents of the EIS, but also must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project. See Tr. of Oral Arg. 31–32, 70–71. That, too, follows from NEPA's status as a purely procedural statute. The ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained. Review of an EIS is only one component of that analysis. Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS. Cf. 5 U. S. C. §706. For example, in a case like this one, even if the EIS drew the line on the effects of separate upstream or downstream projects too narrowly, that mistake would not necessarily require a court to vacate the agency's approval of the railroad project. Cf. *Vermont Yankee*, 435 U. S., at 558.[4]

In other words, as this Court has said before, NEPA does not authorize a court to "'interject itself within the area of discretion . . . as to the choice of the action to be taken'" by the agency. *Strycker's Bay Neighborhood Council*, 444 U. S., at 227–228 (quoting *Kleppe*, 427 U. S., at 410, n. 21). NEPA's procedural mandate helps "to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or this Court

––––––––––

[4]When, unlike this case, an agency *denies* approval of a project, the denied applicant may ordinarily challenge the denial under the APA or the relevant agency's governing statute. The denied applicant may argue, among other things, that the agency acted unreasonably in denying approval by weighing environmental consequences too heavily in light of the agency's governing statute and other relevant factors, or perhaps that the agency erred because the governing statute did not allow the agency to weigh environmental consequences at all. NEPA does not alter those judicial inquiries.

would have reached had they been members of the decisionmaking unit of the agency." *Vermont Yankee*, 435 U. S., at 558.

The "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Id.*, at 555. The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference.

## B

Even apart from failing to afford sufficient deference to the Surface Transportation Board, the D. C. Circuit's decision was mistaken on the merits under NEPA. The D. C. Circuit erroneously required the Board to address environmental effects from projects that are separate in time or place from the 88-mile railroad project at hand— that is, effects from potential future projects or from geographically separate projects. Moreover, those separate projects fall outside the Board's authority and would be initiated, if at all, by third parties.

In its EIS, the Board determined that upstream oil drilling in the Uinta Basin and downstream oil refining along the Gulf Coast were separate from the construction and operation of the 88-mile railroad line. The Board's EIS explained that the "proposed rail line and any future oil and gas development projects are not two phases of a single action," but "separate, independent projects." App. 523. Those other projects, the Board reasoned, should not be considered "part of the proposed action assessed in the EIS." *Ibid.* The Board concluded that its EIS need not evaluate the possible environmental effects from separate upstream or downstream projects.[5]

_____

[5] Even though not mandated by NEPA to do so, the Board did identify some of the potential effects and marginal risks from projects separate from the 88 miles of additional railroad track in rural Utah. See, *e.g.*, App. 354–358 (forecasting the number of oil wells that could be added in the Uinta Basin as a result of increased production spurred by the new

The Board's approach complied with NEPA and this Court's longstanding NEPA precedents.  Importantly, the textually mandated focus of NEPA is the "proposed action"—that is, the project at hand—not other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration. 42 U. S. C. §4332(2)(C) (2018); see *Aberdeen & Rockfish R. Co.* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U. S. 289, 322–324 (1975); *Kleppe*, 427 U. S., at 398–402.  Therefore, when the effects of an agency action arise from a separate project—for example, a possible future project or one that is geographically distinct from the project at hand—NEPA does not require the agency to evaluate the effects of that separate project.

To be clear, the environmental *effects* of the project at issue may fall within NEPA even if those *effects* might extend outside the geographical territory of the project or might materialize later in time—for example, run-off into a river that flows many miles from the project and affects fish populations elsewhere, or emissions that travel downwind and predictably pollute other areas.  Those so-called indirect effects can sometimes fall within NEPA, as the Government explained at oral argument.  See Tr. of Oral Arg. 59–63.

But if the project at issue might lead to the construction or increased use *of a separate project*—for example, a housing development that might someday be built near a highway—the agency need not consider the environmental effects *of that separate project*.  To put it in legal terms, the

---

railway); *id.*, at 420–423, 539–542 (evaluating effects from increased oil refining along the Gulf Coast).  The Board should not necessarily earn bonus points for studying more than NEPA demanded.  But it should definitely not receive a failing grade just because its 3,600-page EIS was less thorough in analyzing the effects from other projects than the Court of Appeals might have preferred.

separate project breaks the chain of proximate causation between the project at hand and the environmental effects of the separate project. See *Public Citizen*, 541 U. S., at 767 (citing *Metropolitan Edison,* 460 U. S., at 774, and n. 7). The effects from a separate project may be factually foreseeable, but that does not mean that those effects are relevant to the agency's decisionmaking process or that it is reasonable to hold the agency responsible for those effects. Cf. *Public Citizen*, 541 U. S., at 766–767. In those circumstances, "the causal chain is too attenuated." *Metropolitan Edison,* 460 U. S., at 774. In other words, there is no "'reasonably close causal relationship'" between the project at hand and the environmental effects of those other projects. *Public Citizen*, 541 U. S., at 767 (quoting *Metropolitan Edison,* 460 U. S., at 774).

Moreover, and importantly, the Board here possesses no regulatory authority over those separate projects. The Board does not regulate oil drilling, oil wells, oil and gas leases, or oil refineries. The Board approves railroad lines. See 49 U. S. C. §§10101, 10901. Other agencies possess authority to regulate those separate projects and their environmental effects. As this Court stated in one of the more important sentences in the NEPA canon, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Public Citizen*, 541 U. S., at 770. In other words, agencies are not required to analyze the effects of projects over which they do not exercise regulatory authority. For that reason as well, there is no "'reasonably close causal relationship'" between the 88-mile railroad project at hand and the environmental effects of the separate oil drilling and oil refining projects. *Id.*, at 767 (quoting *Metropolitan Edison*, 460 U. S., at 774); see also *Robertson*, 490 U. S., at 350–353; *Vermont Yankee*, 435 U. S., at 550–551, 558.

To be sure, NEPA mandates that an agency "consult

with" other agencies as appropriate.    42 U. S. C.
§4332(2)(C).   But there is a vast difference between, for
example, an agency's consulting with the Forest Service to
determine the effects of a railroad line that would pass
through a national forest and an agency's asking another
agency to assess how 88 miles of additional track in rural
Utah would contribute to emissions or climate change along
the Gulf Coast.   Indeed, "no rule of reason worthy of that
title would require an agency to prepare an EIS" addressing
effects from another project that is separate in time or place
from the project at hand—particularly when it would
require the agency to speculate about the effects of a
separate project that is outside its regulatory jurisdiction.
*Public Citizen*, 541 U. S., at 767–768 (citing *Aberdeen &
Rockfish R. Co.*, 422 U. S., at 325).

In this case, the Uinta Basin Railway was the relevant
project.   NEPA therefore required the Board to consider the
environmental effects of that 88-mile railroad line's
construction and operation.   To the extent that the new 88-
mile railroad line could disrupt the habitat of protected
species, or the new rail embankments could cause soil
erosion into local bodies of water, or trains on the new line
could pollute the air, NEPA dictated that the Board
evaluate those effects.   And consistent with NEPA, the
Board here *did* comprehensively evaluate those effects,
including via consultation with other agencies.   As the D. C.
Circuit itself recognized, the Board explained that
"construction and operation of the Railway" would affect
"water resources, air quality, [and] special status species
like the greater sage-grouse."   82 F. 4th, at 1168.   But
nothing in NEPA required the Board to go further and
study environmental impacts from upstream or
downstream projects separate in time or place from the 88-
mile railroad line's construction and operation.

Under NEPA, it also bears emphasis, a mere "'but for'
causal relationship is insufficient to make an agency

responsible for a particular effect." *Public Citizen*, 541 U. S., at 767. Likewise, the fact that other projects might foreseeably be built or expanded in the wake of the current project does not, by itself, make the agency responsible for addressing the environmental effects of those other projects. The agency may draw what it reasonably concludes is a "'manageable line'"—one that encompasses the effects of the project at hand, but not the effects of projects separate in time or place. *Ibid.* (quoting *Metropolitan Edison*, 460 U. S., at 774, n. 7). True, a new airport may someday lead to a new stretch of highway; a new pipeline to a new power plant; a new housing development to a new subway stop. But the environmental effects of the project at hand constitute NEPA's textual focus. An agency need not assess the environmental effects of other separate projects simply because those projects (and effects) might not materialize but for the project at hand, or are in some sense foreseeable.

Simply stated, a court may not invoke but-for causation or mere foreseeability to order agency analysis of the effects of every project that might somehow or someday follow from the current project. See *Public Citizen*, 541 U. S., at 767–768; *Metropolitan Edison*, 460 U. S., at 774–775. NEPA calls for the agency to focus on the environmental effects of the project itself, not on the potential environmental effects of future or geographically separate projects. A relatively modest infrastructure project should not be turned into a scapegoat for everything that ensues from upstream oil drilling to downstream refinery emissions. As Justice Rehnquist underscored in *Vermont Yankee*, NEPA is not a "game" where project objectors can engage in "unjustified obstructionism"—here, for example, by raising a slew of remote effects that they think "'ought to be' considered." 435 U. S., at 553–554.

To be sure, in certain circumstances, other projects may be interrelated and close in time and place to the project at

hand—a residential development next door to and built at
the same time as a ski resort, for example.  See, *e.g.*,
*Robertson*, 490 U. S., at 338–340.  The question then is
whether that is a single project within the authority of the
agency in question.  There may be a gray area in defining
the project at hand.  Even in those circumstances, however,
a court's review still must remain deferential, as we
explained in Part II–A above.  In other words, even if the
reviewing court in such a case might think that NEPA
would support drawing a different line, a court should defer
to an agency so long as the agency drew a reasonable and
"'manageable line.'"  *Public Citizen*, 541 U. S., at 767
(quoting *Metropolitan Edison*, 460 U. S., at 774, n. 7).  All
of that is to again underscore that a difference may exist
between what an agency should do as a matter of good
policy and best practices under NEPA, and what a
reviewing court may subsequently order an agency to do
under NEPA.

In this case, in any event, the NEPA question is not close.
The Board did not need to evaluate potential environmental
impacts of the separate upstream and downstream projects.
As to other projects upstream, the EIS rightly explained
that the environmental consequences of future oil drilling
in the Basin are distinct from construction and operation of
the railroad line.  App. 525–527.  As for other projects
downstream, the Board likewise correctly explained that
any environmental effects from highly regulated oil
refineries along the Gulf Coast are well outside the scope of
the 88-mile railroad project in rural Utah.  *Id.*, at 420–423,
539–542.[6]

_____

[6]In addition, inherent in Board approval of railroad lines is the
understanding that any new freight railroad may transport different
kinds of cargo over an approved line—from corn to cars to coal and the
like.  See Brief for Association of American Railroads as *Amicus Curiae*
2, 8–9.  As common carriers, railroads subject to the Board's jurisdiction
are required to provide "transportation or service on reasonable request"

An agency may decline to evaluate environmental effects from separate projects upstream or downstream from the project at issue. *Public Citizen*, 541 U. S., at 770. Here, the Board's EIS concluded that the "proposed rail line and any future oil and gas development projects are not two phases of a single action," but "separate, independent projects." App. 523. So the Board concluded that they need not be considered "part of the proposed action assessed in the EIS." *Ibid.* Absolutely correct.

\*     \*     \*

In deciding cases involving the American economy, courts should strive, where possible, for clarity and predictability. Some courts' NEPA decisions have fallen short of that objective. The proper judicial approach for NEPA cases is straightforward: Courts should review an agency's EIS to check that it addresses the environmental effects of the project at hand. The EIS need not address the effects of separate projects. In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS.

Plaintiffs' policy objections to this 88-mile Utah railroad may or may not be persuasive. But neither "the language nor the history of NEPA suggests that it was intended to give citizens a general opportunity to air their policy objections to proposed federal actions. The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements." *Metropolitan Edison*, 460 U. S.,

_____

to any person or commodity. 49 U. S. C. §§11101(a), 10102(9). Railroad lines approved by the Board cannot decline to provide "common carrier" transport based on the product or commodity to be carried. §11101(a). For that additional reason, the EIS here correctly explained that the Board was "not required to analyze impacts related to the destinations or end uses of any such products or commodities" transported by the 88-mile railroad line, including Uinta Basin crude oil. App. 422; see *Department of Transportation* v. *Public Citizen*, 541 U. S. 752, 766–770 (2004).

at 777.  Citizens may not enlist the federal courts, "under the guise of judicial review" of agency compliance with NEPA, to delay or  block agency projects based on the environmental effects of other projects separate from the project at hand.  *Vermont Yankee*, 435 U. S., at 558.

We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice Gorsuch took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–975

_____

## SEVEN COUNTY INFRASTRUCTURE COALITION, ET AL., PETITIONERS v. EAGLE COUNTY, COLORADO, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[May 29, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and
JUSTICE JACKSON join, concurring in the judgment.

The National Environmental Policy Act improves agency
decisionmaking by requiring agencies to consider environ-
mental impacts for which their decisions would be respon-
sible. I agree with the Court that the Surface Transporta-
tion Board would not be responsible for the harms caused
by the oil industry, even though the railway it approved
would deliver oil to refineries and spur drilling in the Uinta
Basin. I reach that conclusion because, under its organic
statute, the Board had no authority to reject petitioners' ap-
plication on account of the harms third parties would cause
with products transported on the proposed railway. The
majority takes a different path, unnecessarily grounding its
analysis largely in matters of policy. Accordingly, I write
separately to explain why the result in this case follows in-
exorably from our precedent.

## I

### A

The Uinta Basin spans thousands of square miles across
northwestern Utah and Colorado. Bookended by the Uinta
Mountains in the north and the Roan Cliffs in the south,

the Basin is hard to access and has few residents. The Basin, however, contains "'extensive deposits of valuable minerals,'" including large reserves of "waxy crude," a form of petroleum known for its thick consistency at ambient temperatures. 82 F. 4th 1152, 1165–1166 (CADC 2023). For over a decade, oil producers have transported this oil out of the Basin in heated tanker trucks, to be sold to refineries in Utah and beyond.

Petitioners, the Seven County Infrastructure Coalition and the Uinta Basin Railway, LLC, plan to build a railway connecting the Uinta Basin with the Union Pacific Railroad Company station in Kyune, Utah, and from there to the national rail network. As the Coalition recognizes, "the Railway's predominant and expected primary purpose would be" to enable Basin oil producers to transport, with greater ease and in greater quantities, waxy crude to refineries in the Gulf Coast. *Ibid.* Nearly all the waxy crude transported by train out of the Uinta Basin would continue its travels over the Union Pacific track from Kyune to Denver, which runs through Eagle County, Colorado, and closely abuts the Colorado River.

### B

No person may "construct an additional railroad line" or "provide transportation over . . . an extended or additional railroad line" without a certificate of approval from the Surface Transportation Board. 49 U. S. C. §10901(a). Applicants can file a formal application for such a certificate, §10901(c), or they can seek approval through an abbreviated exemption process, §10502(a). In either case, the Act expresses a clear presumption in favor of approving railways. See *ibid.* (exemptions must be granted "to the maximum extent" consistent with law); §10901(c) (the Board "shall" issue a certificate "unless" inconsistent with public convenience and necessity).

In May 2020, petitioners requested permission to build

the Railway by way of the exemption procedure. Because the proposed railway constitutes a "major Federal action significantly affecting" the environment, the National Environmental Policy Act (NEPA) required the Board to prepare a "detailed" statement addressing its environmental impacts. 42 U. S. C. §4332(C). The Board conditionally approved petitioners' request based on the Railway's "'transportation merits,'" but it deferred a final decision pending the results of its environmental review. Surface Transportation Board, Office of Environmental Analysis, Uinta Basin Railway Final Environmental Impact Statement S–2, n. 2 (Aug. 2021) (Final EIS).

After soliciting public comment, the Board completed its environmental impact statement on August 6, 2021.[1] App. to Pet. for Cert. 76a. The statement recognized that "between 3.68 and 10.52 trains" would travel daily on the proposed new railway, which would be used "primarily to transport crude oil from the Basin to markets across the United States." Final EIS 1–4. Consistent with its obligations under NEPA, the Board discussed the comparative environmental merits of alternative railway routes as well as the environmental consequences common to all alternatives. Among other things, the Board analyzed the Railway's likely impact on the Basin's natural environment and the impacts increased freight traffic from the Railway would have on the existing Union Pacific line running through Eagle County.

Of particular relevance here, the Board recognized that "[r]efiners would refine the crude oil transported by the proposed rail line into various fuels," which in turn would be

——————

[1] The final statement consisted of a 600-page report accompanied by supporting appendixes and responses to the public comments. See www.uintabasinrailwayeis.com (Board-created website containing the complete EIS and all related documentation); cf. *ante,* at 2, 4, 15, n. 5, 22 (asserting that the EIS spanned more than 3,600 pages of analysis).

combusted, causing an increase in greenhouse-gas emis-
sions. *Id.*, at 3.15–35. Depending on market conditions, the
Board estimated that increased oil production made possi-
ble by the Railway would cause greenhouse-gas emissions
equivalent to between 0.04 and 0.1 percent of the global to-
tal. *Id.*, at 3.15–36. (By way of comparison, Sweden and
Ireland are each responsible for about 0.1 percent of global
emissions.[2]) Although the Board recognized the "massive
deleterious impacts" of climate change, it explained that it
was "not required to analyze impacts related to the destina-
tions or end uses of" products transported on proposed rail
lines. *Ibid.* After all, the Board explained, "railroads have
a common carrier obligation to carry all commodities, in-
cluding hazardous materials, upon reasonable request,"
meaning the Board cannot control the products "trans-
ported on the proposed rail line." *Ibid.* (citing 49 U. S. C.
§11101 and *Riffin* v. *STB*, 733 F. 3d 340, 345–347 (CADC
2013)). For that reason, the Board did not consider in fur-
ther detail the effects of increased drilling for oil in the Ba-
sin, or increased refining of oil in the Gulf Coast.

  After completing this analysis, the Board issued a deci-
sion approving the railway. With respect to the anticipated
increase in oil production, the Board again concluded that
it had "no authority or jurisdiction over development of oil
and gas in the Basin nor any authority to control or miti-
gate the impacts of any such development." App. to Pet. for
Cert. 108a. Board member Oberman dissented. In his
view, the Board did have "the power to deny construction
approval based on weighing all of the environmental im-
pacts that will arise from oil and gas development in the
Basin," particularly because the Railway's "'entire pur-
pose'" would be to stimulate such production. *Id.*, at 124a.

——————
[2]See European Commission, Emissions Database for Global Atmos-
pheric Research Report 2024 (last accessed May 7, 2025), https://
edgar.jrc.ec.europa.eu/report_2024#emissions_table.

C

Several environmental groups filed a petition for review
of the Board's decision to approve the railway, arguing prin-
cipally that the Board should have further considered the
consequences of increased oil drilling and refining that the
Railway's construction would enable. Eagle County sepa-
rately petitioned for review of the Board's decision, alleging
that the Board's environmental analysis was deficient be-
cause it ignored or underestimated the Railway's impacts,
through increased rail traffic, on the County and the nearby
Colorado River. Petitioners intervened in support of the
Board's decision.

The D. C. Circuit rejected several claims no longer at is-
sue here, but it sided with the challengers on others. With
regard to the environmental respondents' challenge, the
court held that the Board should have more carefully con-
sidered the deleterious environmental effects of increased
oil production made possible by the Railway's construction.
82 F. 4th, at 1180. Among other things, the court explained,
the Board should have "estimate[d] the emissions or other
environmental impacts" of oil refining as localized for the
"specific regions that will receive the oil based on expected
train traffic." *Id.*, at 1179. The court rejected the Board's
argument "that it lacks authority to prevent, control, or
mitigate those developments." *Id.*, at 1180. Instead, in the
D. C. Circuit's view, the Board's statutory obligation to con-
sider whether the Railway would serve the "'public conven-
ience and necessity'" encompassed "reasonably foreseeable
environmental harms," including those resulting from the
increase in oil production on the Gulf Coast. *Ibid.*

Moving to the County's claims, the D. C. Circuit agreed
the Board's analysis of the Railway's effect on the Union
Pacific track and the Colorado River contained serious, un-
explained errors and omissions. The court further con-
cluded that the Board had failed to comply with several

other statutory requirements unrelated to NEPA. Accordingly, the D. C. Circuit vacated the Board's decision and remanded it to the agency for further proceedings.

Petitioners asked this Court to review only one part of the D. C. Circuit's decision: whether NEPA required the Board to study the environmental impacts of oil wells and refineries that lie outside the Board's regulatory authority. Pet. for Cert. i. This Court granted review to decide that question.

## II
### A

NEPA requires agencies to prepare and publish a "detailed statement" reviewing the environmental impact of any major federal action. 42 U. S. C. §4332. That "action-forcing" requirement serves dual purposes, ensuring both that an agency considers a project's environmental consequences before deciding whether to approve it, and rendering the agency publicly accountable for environmental harms it decides to tolerate. See *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 349–350 (1989). The point, as this Court has recognized, is not merely that an agency produce a report but "that environmental concerns be integrated into the very process of decision-making." *Andrus* v. *Sierra Club*, 442 U. S. 347, 350 (1979); see also *Kleppe* v. *Sierra Club*, 427 U. S. 390, 409–410 (1976); *Robertson*, 490 U. S., at 350. In that way, NEPA's procedural requirements advance Congress's aim that the Federal Government "use all practicable means [to ensure] that the Nation may . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." §4331(b)(1).

Because NEPA's central aim is to improve agency decisionmaking, an agency need not consider every conceivable environmental consequence of a proposed federal action. Rather, agencies need only analyze environmental impacts

for which their decision would be (at least in part) "responsible," a requirement akin to "the familiar doctrine of proximate cause from tort law." *Metropolitan Edison Co.* v. *People Against Nuclear Energy*, 460 U. S. 766, 774, and n. 7 (1983). An agency is not responsible for environmental impacts it could not lawfully have acted to avoid, either through mitigation or by disapproving the federal action. See *Department of Transportation* v. *Public Citizen*, 541 U. S. 752, 770 (2004). Nor is an agency responsible for impacts that, though technically avoidable, are so causally attenuated from or ancillary to the agency's statutorily assigned tasks that it could not reasonably have been expected to consider them as part of its decisionmaking process. *Metropolitan Edison*, 460 U. S., at 774. Together these limitations serve to keep the scope of the agency's review targeted to environmental impacts it is well positioned to address.

Precedent makes these abstract principles concrete. In *Public Citizen*, this Court evaluated the Federal Motor Carrier Safety Administration's environmental analysis of regulations establishing an application process for Mexican motor carriers who wanted to operate in the United States. 541 U. S., at 758–763. The application system itself had only minimal environmental impacts (related to anticipated roadside inspections of the Mexican trucks and buses). Yet the agency developed it at the direction of the President, who had decided to lift a long-running moratorium on Mexican carriers' operation in the United States following the system's completion. *Id.*, at 760. Thus, promulgation of the agency's regulations would enable a substantial influx of new trucking, which in turn would have major environmental implications.

This Court concluded that, though the agency's regulations would be a "but-for" cause of the new trucking, it did not need to consider the related environmental impacts because it had "no authority to prevent" them. *Id.,* at 766–

767.  After all, the decision to lift the moratorium had been
the President's, not the agency's, and the agency could not
lawfully refuse to issue its regulations in order to block the
President's decision.  *Id.*, at 761.  The agency had no means
to prevent, and thus was not responsible for, the conse-
quences of lifting the moratorium.  Hence NEPA did not re-
quire it to analyze those consequences.

  The Court's decision in *Metropolitan Edison* illustrates
the companion principle: Some environmental impacts are
connected to an agency action by way of so "attenuated" a
causal chain that the agency may reasonably dismiss them
as ancillary to its decision.  460 U. S., at 774.  In *Metropol-
itan Edison*, the Court considered whether the Nuclear
Regulatory Commission had to analyze not only the risk
that a proposed nuclear plant would cause an accident, but
also the psychological concern nearby residents might ex-
perience when they learned about that risk.  *Ibid.*  Although
the psychological concern would be "caused by" the nuclear
plant, the Court held that NEPA did not require the agency
to consider it.  *Id.*, at 774–775.  That makes sense: Prevent-
ing nuclear accidents is a core element of the Commission's
statutory task; preventing psychological distress is not.  See
*id.*, at 776 (noting that "psychiatric expertise" is "not other-
wise relevant to [the agency's] congressionally assigned
functions").  Because the agency could reasonably disregard
psychological distress in deciding whether to approve a
power plant, it could disregard that risk in its environmen-
tal analysis as well.

  As these cases show, the dual limitations on an agency's
duty to consider information under NEPA yield a "'rule of
reason,' which ensures that agencies determine whether
and to what extent to prepare an EIS based on the useful-
ness of any new potential information to the decisionmak-
ing process."  *Public Citizen*, 541 U. S., at 767 (quoting
*Marsh* v. *Oregon Natural Resources Council*, 490 U. S. 360,

373–374 (1989)). NEPA requires consideration of environmental impacts only if such consideration would result in information on which the agency could act.

## B

Consistent with these principles, judicial review of an agency's environmental impact statement involves a two-step analysis. First, courts must consider the grounds on which an agency may rely under its organic statute to modify (by mitigation) or reject a proposed federal action. If the organic statute precludes consideration of a particular issue, the agency may set it aside for purposes of its NEPA review as well. That is the rule of *Public Citizen*.[3]

Second, if an agency decided not to review an environmental impact because (in its judgment) the impact was too causally attenuated from the question at hand, courts must ask whether the agency "acted arbitrarily" in doing so. *Kleppe*, 427 U. S., at 412. That deferential standard of review is appropriate here, as it is across substantive areas of administrative law, because "[a]gencies . . . have 'unique expertise,' often of a scientific or technical nature, relevant to applying a regulation 'to complex or changing circumstances.'" *Kisor* v. *Wilkie*, 588 U. S. 558, 571 (2019) (plurality opinion). Thus, as the majority points out, agencies often are "better equipped to assess what facts are relevant to the[ir] . . . own decision than a court is." *Ante*, at 10; cf. *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 456 (2024) (KAGAN, J., dissenting) ("[A]gencies often know things about a statute's subject matter that courts could not hope to").[4]

––––––––––

[3] It follows from this rule that the proper scope of an agency's NEPA review depends in part on the nature of the agency's statutory authority. The greater an agency's authority to consider and prevent environmental impacts in its decisionmaking process, the greater its duty under NEPA to consider those impacts, and vice versa.

[4] Of course, that point applies equally when an agency decides that an environmental impact is relevant to its decision.

This case provides no occasion to consider the second step because the question presented is resolved at the first. The Board twice decided it lacked authority to reject railway applications on account of the ways in which third parties would use the products "transported on the proposed rail line." Final EIS 3.15–36; App. to Pet. for Cert. 108a ("Here, the Board has no authority or jurisdiction over development of oil and gas in the Basin nor any authority to control or mitigate the impacts of any such development"). Each time, the agency cited *Public Citizen* to justify its decision not to analyze further the environmental effects of oil drilling and refining made possible by the Railway. See Final EIS 3.15–36; App. to Pet. for Cert. 108a.

Review of the Board's organic statute, the Interstate Commerce Commission Termination Act, confirms the Board's understanding of the scope of its review. "As common carriers, railroads subject to the Board's jurisdiction are required to provide 'transportation or service on reasonable request' to any person or commodity." *Ante,* at 20, n. 6 (quoting 49 U. S. C. §11101(a)). In addition, the Act contains a clear presumption in favor of approving new railways. See *supra,* at 3. And of the 15 statutory policies the Board must consider in the exemption process, not one concerns the anticipated use of commodities that will be transported on the proposed railway. See §§10101(1)–(15). Unlike the Board, meanwhile, other entities do have authority "to approve oil and gas development projects" and to regulate the effects of refining. See Brief for Federal Respondents 19. All this suggests, as the Board concluded, that the Board could not have rejected petitioners' application in order to prevent the harmful effects of oil drilling and refining.[5] Short of rejecting the Railway entirely, moreover, the

─────────

[5] The D. C. Circuit came to the opposite conclusion because it viewed the Board's authority to license railroad construction based on the "'public convenience and necessity'" as encompassing the effects of oil drilling and refining enabled by the Railway. 82 F. 4th 1152, 1180 (2023). That

common carrier mandate prevented the Board from mitigating, by limiting the transport of crude oil, the Railway's spurring of the oil industry. See §11101(a).

The environmental respondents concede that the Board correctly understood the scope of its decisionmaking authority. See Tr. of Oral Arg. 84–85. Instead, they argue that the Board should have analyzed even environmental impacts it could not lawfully prevent. Yet *Public Citizen* squarely forecloses that position. See *supra*, at 9–10. Even a foreseeable environmental effect is outside of NEPA's scope if the agency could not lawfully decide to modify or reject the proposed action on account of it. NEPA thus did not require the Board to consider the effects of oil drilling and refining.

\*          \*          \*

Under NEPA, agencies must consider the environmental impacts for which their decisions would be responsible. Here, the Board correctly determined it would not be responsible for the consequences of oil production upstream or downstream from the Railway because it could not lawfully consider those consequences as part of the approval process. For that reason, I concur in the Court's judgment reversing the D. C. Circuit's holding requiring the Board to consider in further detail harms caused by the oil industry.

---

phrase, however, must be read "with a view to [its] place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989). Here, the Board's organic statute contains clear indicators, most significantly the common carrier mandate, that the Board's authority does not extend so far.